# Exhibit F

May 8, 2015

SUPERIOR COURT OF NEW JERSEY
ATLANTIC COUNTY/CIVIL DIVISION
DOCKET NO. ATL-L-504-14

— — —

SHELLY RAHMAN and ABU RAHMAN,          : STENOGRAPHIC
wife and husband,                      : TRANSCRIPT OF:
   Plaintiffs,                         :
                                          :
   v.                                  :    — CASE MANAGEMENT
                                          : CONFERENCE —
DAIICHI SANKYO, INC., ET AL.,          :
   Defendants.                         :

— — —

PLACE: ATLANTIC COUNTY COURTHOUSE
       1201 Bacharach Boulevard
       Atlantic City, New Jersey
DATE:  May 8, 2015 at 10:00 a.m.

— — —

B E F O R E:
   THE HONORABLE NELSON C. JOHNSON, JSC

TRANSCRIPT ORDERED BY:
ADAM M. SLATER, ESQUIRE
Mazie Slater Katz & Freeman, LLC

SUSAN M. SHARKO, ESQUIRE
Drinker Biddle & Reath, LLP

— — —

ANN MARIE MITCHELL, CCR, RDR, CRR
GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

May 8, 2015

```
 1    APPEARANCES FOR THE PLAINTIFFS:

 2

 3    ADAM M. SLATER, ESQUIRE
      Mazie Slater Katz & Freeman, LLC

 4

 5

      RAYNA E. KESSLER, ESQUIRE
 6    MUNIR R. MEGHJEE, ESQUIRE
      Robins Kaplan LLP

 7

 8

 9    APPEARANCES FOR THE DEFENDANTS:

10

11    SUSAN M. SHARKO, ESQUIRE
      DANIEL B. CARROLL, ESQUIRE
12    Drinker Biddle & Reath, LLP

13

14

15

16

17

18

19

20

21

22

23

24

25
```

May 8, 2015

```
 1                        -  -  -
 2              THE COURT:  Good morning.  Please be
 3    seated.  How is everybody doing?
 4              This is Atwell and others versus Daiichi
 5    Sankyo.  And we'll just use one docket number,
 6    ATL-3108-14.
 7              Counsel, please enter your appearances.
 8              MS. KESSLER:  Good morning, Your Honor.
 9    Rayna Kessler from Robins Kaplan.
10              THE COURT:  Good morning.
11              MS. KESSLER:  Good morning.  Here for the
12    plaintiffs.
13              MR. MEGHJEE:  Good morning, Your Honor.
14    Munir Meghjee from Robins Kaplan.
15              THE COURT:  Good morning.
16              MR. SLATER:  Good morning, Judge.  Adam
17    Slater for plaintiffs.
18              THE COURT:  Good morning.
19              MS. SHARKO:  Susan Sharko from Drinker
20    Biddle for the defense.
21              THE COURT:  Good morning.
22              MR. CARROLL:  Good morning, Your Honor.
23    Daniel B. Carroll, Drinker Biddle & Reath, for the
24    defendants.
25              THE COURT:  Good morning.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

```
 1              Let's talk about Science Day briefly.

 2              We agreed it's going to be an hour each.

 3    Right?

 4              MS. SHARKO:  Yes, sir.

 5              THE COURT:  Okay, good.  All right.

 6    Because the last time I did something like this, I

 7    thought we agreed an hour each and somebody else

 8    decided it was going to be like an hour-and-a-half

 9    each.  It sort of messed up everybody's schedule.

10    Because Judge Kugler and I spoke a couple weeks ago,

11    and he was very enthusiastic about the idea of having a

12    Science Day and said he didn't see the point of having

13    a second Science Day.  So he said if he wasn't on the

14    bench today, he would come down.  And as o, I think

15    yesterday, they're still on schedule to be here at

16    1:00.  So we'll hopefully be done long before then.  I

17    know he didn't want to do it before noon, so we'll take

18    a short lunch break or whatever.

19              But let me just clear the air a moment.

20              Am I -- before we get to the whole

21    discussion of the FOIA documents and whether or not

22    they're entitled to a protective order, in looking at

23    the pleadings, can I assume that each of you is

24    prepared to provide, looking at the defendants'

25    response to request for admissions, I think it's about
```

May 8, 2015

1    150-plus, within the next 45 days.  And the plaintiffs,

2    with regards to the specialized information as to the

3    case-specific info needed on the plaintiffs, you're

4    prepared to do likewise as to the plaintiffs.  Am I

5    correct?

6              I mean, it seems to be what your pleadings

7    are saying.  And on the only note I made in the margin

8    is, well, you know, why not do it now.  But I

9    understand you need more time to get information from

10   clients.  And probably the same thing on your end.

11             But generally it appears that you are

12   agreeable to furnishing the information that's in

13   dispute.  Am I correct?

14             I always like starting with where we agree

15   and then go to what we disagree on.

16             MS. SHARKO:  So if you're referring to the

17   two 45-page letters that Ms. Kessler sent us after we

18   filed our discovery motion, what we told her when we

19   got those was we would review them, figure out what we

20   could provide, what we didn't think we needed to

21   provide and get that to her by the end of the month,

22   and we would sit down and meet and confer with them

23   about all their requests in those two long letters.

24   And so we're prepared to do that.

25             MS. KESSLER:  Your Honor, we can go into

May 8, 2015

Page 6

1   the specifics of that.  These are document requests

2   that we served last June originally, but --

3                THE COURT:  See, there are times when I go

4   into the specifics --

5                MS. KESSLER:  I understand.

6                THE COURT:  -- of interrogatories and

7   requests for production, but, hopefully, I don't have

8   to do that with you.  I mean, what I'd like to do -- I

9   mean, and there are occasions when you have to do it

10  one by one by one by one, but I got the impression from

11  your responsive pleadings, each of you, that we're

12  going to gather this information and we're going to

13  give you everything we have and, you know, we're not

14  avoiding this or we're not ducking our responsibility.

15               So what I'm hopeful of, unless you can

16  point to things right now where you know I'm not giving

17  it to them.  Because the only thing I see on the table

18  where they're saying I'm not giving it to them, you

19  know, without being compelled to is the FDA

20  information.

21               Is that assessment correct?

22               MS. SHARKO:  Your Honor, while we're --

23               THE COURT:  Let her reply to that first.

24               Go ahead.

25               MS. KESSLER:  We actually submitted a

May 8, 2015

1   consent order to the defense last week, and we did copy

2   the Court, to let you know that in the individual

3   case-specific deficiencies that they cite in their

4   two-page letter brief, we are providing all that within

5   45 days.  And that is the wage loss information that we

6   have still been compiling.

7           THE COURT:  Contact information for the

8   witnesses in Atwell and Braswell but not the experts.

9   Information regarding the medical and out-of-pocket

10   expenses of Douglass and Wallace.  And information and

11   documents supporting lost wage claims for Knight,

12   Braswell and Wallace.

13           MS. KESSLER:  Exactly, Your Honor.

14           THE COURT:  You're going to provide those?

15           MS. KESSLER:  Absolutely.  And we provided

16   a consent order to address that.

17           What we have an issue with, of course, is

18   that there's a lot more discovery that they're asking

19   for in their proposed orders that wasn't explained in

20   their briefs that we're not even sure how we have not

21   complied when we have provided these responses.

22           But we can argue that.

23           THE COURT:  Well, is there any reason for

24   optimism that you can meet and resolve those?

25           MS. KESSLER:  Absolutely, Your Honor.  And

May 8, 2015

1   we've been talking with the defense this week.  We

2   tried to reach out to them last week.  We didn't have

3   any conversations about it.

4           But, Your Honor, another solution that we

5   have proposed to the plaintiffs, and what's happening

6   in the MDL, I know we'll be giving a status report to

7   you --

8           THE COURT:  Proposed to the defendant or

9   are you talking about your clients?

10          MS. KESSLER:  In the MDL that Judge Kugler

11  has --

12          THE COURT:  Okay, go ahead.

13          MS. KESSLER:  Judge Kugler is implementing

14  a plaintiff fact sheet, which I'm sure you're familiar

15  with from Accutane, as well as a defense fact sheet.

16  And we think that is an absolutely fair solution to

17  this, that it's the most efficient way to address which

18  questions are really relevant to this litigation.

19          We can work that out.  We're willing to

20  adopt whatever is done in the MDL to apply to this

21  group of 60 cases as well.  And that clears all of the

22  objections off the table and it clears the Court's time

23  to have to go through --

24          THE COURT:  I think two weeks ago today I

25  spent about two hours reviewing individual questions of

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 9

```
 1    the fact sheet.  We got it resolved.  And that
 2    really -- I mean, I'm not preaching to you, because I'm
 3    sure you know this better than I do, but a lot of these
 4    questions can be resolved by simply agreeing upon
 5    what's the information that you need from everybody and
 6    agree as to what it will be.
 7               MS. SHARKO:  So here's the problem, Judge.
 8               THE COURT:  Go ahead.
 9               MS. SHARKO:  The consent order that Ms.
10    Kessler sent to the Court, without first sending it to
11    us, addresses some of the interrogatories they haven't
12    answered.  It doesn't address all of them.  These
13    interrogatories have been outstanding in the first
14    group of cases since last spring.  Almost a year we've
15    been chasing the plaintiffs for the answers.  And we
16    really would like the answers.  We don't want to have
17    to start over from the beginning on discovery.
18               The two questions that are not in the
19    consent order that have yet to be answered by Ms.
20    Kessler in the cases which are the subject of the
21    motion, and they've been answered by other plaintiffs
22    in other cases, are tell us your version of the events
23    and give a detailed description of the injuries you
24    claim.  We want to know what the injuries they claim
25    are.  That's a standard, basic question.
```

May 8, 2015

Page 10

 1              THE COURT:  I think we'll all concede that
 2     the Form C Interrogatories for cases such as this are a
 3     bit obtuse.  But I also think what the Supreme Court
 4     had in mind when they promulgated those, that everybody
 5     be reasonable and everybody be cooperative and
 6     everybody get as full an explanation as they can.
 7              At some point -- and I agree with Ms.
 8     Sharko on this, Ms. Kessler, at some point you're going
 9     to have to be able to explain to us, you know, how the
10     ingestion of this pill -- and I'm not talking about the
11     scientific right now.  At some point you're going to
12     have to explain time, circumstances, prescription, the
13     whole event surrounding this person's illness so it
14     makes sense to everybody.  Right?  I mean, if this case
15     is going to go to a jury, we have to understand, okay,
16     they were prescribed the pill on a certain date for a
17     certain condition by a certain physician, and within a
18     certain time frame, they develop certain symptoms.
19     Aren't we going to have to know that for everybody?
20              MS. KESSLER:  Absolutely, Your Honor.  And
21     part of this is that some of the discovery that they're
22     seeking is duplicative.  Even though there's that Form
23     A response that they are moving to compel, there's also
24     a Question 7 in their supplemental rogs that is exactly
25     the same language that we fully answered that they're

May 8, 2015

1    not moving to compel except in Braswell.

2              So we have provided more information in

3    these discovery responses.  But in addition, we also

4    have provided thousands of pages of medical records

5    that support these claims.  Our clients have signed

6    medical authorizations, employment authorizations --

7              THE COURT:  And I see this a lot in lots of

8    different cases.  I'm sure they can make the same

9    criticism of you, the plaintiffs sometimes make of

10   defendants, which is, you know, they dumped a whole

11   bunch of records on us and we're supposed to figure out

12   what the hell they mean.  Okay?

13             And, you know, I think if the plaintiffs'

14   claim is focused a little bit, that not only helps the

15   plaintiff, but it helps the defendant have a better

16   understanding of what the claim is about.  So I can

17   empathize with her saying, well, they dumped all these

18   records on us and they spanned so many years and they

19   spanned X number of doctors, but, you know, okay, show

20   me the smoking gun or show me the cause and effect or

21   show me the chain of events.

22             MS. KESSLER:  And I completely understand.

23   And we have not withheld this information.  We are

24   fully complying with the Question 7 in the supplemental

25   rogs that ask for the same information.

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

1          But in addition, there's an example, it's

2    George Williams is a filed case where for a Form A rog,

3    we have provided a narrative form, it goes for two

4    pages.  The plaintiff had 16 hospitalizations.  There's

5    all listed --

6          MS. SHARKO:  There's no motion on that

7    case.

8          MS. KESSLER:  There's no motion, but the

9    discovery --

10          MS. SHARKO:  There's no motion.

11          THE COURT:  Let her finish and then I want

12    to hear what you have to say.

13          MS. SHARKO:  Okay.

14          THE COURT:  Go ahead.

15          MS. KESSLER:  The same deficiency letters

16    that have been served on me have been served on all

17    counsel here and all counsel in all these cases.  And

18    even though we provided that narrative, Ms. Sharko also

19    served a deficiency letter saying that that wasn't

20    specific enough.

21          Now, there isn't a motion pending in front

22    of you, but I think it's important to understand --

23          THE COURT:  I'd rather discuss it now.

24          MS. KESSLER:  And I have it with me, if

25    you'd like to see the full description, but, you know,

May 8, 2015

1    this is where the dispute is.

2                    And then there's also examples of

3    information that they're moving to compel in the

4    proposed orders that isn't in their briefs that we have

5    supplied.

6                    One is -- Number 1, it's a question of

7    provide the name, address and -- name, address and date

8    of birth for the plaintiff.  We've provided that.  And

9    they're moving to compel that.  It's clearly answered

10   if you look at the answer.  We provided that.

11                   And another example is in David Douglas,

12   they're moving to compel all wage loss information.

13   The plaintiff withdrew those claims.  The wage loss

14   isn't even here -- it isn't even part of the case

15   anymore, but they're still moving to compel that

16   information.

17                   There's also another question in Shelly

18   Rahman that they're moving to compel her information as

19   to a criminal history.  She answered that.  She has no

20   criminal history.  We've answered no.

21                   So there's a lot of information that

22   they're moving to compel that we have fully provided.

23                   But then there is another set of questions

24   that are clearly inappropriate and, you know, we can

25   talk about that.  It goes into the FOIA document

May 8, 2015

1    argument as well.

2            THE COURT:  We're going to -- I'm saving

3    that for last, because I assume that's going to consume

4    the most time.

5            Ms. Sharko?

6            MS. SHARKO:  So Ms. Kessler has not

7    addressed the question.  The question is, do they have

8    to answer the interrogatories.  Specifically, we filed

9    targeted motions on the cases --

10           THE COURT:  Well, here's my question:  What

11   if she said, see answer to number something else

12   someplace elsewhere where there's a narrative?

13   Wouldn't that satisfy it?

14           MS. SHARKO:  That would be fine, Judge, but

15   that's not what they did.  In some cases, they provided

16   narratives and answers, like the Williams case, so

17   there's no motion in the Williams case.

18           In the cases where we made the motion, we

19   asked, tell us a detailed description of the nature,

20   extent and duration of any and all injuries.  So, for

21   example, when Mr. Rheingold answered that question in

22   his cases, he laid out, she was in the hospital for

23   five days, she had this problem for two weeks

24   thereafter and now she has this problem.  That's the

25   way plaintiffs' lawyers are supposed to answer those

May 8, 2015

1   questions.

2            What Ms. Kessler did in the cases that are

3   the subject of the motion, not in all of her cases, but

4   in the cases that are the subject of the motion, is she

5   cut and pasted the same answer in all the cases from

6   her Complaint, "Severe and debilitating intestinal

7   and/or colonic disease, manifestations," and it goes on

8   from there.

9            What we're looking for, what we're entitled

10  to have, is what are the damages claimed, what happened

11  to the person and what are their residuals.  And they

12  should have to answer that.  That's what the motion on

13  Question Number 3 is.

14           And so I think we need to look at each of

15  the questions which are the subject of the motion and

16  we request that they answer them.

17           If there's no lost wage claim, then they

18  should say so and we don't -- we won't pursue that.

19  But we need to have answers to these basic things.

20           THE COURT:  Well --

21           MS. KESSLER:  Your Honor, if I could just

22  respond.  I can read you our response in the motion --

23  or the question that they're moving to compel in

24  Braswell.  For Number 7, the supplemental rogs, we

25  provided a much more detailed description of it.

May 8, 2015

```
 1    "Plaintiff identifies the following injuries, elements

 2    or pains:  Dizziness, nausea, belching, diarrhea,

 3    vomiting, weakness and other stomach problems and other

 4    residual problems for which treatment has been given by

 5    those entities listed in plaintiff's answers to Form A

 6    interrogatories."

 7              Just as you said, Your Honor, we're

 8    referring to other parts where we answered this

 9    discovery.  A lot of these questions are duplicative.

10    And then there's others that are just clearly

11    inappropriate.  For example, they request all medical

12    information from date of birth.  You know, I think we

13    can all agree that when the plaintiffs are suing on the

14    basis of ingesting a drug from a particular set of

15    time, which we have provided to the plaintiffs, that

16    their entire medical history from birth isn't relevant.

17              And then in addition --

18              THE COURT:  Unless they're very young.

19              MS. KESSLER:  Most of them are older.

20              But then again, they also ask for the

21    entire employment history, from age 18, of every single

22    one of our plaintiffs.

23              THE COURT:  Again, unless they're very

24    young, you know, I do this with lawyers frequently.  We

25    negotiate what's a reasonable time to look back and we
```

May 8, 2015

Page 17

1    agree upon a number.  Or we don't agree upon a number

2    and I pick a number.

3              But, I mean, I would think, Ms. Sharko, in

4    terms of, you know, entire history from the day they

5    were born, that's pretty overbroad.  And it could turn

6    out to be unreasonable, because there were a time when

7    people didn't keep good records.  There were times when

8    a physician's office was closed and the records got

9    dumped.  We live in a different world right now.  But

10   in terms of trying to get the entire medical history of

11   people, it could be difficult.

12             So, I mean, what's a reasonable time frame?

13   X number of years prior to the -- prior to ever

14   ingesting this medication?

15             MS. SHARKO:  And so I don't think that

16   counsel has correctly framed the issue, but to answer

17   Your Honor's question, we'd like 20 years of medical

18   history.

19             THE COURT:  I think that's excessive.

20   Right now, I can tell you I think it's excessive.  I

21   think half of that is getting to the outer limits.  20

22   years I think is excessive.  I'm talking about the X

23   number of years, not prior to the filing of the

24   lawsuit, but X number of years prior to the ingestion

25   of this medication.  20 years?  I think that's

May 8, 2015

1    excessive.

2              MS. SHARKO:  And the reason is, is these

3    people are taking the medication for hypertension.

4              THE COURT:  Right.

5              MS. SHARKO:  They have long years, many of

6    them, of a history of hypertension.  And so we, I

7    believe, need to know what their medical history has

8    been --

9              THE COURT:  Yeah, but it sounds like they

10   have only a short history of these symptoms.  Right?

11             MS. SHARKO:  Symptoms meaning hypertension?

12             THE COURT:  No, no.  I'm talking about the

13   symptoms of intestinal colonic disease and

14   manifestations known as sprue-like enteropathy.  They

15   have a short history of that.

16             And so I'm saying, when did they take

17   Benicar, and then let's move back from that a

18   reasonable date and then look at all the medical

19   records you want.

20             MS. SHARKO:  So 10 years back from their

21   first Benicar prescription?

22             THE COURT:  I would say 10 years is the

23   outer limits, to be honest with you.  20 is excessive.

24   It really is.  It creates an unnecessary burden on a

25   lot of people.  And let's be candid about it.  It's

May 8, 2015

1    going to create -- judges don't like entering orders

2    that they think can't be complied with.

3            And so if I say 20 years to satisfy you, I

4    know we're going to come up with multiple situations

5    where I'm going to have to be reviewing explanations as

6    to why they couldn't get anything after year 15 or

7    after year 17 or after year 12, because Dr. So-and-so

8    died and the people who brought his practice weren't

9    interested in his records anymore.

10           MS. SHARKO:   I would never bring an issue

11   like that to the Court when --

12           THE COURT:   I don't know if you would or

13   you wouldn't.   20 years is excessive.   It really is.

14   I'm talking from the time -- because I understand

15   hypertension can last a long time.   I've had members of

16   my family that had hypertension for the last 50 years

17   of their life.   Okay?   But they didn't take a

18   particular medication for 50 years.   And they didn't

19   have symptoms from that medication after a certain

20   point in time.

21           So I think the window, the window has got

22   to be a little bit narrower, a lot narrower than 20

23   years.

24           MS. SHARKO:   I would ask for medical

25   records from the first diagnosis of hypertension.   So

May 8, 2015

Page 20

```
 1    in some people, that will be a short period of time,

 2    and in others, that will be longer.  But it's about --

 3    this litigation is about a hypertension --

 4              THE COURT:  See, but the symptoms that

 5    we're talking about here, in terms of, you know,

 6    intestinal difficulties, they had a beginning point.

 7              MS. SHARKO:  Not necessarily, Judge.  There

 8    are plaintiffs who have had these symptoms on and off

 9    for many years, because they have irritable bowel

10    disease, because they have celiac disease, because they

11    have colitis.  These are not --

12              THE COURT:  No, I hear you.  I see

13    it in other cases.  And, again, you see it anecdotally

14    in your own personal history.  There are people who can

15    have, for lack of a better term, spastic colon when

16    they're a young person and then they have no other

17    manifestation until years later.

18              But what I'm trying to negotiate with you,

19    and if I can't do it, I'll arbitrarily set it.  We'll

20    pick a date, which is the date that Benicar was first

21    prescribed, and then go back a certain number of years

22    and say, we want your complete medical history for that

23    window of time preceding the first prescription of

24    Benicar.

25              I think that's the way to approach it.  20
```

May 8, 2015

Page 21

```
 1   years is not the number.  I think a reasonable number

 2   is seven years.  And if within those seven year --

 3   within that seven-year window you detect something that

 4   says, you know, it looks like this condition was a

 5   whole lot prior to that date in the seventh year that

 6   we're looking at, and, Judge, we need more records, my

 7   response will be yes.

 8               MS. SHARKO:  Okay.  We would agree to ten

 9   years before the first Benicar prescription.

10               THE COURT:  Well, doesn't matter.  I'm

11   ordering seven.  I'm glad you agree, but I'm ordering

12   seven.

13               MS. SHARKO:  Okay.

14               MS. KESSLER:  Your Honor, may I just make a

15   suggestion as to --

16               THE COURT:  Ms. Sharko, I don't mean to be

17   disrespectful to you, but I'm sitting here saying to

18   myself, what's reasonable?  If you find something in

19   the seventh year that indicates to us, hmm, this thing

20   looks like it's been around for a while, then you're

21   certainly going to be entitled to the additional

22   medical history.

23               I don't know, but my prognostication is

24   that we're not going to have too many of those

25   situations.  I think what we're going to have is the
```

May 8, 2015

Page 22

```
 1    seven years is going to be plenty of information on
 2    everybody.  It's going to be seven years.
 3              MS. KESSLER:  And I think the same
 4    limitations as far as employment history, all these
 5    other questions of information that they're seeking --
 6              THE COURT:  Well, I look at employment
 7    maybe a little bit differently.  I think seven years is
 8    reasonable for employment, too, unless they were with
 9    one employer that entire seven years and then maybe
10    want to know who the employer was before that, because
11    maybe there was a reason for separation that might be
12    relevant to their credibility, might be relevant to the
13    injury, might be relevant to whatever.  So, you know,
14    if they had one employer for seven years, then I would
15    say, okay, who were you employed with prior to that and
16    prior to that.  The last three employers or seven
17    years.
18              MS. SHARKO:  That's actually not an issue
19    before the Court, but we'll do that.
20              THE COURT:  Hold on.  What I'm trying to do
21    is see what we can agree upon to expedite things.
22    Because, I mean, until you have all the information you
23    need and until you have all the information you need,
24    you know, this case isn't going to be ready for
25    anything.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 23

1          What I'm trying to do is minimize -- I've

2   had enough telephone conferences with you to know that

3   you're not agreeing a whole lot with one another, so

4   what I'm trying to do is expedite things.

5          MS. KESSLER:  Your Honor, I think the most

6   efficient way to do that is for us to meet and confer

7   to figure -- to implement this fact sheet.

8          THE COURT:  Well, I'm giving you some

9   guidelines.

10          MS. KESSLER:  Absolutely.

11          THE COURT:  I think seven years.  And, you

12   know, that's not an arbitrary number.  I get to seven

13   years from -- in many situations, in terms of business

14   records, tax records, seven years is typically a cutoff

15   point.

16          But let's get back to the subject at hand.

17   When I look at answer -- and we'll be specific now.

18   When I look at Answer Number 3 to the interrogatory

19   propounded to Mr. Atwell, detailed description, nature,

20   extent and duration of any and all injuries, severe and

21   debilitating -- and we know what it says.  All right.

22          Now, here's my question:  Do you give

23   supplemental or additional narrative for Atwell

24   someplace else?

25          MS. KESSLER:  Yes, Your Honor.  In Question

May 8, 2015

1    Number 7 in the supplemental interrogatories, which

2    they did not move to compel, the question says,

3    "Describe fully and" --

4              THE COURT:  This is the hospitalizations

5    you're talking about?

6              MS. KESSLER:  The question, it reads,

7    "Describe fully and with particularity how the incident

8    occurred, including all injuries, elements or pains

9    which you allege arose."

10             We provided a more full answer in that, and

11   they have not moved to compel in Atwell.  They have

12   only moved to compel a more complete response in

13   Braswell, which we read before.  So I think they're

14   entirely duplicative questions.

15             THE COURT:  I'm looking at the answer to

16   Number 3.  And we know you're going to have the medical

17   records before this person is deposed.

18             Aren't you going to learn a lot of things

19   you need to learn at the deposition?

20             MS. KESSLER:  Your Honor --

21             MS. SHARKO:  See, the problem is, Judge --

22             THE COURT:  Ms. Sharko is going to reply.

23             MS. SHARKO:  The problem is, Judge, with

24   the answer to 7, there's a long objection and then she

25   says she identifies the following injuries from April

May 8, 2015

Page 25

```
 1    2013, "belching, diarrhea, vomiting, weight loss and

 2    other stomach problems and other residual problems for

 3    which treatment has been given at various times."

 4              And the interrogatory asks specifically

 5    describe what the injuries are, in what respect you're

 6    still affected by them, state where, by whom and how

 7    frequently you're still under treatment and when you

 8    were last seen or given medical attention.  And that's

 9    what we want to know.  How are these people doing

10    today?  And that is particularly important, because as

11    you'll hear this afternoon, the science is overwhelming

12    that these people who have this alleged problem have no

13    residuals.

14              So if the New Jersey plaintiffs are

15    different and they claim residual injuries, they claim

16    that they're still under treatment, we want to know

17    what their residual injuries are, what treatment

18    they're receiving and by whom or whether they've

19    recovered.  It's a basic litigation question.

20              And saying other stomach problems and other

21    residual problems for which treatment has been given at

22    various times by the healthcare providers listed in

23    this other answer isn't enough.  We appreciate that

24    they're giving us a list of healthcare providers, but

25    we want to know what are the permanent injuries they
```

May 8, 2015

Page 26

1    claim, what is the treatment they're still receiving.

2              In these medical records, many of these

3    people have long, complicated medical histories.  And

4    so I could read that and say, yeah, they can't be

5    complaining that their heart palpitations are related

6    because they had heart palpitations for years, but

7    that's me interpreting their answer.  They need to

8    specify what is it that they're laying at our feet as a

9    permanent or continuing injury and what treatment are

10   they receiving for it.  There's no other way to

11   evaluate the case.

12             MS. KESSLER:  Your Honor --

13             THE COURT:  Well, I respectfully disagree

14   with you.

15             Let's hear from Ms. Kessler.

16             MS. KESSLER:  They haven't moved to compel

17   any responses to Question 7 except for Braswell.  The

18   other ones they have deemed sufficient and that's not

19   before you.  So to say that we're not fully complying

20   with providing a description, you know, it's belied by

21   the fact that they're not moving before you for that.

22             But I have George Williams here, where

23   there is a narrative account that's provided, along

24   with their deficiency letter that they're sending.  And

25   it's another point to keep in mind, that Ms. Sharko, as

May 8, 2015

Page 27

1  pro forma, in every single one of these cases is

2  sending all plaintiffs' counsel these deficiency

3  letters where she sets out what she believes is

4  deficient.

5          I think I'm one of a few that is actually

6  responding to these letters and providing additional

7  information.  So it's not, Your Honor, just what's in

8  these interrogatory responses, it's also our

9  correspondence, it's our letters afterwards, it's our

10  medical records.  We have provided an enormous amount

11  of information to Ms. Sharko.

12          MS. SHARKO:  There's no issue before the

13  court in the Williams case.  The Williams case has

14  responsive answers.

15          MS. KESSLER:  And yet a deficiency --

16          MS. SHARKO:  The Levin Papantonio firm gave

17  responsive answers.

18          Where we think we need more information or

19  we want follow-up, we send a letter.  That's how it

20  works.  And there should be a meet and confer.  The

21  Williams case is not the subject of any motion.

22          MS. KESSLER:  It's not the subject of a

23  motion, but it's a subject of this litigation tactic.

24          THE COURT:  And I prefer discussing it now

25  rather than seeing another motion later.

May 8, 2015

```
 1              When I look at the answer to Number 3 and I
 2      look at the answer to Supplemental Number 7, and when I
 3      consider the fact that you're going to have medical
 4      records, I'm saying to myself -- I guess we all bring
 5      our experiences and prejudice with us to the things
 6      that we do.  And I did mostly commercial litigation for
 7      30 years.  And, candidly, there were times when I
 8      didn't propound interrogatories because I wanted that
 9      person under oath so that their lawyer couldn't help
10      them with the answer and so that they couldn't squirm
11      out of the answer later on.  And the more detailed
12      information you ask for in writing, the more assistance
13      they get from the lawyer in preparing the answer.
14              Now, I agree there's a certain amount of
15      limiting of the wiggle room that way too, but stuck in
16      the position I'm in now, in terms of having to decide
17      is this answer sufficient, seems to me it is.  It seems
18      to me that the next thing you want to do is depose this
19      person.  That's my perspective.
20              MS. SHARKO:  Okay.  Then we'll start the
21      depositions.
22              THE COURT:  That's fine.  Because I'm
23      looking at the answer to Number 3, the supplemental
24      answer to 7, and overlaying or, you know, injecting
25      into that, weaving into that, I'm thinking of the
```

May 8, 2015

Page 29

```
 1    medical records.  Fine.  Next thing to do is depose
 2    them.
 3              MS. SHARKO:  Okay.  If that's --
 4              THE COURT:  All right.  Yeah, it's
 5    really -- I'm just looking at this one right now,
 6    Atwell.  Okay?  Because we've got the answer to Number
 7    7 in the first, which is all the hospitalizations and
 8    doctors.  And I'm assuming there's records to back
 9    those up?
10              MS. KESSLER:  Absolutely.
11              THE COURT:  Okay.  So we got the answer to
12    Number 3, we got the answer to Number 7, we've got the
13    answer to this Number 7.  And I'm saying to myself, the
14    next thing you ought to be doing is taking depositions.
15              I'll concede to you, I may be injecting my
16    prejudices into it.  But I think objectively, you've
17    got enough to get started to go from there in taking a
18    deposition.  I genuinely believe that.
19              MS. KESSLER:  And we had --
20              MS. SHARKO:  And --
21              THE COURT:  Let her finish, please.
22              MS. SHARKO:  So we will do that.  I was
23    hoping I could find out, short of a deposition, what
24    the residual injuries were in each case.  I have
25    started to request depositions.  The plaintiffs have
```

May 8, 2015

1    taken a position that we can't go forward with them.

2    They gave us --

3              THE COURT:  That was one of the things we

4    were -- one of the things we're going to talk about

5    today, when we get through the motions, is a schedule

6    to talk about fact witness depositions.

7              MS. SHARKO:  Okay.  They gave us dates for

8    depositions in two cases and not for any others.  But

9    we'll proceed with deposing all of them.  That's fine.

10             THE COURT:  I think that's where we are.

11   If the answers to the others are comparable to what we

12   have in Atwell, then I'm saying, next thing to do is to

13   depose them.  That's my perspective on this.

14             MS. SHARKO:  We do need Answers to

15   Interrogatories and preliminary requests and document

16   requests in a lot of cases.  There are a lot of them

17   that are overdue.  We haven't filed any motions, but

18   that is an issue.

19             THE COURT:  Well, I'm hearing from Ms.

20   Kessler that for those situations where there's

21   disagreement, they're going to meet and discuss it.

22   It's an amazing term, "meet and confer."  I hear it all

23   the time.  You're going to meet and discuss it.  And

24   what you can't agree upon, somebody will make a motion.

25   But hopefully we won't be at that point.

May 8, 2015

Page 31

```
 1                    So all that said, where are we?  Because I
 2      know that plaintiff has agreed to give you the
 3      case-specific information, the three categories that I
 4      just a moment ago read into the record.
 5                    I know that the defendant is prepared to
 6      provide their responses to the requests for
 7      admission -- or excuse me, the request for production
 8      within 45 days.
 9                    Anything else that's still in dispute on
10      the paper discovery that is the subject of this motion
11      today?
12                    MS. SHARKO:  On the paper discovery, we're
13      going to get back to the plaintiffs on the points
14      raised in their letter and meet and confer, supplement
15      where we can.  And where we can't and we'll disagree,
16      then if we disagree, then we'll contact the Court.
17                    THE COURT:  Okay.
18                    MS. SHARKO:  You mentioned the request for
19      admissions.  Mr. Slater and I have an agreement on
20      dates for serving requests for admissions.  That's not
21      before the Court because Mr. Slater and I worked that
22      out.  But you raised request for admissions, so I
23      thought I hadn't answered that question.
24                    THE COURT:  45 days takes us to around June
25      12th, I think.  Right?
```

May 8, 2015

Page 32

```
 1                MS. KESSLER:  Your Honor, I just need --
 2                THE COURT:  If you need a few more days
 3    after that, that's fine too.  We'll plug in a different
 4    date.  June 26th, two weeks after that, and then
 5    everybody lives with that date.  How does that work?
 6                MS. SHARKO:  And that's for the plaintiffs
 7    to respond to our requests and for us to get back to
 8    them on their letter and meet and confer?
 9                THE COURT:  Correct.  That's for both of
10    you, whatever is outstanding, June 26th will be the
11    date by which you have to furnish it.  I think that's
12    like seven weeks from today.
13                MS. SHARKO:  I would -- just one issue
14    raised by Ms. Kessler's letter, and we have to work
15    that out, is documents.  Obviously we won't have all
16    the documents in the entire litigation produced by June
17    26th.  I don't think that's what Your Honor
18    contemplated -- is contemplating.
19                THE COURT:  When you say documents, are you
20    now moving to the next issue, the FDA documents under
21    FOIA, or what are you referring to?
22                MS. SHARKO:  No.  Just her letter addresses
23    discovery requests, interrogatories and document
24    requests.  And we're doing documents on a rolling
25    basis.  We produced 3 million-plus pages, and we
```

May 8, 2015

Page 33

1    continue to do that every week.  I just don't want

2    anyone to think that we're going to be done by June

3    26th.  That's physically impossible.

4                THE COURT:  You understand that?

5                MS. KESSLER:  I understand that as far as

6    the letters where we specified the deficiencies that

7    we're seeing in the responses themselves.  But our

8    cross-motion does have specific documents that we have

9    been seeking for many months that go beyond that.  And

10   a lot of this actually, Your Honor, dates back to your

11   order from December, that you ordered that the

12   defendants provide all adverse event reports.  They

13   still have not complied with that.

14               So there are specific documents that we set

15   out in our cross-motion that we are seeking that we

16   would like a set deadline for the defendants to be

17   producing this information, because we have been

18   waiting this long.

19               MS. SHARKO:  I think the better approach,

20   Judge, is that we meet and confer and see what's at

21   issue.  For example, you denied the plaintiffs' motion

22   to compel the production of every adverse event report.

23   You instead ordered, back in October, that we produce

24   all the adverse event reports for certain categories.

25               THE COURT:  Correct.

May 8, 2015

Page 34

1          MS. SHARKO:  And we've done that.  We've

2    done that.  We did that months ago.

3          So this is why I think we need to meet and

4    confer with Ms. Kessler over her 84 pages of letters.

5          THE COURT:  Well, I agree, but let's

6    overlay on that conversation that the older or the

7    longer her request is outstanding, then the better, the

8    more urgent the need for an explanation as to why it

9    remains outstanding.  If it remains outstanding because

10   you can't find it or haven't been able to put it

11   together, or it remains outstanding because we haven't

12   given it to you, we're never going to give it to you.

13   So, I mean, we need to know the difference.  And maybe

14   you can resolve that at the meet and confer.  But the

15   older the request, the longer it's outstanding, then

16   the more determined I am to get it resolved.

17          MS. SHARKO:  I understand that.

18          And I just want to note that we responded

19   to the discovery request about six months ago and we

20   heard nothing from the plaintiffs.  They did not have

21   any complaints or issues.  The first letter --

22          THE COURT:  In response to the rolling

23   furnishing of documents, you're saying?

24          MS. SHARKO:  Right.

25          THE COURT:  Thus far there have been -- all

May 8, 2015

1    right.  But in their moving papers, they're pointing to

2    specific requests that they think have been outstanding

3    for a while.

4              MS. SHARKO:  Right.  And so we got that

5    letter a week or two ago.  It was 80-some pages long.

6    And we'll meet with her -- as we told her when we got

7    it, we would meet with her and try and get these issues

8    resolved by the end of May.

9              So you've given us an extra 26 days.  We

10   appreciate that.  And we will do that.

11             MS. KESSLER:  Your Honor, again, some of

12   these disputes -- I mean, Ms. Sharko is trying to say

13   that we just told them about this last week.  That's

14   not true.  I mean, I know that you received the letters

15   back in January a couple weeks after they were

16   compelled to produce this information.  We reviewed the

17   documents that we received, and we noticed that we are

18   missing information.

19             The adverse event data, as to the

20   limitations that were placed on it, Your Honor, we

21   don't have all that information yet.  They haven't

22   complied with that.  And it's the same for the FDA

23   communications; we're still waiting for correspondence

24   that the defendants had with the FDA, you know, again,

25   information that's readily available to them that's not

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 36

1    being produced.

2            Another issue, Your Honor, is that there is

3    a Department of Justice civil settlement reached in

4    January.  We didn't find out from the defendants, even

5    though we served requests, as to that information.  We

6    found out from the news, from the Department of Justice

7    website, that they and Daiichi reached a civil

8    settlement, $39 million involving kickback allegations.

9            We don't have a single document related to

10   the investigation that went on for four years with the

11   Department of Justice, with multiple subpoenas served,

12   not only on Daiichi, but also the Forest defendants.

13   We have no information from them.  I have information

14   from the docket and from the Department of Justice

15   website, you know.  And this is something that they

16   clearly have, you know, that should be provided.

17           THE COURT:  Well, her client clearly has

18   it.  It doesn't mean Ms. Sharko has it.

19           MS. SHARKO:  So if I could respond.

20           THE COURT:  Go ahead.  Yes, you can

21   respond.

22           MS. SHARKO:  We have produced the adverse

23   event reports.  We have produced the FDA

24   correspondence.  I'm surprised to hear Ms. Kessler say

25   that.  So I think we need to sit down and maybe we can

May 8, 2015

Page 37

1    again show her where this is in the document

2    production.

3              In terms of the civil settlement, we

4    amended our interrogatory answers to reference that.

5              THE COURT:  You did?  Okay, good.

6              MS. SHARKO:  Yes.  There are no discovery

7    requests that deal with that.  If she wants documents

8    related to that, we'll figure that out.

9              THE COURT:  No, hold on.  Shouldn't she be

10   able to make a FOIA request for those documents too?

11             MS. SHARKO:  Can she make a FOIA request?

12   Sure.

13             THE COURT:  To the Department of Justice.

14             MS. KESSLER:  For the Department of

15   Justice?

16             THE COURT:  Yeah.

17             MS. KESSLER:  But it's more than that, Your

18   Honor.  I mean, I'm not only looking for the

19   communications that happened with the Department of

20   Justice and the defendants.  And a request like that

21   could take years for the Department of Justice to

22   provide information.

23             THE COURT:  Well, hold on, hold on.  We all

24   know that in the Anglo-Saxon tradition of the law,

25   there is a strong preference for settlement of

May 8, 2015

Page 38

1    litigation.  And we all know that in settling

2    litigation, it oftentimes happens that certain things

3    remain confidential because the parties' attitude is

4    that, well, if this case had been litigated, it might

5    have turned out a whole lot different; but because we

6    decided not to litigate it, we've agreed that you're

7    not going to learn about these things.  So, you know,

8    keep that in mind.  That happens at lots of different

9    levels --

10                MS. KESSLER:  I know.

11                THE COURT:  -- you know, not just in these

12   types of proceedings where, you know, everybody agrees,

13   we won't litigate because it makes more sense to

14   settle, but in settling, we want what we've shared with

15   one another in terms of showing our hand, we want that

16   to remain confidential.

17                So I don't know what happened with the

18   Department of Justice.  I'm sure I'll find out to some

19   extent.  So keep that in mind.  I don't know how

20   forthcoming they have to be until we know how it was

21   settled.

22                MS. KESSLER:  Well, we do know how it was

23   settled.

24                THE COURT:  Go ahead, tell me.

25                MS. KESSLER:  There was a public

May 8, 2015

Page 39

1    announcement.  There's a corporate integrity agreement

2    that the defendants agreed to sign.  I have that from

3    the docket.  A lot of this information is released, and

4    I'm not sure that the Department of Justice even agreed

5    to a confidential settlement with those terms.  I think

6    the purpose of it is to make the public aware that this

7    kickback, you know, bribery scheme existed among the

8    promotion of these drugs and that the public is

9    entitled to this information.

10             But even if that information is

11   confidential --

12             THE COURT:  But let me be candid with you

13   about that.  Isn't that really a side issue, too,

14   though?

15             MS. KESSLER:  It's not a side issue, Your

16   Honor.

17             THE COURT:  Not a side issue?

18             MS. KESSLER:  Because it has to do with the

19   promotion of these drugs.  It has to do with the

20   contact that this company had with the physicians who

21   prescribed this drug to our plaintiffs directly.

22             THE COURT:  Yeah.  But at the end of the

23   day, you're going to have to have a credible hypothesis

24   for the biological mechanism of Benicar and a

25   bellyache.  Right?  At the end of the day, that's where

May 8, 2015

Page 40

```
1    we are.  So that's a side issue to that issue.
2                I mean, I'll never discuss that issue at a
3    Kemp hearing, will I?
4                MS. KESSLER:  Well, it's not a causation
5    issue.
6                THE COURT:  Right?  So it's kind of a side
7    issue from my perspective.
8                MS. SHARKO:  It is.
9                THE COURT:  It may become relevant at
10   another time, I don't know.  But right now, you know --
11               MS. KESSLER:  Your Honor --
12               THE COURT:  -- I support your request to
13   get the information.  And she knows she has an
14   obligation to be forthcoming on the information.
15               If we get to a point where she has
16   furnished information --
17               She has to propound an additional request,
18   is that what you're saying?
19               MS. SHARKO:  Yes.
20               THE COURT:  You amended your answer to say
21   there was a settlement?
22               MS. SHARKO:  Right.  And so now, if the
23   plaintiffs want -- we're here arguing about documents
24   that they haven't asked for, for production.  So if the
25   plaintiffs, knowing about this from us and knowing
```

May 8, 2015

1    about it from the news, want specific documents

2    related --

3                THE COURT:  They should ask for them.

4                MS. SHARKO:  They should ask for them.

5                THE COURT:  I agree.

6                MS. SHARKO:  And we will respond.

7                THE COURT:  And I gather they're going to.

8                MS. KESSLER:  We did ask for them, Your

9    Honor.  It's Request Number 15.  Defendants have not

10   produced any documents relating to other lawsuits

11   filed.  They claim privilege.

12               MS. SHARKO:  There was no lawsuit filed.

13               THE COURT:  Hold on, hold on.  That's

14   pretty --

15               MS. KESSLER:  This was.

16               THE COURT:  Other lawsuits filed, I might

17   read that and say other personal injury claims.

18               MS. KESSLER:  Well, then let me take a step

19   back.

20               THE COURT:  I don't think I would read that

21   in this context of this lawsuit, claims brought by the

22   United States government.

23               MS. KESSLER:  It wasn't brought by the

24   United States government.  So I could give a little bit

25   of history of it.  It was a whistleblower suit --

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 42

```
 1    brought by a Michigan sales representative who filed
 2    consumer -- filed a Fraud Claims Act.
 3              THE COURT:  All right.  Hold on.  We are
 4    digressing.  And we don't need to do that.
 5              I think what we need to do is for you to
 6    sharpen your request for information concerning that
 7    settlement and give Ms. Sharko the opportunity to
 8    reply.
 9              MS. SHARKO:  Thank you.
10              MR. SLATER:  And if I could, Your Honor --
11              THE COURT:  Mr. Slater is eager to say
12    something.
13              MR. SLATER:  I think that what Your Honor
14    has suggested -- I think that question does cover it.
15    Just so you know, a civil suit was filed, it was a qui
16    tam action by a whistleblower --
17              THE COURT:  All right.  But I just told
18    her, that's a digression.
19              MR. SLATER:  I get it.  I just wanted you
20    to know --
21              THE COURT:  Okay.
22              MR. SLATER:  -- they'll have a request in
23    their hands by Monday.
24              THE COURT:  Good.
25              MR. SLATER:  A 30-day request.  And then
```

May 8, 2015

Page 43

```
 1    we'll come before Your Honor.  I agree.  It's not going
 2    to be the subject of a Kemp hearing, probably be the
 3    subject of our punitive damage closing at trial.
 4               THE COURT:  You never know.  You never know
 5    where these things go.  But I want to try to stay
 6    focused, because what my goal is, to get everybody have
 7    the discovery that they're entitled to, to have
 8    depositions of the fact witnesses, get your reports
 9    from your experts -- and I don't have a date in mind
10    for that -- get your reports from your experts, get
11    their reply, have depositions of the experts.  Isn't
12    that the logical progression?  That's where we have to
13    go.
14               MS. SHARKO:  It is.  And to that end, there
15    are 18 cases where discovery responses are overdue,
16    15 of -- 16 of Mr. Slater's, a whole list of Ms.
17    Kessler's.  And so if we could have an order compelling
18    plaintiffs to respond to all outstanding discovery
19    requests within a reasonable period of time.
20               THE COURT:  I see smiles from both your
21    adversaries.  Tell me what's your problem with that.
22               MR. SLATER:  I have an attorney who is
23    asking to compel discovery against me when no motion
24    has been filed.
25               MS. SHARKO:  That's what we just did.
```

May 8, 2015

Page 44

```
 1                    MR. SLATER:  Well, hang on.  There's
 2     absolutely --
 3                    THE COURT:  Well, no.
 4                    MR. SLATER:  I don't agree that we have any
 5     discovery outstanding.  In fact, I got a letter a
 6     couple days ago from Ms. Sharko's associate in the
 7     Anzalone case, which is the first case I filed here in
 8     New Jersey, asking us when we're going to serve our
 9     Form A interrogatory answers and supplemental
10     interrogatory answers.  I think they were served about
11     seven months ago.  It was -- they obviously need to
12     check their files, but --
13                    THE COURT:  She's shaking her head no.
14                    MR. SLATER:  I'm not --
15                    THE COURT:  And you'll have a paper trail
16     if they were.
17                    MR. SLATER:  Yeah.  I mean, they need to
18     file a motion if they want to compel discovery from me,
19     because I'm not deficient on anything.  And I just --
20     there's no issue there.
21                    MS. SHARKO:  Well, we sent Mr. Slater a
22     letter back in April.  He owes us interrogatory
23     answers, document requests, preliminary discovery forms
24     for the Avery case, the Dom case, the Evans case, the
25     Lewis case, the Menyweather case, the Parker case, the
```

May 8, 2015

Page 45

1     Pitts case, the Robinson case and the Taylor case.

2               MR. SLATER:  I don't litigate this way,

3     Judge, walk in -- you know what's going on.  If she

4     wants to file a motion --

5               THE COURT:  I don't know what's going on,

6     other than we're having a pretty free discussion.  And

7     I'm okay with it.  This doesn't unsettle me.

8               But in looking at my own notes, one of the

9     things I'm going to add to it is that after you meet

10    and confer, we will have a conference call, which may

11    be preceded by you giving me your submissions, as to

12    where we're having problems, and we will then have an

13    on-the-record management conference.  And we'll

14    probably, you know, figure out that date today, before

15    we're through here.

16              MS. SHARKO:  Okay.

17              THE COURT:  But, again, you have said in

18    your responsive pleadings that there are -- I think

19    it's 156 requests for production that you will respond

20    to between now and I've extended it to June 26th.  You

21    have said there's information that you're going to

22    provide, and you're going to get that case-specific

23    information and the other production information

24    between now and June 26th.

25              And then within that time frame, because

May 8, 2015

Page 46

1    you're going to be knowing what you're producing and

2    what you aren't, you're going to meet and confer.  And

3    then on June 26th, by that date or before, you're going

4    to know where we're at loggerheads, where you're at

5    loggerheads and where you aren't.  Okay?  And then

6    we'll talk about that on the phone, and then we'll meet

7    to see how we can resolve this.

8              MS. SHARKO:  Thank you.

9              MS. KESSLER:  Your Honor, I think the most

10   efficient way to do that is, from the plaintiffs' side,

11   with these requests that are in the proposed order that

12   they're claiming need to be compelled, is for us to

13   meet and confer as to a fact sheet that can apply

14   uniformly across all these cases.

15             THE COURT:  Well, I think that needs to be

16   done.

17             MS. KESSLER:  Along with --

18             MS. SHARKO:  So here's the issue, Judge --

19             MS. KESSLER:  I'm sorry, I --

20             THE COURT:  Go ahead.

21             MS. SHARKO:  We have had discovery requests

22   outstanding to the plaintiffs in many cases for many

23   months.  And what would be unfair is to say, all right,

24   forget about all that.  Now, spend a month agreeing to

25   a fact sheet and then start the clock running again.

May 8, 2015

```
 1              So I absolutely favor the fact sheet that
 2   will be negotiated in the MDL between these same
 3   lawyers, having that apply in this litigation
 4   prospectively, but I don't think for all the cases
 5   where we're waiting for discovery, which is over 20
 6   cases, we should stop.
 7              THE COURT:  Do you have the fact sheet
 8   that's being used in the MDL with Judge Kugler?
 9              MS. SHARKO:  That is just an idea right
10   now.  I actually do have a draft that I'm working on
11   that my plan is to send to the plaintiffs --
12              THE COURT:  I was going to say, have you
13   shared it with the plaintiffs?
14              MS. SHARKO:  No.  I'm not ready to do that
15   yet.
16              THE COURT:  All right.  Once you share it
17   with the plaintiff and the plaintiff has responded,
18   then share it with me.
19              MS. SHARKO:  Sure.
20              But I don't think that -- what I'm
21   concerned about, and I agree that once it's agreed upon
22   we'll use that going forward, but what I don't think
23   should happen is all case-specific discovery from the
24   plaintiffs is now suspended while we do that.  The
25   plaintiffs who have discovery requests, and have had
```

May 8, 2015

Page 48

1    them in some cases for 30, 60, 90 days, should be

2    answering them.  And in the future cases --

3              THE COURT:  I don't disagree with that, but

4    Mr. Slater is saying there isn't any outstanding from

5    his clients.

6              So are there any outstanding from your

7    clients, Ms. Kessler?

8              MS. KESSLER:  I don't -- not that I know

9    of.  I don't know what specific cases she's talking

10   about.

11             You know, we have -- every time they have

12   sent me a letter saying that we're deficient or that

13   we're not responding, I have done my best to answer

14   them.  And that to address this, I did switch law

15   firms.  You know, they were kind enough, they gave me

16   some extensions on a few cases.  I complied with all

17   the extensions that they've given me, I've served

18   within those time periods.  You know, in addition that,

19   I don't know which cases that she's speaking to.

20             But as far as going back in time, what Ms.

21   Sharko is saying is that, again, the proposed orders,

22   the questions that she's moving to compel, the

23   information that she says that isn't sufficient that

24   we're not supplying, we disagree.  We have a

25   disagreement about that.

May 8, 2015

Page 49

```
 1              And then on top of it, some of these
 2    questions are just clearly inappropriate.
 3              THE COURT:  Well, they're inappropriate
 4    or -- I mean, inappropriate is a judgmental thing.  And
 5    maybe I have to decide that.  I would prefer not.  I
 6    would hope you'd be able to decide it.
 7              But duplicative is another thing.  I don't
 8    see the point of redundancy ever.
 9              MS. KESSLER:  I agree.  And I think that's
10    why, if we worked out a fact sheet where we can settle
11    on this universe of what the discovery in these cases
12    should be, is the most efficient solution to this,
13    rather than us coming back here and Ms. Sharko claiming
14    she didn't get a response to Document Number 14 -- or
15    Request Number 14, which requests all documents
16    relating to Benicar in plaintiff's possession,
17    plaintiff's agents and plaintiff's lawyers.  And we
18    have a serious fundamental problem with that question,
19    along with other questions that she's compelling.
20              You know, one of the questions is she wants
21    the identities and names of all of our experts.  That's
22    in their proposed orders.  So it's just --
23              THE COURT:  You'll get it at some point.
24              MS. KESSLER:  Absolutely, Your Honor.  But
25    at this time --
```

May 8, 2015

Page 50

```
 1              THE COURT:  I'm not going to hold -- I'm
 2    not going to hold them to a specific date right now.  I
 3    think that's a little bit premature.
 4              MS. SHARKO:  I agree with that.
 5              THE COURT:  Okay.
 6              MS. KESSLER:  Then, again, that's in their
 7    proposed order.
 8              MS. SHARKO:  The Robins Kaplan firm has had
 9    the Keeler case, and we don't have any discovery
10    responses in.  They were served December 16th.
11              I have -- I mean, I have a list here of who
12    owes what.  My only point is that we should not suspend
13    everything while a fact sheet is worked out.  Because I
14    assume that if we agreed on a fact sheet on June 1, are
15    the plaintiffs then going to go back and fill out that
16    fact sheet for every single case in the litigation,
17    including those where they've answered interrogatories?
18    If they're willing to do that, I might be more
19    interested in it.
20              THE COURT:  Here's the thing.  I think it's
21    in both of your -- in both your interests, to the
22    benefit of both of you, to have uniformity.
23              MS. KESSLER:  Absolutely.
24              THE COURT:  It expedites the handling of
25    information.  It expedites the understanding of
```

May 8, 2015

Page 51

1    information.  And so, you know, I'm mildly chagrinned

2    that we don't have it already.  I mean, I think we'd be

3    a lot better off if we had -- you'd be a lot better

4    off, you'd be a lot better off, if we had an

5    agreed-upon plaintiffs fact sheet.

6                    MS. KESSLER:  Absolutely, Your Honor.

7                    THE COURT:  I know I'd be -- it makes it a

8    lot easier for me.

9                    MS. KESSLER:  Absolutely.  And we'd be

10   happy to adopt --

11                   MS. SHARKO:  So what --

12                   THE COURT:  You're both talking at the same

13   time.

14                   MS. SHARKO:  Once we have an agreed-upon

15   fact sheet then, it will be completed by every

16   plaintiff in the New Jersey litigation, regardless of

17   whether they've answered interrogatories?

18                   THE COURT:  Yes, yes, yes.  It's going to

19   make it a lot easier going forward.

20                   MS. SHARKO:  Okay.

21                   THE COURT:  If it requires you to duplicate

22   some effort on individual plaintiffs, so be it.  But

23   going forward, it makes things a lot easier.  It really

24   does.

25                   MR. SLATER:  Should we suspend answering

May 8, 2015

Page 52

```
 1    interrogatories while this meet and confer process goes
 2    on, so we don't duplicate effort?
 3               THE COURT:  Now, I don't want you
 4    duplicating efforts.
 5               MR. SLATER:  That's the problem.
 6               THE COURT:  But I want you to focus on --
 7    have you given them your thoughts on a plaintiff fact
 8    sheet?
 9               MS. SHARKO:  The plaintiff fact sheet was
10    first raised by Judge Kugler on April 29.
11               THE COURT:  Good.
12               MS. SHARKO:  And we're supposed to meet and
13    confer before May 20.
14               So, no, I haven't.  But I really don't want
15    to have everything stop in New Jersey.  There's no
16    reason the plaintiffs can't give us medical records
17    authorizations or the basic information about their
18    cases.  I believe that each plaintiff should be
19    supplying proof that they took the product and they had
20    an event.
21               We have in -- out of the 59 cases in New
22    Jersey, only 23 plaintiffs have provided prescription
23    records that show a Benicar prescription and event
24    records that show a diagnosis.
25               MS. KESSLER:  Okay.  Well, that's very
```

May 8, 2015

Page 53

```
 1   misleading because there's four medications here.

 2              THE COURT:  That's a perfect example.  The

 3   other 36 are going to have to prove they took the

 4   medication.  Right?  You know, you're not going to be

 5   able to come in here and say, oh, well, I'm pretty sure

 6   it was.

 7              MS. KESSLER:  Your Honor, that was --

 8              MS. SHARKO:  If I could finish --

 9              MS. KESSLER:  -- so misleading, because

10   there are four medications that contain the drug

11   ingredient in question.  It's not just Benicar.  It's

12   Benicar, it's Benicar HCT, Azor and Tribenzor.  So

13   she's saying that 23 may have taken Benicar.  There's

14   three other medications at issue.

15              THE COURT:  But here's what she said to me.

16   That there's 59, and out of those, we have 26.  So that

17   tells me there's -- did you say 23?

18              MS. SHARKO:  There are 23.

19              THE COURT:  So we have 36 that haven't

20   responded.  Those 36 people are going to have to prove

21   they ingested something that hurt them.  Right?

22              MS. KESSLER:  Absolutely.

23              THE COURT:  Okay.  Well, the sooner she

24   knows that, then the more respect she'll have for the

25   claim.
```

May 8, 2015

Page 54

1          MS. KESSLER:  I think we're talking about a

2     short time frame.  And I think that as far as the

3     uniformity that you're suggesting makes absolute sense.

4     And that what's being implemented in the MDL, which is

5     on a very short-term basis here, we're talking May

6     20th.  And we're also drafting a plaintiff fact sheet

7     that Ms. Sharko will see too.

8               And we think that which is implemented in

9     the MDL should also apply to these cases.  And that we

10    can work that out in a very short period of time.

11          THE COURT:  I do think that's the

12    preferable way.  I also think, she raises a point, that

13    some things you're going to have to provide on any fact

14    sheet that's agreed upon.  And so the sooner she has

15    those things, the more sense it makes in terms of

16    expediting the process.

17          MS. KESSLER:  Okay.  We could agree to --

18          MS. SHARKO:  So what I --

19          THE COURT:  Let her finish and then you can

20    go.

21          MS. KESSLER:  We could agree to produce the

22    Form A interrogatories, which is where the medical

23    records are first produced, along with the medical

24    authorization and the employment authorization in the

25    meantime, while we work out the fact sheet.

May 8, 2015

Page 55

1           THE COURT:  I think you need the medical

2   authorizations.  And the Form A should get you started,

3   shouldn't it?

4           MS. SHARKO:  Yes, sir.  What I would really

5   like to have in addition to the authorizations is for

6   each plaintiff a medical record that shows that they

7   had a prescription for Benicar or Tribenzor or Azor or

8   one of the Benicar products and a medical record that

9   shows the diagnosis of sprue-like enteropathy or the

10  event that they claim in the lawsuit.  It's three

11  pieces of paper.

12          THE COURT:  Well, I agree with you.

13  Because, I mean, the things that she just said, why

14  would you file a lawsuit for them if you didn't have

15  it.  Right?

16          MS. KESSLER:  Well, it's more complicated

17  than that.  And this was part of her motion to dismiss

18  a case six months ago.  She is trying to strategically

19  narrow what she thinks this litigation is about.  It's

20  not sprue-like enteropathy.

21          THE COURT:  I remember that conversation.

22  And my response then is my response now.  There may

23  be -- I don't know what they are, but that's up to them

24  to prove it, not for you.  There may be some other

25  named condition that, you know, they're going to be

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 56

1    able to show was connected to the Benicar.  Well, maybe

2    whatever it is.  But you're going to have to articulate

3    that at some point.  Right?

4                MS. KESSLER:  Absolutely, Your Honor.  And

5    I think the other --

6                THE COURT:  And the other -- you know, I'm

7    saying to myself, before a suit gets filed on behalf of

8    a plaintiff who took Benicar, saying that that

9    substance injured me, you should have proof that they

10   took the substance and you should be able to articulate

11   to some degree what the injury was or you shouldn't be

12   filing the Complaint.

13               MS. KESSLER:  Exactly.  And I can tell you

14   that all plaintiffs' counsel here have been carefully

15   vetting the cases that have been filed and that

16   information is being collected.

17               THE COURT:  I sure hope so.  It doesn't

18   always happen.

19               MS. KESSLER:  You know, this is right now a

20   pretty small, manageable amount of cases.  There are 60

21   cases on file.  So there is no reason that we can't

22   streamline this and make this uniform, along with

23   what's going on in the MDL.

24               But in addition to the plaintiff fact

25   sheet, Your Honor, there's also the defense fact sheet.

May 8, 2015

Page 57

```
 1   And that's also being worked on in the MDL, and it
 2   should also apply here.
 3            THE COURT:  Yes.
 4            MS. KESSLER:  And this is very -- it's very
 5   important too, because we have been serving all these
 6   requests in multiple cases.  However, the defendants
 7   have taken the position that they don't have to
 8   apply -- answer to any case-specific discovery except
 9   in Rahman, except two questions that they unilaterally
10   decided are case specific.
11            So they have already implemented their own
12   uniform system of answering, and yet they're expecting
13   from us to be providing this discovery that's
14   duplicative and what I believe a lot of is
15   inappropriate.
16            So I just think that we need a meet and
17   confer both on the plaintiff fact sheet and the defense
18   fact sheet, and we can come back in a very short period
19   of time and have this worked out as to what the
20   universe of this discovery should be.
21            MS. SHARKO:  So what --
22            THE COURT:  Well, I'm happy to hear that
23   Judge Kugler is a step ahead of me on the fact sheets.
24   And that's probably going to get resolved in front of
25   him quicker than it will get resolved in front of me,
```

May 8, 2015

Page 58

1    and then we'll just piggyback on whatever gets prepared

2    there.

3                    MS. SHARKO:   That's fine, Judge.  And we'll

4    do that.

5                    I would ask, though, that in the interim

6    the plaintiffs be ordered to produce for each case the

7    medical record showing a prescription of the product

8    that they received --

9                    THE COURT:   I think that's a fair request.

10                   MS. SHARKO:   -- or whatever.

11                   THE COURT:   I think that's a fair request.

12                   MS. SHARKO:   And number two, the medical

13   record documenting the event for which they seek

14   compensation.  It should be sprue-like enteropathy, but

15   if it's something else, whatever that is.

16                   THE COURT:   Or whatever the condition may

17   be that they're saying caused --

18                   MS. SHARKO:   Exactly, exactly.

19                   THE COURT:   -- was caused by the ingestion

20   of this medication.  You should have that information.

21   This is no big task.  You should have it.

22                   MR. SLATER:   I think that after this

23   afternoon, some of these issues will be a little more

24   clear in terms of why it seems like we're arguing over

25   semantics, but we're really not.  So I would ask Your

May 8, 2015

1   Honor to wait and see what you learn this afternoon

2   about what's really going on.

3           And, for example, what Ms. Sharko was

4   telling you, if a person doesn't have a diagnosis of

5   sprue-like enteropathy, and you're ahead of the game on

6   that, you know they don't have a case, well, one of the

7   problems here is the information was never given to

8   doctors, even the information that they put into their

9   label, which is we don't believe adequate to begin

10  with.  Unlike in Accutane, where Your Honor ruled that

11  the warning system was very extensive, here we're going

12  probably be able to demonstrate to Your Honor, if we

13  find what we think we're going to find and if our

14  investigation bears out, they had a system of

15  suppression of the science and medical information

16  about their products.

17          So, for example, I have clients signing up

18  with me now, they found out about the problem a week or

19  two ago in a conversation, or jumping on the internet

20  and said, I didn't even know this.  I had to take a new

21  drug.  I got switched off by my insurance.  My problems

22  went away, I never even made the connection until I saw

23  something on the internet.  So it's not that simple

24  because doctors didn't know to diagnose.  They didn't

25  know to do pathology.  They didn't know to take

May 8, 2015

Page 60

1    biopsies.  They didn't know this even existed.  There

2    was a couple of articles in the literature that most

3    doctors would never have seen.  And you'll learn about

4    that a lot this afternoon.  So it's a more complex

5    process.

6              The idea that they want this quick slip

7    sheet in the beginning of the case, we actually argued

8    this issue in Anzalone, and Your Honor agreed, you're

9    going to get the responses to the interrogatories, all

10   the information is going to be there in the ordinary

11   course, and that's how we think it should be done.

12   There shouldn't be staged discovery responses.  There

13   should be a fact sheet, and if there were

14   interrogatories already answered, they have the

15   information.  If they think there's a deficiency, they

16   can raise it.

17             THE COURT:  Well, there's merit to what

18   both of you say, but I'm still of the opinion that some

19   of the things that Ms. Sharko is asking for are things

20   that should be in your file.

21             MR. SLATER:  Well, some of it --

22             THE COURT:  They should exist.  Right?

23             MR. SLATER:  Your Honor, we have to get all

24   the medical records.  You file a case, sometimes

25   there's a statute of limitations coming up potentially.

May 8, 2015

Page 61

1                THE COURT:  You give her all the names of

2        the physicians, you give her medical authorizations.

3                MR. SLATER:  And she's getting all that.

4        She gets that when we answer interrogatories.  They get

5        everything in the ordinary course.  If there's a fact

6        sheet, they'll get it with the fact sheet.  The

7        idea that we should have to make --

8                And Judge Kugler, by the way, disagreed

9        with this as well.  She asked for staged responses, and

10       his response was, let's do it once.  So -- and I'm sure

11       you can speak with him, obviously there's a transcript.

12       We're happy to give all this information one time in an

13       ordinarily fashion en masse, the way it's done in every

14       litigation, as opposed to Ms. Sharko cherry picking a

15       few bits of information and trying to define what she

16       wants.

17               THE COURT:  I wouldn't characterize it as

18       cherry picking.  I think what she's saying is these are

19       the fundamentals and we need to have them.

20               But you know what?  You're going to get it.

21       You're going to get all this information or their

22       claims will get dismissed.  It's just that simple.  And

23       so I think once we have the fact sheet agreed upon,

24       we'll agree upon a reasonable time for them to file

25       fully responsive answers to the fact sheets, and that

May 8, 2015

Page 62

1    will be it.  And if they can't, because they don't have

2    a prescription, then those cases are going to go away

3    quick.

4              MS. SHARKO:  So I agree that this

5    information will be in the fact sheet, or should be in

6    the fact sheet, but the problem is that we've served

7    discovery in all these cases.  We have 36 plaintiffs

8    who have had discovery requests pending.

9              THE COURT:  Outstanding and remain

10   outstanding?

11             MS. SHARKO:  And remain outstanding.  And

12   now what the plaintiffs want to do is stop

13   case-specific discovery.  So all I'm saying is --

14             THE COURT:  Here's the flip side of that.

15   The flip side of that is they've got 23 they're going

16   to have to go back and duplicate.  That's the flip

17   side.  And I can see that sitting here.  You know, my

18   vantage point sometimes is different.  And I'm saying,

19   you're going to wait a little bit longer for 36 and

20   they're going to have to duplicate 23.  In terms of,

21   you know, how the scales balance, they're in equipoise.

22   You're each one inconvenienced equally.  So it's just

23   that simple.

24             So when the fact sheet is prepared, we'll

25   talk about a reasonable amount of time in which

May 8, 2015

Page 63

1    plaintiffs will have to furnish you with everything

2    that's listed on the fact sheet.  But in the meantime,

3    you'll have to be patient a little bit longer.

4                MS. SHARKO:  Could we have authorizations

5    at least in the pending cases while the fact sheet is

6    negotiated?

7                MR. SLATER:  They have them.

8                THE COURT:  I admire your persistence.  I

9    admire it.  I really do.  The answer is no.  We'll wait

10   and do everything once with the fact sheet.

11               Okay.

12               MS. KESSLER:  Thank you, Your Honor.  Just

13   two more issues.  I'm sure you're about to turn to the

14   FOIA documents.

15               The first is that with the medical

16   authorizations that we've been giving the defendants --

17               THE COURT:  You've given 23 so far?

18               MS. KESSLER:  I think -- I don't know how

19   many I've given.

20               THE COURT:  All right.  Hold on.  She's

21   being persistent and I admire that, and if we can

22   handle it, is there any reason you can't give medical

23   authorizations on the rest right away?

24               MS. KESSLER:  Well, I mean, some of them

25   aren't even due yet.

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 64

1          But the point that I was making is that the
2    medical authorizations that we have supplied, they're
3    clearly getting records, they're gathering records.
4    And we've also signed facility-specific authorizations
5    where they don't accept the general authorization, so I
6    know that they're getting this information.  They have
7    not produced any of the records that they are receiving
8    on our plaintiffs.
9               THE COURT:  I don't have any doubt that
10   they will.
11              MS. KESSLER:  Well, prior --
12              THE COURT:  Maybe they're waiting until
13   they get a certain bundle, of a certain number.
14              MS. SHARKO:  So here --
15              MS. KESSLER:  It's part of our problem,
16   Your Honor, that we believe that this should be on a
17   rolling basis --
18              THE COURT:  You can't both talk at the same
19   time.  It's hard for her and hard for me.
20              MS. KESSLER:  Well, that this information
21   is being -- that as this information comes into the
22   defendants -- again, it's usually something that's
23   agreed to in the ordinary course.  We just ask Your
24   Honor that it's something that I guess we will meet and
25   confer about this, too, and have -- make sure that

May 8, 2015

Page 65

1    we're receiving all the information that they're
2    receiving on our plaintiffs as well, because these
3    authorizations don't have the limitations as to the
4    time period that we just discussed today.
5              MS. SHARKO:  So this is a good example of
6    why we have the rules of court.  Ms. Kessler never,
7    ever asked for a copy of a single medical record until
8    she filed her cross-motion.
9              MS. KESSLER:  That's not true.
10             MS. SHARKO:  As she pulled up --
11             THE COURT:  So you can really -- I really
12   don't like you interrupting her when she's talking.
13   And she interrupts you too.  You both need to stop it.
14             MS. SHARKO:  Had Ms. Kessler called or
15   asked, and now that she has, we will supply her with
16   copies of the medical records we get as we get them,
17   pursuant to the Vasquez case where they share in the
18   cost of whatever we paid --
19             THE COURT:  I saw that in your response,
20   and I think that's how it should be done.
21             MS. SHARKO:  That's how it's always done
22   here.  I've never had an issue with that.  So I was
23   kind of surprised that I didn't get a phone call, I got
24   a motion, but that's not an issue for the Court.
25             MS. KESSLER:  I just want to correct for

May 8, 2015

Page 66

1      the record, I did ask for that information in a letter

2      in late January.

3                  THE COURT:  Well, she's telling you she's

4      going to provide it, you're going to share in the cost

5      and you'll be receiving the information.

6                  MR. SLATER:  I'm sorry, Your Honor, I just

7      want to make sure that something is clear in the

8      record.

9                  If Ms. Sharko is asking that she goes out

10     and gets the plaintiffs' medical records, which I

11     believe that she's obligated to then give to us, she's

12     now saying she wants us to share in her cost of

13     obtaining the records?  Because I know we've been

14     obtaining our clients' medical records and serving them

15     in the ordinary course.  And I've never had a

16     litigation -- Ms. Sharko says it's ordinary?  I have

17     never had the defendant charge me in the state of New

18     Jersey, where I've practiced law almost exclusively for

19     almost 25 years, try to charge me for medical records

20     they obtained for my clients with my medical

21     authorizations.  They always produced the records that

22     they obtain, and we produce the records we obtain.  And

23     I do not want the record to leave -- be left that all

24     the attorneys in the litigation --

25                 THE COURT:  Well, I appreciate you doing

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 67

```
 1    this, because, candidly, it's never become an issue for
 2    me before because lawyers have agreed.  And what
 3    lawyers agree to, I don't tamper with, unless somehow
 4    it's violating public policy, but...
 5              Ms. Sharko, you've got the floor.
 6              MS. SHARKO:  So in every litigation I've
 7    ever been involved in, and I guess I've never had the
 8    pleasure of being in litigation with Mr. Slater
 9    before --
10              THE COURT:  You were in a different
11    universe, but now you're in the same universe.
12              MS. SHARKO:  Usually we use a medical
13    records provider, and we'll probably have to switch to
14    that here.
15              THE COURT:  Correct.  I've seen that done
16    before, Mr. Slater.
17              MR. SLATER:  I'm not talking about that.
18    That's fine.  And we're going to do that in the MDL.
19    There's going to be a medical records company that's
20    going to obtain records.  But prior to the institution
21    of that, we're serving records, they're serving
22    records.  Once we agree on a vendor, then the parties
23    share, because the vendor goes out and gets the
24    records.  That's -- I'm not disagreeing with that.  We
25    weren't talking about that.
```

May 8, 2015

Page 68

 1                THE COURT:  Well, that's what I assumed was

 2     going on.

 3                MR. SLATER:  It never happened here.  We

 4     should confer about it.

 5                MS. SHARKO:  I'm not -- I wasn't finished

 6     talking, but I'm happy to talk to the plaintiffs

 7     privately and try and work this out.

 8                THE COURT:  This shouldn't be hard.

 9                MS. SHARKO:  Right.

10                THE COURT:  This should be easy.  And I

11     thought what was happening -- and I'm assuming things,

12     and it's wrong to do that.  I thought what we were

13     talking about was a vendor that when you use, pay the

14     one half.  When I read that, I said to myself, well,

15     she's got a vendor who is going to secure the records,

16     and when the documents come in, they split the cost.

17                MS. SHARKO:  Right.  That's how it usually

18     works.

19                THE COURT:  That's how it usually works.

20                MS. SHARKO:  Okay.  We will talk.

21                MR. SLATER:  We'll talk to them about it.

22     That's wasn't what I thought we were talking about

23     here.

24                THE COURT:  All right.

25                MS. KESSLER:  The other issue I had, Your

May 8, 2015

Page 69

1    Honor, and this was brought up in my papers, is that
2    when the defendants filed these motions, we now have
3    very personal information about the plaintiffs that not
4    only violated the court rules, because there's personal
5    confidential identifiers included in these filings --
6              THE COURT:  You know, I understand that.
7    But I -- look, I know a lot of paperwork is going to go
8    back and forth between the two of you.  And I don't
9    know that they violated the protective order unless you
10   tell them that this is protected information.  And I
11   don't think you did that.  So, I mean, what I don't
12   want to do is make a huge issue over something that may
13   have been an inadvertency on both sides and can
14   probably be remedied quickly.
15             I haven't been in this situation before.
16   What's the logistics?  If there are documents, you go
17   down to the clerk's office, say, give them back, I'm
18   going to exchange something?  I mean, because it sounds
19   to me like we're making a bigger problem out of this
20   than it is.  And I'm not accusing anybody of doing
21   that.  I'm simply -- I don't want to make a bigger
22   problem out of it than it is because who's going to
23   come in and look?
24             MS. KESSLER:  Your Honor, I understand what
25   you're saying about the protective order, but that's

May 8, 2015

Page 70

1    separate.  This also includes -- and, I mean, I am

2    genuinely concerned about identify theft of these

3    plaintiffs, because it has their insurance policy

4    numbers filed.  It has, for Shelly Rahman, a whole page

5    of her psychiatric information now filed with the

6    clerk's office.

7              THE COURT:  Well, I would prefer that not

8    be filed.

9              MS. KESSLER:  And that was the whole

10   purpose that we were here last fall is to talk about

11   the admitted protective order.  It works both ways,

12   Your Honor.  Our information should also be protected.

13             THE COURT:  Well, I don't disagree with

14   you.  But I also know that it's rare -- but we have to

15   protect against the rare too.  It's rare that anybody

16   comes in and they want to look at, you know, a pleading

17   filed in connection with a discovery motion.  They come

18   in and want to look at Complaints.  They come in

19   sometimes and want to see briefs.  They come in and

20   they want to look at certifications.  But do they look

21   at these types of pleadings?  No.

22             MS. KESSLER:  But, Your Honor, they do,

23   because other plaintiffs' counsel around the country

24   are litigating these cases, too.  I know that runners

25   have been here getting these filings, our motions to

May 8, 2015

Page 71

```
 1    compel for --
 2                THE COURT:  Well, you know more than I do.
 3    And I'm not being facetious.  You're enlightening me.
 4    It's interesting.
 5                MS. KESSLER:  It happened, Your Honor.
 6    And --
 7                THE COURT:  Ms. Sharko?
 8                MS. SHARKO:  Yes.  If only Ms. Kessler
 9    would call and try to work these things out instead of
10    coming down here and trying to cast blame on everybody.
11                The discovery motions were filed.  The
12    information that was attached was never designated as
13    protected.
14                THE COURT:  Well, see, I don't think it
15    was.  That's part of it.
16                MS. SHARKO:  That's part of it.
17                The second part of it is, the rules specify
18    what is personal identifying information.  That was not
19    in the motion papers.
20                All that said, if Ms. Kessler wants that
21    information removed from the filings, or she wants to
22    substitute a redacted version, so what's in the clerk's
23    office is more satisfactory to her, I don't care.
24                THE COURT:  I would prefer --
25                MS. SHARKO:  That's fine.
```

May 8, 2015

Page 72

```
 1               THE COURT:  -- that be done.
 2               MS. SHARKO:  Sure.
 3               THE COURT:  And how it gets done doesn't
 4    interest me, but I would prefer that it be done.  She's
 5    telling me that it's possible that people from law
 6    firms send -- I'll use a better word, "investigators,"
 7    to look at certain documents.  And I would prefer that
 8    anything that appears to be confidential information
 9    not be available for those investigators to peruse.
10               MS. SHARKO:  Sure.  That's fine.
11               THE COURT:  We're all in agreement on that.
12               MS. SHARKO:  We are.  And all she needs to
13    do is give us, or give the clerk's office what she
14    wants to substitute, let us see it and then they'll
15    take care of it.
16               MS. KESSLER:  I don't --
17               THE COURT:  I think the best way to
18    coordinate this, because I don't think we're talking
19    about a big volume of information, are we?
20               MS. KESSLER:  It's the six motions that --
21    Christy Brooks' motion where they attached medical
22    records.
23               THE COURT:  Total number of pages, what are
24    we talking about?
25               MS. KESSLER:  It's probably 300 pages.
```

May 8, 2015

Page 73

```
 1                THE COURT:  Oh, you think that many?
 2                MS. KESSLER:  Well, with these motion
 3     papers, with these six motions, along with Christy
 4     Brooks -- where they attached the medical records of
 5     Christy Brooks, which they try to characterize as --
 6                THE COURT:  My thought is, there ought to
 7     be a way, maybe starting with an e-mail copied to one
 8     another and then a conference call, there should be a
 9     way that you can resolve this with Trish Allegretto and
10     her staff.
11                MS. KESSLER:  Absolutely, Your Honor.  I
12     think that the defendants should be the ones that
13     initiate that, because they're their motions that were
14     filed.  I'm not sure if I can change what they have
15     filed with the clerk's office.  So we can talk
16     procedurally how to do it.
17                THE COURT:  Yeah, but hold on.  You're the
18     one who's got the beef, so to speak, with the problem.
19     I would want you involved, if not supervising, if not
20     doing the substitution to eliminate the complaint.
21                MS. KESSLER:  To the extent --
22                THE COURT:  The beef.  You know, I don't
23     mean the pleadings.  Eliminate the problem that you
24     perceive.  And I respect it.
25                MS. KESSLER:  But to be the fair, I wasn't
```

May 8, 2015

Page 74

1    the one that violated the court rules.

2              THE COURT:  Yeah, but I don't have any --

3    look, there are -- inadvertencies occur.  And I'm not

4    here to talk about anybody whose conduct is improper,

5    because I think everyone is being advocates, and that's

6    what you're supposed to be.

7              But you can pinpoint the items that you

8    find to be a problem more readily than anybody.  And I

9    would prefer that you do that with Ms. Allegretto,

10   keeping Ms. Sharko informed of what you're doing, and

11   let's just tend to the logistics of the problem as

12   quickly as possible.  And I think you're the one who

13   can expedite it more quickly than anybody.

14             MS. KESSLER:  Yes, Your Honor.  So just to

15   clarify that some of these medical records and these

16   responses were served before the protective order, and

17   so they aren't marked as protected.

18             THE COURT:  The simplest way might be just

19   pull those pages, period.

20             MS. KESSLER:  Exactly.

21             THE COURT:  If we have an incomplete filing

22   at the end of the day, we all know what the

23   incompletion is about.

24             MS. KESSLER:  Right.  And I would like

25   those records to be --

May 8, 2015

1           MS. SHARKO:  And --

2           THE COURT:  If it becomes the subject of an

3    appeal, then you supplement.

4           MS. SHARKO:  I have no objection to that.

5           MS. KESSLER:  And I would like Ms. Sharko

6    to accept that this information is confidential, that I

7    do not need to go back through these productions and

8    produce pages where I mark them as protected, that it

9    is clear from the amended protective order that medical

10   records with this information is protected and within

11   the purview of it.

12           THE COURT:  Well, I think going forward

13   we're all in agreement on that, are we not?

14           MS. SHARKO:  That all --

15           THE COURT:  Well, any medical or

16   psychiatric records, they shouldn't be filed in

17   courthouses.

18           MS. SHARKO:  If Ms. Kessler is now orally

19   designating all the medical records as subject to the

20   protective order, so be it.

21           MS. KESSLER:  And interrogatory responses.

22           THE COURT:  Okay.  But in terms of cleaning

23   the record by, you know, expurgating or redacting,

24   whatever term you want to use, those pages, I'm going

25   to rely upon you to work with Ms. Allegretto and get

May 8, 2015

1    that done.

2              MS. KESSLER:  Yes, sir.

3              THE COURT:  Okay.  What else on discovery?

4              MS. SHARKO:  I want to make sure I just

5    heard what counsel said.

6              So all interrogatory answers are now

7    subject to the protective order for both sides, in

8    addition to medical records and psychiatric records?  I

9    just want to make sure I know what the ground rules

10   are.

11             MS. KESSLER:  I would say as the amended

12   protective order specifies, that this includes all

13   personal information, medical information as to the

14   plaintiffs --

15             THE COURT:  Well, we know it includes

16   Social Security, we know it includes medical records,

17   we know it includes Social Security, psychological,

18   psychiatric.  What else?

19             MS. KESSLER:  So that would include

20   potentially document requests as well, that information

21   that we're attaching to document requests.  So it's

22   potentially all discovery responses that have been

23   served, including medical records, that contain the

24   information that's defined as protected in the amended

25   protective order.

May 8, 2015

1           MS. SHARKO:  I would just ask, designating

2      something under the protective order is significant,

3      and we need to make sure everybody --

4           THE COURT:  It's not insignificant, you're

5      correct.

6           MS. SHARKO:  And so rather than have Ms.

7      Kessler stand up and say on the record, and I want this

8      and I want this and it's somewhat vague, she should --

9           THE COURT:  Yeah, you're going to do a

10     letter to Ms. Sharko.

11          MS. KESSLER:  Okay.  Thank you, Your Honor.

12          THE COURT:  So we don't have any

13     misunderstandings in the future.

14          MS. SHARKO:  Okay.  The cases that have

15     discovery end dates that are coming up, could they be

16     suspended or readjusted for this?

17          THE COURT:  I think we need to suspend them

18     and create a new discovery end date once we have the

19     agreed-upon fact sheets.  I think that's the most

20     practical way to proceed.  Otherwise, you know, we're

21     going to be having more dates expiring.

22          MS. KESSLER:  The only issue with that,

23     Your Honor, is that two of them are expiring in June

24     and then a few more are expiring in July.  So it's

25     something that we should think about addressing

May 8, 2015

```
 1    separately.

 2              Part of this was when the cases were

 3    consolidated.  Right now there's currently 12 cases

 4    that were consolidated by Judge Mendez here in Atlantic

 5    County.  And normally when there's a consolidation,

 6    they take the last discovery end date and it applies to

 7    the entire set of cases.  I'm not sure why it didn't

 8    happen here, but I think that's the easiest solution.

 9    And we can send you a joint consent order on that.

10              THE COURT:  I was going to say, I'm content

11    with zeroing in on those cases that have you concerned,

12    agreeing upon a date somewhere in the future, and

13    that's fine by me.  Because once we have the fact

14    sheets, that's going to expedite everything.

15              MS. KESSLER:  So we will send that back to

16    you within the next week.

17              THE COURT:  All right.  So you'll submit a

18    consent order?

19              MS. KESSLER:  Yes.

20              THE COURT:  Okay.

21              MS. SHARKO:  Meanwhile the dates are

22    suspended in all the cases?

23              THE COURT:  Can't hear you.

24              MS. SHARKO:  The dates for -- the discovery

25    end dates are suspended?
```

May 8, 2015

Page 79

1           THE COURT:  Yes.

2           MS. SHARKO:  Okay, thank you.

3           I believe we're up to item -- I guess we

4   have the MDL status report, which I can give you, if

5   you'd like that, the docket report.  And then the

6   Hudson County cases that are now being filed.

7           THE COURT:  Well, why don't we do that

8   after we finish the one issue on the motions that we

9   have.

10          MS. SHARKO:  Okay.

11          THE COURT:  Isn't that where we are?

12          MS. SHARKO:  That's true.  I forgot about

13  that.

14          THE COURT:  Who wants to start?  The person

15  who is looking for the protective order or the person

16  who -- well, you know, we'll start with the person

17  looking for the protective order, because you have the

18  burden of proof.

19          MS. KESSLER:  Your Honor, I know that we

20  had several -- we had two conference calls on this

21  earlier in the year.  I think you know our position.  I

22  think we set it out very clearly in our papers that

23  there is this case directly on point where one side

24  tried to receive FOIA documents that were requested,

25  and the Court said that clearly this is work product

May 8, 2015

Page 80

1   and that it reflects a grouping of what the parties'

2   mental impressions and opinions as to what's important

3   in the case and that this really goes towards legal

4   theory, not towards factual.  Because as far as the

5   factual information is concerned, the defendants

6   already have these documents.  They already know the

7   factual information.  It's already given to them.

8            I don't think it's all been produced to me

9   yet, but that's a separate issue.  So what they're

10  really seeking here and why they have zeroed in on

11  these documents is to why they think that is relevant,

12  you know, I'm not really sure I understand if there's

13  any relevancy other than it gives my opinions and

14  thoughts as to what documents are important to receive

15  from the FDA.

16           And so I really do believe that these are

17  work product and that it falls within the doctrine,

18  which means that the defendants need to be able to

19  prove that there's a substantial need under the court

20  rules for why they need these documents.  And they

21  clearly aren't able to reach that because, one, they

22  can make their own FOIA requests.  They can take my

23  request and make it themselves to the FDA and get the

24  same documents if they want.  And, two, they already

25  have these documents anyway.  So I don't think they're

May 8, 2015

Page 81

1  able to prove their burden as to what substantial need

2  there is in these documents.

3              THE COURT:  Mr. Carroll?

4              MR. CARROLL:  Good morning, Your Honor.

5              On November 6, 2013, Ms. Kessler sent a

6  Freedom of Information request to the FDA.  She gave

7  that to us, to both of us, in October 2014.  She

8  submitted that with a reply brief on the motion to

9  compel.

10             I don't agree that the Rhone-Poulenc case,

11 which is a 1991 Eastern District of Pennsylvania

12 unreported decision by the magistrate judge, is good

13 law.  I don't agree that that case applies here.

14             Assume for the sake of argument that it

15 does.  That case says the grouping of the request is

16 work product.  That's what it says right in the last

17 page of the opinion.  That's the phrase it uses,

18 "grouping."

19             I have the grouping.  Got it back in

20 October 2014.  Don't need anything else other than the

21 documents.

22             When we were on phone with Your Honor back

23 in December, you said this wasn't necessary for formal

24 motion.  You warned Ms. Kessler that no one would ever

25 come into your courtroom for a trial and be surprised

May 8, 2015

Page 82

1    by documents.

2              THE COURT:  Nobody is going to be surprised

3    if I can help it.

4              MR. CARROLL:  I remembered that statement,

5    Your Honor.  You didn't want Ms. Kessler to undergo the

6    expense of copying the document, so you told her to

7    give us a list.  The list was specific.  It had to be

8    enough of a list so that we could go back and identify,

9    from the millions and millions of pages of documents

10   that we have, what these were.

11             The list was not sufficient.  After the

12   insufficient list was served, Ms. Kessler then, on

13   January 22nd, if I recall, sent you a letter citing the

14   Rhone-Poulenc case.  We're not after work product.  To

15   the degree that work product was involved, it was

16   provided.

17             THE COURT:  I think everybody is going to

18   have to enlighten me as to what they think work product

19   is, because I think we have a definition.

20             MR. CARROLL:  Well, again, I don't agree

21   that the Rhone-Poulenc case applies, I don't agree it's

22   good law.  But if Ms. Kessler wants to ride that

23   case --

24             THE COURT:  I'm in agreement with you that

25   I'm not bound by it.  I think Ms. Kessler is in

May 8, 2015

Page 83

1   agreement with that also.

2           MR. CARROLL:  Right.  But that's all Ms.

3   Kessler has argued.  Under Rhone-Poulenc, she doesn't

4   have to produce documents.  Rhone-Poulenc's stance for

5   the proposition that she doesn't have to produce the

6   grouping of the document request, not the documents.

7   Those are our documents.  The FDA decides what they

8   want to respond to with Ms. Kessler's letter, and we're

9   entitled to know what the FDA responded with.  That's

10  all we're asking for.

11          MR. SLATER:  Your Honor, since this has

12  wider ramifications, obviously --

13          THE COURT:  Hold on.  I don't really know

14  if I'm going to let both of you argue this.

15          MR. SLATER:  I'm sorry.

16          THE COURT:  You huddle and decide who's

17  going to argue it.  I'm very serious.

18          MR. SLATER:  I understand.

19          THE COURT:  Who's going to argue?

20          I run into this every now and then in

21  trials.  When somebody starts with an issue, it's

22  usually their issue.

23          He made -- so if you're going to argue it,

24  then she is going to stay where she's seated and you're

25  going to argue it and you're going to respond from here

May 8, 2015

Page 84

1    on out.  If not, then I'm going to deal with Ms.

2    Kessler.

3               So what's your choice?

4               MR. SLATER:  No.  Understood.  It is Ms.

5    Kessler it was moved against.  My only concern was

6    because they would then try to take this ruling and use

7    it against other counsel in the litigation, that was my

8    concern.

9               THE COURT:  Well, look, there is a thing

10   called law of the case.  And it remains discretionary.

11   But it also, especially when you're in front of the

12   same judge, it is the law of the case pretty much.

13              But I think we interrupted Mr. Carroll, so

14   let him finish.

15              MR. CARROLL:  Thank you, Your Honor.

16              Turn to the issue of the cross-motion for

17   protective order.  The only thing that would be subject

18   under Rhone-Poulenc to a protective order is what I

19   already have.  There are other things that Ms. Kessler

20   claims are privileged, other than the documents which

21   are defendants' own documents, that at the very least

22   we get a privilege log.  But as to a cross-motion for a

23   protective order, there's no privilege.  We're not

24   seeking anything that's privileged.  And there's no

25   undue burden, there's no harassment, there's nothing in

May 8, 2015

Page 85

1    the Rule 4:10-3 that plaintiff has satisfied her

2    burden.  It's just not there.

3              It's very simple.  We want the documents

4    that came back from the FDA.  That's what we want to

5    know.  End of the argument.

6              MS. KESSLER:  Your Honor --

7              THE COURT:  You have the floor.

8              MS. KESSLER:  -- I think we need to take a

9    procedural step back here.  That, first, the question

10   that they're seeking this information through is one of

11   these questions that we discussed before that I believe

12   is inappropriate.  They're saying that they're entitled

13   to these documents that we received from the FOIA

14   through this question.  It's Request Number 14.

15             THE COURT:  I need to point out to you, and

16   I'm going to use this term throughout, they're public

17   records.  They're documents, but they're also public

18   records.  Some documents are corporate documents.  Some

19   documents are personal, confidential documents.  These

20   are public records.  So all this stuff that's

21   downstairs in the clerk's office, public records.

22             MS. KESSLER:  Uh-huh.  And, Your Honor,

23   it's public records with the FDA.  That's available,

24   just as available for the defendants to get as to what

25   I've gotten.  But as to what I actually received, I

May 8, 2015

Page 86

```
 1    didn't receive just what was publicly available from
 2    the FDA.  I made a request asking for these large
 3    categories of documents that are very broad that I
 4    don't think gives any impression as to what I think is
 5    important, but then I had ongoing conversations with
 6    the FDA and their FOIA office.
 7              THE COURT:  And I recall you telling me
 8    that in our first phone conversation.  It was sort of a
 9    negotiation process.
10              MS. KESSLER:  Uh-huh.  Exactly.  And that's
11    where we narrowed it down.  And, you know, it was a
12    conversation where typically, I was told, that the
13    broad request that I gave to them takes about two years
14    to respond.  And so we had a negotiation --
15              THE COURT:  See, ain't that great?
16              MS. KESSLER:  -- and a discussion as to,
17    well, you know, what is it that I'm truly really
18    seeking on an expedited basis.  And that's why I
19    received documents as quickly as I did.
20              As to what particular documents I got,
21    that's a clear grouping.  And Rhone-Poulenc, what Mr.
22    Carroll said, is Rhone-Poulenc says that "requesting
23    and receiving only certain documents that are available
24    to the public is a clear group."  It's not just saying
25    that the grouping itself, the letter that I sent,
```

May 8, 2015

Page 87

```
 1   that's the grouping.  It's what I received that's the
 2   grouping that's protected under the work product
 3   doctrine.
 4            And just procedurally another -- about this
 5   motion is they're also in their proposed order, so this
 6   is not just about the FOIA documents.  They move on all
 7   these other requests too.  So if we're just narrowly
 8   talking about the FOIA documents, I think that's one
 9   thing.  But, again, it's through these questions that
10   are truly inappropriate.
11            I mean, Number 14 that they're claiming
12   entitles them to these documents, I just would like to
13   read it.  "All documents concerning Benicar, Benicar
14   HCT, Azor and Tribenzor that plaintiff or plaintiff's
15   agents or attorneys have received from any source."
16   That's a very problematic question.
17            THE COURT:  A very broad question.
18            MS. KESSLER:  I don't know if we even need
19   to get to the point about these FOIA documents.
20            THE COURT:  My focus right now, because
21   what's before the Court is your request for a
22   protective order on the documents you received on your
23   FOIA request.  So whatever I rule on today is that.
24            MS. KESSLER:  Is just limited to that.  I
25   understand.
```

May 8, 2015

1              MR. CARROLL:  Well, let's go to the

2      response to Number 14.

3              "Plaintiff states she has none in her

4      possession."  We accepted that.  We accepted that until

5      October last year when we got a letter.  Ms. Kessler

6      informed us that she had obtained documents from the

7      FDA.  And don't forget the argument there was that we

8      didn't need a protective order for anything in the FDA

9      because she went and got documents from the NDA -- from

10     the FDA, excuse me.

11             What Ms. Kessler is talking about here is

12     not her thought process, it's what the FDA decided to

13     give her in response to this letter.  We're entitled to

14     know that.  What the FDA did is not work product.  What

15     the FDA gave her is not work product.  We're entitled

16     to have it.  You said we should have it back in

17     December.

18             THE COURT:  And we need to talk about --

19     and I'll let Ms. Kessler start.  We need to talk about

20     how do we define work product.

21             MS. KESSLER:  I think Hickman Taylor is,

22     you know, the best place to start, with the Supreme

23     Court that said that the lawyers need to be free from

24     unnecessary intrusion by opposing parties and counsel,

25     that we --

May 8, 2015

Page 89

1             THE COURT:  That's not a definition, that's

2    a statement of a perspective.  What's the definition of

3    work product?  Because it's readily available, the

4    definition.

5             MS. KESSLER:  I think there's two things.

6    First is they have to prove relevancy.

7             THE COURT:  Again, you're not -- I'm sorry.

8    You're not -- relevancy is not a definition of work

9    product.

10             MS. KESSLER:  Well, Rhone-Poulenc, how they

11    define work product, and how these cases in Jersey also

12    define work product, it's the thoughts, the opinions,

13    the investigation and the resourcefulness of the lawyer

14    involved.

15             And on top of it, there's another --

16             THE COURT:  You're almost there.  You're

17    almost there to the definition.

18             MS. KESSLER:  There's another limitation as

19    to what's discoverable in Jersey, and that's factual

20    information, that discovery is based on what factually

21    exists.  What they're seeking from me has to do with

22    legal theory.  It has to do with my thoughts and

23    opinions.  Making a FOIA request to the FDA, that was

24    my investigation, my resourcefulness.  And it was a

25    result of me knowing and understanding that it would

May 8, 2015

Page 90

1    take me a long time to get these documents from the

2    defendants, that I want to know before, in anticipation

3    of filing these claims for my clients, that I would

4    understand some of the communication that was happening

5    between the FDA.  And what I believe was most important

6    to pursue these cases.  It's truly a thought process.

7    It's my resourcefulness.  It's my investigation.  And

8    it should --

9              THE COURT:  No, no, no, no.  You're --

10   it's -- we're focused on public records.  And my

11   question is, what's in those that's work product?

12             MS. KESSLER:  I think it's the documents

13   that I received from the FDA is work product because it

14   includes my thoughts and my mental impressions as to

15   what's important.

16             THE COURT:  When I look at Rule 4:10-2(c),

17   and I don't know this for certain, but I think Judge

18   Pressler had a whole lot to do with what I think

19   amounts to a codification, a codification of attorney

20   work product under New Jersey common law.  And how she

21   defines it, if you look at the last sentence of

22   subsection c of 4:10-2, "In ordering discovery of such

23   materials when the required showing has been made, the

24   court shall protect against disclosure the mental

25   impressions, conclusions, opinions, or legal theories

May 8, 2015

Page 91

1    of an attorney or other representative of a party

2    concerning the litigation."

3              And then -- and I know this is her

4    language -- when you go to -- and I'm a huge admirer of

5    Judge Pressler.  There's some people you wish could

6    live forever so you can have them around to pick their

7    brain.  And I got to know her through Judge King,

8    because Judge King was a friend of my original mentor,

9    who is still kicking around at 83, practicing law.  But

10   they grew up together in Camden, so I got to know Judge

11   King through John Berman.  And I got to know Judge

12   Pressler through Judge King.

13             And when I look at 4.1, note 4.1 of

14   4:10-2(c), a very simple declaratory statement.  "The

15   fundamental test of applicability of the work product

16   privilege is whether the material sought to be

17   discovered were prepared in anticipation of litigation

18   rather than the ordinary course of business."

19             That last phrase we can forget about.

20             But I'm considering these documents, and

21   I'm saying to myself, they weren't prepared by a

22   lawyer.  They weren't prepared by a lawyer in

23   anticipation of a litigation.  They weren't prepared by

24   a lawyer representing the plaintiff.  There's my

25   problem.

May 8, 2015

Page 92

1              MS. KESSLER:  I don't think the documents

2    themselves have to be prepared by a lawyer.  I think

3    it's the grouping of the documents that shows the

4    mental impression --

5              THE COURT:  Well, that's a novel argument

6    and that's a novel approach to the law by the decision

7    that you're relying upon, but I don't think there's

8    anything in New Jersey law that supports this position.

9              MS. KESSLER:  Well, it's the case that they

10   cite, Dougherty, that they believe supports their

11   position.  The reason why the Court decided that open

12   court testimony -- that the testimony, the transcript

13   of what had happened in open court was not work

14   product, is because they said -- the Court noted that

15   the hearing transcript was not "a product of counsel's

16   investigation or resourcefulness," that sending a court

17   reporter to just transcribe what occurred in open court

18   does not reflect any mental impressions, it does not

19   reflect any thought process.

20             THE COURT:  You're asking for specific

21   documents to be protected and kept from your adversary.

22   And I sat down the other night, after having reviewed

23   everything.  And let me read for you my list of how I

24   view this.  And you can respond one by one, but tell me

25   what I got wrong here.

May 8, 2015

Page 93

1              Okay.  The contents of these public records

2    were not created in anticipation of litigation, nor

3    were they prepared by plaintiffs' counsel.

4              MS. KESSLER:  But --

5              THE COURT:  Do I have that wrong?

6              MS. KESSLER:  The documents themselves, the

7    documents that the FDA have --

8              THE COURT:  Because I'll recognize some of

9    those documents could have been prepared by a lawyer,

10   but they weren't prepared by you.

11             MS. KESSLER:  I agree with that.

12             THE COURT:  And they weren't prepared in

13   anticipation of litigation.

14             MS. KESSLER:  But the request that I made,

15   the fact that a request was even made, that was

16   prepared by me.

17             THE COURT:  I know that, but that's not the

18   document that you're asking to be protected.

19             MS. KESSLER:  But the document -- by

20   producing the documents, it does produce my mental

21   impressions.

22             THE COURT:  Ah.  Let me go through my list,

23   because I think -- I think that you think we're a whole

24   lot brighter than maybe we are.  Okay?  Because your

25   implicit -- I think implicit in what you're saying is

May 8, 2015

Page 94

1    an assumption that we can extrapolate backwards from

2    the results of the selection process to determine the

3    reason that the record was obtained by you in the first

4    place.  I don't know if we can.

5            This is not like case law at all.  In case

6    law, you got the conclusions, you got the reasoning,

7    you know it's right there, the judge articulated it.

8    But you're assuming that we're going to be able to read

9    your mind.

10           MS. KESSLER:  I don't think I'm assuming

11   that.  I think it's clear that the defendants have what

12   I requested, which are very broad categories which I do

13   not think show my process.  But either way, that was a

14   limited waiver for the purpose of the Rahman motion to

15   compel.

16           On top of that, I received a fraction of

17   what I requested from the FDA.

18           THE COURT:  But you're asking me to stray

19   from the rule.  You're asking me to ignore the

20   codification that I think Judge Pressler wrote.  And

21   you're asking me to say something new that I don't

22   think has been done in New Jersey law.  I mean, that

23   rule reads the way it reads for a reason.  Mental

24   impressions, conclusions, opinions or legal theories

25   that were articulated by the party's lawyer.  And we

May 8, 2015

1    don't have that situation here at all.  We really

2    don't.

3                This is a novel argument, but I don't think

4    it's supported by the rule and I don't think it's

5    supported by any New Jersey case law.

6                MS. KESSLER:  I think it is, Your Honor.

7    And I think Rhone-Poulenc defines that for us.

8                THE COURT:  That's not New Jersey case law.

9                MS. KESSLER:  I know it's not New Jersey

10   case law, but it explains that a grouping means a

11   thought process, it is a mental impression.  And the

12   grouping of the documents that I received back from the

13   FDA --

14               THE COURT:  So you're asking me to

15   ignore -- and, see, I don't know if we can do -- if you

16   can do this both ways.

17               You're asking me to ignore the contents of

18   the documents because we agree, they weren't prepared

19   by you, and they don't contain your opinions or

20   medical -- mental impressions.  But then the flip side

21   of that is you're asking me to assume that when

22   somebody reads those documents, then they're going to

23   have a window into your mind.

24               MS. KESSLER:  Your Honor, I'm asking that

25   the defendants need to show that there's a substantial

May 8, 2015

Page 96

1   need --

2                   THE COURT:  No, no, no, no.  You have the

3   burden of proof.  Case law is real clear.

4                   MS. KESSLER:  For the protective --

5                   THE COURT:  On the request for a protective

6   order, you have the burden of proof.

7                   MS. KESSLER:  But they also have the burden

8   of proof on their motion to compel.  And if their

9   question itself is not proper, then whatever flows from

10  that --

11                  THE COURT:  Eh.

12                  MS. KESSLER:  But I understand what you're

13  saying, Your Honor.  But at the end of the day, this

14  information is available to the defendants.  Whatever

15  the FDA has, they also already have.  And on top of it,

16  they can make their own request, their own FOIA

17  request, and get these documents themselves.

18                  So why are they seeking these documents

19  from me?  How are they relevant, other than to show my

20  mental process when they already have these documents?

21  There's no substantial need to produce these documents.

22                  THE COURT:  Well, what I -- here's what I

23  do know.  And we're going to let Mr. Carroll speak for

24  himself.  What I do know is there's a lot of documents

25  here.  Okay?  And so if they -- you know, sort of like

May 8, 2015

Page 97

1    weeding the garden.  If they can figure out, you know,

2    what's real and what isn't, they're going to be further

3    along than they are.

4              But, Mr. Carroll, why don't you respond to

5    that question.  Why do you need them other than to have

6    a window into her brain?

7              MR. CARROLL:  I have the window into her

8    brain.  I got it in October of last year.

9              I'm entitled to know what documents

10   involving our products are in the plaintiffs'

11   possession.  When we asked that question, it was after

12   this request was made.  The response wasn't, I have

13   documents but they're privileged.  The response was,

14   none.  That was incorrect then.  It's incorrect now.

15             Rhone-Poulenc, any way you read it, doesn't

16   apply here.  Ms. Kessler said a few moments ago that

17   they're on limited waiver.  If Rhone-Poulenc applies,

18   and I don't agree that it does, this letter waived any

19   attorney-client work product as to what came back.

20             Again, what she has isn't a result of what

21   she asked for.  What she has is a result of the FDA's

22   decision on how to respond to the grouping that she

23   provided both to the Court and the defendants last

24   year.

25             This is work product.  Your Honor is

May 8, 2015

Page 98

1   correct.  I'm not going to beat a dead horse here.  But

2   Ms. Kessler is asking the Court to depart from the

3   rule, to depart from New Jersey law, and adopt an

4   unreported 1991 Eastern District of Pennsylvania case

5   that's got a lot of red flags on it.

6           The analysis, if you accept it for the

7   purposes of this motion, doesn't apply.  Why?  We have

8   the grouping.  Why do we have the grouping?  It was

9   given to us.  And until we got the grouping, we didn't

10  know that there had been records received from the FDA.

11  It's responsive to our Request for Production Number

12  14.  We need to get the documents.  We're entitled to

13  the documents.

14          MS. KESSLER:  Your Honor, if they agree

15  that it's work product, then we're under Rule 4:10-2,

16  which, again, they need to show a substantial need.

17  And under Kinsella, there's three things that the

18  defendants must to show:  One, a legitimate need for

19  the evidence; its relevance to any issue before the

20  Court; and, three, lack of availability from any less

21  intrusive source.

22          Again, they can make a FOIA request, they

23  can take my request, my categories and do the same

24  things and probably receive the documents in a short

25  period of time also.  There's nothing preventing them

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

1    from getting these documents.

2              And, two, they have these documents.  Any

3    communications that they had with the FDA and the

4    communications that the FDA had with them, they already

5    have.

6              So, again, Mr. Carroll is not answering the

7    question as to why, what substantial need is there to

8    receive these documents from me, other than the fact

9    that it does show my mental impressions, my thoughts

10   and process.

11             And just to make this point again, the

12   requested stuff that I made to the FDA, there's no

13   question that's work product.  And anything that flows

14   from that, anything that I receive from the FDA, all

15   falls within the work product doctrine, whether it's

16   public records or not.

17             THE COURT:  It doesn't fall within the

18   definition prescribed by Judge Pressler.  There's my

19   problem.

20             MS. KESSLER:  Anything prepared in

21   anticipation of litigation that shows the mental

22   impressions.

23             THE COURT:  Yeah, but these documents

24   weren't prepared by you in anticipation of litigation.

25             MS. KESSLER:  It absolutely was.  The

May 8, 2015

Page 100

1    request that I made to the FDA --

2              THE COURT:  The documents are public

3    records.  The documents are public records that you got

4    from FDA.  That's what these documents -- I mean, you

5    want me to ignore what these documents are?

6              MS. KESSLER:  But how I got the documents

7    matter, Your Honor.  And I got it through a FOIA

8    request that I made in anticipation of litigation.

9              THE COURT:  I don't -- I honestly don't --

10   I think, candidly, the issue that you have framed

11   here -- and this is -- I am enjoying this.  Don't think

12   I'm not.  I think it's an issue of first impression.  I

13   don't think a New Jersey court has ruled on this

14   question.  We're talking public records.  We're not

15   talking about general documents that are in somebody's

16   possession because of an estate or because of a

17   business or because of, you know, some sort of

18   confidential exchange that may have been prepared by a

19   lawyer or not.  We're talking about public records.

20             MS. KESSLER:  All right, Your Honor, then

21   let me maybe use an analogy, because a lot of the

22   information that the defendant -- that's relevant to

23   this case potentially is also available publicly.  You

24   can Google --

25             THE COURT:  That's true.

May 8, 2015

Page 101

1           MS. KESSLER:  -- you can do this.  All

2    this -- just because it's available publicly doesn't

3    mean that it's suddenly not work product.  And the

4    request that I made to the FOIA, that was clearly in

5    anticipation of litigation.  I don't think that's even

6    in dispute, the reason why I requested these records.

7           And so anything that flows from that, the

8    documents that I received, they're protected under this

9    doctrine.  And it's a very dangerous road to go down,

10   that if it's not protected, that these sort of requests

11   as to how I'm compiling information to the defendants,

12   which aids not only discovery in this case but makes it

13   more efficient, which is why it was cited in the motion

14   to compel, because the defendants at that time were

15   claiming that everything I was seeking was

16   confidential.  And our concern was overdesignation.

17   And that concern is still there.  And that was the

18   purpose of why we were showing it.

19           I should be able to have an investigation

20   completely free of the defendants' ability to see what

21   I'm investigating and why it's important.  It's my

22   resourcefulness at the end of the day.  And I think

23   Dougherty supports that when they say that a court

24   transcript, you know, that's one thing.  Sending a

25   court reporter to transcribe what happens in open

May 8, 2015

Page 102

1    court, that's not resourcefulness, that's not

2    investigation.  But this negotiation that I had with he

3    FDA to receive documents that they originally told me

4    would take two years to gather, that I received on a

5    very short-term basis, what those documents are, that

6    is my thought process and that is my resourcefulness.

7                THE COURT:  I respect everything you say.

8                Mr. Carroll?

9                MR. CARROLL:  Correction first, Your Honor,

10   I am not admitting that this is work product.

11               THE COURT:  I didn't think you did.

12               MR. CARROLL:  Well, I heard that.

13               THE COURT:  I heard it too, but I don't

14   think you had it.

15               MR. CARROLL:  Want to make that clear.

16               We don't want to be surprised.  We want to

17   know what Ms. Kessler got.  And we don't know if there

18   are internal FDA documents that we don't have in there.

19   We don't know.

20               Don't forget, in response to the request

21   for production, all documents regarding Benicar, we

22   don't have any.  It wasn't true then.  It's not true

23   now.  We're entitled to the documents.

24               Thank you, Your Honor.

25               THE COURT:  Okay.

May 8, 2015

Page 103

1          Ms. Kessler?

2          MS. KESSLER:  Your Honor, so Mr. Carroll

3    has not answered the question as to why they need these

4    documents from me.  They can make a FOIA request.  They

5    can get these documents.  If they're concerned that in

6    their own defendant and their own client records that

7    they don't have complete internal documents, then make

8    a FOIA request.  There's nothing that's stopping them.

9    I am fine with them taking my letter and making a

10   request.  That's fine.  I will even pay the cost of

11   that or split the cost with them.  It's about $120, and

12   it takes about a couple weeks.

13          You know, it's not -- but this grouping,

14   these documents that I received after negotiating with

15   the FDA, they are work product.  And I think we need to

16   go back and that, on their motion to compel, that the

17   basis that they're compelling this information is in a

18   very problematic and inappropriate question.  And

19   that's their only basis for saying that they're

20   entitled to this information.

21          So if the question itself falls, you know,

22   this whole argument that flows from it also falls.

23          Thank you.

24          MR. CARROLL:  These are documents that

25   were --

May 8, 2015

```
 1              THE COURT:  Do you think there's a chance
 2    you really don't have any of these documents somewhere?
 3              MR. CARROLL:  I don't know.  Yes, there is
 4    a chance.  I simply don't know.
 5              These are not attorney work product
 6    documents.  They weren't created by an attorney.  And
 7    this is a point you made back in December or January.
 8    They weren't created by an attorney.  They're not
 9    attorney work product.
10              THE COURT:  Well, some of them may have
11    been created by some attorney somewhere.
12              MR. CARROLL:  Not the attorney who's trying
13    to claim work product, Your Honor.
14              THE COURT:  Okay.  Go ahead.  I'm not
15    cutting you off.
16              MS. KESSLER:  One more analogy would be,
17    there's a lot of information public about our
18    plaintiffs also.  You know, I'm sure they're Googling,
19    I'm sure they're mining this information.
20              THE COURT:  Boy, what a world we're living
21    in now.  Right?  The things that I see litigants put on
22    their Facebook pages?  Wow.  Talk about fools.
23              MS. KESSLER:  Well, that's scary.
24              THE COURT:  I see it all the time.  And
25    read the contract with Facebook.  You have no
```

May 8, 2015

1   expectation of privacy.

2           MS. KESSLER:  Are we then also entitled to

3   their investigation that they're having -- undergoing?

4   I'm sure they're doing background checks.  I'm sure

5   they're mining social media information.  You know,

6   they're fully investigating our clients too.  Are we

7   entitled to that investigation that they're doing also?

8   You know --

9           THE COURT:  Well, the answer is, you may be

10  entitled to it at some point if they decide they're

11  going to rely upon it.  I don't know -- we're -- you

12  and I are, for purposes of this dialogue, assuming that

13  they did something like that.  I don't know if they did

14  or they didn't.  And if they did and they're going to

15  rely up on it, we'll all know about it because there

16  won't be any secrets.

17          MS. KESSLER:  Your Honor, I never said I'm

18  relying on this information.  I need to have the

19  documents authenticated by the defendants.  They need

20  to come from the defendants.

21          THE COURT:  Okay.  Anything else?

22          MR. CARROLL:  Nothing further, Your Honor.

23          THE COURT:  Okay.  All right.  I will have

24  my ruling on the protective order soon.  I do not

25  procrastinate.  There's a couple other things that I

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 106

1    want to look at, but I'll do my best to get it done

2    very quickly.

3              Now, anything else we need to resolve

4    before we break?  Because I think you have IT people

5    that need to speak with our IT people and get you set

6    up.

7              Who's going to go first on the Science Day?

8              MS. SHARKO:  Oh.

9              THE COURT:  Did you agree on that?

10             MS. SHARKO:  No.  I submitted to the

11   plaintiff a day or two ago that I should go first since

12   it's our product.  They told me like at 7:00 last night

13   they disagreed, so --

14             THE COURT:  Flip a coin.

15             MS. SHARKO:  I think it's for Your Honor to

16   choose.

17             THE COURT:  Flip a coin.  Does anybody have

18   a coin?  I have a couple mints, which I should probably

19   hold on.

20             MR. CARROLL:  I've got a coin.

21             THE COURT:  You two flip a coin.  It

22   doesn't matter to me who goes first.  I thought maybe

23   you had agreed on that.

24             MR. CARROLL:  What's your call?

25             MR. SLATER:  Oh.  Let me see that coin.

May 8, 2015

```
 1                     I'll let him flip it and I'll let Ms.

 2    Sharko call it.

 3                     THE COURT:  You going to call it?

 4                     MS. SHARKO:  Heads.

 5                     THE COURT:  Let it drop on the floor.

 6                     What is it?

 7                     MR. CARROLL:  Heads, Your Honor.

 8                     THE COURT:  Okay.  So your choice.

 9                     MS. SHARKO:  I'd like to go first.

10                     THE COURT:  Okay.

11                     MR. SLATER:  You'll receive, okay.

12                     THE COURT:  Okay.  Each side has an hour.

13    And we'll take whatever break makes sense in between

14    the two presentations, 10 minutes, 15 minutes.

15                     MR. SLATER:  There are a couple other

16    issues that I would like to address for the case

17    management conference, but I don't want to usurp on the

18    Science Day.  We're good for this afternoon then?

19                     THE COURT:  Yep.

20                     MR. SLATER:  Okay.  Your Honor, just for

21    the record, Ms. Sharko had mentioned something about an

22    agreement we reached in Anzalone.  I think we should at

23    least have it on the record.  One of my cases is the

24    Anzalone case.

25                     MS. SHARKO:  Do you want to put the whole
```

May 8, 2015

Page 108

1    agreement on the record?

2                    MR. SLATER:  No.  Just the admissions.

3                    MS. SHARKO:  It's everything or nothing.

4                    MR. SLATER:  I don't understand that.

5    We're going to talk.  We'll talk to you in the

6    afternoon about that.  I just got confused by

7    something.

8                    The other thing is, there are other aspects

9    of discovery.

10                   THE COURT:  I'm hoping we're going to talk

11   about some sort of schedule for depositions of fact

12   witnesses starting with the plaintiffs.

13                   MR. SLATER:  All right.  I think that that

14   should probably be part of the meet and confer process

15   in the next few weeks.

16                   THE COURT:  I'm okay with that too.

17                   MR. SLATER:  Okay.  And I think we're

18   agreeable to that.  We'll figure out what makes sense

19   to stagger them in a reasonable way.

20                   There are various categories of discovery

21   that earlier counsel had said, you know, nobody has

22   asked for anything else since they started to produce.

23   We've actually been having an ongoing meet and confer

24   process in earnest.  It went from January to about

25   March.  And there's various aspects of information that

May 8, 2015

1   the defense has assured us you're going to get this,

2   you're going to get this; however, a lot of it has not

3   been produced.  And I would think that just by having

4   an open discussion real quickly, I think we can

5   probably get assurances and get some deadlines, because

6   a lot of it is foundational.  For example --

7            MS. SHARKO:  Can I suggest we have a meet

8   and confer?  I have no idea --

9            MR. SLATER:  We've done it for five months.

10  That's the problem.  That's why I'm here to raise it

11  now.

12           MS. SHARKO:  I have no ideas what issues

13  Mr. Slater is going to raise.  I think we should talk

14  about it.

15           THE COURT:  All right.  Here.  My notes say

16  that you're going to each be furnishing additional

17  discovery to the other by June 26th and that prior to

18  that date you're going to meet and confer.  So what

19  happens on the 26th is that you give each other

20  everything you think the other one is entitled to.

21           And I think rather than any sort of

22  telephone conference call, that we'll meet, you know,

23  the Court with the two litigants will meet and confer

24  in July, and we can have an on-the-record management

25  conference in our conference room.  I'll pick a date in

Golkow Technologies, Inc. - 1.877.370.DEPS

May 8, 2015

Page 110

1    July.  This is May, so I hope whatever date I pick will

2    give you enough notice.

3                 And whatever issues are outstanding then,

4    we'll try to reasonably get to a solution.  And then

5    enter an order that will address all the issues that

6    you've agreed to and all the issues that you've forced

7    me to make a decision upon because you couldn't agree

8    to.

9                 How does that work?

10                MR. SLATER:  That's fine.

11                MS. SHARKO:  That's fine.

12                MR. SLATER:  And many of these will

13   probably be resolved before that.

14                THE COURT:  It will be early July.  You

15   know, it won't be -- you're going to get everything you

16   want done on your end by June 26th, and sometime

17   probably within the first 14 days or earlier in July,

18   we'll meet.  It will be sometime within the first two

19   weeks.

20                MR. SLATER:  That's fine.

21                THE COURT:  Does that make sense?

22                MR. SLATER:  You said it.  It makes sense.

23                THE COURT:  Okay.

24                MS. SHARKO:  The only remaining issue then

25   is Ms. Kessler, who is the person who brought us here

May 8, 2015

1    to Atlantic County, has started to file cases in other

2    courts around the state for out-of-state plaintiffs.

3              Our view is those cases should be --

4              THE COURT:  I can't stop her from doing

5    anything.  You know what?  I haven't -- you sent me an

6    order, and Paragraph 17 said that the -- do I have this

7    confused with another one?

8              MS. SHARKO:  This is -- that's an issue

9    in --

10             THE COURT:  Because it's you popping up

11   again.

12             I can't -- you know, until there's an MCL,

13   because, you know, in New Jersey we call it MCL.  Until

14   there's an MCL designation, she is free to file

15   wherever she wants.  You know, Judge Mendez had that

16   conversation with -- who was it, Ms. Allegretto?  Was

17   it Mr. Wolf?

18             MS. SHARKO:  Judge Martinotti?

19             THE COURT:  Yes, Mr. Wolf.

20             MS. SHARKO:  Okay.

21             THE COURT:  And the judiciary's attitude is

22   until there is an MCL designation or until the parties

23   agree otherwise, then somebody can make a motion or --

24   you know, I'm going to take -- we're talking about Talc

25   now for a moment.

May 8, 2015

```
                                                    Page 112
 1                   I'm going to take your Paragraph 17 in that
 2      order, and I'm basically going to say that, you know,
 3      either party is free to make whatever motion they want.
 4                   MS. SHARKO:  Okay.  That's fine.  That was
 5      the only disputed paragraph in that order.
 6                   THE COURT:  Yeah.  I was going to say.
 7                   And, Dane, do we have that in a Word?
 8                   MR. WUILLERMIN:  Yes.
 9                   THE COURT:  I didn't get a chance to talk
10      to Sheryl about changing that -- we have it in a Word
11      document?  So I'm going to change that paragraph --
12                   MS. SHARKO:  Okay.
13                   THE COURT:  -- to say that either party can
14      file a motion.
15                   But it holds true here.  She's going to
16      file wherever she wants to file.
17                   MS. SHARKO:  Okay.  Got it.  Thanks.
18                   THE COURT:  Okay.  Anything else?
19                   MS. KESSLER:  No, Your Honor.
20                   THE COURT:  Okay.  It's 10 of 12:00.  At
21      1:00 hopefully Judge Kugler, Judge Schneider and I
22      think their law clerks are coming, too, will be here
23      and we'll met -- be in here and Joe will escort you
24      back, but be in here a few minutes before 1:00 because
25      we'll get started as close to 1:00 as we can.  And
```

May 8, 2015

                                                    Page 113

1    we'll have our Science Day.

2                    You can leave everything right here.   It

3    will be safe.

4                    Let's go off the record.

5                    (Hearing concluded at approximately

6    11:49 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

May 8, 2015

Page 114

1                    C E R T I F I C A T I O N

2

3

4              I, ANN MARIE MITCHELL, CCR, RDR, CRR,

5     License Number 30XI00212000, an Official Court Reporter

6     in and for the State of New Jersey, do hereby certify

7     the foregoing to be prepared in full compliance with

8     the current Transcript Format for Judicial Proceedings

9     and is a true and accurate non-compressed transcript to

10    the best of my knowledge and ability.

11

12

13

14    _____

15    Ann Marie Mitchell, CCR-RMR-CRR          Date

16    Atlantic County Courthouse

17

18

19

20

21

22

23

24

25