[Doc. No. 392]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____

:

IN RE: BENICAR (OLMESARTAN)   :  Master Docket

:  No. 15-2606 (RBK/JS)

PRODUCTS LIABILITY LITIGATION  :

:

:

:

:

_____:

### MEMORANDUM OPINION AND ORDER[1]

Defendants' "woodshedding" motion asks the Court to dictate the content of the parties' communications with plaintiffs' treating and prescribing physicians.[2] First, defendants want to limit plaintiff's <u>ex parte</u> communications to only diagnosis, treatment and medical condition issues, and to bar discussions

---

[1]  The Court received defendants' Motion to Preclude "Woodshedding" [Doc. No. 392], plaintiffs' opposition [Doc. No. 422], and defendants' reply [Doc. No. 437]. The Court exercises its discretion not to hold oral argument. Fed. R. Civ. P. 78; L. Civ. R. 78.1.

[2] Presumably what defendants mean by "woodshedding" is an alleged attempt by plaintiffs' attorneys to taint and influence the testimony of plaintiffs' physicians. In this context one Court has referred to the term as "manipulating the physician's recollection of events and tainting their eventual deposition testimony." <u>In re Testosterone Replacement Therapy Products Liability Litigation</u> ("Testosterone"), MDL No. 2545, 2016 WL 929343, at *2, (N.D. Ill. March 7, 2016); <u>see also</u> <u>In re Yasmin & Yaz (Drosipirenone) Mktg., Sales and Products Liability Litig.</u>, MDL No. 2100, 2011 WL 9996459, at *1 (N.D. Ill. March 4, 2011)("woodshedding" refers to impermissibly coaching a witness or unfairly prejudicing a witness during <u>ex parte</u> communications).

regarding liability issues or theories, defendants' conduct, product warnings, or documents produced by any defendant or third party. Second, defendants want the Court to bless their communications with plaintiffs' physicians regarding their possible retention as a prospective or retained consulting or testifying physician-expert. Motions requesting this relief now appear to be de rigueur in Multidistrict Litigation ("MDL") and mass tort cases. The Court will add its voice to the developing case law. For the reasons to be discussed, defendants' motion is denied in part and granted in part. The request to limit plaintiffs' ex parte communications is denied. The request to authorize defendants' contacts for the purpose of expert retention is granted with conditions.

Background

    This is a 1200 plus case Multidistrict Litigation ("MDL") involving defendants' olmesartan prescription drugs.[3] The April 3, 2015 MDL Transfer Order [Doc. No. 1] states that plaintiffs are alleging they suffered "gastrointestinal injury, including sprue-like enteropathy, lymphocytic colitis, microscopic colitis, and collagenous colitis." Pursuant to CMO No. 15 [Doc. No. 193], the parties will soon identify 20 bellwether cases from a pool of 30 cases that were randomly selected. Once bellwether plaintiffs are identified defendants will undoubtedly

---

[3] These are Benicar®, Benicar HCT®, Azor®, and Tribenzor®.

take the depositions of their treating and prescribing physicians. In addition to the cases pending in this MDL, approximately 67 similar cases are pending in New Jersey state court. These cases have been consolidated in Atlantic County and are assigned to the Honorable Nelson C. Johnson.

Given the allegations in this MDL, plaintiffs' physicians are unquestionably important witnesses.[4] Therefore, defendants argue, they want to take advocacy out of the examining room and put it into the courtroom, and they want to put the parties on "equal footing." Brief at 1. To this end defendants propose to restrict plaintiffs' counsels' communications with plaintiffs' physicians. In summary, defendants ask for an Order:

> 1. Permitting plaintiffs' counsel to communicate with their clients' physicians regarding plaintiffs' diagnosis, treatment and medical condition.

> 2. Barring plaintiffs' counsel from engaging in ex parte communications with any MDL plaintiff's physician regarding liability issues or theories, defendants' conduct, product warnings, or documents produced in the case.

> 3. Permitting plaintiffs' counsel to communicate with a "reasonable number" of plaintiffs' physicians as a physician-expert provided that no substantive communications take place before the physician is asked if they want to be an expert and the physician expresses a bona fide interest in being considered as a retained expert.

> 4. If a plaintiffs' physician is consulted as an actual or potential expert, plaintiffs' counsel are

---

[4] Expert witnesses have not yet been identified.

> barred from sharing defendants' "internal documents" until after the physician's fact deposition. All other documents shown to the physician shall be produced five (5) days prior to the physician's fact deposition.

Defendants do not ask for leave to communicate with plaintiffs' physicians about anything other than their prospective or actual retention as a consulting or testifying physician-expert. Defendants acknowledge the physicians cannot be used against a present or former patient.

Defendants argue their requested relief protects the "sanctity" of the physician-patient relationship while at the same time putting the parties on "equal footing." Brief at 1. Defendants argue their proposed relief is "[e]ssential as a matter of due process and fundamental fairness," "[s]trongly supported by the case law," and "[c]onsistent with New Jersey case law." Id. at 2. Defendants want the Court to "allow for equal access to treating physicians" and to permit plaintiffs and defense counsel "to retain[] and engage in ex parte communications with a reasonable number of physicians[] with respect to the discovery pool plaintiffs[.]" Id. at 4.

Not surprisingly, plaintiffs object to defendants' requested relief. Plaintiffs argue the relief is unnecessary because there is no evidence plaintiffs' counsel acted improperly in their communications with any witness or potential witness. Brief at 1. Defendants also argue there is no support

for defendants' due process argument, and the "weight of authority" has rejected defendants' proposed relief. Id. at 1-2. In addition, plaintiffs argue defendants' "level the playing field" argument is "nonsensical" given the fact that "[f]or more than a decade Defendants have aggressively inundated physicians with information about the positive attributes of Benicar, while concealing information about its risks." Id. 2-3. Plaintiffs sum up their opposition by arguing defendants' proposed relief is "unnecessary, unworkable, unenforceable, unfair and would impose an unreasonable burden on the Plaintiffs." Id. at 3.

Discussion

At the outset, the Court acknowledges the flood of developing case law addressing the issues to be decided. Plaintiffs and defendants each cite to precedent to support their positions. This is not a surprise since Courts are given wide discretion to decide discovery and case management issues. Forrest v. Corzine, 757 F. Supp. 2d 473, 477 (D.N.J. 2010); Goodman v. Burlington Coat Factory, 292 F.R.D. 230, 233 (D.N.J. 2013).

1.   Ex Parte Contacts

As noted, defendants want to bar plaintiffs' counsels' communications with plaintiffs' physicians about anything other than plaintiffs' diagnosis, treatment and medical condition. This request is rooted in defendants' belief that otherwise

5

plaintiffs' counsel has "a unique and unfair opportunity to sway the perspective and testimony of key witnesses." Defendants' Brief ("DB") at 7. Further, according to defendants, since physicians may still be prescribing the drugs at issue, there is a "grave risk" plaintiffs could "unfairly influence the doctors' risk-benefit assessment of an FDA approved medicine that he/she is currently using successfully to treat patients." Id.

The problem with defendants' argument is that there is no credible evidence to support it. No contention has been made that plaintiffs' counsel engaged in any type of improper communication. Nor is there evidence plaintiffs' counsel made "a concerted effort to guide [plaintiffs'] physicians' testimony on important liability issue relating to defendants' conduct and warnings." DB at 3. The only instance defendants rely upon to support their argument is a reference to the February 7 and 8, 2013 trial testimony of a physician in a California "DePuy ASR Hip System" case. See DB at Exhibit A. The physician in that case testified he was "coached" by the plaintiff's lawyer. The fact that defendants can only cite to this one isolated instance even though tens and probably hundreds of thousands of MDL and mass tort cases have been filed, is evidence that defendants are proposing a solution to a problem that does not exist. "Putting a blanket restriction on every Plaintiff's attorney, which governs his or her communications with every treating physician,

is akin to using a sledgehammer to crack a nut." In re Xarelto (Rivaroxaban) Products Liability Litigation, MDL No. 2592, 2016 WL 915288, at *6 (E.D. La. March 9, 2016)(citation omitted). Defendants simply have not shown good cause to grant the protective order relief they request. Younes v. 7-Eleven, Inc., C.A. 13-3500 (RMB/JS) 2015 WL 1268313, at *4 (D.N.J. March 18, 2015)(denying protective order where the moving party did not show undue burden or expense)(citing cases).

Defendants' concern that plaintiffs' counsel may improperly influence plaintiffs' doctors is overblown. The Court agrees with Xarelto which expressed a healthy skepticism that plaintiffs' counsel could or would unduly influence the plaintiffs' physicians.

> Furthermore, physicians are learned professionals who have devoted themselves to the sciences. These individuals cannot be analogized to the cowed, reprimanded children referenced in the "woodshed" idiom. See Carothers v. Cty. of Cook, 808 F.3d 1140, 1149 (7th Cir. 2015)(citing From the Horse's Mouth: Oxford Dictionary of English Idioms 387 (John Ayto ed., 3rd ed. 2009). And to suggest that highly trained physicians would be unduly influenced by the comments of Plaintiffs' counsel fails to account for the healthy skepticism which exists between the members of these professions. The Court cannot conclude based on Defendants' sparse anecdotal evidence that physicians are a vulnerable or dishonest population. Assuming otherwise would disserve the medical profession.

Xarelto, at *5.

The fact that some physicians may still be prescribing the drugs at issue does not change the equation. Defendants argue:

> There is a grave risk that if the physician hears from counsel for only one side and receives an unrefuted advocacy presentation of the evidence, it could unfairly influence the doctor's risk-benefit assessment of an FDA-approved medicine that he/she is currently using successfully to treat patients. If in fact the physician changes his/her prescribing decisions as a result of such a one-sided presentation, it will affect not only the plaintiff but also the physicians' other patients, most of whom are using the product successfully, have not had a complication, are not involved in litigation, and have no counsel (but only the Court) to protect their interests.

DB at 7. The Court has more confidence in the medical profession and its professionals than defendants express. The Court is doubtful that plaintiffs' physicians can and will be duped, and that they will defer to plaintiffs' lawyers about what drugs to prescribe. Further, despite the fact that this ex parte issue has been circulating for years, defendants do not cite a single instance where a physician's treatment decisions were improperly influenced.

As evidenced by the DePuy trial testimony defendants rely upon, there is a significant deterrent to plaintiffs' counsel engaging in any improper "coaching." If this occurs, the expert runs the risk of getting obliterated on cross-examination as occurred at the DePuy trial. Defendants are also protected because they are free to question plaintiffs' physicians at their depositions and at trial regarding their contacts with plaintiffs' counsel. "[T]he Court prescribes a strong dose of

cross-examination as the cure for Defendants' perceived ills…. Cross-examination continues to be the most potent tool for diagnosing a failure to sustain credibility." Xarelto, at **12, 19; see also Testosterone, 2016 WL 929343, at *1, stating:

> Rights can, of course, be abused. Lawyers sometimes
> mislead or attempt to exert improper influence over
> witnesses while ostensibly preparing them to testify.
> But the fact that abuses are possible is not grounds
> to prohibit otherwise appropriate witness preparation.
> Rather, the law deals with such abuses in other ways:
> the opposing party may question the witness about his
> contacts with the other side to shed light on improper
> attempts to influence or mislead; may, with some
> limitations, obtain discovery regarding those
> contacts; and may, if the circumstances warrant, seek
> sanctions.

There is nothing uneven or unfair about the Court's ruling. In re Vioxx Products Liability Litigation, 230 F.R.D. 473, 477 (D. La. 2005). Defendants will still get all of plaintiff's medical records and completed fact sheets. Further, as noted, defendants are free to explore the extent of a physician's contacts with plaintiffs' counsel at the physician's deposition. And, as will be discussed, before a physician is deposed defendants will know about the physician's relevant pre-deposition communications with plaintiffs' counsel.

Defendants' due process argument carries little weight. Defendants are entitled to a fair but not perfect trial. Inequities are present in every litigation and it is virtually impossible to construct a perfectly level playing field. Xarelto

at *5 n.3 (citation and quotation omitted). If, as defendants argue, they want to be on an "equal footing" with plaintiffs, one wonders whether they would agree to limit their "ex parte" contacts with defense oriented fact witnesses such as present and former employees outside the "control group", ex-employee sales representatives, etc. Although possible, the Court is doubtful defendants would agree to a reciprocal limitation. Defendants argue if a bar Order is not entered plaintiffs' counsel has "a unique and unfair opportunity to sway the perspectives and testimony of key witnesses." DB at 7. Defendants ignore the fact plaintiffs can make essentially the same argument as to witnesses associated with the defendants. Moreover, it is disingenuous for defendants to ask to be put on an "equal footing" with plaintiffs when to date the physicians have been subject to defendants' marketing communications which likely extolled the benefits of their drugs.[5]

In addition to the fact there is no need to limit plaintiffs' counsels' communications, and defendants' interests are otherwise protected, there is another good reason to deny defendants' requested relief. That is, it will be almost

---

[5] Defendants should take some comfort in the fact that the persons to whom plaintiff can show defendants' "Protected Information" is limited. There is also a limit on the purposes for which defendants' "Protected Information" may be used. See Stipulated Discovery Protective Order [Doc. No. 46]; CMO No. 11, [Doc. No. 153].

impossible and certainly problematic to police the communications between plaintiffs' counsel and physicians. What may seem innocuous to plaintiffs may appear to be coaching to defendants. As the Court recently stated in <u>Xarelto</u>, at *5, "[t]he Court lacks the ability to surgically remove delicate insinuations from the individual sentences of Plaintiffs' counsel…. Simply put, the Defendants' request to cleanse advocacy from Plaintiffs' <u>ex parte</u> physician contacts may not be easily detectable and is not enforceable, and this Court will not issue a pretrial order which is impossible to police." Given the myriad of substantive and procedural issues the Court has to address in this MDL, there is no need to referee the side litigation likely to occur if defendants' restrictions are imposed.

Much of defendants' argument focuses on New Jersey law. Defendants contend New Jersey "fully supports" their requested restrictions on plaintiffs' counsels' communications with plaintiffs' physicians. Reply Brief ("RB") at 1. In addition, defendants argue that if the Court denies their motion it is "highly likely" the federal court and state court litigation will have different rules on this issue. <u>Id.</u> at 3.

To the extent defendants imply that New Jersey law controls, the Court disagrees. Since the Court is not addressing an outcome-determinative issue, and instead is deciding a

federal procedural and/or a discovery related issue, federal law applies. In re Zimmer NexGen Knee Implant Products Liability Litigation ("Zimmer NexGen"), 890 F. Supp. 2d 896, 901-03 (N.D. Ill. 2012)(under Erie analysis the Court is not required to apply state privilege law); Xarelto, at *4. Further, since defendants only rely on two New Jersey trial court decisions, there is hardly a groundswell of case law to support defendants' position. Thus, defendants overstate their case when they argue there is "clarity" in New Jersey law and it is "highly likely" if defendants' motion is denied the federal and state court litigation will have different rules. RB at 3.

Defendants' "uniformity" argument is also not compelling. For one, the Court does not know how Judge Johnson will rule on the present issue if and when it is presented in state court. The Court will not speculate how Judge Johnson will rule despite defendants' "expectation" that he will follow the New Jersey cases they cite. DB at 5. Further, the two New Jersey Law Division Opinions defendants rely upon are not controlling. The fact of the matter is there is no controlling New Jersey state law on whether the Court should or should not limit the communications between plaintiffs' counsel and physicians. In addition, while uniformity between the related federal and state

litigation is a laudable goal, it certainly is not determinative on discretionary discovery and case management issues.[6]

At bottom, however, the Court respectfully disagrees with the New Jersey precedent defendants rely upon. In Pelvic Mesh/Gynecare Litigation ("Pelvic Mesh"), ATL-L-6341-10 (N.J. Super. Ct. Law Div. Dec. 3, 2013), DB Exhibit C, the Court sided with the defendants even though it noted there was merit to both sides. Id. at 6. What ultimately swayed the Court was its "primary goal to ensure that no witnesses are unduly swayed by either side to modify their testimony." Id. Where this Court differs with Pelvic Mesh is that there is no evidence to support the notion that plaintiffs' physicians will in fact be unduly influenced. Also, Pelvic Mesh did not address two important justifications for this Court's ruling. First, the practical inability to effectively police the communications between plaintiffs' counsel and physicians. Second, that the physicians'

---

[6] The Court acknowledges defendants can file a Stempler motion in state court if they so choose. In Stempler v. Speidel, 100 N.J. 368 (1985), the New Jersey Supreme Court authorized the defendant to communicate with the decedent-plaintiff's treating physicians subject to certain conditions, but only with respect to matters relating to the litigation. Nevertheless, the Supreme Court was careful to point out that trial courts have flexibility "to fashion appropriate procedures in unusual cases without interfering unnecessarily with the use of personal interviews in routine cases." Id. at 383. These are certainly not routine cases. See Smith v. American Home Products Corp. Wyeth-Ayerst Pharmaceutical, 372 N.J. Super. 105, 136 (Law Div. 2003)(denying Stempler authorizations in a mass tort case). Thus, there is no guarantee if defendants file a Stempler motion in state court it will be granted.

depositions and cross-examination will reveal any improper influence, with possible devastating effects on the plaintiffs' cases.

Defendants also rely on Gaus v. Novartis Pharmaceutical Corp., Dkt. No. L-704-07-MT (a/k/a In re Aredia and Zometa Litig., Case No. 278)(N.J. Super. Ct. Law Div. Oct. 29, 2009)), DB Exhibit B. In Gaus the court spent almost all of its decision discussing why defendants would not be authorized to conduct ex parte interviews of the plaintiffs' physicians. In only one paragraph the court barred plaintiffs' ex parte contacts reasoning that "fairness" required that "both parties should have the same right of access to all non-party witnesses." Id. at 18. For the same reasons the Court declines to follow Pelvic Mesh, the Court respectfully declines to follow Gaus.

Although not specifically requested in defendants' motion, the Court agrees with recent decisions requiring plaintiffs to reveal their communications with plaintiffs' physicians before they are deposed. See, e.g., Xarelto, at *6; Testosterone, at *3. When the Court recently granted plaintiffs' request for the performance evaluations of defendants' former and present employees, it emphasized that it wanted to get to the "heart of the matter" without wasting limited deposition time. March 24, 2016 Order at 3-4, Doc. No. 435. The Court emphasized that one of its goals in managing discovery is to assure the parties'

focus on relevant rather than tangential issues. Id. This goal is furthered by requiring plaintiffs to disclose their relevant communications before a physician is deposed. While defendants undoubtedly could obtain information about plaintiffs' communications during a deposition, the earlier disclosure will enable defendants to get to the "heart of the matter" sooner rather than later. Accordingly, the Court will Order that before a plaintiff's treating or prescribing physician is deposed plaintiff shall document any pre-deposition communications they had with the physician, other than communications regarding a plaintiff's diagnosis, treatment or medical condition, or an inquiry regarding obtaining medical records or deposition scheduling. Plaintiffs must identify when the communication occurred, the means (in-person, telephone, email, etc.), its approximate duration, the participants, and the identity of any documents or electronically stored information shown, provided to or otherwise described to the physician. All written communications shall be produced. This discovery shall be produced to defendants at least two (2) weeks before the first scheduled date of the physician's deposition.

2.   Ex Parte Contacts Concerning Expert Retention

In addition to seeking to limit plaintiffs' communications with treating physicians, defendants want the right to contact the physicians about their retention as consultants or experts.

In the most recent MDL cases discussing this issue, there is a consensus permitting these contacts. See, e.g., Xarelto, supra at *8; Zimmer NexGen, 890 F. Supp. 2d at 904-05; In re American Medical Systems, Inc. Pelvic Repair Systems Product Liability Litigation ("American Medical"), 946 F. Supp. 2d 512 (S.D. W. Va. 2013); In re Seroquel Products Liability Litigation ("Seroquel"), No.6:06-md-1769-Orl-22DAB, 2008 WL 821889 (M.D. Fl. March 21, 2008); see also In re Pelvic Mesh/Gynecare Litigation, 426 N.J. Super. 167 (App. Div. 2012).[7]

The Court cannot add much to the reasoning in the cited decisions. At bottom, defendants' right to retain qualified experts may be impaired if plaintiffs' treating and prescribing physicians are completely off-limits. Xarelto, at *8 ("Disallowing testimony from the many competent, articulate physicians who have prescribed Xarelto would impose a significant burden on the Defendants. The Court, and ultimately the jury, would also be deprived of physician-experts with firsthand clinical experience with the drugs in question"); Seroquel, at *4 ("A prohibition on … contacting and retaining physicians has the potential to deprive [defendants] of a fair

---

[7] The only federal case plaintiffs rely upon is In re Kugel Mesh Hernia Repair Patch Litigation ("Kugel Mesh"), MDL No. 07-1842 ML, 2008 WL 2420997 (D.R.I. Jan. 22, 2008)(barring defendants' contacts with plaintiffs' treating physicians) and 2008 WL 4372809 (D.R.I. Sept. 19, 2008)(barring defendants' communications with plaintiffs' treating physicians for the purpose of expert retention).

opportunity to present its defense"); NexGen, 890 F. Supp. 2d at 906 ("Defendants will be unfairly limited if the court were to exclude from the potential pool of experts all of the physicians who have treated the 500+ Plaintiffs whose cases have already been consolidated into this MDL"); see also Pelvic Mesh, 426 N.J. Super. at 195 ("Both sides in this litigation should have the opportunity to present evidence from the most qualified physicians who can serve as experts").[8]

Plaintiffs' arguments seeking to bar defendants' ex parte communications are not compelling. HIPAA is not a concern in this context since defendants will be barred from discussing with a physician a plaintiff's diagnosis, treatment and medical condition. Nor can a physician-expert testify against his or her patient. American Medical, 946 F. Supp. 2d at 515-16. There is, of course, the potential that defendants may attempt to influence plaintiffs' physicians. However, "the fear of improper influence cuts in both directions." NexGen, 890 F. Supp. 2d 907. Just as the Court counts on plaintiffs' counsel to abide by proper rules of conduct, the Court expects the same of defendants. It is noteworthy that none of the cases discussing whether defense ex parte contacts are permissible cite a single

---

[8] As decided in NexGen, 890 F. Supp. 2d at 905-06, before their proposed ex parte contacts, the Court will not first require defendants to establish that there are no qualified experts otherwise available.

instance of a defendant actually exerting improper influence. This is true even in Kugel Mesh, supra, the only case plaintiffs rely upon. In the unlikely event the need arises to address either side's improper ex parte contacts with plaintiffs' physicians, appropriate remedies and sanctions can be imposed. See Seroquel, at *4 ("[T]his authorization will be subject to review and potential modification as may be needed."). The fact that an improper contact may take place is not a reason to bar permissible communications.

Plaintiffs also have a concern that defendants' contacts may impinge on their physicians' duty of loyalty to their patients. The applicable case law discounts this argument. "Courts overstep their legitimate powers if they impose a duty of silence upon physicians to avoid taking substantive positons contrary to any patient's interests in litigation." Pelvic Mesh, 426 N.J. Super. at 195; see also NexGen, 890 F. Supp. 2d at 909 ("The patient's interest in the physician-patient relationship does not require a blanket prohibition against any treating physician serving as an expert witness for the defense in cases brought by other Plaintiffs."); American Medical, 946 F. Supp. 2d at 517 (citation and quotation omitted)(whether there is a conflict should be determined by the physician's professional judgment, not by the patient's lawyers, or the courts applying wholesale prohibition and disqualification rules).

The Court is not oblivious to the "potential for misuse of [its] authorization, the danger of inappropriate communications and the possibility of conflicts and complexities as the cases develop and the varying roles of physicians intertwine." Seroquel, 2008 WL 821889, at *4. Therefore, without micro-managing defendants' communications, the Court will impose reasonable conditions that should protect plaintiffs' interests. First, plaintiffs' physicians cannot work on a case involving his or her current or former patient. Nor can the physician communicate about these patients. Second, no substantive communications may take place before a plaintiff's physician expresses a bona fide interest in being considered as a retained expert. Third, defendants may only contact a "reasonable number" of physicians. At this time the Court will limit defendants to 25, with leave to request a higher number for good cause shown.[9] Four, the physicians that are contacted shall be given a copy of this Order before any material communications take place. Of course, nothing in this Order should be read to require any physician to participate in any ex parte communications with defendants (or plaintiffs). The physicians are also free to impose any reasonable condition they request that is not inconsistent with this Opinion and Order.

---

[9] NexGen, 890 F. Supp. 2d at 911-12 (by agreement defendants limited to contacting 25 physicians).

Conclusion and Order

Accordingly, for the foregoing reasons, it is hereby
ORDERED this 6th day of April, 2016, that defendants' Motion to
Preclude Woodshedding is DENIED in part and GRANTED in part; and
it is further

ORDERED that defendants' request that plaintiffs' counsels'
communications with plaintiffs' treating and prescribing
physicians be limited to just diagnosis, treatment and medical
condition issues is DENIED; and it is further

ORDERED that before a plaintiff's treating or prescribing
physician is deposed plaintiffs shall document any pre-
deposition communications they had with the physician, other
than communications regarding a plaintiff's diagnosis, treatment
and medical condition, or an inquiry regarding obtaining medical
records or deposition scheduling. Plaintiffs must identify when
the communication occurred, the means (in-person, telephone,
email, etc.), its approximate duration, the participants, and
the identity of any documents or electronically stored
information shown, provided or otherwise described to the
physician. All written communications shall be produced. This
discovery shall be produced to defendants at least two (2) weeks
before the first scheduled date of the physician's deposition;
and it is further

ORDERED that defendants' request to communicate with plaintiffs' treating or prescribing physicians about their possible retention as a consultant or expert is GRANTED, subject to the following conditions: (1) the physicians cannot work on a case involving his or her current or former patient, and cannot communicate about these patients. Defendants are responsible for assuring that the physicians they contact know the identities of the plaintiffs in this MDL and the related state litigation; (2) no substantive communications may take place before the physician expresses a <u>bona</u> <u>fide</u> interest in being considered as a retained consultant or expert; and (3) defendants may only contact 25 of plaintiffs' treating or prescribing physicians; and it is further

ORDERED that defendants may communicate with plaintiffs' physicians about ministerial issues such as obtaining medical records and scheduling depositions; and it is further

ORDERED that nothing in this Order requires a physician to participate in an <u>ex</u> <u>parte</u> communication with plaintiffs' counsel or defendants; and it is further

ORDERED that before defendants communicate with plaintiffs' treating or prescribing physicians about this litigation they shall be given a copy of this Order; and it is further

ORDERED that no physician is required to participate in any ex parte communication with defendants (or plaintiffs); and it is further

ORDERED that any physician who is contacted is free to impose any reasonable condition they request that is not inconsistent with this Opinion and Order.


                                    s/Joel Schneider
                                    JOEL SCHNEIDER
                                    United States Magistrate Judge