# EXHIBIT 1

Protected Information - Keith T. Wilson, M.D.

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW JERSEY

3        --------------------------

4    IN RE:  BENICAR          MDL NO. 2606

5    (OLMESARTAN) PRODUCTS

6    LIABILITY LITIGATION

7                      -  -  -

8             SUPERIOR COURT OF NEW JERSEY

9           LAW DIVISION - ATLANTIC COUNTY

10       --------------------------

11   IN RE:  BENICAR          MCL NO. 299

12   (OLMESARTAN MEDOXOMIL)

13   LITIGATION

14       --------------------------

15              PROTECTED INFORMATION

16

17        VIDEOTAPED EXPERT DEPOSITION OF

18             KEITH T. WILSON, MD

19             February 25, 2017

20                  9:12 a.m.

21             725 12th Street NW

22             Washington, DC 20005

23

24    BY: Denise D. Vickery, CRR/RMR

Protected Information - Keith T. Wilson, M.D.

Page 2

APPEARANCES:

For the Plaintiffs Via Videoconference:
    ADAM M. SLATER, ESQ.
    MAZIE SLATER KATZ & FREEMAN, LLC
    103 Eisenhower Parkway, 2nd Floor
    Roseland, NJ 07068
    973.228.9898
    aslater@mskf.net

For the Plaintiffs:
    LAURA PITTNER, ESQ.
    GOLDENBERG LAW
    800 LaSalle Avenue
    Suite 2150
    Minneapolis, MN 55402
    612.436.5027
    lpittner@goldenberglaw.com

For the Defendants Daiichi Sankyo Co., Ltd.,
    Daiichi Sankyo U.S. Holdings, Inc., Daiichi
    Sankyo, Inc., Forest Laboratories, LLC, Forest
    Pharmaceuticals, Inc., Forest Research
    Institute, Inc.:
    RANDALL L. CHRISTIAN, ESQ.
    BOWMAN AND BROOKE LLP
    2901 Via Fortuna Drive
    Suite 500
    Austin, TX 78746
    512.874.3800
    randy.christian@bowmanandbrooke.com

Page 3

APPEARANCES:  (Continued)

For the Defendants Daiichi Sankyo Co., Ltd.,
    Daiichi Sankyo U.S. Holdings, Inc., Daiichi
    Sankyo, Inc., Forest Laboratories, LLC, Forest
    Pharmaceuticals, Inc., Forest Research
    Institute, Inc.:
    NEELUM J. WADHWANI, ESQ.
    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street NW
    Washington, DC 20005
    202.434.5148
    nwadhwani@wc.com

Also Present:
    Michael Gay, Videographer
    Isia Jasiewicz, Williams & Connolly LLP

- - -

Page 4

INDEX

EXAMINATION OF KEITH T. WILSON, MD     PAGE
BY MR. SLATER                                     8
AFTERNOON SESSION                   156
BY MR. CHRISTIAN                   278
BY MR. SLATER                      290

E X H I B I T S

WILSON DEPOSITION EXHIBITS          PAGE
Exhibit 1   Notice of Videotaped Deposition   7
Exhibit 2   Responses and Objections to      7
               Plaintiffs' Notice
Exhibit 3   Letter Invoice of December 25,   7
               2016 Wilson to Babington
Exhibit 4   Expert Report on Benicar         7
               (Olmesartan)-General Causation
Exhibit 5   Additional references/materials  7
               consulted
Exhibit 6   HTN Benicar Litigation List      30
   (Original Exhibit Retained by Witness)

Page 5

WILSON DEPOSITION EXHIBITS          PAGE
Exhibit 7   Human Research Protection        56
               Program, FDA MedWatch-Olmesartan
               Medoxomil; Drug Safety
               Communication - Label Changes to
               Include Intestinal Problems
               (Sprue-Like Enteropathy)
Exhibit 8   FDA Drug Safety Communication:   77
               FDA approves label changes to
               include intestinal problems
               (sprue-like enteropathy) linked to
               blood pressure medicine olmesartan
               medoxomil
Exhibit 9   Curriculum Vitae 2/20/17         85
Exhibit 10  Severe Spruelike Enteropathy     91
               Associated with Olmesartan by
               Rubio-Tapia et al. (Mayo Clinic)
Exhibit 11  Drug-induced Sprue-like          213
               Intestinal Disease by Freeman
Exhibit 12  Severe intestinal malabsorption 216
               associated with olmesartan: a
               French nationwide observational
               cohort study by Basson et al.

Protected Information - Keith T. Wilson, M.D.

Page 6

1   WILSON DEPOSITION EXHIBITS          PAGE
2   Exhibit 13  Comparative Effectiveness of   216
3        Olmesartan and Other Angiotensin
4        Receptor Blockers in Diabetes
5        Mellitus, Retrospective Cohort
6        Study by Padwal et al.
7   Exhibit 14  Olmesartan-associated        236
8        enteropathy: results of a national
9        survey by Marthey et al., 1 - 7
10  Exhibit 15  Duodenal Villous Atrophy in a  250
11       TTG-Negative Patient Taking
12       Olmesartan: A Case Report and
13       Review of the Literature by
14       Kulai et al.
15  Exhibit 16  Olmesartan, Other            260
16       Antihypertensives, and Chronic
17       Diarrhea Among Patients Undergoing
18       Endoscopic Procedures: A
19       Case-Control Study by
20       Greywoode et al., 1239 - 1243
21  Exhibit 17  Olmesartan induced           265
22       enterocolitis by Gallivan and Brown
23  Exhibit 18  Drug-Induced Enteropathy by  271
24       Marietta et al.

Page 7

1        PROCEEDINGS
2          - - -
3        (Documents marked for
4   identification purposes as Gutman
5   Exhibit 1, Exhibit 2, Exhibit 3,
6   Exhibit 4, and Exhibit 5.)
7        THE VIDEOGRAPHER:  We are on the
8   record.
9        The time now is 9:12.  This marks
10  the beginning of Disk No. 1 for the
11  videotaped deposition testimony of
12  Dr. Keith Wilson in the matter of Benicar
13  Products Liability Litigation, MDL No.
14  2606.
15       Today's date is February 25,
16  2017.  This deposition is being conducted
17  at 725 12th Street, Northwest,
18  Washington, DC.
19       Will all attorneys present please
20  identify themselves and who they
21  represent.
22       MR. SLATER:  Adam Slater for
23  Plaintiffs.
24       MS. PITTNER:  Laura Pittner for

Page 8

1   Plaintiffs.
2        MR. CHRISTIAN:  Randall Christian
3   for Defendants.
4        MS. WADHWANI:  Neelum Wadhwani
5   for Defendants, and with me I have Isia
6   Jasiewicz.
7        THE VIDEOGRAPHER:  My name is
8   Michael Gay.  I'm with Golkow
9   Technologies.  Our court reporter today
10  is Denise Vickery also with Golkow
11  Technologies and will now swear in our
12  witness.
13          - - -
14       KEITH T. WILSON, MD
15  called for examination, and, after having been
16  duly sworn, was examined and testified as
17  follows:
18       THE VIDEOGRAPHER:  You may
19  proceed.
20       EXAMINATION
21  BY MR. SLATER:
22  Q.    Good morning, Dr. Wilson.
23  A.    Hello.
24  Q.    My name is Adam Slater.  I'm now

Page 9

1   going to take your deposition.  You understand
2   that's what we're doing; right?
3   A.    Yes.
4        MR. CHRISTIAN:  Did you hear him?
5        MR. SLATER:  You didn't hear me?
6        THE WITNESS:  I hear you.
7   BY MR. SLATER:
8   Q.    Did my voice cut out?
9   A.    No.  Am I -- am I live?
10       THE VIDEOGRAPHER:  Yes, you're
11  live.
12       THE WITNESS:  Yes, I heard you
13  and I said yes.
14  BY MR. SLATER:
15  Q.    Okay.  I must have missed it.
16       Okay.  Doctor, have you been
17  deposed before?
18  A.    Once.
19  Q.    You're under oath.  Do you
20  understand that?
21  A.    Yes.
22  Q.    Do you understand you must tell
23  the truth and provide accurate and complete
24  answers to every one of my questions?

Protected Information - Keith T. Wilson, M.D.

Page 10

1    A.   Yes.
2    Q.   If I ask you a question that
3  doesn't make sense to you for any reason, please
4  tell me. I'll try to rephrase it, okay?
5    A.   Yes.
6    Q.   The room may object to a
7  question, most likely just objecting to the form,
8  which is basically them saying I didn't ask the
9  question the right way and they're preserving
10 their rights to the future. Just let them say
11 what they're going to say ask, and then I assume
12 in most cases you're just going to answer the
13 question, okay?
14   A.   Okay.
15   Q.   You said you were previously
16 deposed one time.
17        What was that in connection with?
18   A.   It was a medical malpractice
19 case, and this was around seven years ago.
20   Q.   Were you an expert for the
21 plaintiff or the defense?
22   A.   For the plaintiff.
23   Q.   Did it have anything to do with
24 any sort of a malabsorption or an enteropathy

Page 11

1  condition?
2    A.   No.
3    Q.   Totally unrelated to the subject
4  matter of this case?
5    A.   Other than the fact that it was a
6  case about a gastrointestinal issue, but not
7  anything related to this case.
8    Q.   Okay. I have marked as
9  Exhibit 1 -- let's give Dr. Wilson Exhibits 1, 2,
10 3, 4, and 5 just so he has them.
11        Okay. Exhibit 1 is the
12 deposition notice in this case.
13        Did you ever see the deposition
14 notice for this deposition?
15   A.   Yes. When I met with
16 Mr. Christian yesterday, I was shown it at that
17 time.
18   Q.   Okay. Exhibit 2 is the response
19 we were provided.
20        Have you seen that document?
21   A.   No.
22   Q.   Number 1 the first request was
23 your invoices, and if you look at Exhibit 3, is
24 that what was -- what was provided in response to

Page 12

1  request number 1?
2    A.   Yes.
3    Q.   What date are those invoices
4  current through? It says something about January
5  2017.
6        What was the -- is that through
7  the end of the month all time you've spent since
8  from the beginning to the end of January 2017?
9    A.   When you say "the month," you
10 mean the month of January?
11   Q.   Oh, I see actually there is some
12 February time. Let me rephrase the question.
13        This -- these invoices look like
14 they go through February 23, 2017.
15        Is this all time that you've
16 invoiced through February 23, 2017?
17   A.   So I have not invoiced the
18 February. What the agreement that I was told was
19 that I should at the end of each month provide a
20 monthly invoice. So the February data is just a
21 running Excel spreadsheet that I keep where I
22 document what I do so that I don't forget, and I
23 provided that yesterday, but that is not my
24 official invoice yet because I haven't put it on

Page 13

1  my letterhead.
2    Q.   What other time would need to be
3  added to the February worksheet, which is the
4  last page of Exhibit 3, to make it complete?
5    A.   So I met with Randy and Neelum
6  yesterday for approximately six hours and then
7  whatever time we spent today, and if there will
8  be any follow-up correspondence between now and
9  the end of the month.
10   Q.   Let's go to the first page of
11 Exhibit 3.
12        How was it that you were
13 contacted? Do you know why you were contacted in
14 this case?
15   A.   So the initial contact was that
16 my assistant told me that a Mr. Joseph Babington
17 left a message, that he wanted to speak with me
18 about a product liability case that had some
19 relevance to gastroenterology, and she gave me
20 his phone number. And I called him back, and we
21 had an initial conversation in early June of
22 2016.
23   Q.   Have you ever consulted outside
24 of a litigation context for any pharmaceutical

Protected Information - Keith T. Wilson, M.D.

Page 14

1  manufacturer?
2      A.   No.
3      Q.   Do you know why it is that
4  Mr. Babington thought to call you as opposed to
5  anyone else?  Why?  Do you know why that was?
6      A.   So of course I asked that
7  question, and he said, "We are looking for
8  someone that's a gastroenterologist who's also an
9  expert in immunology -- immunology related to the
10  GI system."  And then I asked, "Why me?"  And he
11  said, "Because I was looking for someone in the
12  Southeastern part of the country because that's
13  where I'm based, and my impression is that you're
14  the best expert in that part of the United
15  States."
16      Q.   At the time you were contacted on
17  this case, had you ever published anything
18  regarding olmesartan?
19      A.   No.
20      Q.   At the time you were contacted in
21  this case, had you ever published any articles
22  regarding celiac disease?
23      A.   No.
24      Q.   At the time you were contacted in

Page 15

1  this case, had you ever been involved either in a
2  research or a clinical capacity with a patient
3  evaluation or treatment where olmesartan was a
4  potential cause of a gastrointestinal syndrome?
5      A.   No.
6          MR. CHRISTIAN:  Objection.  Form.
7          THE WITNESS:  Oh.  No.
8  BY MR. SLATER:
9      Q.   With regard to those three
10  questions, are the answers the same right up
11  until today?
12      A.   I don't understand your question.
13      Q.   You were contacted initially it
14  looks like in the summer of 2016; right?
15      A.   Correct.
16      Q.   As of today, am I correct that
17  you've never published any articles regarding
18  olmesartan?
19      A.   That's correct.
20      Q.   Am I correct that as of today,
21  you've never published any articles regarding
22  celiac disease?
23      A.   Correct.
24      Q.   Am I correct that as of today,

Page 16

1  you have not been involved either in a research
2  or a clinical context with the evaluation or
3  treatment of a patient with a gastrointestinal
4  syndrome or presentation where olmesartan is
5  considered to be a potential cause?
6      A.   That's correct.
7      Q.   Do you know whether or not
8  physicians at Vanderbilt where you work have
9  diagnosed any patients with what is described in
10  the literature as olmesartan-associated
11  enteropathy, olmesartan-induced enteropathy?
12      A.   So I'm a professor at Vanderbilt,
13  but I -- and I have clinical privileges at
14  Vanderbilt hospital, but I don't actually do any
15  attending work there and don't see patients
16  there.  All of my clinical work is done at the
17  adjacent Veterans Affairs hospital, and I've
18  never heard of or seen any patient on olmesartan.
19  So I'm not aware of anything.
20      Q.   Let's just flesh that out.
21          You -- you work for Vanderbilt
22  University Medical Center; correct?
23      A.   Correct, but I'm also a part-time
24  government employee.  I have partial salary

Page 17

1  support from the Department of Veterans Affairs.
2      Q.   Okay.  Move to strike from "but"
3  forward.
4          I just want to talk about
5  Vanderbilt for a couple minutes.
6      A.   Sure.
7      Q.   You're employed by Vanderbilt
8  University Medical Center; correct?
9      A.   Yes.
10      Q.   Okay.  Is your work at Vanderbilt
11  limited to -- well, rephrase.
12          At Vanderbilt, my understanding
13  is that you have certain administrative duties in
14  your department; correct?
15      A.   Correct.
16      Q.   You also do research --
17      A.   Correct.
18      Q.   -- correct?
19          How much time do you spend on
20  clinical treatment of patients at Vanderbilt on a
21  monthly basis?
22      A.   At Vanderbilt?  None.
23      Q.   Other than Vanderbilt, where do
24  you work professionally?

Protected Information - Keith T. Wilson, M.D.

Page 18

1      A.    The Nashville VA Medical Center,
2  which is part of the Tennessee VA healthcare
3  system.
4      Q.    How much time a month do you
5  spend working at Nashville VA?
6      A.    So I would estimate that it's
7  about 10 hours per week. So that would be 40 to
8  50 hours a month on average amortized over the
9  course of the year.
10     Q.    The 10 hours per week at the
11 Nashville VA, what are they spent doing?
12     A.    So every Wednesday I do endoscopy
13 for about five hours where I'm sometimes doing
14 cases by myself. Other times I'm -- most of the
15 time I'm doing cases with our fellows, who are
16 young doctors who have completed residency and
17 are doing a three-year fellowship. And then four
18 weeks of the year I do inpatient consult
19 attending.
20     Q.    When you say "inpatient
21 consultation," does that mean where a patient has
22 been admitted to the hospital and you'll be, as
23 part of the staff, called in for a consultation
24 if there's a gastrointestinal issue?

Page 19

1      A.    Yes.
2      Q.    They're not your patients per se.
3  You're asked to consult on someone else's
4  patient; is that correct?
5      A.    Well, that's an interesting
6  philosophical question.
7            Technically there's an attending
8  of record. However, I will say that our service
9  chief at the VA always preaches to us that when
10 their primary problem is a GI one, that we should
11 really try and take ownership of the patients and
12 make sure that everything is being done exactly
13 right. So sometimes our trainees will even write
14 orders on the patients.
15     Q.    Okay. When you see a patient at
16 the Nashville VA as an inpatient, am I correct
17 you would not be listed as the attending
18 physician for that patient?
19     A.    That's correct. However, let me
20 clarify. It's not like a private hospital where
21 in the old days when there would be a stamp for
22 the name of the patient and above it would be the
23 name of their one assigned attending. At the VA,
24 it's really a group practice for all patients.

Page 20

1  So there's -- there's a department of med --
2  there's an internal medicine attending, but
3  there's lots of other attendings from surgery and
4  GI and nephrology, whatever that see the patient,
5  and we all feel that we're responsible for the
6  issues in front of us.
7      Q.    Okay. In the last -- rephrase.
8            When is the last time you were
9  involved in the treatment of a patient who was
10 being treated for symptoms of celiac disease?
11     A.    So you're saying the treatment.
12 We often are working up patients for celiac
13 disease, but we have a group practice where
14 there's a clinic that is staffed by two
15 attendings. I don't do that, and so if a patient
16 were diagnosed with celiac disease, they'd be
17 followed in that clinic and managed by the
18 fellows that are in training and a different
19 attending than me.
20     Q.    When is the last time you were
21 involved in -- well, rephrase.
22            When is the last time you
23 diagnosed a patient with celiac disease?
24     A.    I can't recall really because we

Page 21

1  take biopsies, and the fellows are the ones that
2  do the follow-up. So I would say probably
3  several times a month we're taking biopsies from
4  the duodenum to evaluate people with
5  iron-deficiency anemia to rule out celiac but,
6  frankly speaking, I don't check the follow-up of
7  those biopsies. So I -- that's somebody else's
8  job. So I actually can't answer that question.
9      Q.    So you're involved in the process
10 whereby the biopsies are taken, but you're not
11 part of the follow-up to evaluate the result and
12 make a diagnosis and a -- and a recommendation to
13 the patient; correct?
14     A.    Right, because, for example, we
15 have our service chief and our director of
16 endoscopy at the VA, and they're full time VA and
17 they're over there every day. I'm just there one
18 day a week. So it's not part of my
19 responsibilities.
20     Q.    Have you spoken to any other
21 physicians in connection with your work in this
22 case?
23     A.    So I did ask a couple of my
24 colleagues at the VA if they had ever seen a case

Protected Information - Keith T. Wilson, M.D.

Page 22

1  of olmesartan-associated GI symptoms, and they --
2  they were a couple of my colleagues at the VA and
3  they both had never heard of the situation.
4      Q.    They hadn't -- they were not
5  aware of the condition?
6      A.    Right.
7      Q.    They hadn't heard of the fact
8  that it existed?
9      A.    That's correct.
10     Q.    And these are
11  gastroenterologists?
12     A.    Yes.
13     Q.    Before you were contacted in this
14  case, had you heard of olmesartan-associated
15  enteropathy, this condition that's at issue in
16  this litigation?
17     A.    No.
18     Q.    Is it fair to assume that you had
19  not read any literature or articles about this
20  condition, olmesartan-associated enteropathy,
21  before you were contacted?
22     A.    That's correct.
23     Q.    You know Joseph Murray; correct?
24     A.    Yes.

Page 23

1      Q.    Essentially a world-renowned
2  gastroenterologist in the field of celiac
3  disease?
4      A.    I would say so.
5      Q.    In looking at your invoice,
6  Exhibit 3?
7      A.    Yes.
8      Q.    It says "Review of medical
9  literature." This is the third entry. "Review
10  of medical literature in advance of December 10,
11  2016 conference."
12          Is that the first time you
13  reviewed medical literature with regard to
14  olmesartan-associated enteropathy?
15     A.    Yes.
16     Q.    Am I correct that your
17  understanding of the clinical diagnosis and
18  management of olmesartan-associated enteropathy,
19  your knowledge of that is limited to what you've
20  read in the literature that's listed in your
21  report and reliance list?
22     A.    Yes. The only caveat I would say
23  is that in my job, I often many, many times look
24  for things on PubMed and will glance at many,

Page 24

1  many articles by looking at the title or starting
2  to skim the abstract, and then if I don't feel
3  like it's useful, I just move on.
4          So there certainly were other
5  things that I might have searched on which I
6  can't give you specifics now, but I use PubMed
7  every day, and I might have encountered other
8  articles that I started to read the abstract and
9  just felt that they were not important enough for
10  me to download the whole article or read it or
11  anything like that. So I can't give you any
12  specifics.
13          I would just say that I did
14  peruse the general literature beyond my reliance
15  list, but I very carefully selected the articles
16  to comment on in my report based on the ones that
17  I felt from my vantage point were the most
18  important.
19     Q.    Am I correct that your
20  understanding of the clinical diagnosis and
21  clinical management of olmesartan-associated
22  enteropathy comes entirely from what you've read
23  in medical literature?
24     A.    Right.

Page 25

1      Q.    And if I understand correctly,
2  the sources you found to be most important and
3  those that you're relying on are those you
4  actually cited to in your report and listed on
5  your reliance lists?
6      A.    That's correct.
7      Q.    You've seen some other literature
8  from time to time since you were retained in this
9  case, but none of it you felt was important
10  enough to list; fair?
11     A.    That -- yes, that's fair.
12     Q.    Did you request any documents
13  from the lawyers who hired you in this case?
14     A.    Could you be more specific?
15     Q.    I've looked at your reliance
16  list. I see that you listed various articles;
17  correct?
18     A.    Yes.
19     Q.    Was there anything that you felt
20  you wanted to see that you asked the lawyers,
21  could you provide this to me as part of my review
22  of the case? Is there anything you asked them
23  for?
24     A.    Well, the way it actually worked

Protected Information - Keith T. Wilson, M.D.

Page 26

1 was initially I was provided a list of some
2 articles and then I found others on my own, but
3 once I needed to find more articles, I just
4 downloaded them myself.
5    Q.    The list of articles you were
6 originally provided, do you have that list?
7    A.    Yes.
8    Q.    In looking -- let's -- let's do
9 this. Exhibit 4 we've marked.
10    It's my understanding that's your
11 report. It's the list of references, your
12 reliance list, and it's your curriculum vitae;
13 correct?
14    A.    Let me just look and see what you
15 have here.
16    So the only thing that Exhibit 4
17 is, is just my CV. I don't see my -- my report
18 is not included in that.
19    Q.    All right. Well, then we need to
20 re-mark this. There should have been -- we sent
21 down the expert report general causation. That
22 should be the first page of this.
23    A.    No.
24    MR. SLATER: So I'm asking the

Page 27

1 court reporter. Do you have that there?
2 It was sent down.
3    THE REPORTER: Yes.
4    MR. SLATER: All right. Let's
5 mark that as Exhibit 4 because that
6 should have attached to it the reliance
7 list, which is part of the report,
8 actually, and his CV.
9    (Exhibit 4 re-marked.)
10    THE WITNESS: So this is 5 and
11 this is 4. So this is obsolete.
12    (Reviewing document).
13    THE WITNESS: Okay. So this is
14 the wrong version of my CV. This is the
15 one from January 27th. I provided an
16 updated one that was dated.
17 BY MR. SLATER:
18    Q.    That's fine. I'm going to mark
19 the updated CV as a different exhibit.
20    A.    Okay.
21    Q.    So do we now have the report
22 marked as Exhibit 4 which had your CV that was up
23 to date as of the time the report was served?
24    A.    Yes.

Page 28

1    Q.    Okay. And there's a list of
2 references and materials reviewed on page 19 of
3 your report?
4    A.    Yes.
5    Q.    Okay. Were any of the materials
6 listed on page 19 and 20 materials that you found
7 on your own as opposed to having been provided on
8 the original list from counsel?
9    A.    Yes, there are. In terms of me
10 trying to find each one, it would take me a few
11 minutes, if that's what you would like me to do.
12    Q.    I just wanted -- let me ask you
13 this.
14    Are you able to tell me real
15 quick if you just ran through the -- there's two
16 items listed 1 and 2 and then 1 through 24.
17    Do you know as you go through it
18 quickly which you found on your own?
19    A.    So 1 and 2 were online resources,
20 UpToDate and Sleisinger, which I access through
21 the Vanderbilt library. So that wasn't on the
22 original list. I believe that reference 2 was
23 referred to in the 2012 paper. So I downloaded
24 that and looked at that, and then Cartee,

Page 29

1 reference 3, was not in that original list.
2 Theophile was. Marthey was. Brown was not. I
3 found --
4    Q.    Tell me the ones that weren't.
5 You can just tell me the numbers of the ones that
6 weren't.
7    A.    Okay. So the 1 and 2 above the
8 references and then 2 wasn't, 3 wasn't, 6 wasn't,
9 7 wasn't.
10    I'm not finding 8 in that
11 original list either.
12    I'm just checking these one by
13 one.
14    16 and 17 were not.
15    (Reviewing document).
16    Q.    Any others?
17    A.    I'm still -- okay. No. I'm down
18 to 22. Just give me a minute.
19    Okay. 22, 23 were not. That's
20 it.
21    Q.    Okay.
22    A.    Plus the in the --
23    Q.    And you were consulting a list
24 that counsel provided you?

Protected Information - Keith T. Wilson, M.D.

Page 30

1    A.    Uh-huh.  Yes.
2          MR. SLATER:  Let's mark that as
3    an exhibit, whatever we're up to.  Let's
4    just get that marked.
5          THE REPORTER:  Exhibit 6.
6          (Document marked for
7    identification purposes as Gutman
8    Exhibit 6.)
9          THE WITNESS:  Then in the
10   supplemental reliance list, items 1
11   through 6 were all items that I found on
12   my own that were not part of the list.
13   BY MR. SLATER:
14   Q.    And the supplemental reliance
15   list is what we marked as Exhibit 5; correct?
16   A.    Yes.
17   Q.    Okay.  I will come back to that.
18         Looking at page 19 of your
19   report, UpToDate, what did you look at on
20   UpToDate?
21   A.    I looked on celiac disease and I
22   looked up acute diarrhea, chronic diarrhea.
23   Those are the main things that I recall.
24   Q.    Did you look for the causes of

Page 31

1    villous atrophy or sprue enteropathy on UpToDate?
2    A.    I don't remember.
3    Q.    Did you see anything on UpToDate
4    indicating that olmesartan causes villous atrophy
5    or enteropathy, anything of that nature?
6    A.    No.
7    Q.    I didn't hear your answer.  Did
8    you say no?
9    A.    No.
10   Q.    You went to UpToDate because --
11   well, rephrase.
12         Why did you consult UpToDate?
13   A.    It's something that I'm very used
14   to using.  In the VA, whenever you're seeing a
15   patient, you can actually -- within the
16   electronic medical record system, you can just
17   use a pulldown to -- to add as a tool, and it
18   brings up a direct link to UpToDate.  So I don't
19   use it often, but I use it occasionally and I
20   like it, and it's a good way to read up on --
21   it's kind of a living document.
22         It's something that experts
23   periodically update their sections, and I just
24   thought it would be a good way to get a nice

Page 32

1    general overview of the workup of acute and
2    chronic diarrhea.  So that was the main reason I
3    consulted it.
4    Q.    Do physicians in clinical
5    practice routinely consult UpToDate for
6    information about medications and side effects,
7    that sort of thing?
8    A.    I, frankly, can't really say what
9    other doctors do.  I just know that on occasion I
10   will.  If I see a patient in the hospital and I
11   see something that I feel like I need a refresher
12   on, I'll just go to it because it's the fastest
13   thing I can think of.  I'll either do that or
14   just run a PubMed first.
15   Q.    Do you consider -- do you
16   consider UpToDate to be a reliable source of
17   medical information?
18   A.    You know, with the caveat that
19   it's written, there's no peer review.  It's just
20   -- it's somewhat reliable, but it's not as
21   reliable as a peer-reviewed randomized controlled
22   trial.  So --
23   Q.    Have you relied on UpToDate in
24   the course of evaluating or treating patients you

Page 33

1    were involved with?
2    A.    In my life?  Sure.
3          Can I restate that?  I don't know
4    that I would use the word "rely."  I rely on my
5    clinical judgment.  I may consult it to see what
6    people are writing about current testing for
7    what's the latest thinking about all the
8    serologies you should consider for celiac disease
9    or anything that might have come along, but,
10   again, it's not a peer-reviewed source of
11   information.
12   Q.    In your treatment or evaluation
13   of patients, are there times where you will look
14   up information on UpToDate and incorporate that
15   information into your decision-making?
16   A.    Very rarely.
17   Q.    Why bother looking at them?  I
18   mean, I'm not sure.  You said you look at it and
19   now it sounds like --
20   A.    It's a quick --
21   Q.    -- you're telling me it's like
22   something that you wouldn't even, it's like a
23   comic book.  I can't get -- I can't get a sense
24   from you what it is.  I mean, so let's try to pin

Protected Information - Keith T. Wilson, M.D.

Page 34

1  it down.  So let me ask you this question.
2           You look at UpToDate from time to
3  time in your own medical practice; correct?
4      A.    I'd say maybe two times a year.
5      Q.    You looked up -- rephrase.
6           You consulted UpToDate as part of
7  your educational process for yourself as to be an
8  expert in this case; right?
9      A.    Yes.
10      Q.    Small intestinal villous atrophy
11  other than celiac disease on UpToDate?
12      A.    I don't remember looking at that.
13      Q.    You certainly didn't mention that
14  anywhere in your report; correct?
15      A.    I don't recall.  Is there
16  something in my report about that?
17      Q.    I'm saying, you didn't say
18  anything about that in your report; right?
19      A.    Not that I can recall.
20      Q.    You mentioned UpToDate other than
21  on page 19 where you list it as a material
22  reviewed; is that correct?
23      A.    Yes.
24           I can point out to you the

Page 35

1  section where I utilized it primarily was pages
2  13 --
3      Q.    Fine.  Where is that?
4      A.    Pages 13 to 14.
5           Sorry.  It's actually just
6  through the second paragraph on page 14.
7      Q.    The information on page 13
8  through the second paragraph of page 14, was that
9  all taken from UpToDate?
10      A.    I mean, I used UpToDate as a way
11  for me to organize my thoughts, but some of what
12  I wrote were -- what I wrote was just my own
13  impression.
14      Q.    Try to do a thorough review of
15  UpToDate to find relevant information relevant to
16  this case and to your opinions?
17      A.    I didn't hear the beginning of
18  what you said.
19      Q.    I say, did you attempt to be
20  thorough in finding relevant information, meaning
21  relevant to the opinions you were going to give
22  in this case?
23      A.    I don't think I would say
24  "thorough," no.  I would say that I typed in

Page 36

1  there "diarrhea evaluation" or something like
2  that and found what they said.
3      Q.    So in reviewing UpToDate, you
4  didn't find the fact that it lists causes of
5  small intestinal villous atrophy other than
6  celiac disease, and one of those listed is
7  medications, for example, olmesartan?  You didn't
8  see that when you went on UpToDate, did you?
9           MR. CHRISTIAN:  Objection.  Form.
10           THE WITNESS:  I honestly can't
11  recall because I wrote this report over a
12  month ago, and I don't remember reading
13  that.
14  BY MR. SLATER:
15      Q.    Anywhere; correct?
16      A.    To my recollection.
17      Q.    I'm saying, that's not referenced
18  anywhere in your report; right?
19      A.    No.
20      Q.    On page 19, you list Sleisenger
21  and Fordtran's "Gastrointestinal and Liver
22  Disease."  What is that?
23      A.    So that's a textbook that when I
24  was in my training was sort of considered the

Page 37

1  bible of gastroenterology, and so through the
2  Vanderbilt online library I accessed that and
3  skimmed through the chapter by Ciarn Kelly about
4  celiac disease.
5      Q.    Do you know what issue date that
6  volume was or, you know, what that --
7      A.    So I believe it's --
8      Q.    -- location date was?
9           MR. CHRISTIAN:  Wait.  Let him
10  completely finish with his question.
11           THE WITNESS:  I'm sorry.
12           So I know this is going to sound
13  like a long-winded answer, but at the
14  time that I was working on this, you
15  could access Sleisenger through the
16  Vanderbilt library and something has
17  happened with their license for that
18  because I tried to access it again a few
19  weeks ago, and I couldn't find it at all.
20           And then yesterday I was trying
21  to show Randy what it was, and it came up
22  and I clicked on it and it said, "This is
23  no longer available at Vanderbilt."  So
24  I'm pretty certain it was the 2016

Protected Information - Keith T. Wilson, M.D.

Page 38

1    edition, but I don't have a way of
2    verifying that and I can't access it
3    anymore. And the book costs like a
4    thousand dollars, so I'm certainly not
5    going to buy it.
6    BY MR. SLATER:
7        Q.    Did you look to see if there was
8    any discussion of olmesartan anywhere in the
9    book?
10       A.    So I only looked at the chapter
11   by Kelly, who's somebody from the Beth Israel in
12   Boston who I know, and there was no mention of
13   olmesartan in his chapter, but there was a very
14   nice algorithm of how to work up patients with
15   possible celiac disease.
16       Q.    So you looked at a chapter in the
17   Sleisenger and Fordtran book regarding celiac
18   written by Dr. Kelly?
19       A.    Yes.
20       Q.    Did you look to see if there was
21   any discussion of olmesartan or whether that drug
22   was even mentioned anywhere in the book?
23       A.    No. It's kind of cumbersome
24   trying to figure out how to use these online

Page 39

1    resources. It's -- it's kind of hard to explain,
2    but you basically -- you sort of see this Table
3    of Contents, and then I just clicked on the
4    chapter for celiac disease. It's not really very
5    easily searchable. So that was all that I looked
6    at.
7        Q.    Okay. Move to strike after "no."
8              Did any -- rephrase.
9              Were you provided any internal
10   Daiichi documents, meaning documents from the
11   company?
12       A.    No.
13       Q.    Were you provided any depositions
14   of any Daiichi witnesses?
15       A.    No.
16       Q.    Do you have any understanding of
17   the inner workings of Daiichi, for example, who
18   is responsible to evaluate potential adverse drug
19   reactions from their medications?
20       A.    No.
21       Q.    As to what evaluation Daiichi has
22   done as to whether there is a causal relationship
23   between olmesartan and olmesartan-associated
24   enteropathy?

Page 40

1              MR. CHRISTIAN: Adam, we missed
2    the first couple of words of your
3    question.
4    BY MR. SLATER:
5        Q.    As to what, if any, findings the
6    company has made with regard to whether
7    olmesartan causes what has been described in the
8    literature as olmesartan-associated enteropathy?
9        A.    I --
10             MR. CHRISTIAN: Objection. Form.
11             THE WITNESS: Shall I answer?
12             MR. CHRISTIAN: Yeah.
13             THE WITNESS: I have no
14   information whatsoever about anything at
15   the company.
16   BY MR. SLATER:
17       Q.    Were you curious as to whether
18   Daiichi was studying the question that you were
19   asked to give an opinion on?
20             MR. CHRISTIAN: Objection. Form.
21             THE WITNESS: I don't know much
22   about the business world or
23   pharmaceutical industry. I am an expert
24   in my own world but -- so, therefore, I

Page 41

1    assume that it's very complicated and
2    wouldn't really try and go there.
3    BY MR. SLATER:
4        Q.    It is fair to say that you formed
5    certain opinions in this case. They were based
6    on your own education and knowledge, what you
7    bring to the case. That was one thing you
8    brought to it; right?
9        A.    Yes.
10       Q.    Did you say yes?
11       A.    Yes.
12       Q.    Okay. We sometimes fade out each
13   way. So I'm not trying to be rude. It's just
14   sometimes I can't tell if you answered.
15             The other thing that you
16   considered in forming your opinions was medical
17   literature that you read; correct?
18       A.    Yes.
19       Q.    You mentioned these other two
20   things that we talked about a moment ago.
21             You looked on UpToDate and you
22   looked at the Sleisenger text, the chapter on
23   celiac disease; correct?
24       A.    Correct.

Protected Information - Keith T. Wilson, M.D.

Page 42

1    Q.    Those -- those sources of
2  information were what you relied on in forming
3  your opinions in this case; correct?
4    A.    Yes.
5    Q.    Okay.  You did not rely to any
6  extent on clinical experience with the evaluation
7  or diagnosis of a potential olmesartan-related
8  gastrointestinal illness because you have no such
9  experience; correct?
10   A.    Correct.
11   Q.    Tell me if I'm correct if I boil
12 down what your opinion is in this case.
13       If I understand correctly, you've
14 essentially done a review of the literature that
15 you've listed in your report and your reliance
16 lists, and essentially after a review of the
17 literature, giving your opinion about the
18 strength of the literature in terms of the
19 strength of the studies and whether from your
20 review of the literature whether you think there
21 is an association or a causal relationship shown
22 by those studies described in the medical
23 literature.
24       Is that a fair overview of what

Page 43

1  your opinion is?
2    A.    Yes.
3    Q.    One of the sources -- rephrase.
4        One of the criteria you
5  referenced in your report is the Bradford Hill
6  criteria; correct?
7    A.    Yes.
8    Q.    And the utilization of the
9  Bradford Hill criteria is an accepted scientific
10 methodology to assess whether a drug is causing
11 an adverse drug reaction; correct?
12   A.    I think it's more general than
13 that.  I don't think it's specific to whether a
14 drug causes an adverse reaction.  It's a way of
15 evaluating.
16   Q.    I understand.  You understand in
17 this case the question is whether or not
18 olmesartan causes, whatever you want to call it.
19 Olmesartan-associated enteropathy we'll call it
20 for the purposes of this case, okay?
21   A.    Okay.
22   Q.    You're asked to answer in this
23 report; right?
24   A.    Yes.

Page 44

1    Q.    With regard to the question of
2  whether or not a drug causes an adverse drug
3  reaction, if you're trying to answer that
4  question, application of the Bradford Hill
5  criteria is an accepted scientific methodology;
6  correct?
7    A.    I don't know that I want to just
8  say it's accepted by everyone.  It's a type of
9  nomenclature that is -- I was asked to address,
10 whether I felt that the articles -- how they fit
11 in that context.  So I, you know, I'm not able to
12 say whether every epidemiologist feels that the
13 Bradford Hill criteria needs to be applied for
14 every situation.
15   Q.    Your expertise is
16 gastroenterology and, more specifically,
17 immunology in the context of gastroenterology.
18       Is that a fair overview of your
19 expertise?
20   A.    I think that's a little bit
21 limiting.  I hold three professorships at
22 Vanderbilt.  Department of -- professor of
23 medicine.  I'm also a professor of cancer biology
24 because a lot of my research relates to the

Page 45

1  process of carcinogenesis.  And then I held a
2  professorship in what's called pathology,
3  microbiology, and immunology.  So my expertise
4  spans those areas.
5        Also, I'm the principal
6  investigator on multiple grants and I'm the PI,
7  as I enumerated in my report, of two very large
8  studies that have a large clinical translational
9  component that deals with the etiology and
10 prevention of cancer.  So I have expertise in
11 evaluating epidemiologic factors in terms of
12 disease prevention.
13   Q.    The studies that you have
14 performed and are performing, none of them relate
15 to olmesartan; correct?
16   A.    Correct.
17   Q.    The studies you've performed and
18 are performing, none of them relate to celiac
19 disease; correct?
20   A.    Correct.
21   Q.    You're not an epidemiologist;
22 correct?
23   A.    Well, as I've said, I do not have
24 a Ph.D. or a master's in Epi, but as the PI of

Protected Information - Keith T. Wilson, M.D.

Page 46

1 two very large grants that about half of the
2 grants are epidemiologic in basis, I have a lot
3 of practical experience.
4        I've also mentored four trainees
5 that have gone through our master's program in
6 clinical investigation and served on the
7 admissions committee for that program for five
8 years.
9        So at Vanderbilt, I am considered
10 someone that has a lot of expertise about the
11 application of bench research to clinical
12 research.
13     Q.    Do you know whether or not
14 Daiichi employs physicians who from time to time
15 evaluate adverse event reports regarding
16 olmesartan to determine whether there's a
17 probable or definite causal relationship?
18     A.    I have no information about that.
19 So I would say I don't know.
20     Q.    If there are physicians employed
21 by Daiichi who have reviewed adverse event
22 reports regarding olmesartan and gastrointestinal
23 syndromes reported with those patients and found
24 in some cases a probable or definite causal

Page 47

1 relationship, would you want to see those?
2        MR. CHRISTIAN:  Objection.
3 BY MR. SLATER:
4     Q.    Would you be interested to see
5 that?
6        MR. CHRISTIAN:  Objection.  Form.
7        THE WITNESS:  I don't know what
8        those reports would look like.  So I
9        don't know if they would be useful to me.
10 BY MR. SLATER:
11     Q.    Did -- rephrase.
12        I think you said earlier that the
13 attorneys who retained you asked you to evaluate
14 the studies you were looking at, the literature
15 you were looking at under the Bradford Hill
16 criteria.
17        Did I understand that correctly?
18     A.    After I looked at all the papers
19 and thought it through, and then in one of the
20 phone consultations it was indicated to me that
21 as I generate my report, I need to make reference
22 to the Bradford Hill criteria.
23        So then on my own, I looked up
24 the Bradford Hill criteria and read up on it.

Page 48

1 Read a couple references that I listed there, and
2 that's how I knew what the Bradford Hill criteria
3 were.  And I looked at things like level of
4 evidence and reviewed that, and I used all that
5 as a framework for writing my report.
6        But when I initially read all the
7 papers, it was just to look at them and get a
8 feel.  Then I later applied that criteria.  So it
9 was sort of a two-step process.
10     Q.    Did you know what the Bradford
11 Hill criteria was before you were asked by
12 counsel to apply it?
13     A.    No.
14     Q.    So the decision to apply that
15 criteria was not part of your methodology.  It
16 was what counsel asked you to do; correct?
17        MR. CHRISTIAN:  Objection.  Form.
18        THE WITNESS:  So it turned out
19        that when I kind of looked at it, it's
20        sort of what we all do but, you know,
21        it's more of a legal standard in a sense
22        that it's from a very old reference from
23        the 1960s, and I don't know if it's even
24        part of the curriculum in the Master of

Page 49

1 Public Health or the Master of Clinical
2 Investigation programs that I'm familiar
3 with at Vanderbilt.
4 BY MR. SLATER:
5     Q.    Is this report that you wrote in
6 this case the first time you have applied the
7 Bradford Hill criteria to an evaluation of a
8 question?
9     A.    So what I would say is,
10 technically, yes.  But if I could continue?
11        A lot of the concepts that are in
12 there are certainly things that as I fleshed out
13 what I thought that they meant, they are things
14 that I've always done in my career anyway.
15     Q.    Move to strike after "yes."
16        You mentioned in your report the
17 Oxford Centre for Evidence-Based Medicine, some
18 criteria they utilize to evaluate the strength of
19 certain studies; correct?
20     A.    Yes.
21     Q.    Was that a criteria you were
22 familiar with before this case?
23     A.    So not necessarily the exact
24 table that's on my page 2.  However, every one of

Protected Information - Keith T. Wilson, M.D.

Page 50

1  these features and the idea of grading levels of
2  evidence as a general concept is something that
3  I'm extremely familiar with, and that in our
4  conferences we'll always talk about whether
5  there's a meta-analysis that's been done and how
6  good that meta-analysis is and what kind of
7  randomized controlled trials and to remember that
8  RCTs are the most important thing compared to
9  retrospective studies.
10        And this is a concept that -- I
11  took an epidemiology course when I was in medical
12  school at Harvard and it was taught by the
13  director of the Framingham Heart Study.  So I --
14  and I wrote an epidemiology honors thesis in
15  college.  So I've been familiar with these
16  concepts going back for 35 years.
17    Q.   Okay.  Move to strike.
18        Before you were asked to work on
19  this report, had you ever read the Oxford Centre
20  for Evidence-Based Medicine levels of evidence?
21  Had you ever looked at that specific standard?
22    A.   No.
23    Q.   Was that standard given to you by
24  counsel?

Page 51

1    A.   No.
2    Q.   Did counsel ask you to look at
3  that standard?
4    A.   No.
5    Q.   No?
6    A.   No.
7    Q.   Okay.  Did you find the --
8  rephrase.
9        You reference in your report
10  the -- it's right on the first page, actually,
11  toward the bottom of the first page.  The -- you
12  say -- let me ask a new question.
13        On the first page of your report,
14  you say:
15        "For this analysis, I will apply
16  standards of the Oxford Centre for Evidence-Based
17  Medicine," and then you have a citation that goes
18  through and talks about March 2009, etc.
19        Do you see that?
20    A.   Yes.
21    Q.   Is that the standard you applied
22  in forming your opinions?
23    A.   Overall, I would say yes.  I
24  mean, it's impossible to constantly apply that

Page 52

1  standard to every study because in some studies
2  it's a little bit difficult to classify exactly
3  what type of study it is, particularly if it's a
4  small study, but I felt that I needed to look at
5  what some of the standards were.  And I -- and I
6  found these things by Google and PubMed
7  searching.
8    Q.   Would you agree with me that a
9  drug can cause a side effect, even if there's no
10  randomized controlled trial that actually has
11  been utilized to show that causal relationship?
12    A.   So what I would say is that
13  practice patterns evolve as doctors use their own
14  practical experience, and they make decisions
15  about whether they think a medication might be
16  associated with particular side effects, and then
17  they have to decide whether they want to use that
18  medicine.  But that may not represent Level I or
19  Level II evidence by any stretch.
20    Q.   A drug can cause an adverse drug
21  reaction, even if there's never been an RCT that
22  studied that question; correct?
23    A.   Yes.
24    Q.   A drug can cause an adverse drug

Page 53

1  reaction, even if the only published literature
2  on that subject is case reports.  That can occur;
3  correct?
4    A.   Well, you're saying "can."  So I
5  suppose that we know that there can be
6  idiosyncratic reactions to -- to essentially any
7  medication.
8    Q.   Let me ask you this.
9        You agree that NSAIDs can cause
10  gastrointestinal inflammation; correct?
11    A.   Yes.
12    Q.   NSAIDs cause gastrointestinal
13  inflammation, even before there were any studies
14  on that subject.  The fact that the drug caused
15  that reaction was real, regardless of what
16  studies had been done on the question; right?
17        MR. CHRISTIAN:  Objection.  Form.
18        THE WITNESS:  Well, I think you
19  need to be very careful with that because
20  there's probably on the order of more
21  than a hundred different types of
22  nonsteroidals and anti-inflammatories
23  that have been in the market over the
24  last 30 years, since I graduated from

Protected Information - Keith T. Wilson, M.D.

Page 54

1  medical school, 31 years, and so it's a
2  well-known association.
3        It's very hard to be specific
4  about any particular one, however.
5  BY MR. SLATER:
6        Q.   Okay.  Did you actually go and
7  find the website for the Oxford Centre for
8  Evidence-Based Medicine on your own, or did
9  counsel tell you where to find that and direct
10 you to it?
11       A.   I found it.
12       Q.   And the standard you applied is
13 the one that is cited on page 1 of your report
14 and then listed on page 2; correct?
15       A.   To the best of my ability, but as
16 I said with some of the studies, you may notice
17 in my report I said this is -- has some features
18 of Level II but also has some features of Level
19 IV, and so with some of the studies, I found it
20 was a bit difficult to pigeonhole.  In other
21 words, they might be a case-control study but
22 have a very small N.
23       Q.   All I'm asking is:  The criteria
24 you applied from the Oxford Centre for

Page 55

1  Evidence-Based Medicine, the website and the
2  specific standard March 2009 and then the
3  Table 1, that's what you applied; correct?
4        A.   Yeah.
5        MR. CHRISTIAN:  Object to form.
6        THE WITNESS:  Essentially, yes.
7  BY MR. SLATER:
8        Q.   Let's just go back to one thing
9  before we go back into the substance.
10       If you could look at Exhibit 2,
11 again, please.  The response to our deposition
12 notice.
13       A.   Yes.
14       Q.   We already established that you
15 produced the invoices that we marked as
16 Exhibit 3, which also have your worksheet for
17 February, which hasn't been billed to counsel
18 yet; right?
19       A.   Correct.
20       Q.   Are there any other documents
21 that you have produced or that you have in your
22 possession that are responsive to any of these
23 requests?
24       A.   No.

Page 56

1        Q.   Look at number 7 if you could.
2        A.   That's within Exhibit 2?
3        Q.   Yes.
4        That asks for any -- copies of
5  any documents, including protocols or information
6  about medications side effects from any hospital
7  or academic institution where you have worked,
8  had an appointment or had privilege which set
9  forth information related to the diagnosis or
10 treatment of any olmesartan/Benicar related
11 medications or medical conditions or side
12 effects.
13       A.   Yes.
14       Q.   Did you produce anything in
15 response to that request?
16       A.   No.
17       MR. SLATER:  Laura, could you --
18 let's mark document 24, which is from the
19 Vanderbilt University website, please.
20       MS. PITTNER:  Sure.
21       MR. SLATER:  We'll mark that as
22 the next exhibit number.
23       THE REPORTER:  Exhibit 7.
24       (Document marked for

Page 57

1        identification purposes as Gutman
2        Exhibit 7.)
3  BY MR. SLATER:
4        Q.   Doctor, Exhibit 7 is something
5  that we printed off of the Vanderbilt website on
6  February 15th, 10 days ago.  Do you see that?
7        A.   Yes.
8        Q.   You work for Vanderbilt
9  University; correct?
10       A.   Yes.
11       Q.   And you see that the title of
12 this page, it looks like it's the Human Research
13 Protection Program supporting the work of the
14 IRB.
15       That would be the Institutional
16 Review Board; correct?
17       A.   Yes.
18       Q.   And providing HRPP oversight.
19       What is HRPP?
20       A.   It's defined at the top here as
21 Human Research Protection Program.
22       Q.   Do you know what the Human
23 Research Protection Program at Vanderbilt
24 University is?

Protected Information - Keith T. Wilson, M.D.

| Page 58 | Page 60 |
|---|---|

**Page 58**

1    A.    I don't know everything that it
2  encompasses, but I know that it is the oversight
3  for the IRB-associated research studies.
4    Q.    And if you go down and look at
5  the title of this specific page within this
6  website, it says:
7        "FDA MedWatch - Olmesartan
8  Medoxomil: Drug Safety Communication - Label
9  Changes to Include Intestinal Problems
10 (Spruc-like Enteropathy)."
11       Do you see that?
12   A.    I see it.
13   Q.    It actually says the audience is
14 health professionals, cardiology, and patients;
15 right?
16   A.    Yes.
17   Q.    And then the issue is listed, and
18 I'm just going to read the first part:
19       "FDA is warning that the blood
20 pressure drug Olmesartan Medoxomil (marketed as
21 Benicar, Benicar HCT, Azor, Tribenzor, and
22 generics) can cause intestinal problems known as
23 sprue-like enteropathy," and then there's a list
24 of symptoms.

**Page 59**

1        Do you see that?
2    A.    Yes.
3    Q.    Are you aware that the position
4  of the FDA is that olmesartan can cause
5  sprue-like enteropathy?
6        MR. CHRISTIAN:  Objection. Form.
7        THE WITNESS:  That's -- to my
8    understanding, that's not their position.
9        Their position is that it -- it
10   may cause -- it has the potential to
11   cause problems.  So that if you as a
12   clinician think that you have a patient
13   that's on it and you believe that there
14   could be some association, you should
15   consider stopping the medication.
16       It does not --
17 BY MR. SLATER:
18   Q.    Is this the first time you've
19 seen something documenting that the FDA has
20 warned that olmesartan can cause intestinal
21 problems known as sprue-like enteropathy?
22       MR. CHRISTIAN:  Adam.
23 BY MR. SLATER:
24   Q.    Is this your first time seeing

**Page 60**

1  that language?
2        MR. CHRISTIAN:  One second.  I
3    think he was still talking when you
4    started your next question, Adam.
5        Did you finish?
6        THE WITNESS:  No.
7  BY MR. SLATER:
8    Q.    I'm sorry.  I didn't mean to.
9    A.    I didn't finish.
10   Q.    Was I?
11   A.    What I was going to say was that,
12 it's my understanding that the FDA has issued a
13 warning in 2013 that clinicians should be aware
14 of this possible association.  They've never said
15 that it can cause it.
16   Q.    Okay.  Now, looking at the
17 language that was posted on Vanderbilt
18 University's website, it says:
19       "The FDA is warning that the
20 blood pressure drug Olmesartan Medoxomil can
21 cause intestinal problems known as sprue-like
22 enteropathy."
23       My question is:  Is this the
24 first time you're seeing anything in writing

**Page 61**

1  indicating that the FDA believes that olmesartan
2  can cause sprue-like enteropathy?
3        MR. CHRISTIAN:  Objection. Form.
4        THE WITNESS:  This is not the
5    first time that I have been made aware
6    that the FDA issued a change to the
7    product insert in 2013.
8  BY MR. SLATER:
9    Q.    My question -- move to strike.
10       My question was:  Is this the
11 first time you're seeing language indicating that
12 the FDA believes that olmesartan can cause
13 sprue-like enteropathy?  Is this the first time
14 you're seeing that language?
15       MR. CHRISTIAN:  Objection. Form.
16       THE WITNESS:  Frankly, I can't
17   recall the exact language in the FDA
18   product insert alteration because I
19   haven't looked at that in over a month.
20 BY MR. SLATER:
21   Q.    One of the things you wanted to
22 do in forming an opinion in this case was to
23 consider all relevant evidence on either side of
24 the question to give a valid opinion; right?

Protected Information - Keith T. Wilson, M.D.

Page 62

1    A.    Correct.
2    Q.    And, for example, if there was
3  important evidence -- rephrase.
4        If there was documentary evidence
5  or deposition testimony from people at Daiichi
6  who are responsible for the safety of the
7  olmesartan drugs, that could be something that
8  would be important to you in rendering an
9  opinion.  You haven't seen any of it, but you
10  would agree in general that could be important if
11  you were shown that; right?
12        MR. CHRISTIAN:  Objection.  Form.
13        THE WITNESS:  I don't agree
14    because I was asked to evaluate the
15    medical and scientific literature and
16    that's just opinion and uncontrolled
17    information, as is these -- this
18    reference on the Vanderbilt website.
19        This is just a pro forma
20    regurgitation of something that was
21    written by the FDA.  It's not scientific
22    evidence.
23  BY MR. SLATER:
24    Q.    To understand, you just said you

Page 63

1  were only asked to evaluate the scientific
2  literature and to form an opinion based on the
3  literature; right?
4    A.    Yes.
5    Q.    Go to the second page of this
6  document.  There's a recommendation.  The
7  recommendation says:
8        "Health care professionals should
9  tell patients to contact them if they develop
10  severe, chronic diarrhea with substantial weight
11  loss while taking an olmesartan-containing
12  product, even if it takes months to years for
13  symptoms to develop."
14        I want to stop there.
15        You see what I just read?
16    A.    Yes.
17    Q.    That is a reasonable
18  recommendation to physicians; correct?
19    A.    I think it's always -- any
20  patient that would have severe, chronic diarrhea
21  with weight loss needs to tell their doctor about
22  it.  There's nothing specific about that in
23  olmesartan.
24        So no one should be walking

Page 64

1  around with --
2    Q.    This recommendation is specific
3  to olmesartan; correct?
4    A.    Shall I go back and finish my
5  previous statement?
6        MR. CHRISTIAN:  Yes.  Yes.
7        THE WITNESS:  What I was saying
8    before was that, no patient should be
9    walking around with symptoms of this
10    nature as described here without telling
11    a healthcare professional, and then the
12    healthcare professional would need to do
13    an appropriate workup and an assessment
14    of all medications they were on.
15        And there's many other
16    medications, hundreds that are linked to
17    development of diarrhea.  So there should
18    be vigilance about looking for any
19    medication.
20  BY MR. SLATER:
21    Q.    Move to strike.
22        This recommendation is to tell a
23  patient who is prescribed olmesartan, specific to
24  olmesartan, if you have this clinical picture,

Page 65

1  severe, chronic diarrhea with substantial weight
2  loss while taking an olmesartan-containing
3  product, even if it takes months to years for
4  symptoms to develop, you should come back to me
5  as the physician and tell me this is happening
6  while you're on olmesartan.
7        That's the recommendation;
8  correct?
9    A.    It's what's written, but what I
10  would like to explain is, I don't know who wrote
11  this.  I think this is just the FDA's
12  recommendation that's pasted onto the Vanderbilt
13  website.
14        I am not aware that the P&T
15  Committee at Vanderbilt reviewed this and wrote
16  this.  I'm not aware that any gastroenterologists
17  were consulted.  I really don't think that this
18  is a website that is designed to provide strong
19  clinical recommendations.  This is a website
20  that's sort of a repository of information about
21  clinical research.
22    Q.    Move to strike from "but"
23  forward.
24        The second sentence says:

Protected Information - Keith T. Wilson, M.D.

Page 66

1  Patients should contact their
2  health care professional right away if they take
3  an olmesartan-containing product and experience
4  severe diarrhea, diarrhea that does not go away,
5  or significant weight loss."
6  Do you see what I just read?
7  A.  Yes.  Yes.
8  Q.  It is reasonable for a physician
9  to tell a patient who is prescribed an
10 olmesartan-containing drug, if you develop
11 severe, chronic diarrhea, diarrhea that doesn't
12 go away, significant weight loss, even if it
13 happens months or years after you start taking
14 this drug, you need to come back to me so I can
15 evaluate whether or not the olmesartan is a
16 factor in that.
17 That's a reasonable
18 recommendation that physicians tell that to
19 patients; correct?
20 A.  I would say that the physician
21 could tell the patient something like this:
22 I'm going to start you on this
23 medication because I think it's a good
24 medication.  You should be aware that there are

Page 67

1  scattered case reports of some patients that
2  develop some possible gastrointestinal side
3  effects.  So you should be aware of that, but
4  there have never been any randomized trials to
5  indicate that this association is a strong one or
6  that it's anything more than rare.  But if you
7  should encounter that, yes, please let me know.
8  That would be the appropriate --
9  Q.  Okay.
10 A.  -- thing to say.
11 Q.  Move to strike.
12 Let's look at Exhibit 5.  We were
13 provided this last night.
14 Are these materials that you
15 reviewed after you wrote your initial report,
16 which is -- well, rephrase.
17 Looking at Exhibit 5, had you
18 read any of these materials when you wrote your
19 report, which we marked as Exhibit 4?
20 A.  To my recollection, I had not
21 read these papers at the time.
22 Q.  You list in number 7, 8, 9, and
23 10 four expert reports.
24 Did you read those reports in

Page 68

1  their entirety?
2  A.  I skimmed them.
3  Q.  You list in 11 and 12 deposition
4  transcripts of Dr. Leffler and Dr. Turner.
5  Did you read those?
6  A.  I skimmed through them.
7  Q.  As you sit here now, was there
8  anything of any significance one way or another
9  that you could point to in any of those materials
10 listed from 7 to 12 that have any significant
11 impact on your opinions as you sit here right
12 now?
13 MR. CHRISTIAN:  Objection.  Form.
14 THE WITNESS:  I think what I
15 would say -- well, perhaps I could get a
16 clarification.  Are you wishing for me to
17 expound upon my opinion about other
18 people's opinion?
19 BY MR. SLATER:
20 Q.  No, I'm not asking you to do
21 that.  Let me ask it differently.
22 You wrote your report, which is
23 marked -- let me go back to the report and we'll
24 come back to this.

Page 69

1  Exhibit 4 is your report in this
2  case, and it's the only report that we've been
3  provided; correct?
4  A.  Yes.
5  Q.  Does this report contain each of
6  the opinions that you formed in this case?
7  A.  Yes.
8  Q.  During the course of the report,
9  you discuss certain facts, mostly facts that are
10 facts from published articles.
11 Are those the facts you felt were
12 most important to you in forming your opinions?
13 A.  Yes.
14 Q.  Did you carefully state each of
15 the opinions and each -- rephrase.
16 Did you carefully write this
17 report in the sense that you went back and
18 proofread it and make sure it said exactly what
19 you want it to say before you signed it and it
20 was sent to us?
21 A.  Yes.
22 Q.  Now, going to Exhibit 5, items 7
23 through 12, did reading any of those items, those
24 reports and those transcripts, change any of the

Page 70

1 opinions that are set forth in Exhibit 4, the
2 report you wrote?
3 A.   What I would -- the only way I
4 can comment on that would be to give you my
5 opinion of other people's opinion.  So if you
6 would like me to do that, I can do that.  If you
7 don't want me to do that, I can't answer your
8 question.
9 Q.   Not asking you to do it.
10 So my question is this:  Did
11 reading those expert reports and those
12 transcripts change the opinions set forth in
13 Exhibit 4 in any way?
14 A.   I think they actually strengthen
15 my opinion because -- if you allow me to say?
16 That in the Lebwohl and Leffler
17 reports, I was rather shocked to read a lot of
18 opinion that wasn't based in fact.  So it was
19 just based on sentiment or ideas of what they
20 believe and, therefore, I felt that this caused
21 me to go back and reread some of the papers out
22 of Columbia again and to think through what I had
23 written in my report.
24 And in so doing, that was why I

Page 71

1 looked up some of the IL-15 papers because I had
2 indicated that I had strong opinions about the
3 Marietta 2015 article, and when I saw that other
4 experts were citing that in a more laudatory vein
5 than the way I appreciated that article, I
6 thought it was worth my time to look at some of
7 the primary references that were cited in the
8 introduction to the Marietta paper, and that's
9 how I came up with some of those papers about
10 IL-15, for example.
11 Q.   Can -- can you guys hear me
12 still?
13 A.   Yes.
14 MR. CHRISTIAN:  Yes.
15 MS. WADHWANI:  Yes.
16 BY MR. SLATER:
17 Q.   Okay.  Move to strike from
18 "because" forward.
19 In medicine, can it be accepted
20 that a medication causes a side effect, even if
21 you don't fully understand the molecular
22 mechanism at the molecular level for why the drug
23 causes the side effect?
24 A.   So you used the word "causes" as

Page 72

1 if it's written in stone.  I would say different
2 doctors, based on their clinical experience, will
3 have their own opinion about whether a drug has
4 the potential to contribute to certain
5 symptomatology and they may decide, I'm never
6 going to use this.
7 For example, endocrinologists
8 struggle with drugs for the treatment of Type 2
9 diabetes because Metformin, which is the most
10 commonly used drugs, causes a lot of GI side
11 effects.  So they have to make their own decision
12 about whether to use that because about 10
13 percent of patients will get diarrhea, for
14 example.  So each -- each time a doctor has to
15 make that decision based on their experience.
16 Q.   Did you hold the opinion that
17 H. pylori causes gastric cancer before there was
18 an understanding of the molecular mechanism?
19 A.   So by the time I started doing
20 research on H. pylori, which was in 1994, there
21 was already an announcement by the National
22 Institutes of Health that they wanted -- the
23 title of the request for applications was that
24 they were seeking grants on H. pylori-associated

Page 73

1 gastric cancer.
2 And the World Health
3 Organization, which is an esteemed global health
4 organization, which I assume you've heard of, had
5 already called H. pylori a class 1 carcinogen
6 back in, I think it was, in the late '80s or
7 early '90s, before I ever did research on it.
8 So that idea was accepted, but
9 there's many of us that are still investigating
10 molecular mechanisms, but there are some that are
11 believed to be important or already understood.
12 Q.   So if I understand your answer,
13 the causal relationship between H. pylori and
14 gastric cancer has been accepted since the 1990s,
15 even before and even up to -- rephrase.  Let me
16 start over.
17 If I understand your answer, it
18 has been accepted in the medical community that
19 H. pylori causes gastric cancer since the 1990s,
20 even though up till today the molecular
21 mechanisms are not fully understood; is that
22 correct?
23 A.   I would say that causation of
24 gastric cancer is complex, but H. pylori is

Protected Information - Keith T. Wilson, M.D.

Page 74

1 considered an important factor in causing gastric
2 cancer, yes.
3      Q.    And the molecular mechanisms
4 whereby H. pylori causes gastric cancer, that has
5 not been fully established yet.  That's still an
6 area of study; correct?
7      A.    I'd like to give -- to answer
8 that question, I'd like to give you a specific
9 example.
10            So there's a --
11      Q.    I just want a yes or no answer to
12 the question, actually, Doctor.
13            MR. CHRISTIAN:  Objection.  Form.
14            THE WITNESS:  So there are
15 specific -- there are numerous molecular
16 mechanisms that have already been
17 established.
18            For example, the bacteria
19 produces a protein that gets injected
20 into cells that's been called CagA that's
21 strongly linked to carcinogenesis in
22 thousands of articles and very, very
23 large epidemiologic studies with a
24 hundred thousand patients, but there's

Page 75

1 still other molecular mechanisms that
2 people like me are continuing to
3 investigate.
4 BY MR. SLATER:
5      Q.    Tell me if you agree with this
6 statement:
7            "Helicobacter pylori is the
8 strongest risk factor for the development of
9 gastric cancer.  Although the specific mechanisms
10 by which this pathogen induces carcinogenesis
11 have not been fully elucidated, high-expression
12 interleukin (IL)-1B alleles are associated with
13 increased gastric cancer risk among
14 H. pylori-infected persons."
15            Is that a true statement?
16      A.    Yes.
17      Q.    So even though the specific
18 mechanisms have not been fully elucidated, the
19 causal connection is accepted; correct?
20            MR. CHRISTIAN:  Objection.  Form.
21            THE WITNESS:  So let me give you
22 a way to interpret that language.  I
23 don't know if that was something that I
24 wrote or --

Page 76

1 BY MR. SLATER:
2      Q.    I'd really just like a yes or no
3 to my question, Doctor.
4      A.    Well, it doesn't --
5            MR. CHRISTIAN:  Objection.  Form.
6            THE WITNESS:  I can't give you a
7 yes or no answer.  You need to rephrase.
8 BY MR. SLATER:
9      Q.    All right, fine.  Then don't.
10 Don't answer the question then.
11            MR. CHRISTIAN:  Objection.  Side
12 bar.
13            THE WITNESS:  Can I have a
14 five-minute bathroom break?
15            MR. SLATER:  Sure.  Sure.  Take
16 five.
17            THE VIDEOGRAPHER:  Time now is
18 10:34.  We are going off the record.
19 This is the end of Disk No. 1.
20            (A brief recess was taken.)
21            (Ms. Jasiewicz no longer
22 present.)
23            THE VIDEOGRAPHER:  The time now
24 is 10:46.  We are back on the record.

Page 77

1            This is the beginning of Disk No. 2.
2 BY MR. SLATER:
3      Q.    Okay.  Doctor, in terms of your
4 methodology, I just asked you about the FDA
5 notification about olmesartan.
6            Did you not factor in the FDA's
7 viewpoint on this question in forming your
8 opinions?
9      A.    No, because I don't consider that
10 scientific evidence.  That was just an update to
11 the product insert.  That was my understanding.
12      Q.    In general, did you factor in the
13 FDA's analysis of this question in any way, or
14 did you just limit your opinion to your
15 evaluation of the literature?
16            MR. CHRISTIAN:  Objection.  Form.
17            THE WITNESS:  No, I didn't factor
18 in the FDA's evaluation.
19            MR. SLATER:  Laura, could you
20 mark as the next exhibit document 3, the
21 FDA safety -- drug safety communication?
22            MS. PITTNER:  Sure.
23            THE REPORTER:  Exhibit 8.
24            (Document marked for

Protected Information - Keith T. Wilson, M.D.

Page 78

1    identification purposes as Gutman
2    Exhibit 8.)
3             MR. SLATER:  We said that's
4    Exhibit 8?
5             THE WITNESS:  Yes.
6             MS. PITTNER:  Yes.
7    BY MR. SLATER:
8        Q.    Doctor, have you seen this
9    document before?
10       A.    No, not in this form.  No.
11       Q.    Go to the second page, please.
12   The bottom of the page under the Data Summary,
13   second paragraph.  It says that:
14            "FDA evaluated adverse event
15   reports received by FDA's Adverse Event Reporting
16   System, published literature case series,
17   information from FDA's Mini-Sentinel pilot of the
18   Sentinel Initiative, and information from the CMS
19   Medicare database."
20            Did you see what I just read?
21       A.    Yes.
22       Q.    It then says:
23            "FDA's evaluation found clear
24   evidence of an association between olmesartan and

Page 79

1    sprue-like enteropathy."
2             Do you see that?
3        A.    Yes.
4        Q.    Were you aware before right now
5    that the FDA's evaluation found clear evidence of
6    an association between olmesartan and sprue-like
7    enteropathy based on the review of those various
8    sources of information?
9        A.    No, because the only thing I was
10   aware of was just there was a change to the
11   product insert.  So I haven't seen this full
12   document.
13       Q.    Okay.  Move to strike after "no."
14            Go to the next page, please.  It
15   says:
16            "FDA identified 23 serious cases
17   in FAERS -- that's all caps -- presenting as
18   late-onset diarrhea with significant weight loss
19   and, in some cases, with intestinal villous
20   atrophy on biopsy.  All patients improved
21   clinically after discontinuation of olmesartan,
22   and a positive rechallenge was seen in 10 of the
23   cases."
24            Do you see that?

Page 80

1        A.    Yes.
2        Q.    Were you aware of what I just
3    read to you before I just read it to you?
4        A.    No.
5        Q.    Okay.  When you're putting
6    evidence in the scale of either yes to causation
7    or no to causation, that information I just read
8    to you would go in the side of the scale that
9    weighs towards yes for causation; correct?
10       A.    It's not evidence.
11       Q.    It's not evidence because you
12   define evidence only to be that information that
13   comes from randomized controlled trials and
14   controlled research; is that correct?
15       A.    Not only that.  I have factored
16   in the current literature which includes case
17   series.  However, this is just something within a
18   document, but there's no opportunity to know
19   whether any of this was reviewed by a physician
20   or scientist.  This could be just laypeople
21   sending in information.  I really don't have any
22   way of knowing what any of this is.
23       Q.    You don't know what was done by
24   the FDA to evaluate the information they

Page 81

1    reference there; right?
2        A.    Well, I think it's kind of
3    striking that they only cite two case series, and
4    there's certainly more literature than that.
5        Q.    Move to strike.
6             What I just read to you at the
7    top of the third page, you don't know what the
8    FDA did to evaluate that data in the FAERS
9    database; right?
10       A.    I do not.
11       Q.    And you did not take that into
12   account in forming your opinions in this case;
13   correct?
14       A.    I did not.
15       Q.    Look at the middle of page 3.  It
16   says in the middle of the middle paragraph:
17            "Mini-Sentinel and CMS Medicare
18   assessments of ICD-9 codes for celiac disease
19   showed that at a 2-year minimum exposure, which
20   correlates with the long latency observed in
21   literature and case reports, olmesartan users had
22   a higher rate of celiac disease diagnoses and
23   claims -- in claims and administrative data than
24   users of other ARBs."

Protected Information - Keith T. Wilson, M.D.

Page 82

1    Do you see what I just read?
2    A.    Yes.
3    Q.    Did you know that before I just
4  read it to you?
5    A.    This seems to be different than
6  the Mini-Sentinel that I reviewed, which showed
7  no differences.
8    Q.    In the Mini-Sentinel or data from
9  the FDA in forming your opinions; right?
10    A.    I couldn't hear the beginning of
11  your question.
12    Q.    You did not rely on the FDA data
13  or data relied on by the FDA at all -- you made
14  that clear to me before -- in forming your
15  opinions; right?
16    A.    Well, there is one Mini-Sentinel
17  that -- I need my Table of Contents.
18    So I was provided the -- the June
19  2013 FDA Mini-Sentinel report, and they have a
20  lot of graphs and tables in there.  And
21  everything I've reviewed in there, I was not able
22  to see anything that suggested that there was any
23  difference between olmesartan and any other ARB
24  or other anti-hypertensives that they looked at

Page 83

1  in there.
2    Q.    Okay.  To be clear, that
3  Mini-Sentinel June 2013 you just said was
4  provided to you, you said by -- was it provided
5  by counsel?
6    A.    Yes.
7    Q.    Okay.  You said there were a lot
8  of graphs and tables.
9    Did you actually interpret those
10  graphs and tables, or are you just telling me
11  they're there?
12    A.    I mean, I flipped through it, and
13  I kept noticing in all of them that the graphs
14  for olmesartan were usually lower or the same as
15  the -- as all the other drugs.  So I just kind of
16  flipped through it, and I saw they're all showing
17  that.
18    Q.    The information I just read to
19  you is information you had not seen before right
20  now; correct?
21    A.    Right.
22    Q.    About the 2-year minimum
23  exposure --
24    A.    Yeah.

Page 84

1    Q.    -- and the higher rate of celiac
2  disease diagnoses?  That you didn't know before I
3  just read it to you; right?
4    A.    Yes, but that's just a sentence
5  in a report.  It's not data like I'm looking at
6  here.
7    Q.    Move to strike from "but"
8  forward.
9    To the extent counsel provided
10  you information, did you hope that they would
11  provide you information in a fair and balanced
12  way in the sense that they would not just give
13  you what would be supportive of your -- of the
14  opinion they wanted you to give, but they also
15  give you the flip side to it if there was data on
16  the other side?
17    MR. CHRISTIAN:  Objection.  Form.
18    THE WITNESS:  Of course.  Yes.
19    MR. SLATER:  Okay.  Let's mark as
20  the next exhibit the updated CV.  That
21  will be Exhibit 9.
22    MR. CHRISTIAN:  This is the one
23  that was previously marked 4?
24    MS. PITTNER:  Yeah.

Page 85

1    (Document marked for
2    identification purposes as Gutman
3    Exhibit 9.)
4  BY MR. SLATER:
5    Q.    Doctor, Exhibit 9, is that your
6  most up-to-date curriculum vitae?
7    A.    As of the date of February the
8  20th that I indicated in the header, yes.
9    Q.    I want to ask you a question
10  about -- well, I'm going -- let me come back to
11  something.
12    In the earlier question, I asked
13  you about the FDA safety notification and a
14  phrase in there, and you said that's not
15  evidence.  Do you remember that?
16    A.    Yes.
17    Q.    And you mean that's not the type
18  of evidence that you are relying on to form your
19  opinions in this case; correct?
20    A.    Correct.
21    Q.    And the only evidence you're
22  relying on to form your opinions, it's my
23  understanding are, is the medical literature you
24  listed in your report; correct?

Protected Information - Keith T. Wilson, M.D.

Page 86

1     A.    Correct.
2     Q.    I want to give you a hypothetical
3  question.
4           I'd like to describe a patient to
5  you who takes olmesartan. Two years after
6  starting the drug, the patient develops severe
7  diarrhea up to 10 times a day, dehydration, loses
8  20 pounds over the course of a month or two, gets
9  hospitalized, and while this person is in the
10 hospital, their blood pressure drops down and
11 they're taken off olmesartan.
12          They're then discharged from the
13 hospital and over the next month or two, the
14 diarrhea resolves, the weight starts coming back,
15 and there's no other change to the person's
16 medications. There's no change to the person's
17 diet. The only change was that the person
18 stopped taking olmesartan.
19          Do you understand my
20 hypothetical?
21    A.    Yes.
22    Q.    Olmesartan would need to be in
23 the differential diagnosis as a potential cause
24 of the diarrhea, the dehydration, and the weight

Page 87

1  loss; correct?
2     A.    Yes.
3     Q.    And in that patient, based on my
4  hypothetical, olmesartan would be the likely
5  cause based on how I set out the hypothetical for
6  the diarrhea, the dehydration, and the weight
7  loss; correct?
8           MR. CHRISTIAN: Objection. Form.
9           THE WITNESS: So I'd like to
10 answer that by saying that I have had the
11 benefit of reviewing two of the
12 individual plaintiff cases, and a very
13 strong point that I'd like to make is
14 that there's essentially a very unlikely
15 possibility that any patient would fit
16 your hypothetical.
17          Because in the cases that I
18 reviewed, they were on numerous other
19 medications, and most of the medications
20 were held when they were admitted. And
21 then when they were discharged, it was
22 extremely difficult to determine if they
23 were resuming their olmesartan or not and
24 which other anti-hypertensives they

Page 88

1  resumed.
2           So that I don't believe there
3  would ever be such a hypothetical because
4  generally if someone is hypotensive or at
5  least evidencing hypovolemia, all their
6  blood pressure meds are going to be held.
7           So it's essentially impossible to
8  assume that somebody is on -- that that's
9  the only medication change that would
10 have been made and that it would be a
11 situation as you enumerate it.
12 BY MR. SLATER:
13    Q.    Move to strike.
14          Based on my hypothetical,
15 olmesartan would be the likely cause of the
16 diarrhea, the dehydration, and the weight loss;
17 correct?
18          MR. CHRISTIAN: Objection. Form.
19          THE WITNESS: I can't say that
20 because they could have had an acute
21 virus. They could have had other GI
22 conditions, like Crohn's disease, or a
23 big problem that we see in hospitalized
24 patients is what we call surreptitious

Page 89

1  use of NSAIDs, which is patients that are
2  taking over-the-counter nonsteroidals and
3  don't realize that that's a medication
4  and fail to tell the physicians about
5  this, and that sort of thing.
6           So you may think that that's the
7  hypothetical scenario, but you haven't
8  told me whether a full workup was done
9  for seronegative celiac disease, or
10 celiac disease, or infectious diarrhea,
11 or parasitic diarrhea, or
12 virally-induced, or autoimmune diarrhea,
13 or any other type of condition.
14 BY MR. SLATER:
15    Q.    Okay. Move to strike.
16          Doctor, taking somebody off
17 olmesartan would not resolve chronic diarrhea,
18 dehydration, and weight loss if the person's
19 symptoms were being caused by celiac disease;
20 correct?
21    A.    Celiac disease can definitely
22 have a waxing and waning course. So it could be
23 that while they were in the hospital, they were
24 taken off of any kind of gluten. Maybe they were

Protected Information - Keith T. Wilson, M.D.

Page 90

1  just on IV fluids. Maybe they just got put on a
2  clear liquid diet that doesn't have gluten in it,
3  so they got better. So they could be
4  mischaracterized as having a drug-associated
5  condition; whereas, it could be that they had
6  occult celiac disease.
7       Q.    Okay. Let's assume for my
8  hypothetical the person had a full workup, was
9  not taking NSAIDs, continued to eat gluten the
10 entire time, and the diarrhea never came back
11 ever again. This severe diarrhea with
12 dehydration and weight loss, it never occurred
13 again and the person never went back on
14 olmesartan.
15      Having added that those factors
16 in response to your question, the likely cause
17 for the diarrhea, the dehydration, and the weight
18 loss would be the olmesartan; correct?
19      MR. CHRISTIAN: Objection. Form.
20      THE WITNESS: It could be a
21 cause. However, when you say a full
22 workup was done, you know, there's the
23 full workup done, but maybe something
24 wasn't thought of or something could have

Page 91

1  been missed.
2       I mean, we often see patients
3  with diarrhea that were worked up in the
4  community, and then they get sent to a
5  tertiary medical center and a different
6  diagnosis is made.
7       MR. SLATER: Move to strike from
8  "however" forward.
9       Laura, let's mark Rubio-Tapia
10 2012 as the next exhibit. It's document
11 13, please.
12      THE REPORTER: Exhibit 10.
13      (Document marked for
14 identification purposes as Gutman
15 Exhibit 10.)
16 BY MR. SLATER:
17      Q.    Doctor, you're familiar with the
18 article we've marked as Exhibit 10 titled "Severe
19 Sprue-Like Enteropathy Associated With
20 Olmesartan"; correct?
21      A.    Yes.
22      Q.    Okay. I want to go through some
23 issues in this study, and the first thing I want
24 to do is just establish.

Page 92

1       It says at the end of the article
2  that there was grant support provided including
3  from the National Institutes of Health; correct?
4       A.    Yes.
5       Q.    Okay. I saw some sort of a
6  reference in your report to doubting whether this
7  was a real peer-reviewed article because it was
8  published in the Mayo Clinic proceedings.
9       Are you testifying here under
10 oath that the Mayo Clinic did not perform a
11 proper peer review of this article in the sense
12 that they just let it slide through because these
13 were Mayo Clinic doctors, and they committed
14 academic impropriety by letting it be published?
15      A.    No.
16      MR. CHRISTIAN: Objection. Form.
17      THE WITNESS: I'm not able to
18 testify to that.
19      It was just speculation regarding
20 my concerns about inconsistencies within
21 the article suggesting to me that as a
22 frequent -- I've done peer review for
23 over 60 journals, and I'm an associate
24 editor for "Gastroenterology," which is

Page 93

1  the premier journal in the field.
2       And, for example, on the number
3  of patients with abnormalities on
4  colonoscopy, there was a difference in
5  the number between the text and the
6  table, which if it had been reviewed by
7  three reviewers, there's zero chance that
8  a reviewer would not have picked up on
9  that.
10 BY MR. SLATER:
11      Q.    Okay. Move to strike after
12 "speculation."
13      Are you challenging in any way
14 the academic bona fides of Dr. Murray?
15      A.    What was that word after
16 academic?
17      Q.    You know that term "bona fides,"
18 meaning are you challenging Dr. Murray's academic
19 stature and credibility?
20      A.    So my interaction with Dr. Murray
21 was that we were a couple of times on the same
22 NIH review panel, and I thought he was quite
23 knowledgeable about celiac disease from observing
24 him there, but I had never reviewed any of his

Protected Information - Keith T. Wilson, M.D.

Page 94

1  papers.
2          And, frankly speaking, after
3  reading this paper and some of the follow-up
4  ones, I'm not challenging his academic
5  credentials, but I have concerns about the
6  quality of the publications.
7          Q.    There may be things in a
8  publication that you have concerns about, maybe
9  that the conclusions in the articles are;
10 correct?
11         MR. CHRISTIAN:  You cut out
12     during your question, Adam.
13 BY MR. SLATER:
14     Q.    I'll just -- I'll move on.
15         Okay.  I want to talk -- ask you
16 some questions about this study now.
17     A.    Can I just -- I would just like
18 to make a comment because I think it's fair game
19 because you brought this up.
20         You mentioned that the study
21 cited an NIH grant.  So I was quite curious about
22 that, and there's a -- there's a publicly
23 available database where you can put in any grant
24 number and read the abstract to that grant about

Page 95

1  what that grant hypothesizes and what the goals
2  of the study are and what the specific aims are.
3          And I reviewed that information
4  relevant to this particular NIH grant that was
5  cited, and that grant has absolutely nothing to
6  do with this condition or this situation.
7      Q.    Move to strike.
8      A.    So it's not -- it's not like the
9  NIH reviewed a plan to study this proposed
10 indication -- proposed situation.
11     Q.    Well, what was the subject of the
12 NIH grant?
13     A.    I don't recall exactly.  I think
14 it was something about celiac disease.
15     Q.    You know these patients were all
16 sent to this hospital at the Mayo Clinic with
17 diagnoses of celiac; right?
18         You know that; right, Doctor?
19     A.    I'm not certain that that was the
20 inclusion criteria.
21         No.  It says that "we were
22 studying a cohort of patients with collagenous
23 sprue."  So I don't know how they found
24 themselves going to Mayo Clinic exactly.  It

Page 96

1  wasn't stated that they were all thought to have
2  celiac disease.
3      Q.    Okay.  Let's do this.  I want to
4  ask you about the subject of a dose effect.
5          What is a dose effect?  How do
6  you define that term?
7      A.    So when we -- I think the purist
8  way of thinking about that would be like this.
9  Let's say I want to know whether a certain drug
10 or chemical that is a pharmacologic agent kills
11 cells.  So what you do is, you take your cells
12 and put them in a dish, and you make replicate
13 wells in a dish.
14         And then you add a dose-response
15 of your drug, and then you assess cytotoxicity.
16 And then you make a graph, and there's all
17 different types of graphs you can see.  Sometimes
18 it's a straight graph on a 45-degree angle where
19 it's a linear relationship.  That's rare.
20         Sometimes it's a situation where
21 there's no effect, and then all of a sudden you
22 get a lot of cytotoxicity.  Sometimes you get a
23 lot of cytotoxicity with a very low dose, and
24 then that plateaus and continues.  So that's the

Page 97

1  purist example.
2          In this study, the problem is
3  there was no attempt to relate the severity of
4  symptoms to the dose of the drug that the
5  patients were taking.
6      Q.    Okay.  Move to strike.
7          Doctor, with all due respect, I
8  didn't need that explanation.  I just was asking
9  for the definition of a dose effect.
10     A.    That's the definition.
11     Q.    A dose -- all right.
12         A dose effect would basically
13 correlate the amount of the drug you take to the
14 side effect you're studying; right?
15     A.    Not necessarily a side effect.
16 It could be an efficacy.
17     Q.    Efficacy issue.  Okay.
18         One does not need to establish a
19 dose effect to prove causation; right?
20     A.    Well, in the Bradford Hill
21 criteria, there's the suggestion that there
22 should be a dose effect.
23     Q.    Understanding of the Bradford
24 Hill criteria that each of those criteria has to

Protected Information - Keith T. Wilson, M.D.

Page 98

1  be met to establish causation; is that your
2  understanding?
3      A.   I don't -- I think it's more of a
4  legal situation with the Bradford Hill criteria.
5  I think that the more criteria you have, the
6  stronger your case that there is an association.
7      Q.   Okay. Here's the question. Move
8  to strike.
9          Do you know in application of the
10  Bradford Hill criteria whether it is necessary to
11  satisfy each criteria to prove causation? Do you
12  know?
13          MR. CHRISTIAN: Objection. Form.
14          THE WITNESS: I don't really know
15      if you need -- so you're -- you're acting
16      like as if every criteria is a binary
17      result, and nothing in medicine is a
18      binary result.
19          So it would be more how good is
20      the evidence for each of those criteria,
21      and then you would factor in everything
22      at the end.
23  BY MR. SLATER:
24      Q.   Move to strike after "I don't

Page 99

1  know."
2          You've never applied the Bradford
3  Hill criteria specifically where you've actually
4  said, I'm applying these criteria, listed them
5  and analyzed them one by one, until you wrote
6  this report; right? This is the first time
7  you've done that; right?
8      A.   That's correct.
9      Q.   And as you sit here now, you
10  don't know whether in order to satisfy the
11  Bradford Hill criteria, as that criteria is
12  understood by people who use it, whether it's
13  necessary to satisfy each criteria to prove
14  causation. You don't know; right?
15          MR. CHRISTIAN: Objection. Form.
16          THE WITNESS: I would say that
17      I've never seen any position that I know
18      is agreed upon in the field as to exactly
19      how many of the criteria need to be met.
20  BY MR. SLATER:
21      Q.   So the answer is you don't know;
22  right?
23          MR. CHRISTIAN: Objection. Form.
24          THE WITNESS: I think that's too

Page 100

1      simplistic a result that you're asking me
2      to answer.
3          I think that it would be obvious
4      that if there's very poor evidence based
5      on the criteria, that you would think
6      that there wasn't causation, and if there
7      were all other the criteria were very
8      strongly met, then you would lean toward
9      saying there is causation and then it's
10      a -- it's a gradient.
11  BY MR. SLATER:
12      Q.   That's your feeling about it, but
13  you haven't actually read anything that says
14  that; right?
15      A.   I suppose not.
16      Q.   Your application of the Bradford
17  Hill criteria is based on your own personal view
18  of how to apply it, not based on having studied
19  how the Bradford Hill criteria is supposed to be
20  applied; correct?
21          MR. CHRISTIAN: Objection. Form.
22          THE WITNESS: Yes.
23  BY MR. SLATER:
24      Q.   There can be a threshold effect

Page 101

1  with regard to, for example, gluten to cause
2  celiac where there's no dose effect; correct?
3      A.   I'm -- I don't understand your
4  question.
5      Q.   Effect as opposed to a dose
6  effect?
7          MR. CHRISTIAN: We missed the
8      first part, Adam.
9  BY MR. SLATER:
10      Q.   Do you know the term "threshold
11  effect" as opposed to a dose effect?
12      A.   I mean, of course I'm familiar
13  with the word "threshold," and it's thrown around
14  in various types of research, but I'm not really
15  sure what a threshold effect is in relationship
16  to celiac disease.
17      Q.   There's no dose effect with
18  regard to gluten and celiac; right?
19      A.   I think there probably is.
20      Q.   Not anything in the published
21  literature for that feeling?
22      A.   I've talked to people that I know
23  who have celiac disease and asked them about that
24  and tried to get a handle on how rigorous they

Protected Information - Keith T. Wilson, M.D.

Page 102

1 feel that they need to be when they have their
2 diet when they travel and such. I've been
3 interested in that exact question, and I think
4 each patient has a different experience.
5    Q.    Doctor, it's a very simple
6 question.
7           Is there anything in the
8 published literature that you can point to that
9 says there is a dose effect with regard to gluten
10 and celiac disease?
11    A.    So the answer is, I don't know
12 because I have not run a search on that because
13 this condition that we're discussing here is not
14 celiac disease. So it did not occur to me to
15 look at the tens of thousands of papers about
16 celiac disease and gluten.
17    Q.    Do you --
18    A.    So I'm not --
19    Q.    -- realize that were not --
20    A.    So I'm not prepared -- go ahead.
21    Q.    I'm sorry. Are you still
22 talking?
23    A.    I'm not prepared to expound upon
24 that detailed question.

Page 103

1    Q.    Okay. As you sit here now, you
2 don't know what the literature says in terms of
3 whether it's accepted or not that there's no dose
4 effect with regard to gluten and celiac. You
5 just don't know that answer as you sit here right
6 now; correct?
7    A.    That's correct.
8    Q.    One does not need a dose effect
9 to prove causality; correct?
10          MR. CHRISTIAN: Objection. Form.
11          THE WITNESS: I think it's
12    important. I can't say that that's the
13    only thing that matters. It's just one
14    of the things that I pointed out that
15    they didn't assess in this study.
16 BY MR. SLATER:
17    Q.    One does not need to prove that
18 there's a dose effect between a drug and a side
19 effect to prove the drug causes the side effect.
20          That's a true statement; correct?
21    A.    I think I've already answered
22 that.
23          In other words, there's multiple
24 criteria to decide if there's a relationship, and

Page 104

1 this is just one and, therefore, I don't think
2 you could make any binary decision based on
3 whether there's a dose effect or not.
4    Q.    Okay. Am I correct that in
5 forming your opinions in this case, you did not
6 consider any analogies between celiac disease and
7 olmesartan-associated enteropathy? Am I correct
8 that's not part of your analysis?
9    A.    In terms of overall causation,
10 no. In terms of when I looked at some of the
11 individual cases, I tried to ferret out whether
12 they could possibly have celiac disease. But in
13 reference to what you're asking me, the answer
14 is, I did not consider that.
15    Q.    Give me one second.
16          Let's look at -- do you have your
17 report handy?
18    A.    Yes.
19    Q.    Exhibit 4?
20    A.    Oh, well, let me.
21    Q.    Please turn to page 3.
22          MR. CHRISTIAN: You can use that
23    copy if you want.
24          THE WITNESS: I can use this

Page 105

1    copy? Mine is a little bit larger.
2          Page 3?
3 BY MR. SLATER:
4    Q.    Right. You have -- you're going
5 through what you call the key points in the
6 Rubio-Tapia case series, and I want to look at
7 number 2 under Duration of Exposure.
8          Do you see where I'm looking?
9    A.    Yes.
10    Q.    You say, in part:
11          "The implication is that the
12 effect may be idiosyncratic since there is not
13 the cause and effect reaction seen with most drug
14 allergies."
15          Do you see what I just read?
16    A.    Yes.
17    Q.    Okay. So if I understand
18 correctly, you're evaluating
19 olmesartan-associated enteropathy as a drug
20 allergy; correct?
21    A.    I'm considering whether it could
22 be.
23    Q.    Do you agree that as described in
24 the literature, olmesartan-associated enteropathy

Protected Information - Keith T. Wilson, M.D.

Page 106

1  is a long-term late-onset adverse drug reaction?
2      A.   Yes.
3          MR. CHRISTIAN: Objection. Form.
4          THE WITNESS: Yes.
5  BY MR. SLATER:
6      Q.   Is there any article you can
7  point to, any of the articles you read, that
8  refer to olmesartan-associated enteropathy as a
9  drug allergy?
10     A.   No.
11     Q.   And I just want to make one thing
12 clear. I've been referring to
13 olmesartan-associated enteropathy and I've
14 referred to "as described in literature."
15         Have you understood me to be
16 talking about that term which is described
17 variously as olmesartan-associated enteropathy,
18 sprue-like enteropathy, olmesartan-induced
19 enteropathy? Have you understood that we're
20 talking about this condition in general?
21     A.   I do find it interesting that
22 you're required to use a hand gesture that's very
23 large, which reiterates my concern as I was going
24 through my report, which is that it would be very

Page 107

1  difficult if I asked you to define the syndrome
2  in one sentence that would be consistent with all
3  of these case series and all of these opinion
4  pieces. I don't think you'd be able to. So
5  it's -- it's a very diffuse, poorly-defined
6  syndrome.
7      Q.   All right. Move to strike.
8          I'll just keep going.
9          And I don't have any idea what
10 you're talking about with the hand gestures. You
11 thought that was some sort of an important tell?
12         I'll tell you what, Doctor. When
13 you're on the witness stand in front of a jury,
14 I'll use the same hand gestures and you can make
15 the same comment. How is that for a deal?
16         MR. CHRISTIAN: Objection. Form.
17         Argumentative. Side bar. Go on.
18 BY MR. SLATER:
19     Q.   We'll do that. Okay.
20         Doctor, there is not a published
21 article in any peer-reviewed journal describing
22 olmesartan enteropathy, sprue-like enteropathy,
23 olmesartan-induced enteropathy as a drug allergy,
24 as far as you can tell; right?

Page 108

1      A.   I'm not absolutely certain about
2  that.
3      Q.   Anything right now; right?
4      A.   No, I cannot.
5      Q.   But your evaluation you
6  believe -- rephrase.
7          In evaluating the question you
8  were asked to answer, you've considered
9  olmesartan enteropathy as a drug allergy;
10 correct?
11         MR. CHRISTIAN: Objection. Form.
12         THE WITNESS: So the reason that
13 I -- the real reason why I thought to
14 write this is that in one of the two
15 cases that I reviewed, the follow-up
16 notes it was indicated that that person
17 was allergic to olmesartan.
18         So I thought, let me look at this
19 literature in the context of whether it
20 would ever be considered an allergy.
21 BY MR. SLATER:
22     Q.   The duration of exposure, the
23 fact that the onset can be months or years even,
24 that does not disprove causality here; correct?

Page 109

1          MR. CHRISTIAN: Objection. Form.
2          THE WITNESS: It doesn't disprove
3  that there could be an association.
4  BY MR. SLATER:
5      Q.   The term "association" -- well,
6  rephrase.
7          When one talks about an
8  association, there are different -- rephrase.
9          There is a spectrum of
10 associations from associations where you would
11 say it's unlikely to be causal, all the way up to
12 causal associations where you believe, yes,
13 there's an association and it causes -- one
14 causes the other. There's a spectrum; right?
15         MR. CHRISTIAN: Objection. Form.
16         THE WITNESS: I think that that's
17 probably true.
18 BY MR. SLATER:
19     Q.   And you agree that there is an
20 association between olmesartan and olmesartan
21 enteropathy as described in the literature. You
22 just disagree that there is a causal association;
23 correct?
24     A.   What I would say is that there

Protected Information - Keith T. Wilson, M.D.

Page 110

1  are case series suggesting an association.
2  However, there are multiple negative studies that
3  I cited in my report that are higher level
4  evidence that are different than just collecting
5  cases where things were looked at in a more
6  unbiased manner, and they found no association.
7      Q.   Is there any article in the
8  literature that you can point me to where the
9  conclusion of the article is that there is no
10 association between olmesartan and olmesartan
11 enteropathy? Any article where that's the
12 conclusion where they say there is no
13 association?
14     A.   So I just want to double-check
15 what I'm about to say. So just give me a moment.
16         Okay. So if you look at the
17 abstract to the Greywoode article published in
18 2014 out of Columbia, they looked at 2,088
19 patients undergoing upper endoscopy and 12,428
20 patients undergoing colonoscopy, and they did a
21 multivariate analysis. Meaning they factored in
22 different criteria which, you know, I'm not
23 certain what every criteria were that they
24 included.

Page 111

1          But they found that there was no
2  statistically significant association between
3  olmesartan and diarrhea among those undergoing
4  either type of procedure, and the review of the
5  pathology reports also showed no association.
6          And then the concluding sentence:
7  "Our findings suggest that
8  neither olmesartan nor other ARBs were associated
9  with diarrhea among patients undergoing
10 endoscopy."
11     Q.   Doctor, look at the conclusion of
12 the article.
13     A.   That is the conclusion.
14     Q.   Actually, don't do that. Go to
15 the next sentence, actually, in the abstract.
16         Do you see the next sentence in
17 the abstract after the one you just read?
18     A.   Yeah, of course I do.
19     Q.   And what does that sentence say?
20 Read it for the record, please.
21     A.   "The sprue-like enteropathy
22 recently associated with olmesartan is likely a
23 rare adverse effect and milder presentations are
24 unlikely."

Page 112

1      Q.   So they don't conclude the
2  association doesn't exist; right? They actually
3  say it does exist, but it's probably rare?
4      A.   They don't say it exists. They
5  say "recently associated with." It doesn't mean
6  that they're advocating it one way or the other.
7      Q.   Doctor, look at the conclusion of
8  the article, the last page. It says:
9          "Our findings suggest that the
10 sprue-like enteropathy recently associated with
11 olmesartan is a rare event and milder
12 presentations causing diarrhea among substantial
13 numbers of outpatients are unlikely."
14         Do you see what I just read?
15     A.   Yes.
16     Q.   So they're calling it a rare
17 event; right?
18     A.   Right.
19     Q.   Next sentence.
20         Future studies should focus on
21 the mechanisms by which olmesartan causes severe
22 sprue-like enteropathy, and the identification of
23 patient-related risk factors that predispose for
24 this rare but serious outcome."

Page 113

1          Do you see that sentence?
2      A.   I see that sentence.
3      Q.   Do you see that the authors
4  actually are saying olmesartan causes severe
5  sprue-like enteropathy? Do you see that, that's
6  what they say --
7          MR. CHRISTIAN: Objection.
8  BY MR. SLATER:
9      Q.   -- in their conclusion?
10         MR. CHRISTIAN: Objection. Form.
11         THE WITNESS: But that is not
12 consistent with the findings of their
13 study. So it doesn't make any sense that
14 they're just referring back to other
15 people's studies at that point.
16 BY MR. SLATER:
17     Q.   Doctor, move to strike.
18         Do you see that that's what the
19 sentence says?
20     A.   I do, but I don't agree with it
21 because that's not the conclusion of their
22 research.
23     Q.   Question, okay?
24         I'm not asking you to interpret