# EXHIBIT C

**EXPERT REPORT**

**DAVID KESSLER, M.D.**

# TABLE OF CONTENTS

**Page**

I.     OVERVIEW ....................................................................................................1

II.    QUALIFICATIONS .........................................................................................2

III.   THE FDA STANDARD FOR DETERMINING WHETHER THERE IS REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION WITH A DRUG SUCH THAT A COMPANY SHOULD INCLUDE A WARNING IN THE WARNINGS AND PRECAUTIONS SECTION OF THE DRUG LABEL. ....................................4

IV.    REGULATORY OVERVIEW OF OLMESARTAN ........................................5

V.     THE IMPORTANCE OF DE/RECHALLENGE DATA IN ASSESSING CAUSAL ASSOCIATIONS UNDER THE FDA STANDARD. ........................................8

     A.     Definition of Positive Dechallenge/Rechallenge ....................................8

     B.     The Importance of Dechallenge/Rechallenge Evidence to Assessing Causation Can Be Seen from the Weight that It Is Given in the Medical Literature, by the FDA, and by Daiichi Sankyo. .....................................9

          1.     Medical Literature....................................................... 9

          2.     FDA.......................................................................... 11

          3.     Daiichi Sankyo.......................................................... 13

     C.     The Scientific Basis of Rechallenge Testing .......................................15

VI.    FDA HAS CHANGED DRUG LABELS BASED IN PART ON POSITIVE DECHALLENGE AND RECHALLENGE EVIDENCE ..................................15

     A.     The Importance of Dechallenge/Rechallenge Data in FDA Drug Safety Determinations Can Be Seen in the Number of Instances Where FDA Used Dechallenge/Rechallenge Data in Making Important Public Health Determinations. .....................................................................................16

     B.     Changes to the Warnings & Precautions Section of Label Based on Dechallenge/Rechallenge Data. ...........................................................16

VII.   BY THE END OF 2006, AND NO LATER THAN 2007, SERIOUS ADVERSE EVENT REPORTS FOR OLMESARTAN SHOW REPRODUCIBLE POSITIVE RECHALLENGE CASES, THUS SATISFYING THE FDA STANDARD OF REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION. ....................................23

VIII.  DAIICHI SANKYO CONCLUDED THAT ITS SAFETY DATABASE DID NOT SHOW A CAUSAL ASSOCIATION. A REASONABLE AND PRUDENT MANUFACTURER SHOULD HAVE CONCLUDED THAT THE SAFETY DATABASE DID SHOW A CAUSAL ASSOCIATION..................................36

IX.    DESPITE THE FACT THAT THERE WAS SOUND SCIENTIFIC EVIDENCE THAT MET THE FDA STANDARD IN DAIICHI SANKYO'S POSSESSION BY THE END OF 2006, AND CERTAINLY BY 2007, DAIICHI SANKYO FAILED TO ACT ON IT AND INFORM DOCTORS AND PATIENTS. ..............................................38

i

## TABLE OF CONTENTS
(continued)

**Page**

X.     CONCLUSIONS............................................................................................................44

## APPENDICES AND SCHEDULES

APPENDIX A – CURRICULUM VITAE

APPENDIX B – PRIOR TESTIMONY

APPENDIX C – PUBLISHED ARTICLES ON FDA ISSUES

APPENDIX D – MATERIALS PROVIDED

SCHEDULE I – TABLE OF ANGIOTENSIN II RECEPTOR BLOCKERS (ARBS) SOLD IN UNITED STATES (DRUGS IN SAME CLASS AS OLMESARTAN MEDOXOMIL)

SCHEDULE II – INTERNAL DISCUSSIONS REGARDING CELIAC DISEASE, SPRUE-LIKE ENTEROPATHY, AND GASTROINTESTINAL SIDE EFFECTS

SCHEDULE III – REGULATORY CORRESPONDENCE AND FDA ACTIONS REGARDING CELIAC DISEASE, SPRUE-LIKE ENTEROPATHY OR GASTROINTESTINAL SIDE EFFECTS

SCHEDULE IV – TIMELINE AND LISTING OF ALL RELEVANT LABELING AND PPI SECTIONS AND CHANGES RE: GASTROINTESTINAL DISORDERS

SCHEDULE V – MEDWATCH REPORTS FROM SECTION VII OF REPORT

SCHEDULE VI – KEY DAIICHI SANKYO EMPLOYEES

SCHEDULE VII - DEPOSITION EXCERPTS

SCHEDULE VIII- FDA REGULATIONS AND GUIDANCES

SCHEDULE IX – LIST OF BELLWETHER PLAINTIFFS

SCHEDULE X – RELEVANT MEDICAL LITERATURE WITH ABSTRACTS

## I.    OVERVIEW[1]

1.      I have been asked to examine the facts relating to Daiichi Sankyo's Olmesartan[2] and FDA's regulatory process and standards.

2.      As part of the process, I examined if, and when, there was a "a reasonable evidence of a causal association, a definitive causal relationship need not be established," for that is the FDA standard for determining whether a company should include a warning in the Warnings and Precautions section of the drug label.

3.      I understand that at this juncture of the litigation the Court has ordered the parties to focus on issues of causation.

4.      Issues of causality are at the heart of the FDA standard.

5.      This report addresses these issues through the prism of FDA's regulatory framework.  It addresses if, and when, Daiichi Sankyo should have recognized that there was a reasonable evidence of a causal association between olmesartan and serious gastrointestinal symptoms.

6.      The report focuses on the importance of dechallenge and rechallenge data in assessing causal associations under the FDA standard.

7.      Simply put, as I describe in more detail below, dechallenge means stopping the drug and seeing if the adverse event goes away. Rechallenge means restarting the drug and seeing if the adverse event comes back. It is a bedrock methodology of establishing a reasonable causal association between a drug and an adverse event.

---

[1] For all my opinions, see my full Report.

[2] In this Report, "olmesartan" refers to olmesartan medoxomil and the brand names of the drugs in which it is sold as a monotherapy or combination therapy, including Benicar, Benicar HCT, Azor, and Tribenzor. The labeling history of these drugs is set forth in Schedule IV. All Schedules were prepared by legal staff under my direction and subject to my review.

8.      The report shows how FDA has had manufacturers change drug labels based in part on positive dechallenge and rechallenge evidence.

9.      The report concludes that by the end of 2006, and certainly by 2007, serious adverse event reports for olmesartan showed reproducible positive rechallenge cases, thus satisfying the FDA standard of "reasonable evidence of a causal association."

10.      The report further concludes that despite the fact that there was sound scientific evidence that met the FDA standard by the end of 2006, and certainly by 2007, in Daiichi Sankyo's possession, Daiichi Sankyo failed to act on it and inform doctors and patients.

## II.      QUALIFICATIONS

11.      I received my M.D. degree from Harvard Medical School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.

12.      I did my pediatrics training at John Hopkins Hospital.

13.      I was appointed in 1990 by President George H.W. Bush as Commissioner of the United States Food and Drug Administration and was confirmed by the United States Senate.  I also served in that position under President William Jefferson Clinton until February 1997.

14.      I have taught food and drug law at Columbia University Law School, and I have testified many times before the United States Congress on food, drug, and consumer protection issues under federal and state law.  Over the last thirty years, I have published numerous articles in legal, medical, and scientific journals on the federal regulation of food, drugs, and medical devices.  I have had special training in pharmacoepidemiology at Johns Hopkins Hospital.  My resume is included as Appendix A.  A list of cases in which I have appeared as a witness in the last five years and documentation of my expert witness fee is attached as Appendix B.  A list of my published articles relating to FDA issues, including drugs and devices, is attached as Appendix C.

2

15.     As Commissioner, I had ultimate responsibility for implementing and enforcing the United States Food, Drug, and Cosmetic Act.  I was responsible for overseeing five Centers within FDA.  They included, among others, the Center for Drug Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Biologics Evaluation and research.  In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as possible.  During my tenure as Commissioner, the FDA announced a number of new programs, including: the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MedWatch program for reporting adverse events and product problems involving both drugs and devices.  I created an Office of Criminal Investigation within the Agency.

16.     I am a senior advisor to TPG Capital, a leading global private equity firm, which owns pharmaceutical and biomedical companies.  I served on the board of Aptalis Pharma and serve on the Boards of Stoke Therapeutics, Tokai Pharmaceuticals and the medical device and biologics company Immucor, Inc.  In these advisory and fiduciary capacities, I have advised companies on the standards and duties of care within the pharmaceutical and medical device industry.  I also chaired the compliance committee of Aptalis, and I chair the quality committee of Immucor, which involves ensuring compliance with FDA laws and requirements.

17.     The documents provided to me by counsel, or that I accessed independently from various sources, including, but not limited to, FDA's website, are listed in Appendix D to this report.  At my request, Appendix D was prepared by counsel. Based on my review of those documents and my training and experience, I have a number of opinions that are detailed below.

18.     In this report I use the term "Daiichi Sankyo" to mean Daiichi Sankyo, Inc.; Daiichi Sankyo U.S. Holdings, Inc.; Daiichi Sankyo Co., Ltd; Forest Laboratories, Inc.; Forest Pharmaceuticals, Inc.; and Forest Research Institute, Inc.  I understand that olmesartan was sold as part of a co-promotion agreement with Forest at various points in time.[3]

19.     The causes of action in this litigation include: products liability—design defect and failure to warn; gross negligence; negligence; negligence per se; negligent misrepresentation; negligent design; fraudulent concealment; constructive fraud; fraud; breach of express warranties; breach of implied warranties; unjust enrichment; violation of consumer protection laws; loss of consortium; wrongful death; survival action; and punitive damages.

20.     The Plaintiffs in the bellwether cases are listed in Schedule IX.

## III.   THE FDA STANDARD FOR DETERMINING WHETHER THERE IS REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION WITH A DRUG SUCH THAT A COMPANY SHOULD INCLUDE A WARNING IN THE WARNINGS AND PRECAUTIONS SECTION OF THE DRUG LABEL.

21.     In 1979, FDA, as part of a final rule titled "Labeling and Prescription Drug Advertising: Content and Format for Labeling for Human Prescription Drugs" issued 21 CFR §§ 201.57 (e) and (g) which stated, respectively:

> "(e) Warnings: Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them and steps that should be taken if they occur. The labeling shall be revised to include a warning <u>as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved</u>."[4] "(g) Adverse Reactions: An adverse reaction is an undesirable effect reasonably associated with the use of the drug that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence."[5]

---

[3] See OLM-DSI-0001247338 – 387.

[4] 21 CFR § 201.57(e).

[5] 21 CFR § 201.57(g).

22.     In 2006, FDA adopted final rules for 21 CFR §§ 201.57 (c)(6) and (7) which stated:

> "(c)(6) 5 Warnings and precautions. (i) General. This section must describe clinically significant adverse reactions....the labeling must be revised to include a warning about a clinically significant hazard <u>as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established</u>...." "(c)(7) 6 Adverse reactions. This section must describe the overall adverse reaction profile of the drug based on the entire safety database. For purposes of prescription drug labeling, an adverse reaction is an undesirable effect, reasonably associated with use of a drug, that may occur as part of the pharmacological action of the drug or may be unpredictable in its occurrence. This definition does not include all adverse events observed during use of a drug, only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event."[6]

23.     Hereinafter I refer to post-2006 standard as the "FDA Standard."

## IV.     REGULATORY OVERVIEW OF OLMESARTAN

24.     Benicar, Benicar HCT, Azor and Tribenzor contain the active chemical ingredient known as olmesartan medoxomil.  Olmesartan medoxomil is an angiotensin II receptor antagonist used for the treatment of high blood pressure.

25.     On April 25, 2002, FDA approved Benicar for treatment of hypertension as a monotherapy containing the active ingredient olmesartan medoxomil (hereinafter "olmesartan"). On June 5, 2003, FDA approved Benicar HCT for treatment of hypertension, as a combination therapy drug containing the active ingredients olmesartan and hydrochlorothiazide.  On September 26, 2007, the FDA approved Azor for treatment of hypertension as a combination therapy drug, which contains the active ingredients olmesartan and amlodipine besylate.  On

---

[6] 71 Fed. Reg. 3922-3997 (January 24, 2006) at 3990.

July 23, 2010, the FDA approved Tribenzor for treatment of hypertension as a combination

therapy drug, which contains olmesartan, amlodipine and hydrochlorothiazide

26.     The original labels for all four drugs did not include any statement in the

Warnings and Precautions section of the label regarding olmesartan and serious gastrointestinal

symptoms.  Listings of gastrointestinal symptoms in Adverse Reactions Clinical Trial

Experience and Post-Marketing sections of the labels for the four olmesartan drugs are described

in Schedule IV.

27.     Daiichi Sankyo submitted an Annual Periodic Adverse Drug Experience Report

(PADER) for Benicar to FDA on June 24, 2009, which reported six serious adverse event reports

containing the preferred term "coeliac disease."[7] On November 23, 2009, the FDA requested that

Daiichi Sankyo provide a review of all celiac disease cases after reviewing Daiichi's PADER.[8]

In response to FDA's request, Daiichi Sankyo provided a report on January 14, 2010, identifying

43 reports of adverse events coded with the term "celiac disease" in its global safety database,

including 16/17 cases with positive rechallenge.[9]

28.     Schedule III provides a timeline of correspondence between Daiichi Sankyo and

FDA regarding celiac disease and serious gastrointestinal symptoms involving olmesartan.

29.     The FDA also initiated a query using its Mini-Sentinel pilot[10] to assess the risk of

celiac disease with the use of angiotensin II receptor blockers, including olmesartan. Mini-

Sentinel reports were issued on January 17, 2012 and June 7, 2013.[11]

---

[7] OLM-DSI-0001386786

[8] OLM-DSI-0004794456 at 462, 465.

[9] OLM-DSI-0001247409-541, at 419, 423, 425, 432.

[10] "Mini-Sentinel" was a working pilot project of the FDA that uses secure access to the
electronic health records of more than 100 million patients with at least 17 data partners.  The
program was authorized by Congress in 2007.  One of the Mini-Sentinel queries that may be

30.     On June 29, 2012, the FDA notified Daiichi Sankyo that it had created a Tracked

Safety Issue ("TSI")[12] for 0lmesartan regarding malabsorption.[13]

31.     On July 11, 2012, citing a case series just published by Dr. Murray in the *Mayo*

*Clinic Proceedings* regarding Olmesartan and serious gastrointestinal symptoms, FDA requested

that Daiichi Sankyo provide a review of "all serious spontaneous post-marketing reports of

malabsorption, enteropathy, microscopic colitis, celiac-like symptoms, or chronic diarrhea with

clinically significant weight loss associated with olmesartan," along with any other "additional

relevant information on potential underlying mechanism."[14]   Daiichi Sankyo submitted a report

in response to FDA's inquiry on September 28, 2012, describing a total of 80 adverse event

reports which met FDA's criteria in its Daiichi global safety database, including 28 cases with

positive rechallenge.[15]

32.     The results of FDA's Tracked Safety Issue for olmesartan are documented in a

memorandum dated May 14, 2013, which "found sufficient evidence to support an association

---

undertaken is to assess potential safety risks with medications.  However, the "[d]ata obtained
through Mini-Sentinel are intended to complement other types of evidence such as preclinical
studies, clinical trials, postmarket studies, and adverse event reports, all of which are used by
FDA to inform regulatory decisions regarding medical product safety."  *See* OLM-DSC-
0000094055 – 82, at 55; OLM-DSI-0002169412 – 55, at 12.

[11] *See* OLM-DSC-0000094055 – 82; OLM-DSI-0002169412 – 55.

[12] The FDA's Office of New Drug (OND) and Office of Surveillance and Epidemiology (OSE)
receive and analyze safety information.  When tracking significant safety issues related to
marketed prescription and over-the-counter drugs, the FDA may issue a Document Archiving,
Reporting, and Regulatory Tracking System (DARRTS) Tracked Safety Issue (TSI).  *See*
Manual of Policies and Procedures, Center for Drug Evaluation and Research, "Tracking of
Significant Safety issues in Marketed Drugs – Use of DARRTS Tracked Safety Issues,"
effective date of 6/8/2009; 12/20/2011, available at
http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ManualofPoliciesProcedures/
UCM164967.pdf.

[13] OLM-DSI-0002100590-593 at 592.

[14] OLM-DSI-0001247624-626 at 25.

[15] OLM-DSI-0001247542 – 840 at 13-14.

between olmesartan and sprue-like enteropathy," and recommended a revision to the Warnings and Precautions and Adverse Reactions-Postmarketing Experience sections of all labels for Daiichi Sankyo's olmesartan-containing products sold in the United States, and issuance of a Drug Safety Communication to healthcare professionals.[16]

33.     On July 3, 2013, the FDA issued a Drug Safety Communication "warning that the blood pressure drug olmesartan medoxomil (marketed as Benicar, Benicar HCT, Azor, Tribenzor, and generics) can cause intestinal problems known as sprue-like enteropathy."  The FDA stated that its evaluation "found clear evidence of an association between olmesartan and sprue-like enteropathy," noting that it had identified 10 cases in FAERS[17] of positive rechallenge for "late-onset diarrhea with significant weight loss and, in some cases, with intestinal villous atrophy on biopsy."[18]

## V.    THE IMPORTANCE OF DE/RECHALLENGE DATA IN ASSESSING CAUSAL ASSOCIATIONS UNDER THE FDA STANDARD.

### A.    Definition of Positive Dechallenge/Rechallenge

34.     "Dechallenge" refers to the withdrawal of a drug from a patient's treatment regime.  The FDA defines positive dechallenge as "partial or complete disappearance of an adverse experience after withdrawal of the suspect product." "Rechallenge" refers to the reintroduction of a drug suspected of having caused an adverse experience following a positive dechallenge.  The FDA defines positive rechallenge as "reoccurrence of similar signs and

---

[16] *See* May 14, 2013, Tracked Safety Issue (TSI) Integrated Review Memorandum, attached hereto in Schedule III.

[17] The FDA Adverse Event Reporting System (FAERS) is a database that contains information on adverse event and medication error reports submitted to the FDA.  The database is designed to support the FDA's post-marketing safety surveillance program for drugs and therapeutic biologic products.

[18] Caspard Exhibit No. 184.

symptoms upon reintroduction of the suspect product."  Dechallenge/rechallenge information is used by the FDA in making causality assessments.[19]

> **B.    The Importance of Dechallenge/Rechallenge Evidence to Assessing Causation Can Be Seen from the Weight that It Is Given in the Medical Literature, by the FDA, and by Daiichi Sankyo.**
>
> **1.    Medical Literature**

35.    As an example of the importance of how dechallenge/rechallenge data is used in various causation assessment tools, the Bradford Hill criteria, a well-accepted guideline useful for providing evidence of a causal relationship, considers dechallenge/rechallenge evidence. Specifically, the criteria assesses causality from multiple sources using the following parameters: strength of association, temporality (whether condition followed exposure), consistency (reproducibility), specificity (whether there are alternative causes), plausibility (whether the association is biologically plausible), coherence, dose response relationship, experiment **(whether the condition improves upon removal of the hypothesized causative agent),** and analogy.[20]

36.    The Naranjo scale is another validated methodology for assessing the causal relationship between a drug and an adverse event using a questionnaire to assign probability scores.  Under the scale, the likelihood of whether an adverse event was caused by the drug can be termed "definite," "probable," "possible," or "doubtful."  The scoring system gives points for positive dechallenge and positive rechallenge.  "A 'definite' reaction was one that (1) followed a

---

[19] FDA Guidance for Industry, Guideline for Postmarketing Reporting of Adverse Drug Experience (1997), p. 18; s*ee also* FDA Draft Guidance for Industry. Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines (2001), p. 35.

[20] *See e.g*., Austin Bradford Hill, "The Environment and Disease: Association or Causation," Proceedings of the Royal Society of Medicine, 58 (1965), 295-30; Strom BL, Chapter 3 Basic Principles of Clinical Epidemiology Relevant to Pharmacoepidemiologic Studies, in Strom BL, Pharmacoepidemiology 82-84 (5th ed. 2012).

reasonable temporal sequence after a drug…(2) followed a recognized response to the suspected drug, and (3) was confirmed by improvement on withdrawing the drug and reappeared on reexposure."[21]

37.     The World Health Organization-Uppsala Monitoring Centre causality assessment recognizes that positive rechallenge information can permit a suspected adverse drug reaction to be upgraded from "probable/likely" to "certain" in its causal connection to the drug.[22]

38.     Strom's <u>Pharmacoepidemiology</u> textbook describes the importance of rechallenge data in making causal assessments.  "Case reports can be particularly useful to document causation when the treatment causes a change in disease course which is reversible, such that the patient returns to his or her untreated state when the exposure is withdrawn, can be treated again, and when the change returns upon repeat treatment."[23]

39.     Another chapter in Strom states that case reports may establish a causal relationship where "there is at least one case with a positive re-challenge and some other supportive cases which do not have known confounding drugs or diseases."[24]

40.     A different chapter in Strom states, "[I]t has been suggested that a temporal relationship between medical product and adverse event, coupled with positive de-challenge and

---

[21] Naranjo CA, Busto U, Sellers EM, et al., A method for estimating the probability of adverse drug reactions, Clin. Pharmacol. Ther. 30 (2): 239–45 (1981).

[22] Uppsala Monitoring Centre. Pharmacovigilance.  Definitions. http://who-umc.org/DynPage.aspx?id=97224&mn1=7347&mn2=7252&mn3=7257 (accessed October 2016).

[23] Strom BL, Chapter 3 Basic Principles of Clinical Epidemiology Relevant to Pharmacoepidemiologic Studies, in Strom BL, Pharmacoepidemiology 86 (5th ed. 2012).

[24] Edwards IR, Olsson S., Lindquist M, Hugman B. Chapter 10 Global Drug Surveillance:  The WHO Programme for International Drug Monitoring, in Strom BL, Pharmacoepidemiology 175 (4th ed. 2005).

re-challenge, can occasionally make isolated reports conclusive as to a product-event association."[25]

41.      An article in Drug Safety states "[o]nly rarely does the presence of one or more proof positive reports - for instance, in the case of a convincing recurrence on re-exposure to the drug ('positive rechallenge') - produce conclusive evidence with regard to the role of the drug."[26]

42.      The Drug Safety article further states "[a] well-documented positive rechallenge, intentional or incidental, may irrefutably prove the connection between a drug and an adverse reaction.  Since certainty is notoriously rare in pharmacovigilance, such proof-positive observations (of previously unknown as well as of established adverse reactions) have great scientific value and their reporting is of utmost importance."[27]

**2.      FDA**

43.      The FDA gathers dechallenge/rechallenge information in collecting and assessing adverse drug reactions.

44.      The FDA's form for reporting adverse drug events, Form 3500/3500A (also known as a MedWatch form), solicits dechallenge/rechallenge data from consumers, health professionals, manufacturers and distributors about the suspect medication. Specifically, the Form asks whether the "event abated after use stopped or dose reduced" and whether the "event reappeared after reintroduction."

http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM295636.pdf.

---

[25] Rizwanuddin A, Chapter 9 Spontaneous, Reporting in the United States, in Strom BL, Pharmacoepidemiology 152 (4th ed. 2005).

[26] R.H.B. Meyboom, Y.A. Hekster, A.C.G. Egberts, *et al*, Causal or Casual? The Role of Causality Assessment in Pharmacovigilance, Drug Safety 1997 Dec; 17 (6): 374-389 at 377.

[27] R.H.B. Meyboom, Y.A. Hekster, A.C.G. Egberts, et al, Causal or Casual? The Role of Causality Assessment in Pharmacovigilance, Drug Safety 1997 Dec; 17 (6): 374-389 at 383.

45.     The FDA's 1997 Guideline for Postmarketing Reporting of Adverse Drug Experiences defines "causality assessment" as including "for example, assessment of temporal relationships, dechallenge/rechallenge information, association with (or lack of association with) underlying disease, presence (or absence) of a more likely cause, plausibility, etc."[28]

46.     The FDA's guidance for reviewers conducting clinical safety reviews of NDA, stresses the importance of rechallenge information when assessing drug-relatedness of adverse events experienced in clinical trials.  "A … reason for individual case review of deaths, serious adverse events, and adverse events leading to discontinuation is to look for results of rechallenge. A potentially important source of information about causality is when an individual is rechallenged with drug, accidentally or deliberately.  Recurrence with rechallenge is a potentially strong indicator of causality, but interpretation of the results of rechallenge is highly dependent on the natural course of the event being considered.  For noncyclical events that are exceedingly rare in the background (e.g., acute liver failure, aplastic anemia) recurrence of the event upon rechallenge (i.e., positive rechallenge) provides strong evidence of causality.  Positive rechallenges are less definitive for diagnoses/events that can occur in cyclical or recurrent fashion (e.g., worsening glucose control in a subject with diabetes mellitus), but close observation of the patient's whole course (i.e., both challenge periods and dechallenge periods) may be helpful."[29]

---

[28] FDA Guidance for Industry, Guideline for Postmarketing Reporting of Adverse Drug Experience (1997), p. 18; see also FDA Draft Guidance for Industry. Postmarketing Safety Reporting for Human Drug and Biological Products Including Vaccines (2001), p. 35.

[29] FDA Reviewer Guidance, Conducting a Clinical Safety Review of a New Product Application and Preparing a Report on the Review, p. 9 (2005).

47.     A third FDA Guidance also states, "[i]t is possible that even a single well-documented case report can be viewed as a signal, particularly if the report describes a positive rechallenge or if the event is extremely rare in the absence of drug use."[30]

48.     As discussed below, the FDA has required labeling changes based on adverse event reports of positive rechallenge.

### 3.     Daiichi Sankyo

49.     Daiichi Sankyo's Standard Operating Procedure ("SOP") for assessing causality of olmesartan serious adverse events in its drug safety database, ARGUS, requires consideration of positive rechallenge information.  "A number of factors must be considered when assessing causality, including the study drug (e.g., known pharmacological effect, known adverse event), the patient (e.g., medical history, concomitant medication use), the disease under study (e.g., expected outcome event in the population), the event itself (e.g., whether the event is likely drug induced; specificity of the event), and case-specific information (e.g., plausible temporal association; positive rechallenge)."  **A causality assessment of "related" is appropriate "based on a positive rechallenge and lack of other confounding factors."**(Emphasis added.)[31]

50.     Daiichi Sankyo's SOP for "Receipt, Assessment, and Reporting of Adverse Events from Non-Study Sources," RM-S01-003 effective April 1, 2007, instructs that causality between an adverse event and drug is "definitely related" if the event:  "Follows a reasonable temporal sequence from study product administration; Abates upon discontinuation of the study

---

[30] FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, p. 4 (2005).

[31] Argus Safety Data Entry Convention, effective March 10, 2014, OLM-DSC-0001431008 at 070.

product (dechallenge); **Is confirmed by reappearance of the reaction on repeat exposure (rechallenge)**." (Emphasis added.)[32]

51.     In a September 28, 2012 report to the FDA regarding 80 cases retrieved from the Daiichi Sankyo global safety database reporting malabsorption, enteropathy, microscopic colitis, celiac or sprue like symptoms and chronic diarrhea with clinical significant weight loss, Daiichi Sankyo states that the "most interesting cases" were the reports of positive rechallenges.  The report goes on to state that rechallenge is a "rigorous criterion for implicating a drug in drug induced enteropathy."[33]

52.     At his deposition on May 6, 2016 Allen Feldman, Daiichi Sankyo's Vice President for Clinical Safety and Pharmacovigilance from 2007 forward, testified as follows:

```
14          Q. The third criteria in
15      looking to see if there's a causal
16       relationship is, "Evidence of positive
17      dechallenge or positive rechallenge."
18      You would agree with that,
19      that that's important evidence to look at
20      if you have that information to determine
21      causation?
22          A. That's very useful
23      information to have.

22          Q. And again, we went through
23      this earlier in the deposition. A
24      rechallenge is certainly very, very

                    231
1       important information in terms of
2       determining an association, right?
3           A. The rechallenge is.[34]
```

---

[32] OLM-DSI-0007160734 at 749.

[33] OLM-DSI-0001247542 at 545 and 574.

[34] Deposition of Allen Feldman, May 6, 2016, at 136:14-23 and 230:22-231:3.

### C.      The Scientific Basis of Rechallenge Testing

53.      Using rechallenge methodology experimentally seeks to isolate the role of the drug in contrast to other potential causes/confounding factors.  In a rechallenge experiment the variable that is manipulated is the drug.  Furthermore, as a positive rechallenge necessarily involves a prior positive dechallenge, there are two experimental instances where the administration or withdrawal of the drug is determined to be linked to the disease.  Thus in any positive dechallenge rechallenge situation, there is, in essence, built-in replicability that limits the chances that a confounding factor is at work.  As Professor Strom has stated, while there are no guarantees that a positive dechallenge and rechallenge is absolute evidence of causation, practically speaking it is a method of choice for establishing a causal association.  FDA regulations require a warning in the Warnings and Precautions section of the label when there is "reasonable evidence of a causal association, a definitive causal relationship need not be established."

54.      In my opinion, positive de/rechallenge evidence that is reproducible meets the FDA standard of reasonable evidence of a causal association.[35]

## VI.     FDA HAS CHANGED DRUG LABELS BASED IN PART ON POSITIVE DECHALLENGE AND RECHALLENGE EVIDENCE

55.      My opinion that positive de/rechallenge evidence that is reproducible meets the FDA standard of reasonable evidence of a causal association and can lead to changes in drug labels is further supported by numerous examples of FDA revising drug labels based on de/rechallenge evidence.  An analysis of such cases is included in the next section.

---

[35] Meeting this standard triggers the requirement for a Warning in the Warnings and Precautions section of the label.

**A.    The Importance of Dechallenge/Rechallenge Data in FDA Drug Safety Determinations Can Be Seen in the Number of Instances Where FDA Used Dechallenge/Rechallenge Data in Making Important Public Health Determinations.**

56.    I searched for the term rechallenge in FDA Drug Safety Newsletters from Volume 1, November 1 (Fall 2007) to the last available, Volume 2, Number 3 (2009).  I also searched FDA Drug Safety Communications from 2010 through 2016 (as of November 27, 2016) and MedWatch Safety Alerts from 2012 through 2016 (as of November 27, 2016). [36]

57.    I reviewed FDA Drug Safety Newsletters, FDA Drug Safety Communications, and FDA MedWatch Safety Alerts that resulted in Warnings based on or in part on dechallenge/rechallenge data.

58.    This search revealed the following examples of changes in the Warnings based on or in part on de/rechallenge data.

**B.    Changes to the Warnings & Precautions Section of Label Based on Dechallenge/Rechallenge Data.**

59.    **Provigil (modafinil)**.  FDA received six reports of severe skin adverse events, including erythema multiforme, Stevens-Johnson Syndrome, toxic epidermal necrolysis and drug rash with eosinophilia and systemic symptoms.  According to FDA, "[i]n one case of SJS. . . rechallenge with modafinil resulted in recurrence of the rash. . . which supported a causal relationship with modafinil use."  FDA further stated that "[t]he cases described a temporal relationship with detailed clinical descriptions, relevant laboratory data, dermatologist-substantiated diagnoses, skin biopsy confirmation, positive dechallenges, and/or a positive rechallenge, all of which support an association between modafinil use and serious cutaneous

---

[36] The FDA website for these materials starts at the dates indicated.

skin reactions."  The Warnings were changed to add "Serious Rash, Including Stevens-Johnson Syndrome."[37]

60.  **Tysabri (natalizumab).**  FDA identified in FAERS 28 cases of liver dysfunction, 24 of which were mild lab abnormalities or potentially due to another etiology.  FDA stated of the four cases with serious liver injury, "one patient had a positive rechallenge with development of jaundice and significant elevation of liver enzymes after resuming natalizumab."  FDA further stated, "[t]he cases. . .  describe a temporal relationship between serious liver injury and the use of natalizumab with detailed clinical descriptions, relevant laboratory data, biopsy confirmation of drug-induced liver injury, positive dechallenge, and/or a positive rechallenge.  These cases support an association between natalizumab use and serious liver injury."  Warnings and Precautions were revised to add: "Hepatotoxicity. Clinically significant liver injury has been reported in patients treated with Tysabri in the postmarketing setting…In some patients, liver injury recurred upon rechallenge, providing evidence that Tysabri caused the injury."[38]

61.  **Strattera (atomoxetine)**.  A search of FAERS and published literature was performed for cases of serious liver injury.  In 2004, a labeling change was prompted by two published reports of atomoxetine-induced hepatitis.  In one of these reports, there was a positive rechallenge with atomoxetine.  As a result, "[s]evere liver injury. . . postmarketing report. . . of two cases of markedly elevated hepatic enzymes and bilirubin. . .  In one patient, liver injury. . . recurred upon rechallenge, and was followed by recovery upon drug discontinuation providing evidence that Strattera caused the liver injury" was added to the Warnings in 2004. Warnings and Precautions were again revised in 2007.  Since 2004, FDA received six additional reports of serious liver injury, including two in the published literature.  Four of the six patients recovered

---

[37] Fall 2007 Drug Safety Newsletter; 10/24/2007 Safety Alert.

[38] Spring 2008 Drug Safety Newsletter; 1/2008 Tysabri label.

upon discontinuation of atomoxetine.  FDA encourages physicians to inform patients of the signs and symptoms of liver injury and "discontinue and not resume atomoxetine treatment if patients present with jaundice or laboratory evidence of liver injury."[39]

62.      **Byetta (exenatide).**  FDA reviewed 30 reports of acute pancreatitis associated with use of the drug.  In 22 of the 30 cases, a positive dechallenge was reported; three of these cases reported recurrence of various symptoms (e.g., nausea and vomiting, abdominal pain) at re-initiation of exenatide.  The FDA also noted that 27 cases reported one or more possible contributory factors, including concomitant use of medications that list pancreatitis among reported adverse events in product labeling, or confounding conditions.  Nevertheless, the FDA concluded "[t]hese findings suggested a strong temporal association between exenatide and acute pancreatitis." The product labeling was updated to include information about acute pancreatitis in the Precautions section of the label, and information for healthcare professionals was posted on FDA's website, including a recommendation not to resume treatment "if pancreatitis is confirmed and an alternative etiology for pancreatitis has not been identified."  [40]

63.      **Viagra and Revatio (PDE5 Inhibitors), Levitra (vardenafil hydrochloride), and Cialis (tadalafil).**  A published case report of sudden sensorineural hearing loss (SSHL) in a male patient taking Viagra prompted FDA to search FAERS for postmarketing reports of hearing impairment associated with use of PDE5 inhibitors.  There were 29 unique cases describing hearing loss that met the definition of SSHL and "reported a strong or reasonably plausible temporal relationship" with the use of a PDE5 inhibitor, vardenafil hydrochloride, and tadalafil. Two patients reported a positive rechallenge. The FDA revised the labeling for the entire class of drugs to reflect this information in the Adverse Reactions section and provide guidance for

---

[39] 2009 Drug Safety Newsletter; Volume 2, No. 1, 10/2006 Strattera Label.

[40] Winter 2008 Drug Safety Newsletter, Volume 1, No. 2; 11/01/2006 Label, 1/11/2008 Label.

patients who experience sudden hearing loss in the Precautions, Information for Patients section of the labeling.[41]

64.    **Rocephin (Intravenous Ceftriaxone).**  FDA reviewed seven case reports from FAERS of serious cardiopulmonary adverse events in neonates undergoing concurrent treatment with Rocephin and calcium-containing intravenous products.  Three representative cases were described in detail, including one with a positive rechallenge.  A repeat cardiopulmonary event occurred after the second dose. The Warnings were revised to reflect this risk, including that "Rocephin must not be administered simultaneously with calcium-containing IV solutions. . . ."[42]

65.    **Cubicin (daptomycin)**.  FDA located in FAERS and the medical literature seven cases of eosinophilic pneumonia. Two of the cases reported recurrence of eosinophilic pneumonia after Cubicin was restarted.  The Warnings and Precautions section of the label was revised to add: "Eosinophilic pneumonia has been reported in patients receiving CUBICIN…. Recurrence of eosinophilic pneumonia upon re-exposure has been reported."[43]

66.    **Lamictal (lamotrigine)**.  FDA reviewed adverse event reports submitted to the Agency for cases of aseptic meningitis. FDA identified 40 cases. Fifteen of the cases reported a rapid return of symptoms following re-initiation of Lamictal.  FDA stated, "[i]n these rechallenge cases, symptoms were frequently more severe after re-exposure."  The Warnings and Precautions were revised to add:  "Aseptic meningitis.  Re-exposure resulted in rapid return of

---

[41] Winter 2008 Drug Safety Newsletter, Volume 1, No. 2; 2/25/2008 Viagra Label, 12/18/2007 Revatio Label; 10/18/2007 Levitra Label, 10/18/2007 Cialis Label.

[42] 2009 FDA Drug Safety Newsletter, Volume 1, No. 3; 7/17/2007 Label.

[43] 7/29/10 Drug Safety Communication; 11/2010 Cubicin Label.

symptoms (from within 30 minutes to 1 day following re-initiation of treatment) that were frequently more severe." [44]

67.  **Proton Pump Inhibitor (PPI) Drugs**.  FDA searched FAERS, the medical literature, and periodic safety update reports for reports of low magnesium levels.  A total of 38 AERS cases and 23 cases from the literature were found, including eight reported in both FAERS and the literature.  FDA stated, "[h]ypomagnesemia has been reported in adult patients taking PPIs for at least three months, but most cases occurred after a year of treatment. . .   Some cases cited both positive dechallenge as well as positive rechallenge. . .   After restarting the PPI, the median time to develop hypomagnesemia again was two weeks."  The Warnings and Precautions Section was revised to add "Hypomagnesemia, symptomatic and asymptomatic, has been reported rarely in patients treated with PPIs for at least three months…treatment of hypomagnesemia required magnesium replacement and discontinuation of the PPI." [45]

68.  **Saphris (asenapine maleate).**  FDA performed a search of FAERS for reports of type 1 hypersensitivity reactions and identified 52 cases.  FDA found that "[o]f the 52 cases, 15 reported a resolution of symptoms following Saphris discontinuation, while two of these cases reported a reappearance of symptoms upon reintroduction of Saphris."  The Warnings and Precautions Section was revised to add:  "Hypersensitivity Reactions, including anaphylaxis and angioedema, have been observed…" [46]

69.  **Tumor Necrosis Factor-alpha blockers (Remicade, Enbrel, Humira, Cimzia, Simponi).**  FDA performed a search of FAERS and the medical literature for reports of opportunistic pathogens seen in patients treated with TNF-a blockers.  FDA identified 80 cases

---

[44] 8/12/10 Drug Safety Communication; 10/12/2010 Lamictal Label.

[45] 3/22/11 Drug Safety Communication, 05/2011 label.

[46] 9/1/2011 Drug Safety Communication, 08/2011 label.

of *Legionella* in FAERS and 23 cases in the literature.   One published case reported that a "patient developed a second episode of Legionella pneumonia following re-initiation of a TNF-a blocker."  The Boxed Warning Section was revised to add the following italicized words: "Bacterial, viral and other infections due to opportunistic pathogens, *including Legionella and Listeria.*" [47]

70.  **Acetaminophen and acetaminophen-containing medications**.  A search of FAERS and the medical literature was performed for serious skin reactions. Three cases of positive rechallenge were found in the published literature.  "The evidence supporting causality between acetaminophen and serious skin reactions primarily comes from a small number of published cases in which patients were rechallenged with acetaminophen and had a recurrence of serious skin reaction."  The Warnings were revised to add "Serious skin reactions. . .  Patients should be informed about the signs of serious skin reactions, and use of the drug should be discontinued at the first appearance of skin rash or any other sign of hypersensitivity."  For over the counter medications, FDA requested/encouraged additional language.[48]

71.  **Geodon (ziprasidone).**  FDA searched the FAERS database for cases of serious skin reaction known as Drug Reaction with Eosinophilia and Systemic Symptoms (DRESS).  Six cases of DRESS associated with ziprasidone use were located. The FDA found that "[i]n three cases, a recurrence of symptoms was reported following the discontinuation and re-initiation of ziprasidone, with a faster time to onset following the re-initiation."  The FDA concluded that the "FAERS cases support an association between ziprasidone and the development of DRESS because of the consistency of the case characteristics to the signs and symptoms of DRESS, the

---

[47] 9/7/2011 Drug Safety Communication; 09/2011 Remicade Label, 12/2012 Enbrel Label, 12/2011 Humira Label, 04/2012 Cimzia Label, 12/2011 Simponi Label.

[48] 8/1/2013 Drug Safety Communication.

21

temporal relationship between ziprasidone initiation and the onset of symptoms, and reported

cases of positive re-challenge." The Warnings and Precautions were revised to add "[d]rug

Reaction with Eosinophilia and Systemic Symptoms (DRESS). . .  Discontinue ziprasidone if

DRESS is suspected."[49]

72.     **DPP-4 inhibitors (Januvia, Onglyza, Tradjenta)**.  FDA searched FAERS and

the medical literature for reports of severe, disabling joint pain.  The FDA identified 33 cases of

severe arthralgia in FAERS.  The FDA reported that "[e]ight of the 33 cases documented a

positive rechallenge."  The Warnings and Precautions were revised to add the following

language: ". . . postmarketing reports of severe and disabling arthralgia…A subset of patients

experienced a recurrence of symptoms when restarting the same drug or a different DPP4

inhibitor."[50]

73.     **Harvoni (ledipasvir/sofosbuvir) or Sovaldi (sofosbuvir) and amiodarone in**

**combination with another Direct Acting Antiviral drug.**  FDA searched the FAERS database

for reports of serious slowing of heart rate.  The FDA located nine cases of symptomatic

bradycardia.  The FDA noted that "[i]n 3 of the patients, rechallenge with hepatitis C treatment

in the setting of continued amiodarone therapy resulted in recurrence of symptomatic

bradycardia."  The Warnings and Precautions were revised to add "Serious Symptomatic

Bradycardia When Coadministered with Amiodarone."[51]

74.     **Zyprexa.**  FDA performed a search of the FAERS database and located 23 cases

of Drug Reaction with Eosinophilia and Systemic Symptoms ("DRESS").  FDA noted that

"[o]ne reported the recurrence of DRESS after olanzapine was restarted.  Nine cases reported the

---

[49] 12/11/14 Drug Safety Communication; 12/2014 label.

[50] 8/28/15 Drug Safety Communication; 8/2015 labels.

[51] 3/24/15 Drug Safety Communication; 03/2015 labels.

symptoms completely resolved after discontinuation of olanzapine." The Warnings and

Precautions Section was revised to add a warning about DRESS.[52]

75.     **Abilify.**  FDA searched the FAERS database and the medical literature to locate

cases of impulse-control problems.  The FDA located 184 total cases, 167 in FAERS and 17 in

the medical literature.  The FDA noted that for the "17 cases published in the medical literature,

all cases contained information that the compulsive behavior resolved completely when

aripiprazole was discontinued, and four cases reported the return of compulsive behaviors when

aripiprazole was restarted."  The Warnings and Precautions Section added new warnings about

the different types of compulsive behaviors that might result, including the language "consider

dose reduction or stopping the medication if a patient develops such urges."[53]

76.     Thus, based on the above, from 2007 to present, there were 17 cases where

rechallenge data led to a change in the Warnings section of the label in drugs other than

olmesartan medoxomil.  In 16 of these cases the number of rechallenge cases that led to the

change in the Warnings section were specified.  In these 16 cases, the average number of

rechallenge cases was 3.19, with a range of 1 to 15 and a median of 2.

**VII.    BY THE END OF 2006, AND NO LATER THAN 2007, SERIOUS ADVERSE
        EVENT REPORTS FOR OLMESARTAN SHOW REPRODUCIBLE POSITIVE
        RECHALLENGE CASES, THUS SATISFYING THE FDA STANDARD OF
        REASONABLE EVIDENCE OF A CAUSAL ASSOCIATION.[54]**

77.     Daiichi Sankyo's production of MedWatch reports regarding olmesartan, and

their corresponding source files, for the ten year period starting at the time of NDA approval

(from 2002 through 2012) were reviewed for evidence of serious rechallenge cases involving

---

[52] 5/10/16 Drug Safety Communication; Zyprexa label.

[53] 5/3/16 Drug Safety Communication; 8/2016 label.

[54] Hereinafter, the term "rechallenge" is used to encompass positive dechallenge and positive rechallenge occurring together.

olmesartan and symptoms of olmesartan associated enteropathy. Any serious reports with a positive rechallenge and symptoms (terms) of diarrhea, vomiting, and/or celiac disease were identified.

78.     The methodological review identified 62 MedWatch forms that were submitted to FDA concerning olmesartan and that met the following criteria: 1) at least one of the symptoms of diarrhea, vomiting, or celiac disease appeared in either coded preferred terms in Section G.8 or the narrative in Section B.5; 2) positive rechallenge was documented either through checked rechallenge box in Section C.5 or the narrative in Section B.5; and 3) seriousness was documented either through checked box in Section B.2 or other evidence of hospitalization. I reviewed each of these 62 MedWatch forms, which are attached in Schedule X. These MedWatch forms were produced by Daiichi Sankyo as part of the MDL concerning olmesartan. They were selected from a total of approximately of 9,540 MedWatch reports concerning olmesartan that were produced.

79.     Although I am a licensed medical physician, when confronted by a specific medical question, it has been my practice at times, like many physicians, to consult with other medical experts who have considerable expertise in the issue. Toward that end, on November 1, 2016, I wrote to Dr. Daniel Leffler, Associate Professor of Medicine (Gastroenterology) at Harvard Medical School and Director of Research at the Celiac Center at Beth Israel Deaconess Medical Center in Boston, who has published extensively on gastrointestinal symptoms, including celiac disease, and has treated patients with olmesartan associated enteropathy.

80.     In my letter of November 1, 2016, to Dr. Leffler, I requested that he review the 62 FDA MedWatch forms and provide his clinical opinion on whether the presentation of symptoms in each of the MedWatch patients after taking olmesartan is consistent with the clinical syndrome

of olmesartan associated enteropathy. I also requested that he exclude any of the 62 MedWatch patients whose presentation of symptoms he believes is inconsistent with the clinical syndrome of olmesartan associated enteropathy.

81.     Of the 62 cases submitted to Dr. Leffler, Dr. Leffler concluded that 60 were highly consistent with olmesartan associated enteropathy, both by clinical syndrome and response to olmesartan withdrawal and rechallenge. One of the 62 cases, DSJ-2012-13566, was excluded by Dr. Leffler because the clinical syndrome of constipation, intestinal obstruction and pancreatitis was inconsistent with olmesartan associated enteropathy.  A second case, DSM-2011-00109, was excluded by Dr. Leffler because the very fast onset of symptoms, within one week of starting olmesartan, is unusual with olmesartan associated enteropathy.[55]

82.     Dr. Leffler also confirmed that the criteria used to identify the MedWatch reports selected—serious positive rechallenges involving diarrhea, vomiting or celiac disease—are highly relevant to clinical diagnosis of olmesartan associated enteropathy.[56]

83.     The following chart lists the 60 MedWatch forms that concerned olmesartan, met the three criteria above, and were validated as consistent with the clinical syndrome of olmesartan associated enteropathy.

---

[55] Expert Report of Daniel Leffler, M.D.

[56] *Id.*

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| 1 | SU-2004-002638 | Diarrhea (narrative) Vomiting | 58 | F | Box checked | Hospitalization (source file) | Over one year (source file) |
| 2 | SU-2005-004027 | Vomiting Dehydration Fall Laceration Nausea Hypotension | 58 | F | Box checked | Hospitalization. | Two years |
| 3 | SU-2006-005321 | Diarrhea GI inflammation Hypotension | 67 | M | Box checked | Hospitalization | One year |
| 4 | SP-2006-003299 | Diarrhea Vomiting Abdominal pain | 73 | F | Box checked | Hospitalization | Three months |
| 5 | SU-2006-005596 | CD Diarrhea Vomiting Weight loss Dehydration Anemia Malaise | 76 | M | Narrative | Hospitalization | Two to three years |
| 6 | SU-2006-005527 | Diarrhea Vomiting Tropical sprue Weight decreased Renal failure | 61 | M | Narrative | Hospitalization | Two years |
| 7 | SU-2006-005001 | CD Vomiting Pyrexia Chills Nausea Diarrhea (narrative) | 63 | M | Box checked | Hospitalization | Two to three years |
| 8 | SP-2006- | Gastroenteritis Hypokalaemia | 56 | F | Narrative | Hospitalization | Nine months |

[57] For the sake of completeness, this includes all coded preferred terms, not only the terms searched for. All terms are coded except where indicated, when term was used in narrative.

[58] From Section C.5 on Medwatch unless other source indicated.

[59] From Section B.2 on the Medwatch unless other source indicated.

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|-----|-----------|-----|--------|-----------------|-------------|---------------------------|
| | 003369 | Hypocalcaemia Diarrhea (narrative) Vomiting (narrative) | | | | | |
| 9 | DSU-2007-00076 | Vomiting Hypotension Renal failure | unk | M | Box checked | Hospitalization | Unknown |
| 10 | DSU-2007-00519 | CD Diarrhea Vomiting Hypotension Stress | 77 | F | Box checked | Hospitalization | Five to six years |
| 11 | SU-2007-005968 | Diarrhea Weight loss Dehydration | 67 | M | Box checked | Other Serious | Nine months |
| 12 | DSJ-2007-05652 | Vomiting Nausea Alanine aminotransferase abnormal Aspartate aminotransferase abnormal Jaundice | 70 | F | Box checked | Hospitalization | Nine months |
| 13 | DSM-2008-00111 | Diarrhea Vomiting | 59 | M | Box checked | Hospitalization | Two years and 7 months |
| 14 | DSM-2008-00300 | Diarrhea Vomiting | 75 | F | Box checked | Hospitalization | One year |
| 15 | DSM-2008-00239 | Vomiting Syncope Loss of consciousness Diarrhea (narrative) | 81 | F | Box checked | Hospitalization | Eleven months |
| 16 | DSU-2008-02107 | Diarrhea Vomiting CD Dehydration Weight loss Hypotension | 63 | M | Box checked | Hospitalization Other Serious | Two years |

27

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | | Nausea<br>Fall<br>Drug administration error | | | | | |
| 17 | DSM-2008-00607 | Vomiting<br>Dizziness<br>Tongue disorder | 82 | F | Box checked | Other Serious | Fifty-six days |
| 18 | DSU-2008-01355 | Vomiting<br>Viral infection<br>Acute kidney injury<br>Sneezing<br>Asthenia<br>Blood pressure increased | 70 | F | Box checked | Hospitalization | Over one year (narrative) |
| 19 | DSU-2008-02020 | Vomiting<br>Hyponatremia<br>Surgery<br>Blood creatinine increased<br>Glomerular filtration rate decreased<br>Gamma-glutamyltransferase increased<br>Blood cholesterol increased<br>Blood triglycerides increased<br>Blood glucose increased<br>Blood urea increased<br>Blood uric acid increased<br>Blood alkanine phosphatase increased<br>Alanine aminotransferase increased<br>Protein total increased<br>Blood albumin increased | 47 | F | Box checked | Other Serious | Unknown |

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | | Blood cholesterol decreased | | | | | |
| 20 | DSM-2009-00482 | Diarrhea Vomiting Nausea Dehydration Decreased appetite Acute kidney injury Urinary tract infection | 81 | F | Box checked | Hospitalization Other Serious | One year nine months |
| 21 | DSM-2009-00694 | Diarrhea Gastroenteritis Hypokalaemia Weight decreased | 70 | F | Box checked | Other Serious | One year |
| 22 | DSM-2009-01869 | Colitis Diarrhea (narrative) | 83 | F | Narrative | Hospitalization Other Serious | Unknown |
| 23 | DSU-2009-01835 | Diarrhea Vomiting Lipase increased Weight decreased Dehydration | 55 | F | Box checked | Hospitalization | One year one month |
| 24 | DSM-2009-00451 | Diarrhea haemorrhagic Vomiting Hypotension | 62 | F | Box checked | Hospitalization | Unknown |
| 25 | DSU-2009-00162 | Celiac disease Diarrhea Retching Dehydration Pain Asthenia Renal impairment Hypotension Fatigue Hyperhidrosis | 63 | M | Box checked | Hospitalization | Four years ago (narrative) |
| 26 | DSU-2009-00531 | Celiac disease Diarrhea Dehydration Weight decreased Malnutrition Lethargy Blood chloride | 65 | M | Box checked | Hospitalization Other Serious | Unknown |

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | | increased<br>White blood cell count decreased<br>Platelet count decreased<br>Anemia<br>Skin atrophy<br>Confusion<br>Heart rate decreased<br>Hypertension<br>Transferrin saturation increased | | | | | |
| 27 | DSU-2009-01026 | Celiac disease<br>Diarrhea<br>Vomiting<br>Cold sweat<br>Dehydration | 75 | F | Box checked | Hospitalization | Two years |
| 28 | DSU-2009-01282 | Celiac disease | Unk | F | Narrative | Other Serious | Two to six months |
| 29 | DSU-2009-01963 | Diarrhea<br>Vomiting<br>Weight decreased<br>Renal impairment<br>Fall<br>Confusion<br>Asthenia | 75 | F | Narrative | Hospitalization | One year seven months |
| 30 | DSU-2009-02204 | Celiac disease<br>Diarrhea<br>Vomiting<br>Dehydration<br>Enterocolitis bacterial<br>Hypotension<br>Nausea | 62 | F | Box checked | Hospitalization | Five years |
| 31 | DSU-2009-02266 | Celiac disease<br>Vomiting<br>Cholecystectomy<br>Malaise<br>Blood pressure increased | 69 | F | Narrative | Hospitalization<br>Other Serious | One year |
| 32 | DSM-2009- | Gastroenteritis<br>Acute kidney | 63 | F | Box checked | Hospitalization<br>Disability or | Three years |

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | 00204 | injury Diarrhea (narrative) | | | | Permanent Damage | |
| 33 | DSU-2010-04766 | Celiac disease | 65 | F | Narrative | Hospitalization | Two years |
| 34 | DSU-2010-01914 | Celiac disease | 66 | F | Box checked | Hospitalization | One month |
| 35 | DSM-2010-01260 | Diarrhea Vomiting | Unk | M | Box checked | Hospitalization | Unknown |
| 36 | DSU-2010-00207 | Celiac disease Diarrhea Vomiting Weight decreased Gastrointestinal infection Blood pressure increased | 76 | F | Box checked | Hospitalization Other Serious | Over one year (narrative) |
| 37 | DSU-2010-04862 | Celiac disease | 70 | F | Narrative | Hospitalization | Two years |
| 38 | DSM-2010-01269 | Malabsorption Diarrhea (narrative) Vomiting (narrative) | Unk | M | Narrative | Hospitalization Other Serious | Four years |
| 39 | DSU-2010-01718 | Diarrhea Hospitalization | > 65 | F | Box checked | Hospitalization | Unknown |
| 40 | DSU-2010-02706 | Vomiting Nausea Gallbladder disorder | 70 | F | Box checked | Hospitalization | Five years |
| 41 | DSU-2010-03745 | Vomiting Nausea Hepatic enzyme increased Faeces discolored | 63 | M | Box checked | Other Serious | Five years |
| 42 | DSM- | Diarrhea | 73 | F | Narrative | Hospitalization | Two years |

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | 2011-00236 | Vomiting Dehydration Hypokalaemia | | | | | seven months |
| 43 | DSM-2011-00846 | Diarrhea Vomiting Abdominal pain Hypotension | 76 | F | Box checked | Hospitalization | Four hundred and 44 days |
| 44 | DSU-2011-01068 | Coeliac disease | 74 | F | Box checked | Hospitalization | Unknown |
| 45 | DSU-2011-01739 | Coeliac disease | 68 | F | Narrative | Other serious | Two to three years |
| 46 | DSM-2011-01329 | Diarrhea Vomiting Weight decreased Abdominal pain | 63 | M | Box checked | Hospitalization | Two months |
| 47 | DSU-2012-01841 | Diarrhoea Vomiting Nausea Dehydration | 67 | M | Narrative | Hospitalization Other Serious | Two years |
| 48 | DSU-2012-05283 | Coeliac disease Hip fracture Weight decreased Hypotension | 71 | F | Box checked | Hospitalization Other Serious | Unknown |
| 49 | DSU-2012-05368 | Malabsorption (SLE) Diarrhea Vomiting | 70 | M | Box checked | Hospitalization | Months |
| 50 | DSU-2012-05969 | Coeliac disease Vomiting Clostridium difficile infection Hyperhidrosis | 72 | M | Narrative | Hospitalization | Over one year |
| 51 | DSU-2012-07932 | Diarrhea Intestinal villi atrophy Abdominal pain Nausea Weight decrease Afib Lymphocytic | 80 | F | Narrative | Hospitalization Other Serious | Over six years |

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | | infiltration Gastrooesophageal reflux disease Lab test abnormal (autoimmune test positive) | | | | | |
| 52 | DSU-2012-09190 | Coeliac disease Diarrhea Dehydration Malnutrition Hypotension | 87 | F | Narrative | Hospitalization | Over three years |
| 53 | DSM-2012-00455 | Diarrhea Vomiting Dehydration Microcytic anaemia Acute kidney injury | 63 | F | Box checked | Hospitalization | Two years |
| 54 | DSM-2012-00571 | Diarrhea Renal failure | 80s | M | Box checked | Hospitalization | Many months |
| 55 | DSM-2012-00581 | Diarrhea Renal failure | 55 | M | Box checked | Hospitalization | Two years |
| 56 | DSM-2012-01055 | Diarrhea Vomiting Dehydration Nausea Afib Hypokalemia | 69 | M | Box checked | Hospitalization Other Serious | Four years |
| 57 | DSU-2012-07482 | Diarrhea Vomiting Intestinal villi atrophy Gastritis Duodenitis Acute kidney injury Dehydration Syncope Bradycardia Cold sweat Dizziness Nausea Blood pressure | 62 | M | Box checked | Hospitalization Other Serious | 20-24 months |

33

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | | decreased Cardiomegaly Pericardial effusion Emphysema Arteriosclerosis coronary artery Weight decreased Anxiety Fatigue Hepatic steatosis Lipase increased Large intestine polyp Decreased appetite Pyrexia Hiatus hernia Goitre Benign neoplasm of thyroid gland Atelectasis Red blood count decreased Haemoglobin decreased Haematocrit decreased Haemorrhoids Pulmonary mass Blood pressure increased White blood cell count increased Neutrophil count increased Blood magnesium decreased | | | | | |
| 58 | DSU-2012-08571 | Diarrhea Acute kidney injury | 56 | F | Box checked | Hospitalization | Unknown |
| 59 | DSU-2012-09732 | Malabsorption (SLE) Diarrhea Vomiting Intestinal villi atrophy Fall Clostridium difficile infection Weight decreased | 75 | F | Box checked | Life-threatening Hospitalization Other Serious | One year |

34

| # | MFR | TERMS[57] | AGE | GENDER | RECHALLENGE[58] | SERIOUS[59] | TIME TO ONSET OF SYMPTOMS |
|---|---|---|---|---|---|---|---|
| | | Dehydration Acute kidney injury WBC increased Blood pressure increased Culture urine positive Hypotension Nausea | | | | | |
| 60 | DSU-2012-02939 | Diarrhea Vomiting Weight decrease Hypotension Clostridium difficile infection Helicobacter infection | 81 | M | Box checked | Other Serious | Three years |

84.     A breakdown by year reveals the number of verified positive rechallenge cases

with olmesartan to be:

| Year | No. of Verified Positive Rechallenge Cases |
|---|---|
| 2004: | 1 |
| 2005: | 1 |
| 2006: | 6 |
| 2007: | 4 |
| 2008: | 7 |
| 2009: | 13 |
| 2010: | 9 |
| 2011: | 5 |
| 2012: | 14 |
| **TOTAL** | **60** |

85.     In my opinion, by the end of 2006, and certainly no later than 2007, there was reproducible positive de/rechallenge evidence that met the FDA standard of reasonable evidence of a causal association.[60]

**VIII.   DAIICHI SANKYO CONCLUDED THAT ITS SAFETY DATABASE DID NOT SHOW A CAUSAL ASSOCIATION. A REASONABLE AND PRUDENT MANUFACTURER SHOULD HAVE CONCLUDED THAT THE SAFETY DATABASE DID SHOW A CAUSAL ASSOCIATION.**

86.     Daiichi Sankyo reported to FDA in 2010 and 2012 that its safety database did not show a causal association between olmesartan and enteropathy.[61]

87.     Daiichi Sankyo did identify in its reports to FDA 16 positive rechallenges as of December 8, 2009 and 28 positive rechallenges as of July 12, 2012.[62]

88.     In fact, as noted above, there were 32 serious positive rechallenges involving diarrhea, vomiting, or celiac disease, as of those December 8, 2009 in Daiichi Sankyo's database, and 53 such positive rechallenges as of July 12, 2012 in its database.

89.     In my opinion, a reasonable and prudent manufacturer would have noted and acted upon the reproducible positive rechallenge data in Daiichi Sankyo's database.

90.     In my opinion, a reasonable and prudent manufacturer should look for safety problems at all stages of drug development.

91.     Herve Caspard, Daiichi Sankyo's Senior Director for Risk Management from 2009 to 2010 provided the following testimony at his deposition on April 7, 2016 .

                19          Q. The drug and its label is -- are the

---

[60] The standard that I have adopted is that positive de/rechallenge evidence that is reproducible meets the FDA Standard for reasonable evidence of a causal association. By 2005, de/rechallenge evidence of olmesartan associated enteropathy had been duplicated, which is the hallmark of reproducibility. By the end of 2006, there were an additional six cases with positive de/rechallenge, which again strengthens a finding of reproducibility.

[61] *See* OLM-DSC-0001556439 – 461 (2010) and OLM-DSI-0001247542 -7840 (2012).

[62] *Id.*

20    drug manufacturer's responsibility, correct?
21    A. Yes.
22    Q. Okay. And regardless of what the FDA
23    requests or not, it is the responsibility, the duty
24    of the drug company, to engage in the drug

68

1    safety analysis throughout the life of the drug.
2    We talked about that earlier, correct?
3    A. Yes, with respect to the guidance, yes.
4    Q. Right. So as you're looking at
5    something, and I think what we talked about in good
6    pharmacological practices was that you have to be
7    active. I think I asked you about that.
8    A. Yeah.
9    Q. You have to be proactive, right?
11    THE WITNESS: Yes.
13    Q. You don't want to be passive and just
14    see what happens, correct?
15    A. Completely.[63]

92.    Tina Ho, Daiichi Sankyo's Executive Director for Clinical Safety and

Pharmacovigilance from 2009 to 2015 and previously Senior Director of Risk management from

2006-2009, testified similarly at her deposition on March 23, 2016.

4    Q. So your company needs to be
5    very vigilant in monitoring adverse
6    events from whatever sources you can --
7    A. Yes.
8    Q. -- and to actively seek
9    those out to constantly be assessing the
10    overall safety profile of the drug;
11    correct?
12    A. Yes. [64]

93.    Ms. Ho further testified:

16    Q. And it talks about the fact
17    -- I think we talked about this earlier
18    -- it's impossible to identify all safety
19    concerns during clinical trials. That's

[63] Deposition of Herve Caspard, April 7, 2016, at 67:19 - 68:15.

[64] Deposition of Tina Ho, March 23, 2016 at 185:4-12.

20     why it's, they say, critical to look at
21     postmarketing safety data after the
22     product is on the market. Right?
23           A. Yes. [65]

94.     Similarly, the webpage for Daiichi Sankyo's Quality and Safety Management Unit states that one function it focuses on is "[a]ssurance of patient safety through safety measures based on analyses and evaluations of information on adverse drug reactions received from all stages of use ranging from clinical trials to post-marketing."[66]

95.     In my opinion, Daiichi Sankyo failed to adequately identify the safety problems associated with olmesartan associated enteropathy in a timely manner.

## IX.    DESPITE THE FACT THAT THERE WAS SOUND SCIENTIFIC EVIDENCE THAT MET THE FDA STANDARD IN DAIICHI SANKYO'S POSSESSION BY THE END OF 2006, AND CERTAINLY BY 2007, DAIICHI SANKYO FAILED TO ACT ON IT AND INFORM DOCTORS AND PATIENTS.

96.     As discussed above, a reasonable and prudent manufacturer, looking at the de/rechallenge data in Daiichi Sankyo's possession, would have found multiple positive de/rechallenge cases by 2006/2007 and acted upon it.

97.     In my opinion, a pharmaceutical manufacturer has an affirmative responsibility to look for and detect serious adverse reactions that can be associated with their drug.

98.     In addition, several times over the years the possibility of a safety risk with olmesartan and gastrointestinal symptoms was brought to Daiichi Sankyo's attention.

99.     First and most importantly, as noted above, by 2006/2007 Daiichi Sankyo had in their possession multiple MedWatch forms to the FDA that noted positive rechallenges.

---

[65] *Id.* at 314:16-23 (referring to Exhibit 111, FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment (2005)).

[66] http://www.daiichisankyo.com/about_us/responsibility/csr/enterprise/reliability/index.html

100.     Despite having multiple such reports, there is no evidence that Daiichi Sankyo did any further scientific analysis with this data until November 2009.

101.     Second, in November 2009, Daiichi Sankyo's pharmacovigilance consultant Dr. Ronke Dosunmu did an analysis of Daiichi Sankyo's adverse event data and identified five positive dechallenge/rechallenge cases for new diagnoses of celiac disease dating back to 2006.[67]

102.     Dr. Dosunmu recommended "further investigation into the clinical database as well as epidemiologic studies be considered to fully understand the issue and determine inclusion into the core data sheet."[68]

103.     Based on my search, the record does not show any response to Dr. Dosunmu's recommendations.

104.     Third, Dr. Joseph Murray of the Mayo Clinic contacted Daiichi Sankyo in May 2009 and asked the following question:  "Do you have any information on GI side effects and Benicar?  I am specifically interested in any data pertaining to colitis, enteritis, or sprue-like symptoms."[69]

105.     Daiichi Sankyo responded by leaving a message with Dr. Murray's receptionist.[70]

106.     Based on my search, there is no record that Daiichi Sankyo provided "any data pertaining to colitis, enteritis, or sprue-like symptoms" to Dr. Murray in response to his inquiry.

107.     Dr. Murray contacted Daiichi Sankyo again in November 2010 and January 2011.[71] Daiichi Sankyo submitted a MedWatch form to the FDA describing these additional contacts.[72]

---

[67] *See* OLM-DSI-0001401249 – 253.

[68] *See* OLM-DSI-0001401249 at 253.

[69] *See* OLM-DSI-0003380866 – 871, at 866.

[70] *Id.*

108.     Dr. Murray initially left a voicemail, on November 26, 2010, stating that he "wanted 'to discuss possible side effects of olmesartan, specifically Benicar and the association with unusual and rare enteropathy (malabsorption). [He] may have seen several cases that would suggest association with this and the use of olmesartan'."[73]

109.     On January 26, 2011, Dr. Murray provided additional information in a faxed letter to Daiichi Sankyo, including that "five patients experienced enteropathy-like disease while taking olmesartan medoxomil."[74]

110.     Dr. Murray also stated in the letter "I think it may be worthwhile to arrange a time for a telephone call to discuss findings."[75]

111.     I can find no record or testimony to indicate that there was any follow up by Daiichi Sankyo with Dr. Murray to discuss his findings prior to the publication of his case series in July 2012.

112.     In July 2012, Dr. Murray published the first case series on the association between olmesartan and enteropathy.  His paper described 22 patients, seen from August 2008 to August 2011, who experienced chronic diarrhea, weight loss and enteropathy while on olmesartan. Celiac disease was ruled out in all cases. All patients had resolution of their symptoms upon discontinuation of olmesartan.  The paper reports that no deliberate rechallenge

---

[71] *See* OLM-DSI-0003380866 – 871.

[72] *See* OLM-DSI-0001096152-R – 153-R.

[73] *Id.*

[74] *See* OLM-DSI-0021819177 – 195, at 181.

[75] *Id.*

was undertaken because of the "life threatening nature of the syndrome," but that "2 patients reported anecdotally that their symptoms had worsened when they restarted olmesartan."[76]

113.    Fourth, in December 2009, the company undertook a proportional reporting ratio (PRR) of celiac disease cases in FAERS from the first quarter of 2005 to the second quarter of 2009, which revealed a proportionate reporting ratio (PRR) of 23.36.[77]  The olmesartan cases identified dated back to 2005. As FDA recognizes, a PRR is a data mining method that may give rise to a safety signal which requires further investigation.[78]

114.    Herve Caspard, Daiichi Sankyo's Senior Director for Risk Management from 2009 to 2010 stated the following regarding PRR analysis at his deposition on April 7, 2016:

```
 1              Q. Okay. So you talked about the
 2       Proportional Reporting Ratio.
 3              A. Yes.
 4              Q. That in fact is one of the
 5       epidemiological tools that you can use to analyze
 6       the information once you cast that net and bring it
 7        in, that you can use to analyze the data, correct?
 8              A. Yes.
 9              Q. Okay. And it's a generally accepted
10       method of analyzing data in pharmacovigilance,
11       correct?
12              A. Yes.
13              Q. In fact I think the guidance talks about
14        it, correct?
15              A. Yes, it is -- it is imperfect, like, you
16        know, any analysis of exceptional data, but it's
17        the least -- one of the least bad indicators we
18        have.
19              Q. Yeah. It's used fairly commonly amongst
20       epidemiologists and biostatisticians in terms of
```

---

[76] Rubio-Tapia A, Herman ML, Ludvigsson JF, Kelly DG, Mangan TF, Wu TT and Murray, JA. *Severe Spruelike Enteropathy Associated With Olmesartan*. Mayo Clin Proc. 2012 Aug;87(8):732-8. Epub 2012 Jun 22.

[77] *See* OLM-DSI-0005439763 – 76.

[78] *See* FDA Guidance for Industry: Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment, p. 8 (2005).

21    signal analysis, correct?
22         A. I agree.
23         Q. Okay. And it's a valuable tool for you
24    to use in pharmacovigilance, correct?

88

1         A. It is. [79]

115.    Regarding the PRR of 23.36 obtained by Daiichi Sankyo, Mr. Caspard testified:

11         Q. All right. 23.36 --
12         A. Is high.
13          Q. -- is a very high PRR, isn't it, doctor.
14         A. Yes. [80]

116.    Mr. Caspard further testified regarding the PRR:

21         Q. Okay. That is -- and when we talk about
22    the 95% confidence interval and it being 23.36,
23    that means that your determination or the PRR shows
24    that there were 23 times more events than you would

107

1    have expected on olmesartan as compared to all
2    other drugs, correct?
3         A. That's correct.
…
11         Q. Okay. And when we talk about the 95%
12    confidence interval, that means that, if you did
13    this test a hundred times, 95 of those times it
14    would be between the lower and upper bounds of the
15    confidence interval, correct?
16         A. Sorry. I have to be very careful about
17    this.
18         Q. Well, let me strike --
19         A. Yes.
20         Q. -- because I'm not trying to --
21         A. Yes, but I'm always struck by that.
22         Q. I know. The upper bound, let's just do
23    it this way, the upper bound, it could be, that
24    number, 23.36, could be as high as 36.77 –

108

---

[79] Deposition of Herve Caspard, April 7, 2016, at 87:1-88:1.

[80] *Id.* at 104:4-108:22.

42

```
1          A. Yes.
2          Q. -- or it could be as low as 14.05,
3    correct?
4          A. Yes. Yes. The truth is somewhere in
5    between.
6          Q. Okay. The truth is somewhere in
7    between. And the best estimate you can give is
8    23.36 from a statistical standpoint.
9          A. Yes.
10         Q. Okay. But even at the lower bounds
11   you're seeing 14 times more reports of celiac
12   disease on olmesartan than you would have expected.
13         A. Yes.
14         Q. And that is a significant finding,
15   correct, doctor?
17         THE WITNESS: From -- I have to
18   characterize that -- statistically.
20         Q. It is a statistically significant
21   finding, right, doctor?
22         A. Yes. [81]
```

117.   Based on my search, the record does not show that the company did anything with this PRR result.

118.   Fifth, in January 2010, in response to an FDA inquiry, Daiichi Sankyo stated that in 16 of 17 cases where olmesartan was restarted, there was a "recrudescence" of GI symptoms suggestive of celiac disease after restarting the drug. These rechallenge cases dated back to 2007. Daiichi Sankyo concludes in its response that an association between olmesartan and celiac disease is very unlikely, yet also concludes that olmesartan may exacerbate the symptoms of celiac disease.[82]

119.   In my opinion, if Daiichi Sankyo concluded that olmesartan was associated with an exacerbation of celiac disease, Daiichi Sankyo had a duty to investigate to confirm whether this was the case.  Based on my search, the record does not show the company acted on its

---

[81] *Id.* at 106:21-108:22.

[82] *See* OLM-DSI-0001247409 – 541.

conclusion that there were 16 cases of recrudescence of GI symptoms suggestive of celiac disease after olmesartan was restarted. In my opinion, a reasonable and prudent manufacturer, faced with these positive rechallenge cases, would conclude that warning about a causal link between olmesartan and celiac-like symptoms was appropriate.

120.    In my opinion, any view that celiac disease was the culprit in the cases discussed in Section VI above was contradicted by the fact that 1) olmesartan did not contain gluten, as confirmed by Daiichi Sankyo[83]; and 2) celiac symptoms emerge in those patients with the condition when challenged and rechallenged by gluten, and there was no evidence of such a challenge and rechallenge pattern with gluten in the adverse event reports discussed above.

121.    In my opinion, a reasonable and prudent drug manufacturer who attributes a "recrudescence" of celiac disease to their drug, when they conclude that their drug does not contain gluten, the known trigger of celiac disease, would investigate alternative causes.

122.    Despite the fact that there was reproducible scientific evidence that met the FDA standard by 20006/2007 in Daiichi Sankyo's possession, Daiichi Sankyo failed to act on it and inform doctors and patients.

## X.    CONCLUSIONS

In my opinion[84]:

123.    A drug manufacturer has a duty to revise the labeling of its drug "to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug; a causal relationship need not have been definitely established."

124.    A pharmaceutical manufacturer has an affirmative responsibility to look for and detect serious adverse reactions that can be associated with their drug.

---

[83] *See* OLM-DSC-0001432320.

[84] For all my opinions, see the full Report.

125.     A reasonable and prudent manufacturer should look for safety problems at all stages of drug development.

126.     Positive de/rechallenge evidence that is reproducible meets the FDA standard of reasonable evidence of a causal association, and should trigger a Warning in the Warnings and Precautions section of the label.

127.     There are multiple examples of FDA revising drug labels based on positive de/rechallenge evidence that support my opinion that positive de/rechallenge evidence that is reproducible meets the FDA standard of reasonable evidence of a causal association.

128.     A reasonable and prudent manufacturer, faced with multiple positive rechallenge cases between olmesartan and gastrointestinal symptoms, would conclude that warning about a causal link between olmesartan and celiac-like symptoms was appropriate.

129.     A reasonable and prudent manufacturer would have noted and acted upon the reproducible positive rechallenge data in Daiichi Sankyo's database.

130.     Any view that celiac disease was the culprit in the adverse event reports discussed in Section VI above was contradicted by the fact that 1) olmesartan did not contain gluten, as confirmed by Daiichi Sankyo; and 2) celiac symptoms emerge in those patients with the condition when challenged and rechallenged by gluten, and there was no evidence of such a challenge and rechallenge pattern with gluten in the reports discussed above.

131.     A reasonable and prudent drug manufacturer who attributes a "recrudescence" of celiac disease to their drug, would, when they conclude that their drug does not contain gluten, the known trigger of celiac disease, investigate alternative causes.

132.    By the end of 2006, and no later than 2007, there was reproducible positive de/rechallenge evidence that met the FDA standard of reasonable evidence of a causal association.

133.    Despite the fact that there was sound scientific evidence that met the FDA standard by the end of 2006, and no later than 2007, in Daiichi Sankyo's possession, Daiichi Sankyo failed to act on it and inform doctors and patients.

134.    Daiichi Sankyo failed to adequately identify the safety problems associated with olmesartan associated enteropathy in a timely manner.

135.    I reserve the right to supplement this Report based on new information.


David A. Kessler, M.D.

11 / 30 / 2016

Date