Exhibit A

Protected Information - Steven M. Lagana, M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

IN RE:  BENICAR          :   MDL NO. 2606
(OLMESARTAN) PRODUCTS    :
LIABILITY LITIGATION     :
                         :

- - -

February 7, 2017

- - -

PROTECTED INFORMATION

- - -

            Oral expert deposition of
STEPHEN M. LAGANA, M.D., taken pursuant
to notice, was held at the law offices of
Robins Kaplan LLP, 601 Lexington Avenue,
Suite 3400, New York, New York, beginning
at 10:09 a.m., on the above date, before
Kimberly A. Cahill, a Federally Approved
Registered Merit Reporter and Notary
Public.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Protected Information - Steven M. Lagana, M.D.

```
1   APPEARANCES:
2

    MAZIE SLATER KATZ & FREEMAN, LLC
3   BY:  ADAM M. SLATER, ESQUIRE
    103 Eisenhower Parkway, 2nd Floor
4   Roseland, New Jersey 07068
    (973) 228-9898
5   aslater@mskf.net
    Representing the Plaintiffs
6

7   VENABLE LLP
    BY:  BRUCE R. PARKER, ESQUIRE
8   750 East Pratt Street
    Suite 900
9   Baltimore, Maryland  21202
    (410) 244-7534
10  brparker@Venable.com
    Representing Daiichi Sankyo, Inc.
11

12  DRINKER BIDDLE & REATH, LLP
    BY:  JESSICA L. BRENNAN, ESQUIRE
13  600 Campus Drive
    Florham Park, New Jersey  07932
14  (973) 549-7000
    jessica.brennan@dbr.com
15  Representing Daiichi Sankyo, Inc.
16

17  ALSO PRESENT:
18          Amy Klug, Esquire
            Assistant General Counsel
19          Daiichi Sankyo, Inc.
20

21

22                  -   -   -
23

24
```

Protected Information - Steven M. Lagana, M.D.

1    General.

2              What was the question, as

3    you recall, that you were asked to

4    address?

5         A.    Well, the question that was

6    posed to me in a general sense was, Mr.

7    Slater represented to me that he had a

8    number of cases which could represent

9    olmesartan enteropathy and he wanted my

10   expert opinion on that question, to

11   review both clinical histories as well as

12   pathologic specimens, and to give my

13   opinion on them.  And as part of that

14   work, a general causation statement was

15   going to be produced.

16             And so that's what I

17   understood that I would be doing and

18   that's what I did.

19        Q.    How do you define the term

20   -- and how did you define it in your

21   report -- general causation?

22        A.    Well, I would say causation

23   or general causation refers to, if a

24   stimulus leads to an event, that would be

1    causation; and in medicine, we apply the

2    reasonable medical certainty threshold,

3    which means more likely than not.

4            So that is the background

5    that I used when evaluating this

6    question.

7        Q.    Is there a difference in

8    your understanding between the question

9    of general versus specific causation?

10       A.    Yeah, I would understand

11   them to be different insofar as, in a

12   general case, I'm opining about the

13   plausibility of this adverse event or,

14   you know, if we take it away from the

15   Benicar question and just say in general,

16   for any stimulus, is it likely that this

17   stimulus causes this event --

18       Q.    In the general population?

19       A.    I wouldn't necessarily say

20   in the general population, because there

21   are different -- populations can be

22   affected by diseases differently.  So,

23   for instance, in celiac disease, gluten

24   can affect genetically predisposed

Protected Information - Steven M. Lagana, M.D.

1    -- making up a name -- you would

2    understand your task to be whether or not

3    you can determine to a reasonable degree

4    of medical probability that olmesartan

5    was causing some adverse event in Mr.

6    Jones.

7         A.    Sorry.   Could you just

8    repeat that, please?

9         Q.    Sure.   I'm trying to better

10   understand in your mind what you

11   understood your task to be when asked a

12   question to assess whether olmesartan has

13   been proven by reliable, methodologically

14   sound, derived evidence of being a

15   general -- a cause of sprue-like

16   enteropathy in the general population.

17   And that's what I'm trying to understand,

18   how you approached that question.

19        A.    I think maybe the term

20   "general population" is throwing me a

21   little bit in this context, because we

22   know certainly plenty of people take

23   olmesartan and do not have sprue-like

24   enteropathy, so there is likely cofactors

Protected Information - Steven M. Lagana, M.D.

1    that are still being determined.  They

2    may be genetic.

3            So in the public at large,

4    yes, I certainly believe olmesartan is

5    causative of sprue-like enteropathy in

6    some patients.

7        Q.    And did you attempt to

8    answer that question by looking at

9    individual cases or did you attempt to

10   answer that question by looking at

11   population-based studies?

12           MR. SLATER:  I'm just going

13       to object to the form of the

14       question.

15           You can answer.

16           THE WITNESS:  Okay.  One

17       point that I would make before I

18       answer your question, if I may, is

19       that I was pretty deeply familiar

20       with this topic before Mr. Slater

21       called me, so that question to me

22       was an evolution, I would say, as

23       it should be in science.  You get

24       initial reports and then you

Protected Information - Steven M. Lagana, M.D.

1    used to make the diagnosis.

2              And there are different

3    criteria, by the way, I should say, for a

4    gastroenterologist seeing a patient in

5    the office as compared to me as a

6    pathologist seeing the patient's slides

7    --

8         Q.    Let me stop you there.  Are

9    you comfortable addressing the criteria

10   that a gastroenterologist should be using

11   to diagnose the condition?

12        A.    Yes.

13        Q.    So then let's start first

14   with your area of specialty, pathology.

15   What are the pathologic criteria that you

16   need before you personally conclude that

17   someone has sprue-like enteropathy

18   associated with olmesartan use?

19        A.    The specific pathologic

20   criteria, that's not a simple question,

21   actually, because it really -- it's a

22   clinicopathologic diagnosis, so showing

23   me a slide in a vacuum, I can't give you

24   that diagnosis.  I can raise that as a

Protected Information - Steven M. Lagana, M.D.

1    possibility and then in following up with

2    the clinical information, certainly I can

3    get there as the most likely cause of the

4    pattern of injury that I see.

5            But I think you're asking me

6    to describe the histologic findings in

7    olmesartan enteropathy.  Would that be --

8    is that a fair way to characterize your

9    question?

10           Q.    I'll accept that answer.

11   It's not exactly what my question was,

12   but let's start there and then we can go

13   into a little bit further.

14           MR. SLATER:  You should let

15       him rephrase your questions.  He's

16       doing a better job.  Just kidding.

17           THE WITNESS:  Olmesartan

18       enteropathy affects the entire

19       gastrointestinal tract as far as

20       we know, most prominently in the

21       small intestine, but also

22       prominently in the stomach and the

23       colon.

24           And the way that we can

Protected Information - Steven M. Lagana, M.D.

1   strong evidence that the patient had

2   olmesartan enteropathy.

3       Q.    So there -- it can be -- any

4   GI complaint is worthy of this diagnosis

5   provided it goes away when you stop

6   taking olmesartan?

7       A.    "Goes away" is a strong -- a

8   strong term.  "Improves" is the word I

9   would use.  But there are different

10  levels of certainty that one can have.

11  For instance, in the patient who has

12  severe weight loss and diarrhea as

13  originally described by Rubio-Tapia, who

14  has a biopsy that shows total villous

15  atrophy, who has negative serologic

16  testing for celiac disease, then is taken

17  off olmesartan, the symptoms improve and

18  the biopsy resolves, well, I've just

19  described for you a case that is, you

20  know, hundred percent, locked, that's

21  what it is and it would be crazy to think

22  otherwise.  And -- in my opinion.

23              And in the real world, as

24  physicians are seeing more and more of

Protected Information - Steven M. Lagana, M.D.

1    this, they're thinking about it sooner,

2    so if I -- if someone goes to a physician

3    now and says, I have -- I have nausea and

4    vomiting and it's been for the last

5    several months, and the physician sees

6    that the patient is on olmesartan, from

7    my interaction with treating physicians

8    -- and I'm not one -- a lot of them are

9    switching antihypertensives at that

10   point; and I would think if that patient

11   improved, that is good evidence of

12   olmesartan-induced injury if that's the

13   only change that was made.

14          Q.    Let me go back -- and that's

15   an important qualification.

16          A.    Yeah.

17          Q.    Let me come back to my

18   question.  My question is, what are the

19   clinical features that have to be

20   present, if any, before one gets the

21   label?

22              And the first part of that

23   answer, you said, well, they have to have

24   dechallenge.  Let me make sure I'm

1   understanding.  If someone were to come

2   in and their only complaint is abdominal

3   pain, there is no biopsy evidence of any

4   villi loss, there's no complaint of

5   diarrhea, they have not vomited, and the

6   GI doctor says stop the olmesartan and

7   their abdominal pain goes away in three

8   days, does that person get the diagnosis

9   of sprue-like enteropathy associated with

10  olmesartan?

11          MR. SLATER:  Objection to

12      the form.

13          You can answer.

14          THE WITNESS:  Well, the case

15      you've just described to me is a

16      nonclassical case --

17          MR. PARKER:  Okay.

18          THE WITNESS:  -- whether

19      that person had injury due to

20      olmesartan causing their abdominal

21      pain, that, I would conclude to be

22      fairly likely.

23          Whether they had sprue-like

24      enteropathy is a different

Protected Information - Steven M. Lagana, M.D.

```
 1          question and I'm not sure that I

 2          would put that particular label on

 3          it.

 4  BY MR. PARKER:

 5          Q.    And that's what I'm trying

 6  to drive at.  What do you have to have

 7  when you come into the doctor, what

 8  complaints, what findings by the doctor

 9  do you have to have, before, as you put

10  it, the label goes on the patient?

11          MR. SLATER:  Objection to

12          the form of the question;

13          foundation.

14          You can answer.

15          MR. PARKER:  And if this is

16          outside your area of expertise,

17          just tell me and I'll move on, but

18          I thought you said you felt

19          comfortable answering the

20          question.

21          MR. SLATER:  And objection

22          to that lead-in just now.

23          You can answer.

24          THE WITNESS:  Well, I think
```

Protected Information - Steven M. Lagana, M.D.

1              it's really at the judgment of the

2              treating physician.

3    BY MR. PARKER:

4              Q.    So it can be anything if in

5    the judgment of the treating physician --

6    something as abdominal pain for a couple

7    days, in that physician's mind, that can

8    qualify for a label of sprue-like

9    enteropathy associated with olmesartan?

10             A.    I think that you would have

11   more definite and less definite cases and

12   I think if you are the treating

13   physician, your interest is the results;

14   and if someone had minimal abdominal pain

15   for three -- you know, for a few days and

16   stopped taking olmesartan and they

17   improved, I would not personally find

18   that to be a very plausible case of

19   sprue-like enteropathy.

20             But if you're trying to

21   whittle -- you know, kind of get to the

22   exact criteria, I don't think that we're

23   there yet.  I don't think that we have --

24   we've seen a fairly wide presentation as

Protected Information - Steven M. Lagana, M.D.

1      this syndrome or you need to add to?

2      That's what I'm not hearing.

3              A.      Because most of these are

4      negative findings.  They're saying

5      exclude this, that, and the other,

6      negative IgA/tTG antibody test --

7              Q.      Is that required?

8              A.      No, not in my opinion.

9              Q.      So you don't have to rule

10     that out.

11             A.      No.

12             Q.      Okay.  Do you have to rule

13     out lack of a clinical response to

14     gluten?

15             A.      No.

16             Q.      Do you have to rule out

17     other causes of enteropathy before you

18     diagnose someone with sprue-like

19     enteropathy associated with olmesartan?

20             A.      No.

21             Q.      And if I understood your

22     last answer, the only thing that you

23     absolutely require for the diagnosis is

24     some clinical report of some improvement

Protected Information - Steven M. Lagana, M.D.

1    exceptional case and I would consider it,

2    from my end, the diagnosis to be somewhat

3    uncertain.   But I would not -- if an

4    experienced gastroenterologist thought

5    that was the diagnosis and I had no

6    better diagnosis, I wouldn't fight with

7    him on it.

8           Q.    And, Doctor, is it within

9    your area of expertise -- if not, I'll

10   move on -- to discuss now with me what

11   degree of clinical improvement would be

12   needed before someone can conclude

13   there's been successful dechallenge?

14              MR. SLATER:  Objection.

15              You can answer.

16              MR. PARKER:  In the context

17        of sprue-like enteropathy.

18              THE WITNESS:  I think it's a

19        better question for a

20        gastroenterologist.

21   BY MR. PARKER:

22         Q.    Let's turn now to

23   rechallenge.  Doctor, is there a period

24   in which someone has to return to

1       A.     I had formed the bulk of my

2  opinion before I spoke to Mr. Slater.

3       Q.     Okay.

4              And, Doctor, you make

5  reference to, in here -- let me see if I

6  can find it -- I think it's elsewhere,

7  but I see it in the last section, 4,

8  under opinions, on the last page, page 8

9  --

10      A.     Okay.

11      Q.     -- you make reference to

12 applying the scientifically accepted

13 methods set forth above.

14             Can you describe for me what

15 methods you have in mind that you

16 discussed in this report by which or

17 through which you reached an opinion on

18 general causation?

19      A.     Well, I think the

20 scientifically accepted method for any

21 physician to stay abreast of new

22 developments in medicine is to review the

23 peer-reviewed, published literature,

24 which I've done, to apply one's own

Protected Information - Steven M. Lagana, M.D.

1    experiences with various entities, which

2    I've done, to discuss new entities with

3    your colleagues and experts, which I've

4    done, and I would say that those are the

5    scientifically accepted methods which I

6    have employed.

7          Q.    We can agree that in the

8    report itself, there's no discussion of

9    any of the literature reporting on

10   epidemiological studies; correct?

11         A.    Let's double-check.

12         Q.    Sure.

13               (Pause.)

14               THE WITNESS:   I believe --

15   we can clarify this if necessary

16   -- I believe that the Theophile

17   article, number 23, and the

18   Marthey article, get into

19   epidemiology; but the

20   epidemiologic article that I

21   consider most important is the

22   Basson article, which I did not

23   reference.

24               MR. PARKER:   My question I

Protected Information - Steven M. Lagana, M.D.

1          it completely accurately, but you

2          can answer.

3               MR. PARKER:  Well, I

4          certainly wanted to, so I'll try

5          it one more time.

6               MR. SLATER:  I know what you

7          wanted to.  I know what you desire

8          in life.  Just making an

9          objection.

10   BY MR. PARKER:

11          Q.     "This broadens the

12   differential even further and there is no

13   cardinal finding which can establish the

14   diagnosis of olmesartan-induced injury

15   based solely on histopathology," does

16   that remain your opinion today?

17          A.     It does.

18          Q.     Under celiac disease,

19   section 5.1, the last sentence,

20   "Ultimately, seronegativity and ARB use

21   are the most meaningful discriminators

22   between celiac disease and ARB

23   enteropathy," does that remain your

24   opinion today?

Protected Information - Steven M. Lagana, M.D.

1   we're evaluating those questions, but

2   I've never -- I've never, you know,

3   specifically written a paper in which I

4   looked at each point and made a response.

5       Q.    I take it from your last

6   answer that in the period of time that

7   you were writing your general causation

8   report, you were aware of and understood

9   the Bradford Hill factors criteria.

10      A.    I was familiar with the

11  criteria.

12      Q.    And what is their use in

13  medical science?

14      A.    They are a set of questions

15  which are used to address cause and

16  effect.

17      Q.    Can you explain for me why

18  that methodology was not used in your

19  report?

20      A.    I think it influences my

21  thinking, those points influence my

22  thinking.  I didn't explicitly go through

23  them because -- I don't know.  Just did

24  not do that.

Protected Information - Steven M. Lagana, M.D.

```
 1          Q.     Okay.

 2                 Even though it was not

 3    named, did you take into account the

 4    factors in the Bradford Hill criteria in

 5    doing your analysis of the available

 6    information that you relied on in forming

 7    your opinion?

 8                 MR. PARKER:  Objection.

 9                 MR. SLATER:  You can answer.

10                 THE WITNESS:  Okay.  I think

11          that those factors are fundamental

12          to how people in medicine think

13          about medical science, and

14          certainly I did think about them

15          and I did address them, although

16          not in the context of listing the

17          criteria point -- on a

18          point-by-point basis.  But, yeah,

19          I did think about them and I did

20          try to incorporate them.

21                 MR. SLATER:  And I'm just,

22          for the record, going to give you

23          a list of the Bradford Hill

24          criteria.
```

Exhibit B

2016 WL 4580145 (N.J.Super.L.) (Trial Order)
Superior Court of New Jersey, Law Division.
Atlantic County

Brandi CARL, Plaintiff,
v.
JOHNSON & JOHNSON, et al., Defendant.
Diana BALDERRAMA, Plaintiff,
v.
JOHNSON & JOHNSON, et al., Defendant.

Nos. ATL-L-6546-14, ATL-L-6540-14.
September 2, 2016.

## Order

Mark C. Haggerty, Esquire, Michael R. Klatt, Esquire, Gene M. Williams, Esquire, Susan M. Sharko, Esquire, Julie Tersigni, Esquire, Lorna Dotro, Esquire, Hunter K. Ahem, Esquire, Kenneth J. Ferguson, Esquire, and Ann Thorton Field, Esquire.

Richard Golomb, Esquire, Ruben Honik, Esquire, Ted G. Meadows, Esquire, David B. Dearing, Esquire, Timothy W. Porter, Esquire, Michelle Parfitt, Esquire, and Paul R. D'Amato, Esquire.

Nelson C. Johnson, Judge.

**\*1 THIS MATTER** having come before the court on Defendants' motions to bar expert testimony; and Defendants having filed companion motion(s) for summary judgment seeking I dismissal of Plaintiffs' Complaints in the event the motion(s) to bar testimony are granted; and Plaintiffs having filed cross motions to bar Defendants' expert testimony; and the court having conducted a plenary hearing on August 8, 9, 11, 12, 15, 16, and 19, 2016, at which time the court heard from Mark C. Haggerty, Esquire, Michael R. Klatt, Esquire, Gene M. Williams, Esquire, Susan M. Sharko, Esquire, Julie Tersigni, Esquire, Lorna Dotro, Esquire, Hunter K. Ahem, Esquire, Kenneth J. Ferguson, Esquire, and Ann Thorton Field, Esquire, on behalf of Defendants in support of their application; and Plaintiffs opposing this motion, Richard Golomb, Esquire, Ruben Honik, Esquire, Ted G. Meadows, Esquire, David B. Dearing, Esquire, Timothy W. Porter, Esquire, Michelle Parfitt, Esquire, and Paul R. D'Amato, Esquire, appearing; and the court having received expert testimony and oral argument of counsel conducted pursuant to *Evid. R.* 104 and 702, the standards articulated by our Supreme Court in *Kemp vs. The State of New Jersey* 174 *N.J.* 412 (2002), and for the reasons stated in the Opinion of even date herewith; and for good cause shown;

**IT IS ON THIS** 2nd **DAY OF SEPTEMBER, 2016, ORDERED** as follows:
1. Defendants' motion to bar the testimony of Dr. Graham A. Colditz is hereby GRANTED.

2. Defendants' motion to bar the testimony of Dr. Daniel W. Cramer is hereby GRANTED.

3. As a consequence of the aforesaid rulings, Defendants' motion for summary judgment as to Plaintiff, Brandi Carl, is hereby GRANTED. Plaintiff, Carl's Complaint is dismissed with prejudice.

4. As a consequence of the aforesaid rulings, Defendants' motion for summary judgment as to Plaintiff, Diana Balderrama, is hereby GRANTED. Plaintiff, Balderrama's Complaint is dismissed with prejudice.

5. As a consequence of the aforesaid rulings, Defendants' motions to bar testimony of other expert witnesses are deemed MOOT.

6. As a consequence of the aforesaid rulings, Plaintiffs' cross-motions to bar Defendants' experts are deemed MOOT.

<<signature>>

NELSON C. JOHNSON, JSC

## I. POSTURE OF ISSUES BEFORE THE COURT

This matter is before the court on the motion of the Defendants, Johnson & Johnson and Imerys Talc America, Inc. (hereinafter referred to collectively as "Defendants") seeking relief against Brandi Carl and Diana Balderrama (hereinafter the "Plaintiffs"), both of whom brought claims alleging that a talc-based product manufactured by Defendants has caused each of them to develop ovarian cancer.

These two lawsuits were filed in the Superior Court of New Jersey, Atlantic County; the *Carl* matter on November 17, 2014 and the *Balderamma* matter on November 25, 2014. Pursuant to *R.* 4:38A, on October 20, 2015, the Supreme Court designated this litigation as a Multi-County Litigation (MCL), to receive centralized management by this court. The court is confident that, in these matters, every avenue of legal and scientific research has been explored by capable legal counsel and learned scientists, and that the litigants' interests have been well represented.

**\*2**  Presently before the court is a challenge brought by Defendants to Plaintiffs' contention that the use of talc-based products caused them to develop ovarian cancer; said challenge was brought by motions to bar testimony of each of Plaintiffs' several expert witnesses. [NOTE: Defendants have filed companion motion(s) for summary judgment seeking dismissal of Plaintiffs' Complaints in the event the motion(s) to bar testimony are granted.] Defendants' challenge to Plaintiffs' experts was heard, and expert testimony, together with legal briefs and oral argument of counsel, were received by the court at a plenary hearing conducted pursuant to the standards articulated by the Supreme Court in *Kemp v. State of New Jersey*, 174 *N.J.* 412 (2002), (hereinafter a "*Kemp* Hearing") as required by *Evid. R.* 104 and consistent with *Evid. R.* 702. The court conducted said hearing on August 8, 9, 11, 12, 15, 16, and 19, 2016.

Defendants argue that Plaintiffs' hypotheses as to both general and specific causation are flawed; that there is no reliable scientific evidence to support Plaintiffs' contentions; and that accordingly, Plaintiffs' experts must be barred from testifying at trial. In reply, Plaintiffs argue that their experts are qualified by education, training, and experience and that their opinions are reliable because they are based on a sound scientific methodology, involving the type of information relied upon by experts in their field.

Thus, in evaluating the totality of the evidence presented by Plaintiffs, the question before the court may be stated as follows; Have Plaintiffs shown that their experts' theories of causation are sufficiently reliable as being based on a sound, adequately-founded scientific methodology, *to wit*, that they are based upon methods upon which experts in their field would reasonably rely in forming their own (possibly different) opinions about the cause(s) of each of Plaintiffs' ovarian cancers?

Courts are experts in the law, not science. This court's review "is as broad as the breadth of the proffer and the challenges thereto that the parties present." *Hisenaj v. Kuehner*, 194 *N.J.* 6, 19 (2008). Accordingly, this court's role is that of a "gatekeeper" who - based upon the proofs presented by the parties – must assess whether or not the hypotheses of causation advanced by Plaintiffs' experts are sufficiently reliable to be presented to a jury.

Carl v. Johnson & Johnson, 2016 WL 4580145 (2016)

## II. SCIENTIFIC STUDIES

Prior to receipt of testimony from the parties' experts, the court solicited from counsel the submission of all reports, abstracts, epidemiology studies, and peer-reviewed articles ("treatises" or "scientific literature") that were relied upon by the witnesses in formulating their opinions. That process began several months prior to the *Kemp* Hearing. As a result, approximately 100 treatises relating to talc, cancer, and miscellaneous related scientific issues were reviewed by the court both prior to and during the hearing. The court is grateful to counsel for these submissions; they were invaluable in preparing for the hearing and analyzing the evidence presented. [NOTE: Accompanying this ruling are Appendices A thru E which catalogue a portion of the peer-reviewed articles discussed at the hearing, together with public pronouncements by agencies possessing authoritative knowledge on cancer.]

Of particular value to the court in making its analysis is *The Reference Manual on Scientific Evidence* (3rd Edition, hereinafter, "the *Reference Manual")* issued by the Federal Judicial Center and the National Research Council of the National Academies. The *Reference Manual* is an invaluable tool. Because it is indicative of what the scientific community deems to be reasonable, the *Reference Manual* provides excellent guidance to trial judges in sifting through and prioritizing the information generated at a *Kemp* Hearing. At such a hearing, a court is asked to assess whether the experts in the field would reasonably rely on methods and data as Plaintiffs' experts have done in this case. Through the *Reference Manual*, the scientific community "speaks" to trial courts, and advises as to what may be considered to be reasonable, from an informed and objective perspective.

## III. INITIAL FINDINGS RE: EXPERT WITNESSES

*3 Based upon consideration of the experts' written submissions and a careful review of all witnesses' testimony, together with the court's reading of the learned scientific treatises referenced herein, the court makes the following findings:

### A. *Expert Witnesses*

The nine witnesses who testified at the *Kemp* Hearing are exceptionally learned and accomplished professionals; their credentials are impressive. No serious challenge was made to the qualifications of any witness. The court benefited greatly from their testimony. A brief profile of each witness follows:

### *Witnesses for Plaintiffs*

(1) *Graham A. Colditz, M.D., MPH, DRPH, FAFPHM*: Dr. Colditz trained in Medicine at the University of Queensland, obtaining a M.B., B.S. degree. He trained in Epidemiology at Harvard School of Public Health, obtaining a Master of Public Health degree and subsequently a Doctorate. Dr. Colditz is the Niess-Gain Professor of Medicine at Washington University School of Medicine and the Associate Director, Prevention & Control, at the Alvin J. Siteman Cancer Center. He is the Chief of the Division of Public Health and Sciences in the Department of Surgery at Washington University School of Medicine. Dr. Colditz also serves as co-director of the Biostatistics Core for the Siteman Cancer Center. Dr. Colditz was presented on the issue of general causation of ovarian cancer.

(2) *Daniel W. Cramer, M.D., Sc.D.*: Dr. Cramer received his M.D. degree from the University of Colorado School of Medicine and a Doctor of Science degree in Epidemiology from the Harvard School of Public Health. Dr. Cramer is a Professor of Obstetrics, Gynecology and Reproductive Biology at Brigham and Women's Hospital, Harvard Medical School, and Professor of Epidemiology at the Harvard T.H. Chan School of Public Health. He heads the Research Division of the OB-GYN Epidemiology Center, doing research in the field of environmental and genetic risk factors for

Carl v. Johnson & Johnson, 2016 WL 4580145 (2016)

a variety of obstetrical and gynecologic problems with a particular focus on ovarian cancer. Dr. Cramer was presented on the issues of both general and specific causation of ovarian cancer.

(3) *John J. Godleski, M.D.*; Dr. Godleski received his M.D. degree from the University of Pittsburgh School of Medicine. He is a Professor of Pathology at Harvard Medical School, Brigham and Women's Hospital, and a Professor of Environmental Health at Harvard TH Chan School of Public Health. Dr. Godleski has published more than 160 papers related to pulmonary/environmental pathology including a number using analytical electron microscopy. He currently leads the Particles Research Core in the Harvard-NIEHS Environmental Research Center and serves as Associate Director of the Harvard Clean Air Research Center supported by the US Environmental Protection Agency. Dr. Godleski was presented on the identification of particles, and on the issue of specific causation of ovarian cancer.

(4) *Curtis J. Omiencinski, Ph.D., ATS*: Dr. Omiencinski is an elected fellow and professor in the Academy of Toxicological Sciences and a Professor and the H. Thomas and Dorothy Willits Hallowell Chair in the Center for Molecular Toxicology & Carcinogenesis and the Department of Veterinary and Biomedical Sciences, College of Agricultural Sciences, at The Pennsylvania State University. He received his B.S. degree from the State University of New York at Albany and his Ph.D. degree in Pharmacology from the University of Washington's School of Medicine. He has authored more than 115 peer-reviewed papers and has published over 30 reviews, book chapters and other reports in the areas of pharmacology, molecular biology, toxicology, cancer research and genetics. His testimony was presented in connection with Plaintiffs' hypothesis of biologic causation of ovarian cancer.

**\*4** (5) *David C. Steinberg, MBA, FRAPS*: Mr. Steinberg owns a regulatory consulting firm for the cosmetic industry, specializing in the chemistry of cosmetic ingredients, preservatives and preservation, international and U.S. cosmetic regulations, and marketing of raw materials. He received his B.S. degree in Chemistry from Drexel University and an MBA Management degree from Pace University. He is a Fellow for the Regulatory Affairs Professionals Society.

### Witnesses for Defendants

(1) *Lewis A. Chodosh, M.D., Ph.D.*: Dr. Chodosh is a physician and cancer researcher. He graduated *summa cum laude*, Phi Beta Kappa from Yale University with Distinction in Molecular Biophysics and Biochemistry. He received his M.D. degree from Harvard Medical School, graduating *magna cum laude* and his Ph.D. degree in Biochemistry from the Massachusetts Institute of Technology. Dr. Chodosh currently serves as Chairman of the Department of Cancer Biology and is a Professor in the Department of Cancer Biology and in the Department of Medicine in the Division of Endocrinology, Diabetes and Metabolism at the University of Pennsylvania School of Medicine. He also serves as Associate Director for Basic Science in the Abramson Cancer Center at the University of Pennsylvania, as well as the Director of Cancer Genetics at the Abramson Family Cancer Research Institute. Dr. Chodosh testified as to the diverse means by which cancer(s) develop in the human body and challenged the fundamental bases of Plaintiffs' biological hypothesis and contentions regarding specific causation.

(2) *Mary J. Cunningham, M.D.*: Dr. Cunningham is a board-certified gynecologic oncologist with GynOncology of Central New York in Syracuse, New York. She received her M.D. degree from Northwestern University Medical School. Dr. Cunningham serves as a Professor in the Department of Obstetrics and Gynecology and Director of the Division of Gynecologic Oncology at the State University of New York Upstate Medical University. She is a member of the American Congress of Obstetricians and Gynecologists and the Society of Gynecologic Oncology and the Principal Investigator for with the NRG Oncology cooperative trial group. Dr. Cunningham was presented in opposition to the testimony of Dr. Colditz and Dr. Cramer.

(3) *Elaine F. Schumacher*: Ms. Schumacher is a Senior Research Scientist and Analytical Microscopist with McCrone Associates, Inc. of Westmont, Illinois. She received her B.S. degree in Chemistry from Elmhurst College. Ms. Schumacher is a member of Microscopy Society of America, Midwest Microscopy and Microanalysis Society, Microanalysis Society

and American Chemical Society. In addition, she has authored several publications on the application of microscopy. Ms. Schumacher was presented in opposition to the testimony of Dr. Godleski.

(4) *Douglas L. Weed, M.D., M.P.H., Ph.D.*: Dr. Weed serves as a member of the Ethics Committee of the American College of Epidemiology. He received his B.S. and M.D. degrees from Ohio State University and his Ph.D. and M.P.H in Epidemiology degree from the University of North Carolina at Chapel Hill. Dr. Weed has 25 years of service at the National Cancer Institute ("NCI") and serves as a Visiting Professor at numerous universities. He is the Review Editor of the Journal of the NCI and a peer reviewer for many medical journals in the field of epidemiology. Dr. Weed has authored more than 30 peer-reviewed papers on causation methodology and systematic reviews, as well as meta-analyses of cancer epidemiology studies. Dr. Weed was presented in opposition to the testimony of Dr. Colditz and Dr. Cramer.

## IV. CASE LAW PERTINENT TO THE COURT'S ANALYSIS

**\*5** As confirmed by the case law cited hereinafter, New Jersey's courts recognize that litigants claiming that they were harmed by the use of a product may never recover if they must await general acceptance by the scientific community of a reasonable, but not as yet certain, theory of causation linking the harm claimed to the product ingested. Because of our courts' concern that - despite compelling indicators linking a product to the harm - plaintiffs may never recover for their injuries, there are situations in which a theory of causation that has not yet reached general acceptance in the scientific community may still be found sufficiently reliable to support submission of such a claim to a jury.

In his learned essay first published in the *New Jersey Law Journal* on May 5th and 12th of 1988 (*see* 121 *N.J.L.J.* Index Page 882, *et seq.*), Justice Handler noted that "…there are many new classes of litigation, such as those involving exposure to toxic contaminants, asbestos and carcinogens, that pose complicated and novel problems." Justice Handler noted the "warfare" in our courtrooms is oftentimes resolved by the testimony of experts from diverse fields of knowledge:
The point is that there is no difference in the treatment of testimony of social scientists and psychologists, on the one hand, and chemists or biologists, on the other. Differences in acceptability have more to do with expanding frontiers of scientific knowledge.

121 *N.J.L.J.* Index at 883.

Until the final decade of the 20th Century, the time-honored test for the admissibility of expert testimony based upon a body of knowledge peculiar to a field of scientific study was that it had to be generally accepted or had been accepted by at least a substantial minority of the scientific community. *See Frye v. United States*, 54 *App. D.C.* 46 (D.C. Cir. 1923). In *Rubanick v. Witco Chem. Corp.*, 125 *N.J.* 421, 432 (1991), our Supreme Court modified that test with regard to evidence proffered for use in toxic tort cases. The Court held that a less stringent test than the general acceptance test should apply with regard to "new or developing theories of causation in toxic-tort litigation." *Id.* at 432. In writing for the Court, Justice Handler spoke of a methodology based test, that is, if the methodology by which the expert reached a conclusion is sound, the conclusion may be introduced into evidence. *Id.* at 438-40.

Pursuant to *Rubanick*, the key to reliability is the determination that the expert's opinion is based on a "sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field." *Id.* at 449. In order to be *valid methodology* (*viz.*, accepted by others in the scientific community), the expert's opinions must be supported by "prolonged, controlled, consistent, and validated experience." *Id.* at 436.

As this court understands *Rubanick*, in determining whether a scientific methodology is valid, trial courts must consider whether other scientists in the field use similar methodologies in forming their opinions and also should consider other factors that are normally relied upon by medical professionals. The appropriate inquiry is not whether the court thinks

that the expert's reliance on the underlying data was reasonable, but rather whether comparable experts in the field would actually rely on that information. With regard to evaluating the testimony of knowledgeable experts in order to determine the acceptability of a theory, the *Rubanick* Court cautioned trial courts to attend to "the hired gun phenomenon," *i.e.*, that an expert can be found to testify to the truth of almost any factual theory or to disagree with almost any theory and to discount the research of others. *Rubanick, supra* at 453 (citations omitted).

**\*6** Following *Rubanick*, in *Landrigan v. Celotex Corp.*, 127 *N.J.* 404 (1992), *Caterinicchio v. Pittsburgh Corning Corp.*, 127 *N.J.* 428 (1992), and *Dafler v. Raymark Industries, Inc.*, 259 *N.J. Super.* 17, 36 (App. Div. 1992), *aff'd. o.b.*, 132 *N.J.* 96 (1993), the Court held that experts relying on epidemiological studies could provide sufficient reliable evidence for the causes of diseases in specific individuals to present the issue of causation to juries. *Landrigan* and *Caterinicchio* involved the relationship of asbestos to colon cancer; *Dafler* addressed the relationship of cigarette smoking and asbestos to lung cancer.

In *Landrigan*, an occupational asbestos exposure case, the trial court dismissed the case on the ground that there was a lack of medical evidence to establish asbestos exposure as the cause of the disease. The Appellate Division affirmed. The Supreme Court reversed and held that epidemiologists could help juries determine causation in toxic tort cases and rejected the proposition that epidemiological studies must show a relative risk factor of "2.0" before gaining acceptance by a court, *Landrigan, supra* at 419. (A discussion of epidemiology and relative risk begins at p. 12).

The Supreme Court in *Landrigan* ruled that a trial judge must consider all the scientific data, sources thereof, and the methodology by which an expert reaches a conclusion, "includ[ing] an evaluation of the validity both of the studies on which he relied and of his assumption that the decedent's asbestos exposure was like that of the members of the study populations." *Id.* at 420. Additionally, the Supreme Court advised that "to determine the admissibility of the witness's opinion, [a] court, without substituting its judgment for that of the expert, should examine each step in [the expert's] reasoning." *Id.* at 421.

During the *Kemp* Hearing in these proceedings the court invited counsel to research what other courts have done on a relative risk factor of less than "2.0" and to submit their findings. The briefs furnished and the case law cited were very helpful. In reviewing the case law submitted by counsel, it is apparent that most courts across the nation - federal and state alike - discourage a dogmatic insistence upon a showing of a relative risk factor of "2.0" to support general causation. This court shares that perspective.

One case, cited by both sides, provided valuable guidance, namely *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 *F. Supp.* 2d 584 (D.N.J. 2002), *aff'd*, 68 F. Appx. 356 (3d Cir. N.J. 2003). The court in *Magistrini* noted "[a]s a general matter, the Rules of Evidence 'embody a strong and undeniable preference for admitting any evidence' that could potentially assist the trier of fact and Rule 702 is liberally interpreted by the district courts." *Id.* 595 (citations omitted), *New Jersey Evidence Rule* 702 is identical to the Federal Rule. That said, the court in *Magistrini* also cautioned, "[t]he Court's inquiry 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Id.* (citing *Daubert v. Merrell Dow Pharms.*, 509 *U.S.* 579, 595 (1993)). In articulating the mental process of the "gatekeeper," the court in *Magistrini* cited the Supreme Court decision in *GE v. Joiner*, 522 *U.S.* 136 (1997), wherein Chief Justice Rehnquist advised trial judges:

> But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

**\*7** *Id.* at 146.

A reading of the case law as to the weight attached to a relative risk factor of less than "2.0" shows that it is only one of the factors to be considered by the court. What must also be examined are the foundational sources of the expert's opinions. As discussed herein (see p. 17) in connection with the court's examination of the "Bradford Hill" criteria, although no single criterion is dispositive, research performed prior to litigation and peer-reviewed essays on the scientific issue at hand are the basic means by which to demonstrate reliability. Where neither exists, an expert witness is obligated to explain to the court how she/he proceeded in arriving at his/her conclusions by referencing some objective source(s), *e.g.*, a peer-reviewed article in a reputable medical/science journal, the public pronouncements of an agency with respected authority on the issue, or a learned treatise on the issue, in order to demonstrate that she/he has followed the scientific method at the standard maintained by some recognized minority of scientists in his/her area of science.

Accordingly, as this court understands New Jersey law and our Supreme Court's holding in *Landrigan*, the admissibility of expert testimony in toxic tort cases "depends on the expert's ability to explain pertinent scientific principles and to apply those principles to the formulation of his or her opinion. Thus, the key to admission of the opinion is the validity of the expert's reasoning and methodology." *Landrigan, supra* at 414. Nonetheless, the Supreme Court noted that, traditionally, "plaintiffs have established a connection between tortious conduct and personal injuries through the testimony of medical experts who testify that the defendant's specific conduct was the cause of the plaintiffs' injuries[,]" but that "[t]oxic torts, however, do not readily lend themselves to proof that is so particularized." *Id.* at 415. Accordingly, plaintiffs in toxic tort cases "may be compelled to resort to more general evidence, such as that provided by epidemiological studies." *Id.* This court is, of course, bound by the holding in *Landrigan* that "when an expert relies on such data as epidemiological studies, the trial court should review the studies, as well as other information proffered by the parties, to determine if they are of a kind on which such experts ordinarily rely." *Id.* at 417. (In the course of analyzing the issues raised herein, the court has carefully read every epidemiological study cited by the witnesses and legal counsel at the *Kemp* Hearing).

Ten years after *Landrigan*, in *Kemp* v. *State of New Jersey*, 174 *N.J.* 412, 430-32 (2002), the Supreme Court applied the *Rubanick* standard to a case involving an injury allegedly caused by vaccination, and implied its applicability to all tort cases in which a medical cause-effect relationship has not yet been confirmed by the scientific community but for which "compelling" evidence suggests that such a relationship does exist. In *Kemp*, the Supreme Court suggested that an *N.J.R.E.* 104 hearing is the preferred procedural practice in every case involving an expert's theory that has not yet achieved "general acceptance," finding that the trial court has an obligation, *sua sponte*, to conduct such a hearing and that the failure to do so is plain error.

**\*8** Accordingly, from this court's perspective, the inquiry at a *Kemp* Hearing must be "flexible." Its focus must be on principles and methodology and not necessarily on the conclusions/opinions that such scientific methodology may generate. The trial court's role is to determine whether the expert's opinion is derived from a sound and well-founded methodology. "There must merely be *some expert consensus* that the methodology and the underlying data are generally followed by experts in the field." *Rubanick, supra* at 450 (Emphasis added). Thus, at this *Kemp* Hearing, Plaintiffs' burden is to demonstrate that the methodologies used by their experts are consistent with valid scientific principles accepted in the scientific and medical communities.

Finally, the court is guided by the words of Justice Handler in *Rubanick, supra*, 125 *N.J.* 451, wherein he cautioned trial court judges that they must exercise restraint.

> We do not believe that in determining the soundness of the methodology the trial court should directly and independently determine as a matter of law that a controversial and complex scientific methodology is sound. The critical determination is whether comparable experts accept the soundness of the methodology, including the reasonableness of relying on this type of underlying data and information. *Great difficulties can arise when judges, assuming the role of scientist, attempt to assess the validity of a complex scientific methodology*, (Emphasis added).

# V. "BUILDING BLOCKS" OF THE SCIENTIFIC METHOD
## RELEVANT TO TALC-BASED POWDER AND OVARIAN CANCER

A *Kemp* Hearing is the intersection of the scientific method and the rule of law. If our court system is to be respected by the scientific community, then we must respect the scientific process. Essentially, the scientific method is the systematic pursuit of knowledge. This pursuit consists of those principles and procedures involved in the recognition and formulation of a problem, the collection of data through observation and experimentation, and the articulation and testing of a hypothesis by which to resolve the problem, and hopefully gain new knowledge useful to society.

What follows are the "building blocks" of the scientific method which the court must consider in evaluating Plaintiffs' experts' methodologies in arriving at their conclusions and opinions, and whether the same are "reliable." The key is consistent adherence to the scientific method. In addressing the issues to be resolved, the court has endeavored to faithfully apply the principles and tools of science to the issues at hand.

### A. Epidemiological Studies

The two primary types of observational studies relevant to these proceedings (*viz.*, epidemiology studies) are (1) cohort studies, and (2) case-control studies. Cohort studies compare the incidence of disease among individuals exposed to a substance with an unexposed group. Case-control studies examine the frequency of exposure in individuals who presently have the disease and compare them to a group of individuals who do not have the disease.

Epidemiologic studies provide "the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease." See *Conde v. Velsicol Chem. Corp.*, 804 *F. Supp.* 972, 1025-26 (S.D. Ohio, 1992), *aff'd*, 295 *F.3d* 1194 (11th Cir. 2002). When a scientific rationale doesn't exist to explain logically the biological mechanism by which an agent causes a disease, courts may consider epidemiologic studies as an alternate means of proving general causation. According to the *Reference Manual* at page 723-24, large epidemiological studies present some of the strongest medical/scientific evidence. The typical use of large population-based studies is in connection with "general causation." As noted in the *Reference Manual* at page 623, general causation is concerned with "whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease." Nonetheless, the *Reference Manual* at page 552 cautions trial judges that "it should be emphasized that *an association is not equivalent to causation.*" (Emphasis in the original text).

**\*9** Epidemiologic studies attempt to identify agents that are associated with an increased risk of disease. Thus, the first question an epidemiologist must ask is whether or not an association exists between exposure to a substance and a particular disease. An association between exposure to an agent and a disease exists when the two occur together more frequently than they would by mere chance. In that situation, the association is referred to as *significant*. "Statistically significant" means that the scientific community recognizes that the association between two or more variables is caused by something other than "random chance." Once a significant association is observed, the scientist undertaking the study must assess the *strength* of the association, plus whether the reason for the observed association is due to *bias, chance or a genuine effect*. A measure of the strength of an association in an epidemiological study can be expressed in terms of its "relative risk" (hereinafter "R/R"). R/R indicates the difference in the risk of contracting a disease in people exposed to a substance, as compared to those who are unexposed but are otherwise similar, in this case the American adult female population. Determining the R/R is important in understanding the results of a study because virtually every disease associated with a risk factor also occurs, at some rate, in the general population among study participants who are unexposed to the risk factor.

R/R is commonly calculated by dividing the risk of developing a disease observed in an exposed group by the risk observed in an unexposed, but otherwise similar, group. If the risks of the unexposed and exposed are the same, then the relative risk estimate (which mathematically is simply the former divided by the latter) is "1.0," also termed "null." The null value indicates that exposure is not associated with the disease in that study. Thus, an R/R of "1.0" means that the agent has no effect on the incidence of disease. Similarly, if the R/R estimate is "1.3," then risk appears to be 30% higher among the exposed compared to the non-exposed. When an R/R reaches "2.0," the risk has doubled, indicating that the risk is twice as high among the exposed group as compared to the unexposed group. As discussed in the *Reference Manual* at page 612, note 192, there exists "… considerable disagreement on whether a relative risk of 2.0 is required or merely a taking-off point for determining sufficiency …".

In evaluating epidemiological studies, it is important to note that "[a]n association is not equivalent to causation. An association identified in an epidemiological study may or may not be causal. Assessing whether an association is *causal* requires an understanding of the strengths and weaknesses of the study's design and implementation, as well as a judgment about how the study findings fit with other scientific knowledge." *Reference Manual* at page 552-3. As cautioned by the *Reference Manual*, the closer the R/R is to the null (or the further it is from 2.0), the greater the concern for bias or confounding.

Generally, there are three reasons that a positive association may be observed: (a) bias (including confounding factors), (b) chance, and (c) real effect. Each must be evaluated to extract a valid message from the study. Evaluation of these factors measures the "internal validity" of an epidemiology study, *viz.*, the extent to which a particular study's findings are viable and sound. "Bias" in epidemiology is systematic error, which includes "confounding bias." The underlying impact of these biases is to make the two groups being compared different in more ways than just the variable being studied. Sources of bias must be considered in interpreting an epidemiological study because bias can produce an erroneous association. *Reference Manual* at pages 591-3.

The record of the *Kemp* Hearing conducted by the court is replete with testimony, argument, and legal briefs regarding the significance to be attached to various studies conducted by epidemiologists on the possible association of talc-based products and ovarian cancer. Each side cited numerous studies to support its position. Nevertheless, this court's review of the various studies is informed by the admonishment of the *Reference Manual* at page 576:

> Common sense leads one to believe that a large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists. Common sense also suggests that by enlarging the sample size (the size of the study group), researchers can form a more accurate conclusion and reduce the chance of random error in their results…With large numbers, the outcome of test is less likely to be influenced by random error, and the researcher would have greater confidence in the inferences drawn from the data.

### B. Laboratory Studies on Talc and Cancer

**\*10**  To confirm a possible cause-and-effect relationship suggested by epidemiological studies, an exposure assessment can be conducted in order that the findings of those studies may be compared to the adverse health impacts predicted from exposure estimates and toxicological data from laboratory experiments.

Laboratory studies can be conducted using cells from animals or humans. Research involving a controlled environment, such as cell cultures in a test tube or in a petri dish, are called *in vitro* studies. Studies done on living organisms are called *in vivo* studies. There are many institutions around the world conducting laboratory studies focused upon the potentially causal relationship between various substances and cancer. Much can be learned from those studies.

Carl v. Johnson & Johnson, 2016 WL 4580145 (2016)

Here, regarding Plaintiffs' claim of a specific causal relation between talc-based powder and ovarian cancer, laboratory studies can be performed on both human and animal cells to assess the impact of talc upon tissue and cells removed from both women and animals.

## C. Cancer Biology and Research

The past generation has seen large strides made in understanding the pathways which cause human cancers. These "pathways" are essentially a molecular chain of events that cause human cancers. Scientists now have the ability to analyze many thousands of genes, and to study how a particular gene responds to various substances. This can be done in both human and animal cells, both *in vitro* and *in vivo*. In the process scientists can gain a better understanding of what triggers cancer. Thus, understanding how these pathways get turned on or turned off by the mutations in key genes is critical to understanding the rudimentary causes of cancer. As will be discussed hereinafter in connection with the testimony of Dr. Lewis Chodosh, there is a great deal to be learned from studying the biology of cancer. The biology of cancer and the research being done (and results from years past) are all relevant to any scientific inquiry into the alleged causal connection between talc-based powder and ovarian cancer.

## D. Animal Studies

Another means by which to measure the toxicity of an agent in humans is through animal toxicology studies. The purpose of animal studies is not to predict what specific types of cancer a particular carcinogen might cause in humans, but rather to identify whether it can cause cancer at all. However, animal studies are of limited use in determining whether a particular substance causes a particular disease, or type of cancer, in humans. Generally, where both epidemiologic studies and animal toxicology are available, there is no universal rule for how to reconcile them. The scientific method dictates that careful assessment of the methodological validity and power of the epidemiologic evidence must be undertaken and the quality of the toxicological studies and the question of interspecies extrapolation and dose-response relationship must be also considered.

## E. Agencies Which Study Cancer

Though cancer has plagued mankind throughout the history of civilization, it wasn't until the twentieth century that the U.S. Congress decided to take the lead in developing a permanent agency of government to encourage research into the causes and cures of cancer.

In 1937, Congress established the National Cancer Act of 1937 to provide additional support for cancer research – it was the first time Congress had appropriated funds toward a non-communicable disease. The Act established the National Cancer Institute ("NCI") as the federal government's primary agency to address research and training needs for the cause, diagnosis, and treatment of cancer. NCI's responsibilities included (in part):

**\*11**  • Conducting, coordinating, and promoting research and studies relating to the cause, diagnosis, treatment, and prevention of cancer.

• Reviewing and approving grant applications to support promising cancer research.

• Collecting, analyzing, and disseminating the results of cancer research conducted in the United States and in other countries.

[The above can be found at: http://www.cancer.gov/about-nci-overview/history.]

Carl v. Johnson & Johnson, 2016 WL 4580145 (2016)

In addition to the NCI, several other agencies and associations study and report to the public. As shown in Appendix E, those entities include: U.S. Food and Drug Administration, American Cancer Society, World Health Organization, International Agency Research on Cancer, and The American College of Obstetricians and Gynecologists. [NOTE: Each of these agencies has made public pronouncements which are inconsistent with, and/or unsupportive of Plaintiffs' claims that talc-based powder causes ovarian cancer.]

### F. Bradford Hill Criteria

From the court's perspective, this "building block" is really the "mortar" for the scientific method. The Bradford Hill criteria should be acknowledged, either initially or by way of summary, in any discussion of the method(s) by which scientists seek new knowledge on a given scientific question. Because this court sees the criteria discussed below as "mortar" for building the conclusions in this analysis, it is the final item discussed.

In 1965, respected scientist and pioneer in medical statistics, Sir Austin Bradford Hill (1897-1991), made a speech before a group of colleagues wherein he attempted to articulate those essential benchmarks which the scientific community must consider in distinguishing between causal and non-causal explanations of observed associations. That speech is likely the most widely-published and quoted after-dinner speech delivered by a physician.

In determining whether an observed association between a chemical and a disease is causal (*i. e.*, general causation), Hill advised that scientists should be guided by various factors, which are often referred to as the "Hill criteria."

These factors include: (1) **strength** of association (*i.e.*, is the association strong and statistically significant?); (2) consistency of the relationship (*i.e.*, whether it has been repeatedly observed in other persons?) (3) **specificity** of association (*i.e.*, is there a particular association between the substance and the condition it purportedly causes?); (4) **temporality** (are the cause and effect bound in time, or as Hill states, "which is the cart and which is the horse?); (5) **biological gradient** (does the association reveal a dose-response curve?); (6) **plausibility** (*i.e.*, whether there exists a biologically plausible *mechanism* by which the agent *could* cause the disease?); (7) **coherence** (does cause-and-effect interpretation of the data conflict with the history and biology of the disease?); (8) **experiment** (is the frequency of the associated events affected by reducing the amount of the suspected substance?); (9) **analogy** (should science anticipate similar results from a consideration of alternative explanations?). Here, regarding talc-based products and ovarian cancer, though most of the factors come in for consideration to varying degrees; this is particularly true factors 1, 2, 5, and 6, [NOTE: When, as here, the R/R is significantly less than "2.0", factor #6 is essential]

**\*12** Finally, it should be noted that it is unlikely that Hill intended that scientists should be inflexibly bound to his criteria. There is little doubt in the scientific community that he encouraged that the seven identified considerations be applied flexibly. That said, a final portion of his speech is worthy of quoting verbatim.

> All scientific work is incomplete – whether it be observational or experimental. All scientific work is liable to be upset or modified by advancing knowledge. *That does not confer upon us a freedom to ignore the knowledge we already have*, or to postpone the action it appears to demand at a given time. (Emphasis added).

### VI. PRELIMINARY OVERVIEW OF EXPERT TESTIMONY AND ANALYSIS OF THE TOTALITY OF THE EVIDENCE PRESENTED

This court is ever mindful of its role as a "gatekeeper" and the "great difficulties" that can arise for a trial judge in ruling on the admissibility of expert testimony. The analysis for determining what proofs may be presented to a jury must be in accordance with the standards expressed by our Supreme Court; that is the frame of reference by which the information

Carl v. Johnson & Johnson, 2016 WL 4580145 (2016)

presented by counsel and the experts must be scrutinized. The court had the opportunity to observe closely the nine expert witnesses presented by the parties. Much was learned from each witness; nonetheless, a preliminary observation sets the foundation for all that follows.

Throughout these proceedings the court was disappointed in the scope of Plaintiffs' presentation; it almost appeared as if counsel wished the court to wear blinders. Plaintiffs' two principal witnesses on causation, Dr. Daniel Cramer and Dr. Graham Colditz, were generally dismissive of anything but epidemiological studies, and within that discipline of scientific investigation they confined their analyses to evidence derived only from small retrospective case-control studies. Both witnesses looked askance upon the three large cohort studies presented by Defendants. As confirmed by studies listed at Appendices A and B, the participants in the three large cohort studies totaled 191,090 while those case-control studies advanced by Plaintiffs' witnesses, and which were the ones utilized in the two meta-analyses performed by Langseth and Terry, total 18,384 participants. As these proceedings drew to a close, two words reverberated in the court's thinking: "narrow and shallow." It was almost as if counsel and the expert witnesses were saying, *Look at this, and forget everything else science has to teach us.*

The *Reference Manual* expressly cautions against a narrow and shallow examination of the science supporting Plaintiffs' contentions. "The critical difference between cohort studies and case-control studies is that cohort studies begin with exposed people and unexposed people, while case-control studies begin with individuals who are selected based on whether they have the disease or do not have the disease and their exposure to the agent in question is measured." (p. 557). Additionally, Section IV. B. of the *Reference Manual* warns of bias, particularly "information bias" of the participants. "In a case-control study, potential information bias is an important consideration because the researcher depends on information from the past to determine exposure and disease and their temporal relationship." (p. 585).

Equally troubling is Plaintiffs' failure to address meaningfully the other fields of scientific inquiry – or "building blocks" – in support of their assertion of general causation, *e.g.*, laboratory studies on talc, cancer biology, and animal studies. Most critical is their failure to provide a coherent explanation to support their hypothesis for biologic plausibility, which is #6 of the Hill criteria, to wit, "plausibility".

**\*13** Neither Dr. Cramer nor Dr. Colditz expressed much interest in explaining just how it is that talc-based powder supposedly causes cancer in the ovaries, or for that matter any part of the human anatomy. "Inflammation" was used almost as a talisman that supposedly explained everything the court needed to know. Stated in lay terms, Dr. Cramer's and Dr. Colditz's postulation, essentially, is as follows: *The talc flows upstream and lodges in the ovaries; it irritates cells in the ovaries, causes inflammation, which in turn causes immunosuppression, and the inescapable result is cancer.* Positing that premise (which the court does not), both witnesses ignore the fact that that Dr. Godleski conceded on cross examination that he did not observe inflammation in any of the tissue -of either Plaintiff – that he examined.

Q Doctor, you agree also that neither Mrs. Carl nor Mrs. Balderrama's treating pathologists noted any talc-related inflammatory reactions in their reports in these cases?

A That's correct.

(See generally the testimony of 8/9/16; see P129, L1 thru P130, L21).

A cornerstone of the "talc causes cancer" hypothesis is "inflammation," yet none was present in any of the tissue samples studied.

Incident to the meager width and depth of the investigation employed by Plaintiffs' experts in this litigation was the failure to address several questions arising from the proffered evidence. These questions illustrate the flaws in the methodology of Plaintiffs' experts,

1. Those epidemiological studies showing a potential link between talc-based powder and ovarian cancer repeatedly rank serous ovarian cancer as the most likely type of cancer that may result among talc users. Dr. Cramer confirmed that in his testimony; "...invasive serous cancer, [is] the type most commonly associated with talc use." (Testimony of 8/8/16; see P320, L19) Neither Plaintiff was diagnosed with this condition. *Why was there no testimony presented to address this obvious incongruity?*

2. Talc was purportedly found in tissue surgically removed from each of the Plaintiffs. It was argued by Plaintiffs and their experts that inflammation is the root cause of all cancers. Yet there is nothing in the records nor expert reports demonstrating that the tissue samples were inflamed. *Why was there no testimony presented to address this obvious question?*

3. Positing Plaintiffs' contention that talc particles travel naturally through the female anatomy, from the perineum to the ovaries, then, *a fortiori*, the potential for talc particles to lodge elsewhere along the reproductive tract and create similar conditions would be apparent. Yet the only portion of the reproductive tract in which talc has purportedly caused cancer is the ovaries. Nothing was presented showing an increase in the other gynecologic cancers such as vaginal cancer, cervical cancer, uterine cancer, or fallopian tube cancer, which is what one would reasonably expect. *Why was there no testimony presented to address this obvious conundrum?*

### Summary of Dr. Chodosh's Testimony

As part of its preliminary overview of the expert testimony presented, the court is compelled to highlight the testimony of one witness in particular. Dr. Chodosh's testimony for Defendants was akin turning on the lights in a dark room. The failure of Plaintiffs' experts to articulate a plausible hypothesis for the biological mechanism by which talc purportedly causes ovarian cancer is a serious deficiency. After hearing Dr. Chodosh's testimony, it is apparent to the court that there was no articulation of a plausible hypothesis because it is unlikely that one can be made. Dr. Chodosh's testimony illustrates the huge hole in Plaintiffs' scientific methodology, namely, the failure to consider the biology of cancer. Dr. Chodosh's testimony and the scientific studies (see Appendix D) upon which he relies in formulating his opinions appear to support a reasonable hypothesis that talc does not cause cancer because it cannot cause cancer.

**\*14** What follows are the most significant conclusions from Dr. Chodosh's testimony, none of which were addressed by anything Plaintiffs' experts presented, nor diminished in their impact on cross-examination.
1. Talc is *inert*. "...talc does not change gene expression in ovarian cells. Treating ovarian cells with talc didn't change the expression." (Testimony of 8/19/16; see P71, L2 thru P77, L13).

2. Talc is an anti-cancer property because it inhibits the formation of blood cells, and it cannot cause mutations.

Q What do they show just in some --

A In a thumbnail, it basically shows that talc actually inhibits the formation of blood vessel growth.

Q Which is an anticancer property of talc?

A Yes, that would be an anticancer property.

(See generally the testimony of 8/19/16; see P33, L23 thru P34, L7 and P39, L10 thru P53, L8).
See also the study by N. Najmunnis, et al., *Talc mediates angiostasis in malignant pleural effusions via endostatin induction* at Appendix D wherein these scientists concluded: "In conclusion, talc alters the angiogenic balance in the pleural space

from a biologically active and angiogenic environmental to an angiostatis milieu. Functional improvement following talc poudrage in patients with malignant pleural effusions may, in part, reflect these alterations in the pleural space."

3. Talc induces cancer cells to apoptosis but not to normal cells. (Testimony of 8/19/16; see P41, L5 thru P45, L3 and P143, L18 thru P145, L7).

4. It's universally accepted that mutations in critical genes is the mechanism that causes cancer, and talc doesn't cause mutations. (Testimony of 8/19/16; see P52, L22 thru P56, L9).

5. "Inflammation" is an extremely complex issue and it is unclear whether chronic inflammation is sufficient to induce cancer in the absence of a carcinogen. (Testimony of 8/19/16; see P177, L11 thru P181, L10).

## VII. FOOD and DRUG ADMINISTRATION LETTER ON TALC

Much was made by counsel for both sides in their questioning of witnesses during the several days of the *Kemp* Hearing with regard to a letter from the Food and Drug Administration (FDA), dated April 1, 2014, hereinafter "the FDA letter." The FDA letter was in reply to the "Citizen Petitions" filed by Samuel S. Epstein, M.D., of the University of Illinois, School of Public Health, on behalf of the "Cancer Prevention Coalition." Said petitions (dated November 17, 1994 and May 13, 2008) requested the FDA to require all cosmetic talc products to bear a warning label, Particularly, with regard to talcum powder, the Coalition requested a prominent warning reading as follows: "Frequent talc application in the female genital area is responsible for major risks of ovarian cancer."

The court perused the FDA's letter on multiple occasions. Depending upon one's perspective, the letter can be cited for a great deal of importance, or, it might be said that the letter provides very little new information of significance to the issues that must be addressed herein. This court's reading falls into the latter category

There was limited discussion of the FDA's statutory and regulatory authority during the *Kemp* Hearing. Yet, there is a need to place the letter and the FDA's role into proper context. The pertinent regulation dealing with labeling of talcum powder or any other "cosmetic" product is set forth at Title 21 of the Federal Register. It states in pertinent part:
*15 §740.1 Establishment of warning statements.

(a) The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product.

(b) The Commissioner of Food and Drugs, either on his own initiative or on behalf of any interested person who has submitted a petition, may publish a proposal to establish or amend, under subpart B of this part, a regulation prescribing a warning for a cosmetic. Any such petition shall include an adequate factual basis to support the petition, shall be in the form set forth in part 10 of this chapter, and will be published for comment if it contains reasonable grounds for the proposed regulation.

Subpart "(a)" of Section 740.1 was discussed with one witness, and comments were made by counsel concerning the same. Yet there was no discussion by Plaintiffs' experts with regard to subpart "(b)." That subpart requires petitions such as those filed by Dr. Epstein and the Cancer Prevention Coalition to *include an adequate factual basis to support the petition.* Subpart "(b)" states that upon submission of an "adequate factual basis," the Commissioner of the FDA "either on his own initiative or on behalf of any interested person who has submitted a petition" has the authority to "publish a proposal to establish" a warning label for a "cosmetic product." That would include talcum powder. As noted by Deputy Director Steven M. Musser, Ph.D., the petitions were denied because they lacked sufficient "evidence of a

causal association between talc use in the perineal area and ovarian cancer." In denying the petitions, the "FDA found" and articulated six points which the agency concluded were supported by its review of "an expanded literature search."

Relevant to the court's analysis are findings #2 and #4 of the FDA letter. Finding #2 expressed concerns with biases in the design of studies and uncontrolled confounding. It also noted that "no single study has considered all the factors that potentially contribute to ovarian cancer". Finding #4 states in relevant part, "[a] cogent biological mechanism by which talc might lead to ovarian cancer is lacking…" Nothing was presented by Plaintiffs' expert with regard to these two critical findings of the FDA.

The FDA letter is essentially an acknowledgement of the status quo, based upon its own "expanded literature search." In short, the real rationale that can be drawn from the FDA letter is that if there existed sufficient evidence linking talc causally to ovarian cancer, *viz., an adequate factual basis to support* such a postulation, the FDA has the resources and regulatory authority to mandate a warning label for talcum powder.

## VIII. DEFICIENCIES IN DR. COLDITZ'S METHODOLOGY

Dr. Graham Colditz is a brilliant scientist and a dazzling witness. His vocal inflection, cadence, and adroit use of histrionics are extremely effective. Dr. Colditz's reputation for his breadth of knowledge about cancer and the esteem in which he is held by his peers is well deserved. Yet, at times, it seemed that issues raised in these proceedings, and the questions posed to him, were a bit mundane for a scientist of his caliber.

**\*16**   At page 10 of his report of July 31, 2015, Dr. Colditz discusses "biologic plausibility." His discussion of the subject entails fewer than 75 words. He cites a total of four peer-reviewed articles in arriving at his opinion: "Thus it is established that talc can travel to the ovary, it causes an inflammatory response, and this mechanism is consistent with the increase of ovarian cancer that is observed."

Scrutiny of the articles cited in Appendix C does not support his conclusion. What follows is a brief discussion of the aforesaid learned treatises referenced by Dr. Colditz.

**Roberta B. Ness:** This paper is limited to a review of existent epidemiologic literature in the English language on the risk and protective factors for ovarian cancer and "proposes a novel hypothesis that a common mechanism underlying this disease is inflammation." Though talc exposure is mentioned, along with other theories of what may cause ovarian cancer, this paper does not discuss the means by which *talc can travel to the ovary*, nor does it discus the means by which talc causes *an inflammatory response* in the cells of the ovaries.

**Jack Cuzik:** This paper is limited to use of aspirin and NSAIDs for cancer prevention. This treatise does not discuss the means by which *talc can travel to the ovary*, nor does it discuss the means by which talc causes *an inflammatory response* in the cells of the ovaries,

**Britton Talbert:** This paper is limited to the "multiple lines of evidence" which "suggest that ovarian cancer may be related to chronic inflammation." In short, "this pooled analysis supports the hypothesis that regular aspirin use reduces ovarian cancer risk." This treatise does not discuss the means by which *talc can travel to the ovary*, nor does it discuss the means by which talc causes *an inflammatory response* in the cells of the ovaries.

**Britton Talbert:** This paper is limited to a discussion of the pro-inflammatory mechanisms that may explain "the increased risk linked to more lifetime ovulations, endometriosis, and exposure to talc and asbestos, as well as the decreased risk with non-steroidal anti-inflammatory drugs." This treatise does not discuss the means by which *talc can travel to the ovary*, nor does it the means by which talc causes *an inflammatory response* in the cells of the ovaries.

Even the most generous reading of these four cited articles reveals that none of them proffers an articulation of a hypothesis – nor a means by which to test the same – setting forth a biologic mechanism by which talc-based powder may/can/possibly does cause ovarian cancer, Dr. Colditz's reliance upon these four treatises supports a finding by this court that he has failed to make a systematic review of the scientific literature and has ignored the rudiments of the scientific method in arriving at his conclusion that, "[t]hus it is established that talc can travel to the ovary, it causes an inflammatory response, and this mechanism is consistent with the increase of ovarian cancer that is observed."

Further, with regard to "biologic plausibility," the court recalls Dr. Colditz's answer to the questions posed from the bench on this issue. Those questions dealt with a hypothesis on biologic causation postulated by Dr. Cramer. The exchange between the court and Dr. Colditz reads as follows:
THE WITNESS: Yes, it is Dr. Cramer's study.

THE COURT: Then turn to page 355. I'm determined to get an answer to this question. I asked it yesterday, and I wasn't able to get an answer. 355. Look at the second column. And then let's go to the last long sentence. "We have also proposed that talc use during periods of ovulation may carry greater risk, based upon the hypothesis that ovarian surface epithelial disruption and repair accompanying ovulation might allow talc to become entrapped within the inclusions cysts that form with ovulation." First question is, explain that to me in laymen's terms.

*17  THE WITNESS: Wow. Ovulation.

THE COURT: A good scientist can do that. I'm sure you will. I understand ovulation.

THE WITNESS: You understand the ovulation. Right? That's --and so he's saying that with ovulation and then in that disrupted epithelium, the presence of talc can more likely get --

THE COURT: How? THE WITNESS: -- into a cell --

THE COURT: How? What's the cyst? What's an inclusion cyst?

THE WITNESS: Oh, so the -- this is the cyst that develops in an ovary that would have a talc particle in it as an inclusion cyst. So he's saying that with sort of the surface of the ovary has to repair each time it pops. And so there's --

THE COURT: That's a traumatic experience for that part of the body.

THE WITNESS: Yeah, right. And so there's inflammatory response.

THE COURT: Go ahead.

THE WITNESS: And so you got some macrophages and other things working to clean up and repair the epithelium. And if you've got the talc present at that time --

THE COURT: If you have it present at that time.

THE WITNESS: -- if you've ovulated, you've got higher likelihood is, I think, what he's trying to say.

THE COURT: And based upon your readings in preparation for your report, did you find any other peer-reviewed articles where Dr. Cramer discussed this hypothesis? And coupled with that, has anybody else discussed this hypothesis? Because if they do, I want to read it.

THE WITNESS: So obviously others have discussed the description of talc in ovary. The IARC and others describe inflammation and the carcinogenic process.

THE COURT: I've heard lots of testimony. But I'm talking about this hypothesis.

THE WITNESS: This actual --

THE COURT: I'm not asking you to defend this hypothesis.

THE WITNESS: No, no.

THE COURT: I'm asking you to tell me has anybody else discussed it so I can read it.

THE WITNESS: I can't think of this specific mechanism for getting in -- being described.

THE COURT: So you don't know of any other study where Dr. Cramer did or anybody else did?

THE WITNESS: To look at the inclusion cysts?

THE COURT: That's what it says.

THE WITNESS: No.

THE COURT: Okay. Then I still don't have an answer to my question.

THE WITNESS: Then you don't. It's a great question.

THE COURT: It doesn't mean it's a good question. It just means I don't have an answer to it.

THE WITNESS: This is why there's got to be continuing studies to understand this whole process better.


(Testimony of 8/16/16, P312, L13 thru P315, L19).

To summarize this court's understanding of Plaintiffs' inability to explain the biological mechanism for how talc causes cancer, Dr. Colditz noted candidly, "This is why there's got to be continuing studies to understand this whole process better."

Though there are additional deviations from the scientific method included in Dr. Colditz's report – namely, the manner in which he blithely passes over most of the Hill criteria – the most egregious may be his failure/refusal to discuss *strength* of association, and how the same supports general causation. Repeated use of the term "significant" with regard to the R/R adds something to the discussion, but not much. As noted above, this court cannot be inflexibly bound by a R/R of "2.0" nor are the Hill criteria. A review of Dr. Colditz's testimony – both on direct and cross-examination – fails to establish a single instance in which he states that any number less than "2.0" for the R/R equates to sufficient strength to find a causal relation. His testimony supports neither general nor specific causation, nor does it address the question of where or whether a "significant" relationship becomes "causal."

**\*18**  Finally, Dr. Colditz's expert opinion is *ipse dixit* and has all the earmarks of a made-for-litigation presentation. We need look no further than his own past writings. *First,* in 2000 in his peer-reviewed article entitled, "Prospective Study of Talc and Ovarian Cancer," he concluded, "[o]ur results provide little support for any substantial association

between perineal talc use and ovarian cancer risk overall…" *Second*, in his "2004 Handbook of Cancer Risk Assessment and Prevention," he lists talc as a "factor under study" in lieu of a modifiable factor which increases the risk of ovarian cancer. *Third*, as of 2011, on the website of the Alvin J. Siteman Cancer Center of which he is the Associate Director, the consensus of the Siteman scientific panel – which included both Dr. Colditz and Dr. Cramer – concluded that it was not appropriate to list talc as a risk factor on the "Your Disease Risk" portion of the website.

There is no challenge to Dr. Colditz's qualifications, nor that his testimony is relevant. Yet from the court's perspective, there are significant gaps in his methodology and analysis. He has committed the very error which Hill warned scientists against, namely, that the results of their research "…does not confer upon us a freedom to ignore the knowledge we already have." Dr. Colditz has overlooked the knowledge to be learned from laboratory research regarding the biology of cancer.

Applying the standards established in *Rubanick, supra*, 125 *N.J.* at 449, and *Landrigan, supra*, 127 *N.J.* at 420-1, the court concludes that the significant deficiencies in Dr. Colditz's methodology and analysis herein described, render his opinions inadmissible in these proceedings, and that the Defendants' motion to bar the testimony of Dr. Colditz is hereby GRANTED.

## IX. DEFICIENCIES IN DR. CRAMER'S METHODOLOGY

Dr. Cramer is a distinguished professional. His commitment to medical science generally, and to learning more about the potential health consequences to women from the frequent use of talcum powder in particular, have been unswerving throughout his career. Few people possess the knowledge he has acquired from case-control studies regarding the potential effects of talc *vis a vis* ovarian cancer. His passion for this subject is palpable and exemplary.

Dr. Cramer's study of this subject together with his examination and his analysis of the results of many case-control studies addressing the relationship between talc and ovarian cancer date back more than 30 years. In July, 1982 he published his initial peer-reviewed article on this subject entitled, "Ovarian Cancer and Talc: A Case-control Study." Over the past 34 years, Dr. Cramer has authored and co-authored numerous peer-reviewed articles on talc. He has also conducted several meta-analyses of other epidemiology reports. All those studies appear to demonstrate a consistent, albeit uniformly weak, association between talc and ovarian cancer.

Dr. Cramer is highly qualified and his testimony is relevant. Yet from the court's perspective, there is a large gap in his methodology. Dr. Cramer has totally ignored laboratory research regarding the biology of cancer and the ameliorative effects of talc on cancer. He has made the error that Hill expressly warned scientists against, viz., that the results of their research "…does not confer upon us a freedom to ignore the knowledge we already have."

As discussed above, the research and existing studies cited in the testimony of Dr. Chodosh dismantled the premise of Dr. Cramer's opinions on the causal association between talc-based products and ovarian cancer. Dr. Cramer's failure to address the opinions of Dr. Chodosh and the results of laboratory research on the ameliorative effects of talc on cancer highlights the serious flaws in his methodology.

For purposes of this *Kemp* Hearing, the court must consider whether Dr. Cramer's testimony is sufficiently reliable to be presented to a jury. Defendants attack his opinions on both *general* and *specific* causation.

**\*19** On the issue of *general causation*, Defendants attack the odds ratios (O/R) established in his report. Dr. Cramer notes that in general, his research — relying almost entirely upon case-control studies – confirms that there is an O/R of 1.29 between perineal talc use and ovarian cancer. As indicated in his report, Dr. Cramer performed a case-control study to generate his final conclusions. In both his report and in his testimony, Dr. Cramer opines that the causal association between ovarian cancer and the use of talc has been "significant" and consistent for 30 years. The O/R of 1.29 reported by

Carl v. Johnson & Johnson, 2016 WL 4580145 (2016)

Dr. Cramer is admittedly "weak" and neither he nor any other witness explained when/how a "significant" association becomes causal?

A retrospective case-control study is commonplace in the field of epidemiology, but as noted by the *Reference Manual* at page 576 such studies are considered less reliable than a prospective cohort study. Yet, that is almost entirely where Dr. Cramer devotes his research. According to Dr. Cramer, there have been 19 peer-reviewed scientific articles addressing the talc and ovarian cancer association since 1982. More recently there have been three very large cohort studies whose number of participants dwarfs those of the case-controls studies. (See Appendix A). Undermining the reliability of his testimony, Dr. Cramer is rigidly dismissive of the knowledge to be gained from the much larger cohort studies. On cross-examination, when asked if he had performed a meta-analysis of the three large cohort studies, he tartly replied, "I have not done that. The defense is very capable of doing that themselves." (Testimony of 8/8/16; see P324, L1 thru L8. See also his testimony at P199, L24 thru P200, L5).

Most troubling to the court is the effort made by Dr. Cramer to use epidemiology to prove *specific* causation. As noted by the *Federal Manual* at page 553, trial judges are warned of the overreliance upon such studies, "[a] final caveat is that employing the results of group-based studies of risk to make a causal determination for an individual plaintiff is beyond the limits of epidemiology." And again, the *Federal Manual* cautions, "[e]pidemiology is concerned with the incidence of disease in populations, and epidemiologic studies do not address the question of the cause of an individual's disease. This question, often referred to as specific causation, is beyond the domain of the science of epidemiology." (p. 608). In short, Dr. Cramer's methodology appears to be litigation driven rather than objectively and scientifically grounded.

The court uses the phrase *made-for-litigation* methodology for a reason. In all his prior peer-reviewed articles, Dr. Cramer never once stated that he believes talc causes ovarian cancer; not in his articles of 1982, 1999, 2000 (with Gertig) and 2007 does he make such an assertion. In fact, in his study of 2007, he concluded, "[w]e are not claiming that a causal relationship between ovarian cancer and talc is proven for this case or in general." Yet now, after having never made such a claim, he asserts here not only general causation, but specific causation as to both Plaintiffs, and purports to do so by re-analyzing old studies and subjectively mingling the various risk factors for each Plaintiff in order to prove ovarian cancer *by the numbers*. This "methodology" is not one based upon "prolonged, controlled, consistent and validated experiences". *Rubanick* at 436.

A final issue which must be addressed with regard to specific causation is the detailing of a hypothetical etiology of the disease in question and how the alleged substance is the malefactor. In his study of 1999 (See Appendix B), Dr. Cramer – in passing – made a partial articulation of a hypothesis for the biological mechanism by which talc purportedly causes ovarian cancer. That partial articulation is set forth in a single sentence which reads:

> **\*20** We have also proposed that talc use during periods of ovulations may carry greater risk, based on the hypothesis that ovarian surface epithelial disruption and repair accompanying ovulation might allow talc to become entrapped within the inclusion cysts that form with ovulation. (p. 355).

This is the closest Dr. Cramer has ever come to postulating a hypothesis for the causal link between talc and ovarian cancer. He does not allude to this hypothesis in either the Carl or the Balderamma reports. Nor was he asked about this hypothesis by counsel on direct-examination.

Instead of a plausible explication of a hypothesis setting forth the biological mechanism of the causal link between talc-based powder and ovarian cancer, what the court received was a *made-for-litigation* methodology, to wit, the subjective mingling of risk factors to advance the base-line relative risk for each of the Plaintiffs (as members of the U.S. population) from 1.29 to 1.75 (Carl) and 1.79 (Balderamma). The knowledge learned to date from epidemiology studies involving talc and ovarian cancer is insufficient to prove ovarian cancer *by the numbers*.

Each of the Plaintiffs had significant risk factors for ovarian cancer to which Dr. Cramer's testimony showed a stark indifference. Ms. Carl had the following risk factors: obesity, nulliparity, infertility, past use of an IUD, psychotropic medication, smoking, and exposure to hair dye. Ms. Balderamma had the following risk factors: obesity, nulliparity, irregular cycles, early menarche (age 11), polycystic ovarian syndrome, past use of an IUD, and a potential BRCA gene diagnosis.

Despite his failure to eliminate – or make an objective accounting of- those multiple risks, Dr. Cramer leaps to specific causation *by the numbers.* He is not concerned that he hasn't even attempted to postulate a plausible biological hypothesis for how talc causes ovarian cancer as urged by factor #6 of the Hill criteria. His opinions rely upon an incomplete/ irregular methodology unlike anything upon which his peers would rely, and appear to be grounded only in his instincts and personal predilections. In short, the mingling of various risk factors and the purported "synergy" between talc and other health conditions is highly speculative and does not conform to any methodology utilized in the scientific community.

Finally, Dr. Cramer and Plaintiffs' counsel would be better served to heed the wisdom contained in the FDA Letter of April 1, 2014. Finding #4 of "Epidemiology and Etiology Findings" reads in pertinent part: "A cogent biological mechanism by which talc might lead to ovarian cancer is lacking..." Hill criterion #6, to wit, **plausibility** (*i.e.*, whether there exists a biologically plausible *mechanism* by which the agent *could* cause the disease?) requires Plaintiffs' experts to articulate and support/defend a plausible *mechanism* by which talc *could* cause ovarian cancer. Their failure to do so is decisive in the court's analysis.

Applying the standards established in *Rubanick, supra,* 125 *N.J.* at 449, and *Landrigan, supra,* 127 *N.J.* at 420-1, the court concludes that the significant deficiencies in Dr. Cramer's methodology and analysis herein described, render his opinions inadmissible in these proceedings, and that the Defendants' motion to bar the testimony of Dr. Cramer is hereby GRANTED

## X. RULING

**\*21**  As is true of most adversarial proceedings, the written reports and testimony of Plaintiffs' experts are much like a patch-work quilt; individual pieces that when sewn together create a single blanket. If well sewn, the blanket covers the issues required to meet Plaintiffs' burden of proof. Positing, for the sake of discussion, that each piece of cloth is sound, the fragments cannot become a quilt without thread. Without a clearly stated, demonstrable hypothesis of specific causation, grounded in a reliable methodology, there is no thread and the pieces of cloth remain disparate.

Accepting, for the sake of discussion, that the case-control studies relied upon by Dr. Cramer — to the exclusion of cohort studies, laboratory studies, cancer biology and the pronouncements of those agencies that study cancer – convey an inference that there is some type of causal association between talc and ovarian cancer, it means nothing without a hypothesis of specific causation. No witness for Plaintiffs ventured to articulate just how it is that talc in the ovaries, or, what it is about talc in the ovaries, that sets off a chain of events which purportedly causes ovarian cancer. Uttering the term inflammation does not explain the etiology of ovarian cancer, nor can the manipulation of numbers serve as a hypothesis for specific causation. Absent the thread, there is no quilt.

As the proponent of the evidence on general and specific causation, "the plaintiff bears the burden of establishing admissibility." *Kemp, supra,* 174 *N.J.* at 429. As discussed, the testimony of Plaintiffs' experts suffers from multiple deficiencies, the most salient of which are the narrowness and shallowness of their scientific inquiries and the evidence upon which they rely. Their peers in the scientific community would not rely upon such limited information.

Ultimately the admissibility of these experts' opinions depends "on the trial court's assessment of both [their] qualifications and [their] methodology." *Landrigan, supra,* 127 *N.J.* at 422. "The key to the admission of the opinion

is the validity of the expert's reasoning and methodology." *Id.* at 414, Though both Plaintiffs' experts are eminently qualified, their areas of scientific inquiry, reasoning, and methodology are slanted away from objective science and towards advocacy. It is this court's conclusion that the opinions expressed by Plaintiffs' experts fail to demonstrate "that the data or information used were soundly and reliably generated and are of a type reasonably relied upon by comparable experts." *Rubanick, supra,* at 477.

For the reasons stated herein, the Defendants' motion to bar expert testimony and for entry of summary judgment as to both the Carl and Balderrama matters are hereby GRANTED.

With regard to the other expert witnesses of the Plaintiffs as well as Plaintiffs' cross-motions to bar the Defendants' experts, the Court will neither opine nor rule on the same. In light of the foregoing ruling, said petitions are of no practical significance and are deemed MOOT.

<<signature>>

NELSON C. JOHNSON, J.S.C.

Date of Decision: 9/2/16

**Appendix not available.**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.