# EXHIBIT 1

Protected Information - Jerrold R. Turner, M.D., Ph.D.

1    UNITED STATES DISTRICT COURT OF NEW JERSEY
     CAMDEN DIVISION

2

     ****************************

3    IN RE:  BENICAR (OLMESARTAN)
     PRODUCTS LIABILITY LITIGATION   MDL No. 2606

4    ****************************

5

6    SUPERIOR COURT OF NEW JERSEY
     ATLANTIC COUNTY

7

     ****************************

8    IN RE:  BENICAR (OLMESARTAN)    MCL No. 299
     MEDOXOMIL) LITIGATION

9    ****************************

10

11            ***PROTECTED INFORMATION***

12

13            VIDEOTAPED DEPOSITION OF

14            JERROLD R. TURNER, MD, PhD

15

16            Thursday, February 16th, 2017

17                   9:14 a.m.

18        Held At:

19            Campbell Campbell Edwards & Conroy, PC

20            One Constitution Plaza

21            Boston, Massachusetts

22

23   REPORTED BY:

24   Maureen O'Connor Pollard, RMR, CLR, CSR

Protected Information - Jerrold R. Turner, M.D., Ph.D.

---

Page 2

1  APPEARANCES:
2
3  FOR THE PLAINTIFFS:
4    ADAM SLATER, ESQ. (By videoconference)
       MAZIE SLATER KATZ & FREEMAN, LLC
5      103 Eisenhower Parkway
       Roseland, New Jersey 07068
6      973-228-9898
       aslater@mskf.net
7
       -and-
8
     PETER N. FOUNDAS, ESQ.
9      ROBINS KAPLAN, LLP
       800 Boylston Street
10     Boston, Massachusetts 02199
       617-859-2720
11     pfoundas@robinskaplan.com
12
13  FOR THE DEFENDANT DAICCHI-SANKYO and THE
    DEPONENT:
14
     BRUCE R. PARKER, ESQ.
15     VENABLE LLP
       750 E. Pratt Street
16     Baltimore, Maryland 21202
       410-244-7534
17     brparker@venable.com
18
19  VIDEOGRAPHER: Christopher Coughlin
20
    Present via phone:
21   Hilary Kelly, Esq.
     Daiichi-Sankyo
22
23
24

---

Page 3

1              INDEX
2  EXAMINATION                          PAGE
3  JERROLD R. TURNER, MD, PhD
4  BY MR. SLATER                        6
5  BY MR. PARKER                        302
6  BY MR. SLATER                        318
7
8
9           E X H I B I T S
10 NO.    DESCRIPTION                   PAGE
11 1   Notice to Take Videotaped Oral
       Deposition........................... 8
12
    2   Responses and Objections to
13      Plaintiffs' Notice of Oral
        Deposition........................... 8
14
    3   2/15/17 Letter to Adam Slater from
15      Susan Sharko........................ 8
16 4   Dr. Turner's General Causation
        Statement........................... 19
17
    5   Document titled Supplemental
18      Reliance List....................... 54
19 6   Copies of three invoices............. 10
20 7   Parker report titled Olmesartan
        and Sprue-like Enteropathy, Bates
21      OLM-DSI-0003347042 through 3347100... 43
22 8   Printout from Brigham & Women's
        Hospital website on Olmesartan
23      tablets.............................. 86
24

---

Page 4

1
2  9   Gallivan and Brown letter to the
       editor titled Olmesartan induced
3      enterocolitis........................104
4  10  Marietta, et al article titled
       Drug-Induced Enteropathy............125
5  11  Freeman article titled
       Drug-induced Sprue-like Intestinal
6      Disease..............................137
7  12  Green and Cellier article titled
       Celiac Disease.......................145
8
9  13  Setty, et al article titled
       Distinct and Synergistic
10     Contributions of Epithelial Stress
       and Adaptive Immunity to Functions
11     of Intraepithelial Killer Calls
       and Active Celiac Disease...........170
12 14  Marietta, et al article titled
       Immunopathogenesis of
13     olmesartan-associated enteropathy....225
14 15  Rubio-Tapia, et al article titled
       Severe Spruelike Enteropathy
15     Associated With Olmesartan..........225
16 16  Choi and McKenna article titled
       Olmesartan-Associated Enteropathy.
17     A Review of Clinical and
       Histologic Findings.................239
18
19 17  Marthey, et al article titled
       Olmesartan-associated enteropathy:
20     results of a national survey.........274
21 18  Kulai, et al article titled Images
       of the Month, Duodenal Villous
22     Atrophy in a TTG-Negative Patient
       Taking Olmesartan:  A Case Report
23     and Review of the Literature.........280
24 19  FDA Drug Safety Communication........322

---

Page 5

1          P R O C E E D I N G S
2
3       THE VIDEOGRAPHER:  We are now on the
4  record.  My name is Chris Coughlin, and I'm a
5  videographer for Golkow Technologies.
6       Today's date is February 16, 2017, and
7  the time is 9:14 a.m.
8       This video deposition is being held in
9  Boston, Massachusetts in the matter of Benicar
10 (Olmesartan) Products Liability Litigation,
11 Civil Action Number 15-2606(RBK)(JS), all cases,
12 in the United States District Court, District of
13 New Jersey.  The deponent is Dr. Jerrold Turner.
14      Will counsel please identify
15 yourselves for the record.
16      MR. SLATER:  Adam Slater for the
17 plaintiffs.
18      MR. FOUNDAS:  Peter Foundas for the
19 plaintiffs.
20      MR. PARKER:  Bruce Parker for Daiichi.
21      THE VIDEOGRAPHER:  The court reporter
22 is Maureen Pollard, and she will now swear in
23 the witness.
24

---

Golkow Technologies, Inc.                    Page 2 (2 - 5)

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 6

1     JERROLD R. TURNER, MD, PhD,
2 having been first duly identified and sworn, was
3 examined and testified as follows:
4           EXAMINATION
5 BY MR. SLATER:
6     Q.  Good morning, Dr. Turner.
7     A.  Good morning.
8     Q.  I introduced myself in a bit of a
9 flurry of activity just a few moments ago, my
10 name is Adam Slater, I'm going to take your
11 deposition now in the Benicar (Olmesartan)
12 Product Liability Litigation.
13           Do you understand that's what we're
14 going to do today?
15     A.  Yes.
16     Q.  My understanding is you have had your
17 deposition taken previously as an expert witness
18 in other litigation, correct?
19     A.  Yes, I have.
20     Q.  You understand you're now under oath
21 and must tell the truth in response to every
22 question I ask you?
23     A.  Yes.
24     Q.  If I ask you a question that doesn't

Page 7

1 make sense to you for any reason, for example, I
2 mispronounce terminology, the question that
3 doesn't make medical sense to you, for whatever
4 reason, if the question doesn't make sense to
5 you, such that you cannot answer truthfully and
6 completely, you just need to tell me that, and
7 then we'll talk about what's unclear and I'll
8 try to rephrase the question.  Okay?
9     A.  Yes.
10     Q.  Mr. Parker may object to some of my
11 questions, and if he does, just let him speak,
12 and then my expectation is in those cases, if
13 not all cases, you'll go ahead and answer the
14 question.  But I'm sure you've been in
15 depositions where lawyers object to the form of
16 the question that you probably will hear several
17 times today, that's not a signal not to answer,
18 it just means he's preserving his rights for the
19 future, and then you'll go ahead and answer.
20           Do you understand that?
21     A.  Yes, I did.
22     Q.  Doctor, in front of you should be
23 what's been marked as Exhibit 1, the notice of
24 deposition.

Page 8

1     Q.  Do you see that?
2     A.  Yes, I do.
3           (Whereupon, Turner Exhibit Number 1,
4           Notice to Take Videotaped Oral
5           Deposition, was marked for
6           identification.)
7 BY MR. SLATER:
8     Q.  Have you seen that before right now?
9     A.  Yesterday.
10     Q.  What I'd like to do now is mark
11 Exhibit 2.  We have Exhibit 2.  Do you have that
12 in front of you?  And Exhibit 3.
13           MR. SLATER:  Give him both, please.
14           (Whereupon, Turner Exhibit Number 2,
15           Responses and Objections to
16           Plaintiffs' Notice of Oral Deposition,
17           and Number 3, 2/15/17 Letter to Adam
18           Slater from Susan Sharko, were marked
19           for identification.)
20     A.  Okay.
21 BY MR. SLATER:
22     Q.  Doctor, do you see Exhibit 2 and
23 Exhibit 3?
24     A.  Yes, I do.

Page 9

1     Q.  Exhibit 3 is a letter I received
2 yesterday enclosing the response and objections
3 to our deposition notice, which is Exhibit 2.
4           Do you see that?
5     A.  Yes, I do.
6     Q.  Have you seen Exhibit 2 before right
7 now?
8     A.  No.
9     Q.  Have you seen Exhibit 3, which is the
10 cover letter, have you ever seen that before
11 right now?
12     A.  No.
13     Q.  Let's go through Exhibit 2 for a few
14 minutes, okay?
15     A.  Okay.
16     Q.  The first request was for "Copies of
17 all invoices for work performed in connection
18 with Benicar/Olmesartan whether for litigation
19 or non-litigation related consulting, or
20 litigation related work."
21           Do you see that request?
22     A.  Yes, I do.
23     Q.  Okay.  Now, I'd like you to look at
24 Exhibit 6, please?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

| | |
|---|---|
| **Page 10** | **Page 12** |

**Page 10**

1  (Whereupon, Turner Exhibit Number 6,
2  Copies of three invoices, was marked
3  for identification.)
4      MR. SLATER:  Maureen, you can just
5  give him all the exhibits.  There's no reason
6  not to just give it to him.  I don't mind.
7  Let's make it easier.
8  BY MR. SLATER:
9      Q.  Doctor, what is Exhibit 6?
10     A.  Exhibit 6 is invoices.
11     Q.  Is Exhibit 6 the documents you
12  produced in response to request number 1 in the
13  deposition notice?
14     A.  Yes, but there's a lot of duplications
15  in here, I think.
16         MR. PARKER:  I think there are two
17  sets.
18     A.  At least two sets.
19  BY MR. SLATER:
20     Q.  It should be three pages, correct?
21     A.  I think there's only three invoices
22  total, right.
23     Q.  Let's fix it.  Let's make it so that
24  Exhibit 6 is the three pages it should be, and

**Page 11**

1  that's it.
2      A.  Just the first three is fine.
3      Q.  Okay.  Doctor, Exhibit 6, that's a
4  three page document now which is invoices dated
5  April 23, 2016, May 24, 2016, and October 9,
6  2016.  Are those the invoices you produced in
7  response to request number 1?
8      A.  Yes.
9      Q.  Does that represent all of the time
10  that you have spent working on this litigation?
11     A.  No.
12     Q.  Tell me what time is not reflected on
13  those invoices.
14     A.  Anything after October 9th.
15     Q.  Tell me what occurred after October 9.
16  Tell me how much time, and what was done.
17     A.  I can tell you that that's when I
18  prepared all the reports that I've worked on.
19  I've had several meetings with Mr. Parker,
20  several phone calls with Mr. Parker.
21     Q.  Anything else that you've done since
22  October 9 up until the time we sat down and
23  started this deposition?
24     A.  I think in broad terms that covers it.

**Page 12**

1      Q.  Did you prepare for this deposition?
2      A.  Yes, I did.
3      Q.  How much -- all right.
4         How much time have you spent since
5  October 9th that has not been placed into one of
6  these invoices?
7      A.  I'm guessing somewhere between 100 and
8  200 hours.
9      Q.  That's a pretty broad range.  Let's
10  break it down.
11        How much time did you spend preparing
12  your report?  That was one of the categories you
13  gave me.
14     A.  I couldn't tell you.
15     Q.  You have no idea?
16     A.  I haven't gone back through notes.
17  That's why I gave you a range.  I have not gone
18  back in billing.
19     Q.  Do you have notes that reflect the
20  time you've spent that has not yet been placed
21  into invoices?
22     A.  I have my calendar, my overall
23  calendar.
24     Q.  Where is that?

**Page 13**

1      A.  It's at home on my computer.
2      Q.  And on that calendar, did you document
3  the amount of time that you spent on this case
4  since October 9th?
5      A.  I noted blocks of time I spent, yes.
6      Q.  And did you label what you spent time
7  doing?
8      A.  No.
9      Q.  What were you going to do when you
10  invoiced them, just arbitrarily do categories,
11  or do you have a record of what you actually did
12  during those time blocks?
13     A.  I don't have a specific record in each
14  time block.  I do think I can generally estimate
15  when I look at that how much time was spent on
16  which report.
17     Q.  Do you have access to your calendar
18  from where you are right now?
19     A.  No, I do not.
20     Q.  Look at request number 2, please, on
21  the deposition notice we marked -- well, look at
22  Number 2 actually.  Okay?  That's with the
23  response.  Request number 2 was "Copies of any
24  notes, i.e. written or electronic, reflecting

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 14

1 consulting or litigation work that has not been
2 documented in invoices as of the date of the
3 deposition."
4        Do you see that request?
5    A.  I do.
6    Q.  And responsive to that would be the
7 entries on your calendar that you keep on your
8 computer at home, correct?
9    A.  I don't think there's a good way to
10 separate those.
11   Q.  Sir, I move to strike.  I didn't ask
12 you.
13       The question is, the time -- rephrase.
14       The electronic notes of the time that
15 you have spent that has not yet been documented
16 in the invoices you produced as Exhibit 6 is on
17 your calendar on your computer at home, correct?
18   A.  I don't think that's right.  I think
19 it asks for consulting or litigation work.
20   Q.  Do you -- you don't -- rephrase.
21       You don't consider the work to prepare
22 the report, have meetings with Mr. Parker, phone
23 calls with Mr. Parker, and prepare for this
24 deposition to be consulting or litigation work?

Page 15

1    A.  Of course I do.
2    Q.  Okay.  So that time is documented on
3 your electronic calendar, and you did not
4 produce copies of that today, correct?
5    A.  As I said, I don't think -- I don't
6 think an annotation in my calendar that says --
7 you know, blocks out the morning for working on
8 this case represents work.  It's just a space
9 holder in my calendar so that I don't get caught
10 up in other things there.
11   Q.  Sir, those notes in your calendar
12 document that you did consulting or litigation
13 work that you have not put into an invoice yet,
14 correct?
15   A.  They document time that I spent, yes.
16   Q.  You didn't produce that today,
17 correct?
18   A.  No.
19   Q.  I'm going to ask, is there a way to
20 get that to us before this deposition ends
21 today?
22   A.  I don't think so.
23   Q.  You can't electronically get into your
24 calendar from where you are remotely and look at

Page 16

1 those times and at least tell me what the times
2 are that are documented?
3    A.  Not on my home computer, no.
4    Q.  What's the amount that you are billing
5 in terms of an hourly rate for the work you're
6 doing in this case?
7    A.  $500 per hour.
8    Q.  Does that include deposition time?
9    A.  That includes everything.
10   Q.  It includes trial testimony or hearing
11 testimony if you go to court?
12   A.  Yes.
13   Q.  You estimated that you have 100 to
14 200 hours that you have not yet invoiced since
15 October 9, 2016, correct?
16   A.  Correct.
17   Q.  When are you going to invoice for that
18 time?
19   A.  Certainly by the end of March.
20 Quarterly.
21   Q.  In looking at your invoices, the first
22 one dated April 23, 2016 documents a three and a
23 half hour document review and phone call with
24 Mr. Babington.  Is that the first time that you

Page 17

1 ever did any work in connection with this
2 litigation?
3    A.  Yes.
4    Q.  Have you consulted for Daiichi
5 separate and apart from the litigation work and
6 litigation consulting you're doing?
7    A.  No.
8    Q.  When were you first contacted and
9 asked if you would review documents and speak to
10 the representatives of Daiichi in connection
11 with this litigation?
12   A.  Somewhere in the few months before
13 April 23rd, 2016, actually in the --
14   Q.  It says that your first phone call was
15 March 31.
16   A.  Right.  I was trying to finish.
17   Q.  You would have been contacted before
18 March 31, right?
19   A.  You have to let me finish my answers.
20       What I was saying was, given the date
21 on it is March 31st, it would probably be
22 somewhere in the few months before that,
23 February perhaps.
24   Q.  Who contacted you first?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 18

1    A.  I believe it was Mr. Babington.
2    Q.  Who is he?
3    A.  He's a lawyer.
4    Q.  Has he been your contact throughout
5  this litigation, your direct contact?
6    A.  Initially, yes.
7    Q.  And then what happened?
8    A.  Then I became connected to Mr. Parker,
9  and that's who my contact has been.
10   Q.  How is it that Mr. -- rephrase.
11       Had you ever worked with Mr. Babington
12 in the past before this litigation?
13   A.  No, I have not.
14   Q.  Was he the person who initially
15 approached you?
16   A.  I believe so.
17   Q.  Why did he approach you?  Do you have
18 an understanding of why he contacted you?
19   A.  Other than my expertise, no.
20   Q.  Did he tell you that somebody had
21 recommended that he speak to you?
22   A.  Not that I recall.
23   Q.  Do you hold yourself out through any
24 service or network whereby people can find

Page 19

1  experts?
2    A.  No.
3    Q.  Have you ever been an expert for a
4  pharmaceutical company in the past, besides this
5  litigation?
6    A.  Once.
7    Q.  What did that involve?
8    A.  That was for Hoffmann-La Roche.
9    Q.  What drug?
10   A.  Accutane.
11   Q.  Did you testify?
12   A.  I did not testify.
13   Q.  What did you do in connection with the
14 Accutane litigation?
15   A.  I reviewed some of the pathology
16 cases, and I gave one deposition, which is
17 documented in the report you received.
18   Q.  Which case is it that's listed in the
19 report, just so that we have that in the record.
20       (Whereupon, Turner Exhibit Number 4,
21       Dr. Turner's General Causation
22       Statement, was marked for
23       identification.)
24   A.  I stand corrected.  I was thinking of

Page 20

1  Turner P. versus GWU, but I'm not certain that
2  that's what that was, so I have to -- I stand
3  corrected.  I don't believe I gave a deposition
4  for that then.
5  BY MR. SLATER:
6    Q.  Well, could it be that you gave that
7  deposition and didn't list it in your list of
8  previous testimony?
9    A.  No, I think all my recent depositions
10 are there.  Anything is possible.
11   Q.  Could that deposition have been before
12 January 1, 2012?
13   A.  I don't think so.  It's certainly
14 possible that it happened and it's not
15 documented there.  I don't keep a rigorous list
16 of what depositions or testimonies I've given.
17 But I went through, and I think it's likely to
18 be completely accurate.
19   Q.  Who was the lawyer who you were
20 working with in the Accutane litigation?
21   A.  His name is Matt Griffin.
22   Q.  What law firm?
23   A.  I don't know.
24   Q.  Do you know who took your deposition?

Page 21

1    A.  No.
2    Q.  Other than the Accutane litigation,
3  have you worked on behalf of any other
4  pharmaceutical company?
5    A.  No, I have not.
6    Q.  Have you ever consulted for a
7  pharmaceutical company outside of litigation?
8    A.  No.
9    Q.  Have you ever conducted a study with
10 regard to a pharmaceutical drug?
11   A.  I did a small project looking at some
12 binding interactions of an agent.  It was a
13 number of years ago.  It was a small, several
14 week project.
15   Q.  What was the agent?
16   A.  I don't remember.  That's what I'm
17 trying to think.  I don't remember.  I don't --
18 I can remember the people in my research lab who
19 did it, it was a small sponsored research
20 agreement with that company.  And other than
21 that, I don't remember details.
22   Q.  Was anything published out of that
23 small study?
24   A.  No.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 22

1    Q.   Was anything presented or placed into
2    an abstract or a poster presentation?
3    A.   No.
4    Q.   Were the results of that study ever
5    shared publicly, or were they only shared with
6    the company that funded it?
7    A.   I'm sure they weren't shared publicly.
8    Q.   Was that study meant to evaluate
9    potential side effects or risks of this
10   medication?
11   A.   No.  It was a completely in vitro
12   study.
13   Q.   Does that study have any relevance to
14   the issues that you're going to -- that you've
15   provided opinions on in this litigation?
16   A.   No, it does not.
17   Q.   Have you conducted any study of
18   olmesartan?
19   A.   In the research lab?
20   Q.   Yes.
21   A.   In the research lab, I have not.
22   Q.   Did you suggest to anybody that you
23   thought it would be prudent for you to perform
24   any sort of in vitro study in a research lab

Page 23

1    regarding olmesartan?
2    A.   No.
3    Q.   The first time that you spoke with
4    Mr. Babington was March 31, 2016, according to
5    Exhibit 6, correct?
6    A.   We may have had e-mails before that,
7    but something along those lines, yes.
8    Q.   It says there was a document review.
9    What documents did you review at that initial
10   meeting, do you know?
11   A.   I think they sent me a few articles
12   related to olmesartan.
13   Q.   Do you remember what articles they
14   were?
15   A.   I couldn't tell you exactly.  I would
16   -- I'd be speculating.  I could speculate.
17   Q.   Have you published any articles with
18   regard to olmesartan?
19   A.   No, I have not.
20   Q.   Have you given any presentations
21   regarding olmesartan?
22   A.   I have not.
23   Q.   Am I correct that before you were
24   retained in this litigation, you had no interest

Page 24

1    in olmesartan?
2    A.   Other than the medical literature that
3    reported it.
4    Q.   Meaning you were familiar with the
5    fact that some articles had been published in
6    the literature, but other than that awareness
7    you had no interest in olmesartan, correct?
8    A.   That's right.
9    Q.   You know Joseph Murray, correct?
10   A.   Yes, I do.
11   Q.   You respect him?
12   A.   Yes.
13   Q.   Is he considered perhaps one of the
14   most -- rephrase.
15       Is he considered the or one of the
16   most respected celiac specialists in the world?
17   A.   I think he's one of the most
18   respected, absolutely.
19   Q.   Joseph Murray is the world's authority
20   regarding celiac and other disease processes,
21   correct?
22   A.   I think specifically regarding celiac
23   disease, yes.
24   Q.   Have you ever spoken with Dr. Murray

Page 25

1    regarding olmesartan?
2    A.   I have not.
3    Q.   Have you ever attended a presentation
4    regarding olmesartan?
5    A.   I have not.
6    Q.   Before you were contacted to act as an
7    expert in this litigation, what, if any,
8    articles regarding olmesartan were you familiar
9    with specifically?
10   A.   You know, I've been looking at a lot
11   of articles in the months since then, and I
12   don't think I could give you a clear list of
13   what I had seen before and what I hadn't.  I'm
14   sure I'd seen the 2012 Mayo Clinic report.  And
15   I'm sure I'd seen some other papers, but I
16   couldn't specifically tell you which ones.
17   Q.   The second invoice of May 24 bills for
18   document preparation, protocol, phone call
19   preparation, and phone call with Mr. Babington
20   on May 14.
21       Do you see that?
22   A.   Yes.
23   Q.   It says you spent two and a half hours
24   on that day?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 26

1     A.  No.  The phone call was on May 14.  I
2  think the two and a half hours total was between
3  April 23rd and May 24th.
4     Q.  Okay.  Let me ask you again.
5        The two and a half hours that you
6  billed would have encompassed all of those
7  activities you described between April 23 and
8  the date of this invoice, May 24?
9     A.  Yes.
10    Q.  What protocol are you referring to?
11    A.  Mr. Babington asked me to put together
12 a rough protocol of, if we were going to
13 approach these biopsies in a standardized way,
14 how we might go about doing that.
15    Q.  These were biopsies of patients who
16 were having their cases reviewed as part of the
17 litigation?
18    A.  Yes.
19    Q.  In your clinical practice, it's my
20 understanding that you spend most of your time
21 on research related activities, is that correct?
22    A.  Yes, about 70 percent.
23    Q.  You're at Brigham & Women's now.  When
24 did you return to Brigham & Women's?

Page 27

1     A.  Last February.
2     Q.  At Brigham & Women's, do you have any
3  clinical responsibilities?
4     A.  Yes.
5     Q.  What are your clinical
6  responsibilities at the Brigham?
7     A.  It's exclusively GI pathology, almost
8  exclusively biopsies.
9     Q.  How many hours a week do you have
10 clinical responsibility at Brigham & Women's?
11    A.  I have eight weeks per year, so you
12 can break that out any way you like.
13    Q.  Since you went to Brigham & Women's,
14 how many times have you looked at biopsies in
15 connection with suspected or identified celiac
16 disease?
17    A.  I couldn't give you an exact number,
18 but I'm sure it's quite a few.  We see a lot of
19 those.
20    Q.  Estimate for me, how many have you
21 seen?
22    A.  Well, an estimate, maybe a couple
23 hundred.
24    Q.  In the time you've been at Brigham &

Page 28

1  Women's, how many biopsies have you looked at
2  where there was a suspected or identified case
3  of olmesartan enteropathy?
4     A.  None.
5     Q.  Have you ever looked at a biopsy for a
6  patient where olmesartan enteropathy was part of
7  the differential diagnosis?
8     A.  Yes.
9     Q.  In your clinical practice?
10    A.  No.
11    Q.  Is the first time that you ever looked
12 at a biopsy for a patient where olmesartan
13 enteropathy was a part of the differential
14 diagnosis in connection with this litigation?
15    A.  Yes.
16    Q.  In connection with your work in this
17 case, did you speak with any other physician or
18 physicians regarding olmesartan enteropathy?
19    A.  I did not.
20    Q.  Not up to the present, you've never
21 spoken to another doctor about the subject?
22    A.  I have not.
23    Q.  In order to prepare the protocol, what
24 did you consult in order to prepare the protocol

Page 29

1  to look at olmesartan enteropathy biopsies?
2     A.  I essentially put together a protocol
3  for how I would morphometrically assess a small
4  intestinal biopsy.
5     Q.  The third of the invoices within
6  Exhibit 6 is dated October 9, 2016, and there's
7  a description.  Does that describe the work that
8  you did between May 24 and October 9?
9     A.  Yes, it does.
10    Q.  In your career, outside of this
11 litigation, have you ever been asked to consult
12 on the question of whether or not a patient had
13 olmesartan related illness?
14    A.  I have not.
15    Q.  Do you know anybody that you've worked
16 with who has ever -- rephrase.
17       Are there any other pathologists
18 you've worked with, either at Brigham & Women's
19 or at your prior institutions where you were
20 employed, where anybody you worked with was
21 evaluating, to your knowledge, whether a patient
22 had an olmesartan related illness?
23    A.  Not to my knowledge.
24    Q.  Let's look back at the deposition

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 30

1 notice -- your response actually, Exhibit 2.
2      Number 3 is "Copies of any notes or
3 other documentation, including PowerPoints, for
4 any presentations given by Dr. Turner with
5 regard to (1) Olmesartan/Benicar, and (2) celiac
6 disease."
7      Do you see that request?
8      A. Yes, I do.
9      Q. Have you ever given any such
10 presentation, meaning a presentation with regard
11 to olmesartan or Benicar? Let's start there.
12      A. No.
13      Q. Have you ever given a presentation
14 with regard to celiac disease?
15      A. In the past I've done a lot of
16 teaching in the medical school. Now I write
17 textbook chapters that are used worldwide, and
18 in those, celiac disease is certainly discussed.
19      Q. Let's talk about a presentation to
20 other physicians at a professional conference or
21 a professional organization. Have you ever
22 given a presentation on celiac disease in that
23 context?
24      A. It's possible. I can't be specific.

Page 31

1      Q. Nothing you can point to right now?
2      A. Nothing specific. I was chair of the
3 intestinal disorders section of the American
4 Gastroenterological Association, and celiac
5 disease is the primary disease of that section,
6 and so it's very possible in the course of those
7 duties I was involved in sessions related to
8 celiac disease.
9      I think I may have also done a session
10 related to celiac disease in some of our
11 professional education courses for pathologists
12 at University of Chicago, but honestly, it's
13 been a couple years, and I can't remember in
14 detail.
15      Q. You're not considered in the field
16 that you practice in to be an authority on
17 celiac disease, are you?
18      A. I'm considered to be an expert in GI
19 pathology generally. I don't know any GI
20 pathologists who are experts just in celiac
21 disease.
22      Q. I understand that there are some GI
23 pathologists who are known to have a special
24 interest or a subspecialization regarding

Page 32

1 celiac. You would not be one of those, correct?
2      A. I guess I don't agree with your
3 question.
4      Q. Are there GI pathologists who have
5 published on celiac?
6      A. Sure.
7      Q. Are there GI pathologists that one
8 would think of if they had a complex case they
9 were looking at and wanted the input of somebody
10 who had a lot of experience and knowledge
11 regarding celiac who people would think to
12 consult around the country --
13      A. No, I don't think so.
14      Q. -- to help with the interpretation of
15 a biopsy slide?
16      A. No, I don't think so. Other than
17 generally skilled GI pathologists.
18      Q. Request number 4 is "Copies of any
19 documents or articles relied upon for the
20 opinions set forth in the report served, if not
21 listed in the report." And from reading your
22 response, my understanding is you're not
23 producing anything, because anything you relied
24 on is actually listed in the report and the

Page 33

1 reliance list, is that correct?
2      A. Well, I also relied on my general
3 knowledge, so I think that we couldn't do that.
4      But specific articles with specific
5 facts that are related to this I think are
6 listed in my report and my general reliance
7 list.
8      Q. With regard to any particular document
9 that you're relying on, those are listed either
10 in the report or the reliance lists, correct?
11      A. Again, you know, I think there's a
12 broad fund of medical knowledge that I've
13 accumulated over years, sometimes from specific
14 articles, sometimes from textbooks, sometimes
15 from multiple experiences, I can't tell you that
16 none of those played into my thinking. But I
17 think the specific documents related to
18 olmesartan are, for the most part, included in
19 my reliance lists.
20      Q. You understand that the reason I'm
21 asking this is so that, if you testify, I will
22 know in advance which specific documents or
23 specific articles you might refer to or rely on
24 for your opinions. In that context, those

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 34

1 documents or articles are listed in your report
2 or in the reliance lists, correct?
3    A. I don't anticipate calling up any
4 specific articles that aren't listed there, or
5 in my CV, I guess.
6    Q. Is there anything that you've asked
7 for from the lawyers who retained you or were
8 working with you that they did not provide you?
9    A. No.
10    Q. Are there any documents or materials
11 that you were shown with regard to olmesartan
12 that you did not list in the reliance list or
13 the report?
14    A. Yesterday -- Tuesday, Tuesday I
15 received an e-mail with some of the internal
16 documents from Daiichi, and I don't think I had
17 time to list those. I just looked at those
18 briefly. They've been mentioned in one of the
19 depositions I'd seen most recently from
20 Mr. Leffler, and -- from Dr. Leffler, and I
21 wanted to see for myself. So I looked at those
22 enough to confirm that they were what I
23 anticipated.
24    Q. Whatever documents you looked at this

Page 35

1 week, or Tuesday I guess you said, did they have
2 any impact on your opinions?
3    A. I think they were consistent with what
4 I expected from MedWatch reports, and the
5 internal documentations. MedWatch reports are
6 fairly standard, and I know what they look like.
7    The internal documentation was an
8 analysis that was mostly encompassed by the
9 Mini-Sentinel reports that I'd seen, so I don't
10 think they ended up changing my opinion. I do
11 think they added to data supporting that.
12    Q. Do you have those documents with you
13 today?
14    A. I do.
15    Q. All right. Did you think maybe you
16 should let me know before we started the
17 deposition that you'd reviewed other documents
18 so I could actually have those and be prepared
19 for that? Did you think that would have been a
20 good thing to do?
21    A. I believed that Mr. Parker would do
22 that.
23    Q. Well, now I'm telling you, you see the
24 response to the deposition notice which you told

Page 36

1 me you saw yesterday, and it doesn't list
2 anything other than what's in the report, and I
3 had no notice before now. You realize that,
4 right?
5    A. I need to clarify. I told you I
6 hadn't seen the deposition notice until just
7 now.
8    Q. Oh, I thought you said you'd seen it.
9    A. Look back at your notes.
10    Q. The record will speak for itself.
11    A. Yeah.
12    Q. So is there anything that you saw this
13 week, these so-called internal documents, that
14 you are relying on for the opinions that you are
15 offering in this case?
16    A. Can you restate that?
17    Q. Sure.
18    Is there anything that you saw in
19 these internal documents that you saw this week
20 that you are relying on now for the opinions
21 you're offering in this case?
22    A. I think they would be supportive, and
23 I've now internalized them into my knowledge, so
24 I can't tell you that I wouldn't refer to one of

Page 37

1 them. I'm sure you've seen them.
2    Q. Tell me what documents you have
3 internalized into your knowledge that you are
4 relying on for your opinions in this case?
5    A. You just asked two questions. Which
6 one?
7    Q. Well, here's the thing. If you read a
8 document, if you're not relying on it, then we
9 can say we can push those to the side. I only
10 care about documents you're actually relying on
11 for your opinions. So to be very clear, just
12 let me ask you the question clean.
13    The documents you saw this week, are
14 you relying on any particular document that was
15 a so-called internal document for the opinions
16 that you're offering in this litigation?
17    A. It depends on what you ask me.
18    Q. Well, you served a report, we marked
19 it as Exhibit 4, right?
20    A. Yes.
21    Q. That's the only report you've written
22 in this case, right?
23    A. No.
24    Q. Let me rephrase.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 38

1    With regard to the subject of general
2  causation, Exhibit 4 is the only report you have
3  written in this case, right?
4    A.  Yes.
5    Q.  Does that report contain each of your
6  opinions?
7    A.  Yes, it does.
8    Q.  In the course of the report, you
9  analyzed certain facts and certain articles.
10  Are those facts and articles that you discuss
11  those that you felt were most important to you
12  in forming your opinions that are set forth in
13  that report?
14    A.  I think those were most important,
15  yes.
16    Q.  Is there anything that you saw this
17  week, these so-called internal documents, which
18  you feel is so important that you would have
19  listed it in your report if you had seen it
20  before you wrote your report?
21    A.  I think I would have cited it, the
22  MedWatch reports, as further anecdotal case
23  reports that were not particularly
24  well-controlled, like most of the case reports

Page 39

1  that I -- the published case reports that I
2  referred to, but I don't think they would have
3  changed anything substantive.
4    Q.  Do you have a list of what you
5  reviewed?
6    A.  I do.
7    Q.  The internal documents you saw this
8  week which I never knew about until now?
9    A.  Yes.  I'm sure you've seen them.
10    Q.  No, no.  Do you have a list of what
11  you saw?
12    A.  Yes, I think I do.
13    Q.  All right.  How am I going to get
14  that?  How can I have that sent to me right now?
15    MR. SLATER:  Mr. Parker, do you have
16  the ability to e-mail me the list?
17    MR. PARKER:  It's two documents, Adam,
18  the Caspard report and the Parker report.
19  That's it.
20    MR. SLATER:  I'm sorry, you said the
21  Caspard report and what?
22    MR. PARKER:  And the Parker report.
23  That's it.  Two documents.
24    MR. SLATER:  Well, he just said he saw

Page 40

1  MedWatch reports.
2    MR. PARKER:  Well, I think -- well,
3  you'll ask the witness, but that's all he was
4  sent.
5    A.  There was --
6  BY MR. SLATER:
7    Q.  Dr. Turner, you saw MedWatch reports,
8  you testified to that under oath, right?
9    A.  Right.  There was a table --
10    Q.  How many?
11    A.  There was a table summarizing MedWatch
12  reports at the end of one of those.
13    Q.  So you didn't see the actual MedWatch
14  reports, you just saw the table summarizing the
15  MedWatch reports?
16    A.  In this case I don't think I saw the
17  actual full reports.  I saw the summaries of the
18  reports.  I have seen a couple MedWatch reports
19  in the course of my meetings with Mr. Parker and
20  Mr. Christian.
21    But I guess you're right that I saw
22  the summary of the reports individually, each
23  one had its own line and lots of details, but I
24  did see the actual MedWatch forms.

Page 41

1    Q.  When did you see MedWatch forms during
2  the course of your meetings?  When did you see
3  those?
4    A.  In the last week, I believe
5  Mr. Christian showed me a couple of them.
6    Q.  Which ones?
7    A.  I don't remember.
8    Q.  Do you have them there?
9    A.  No.
10    Q.  How many did you see?
11    A.  Less than five, a handful.  They were
12  consistent with those in the tables of the
13  documents.  That was part of why I was asked for
14  those documents.
15    MR. SLATER:  Move to strike "they were
16  consistent," etcetera.
17    Q.  Other than the less than five MedWatch
18  reports that you saw in the last week, and the
19  Caspard report and the Parker reports which you
20  were shown two days ago, have you seen any other
21  internal documents from Daiichi?
22    A.  I don't believe so.
23    Q.  Do you have any knowledge of whether
24  or not the Caspard report -- which addressed

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 42

1 celiac disease, correct?
2    A.  I believe that's true.
3    Q.  Do you have any knowledge as to
4 whether that includes all MedWatch reports that
5 should have been included in that report if the
6 inclusion criteria were followed strictly within
7 Daiichi?
8       THE VIDEOGRAPHER:  Mr. Slater, you
9 broke up on that question.  Could you repeat the
10 question?
11      MR. SLATER:  Sure.  I'll ask it again.
12    Q.  Do you have any knowledge as to
13 whether or not the Caspard report actually
14 includes all of the celiac reports that should
15 be included in that report?
16    A.  I didn't do my own search of MedWatch
17 reports, so I couldn't comment on that.
18    Q.  You never read Mr. Caspard's
19 deposition, right?
20    A.  I did not read Mr. Caspard's
21 deposition.
22    Q.  Have you seen any deposition of any
23 company witness from Daiichi?
24    A.  No.

Page 43

1    Q.  Other than the Caspard report, the
2 Parker report, and the less than five MedWatch
3 reports, just to be very clear, you have not
4 seen any other Daiichi document, correct?
5    A.  Correct.
6    Q.  The Parker report, is that the one
7 that concluded there was no need to add a
8 warning to the label about sprue-like
9 enteropathy?
10    A.  I need to look back at it.
11    Q.  Let's throw a sticker on that.
12    A.  The Parker report?  Did you just ask
13 about the Parker report?
14    Q.  The Parker report.  Let's mark it just
15 so we know what you're looking at.
16      (Whereupon, Turner Exhibit Number 7,
17      Parker report titled Olmesartan and
18      Sprue-like Enteropathy, Bates
19      OLM-DSI-0003347042 through 3347100,
20      was marked for identification.)
21      MR. SLATER:  Let's mark that 7.  And
22 let's mark, if you have the Caspard report
23 handy, let's mark that 8.
24      Bruce, I don't know if it's going to

Page 44

1 become an issue, but I'm going to potentially
2 request additional time beyond the seven hours,
3 because I'm spending all this time going through
4 documents that I had no idea he had seen until
5 the middle of the deposition.  It probably won't
6 be an issue, but if it becomes an issue I just
7 want to state it for the record.
8       MR. PARKER:  You did that.
9    A.  I don't think I -- I expect I should,
10 but I'm not seeing a hard copy of the other
11 report.  It may be stapled together with
12 something else.
13 BY MR. SLATER:
14    Q.  We marked the Parker report, right?
15    A.  Yes.
16    Q.  Do you see the conclusion by
17 Dr. Crawford Parker where he says there's no
18 need to add a warning to the label about
19 sprue-like enteropathy, or words to that effect?
20    A.  Can you tell me where you're referring
21 to?
22    Q.  I don't have the report in front of
23 me, I didn't know you'd seen it, so I'm going by
24 memory.  My understanding is that was his

Page 45

1 conclusion.
2       (Witness reviewing document.)
3    A.  He says that "Based on this
4 assessment, no change to the existing olmesartan
5 product labeling is recommended."  And then he
6 says --
7 BY MR. SLATER:
8    Q.  Are you aware that --
9    A.  Can you finish my answer?
10    Q.  I'm sorry, I didn't realize.  I
11 thought you were done.  I apologize.
12    A.  No.  That's becoming common.
13      "In view of the findings and
14 conclusions of this and prior assessments,
15 Daiichi-Sankyo proposes to continue" --
16      MR. PARKER:  Slow down.  We have to
17 take this down, please.
18    A.  Sorry, sorry.
19      He goes on to say that "Daiichi-Sankyo
20 proposes to continue routine safety surveillance
21 for sprue-like enteropathy and celiac disease."
22 So I think what he's saying is there's not
23 enough -- my synthesis is that there's not
24 enough data to do a lot right now, but that this

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 46

1  should be watched.
2  BY MR. SLATER:
3      Q.  Do you know the date of that report?
4      A.  It's dated September 28th, 2012.  They
5  were obviously aware -- although that's before
6  the publication date, they were obviously aware
7  of the Mayo report at that time.  I guess it's
8  just after the publication date of the Mayo
9  report.  Excuse me.
10     Q.  Are you aware that the position
11  Mr. Parker took in that report was rejected by
12  the FDA -- rephrase.
13         Are you aware that the FDA reached a
14  different conclusion and required that a warning
15  be added to the label for olmesartan?
16     A.  I'm aware that the FDA changed the
17  label, or recommended the changes to the label.
18     Q.  What, if anything, is significant to
19  you about the Parker report?
20     A.  What was helpful to me about the
21  Parker report was the specifics of individual
22  cases.  And appended to it is a detailed table
23  that lists individual cases in the MedWatch
24  report, and I think it's a fairly exhaustive

Page 47

1  list.  I can't promise that everything is there,
2  but it's a fairly exhaustive list.
3      Q.  You think -- rephrase.
4          You're trusting that Crawford Parker
5  included all the adverse event reports that
6  would have potentially implicated sprue-like
7  enteropathy?  Was that your understanding?
8      A.  No, I think I just said the exact
9  opposite.
10     Q.  You did?  Tell me, what was your
11  understanding as to what the inclusion criteria
12  was for this report.
13     A.  That's a different question than you
14  asked a moment ago.  Let me find those to be
15  sure that I'm not remembering incorrectly.
16         (Witness reviewing document.)
17     A.  So they used several approaches.  The
18  first was patients with diarrhea and weight
19  loss.  The second was serious diarrhea.  That
20  was it.
21  BY MR. SLATER:
22     Q.  Do you know whether Daiichi had in its
23  database additional adverse event reports, not
24  including the Parker report, which would have --

Page 48

1  which did have the clinical picture of
2  olmesartan enteropathy that aren't listed?  Do
3  you know whether there are any such reports?
4      A.  So you've made a conclusion in your
5  question that I can't agree with.
6      Q.  Do you know whether there are other
7  reports that aren't listed in that report where
8  patients either had diarrhea and weight loss or
9  serious diarrhea that aren't included?
10     A.  I don't know that.
11     Q.  Do you know who Crawford Parker is?
12     A.  No, I don't, other than his title
13  here.
14     Q.  With regard to the Caspard report,
15  what, if anything, about it is significant to
16  you?
17     A.  You know, I can't remember anything
18  specific.  I'm sorry that I don't have a copy of
19  it with me.
20     Q.  With regard to the less than five
21  MedWatch reports that you reviewed a week or so
22  ago, or in the last week, what, if anything, can
23  you specifically point to in your deposition
24  right now that you would say is significant to

Page 49

1  you about those MedWatch reports, specific to
2  each one?
3      A.  I think that what's specific to the
4  MedWatch reports is the same thing that I found
5  in each of the case reports, is that they were
6  wholly uncontrolled, and showed correlation, but
7  no data really supporting causation.
8      Q.  What does correlation mean?
9      A.  Correlation means if something, A,
10  happened, then more often than not B will follow
11  or be accompanying that.
12     Q.  The MedWatch reports you saw you
13  believe did show a correlation between
14  olmesartan and gastrointestinal illness,
15  correct?
16     A.  In some individual cases there was a
17  correlation.
18     Q.  Were you shown any adverse event
19  reports in which Daiichi performed a causality
20  assessment internally, when their physicians
21  actually evaluated causality?
22     A.  I don't think so.
23     Q.  Do you know whether Daiichi actually,
24  their internal physicians actually evaluated any

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 50

1 adverse event reports and made the finding that
2 the gastrointestinal conditions related in the
3 MedWatch report was definitely related to the
4 use of olmesartan? Do you know if that was
5 concluded in any MedWatches?
6     A. I'm not aware of any of those.
7     Q. If those existed, that would be
8 something that would be relevant to you in
9 reviewing MedWatch reports, right? If they're
10 going to show you some, they should show you
11 those, right?
12     A. I would think those would be worth
13 seeing.
14     Q. Okay. Did you ask, when you were
15 provided less than five MedWatch reports, if
16 there were any others that might be of
17 significance?
18     A. I did.
19     Q. And what were you told?
20     A. I was told that the stack pretty much
21 looked like this. It was in reference to the
22 stack that Dr. Leffler went through where he
23 threw out a couple of them, but felt that the
24 others were valid, and so I asked to see those,

Page 51

1 and I was shown some that I was told were
2 representative of the whole. I clearly didn't
3 have the time at that late date to go through
4 all 62.
5     Q. Are you aware of whether the highest
6 level executive in the pharmacovigilance
7 department testified as to his opinion as to
8 whether any MedWatch reports, the adverse events
9 reflected in MedWatch reports, were -- there was
10 a causal relationship between olmesartan and the
11 gastrointestinal disorder reflected? Do you
12 know about that?
13         MR. PARKER: Objection.
14     A. I'm not aware of any depositions.
15 BY MR. SLATER:
16     Q. You're not able to tell me, as you sit
17 here now, which MedWatch reports you actually
18 saw, right? You can't identify those for me,
19 right?
20     A. No. As you know, they're only
21 identified by a series of numbers, and I didn't
22 write down the numbers, and I certainly don't
23 remember them.
24     Q. Let's look at the deposition notice,

Page 52

1 the response, request number 5, "Any
2 illustrations, PowerPoints, images, charts,
3 tables or demonstrative exhibits that may be
4 used in connection with the Daubert hearing or
5 testimony of Dr. Turner."
6         Do you see where I just read?
7     A. Can you repeat that? You broke up.
8     Q. Do you see number 5?
9     A. Yes, I do.
10     Q. Have you prepared any illustrations or
11 PowerPoints regarding your opinions in this
12 litigation?
13     A. I have not.
14     Q. Have you prepared -- well, rephrase.
15         Are there any images, charts, or
16 tables that, if you were testifying, that you
17 would consider using as part of your testimony?
18     A. I've taken photomicrographs of some of
19 the cases, so in specific cases.
20     Q. You're talking about cases you've
21 reviewed?
22     A. Yes.
23     Q. Anything else?
24     A. Not related to general causation, no.

Page 53

1     Q. Request 6 is "Documentation of any
2 research grant you have been provided to study
3 Olmesartan/Benicar, or celiac disease, or health
4 effects potentially related thereto."
5         Are there any such research grants?
6     A. No.
7     Q. Look at request number 7, please.
8 "Copies of any documents including protocols or
9 information about medication side effects, from
10 any hospital or academic institution where you
11 have worked, had an appointment, or had
12 privileges, which set forth information related
13 to the diagnosis or treatment of any
14 Olmesartan/Benicar related medical conditions or
15 side effects."
16     A. I'm not aware of any.
17     Q. Are there any such documents that
18 you're aware of?
19     A. I'm not aware of any.
20     Q. Now let's look at your report,
21 Exhibit 4.
22     A. Yes.
23     Q. Exhibit 4 is several documents that we
24 were provided together as one group, and at the

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 54

1 beginning is your report on general causation in
2 this litigation, correct?
3    A.   Correct.
4    Q.   After that, starting on Page 10, is a
5 list of literature cited, and that literature,
6 that was actually cited in the report?
7    A.   Correct.
8    Q.   On Page 16 is previous testimony.  And
9 are those the only times that you've testified,
10 or the only cases you've testified in since
11 January 1, 2012 --
12    A.   To the best of my knowledge --
13    Q.   -- other than perhaps that Accutane
14 case we talked about?
15    A.   To the best of my knowledge, this is
16 complete.
17    Q.   After that page is a document starting
18 with Page 1.  Is that your up-to-date curriculum
19 vitae as of January 31, 2017?
20    A.   Yes, it is.
21    Q.   Let's look at Exhibit 5.
22       (Whereupon, Turner Exhibit Number 5,
23       Document titled Supplemental Reliance
24       List, was marked for identification.)

Page 55

1 BY MR. SLATER:
2    Q.   Titled "Supplemental Reliance List."
3 What is that document?
4    A.   It seems to be -- I see.  It's stuck
5 together.  Yes, I have it.
6    Q.   What is that document?
7    A.   I went through -- in response to your
8 request, I went through my library of articles
9 and pulled those that I thought I had relied on
10 in preparing the report for information, but may
11 or may not have specifically cited in the
12 report.
13    Q.   Did you compile this reliance list
14 that's Exhibit 5, or did someone else do it for
15 you?
16    A.   No, I compiled it.
17    Q.   You typed all those articles yourself?
18       THE VIDEOGRAPHER:  You broke up, sir.
19    Q.   You typed this up yourself?
20    A.   I copied and pasted them from my
21 EndNote library.
22    Q.   Is it your testimony that you've read
23 each article on the supplemental reliance list?
24    A.   I've read them, maybe not recently.

Page 56

1 There's one, I'm sorry, there's one that I could
2 not get the full text of, so I haven't read that
3 entire article.
4    Q.   Which one is that?
5    A.   I believe it was Laeis, L-A-E-I-S, is
6 the first author's name.  As far as I could
7 tell, that's not available electronically.  I
8 did put in a request for it, but I was unable to
9 get it.
10    Q.   In your review of medical literature,
11 can you point to any article in the
12 peer-reviewed literature where the authors
13 reached the conclusion explicitly that
14 olmesartan is not associated with sprue-like
15 enteropathy?
16    A.   Can you state that more specifically?
17    Q.   Well, let's use the term
18 olmesartan-associated enteropathy.  You
19 understand what that term means?
20    A.   I understand that people have used
21 that term.  I'm not sure I entirely understand
22 or agree with how people have used it.
23    Q.   You've used that term, right?
24    A.   I have not.

Page 57

1    Q.   You don't know what
2 olmesartan-associated enteropathy means?
3    A.   I've used that term to reflect what
4 others have written in their texts, but I have
5 not used it myself because I don't think it
6 represents something that's factually based.
7    Q.   What is your understand -- well, let
8 me ask you this.
9       Is there any article in the
10 peer-reviewed literature that reaches the
11 conclusion that olmesartan does not cause in any
12 patients what has been termed in the medical
13 literature olmesartan-associated enteropathy or
14 sprue-like enteropathy?
15    A.   Not that I'm aware.
16    Q.   Same question with regard to
17 association, is there any article that concludes
18 that there is not an association between the
19 two?
20    A.   Are we talking about in any patient,
21 or in epidemiological studies, or groups of
22 patients?  You need to be more specific in your
23 question.
24    Q.   Is there any article in the published

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 58

1 peer-reviewed medical literature you can point
2 to that concludes explicitly that there is no
3 association between olmesartan and what has been
4 termed in the literature olmesartan-associated
5 enteropathy or sprue-like enteropathy?  Any
6 article that reaches that conclusion?
7     A.  Yes, there's several.
8     Q.  That says there's no association?
9     A.  That says there was no association
10 detected in their study.
11     Q.  Which articles say there's no
12 association.  Well, let me stop you for a
13 second, stop you for a second.
14        My question is not somebody saying
15 whether or not they found an association in
16 their study.  My question is, is there any
17 article in the peer-reviewed literature where
18 there is an explicit conclusion that olmesartan
19 is not associated with olmesartan-associated
20 enteropathy as that term is used in the
21 literature, or sprue-like enteropathy, any
22 article that reaches that explicit conclusion?
23     A.  Well, I think failure to detect an
24 association in a highly powered study would come

Page 59

1 to that conclusion to the extent that it's
2 possible to prove a negative.  Proving a
3 negative is obviously impossible or very
4 difficult.  So it depends how you interpret
5 that.
6        MR. SLATER:  Move to strike.
7     Q.  Is there any article that reaches that
8 conclusion that I just asked you, explicitly
9 states there is no association?
10     A.  Yes.
11     Q.  Are you saying that there's articles
12 where a study was done and they did not find an
13 association in their study?  Because that's not
14 what I'm asking you.
15        MR. PARKER:  Objection.
16 BY MR. SLATER:
17     Q.  That's a different conclusion than
18 what I'm asking you about.
19        MR. PARKER:  Objection.
20 Argumentative.
21        You may answer.
22     A.  I'm saying --
23 BY MR. SLATER:
24     Q.  Do you understand my question?

Page 60

1     A.  I'm not sure I do, because if you're
2 asking what I think you're asking, there could
3 be a thousand studies that say we didn't find an
4 association and one study that says we found an
5 association, and I would be -- it would be the
6 appropriate answer to say no, there's no
7 articles that concluded there was absolutely no
8 association in any way possible ever?  Is that
9 what you're asking?
10     Q.  That's what I'm asking.
11     A.  Yeah, there's no articles that
12 conclude absolutely positively there could
13 never, ever be an association between olmesartan
14 and enteropathy.
15     Q.  You're familiar with the Rubio-Tapia
16 article, correct?
17     A.  Which one?
18     Q.  2012, the first major article in this
19 area.
20     A.  Yes.
21     Q.  The authors in that study include
22 Joseph Murray, correct?
23     A.  Yes.
24     Q.  Dr. Murray and his co-authors conclude

Page 61

1 that there is an association between olmesartan
2 and either olmesartan-associated enteropathy or
3 sprue-like enteropathy, whatever you want to
4 call it, they concluded there was an
5 association, correct?
6     A.  Let me pull the article, please.
7        (Witness reviewing document.)
8     A.  What they say at the end of the
9 article is suggesting that perhaps, and I'm
10 going to paraphrase a little bit, this may be
11 another example of drug-associated enteropathy
12 of which the medical community should be aware.
13        Elsewhere in the article they conclude
14 that further study is needed.  I'm looking for
15 the exact phraseology.  I don't think they
16 conclude that there's a causative relationship,
17 I think they're actually very careful not to
18 conclude that.  And I'm looking to see if the
19 exact words you said, an association, are
20 listed.
21 BY MR. SLATER:
22     Q.  Check the title.
23     A.  That's a little bit different than
24 what you said.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

---

Page 62

1    Q.   What's the title of the article?
2    A.   The title says "Severe Spruelike
3   Enteropathy Associated With Olmesartan."
4    Q.   You understand what those words mean,
5   right?
6    A.   Of course I do.
7    Q.   So the title of the article is stating
8   that severe sprue-like enteropathy is associated
9   with olmesartan, that's the actual title of the
10  article, right?
11   A.   That is the title.
12   Q.   Did you see in the article where they
13  said they did not believe this was a chance
14  association?
15   A.   I did.  I also saw they said that it's
16  a case series that lacks all information
17  necessary to prove causality, but rather
18  reflects an association.
19       MR. SLATER:  Move to strike after "I
20  did."
21   Q.   So you agree with me that the authors
22  of the Rubio-Tapia 2012 article titled "Severe
23  Spruelike Enteropathy Associated With
24  Olmesartan" stated explicitly that they did not

---

Page 63

1   believe this was a chance association?  You
2   agree with that statement, correct?
3    A.   I'm looking, because I don't think
4   that's their exact words.  I do see, again,
5   where they say that this case series lacks
6   information necessary to prove causality, and
7   I'm looking for -- I do remember something to
8   the effect of that they thought it was not
9   likely due to chance, but they didn't say that
10  it's not due to chance.  I'm looking for the
11  wording.
12       MR. SLATER:  I'm going to move to
13  strike.
14   Q.   Look at Page 735, please, the
15  "Discussion" section.  The second paragraph
16  under the Discussion section starts "We
17  acknowledge."
18       Do you see where I am?
19   A.   Yes, that's what I was reading from.
20   Q.   In the first sentence they state that
21  this reflects an association, right?
22   A.   Well, you'd need to read the whole
23  sentence to be complete.
24   Q.   Okay.  Do the authors -- withdrawn.

---

Page 64

1        Looking in the second paragraph of the
2   discussion on Page 735, let's go to the last
3   sentence of that paragraph that starts
4   "Resolution."
5        Do you see the word "resolution"?
6    A.   Yes, I do.
7    Q.   It says, "Resolution of the presenting
8   symptoms and subsequent histologic improvement
9   after suspension of olmesartan, in the absence
10  of clinical evidence of other diseases
11  associated with enteropathy, suggest that the
12  association is not likely to be due to chance."
13       Do you see that?
14   A.   Yes, I see that.
15   Q.   There is a spectrum of association,
16  correct?  There's chance associations, and then
17  there's causal associations at the other end of
18  the spectrum, correct?
19   A.   Correct.
20   Q.   So the authors concluded this is not a
21  chance association?
22       MR. PARKER:  Objection.
23  BY MR. SLATER:
24   Q.   They're saying that it's at the other

---

Page 65

1   end, at some part of the spectrum away from
2   chance?  That's basically what it's saying,
3   right?
4        MR. PARKER:  Objection.
5    A.   No, I think you're reading that
6   incorrectly.  They're being very careful to
7   exactly not say what you're saying.
8   BY MR. SLATER:
9    Q.   You would agree that the Rubio-Tapia
10  study showed an association between olmesartan
11  and severe sprue-like enteropathy, correct?
12   A.   No, I would not.
13   Q.   So you disagree with the authors of
14  the study?
15   A.   No, I think I agree with their
16  interpretations, but you do have to look at
17  their inclusion criteria.  Based on their
18  inclusion criteria, you can't speculate whether
19  there's an association, because unless there was
20  recovery after withdrawal of olmesartan the
21  patient was not included in their study.  So by
22  definition, the study must show in the subgroup
23  of patients carefully selected, that those
24  patients had an association.

---

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 66

1    So -- and you can make an analogy with
2 flipping a coin.  If every time I flip a coin it
3 turns up heads or tails, but I only show you the
4 versions where it shows up heads, then you could
5 conclude that flipping a coin was associated
6 with turning out heads if you ignore those that
7 turn out tails.
8         That's, in essence, how this study was
9 prepared.  It's great as something to make the
10 medical experts aware of, but it doesn't prove
11 association because it's not statistically
12 designed to do that.
13    Q.  You would agree it was important for
14 this article to be published so that clinicians
15 would be aware of this potential association,
16 correct?
17    A.  Yes.  But you should also recognize
18 where it was published.  That also tells you
19 something about the importance and impact to the
20 medical literature.
21         MR. SLATER:  Move to strike after
22 "yes."
23    Q.  Are the Annals of Internal Medicine
24 considered to be a high powered medical journal?

Page 67

1    A.  Annals of Internal Medicine is a
2 reputable journal.
3    Q.  It's considered to be a high powered
4 journal, correct?
5    A.  I don't know the impact factor or the
6 citation rate or anything else about it to
7 specifically comment on that, but it's a
8 reputable journal.
9         Do you have those numbers for me?
10    Q.  No, I don't.
11    A.  Then I don't know.
12    Q.  Is the New England Journal of Medicine
13 a high powered journal?
14    A.  Yes, it is.
15    Q.  Are the Annals of Internal Medicine
16 and the New England Journal of Medicine roughly
17 on the same level?
18    A.  Not even close.
19    Q.  Okay.
20    A.  That's a surprising question.
21    Q.  Really?  How come it's surprising,
22 Doctor?
23    A.  Because it's naive to think that those
24 journals are on par with one another.  They're

Page 68

1 not even close.
2    Q.  Is it your opinion that I'm naive?
3    A.  No.  The question is naive.
4    Q.  I mean if you think I'm naive, you
5 should say it.
6    A.  I think you're probably quite
7 knowledgeable.  But I think in that area, your
8 question was naive.
9    Q.  Okay.  Has the New England Journal of
10 Medicine ever published an article that later
11 had to be corrected because the information
12 communicated turned out to be wrong?
13    A.  I'm sure it has.
14    Q.  So am I.  So let's not be naive,
15 Doctor.
16    A.  I don't think that's the same thing.
17    Q.  Okay.  You've made a comment about
18 where the article was published, the Rubio-Tapia
19 2012 article.  Do I understand you to be
20 impugning the value of the Mayo Clinic
21 Proceedings, that journal that it was published
22 in?
23    A.  Well, knowing some of the authors
24 here, I would suspect that they would have sent

Page 69

1 it to a more reputable journal if that option
2 had been available to them.  And I'm not sure
3 what -- I have never talked to them, I don't
4 know the track of what this article took, but
5 this is not what you'd call a highly respected
6 journal.  It's essentially an internal journal.
7    Q.  So you're speculating about why they
8 published the article in that journal, right?
9 You have no idea?
10    A.  I'm not speculating.  I'm telling you
11 that this is essentially an internal journal
12 with limited stature in the field.  And if they
13 felt it was as important a study as you're
14 implying, then I am surprised that they would
15 publish it here.
16    Q.  All I'm asking is this.  You don't
17 know why Dr. Murray and his co-authors chose to
18 publish the article in the Mayo Clinic
19 Proceedings?  You don't know, right?
20    A.  It could be for any number of reasons.
21    Q.  Look at Page 737 of the article,
22 please, bottom right, Table 3, it says "Clinical
23 Features of Spruelike Enteropathy Associated
24 With Olmesartan."

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 70

1    Do you see that?
2    A. Yes.
3    Q. If a patient meets those criteria, do
4 you agree that an association is shown in the
5 case of those patients between olmesartan and
6 sprue-like enteropathy?
7    A. No.
8    Q. Are you saying that every patient that
9 meets that criteria, it's just a coincidence
10 that when they got off the olmesartan that they
11 got better?
12    A. I'm saying that the title of the table
13 says these are features associated with
14 olmesartan. They don't say diagnostic of, using
15 your words, olmesartan-associated enteropathy.
16 So I don't think that you should be used that
17 table for the purpose of which it was clearly
18 not intended.
19    Q. Did I say diagnostic? I didn't say
20 that word, Doctor.
21    A. You're making a diagnostic conclusion
22 in the way you phrased your question. Can we
23 read it back?
24    Q. I'll ask a different question. I'll

Page 71

1 ask it again. I don't need to read it back.
2 Here's the question.
3    If a patient meets the criteria in
4 Table 3, do you agree that in those cases those
5 clinical features would be associated with the
6 use of olmesartan?
7    A. First, there are no criteria listed in
8 Table 3. There are features listed. And
9 nowhere does it say that meeting these -- having
10 these features confirms that the patient has a
11 specific diagnosis, in this case you're saying
12 the diagnosis would be olmesartan-associated
13 enteropathy.
14    MR. SLATER: Move to strike.
15    Q. I haven't used the word diagnosis,
16 Doctor, so I just don't understand why you keep
17 saying it. I'm asking about association.
18    A. You're saying does that -- can we read
19 the question back?
20    Q. No, we're not going to read the
21 question back. I'm going to ask it again to
22 you. I'm not going to use the word diagnosis, I
23 promise.
24    A. I know, but you're implying --

Page 72

1    MR. PARKER: Hold on. Objection.
2 Argumentative. You can ask your question again.
3 BY MR. SLATER:
4    Q. Doctor, look at Table 3, the title,
5 "Clinical Features of Spruelike Enteropathy
6 Associated With Olmesartan."
7    Do you see that?
8    A. Yes, I do.
9    Q. And you see the list of clinical
10 features?
11    A. Yes, I do.
12    Q. For a patient that has those clinical
13 features, do you agree that that is a patient in
14 which those clinical features are associated
15 with olmesartan?
16    A. That's really kind of circular logic
17 the way you phrased it. Do you want to try a
18 fourth time?
19    Q. No. I want you to answer the
20 question.
21    A. It's circular logic, so I have to say
22 no.
23    Q. Is there an association that has been
24 established in the literature for at least the

Page 73

1 subset of patients who would meet this clinical
2 criteria?
3    A. No.
4    Q. Are there published studies in
5 reputable medical journals where they do
6 conclude that the association exists for
7 patients that have this type of clinical
8 criteria?
9    A. If you exclude and make a very
10 carefully selected subset, yes, but only in that
11 context.
12    Q. The very carefully selected subset
13 would be those patients that fit this criteria
14 that's listed as clinical features, correct?
15    A. And others. This is not exhaustive.
16    Q. Other clinical features?
17    A. Yes, this is not exhaustive and is not
18 sufficient to make that conclusion.
19    Q. What other clinical features would you
20 add to this table to make it complete?
21    A. It depends if you're asking about
22 associated with or caused by. Are you asking
23 about associated with?
24    Q. Let's start with associated with.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 74

1    A.   Associated with, you would like to see
2 some evidence of a controlled rechallenge that
3 really told you that it was due to olmesartan,
4 or at least a highly controlled dechallenge in
5 which you could say it was associated.
6 Obviously a dechallenge would never be
7 sufficient in a single case for making that
8 conclusion of causation, but it probably could
9 be sufficient for saying in that patient it's
10 associated and maybe we should just sort of not
11 worry about it and give that patient some other
12 drug.
13    Q.   There are some highly controlled
14 dechallenges in the case reports published in
15 the literature, right?
16    A.   I don't believe so.
17    Q.   Okay.  If you have a patient who --
18 let me rephrase.
19       I'm going to give you a hypothetical
20 patient and ask you a question about the
21 patient.  Okay?
22    A.   Okay.
23    Q.   If you have a patient who is taking
24 olmesartan for more than two years, and more

Page 75

1 than two years after starting to take olmesartan
2 the patient develops chronic diarrhea, weight
3 loss greater than 10 pounds, villous atrophy,
4 the patient tests negative on celiac serologies,
5 the patient stops taking the olmesartan, and
6 over the course of time after that, with no
7 other change in any medications or any other
8 changes in diet, the patient's clinical symptoms
9 of chronic diarrhea and weight loss resolve, and
10 the villous atrophy resolves.  Okay?  That's my
11 patient.  Do you understand?
12    A.   Yes.
13    Q.   In that patient, the most likely cause
14 of the chronic diarrhea, the weight loss and the
15 villous atrophy would be the olmesartan,
16 correct?
17    A.   I would need to know more about the
18 patient.
19    Q.   What else would you need to know?
20    A.   Well, I can give you a hypothetical.
21    Q.   No, no, no.  I have a hypothetical.
22 What else would you need to know about that
23 patient to tell me whether or not the olmesartan
24 is the most likely cause of the chronic

Page 76

1 diarrhea, the weight loss, and the villous
2 atrophy?
3    A.   Were they IgA deficient?
4    Q.   Why would you want to know that?
5    A.   If they were IgA deficient, they would
6 have some chance of having seronegative celiac
7 disease.
8    Q.   Okay.  Let's assume that they are IgA
9 deficient, however, the patient continued to eat
10 gluten both before, during, and after the use of
11 olmesartan, and that had no impact on the
12 symptoms, meaning the patient had no chronic
13 diarrhea, weight loss, or villous atrophy before
14 taking the olmesartan, and after stopping the
15 olmesartan when the resolution occurred the
16 patient was continuing to eat gluten without any
17 restrictions, with that addition to the
18 hypothetical, the most likely cause would be the
19 olmesartan, correct?
20    A.   What other agents are they taking?
21    Q.   No other medications.
22    A.   Do they have any comorbidities?
23    Q.   No comorbidities.
24    A.   Do they have any evidence of vascular

Page 77

1 disease?
2    Q.   No evidence of vascular disease, other
3 than if you want to term hypertension vascular
4 disease.  They have hypertension, that's why
5 they took the olmesartan.
6    A.   Do they have -- have they had
7 autoimmune serologies?
8    Q.   Yes.  They were negative.
9    A.   Have you done O&P?
10    Q.   What is an O&P?
11    A.   Ova and parasite test.
12    Q.   Yes, they were negative.  And stool
13 studies were done, which were negative.
14    A.   Okay.  And they didn't take any other
15 drugs at the time the olmesartan was
16 discontinued?
17    Q.   No.
18    A.   And they were on a controlled diet
19 that was identical?
20    Q.   They made no changes to their diet,
21 freely ate gluten the entire time.
22    A.   Anything else?
23    Q.   No.
24    A.   I mean, was it a controlled diet that

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 78

1 was the same or not?
2    Q.  Well, I don't know what you mean by
3 the same.  You mean did they eat three meals a
4 day that were the exact same food?  There was no
5 -- let me answer the question.  There was no
6 alteration in the diet from before using the
7 olmesartan, during the olmesartan, and after the
8 olmesartan, whatever the person ate generally
9 did not change.
10    A.  In that patient, under that setting, I
11 would say let's find you a different
12 antihypertensive, there are reports of this in
13 patients taking olmesartan, and if you stay
14 healthy on another antihypertensive we'll call
15 it a win.  I don't think you can necessarily
16 conclude causation.
17    Q.  More likely than not that patient, the
18 cause of the chronic diarrhea, the weight loss,
19 and the villous atrophy was the olmesartan,
20 that's the most likely cause, correct?
21    A.  Well, I would draw a direct analogy to
22 celiac disease and say no.
23    Q.  In that patient was the most likely
24 cause of the chronic diarrhea, the weight loss,

Page 79

1 and the villous atrophy, tell me what the most
2 likely cause was.  If it's not olmesartan, what
3 is it?
4    A.  I can't name a specific cause.  But
5 what I can tell you is that, for example, in
6 celiac disease, response to a gluten-free diet
7 is insufficient to conclude that it's celiac
8 disease.  I don't know how withdrawing the drug,
9 which would be the same as withdrawing the
10 gluten from the diet, is sufficient then to
11 conclude that it must be due to the drug.
12        MR. SLATER:  Move to strike after
13 "but."
14    Q.  Doctor, have you ever been involved in
15 the actual diagnosis of a patient that actually
16 had a gastrointestinal disorder where a
17 differential diagnosis was used?
18    A.  Of course.
19    Q.  For the patient that we have described
20 in this hypothetical, olmesartan as a cause
21 would be at the very top of the differential
22 diagnosis, correct?
23    A.  I don't think it could be.
24    Q.  What else would be on that

Page 80

1 differential diagnosis in that hypothetical as
2 we developed it?
3    A.  To put that at the top of your
4 differential diagnosis you'd have to know that
5 it was a cause.  We don't know that.
6    Q.  Olmesartan would be on the
7 differential diagnosis for that patient,
8 correct?
9    A.  You would have to think about
10 olmesartan based on case reports and labels, but
11 not based on scientifically rigorous fact.
12        MR. SLATER:  Move to strike from "but"
13 forward.
14    Q.  Doctor, it's a very simple question,
15 yes or no.  Would olmesartan be on the
16 differential diagnosis as the cause of this
17 patient's clinical presentation as we described
18 it?
19        MR. PARKER:  Objection.
20    A.  No.
21 BY MR. SLATER:
22    Q.  What -- now you're saying olmesartan
23 is not on the differential diagnosis?  You just
24 said a question ago it is on the differential

Page 81

1 diagnosis, you realize that, right?
2        MR. PARKER:  Objection.
3    A.  You realize you asked the question
4 differently.
5 BY MR. SLATER:
6    Q.  Look, you know what?  There's a
7 transcript and you're going to testify in a
8 courtroom, so, you know, every answer you give
9 you own.  You know that, right?
10        MR. PARKER:  And you own your
11 questions.  Let's go on, Adam.
12        MR. SLATER:  Believe me, I do.
13 BY MR. SLATER:
14    Q.  Let me ask you this, Doctor.  The
15 answer you just gave to this hypothetical, would
16 you be comfortable if I took this video and put
17 it on YouTube for all your colleagues around the
18 United States to see that testimony?
19    A.  Absolutely.
20    Q.  Okay.  You would agree with me that
21 there have been some patients who have developed
22 what is described in the Rubio-Tapia article as
23 severe sprue-like enteropathy caused by
24 olmesartan?  There are some patients in the

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 82

1 world where that has happened, you would agree
2 with that, correct?
3     A.  No.
4     Q.  So all of these reports, the case
5 reports and all the other studies, in every one
6 of those patients it was a coincidence that the
7 patient was taking olmesartan, got off
8 olmesartan, their use of olmesartan in every one
9 of those cases was coincidental and had nothing
10 to do with their illness, is that your
11 testimony?
12     A.  My previous response was in response
13 to your question.  We can ask the court reporter
14 to read back the question if you'd like.
15     Q.  I just asked you a new question.
16         Is that your testimony?
17     A.  Can you repeat that question somebody?
18     Q.  She'll read it back to you.
19         (Whereupon, the reporter read back the
20 pending question.)
21     A.  There's not sufficient evidence to
22 conclude either way.
23 BY MR. SLATER:
24     Q.  So you don't have an opinion one way

Page 83

1 or the other on that question?
2     A.  No, I do have an opinion.
3     Q.  You just said the information -- the
4 evidence is not sufficient one way or the other.
5 That means you can't state to a reasonable
6 degree of medical certainty one way or the other
7 on that question, right?
8         MR. PARKER:  Objection.
9     A.  You asked me if I believed it was
10 coincidence, and I said there was not enough
11 information to conclude whether or not it was a
12 coincidence.
13 BY MR. SLATER:
14     Q.  Okay.  If it was not a coincidence,
15 then that would mean that in some cases there
16 was a causal relationship between the olmesartan
17 and the illness, right?
18     A.  If that were true, and it was not --
19 it was shown rigorously not to be a coincidence,
20 that would mean in those specific patients there
21 would be an association, yes.
22     Q.  It would be a causal association,
23 right?
24     A.  I think you need more to conclude a

Page 84

1 causal association.
2     Q.  Let me ask you this question.
3         Do you understand what reasonable
4 degree of medical certainty means?
5     A.  Yes, I do.
6     Q.  What do you think it means?
7     A.  It means more likely than not.
8     Q.  Okay.  Are you aware that there are
9 physicians at some of -- at the top celiac
10 centers in the United States who have diagnosed
11 patients with sprue-like enteropathy caused by
12 olmesartan?  Are you aware that that has been
13 happening in the United States the last five
14 years?
15     A.  I'm aware that patients in those
16 sentence have -- some patients have done well
17 when olmesartan was withdrawn.
18     Q.  For those patients, you realize they
19 were diagnosed with, we can call it sprue-like
20 enteropathy or olmesartan-associated
21 enteropathy, you realize that was their
22 diagnosis at the top celiac centers in the
23 United States for some patients?  Do you realize
24 that?  Yes or no.

Page 85

1     A.  Yes, that's a label that's been put on
2 them, absolutely.
3     Q.  You're not telling this jury that you
4 think that every single time a patient got off
5 olmesartan and got better, in the absence of
6 changing any of their other medications or
7 changing their diet in any other way, you're not
8 saying that you think it was coincidence that
9 they got better after taking off -- stopping the
10 olmesartan in every one of those cases?  You're
11 not saying that, are you?
12     A.  I don't think I've seen documentation
13 of the case you just described.
14     Q.  You haven't seen documentation of a
15 case where a patient got off of olmesartan and
16 got better where their other medications weren't
17 changed and their diet wasn't changed?
18     A.  I think the reports that we've seen
19 are pretty superficial in those descriptions,
20 and there really isn't sufficient data to know
21 that.
22         MR. SLATER:  Why don't we do this.
23 Why don't we take a break for about 5 or
24 10 minutes.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 86

1      MR. PARKER:  Okay.  We've got to
2  refill the water jug anyway, I've been pretty
3  much consuming all of it.
4      MR. SLATER:  Let's go off the video,
5  please.
6      THE VIDEOGRAPHER:  Going off the
7  record.  The time is 10:42.
8      (Whereupon, a recess was taken.)
9      (Whereupon, Turner Exhibit Number 8,
10         Printout from Brigham & Women's
11         Hospital website on Olmesartan
12         tablets, was marked for
13         identification.)
14      THE VIDEOGRAPHER:  Back on the record.
15  The time is 10:55.
16  BY MR. SLATER:
17      Q.   Doctor, I just provided you what we've
18  marked as Exhibit 9, and I can tell you I
19  printed this off the website at Brigham &
20  Women's Hospital two days ago.  You can see it
21  in the top left, February 14, 2017.
22      MR. FOUNDAS:  Adam, it's actually
23  Exhibit 8.
24      MR. SLATER:  Oh, it's Exhibit 8?

Page 87

1      MR. FOUNDAS:  Yes.
2      MR. SLATER:  I'll start over.
3  BY MR. SLATER:
4      Q.   Doctor, do you see in front of you
5  Exhibit 8?
6      A.   You're breaking up a lot.
7      Q.   Doctor, do you see in front of you
8  Exhibit 8?
9      A.   Yes, I do.
10      Q.   This is a document I printed off the
11  Brigham & Women's Hospital website, you can see
12  in the top left February 14, 2017, from the
13  health library at your hospital.
14      Do you see that?
15      A.   Yes, I do.
16      Q.   Have you seen this before?
17      A.   I have not.
18      Q.   And this is a page regarding
19  olmesartan tablets.
20      Do you see that?
21      A.   Yes, I see that.
22      Q.   And if you go down a few lines it
23  says, "What side effects may I notice from
24  receiving this medicine?"

Page 88

1      Do you see that?
2      A.   Yes.
3      Q.   And then it says, "Side effects that
4  you should report to your doctor or health care
5  professional as soon as possible," and then
6  there's a list.
7      Do you see that list?
8      A.   Yes, I do.
9      Q.   And you see that list includes
10  diarrhea, vomiting, and weight loss.
11      Do you see that?
12      A.   I think this is essentially the same
13  as the label on the bottle, is that right?
14      MR. SLATER:  Move to strike.
15      Q.   Do you see what I just pointed out, it
16  says diarrhea, vomiting, and weight loss?
17      A.   Yes.
18      Q.   And you agree that diarrhea, vomiting,
19  and weight loss are side effects that a patient
20  may experience from receiving olmesartan,
21  correct?
22      A.   It's possible.
23      Q.   You agree that in some patients that
24  occurs, correct?

Page 89

1      A.   No.  We've been over that.
2      Q.   So Brigham & Women's when they say
3  that these side effects can occur as a result of
4  the patient taking the medication, you disagree
5  with the hospital you work at?
6      MR. PARKER:  Objection.
7      A.   I don't think the document says that
8  these occur.
9  BY MR. SLATER:
10      Q.   So you think they're listing random
11  side effects there that they don't -- that your
12  hospital doesn't think occur from olmesartan?
13  That wouldn't seem to make sense, would it?
14      MR. PARKER:  Objection.
15      A.   No.  They're protecting themselves
16  from legal challenge and from lawsuits by
17  reproducing what I presume is on the label.  I
18  haven't memorized the olmesartan label, but I'm
19  guessing this is pretty close to what the label
20  represents.
21      MR. SLATER:  Move to strike.
22  BY MR. SLATER:
23      Q.   The label for olmesartan and the
24  information about sprue-like enteropathy is in

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 90

1  the label in part because the FDA thinks that
2  language is necessary, right?
3      A.  Right.
4      Q.  Do you know if Daiichi objected when
5  the FDA asked them to put a warning for
6  sprue-like enteropathy in the label?  Do you
7  know whether Daiichi objected to that?
8      A.  No, I don't know.
9      Q.  Do you know what warnings Daiichi
10 wrote internally before the FDA sent them the
11 language regarding Daiichi's internal assessment
12 of what the warning should say?
13     A.  No.
14     Q.  Would you expect that Daiichi, the
15 manufacturer, the seller of the drug would have
16 extensive knowledge about these side effects
17 caused by the drug?
18     A.  I would imagine that they've done
19 careful studies, yes, and know everything they
20 can know.
21     Q.  Do you know what the term drug --
22 rephrase.
23         Do you know what the phrase olmesartan
24 induced enteropathy means?

Page 91

1      A.  I've heard people use that rarely.
2      Q.  Do you know what it means?
3      A.  I know what they're implying, yes.
4      Q.  Doctor, olmesartan induced enteropathy
5  means sprue-like enteropathy caused by
6  olmesartan, correct?
7          MR. PARKER:  Objection.
8      A.  That's the implication.
9  BY MR. SLATER:
10     Q.  That's what it means, right?
11         MR. PARKER:  Objection.
12     A.  I answered you, right?
13 BY MR. SLATER:
14     Q.  I don't think you did.  I didn't ask
15 you if it's implied.  It's a very simple
16 question.
17         Olmesartan induced enteropathy means
18 enteropathy caused by olmesartan, correct?
19     A.  If it meant exactly that, why don't
20 they just say enteropathy caused by olmesartan?
21         MR. SLATER:  Move to strike.
22     Q.  Doctor, I'm not here to argue with
23 you.  It's a simple yes or no question.
24         Is that what the terms mean?

Page 92

1      A.  I would say that that's what's implied
2  by those terms.
3      Q.  Well, when you say it's implied,
4  that's what it means, right?
5          MR. PARKER:  Objection.
6      A.  It's what's implied.
7  BY MR. SLATER:
8      Q.  Well, it's implied, so it's not clear
9  to you what the word induced means?  You don't
10 understand that word?  Should we pull out a
11 dictionary, or Wikipedia or something?
12         MR. PARKER:  Objection.
13     A.  Sure, let's get a dictionary.  That's
14 okay.
15         MR. PARKER:  Come on, guys, let's move
16 on.
17 BY MR. SLATER:
18     Q.  Let's do this.  You don't know what
19 induced means, is that what you're telling me?
20 You know what it's implied to mean, but you
21 don't know what it actually means, that's what
22 you're telling the judge and the jury, right?
23     A.  No.  I know what induced means, and I
24 don't think it means exactly the same thing as

Page 93

1  caused.
2      Q.  Do you know what the head of
3  pharmacovigilance for Daiichi in the United
4  States said when I asked him if olmesartan
5  induced enteropathy means enteropathy caused by
6  olmesartan?  Do you know what he said?
7      A.  No, I don't.
8      Q.  Would you be interested in knowing
9  what he said?
10     A.  Sure.
11     Q.  He said it means caused by.  Is that
12 helpful to you in defining that term?
13         MR. PARKER:  Objection.
14     A.  Then that's what it means to him.  But
15 I interpret induced and caused to be subtly
16 different.
17         Is he a native English speaker?  Maybe
18 he doesn't get the vocabulary quite right.
19 BY MR. SLATER:
20     Q.  I guess you don't know who he is, so
21 we'll keep you in the dark on that one.
22     A.  Okay.
23     Q.  Do you know if Daiichi uses the term
24 olmesartan induced enteropathy in their internal

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 94

1 documents to describe this condition that we're
2 talking about?
3    A.  I don't believe I saw it in the
4 documents that I saw.
5    Q.  Would it be helpful to you to know
6 that -- rephrase.
7    If, in fact, Daiichi in its own
8 internal documents refers to the condition as
9 olmesartan induced enteropathy, that would be
10 significant to you, since they presumably are
11 experts regarding the side effects caused by
12 their drug, right?
13    MR. PARKER:  Objection.
14    A.  It depends.  It would certainly be
15 something to be aware of, but it wouldn't be the
16 only factor in my thinking, because then I would
17 be just accepting their conclusion based on data
18 I haven't seen.  So it would really depend on
19 why they were making that conclusion.
20 BY MR. SLATER:
21    Q.  If there are physicians employed by
22 Daiichi who found in reviewing adverse event
23 reports that gastrointestinal illness
24 representing sprue-like enteropathy in terms of

Page 95

1 the collection of symptoms was caused by
2 olmesartan in some patients, that would be very
3 significant to you, correct?
4    A.  Sure, I'd very much like to see those
5 data.
6    Q.  Nobody showed it to you, right?
7    A.  No.
8    Q.  And, in fact, if you were to be shown
9 that data, that could change your opinions in
10 that case, correct?
11    A.  It depends on what the data were, but
12 certainly.
13    Q.  Coming back to Exhibit 8, I think you
14 said that you believe that the listing of
15 diarrhea, vomiting, and weight loss as potential
16 side effects with olmesartan, I think you said
17 that's your understanding of essentially what
18 the label says about sprue-like enteropathy,
19 correct?
20    A.  No.  I said I think that this
21 information generally reproduces what's on the
22 label.
23    Q.  And the label for olmesartan includes
24 a warning about sprue-like enteropathy which

Page 96

1 talks about severe diarrhea and weight loss,
2 correct?
3    A.  Can we -- let's be specific.  Do we
4 have a copy of the label?
5    Q.  No, we don't.  You don't know if the
6 label says that?
7    A.  I don't know the specific words.  You
8 seem to be very fond of slipping in words that
9 change nuanced meanings, so I'm cautious about
10 that.  I don't know the exact words on the label
11 by memory.
12    Q.  Is there a warning in the label for
13 olmesartan that warns of sprue-like enteropathy?
14    A.  Let me see if I have a copy of the
15 label.
16    (Witness reviewing document.)
17 BY MR. SLATER:
18    Q.  You don't know if the word sprue-like
19 enteropathy appears in the label for the
20 olmesartan drugs?  Doctor, you don't know if
21 that term appears in the label?
22    A.  I'm looking for the label.
23    Q.  I'm asking you, without looking at it
24 you don't know if that term appears in the

Page 97

1 label?  It's a yes or no question before you
2 pull the label out.
3    A.  I would like to --
4    Q.  I'm instructing you not to look at the
5 label to answer this question.
6    MR. TURNER:  You can't instruct him
7 not to look at the label.  You've asked him
8 three times.
9    Doctor, do the best you can in
10 answering the question.
11    You can't instruct him what he can and
12 can't do, Adam.
13    MR. SLATER:  I can.
14 BY MR. SLATER:
15    Q.  Doctor, without looking at the label,
16 do you know whether the term sprue-like
17 enteropathy appears in the label for the
18 olmesartan drugs?
19    A.  I believe it likely does, but I'm not
20 entirely sure that it's that exact phraseology,
21 and that's why I'd like to check and be precise.
22    Q.  Wonderful.  If you have the label
23 there, pull it out.
24    (Witness reviewing documents.)

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 98

1  BY MR. SLATER:
2      Q.  Did you find it, Doctor?
3      A.  No, I'm not finding an actual reprint
4  of the label, I'm sorry.
5      Q.  You have the FDA safety notification
6  right in front of you, right?
7      A.  Yes, I do.
8      Q.  Right in the beginning it says that
9  "Olmesartan can cause sprue-like enteropathy,"
10  right?  Doctor, the very first paragraph, do you
11  see it?
12      A.  Yes.  And I think they're using the
13  regulatory phraseology, so they're saying "can"
14  as in it's possible that they caused these
15  intestinal problems.
16      Q.  Doctor, it says right on the drug
17  safety communication, July 3, 2013, "The US Food
18  and Drug Administration (FDA) is warning that
19  the blood pressure drug olmesartan medoxomil
20  (marketed as Benicar, Benicar HCT, Azor,
21  Tribenzor, and generics) can cause intestinal
22  problems known as sprue-like enteropathy."
23  That's the words, right?
24      A.  That's the words.

Page 99

1      Q.  Do you disagree with the FDA?
2      A.  No.
3      Q.  Now, going to Exhibit 8, Brigham &
4  Women's Hospital is telling people who want to
5  read their health library that side effects that
6  patients can suffer as a result of taking
7  olmesartan include diarrhea, vomiting, and
8  weight loss, that's what your institution is
9  telling patients, correct?
10      A.  Yes.
11      Q.  And that's truthful -- let me
12  rephrase.
13          And that is truthful information,
14  correct?
15      A.  They're saying what side effects may I
16  notice from receiving this medication.  So
17  they're listing that as a possible side effect
18  that you should report to your doctor or health
19  care professional.
20      Q.  The reason Brigham & Women's provides
21  possible side effects here in that library is so
22  patients will be aware of side effects that your
23  institution thinks can occur in some patients
24  due to taking the drug, right?

Page 100

1      A.  I don't know this document, but my
2  impression is that this is computer generated
3  from some library at the FDA.
4          MR. SLATER:  Move to strike from "but"
5  forward.
6      Q.  Diarrhea, vomiting, and weight loss
7  are features of olmesartan-associated
8  enteropathy, correct?
9      A.  They have been listed in articles as
10  under that heading.
11      Q.  You mentioned rechallenges earlier.
12  Remember you mentioned rechallenges?
13      A.  Yes.
14      Q.  Were there a controlled rechallenge
15  and the person's symptoms recur when that
16  occurs, that is strong evidence of causation,
17  correct?
18      A.  In a randomized clinical trial
19  setting, absolutely.
20      Q.  Are you saying the only rechallenge
21  that you would ever recognize as being
22  legitimate would be one that occurs in a
23  randomized controlled trial?
24      A.  It depends on what you're asking the

Page 101

1  question -- what question you're asking that to
2  inform.
3      Q.  If a physician or physicians are
4  treating a patient, they rechallenge the patient
5  with olmesartan without any other changes to
6  what medication the patient is taking or any
7  other changes to diet, and the symptoms of
8  sprue-like enteropathy happen again on
9  rechallenge, that is strong evidence of
10  causation, correct?
11          THE VIDEOGRAPHER:  Mr. Slater, this is
12  the videographer speaking.  That question broke
13  up a number of times.
14          MR. SLATER:  All right.  I'll ask it
15  again.
16      Q.  Where a physician is treating a
17  patient, the patient has been taken off of
18  olmesartan and their symptoms of sprue-like
19  enteropathy stopped, and then the doctor puts
20  the patient back on olmesartan, and the symptoms
21  happen again where there were no other changes
22  to medication and no other changes to diet, that
23  positive rechallenge is strong evidence of
24  causation, correct?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 102

1    A.   There's more details that I would
2  need.
3    Q.   Based on my question, that is strong
4  evidence of causation, correct?
5    A.   No.
6    Q.   There may be other -- hang on.  There
7  may be other evidence that you may look at also,
8  but that rechallenge with recurrence of symptoms
9  is strong evidence in and of itself of
10  causation, correct?
11    A.   With the limited data you provided, my
12  answer is no.
13    Q.   What other data do you need on that
14  question?
15    A.   Was there a repeat biopsy.
16    Q.   What else do you need to know?
17    A.   Was the patient -- were there any
18  other health conditions at the time.
19    Q.   What else do you need to know?
20    A.   Was there a control.
21    Q.   What else do you need to know?
22    A.   Again, you know, we're coming back to
23  what are you trying to ask.  Are you trying to
24  ask if it's an evidence of causation, or are you

Page 103

1  trying to ask how to manage the patient?
2    Q.   I'm talking about evidence of
3  causation.
4    A.   That's a much higher standard than how
5  to best manage the patient.  People do
6  therapeutic trials all the time, and if they
7  work out they say it's working for the patient,
8  I'm happy for them, let's go with that.  That's
9  not evidence of causation.
10        So in this case I would say that your
11  sort of rechallenge, you know, if the patient
12  got sick within minutes of taking the tablet,
13  I'd say, well, that's completely inconsistent
14  with anything meaningful in the literature, so
15  no, sorry.  If the patient got sick three years
16  after starting to take olmesartan again, no,
17  that's not consistent.
18        So you really are not sufficiently
19  detailed for me to answer that question.
20        MR. SLATER:  Let's look at document
21  number three, if we could.  Not Exhibit 3.
22
23
24

Page 104

1        (Whereupon, Turner Exhibit Number 9,
2        Gallivan and Brown letter to the
3        editor titled Olmesartan induced
4        enterocolitis, was marked for
5        identification.)
6  BY MR. SLATER:
7    Q.   Okay.  Doctor, I've just handed you or
8  we've just handed you Exhibit 9, and that's a
9  case report that was authored by Dr. Gallivan
10  and Brown in 2014, and that appears on the list
11  of literature you cite in your report, correct?
12    A.   I cite it.  I wouldn't call it a case
13  report.  It's not.
14    Q.   What is it?
15    A.   It's a letter to the editor.  It's in
16  the correspondence section of the journal.
17    Q.   You cite this in your report, correct?
18    A.   Yes.
19    Q.   Let's look at it.  I want to look at
20  this case report.  First of all, let me ask you
21  this question.
22        Are you familiar with this document?
23    A.   Yes, I am.
24    Q.   And if you look at what is reported,

Page 105

1  it talks about "a 78-year-old woman with a
2  clinical history of hypertension,
3  gastroesophageal reflux disease,
4  hypercholesterolemia and osteoporosis, who had
5  been prescribed olmesartan for four years,"
6  right?
7    A.   Right.
8    Q.   It lists her regular medications,
9  right?
10    A.   Right.
11    Q.   "There was no history of recent use of
12  a nonsteroidal anti-inflammatory medication,"
13  correct?
14    A.   Right.
15    Q.   "Over the past four months she had
16  experienced severe watery diarrhea which
17  resulted in three hospital admissions, including
18  an ICU admission for acute renal failure
19  secondary to dehydration," correct?
20    A.   Correct.
21    Q.   She had upper endoscopy and
22  colonoscopy, and "biopsies revealed mild villous
23  blunting in the proximal small intestine with
24  intraepithelial lymphocytosis and lamina propria

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 106

1  inflammation," correct?
2      A.  Correct.
3      Q.  If you go further into the next column
4  about halfway down, it says "Serum tissue
5  transglutaminase antibodies were negative and
6  the clinical setting did not support an
7  autoimmune enteropathy or immunodeficiency
8  syndrome," correct?
9      A.  Correct.
10      Q.  "Withdrawal of olmesartan and
11  atorvastatin with implementation of total
12  parenteral nutrition and oral budesonide
13  produced resolution of diarrhea," correct?
14      A.  Correct.
15      Q.  "On selectively recommencing only
16  olmesartan and oral intake, the diarrhea
17  returned," correct?
18      A.  Correct.
19      Q.  That is a rechallenge, correct?
20      A.  That's an uncontrolled rechallenge.
21      Q.  It's a rechallenge that was overseen
22  and conducted by physicians treating the
23  patient, correct?
24      A.  Where does it say that?

Page 107

1      Q.  The doctors said that they --
2  rephrase.  I'll come back to it.
3      After the rechallenge which brought on
4  a -- rephrase.
5      The rechallenge was positive because
6  the diarrhea returned, correct?
7      A.  "On selectively recommencing only
8  olmesartan and oral intake, the diarrhea
9  returned," that's what it says.
10      Q.  That's a positive rechallenge, right?
11      A.  It's not a selective or controlled
12  rechallenge.  It's a positive uncontrolled
13  rechallenge, I suppose.
14      MR. SLATER:  Move to strike.
15      Q.  That's a positive rechallenge,
16  correct?
17      MR. PARKER:  Objection.  Asked and
18  answered.
19      A.  It's a positive uncontrolled
20  rechallenge.
21  MR. SLATER:  Move to strike.
22  BY MR. SLATER:
23      Q.  It is a positive rechallenge, correct?
24      A.  It's not a controlled rechallenge.

Page 108

1  Oral intake --
2      Q.  Have I asked you if it's controlled?
3      MR. PARKER:  Will you let him finish,
4  Adam, please?
5      MR. SLATER:  He's wasting my time.
6      MR. PARKER:  And you're wasting our
7  time.
8  BY MR. SLATER:
9      Q.  Don't tell me whether it's controlled,
10  Doctor.
11      MR. PARKER:  You're wasting everyone's
12  time by not letting the witness answer.  You
13  don't like his answer, that's fine, move on.
14      MR. SLATER:  Maybe you should instruct
15  your answer to stop talking about whether it's
16  controlled when I'm not asking about it and
17  burning -- and wasting our time.
18      MR. PARKER:  Instruct my answer?  I
19  don't understand your comment.
20      MR. SLATER:  You should instruct your
21  witness to be responsive.
22      MR. PARKER:  He is responsive.  Let's
23  go on, gentlemen.  Gentlemen, let's go on.
24      MR. SLATER:  I'm trying to.  You keep

Page 109

1  saying go on.
2  BY MR. SLATER:
3      Q.  That is a positive rechallenge,
4  correct?
5      A.  Both olmesartan and oral intake were
6  present, it's a positive uncontrolled
7  rechallenge for olmesartan and oral intake.
8      MR. SLATER:  Move to strike.
9      Q.  Doctor, if you keep saying
10  "uncontrolled" when I don't ask whether it's
11  uncontrolled or not, I'm going to call the
12  federal judge in charge of this case and ask him
13  to instruct you to answer my questions.  Okay?
14      A.  Okay.
15      Q.  So here you go.
16      Is that a positive rechallenge?
17      A.  It is a positive uncontrolled
18  rechallenge.
19      Q.  Did I ask you if it's uncontrolled?
20      A.  By leaving out uncontrolled, you're
21  implying it's controlled.
22      Q.  Doctor, Mr. Parker will ask you
23  questions at the end of the deposition.  I
24  didn't ask you if it's controlled or

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 110

1  uncontrolled.  Okay?  It may matter to you.  It
2  doesn't matter to me.  So I would appreciate if
3  you would answer my questions instead of trying
4  to insert what you think may be important to
5  support whatever opinions it is that you're
6  casting in this case.
7       MR. PARKER:  Objection to your speech,
8  and just ask a question, please.
9  BY MR. SLATER:
10      Q.   That is a positive rechallenge,
11  correct?
12      A.   It is a positive uncontrolled
13  rechallenge.
14      Q.   All right.  In the interest of time,
15  I'm going to ask, Doctor, that your entire
16  testimony be stricken and that you be sanctioned
17  for refusing to answer my questions.  Okay?
18  What I may do -- you know what?  And I'm going
19  to reserve the right during lunch to call the
20  judge and ask him to instruct you on this.
21      A.   I'll leave it to you and Mr. Parker to
22  determine if that's within your rights.
23      Q.   Just for the record, did I ask you
24  whether it's controlled or uncontrolled?  Yes or

Page 111

1  no.
2      A.   No.
3      Q.   It's a yes or no question.
4      A.   I said no.
5      Q.   Okay.  So I'll try it again.  Would
6  you try to answer my question directly only with
7  what I ask?
8       MR. PARKER:  Just do that.
9  BY MR. SLATER:
10      Q.   Would you do that for me?
11      A.   Sure.
12      Q.   That is a positive rechallenge,
13  correct?
14      A.   It is a positive rechallenge.
15      Q.   The letter next states, "Her
16  antihypertensive medication was subsequently
17  changed to ramipril and the diarrhea again
18  resolved."
19       That is a dechallenge, correct?
20      A.   Making some assumptions, yes.
21      Q.   Assuming that they mean to say we took
22  her off the olmesartan and put her on this
23  different condition, that is a positive
24  dechallenge with the olmesartan, correct?

Page 112

1      A.   If you include that they kept her on
2  oral intake, it's, again, a positive drug
3  withdrawal.
4      Q.   So this is reported in this document
5  that the patient had a positive dechallenge, a
6  positive rechallenge, and then another positive
7  dechallenge, correct?
8      A.   We can debate, you know, I believe
9  those are all uncontrolled based on what we've
10  discussed, but with that recognition I'll say
11  yes.
12      Q.   The document goes on to state, "A
13  subsequent colonoscopy, performed four months
14  after the initial biopsies, showed
15  microscopically normal appearing small and large
16  intestine with complete resolution of
17  enteropathy-like changes and thickened collagen
18  band."
19       That's what it documents, correct?
20      A.   I'd like to see biopsies of the
21  proximal small intestine, since they imply that
22  those are more severe.
23      Q.   Look at the next page, Figure 2.  And
24  you can compare it to Figure 1.  Do you see that

Page 113

1  in Figure 2 they say that this shows
2  "Improvement in the appearance of histological
3  feature in the proximal small intestine and the
4  colon following withdrawal of the drug"?  Do you
5  see that?
6      A.   You asked me about the colonoscopy,
7  and I'm pretty certain they could not biopsy the
8  proximal small intestine on colonoscopy.
9      Q.   They obviously think they biopsied the
10  proximal small intestine because they're
11  labeling the picture on the left, correct?
12      A.   It's not possible.  You don't biopsy
13  proximal small intestine on colonoscopy.
14      Q.   I understand that.
15       Do you see the picture in Figure 2 on
16  the left, Figure A?
17      A.   Sure.  The figure legend says proximal
18  small intestine.  I, therefore, have to conclude
19  that they feel that was a biopsy of proximal
20  small intestine.  You did not ask me about the
21  figure, you were asking me about the sentence.
22  The sentence says colonoscopy.
23      Q.   Figure 2 on Page 361 states that
24  illustration A is the proximate small intestine.