# EXHIBIT 1

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 114

1 Do you see that?
2     A.   The figure legend says that, yes.
3     Q.   And that would be small intestine
4 because you see villi, right?
5     A.   It's small intestine.  Histologically
6 I can't confirm that it's proximal because
7 specific features of proximal small intestine
8 aren't present in this image, but I can take
9 their word for it.
10    Q.   And if you compare that image to what
11 is shown on the prior page, do you agree with
12 them that this shows improvement in the
13 histological picture of the villi?
14    A.   With the recognition that celiac-like
15 diseases are patchy, yes.
16        MR. SLATER:  Move to strike before the
17 word "yes."
18    Q.   I just want to understand one thing.
19 When you say that celiac-like diseases are
20 patchy, you would include olmesartan-associated
21 enteropathy in that, correct?
22    A.   I think we've been over this.  No.
23    Q.   Is that because you don't believe
24 olmesartan-associated enteropathy exists as an

Page 115

1 entity?
2     A.   I don't think it's been definitively
3 shown to be true, to be an entity.
4     Q.   If the people -- I'd like you to
5 assume -- a hypothetical.  I'm going to ask you
6 a new question.  I'd like you to assume that the
7 people who believe olmesartan-associated
8 enteropathy is a real clinical entity are
9 correct and that you're wrong, I'd like you to
10 assume that, okay?
11    A.   Okay.
12    Q.   Assuming that to be true, there is
13 evidence that it has a patchy appearance on
14 biopsy, correct?
15    A.   I believe that's what's been reported.
16    Q.   Looking at Exhibit 9, this letter from
17 Drs. Gallivan and Brown, in the last paragraph
18 they state in the second sentence, "Thus, it is
19 important to consider olmesartan induced
20 enteropathy in patients with histological
21 sprue-like findings, with or without colonic
22 inflammation, in the absence of other celiac
23 disease or other medical condition."
24        Do you see that?

Page 116

1     A.   Yes.
2     Q.   You agree with that statement in terms
3 of that clinicians should consider olmesartan
4 induced enteropathy under those circumstances,
5 correct?
6     A.   For the reasons we discussed, I
7 wouldn't agree with the phraseology.  I would
8 agree that you'd want to consider taking your
9 patient off olmesartan if they failed a
10 gluten-free diet and have appropriate
11 histopathology, and so on.
12    Q.   The reason that a clinician would take
13 a patient off of olmesartan in the setting of
14 the clinical features of sprue-like enteropathy
15 is because the clinician thinks that the
16 olmesartan may be causing the clinical syndrome,
17 correct?
18    A.   They recognize it as a possibility,
19 yes.
20    Q.   And where the only change that's made
21 is the withdrawal of the olmesartan in a
22 particular patient, and the patient's clinical
23 syndrome resolves, the symptoms go away, the
24 pathology normalizes, in that case, all other

Page 117

1 things being equal, olmesartan-associated
2 enteropathy should be on the differential
3 diagnosis as the cause of that clinical
4 presentation, correct?
5        MR. PARKER:  Objection.
6     A.   I think permanent withdrawal of
7 olmesartan in their drug regimen would be a
8 reasonable practice.
9 BY MR. SLATER:
10    Q.   And the reason why it would be
11 reasonable to permanently withdraw the
12 olmesartan is because, and we'll start small
13 here, of the possibility that the olmesartan was
14 causing the clinical syndrome, correct?
15    A.   Sure, that remains a possibility.
16    Q.   Where the only change made is the
17 withdrawal of the olmesartan, and the patient
18 then has resolution of the clinical symptoms and
19 the pathology normalizes, in the absence of any
20 other change for that patient, the olmesartan is
21 the likely cause of the clinical syndrome that
22 was being suffered by patient, correct?
23        MR. PARKER:  Objection.
24 BY MR. SLATER:

Protected Information - Jerrold R. Turner, M.D., Ph.D.

| Page 118 | Page 120 |
|---|---|
| 1    Q.  From a clinical perspective for that<br>2 patient, correct?<br>3    A.  That would indicate a correlation, and<br>4 a good management decision in the patient.  It<br>5 does not indicate that olmesartan caused that.<br>6    Q.  It indicates that olmesartan, from a<br>7 clinical perspective, was the likely cause of<br>8 the clinical symptoms that ceased and normalized<br>9 and got all better when the patient stopped<br>10 taking the olmesartan if it was the only change<br>11 that the patient had, correct?<br>12    A.  Again, I --<br>13    Q.  Clinically.<br>14    A.  I think clinically it tells you that<br>15 it would be a good idea to change the medication<br>16 regimen for that patient.  You can theoretically<br>17 say maybe it was the cause, let's not give this<br>18 patient olmesartan.  But I don't think you can<br>19 conclude that olmesartan was the cause.<br>20    Q.  Is it your testimony the only way that<br>21 you can conclude the olmesartan was the cause if<br>22 you then were to put the patient back on the<br>23 olmesartan, and the symptoms and the pathology<br>24 were to recur? | 1 disease in that patient, then it may not be<br>2 general causation, it may just be a trigger.<br>3 BY MR. SLATER:<br>4    Q.  Are you aware whether any of the<br>5 patients in the ROADMAP Trial had dechallenges<br>6 and rechallenges that were positive?<br>7    A.  I'm not aware of any rechallenges in<br>8 the ROADMAP Trial.<br>9    Q.  If the patient in my hypothetical to<br>10 you that we were just talking about had a<br>11 controlled rechallenge and the clinical symptoms<br>12 were to recur, then in terms of what's more<br>13 likely than not, from a clinical perspective it<br>14 would be more likely than not to say the<br>15 olmesartan was causing that condition, correct?<br>16    A.  A blinded control rechallenge, then I<br>17 would say yes.<br>18    Q.  The reason that you say a blinded<br>19 controlled rechallenge is for what reason?  Why<br>20 do you use that as your standard?<br>21    A.  Because we know that the placebo<br>22 effect is very strong, and that it's been<br>23 demonstrated in study after study.  And so if<br>24 you tell the patient now I'm going to give you |

| Page 119 | Page 121 |
|---|---|
| 1    A.  You know, you really need -- in these<br>2 sorts of cases we know the placebo effects can<br>3 be strong, you really need controlled tests.<br>4 That's really the only way to do it.  Really<br>5 case reports are the weakest form of data in the<br>6 medical literature, that's well-recognized<br>7 throughout the medical literature, you really<br>8 can't draw these conclusions from uncontrolled<br>9 case reports like this.<br>10    Q.  So you're saying that you'd need to<br>11 see a controlled rechallenge to prove causation<br>12 in that case, right?<br>13       MR. PARKER:  Hold on.  Technical<br>14 problem.<br>15    A.  I'm saying we need a controlled and<br>16 properly done randomized rechallenge, and then<br>17 you can make a determination about one patient.<br>18 BY MR. SLATER:<br>19    Q.  If it causes it in one patient, then<br>20 that would answer the question that there is<br>21 general causation, correct?<br>22       MR. PARKER:  Objection.<br>23    A.  If it causes it in one patient by some<br>24 idiosyncratic reaction where it unmasks a | 1 olmesartan, let's see if things recur, and the<br>2 patient in their mind is believing that<br>3 olmesartan caused that, without intentionally<br>4 lying or any other intended deceit, the patient<br>5 may experience those symptoms.<br>6    Q.  Any other reason?<br>7    A.  No, it's really we need to eliminate<br>8 placebo effect as a cause.<br>9    Q.  Okay.  Can you tell me any published<br>10 article in the olmesartan literature that gives<br>11 the opinion that you just gave, that the only<br>12 way to prove causation is through a blinded<br>13 controlled rechallenge that shows a positive<br>14 rechallenge?  Can you point to any peer-reviewed<br>15 article that actually has that?<br>16    A.  I don't think anybody has discussed<br>17 the issue of how would you really prove this<br>18 rigorously, so no.<br>19    Q.  The Exhibit 9, the letter from<br>20 Drs. Gallivan and Brown is published in a<br>21 journal called Pathology.  Is that a respected<br>22 medical journal?<br>23    A.  I think I've heard of it.  It's<br>24 certainly not one of the better pathology |

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 122

1 journals.
2   Q.   What are the high powered journals
3 that you would say are the ones that you can
4 respect what they publish?
5   A.   In pathology specifically?
6   Q.   Let's start pathology.
7   A.   Annual Review of Pathology Mechanisms
8 of Disease, Journal of Pathology, American
9 Journal of Pathology, perhaps Laboratory
10 Investigation, Nature Medicine will address
11 pathology sometimes, American Journal of
12 Surgical Pathology for a subset of entities.
13   Q.   Any others?
14   A.   That's a pretty reasonable list.  You
15 might include Modern Pathology for certain
16 things, not really clinical trial type stuff, so
17 not in this context, but Modern Pathology can be
18 reputable.
19   Q.   Are you aware that in the
20 Mini-Sentinel that was performed by the FDA that
21 they identified 23 cases of what they believed
22 to be olmesartan-associated enteropathy, 10 of
23 which had rechallenges?
24       MR. PARKER:  Objection.

Page 123

1   A.   I'm looking for the exact number.
2 Yes, I'm aware in general that in the
3 Mini-Sentinel there were cases with these same
4 sorts of case report rechallenges that we've
5 been discussing.
6       Do you want me to find the exact
7 numbers?
8 BY MR. SLATER:
9   Q.   I asked you if you're aware that 10 of
10 the 23 patients were stated by the FDA to have
11 positive rechallenges?
12   A.   I can't confirm that number.
13   Q.   Does it sound correct to you?
14   A.   Sorry, I've read a lot of literature
15 for this.  I'm trying to remember exactly what
16 this said.
17       (Witness reviewing document.)
18   A.   You'll have to tell me where it
19 specifies the rechallenge cases.  I'm not seeing
20 it in looking through it briefly here.
21 BY MR. SLATER:
22   Q.   Assuming -- I'll find it at some
23 point.
24       But assuming that I'm correct that of

Page 124

1 the 23 cases identified by the FDA, 10 of them
2 had positive rechallenge, that is significant
3 evidence supportive of the proposition that
4 olmesartan causes sprue-like enteropathy,
5 correct?
6   A.   It certainly causes you to want to
7 investigate further, absolutely.
8   Q.   In fact, if you put evidence in a
9 scale, on one side is supportive of causation
10 and on the other side is evidence that cuts
11 against causation, the positive dechallenges and
12 positive rechallenges reported in the
13 literature, they all weigh on the side of
14 supporting the opinion that olmesartan causes
15 this condition, correct?
16   A.   Correct.
17   Q.   You know what, actually I do have it
18 here.
19   A.   Great.
20   Q.   So let's do this to be fair to you.
21 Peter, can you go to document 8?  It's an
22 article by Marietta, Cartee, Rishi and Murray.
23
24

Page 125

1       (Whereupon, Turner Exhibit Number 10,
2       Marietta, et al article titled
3       Drug-Induced Enteropathy, was marked
4       for identification.)
5 BY MR. SLATER:
6   Q.   Doctor, do you see this article?  Are
7 you familiar with this?
8   A.   I am.
9   Q.   Okay.  And let's look, to begin with,
10 at the title, "Drug-Induced Enteropathy."
11       Do you see that?
12   A.   Yes.
13   Q.   Would you agree with me that as the
14 authors use that term in this article, when they
15 use the word "induced," they're using it
16 synonymously with caused by?
17   A.   I think they probably are.
18   Q.   And just to start off, go to Page 217,
19 the right-hand column just above the heading
20 that says "Treatment," it says, "The
21 Mini-Sentinel study on olmesartan and celiac
22 disease by the FDA found 10 of 23 patients had a
23 positive rechallenge."
24       Do you see that?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 126

1  A.  Yes.
2  Q.  That is evidence that supports the
3 argument for causation, correct?
4  A.  Sure.
5  MR. PARKER:  Objection.
6  A.  Yes, that would be on the in favor of
7 causation side of the balance.
8 BY MR. SLATER:
9  Q.  Let's look at the very beginning of
10 this article on the first page in the Abstract
11 section.  It says, "Many medications can cause
12 diarrhea by increasing motility, inflammation or
13 enteropathy."
14  Do you agree with that statement?
15  A.  Yes.
16  Q.  And this is published in Digestive
17 Diseases.  Is that a respected medical journal?
18  A.  Not really.
19  Q.  Do you respect Dr. Murray?  I think
20 you said before he's one of the world's
21 authorities in this field, right?
22  A.  I respect Dr. Murray.  I was asked to
23 be an associate editor of Digestive Diseases and
24 declined.  It's not really a great journal.

Page 127

1  Q.  Dr. Murray is one of the world's
2 authorities on this issue, correct?
3  A.  On celiac disease, absolutely.  Is
4 that what you're asking?
5  Q.  And do you know -- and you've actually
6 co-authored a publication with Dr. Murray, is
7 that right?
8  A.  I think we're co-authors of a
9 publication, might be two.
10  Q.  The second sentence in the abstract --
11 I'm sorry, did I interrupt you?
12  A.  Yeah.  I was going to say there might
13 be more than one that I'm co-authors with Joe
14 on, but I'm not certain.
15  Q.  Okay.  Have you ever told him that you
16 think he publishes in garbage medical journals?
17  A.  You know, I think probably everybody
18 has published papers in garbage medical journals
19 from time to time.  And I think if I told him
20 maybe not in such crude terms that I thought
21 this was not really the best journal, I think
22 he'd agree.
23  Q.  Are very good articles with very good
24 science published in garbage medical journals

Page 128

1 sometimes?
2  A.  They can be.  This is really a review
3 more than anything, so this isn't even original
4 article with particular data.
5  MR. SLATER:  Move to strike after
6 "they can be."
7  Q.  Let's look now at the second sentence
8 of the abstract.  "Olmesartan and mycophenolic
9 acid (CellCept) are drugs that are capable of
10 increasing inflammation in some individuals and,
11 if not recognized, can lead to chronic
12 diarrhea."
13  Do you agree with that sentence?
14  A.  I agree that that's what's written.
15  Q.  Do you agree that that statement is
16 accurate?
17  A.  No.
18  Q.  In this type -- rephrase.  The next
19 sentence says -- I'll withdraw that.  Okay.
20  You agree with me that the prevailing
21 opinion in the peer-reviewed medical literature
22 is that the sentence I just read to you is an
23 accurate statement, correct?
24  MR. PARKER:  Objection.

Page 129

1  A.  I think many people have said that
2 it's associated.  I think that demonstration
3 that it's capable of increasing inflammation and
4 enteropathy is not well established.
5 BY MR. SLATER:
6  Q.  The majority of articles that have
7 addressed the question and state either directly
8 or indirectly whether there's causation, the
9 majority do indicate that olmesartan can cause
10 this condition, correct?
11  A.  I'd have to count them.  I think some
12 with a lack of scientific rigor state that.  I
13 don't know if it's equal or not.  I know, for
14 example, that the 2012 Rubio-Tapia article we
15 were discussing takes careful lengths not to say
16 that.
17  MR. SLATER:  Move to strike.
18  Q.  Let's go to the conclusion of this
19 article.  The conclusion states, "The
20 drug-associated enteropathy that is most common
21 and serious is that seen with olmesartan, albeit
22 at an extremely low rate."
23  Is that a true statement?
24  A.  I think there's an association in some

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 130

1  patients with olmesartan, as we've been over. I
2  don't know if I'd agree that was most serious.
3  I think I've seen patients on ipilimumab, which
4  is discussed here, and mycophenolate who are
5  pretty ill, so maybe.
6      Q.  Is Dr. Murray an expert regarding the
7  clinical manifestations and treatment of
8  olmesartan-associated enteropathy?
9      A.  I think he's probably published more
10  than anybody on it, if that's your question.
11      Q.  And you've -- rephrase.
12          You've read his articles, and you see
13  he's been involved in the treatment of many
14  patients with this condition, correct?
15      A.  With what he refers to as
16  olmesartan-associated enteropathy, absolutely.
17  I also see that he's really careful not to say
18  it's caused.
19      Q.  And just to be clear, you've never
20  been involved in the evaluation or treatment of
21  any patient where an olmesartan-associated
22  illness was a part of the patient's clinical
23  picture, or even considered, right?  You've
24  never been involved with that, right?

Page 131

1      A.  Right.
2      Q.  Dr. Murray states in the second --
3  rephrase.
4          The second sentence states, "One
5  should then suspect olmesartan-associated
6  enteropathy in any patient who presents with
7  severe diarrhea and weight loss.  Many of the
8  features associated with olmesartan-associated
9  enteropathy are also found in the enteropathy
10  found in celiac disease; because of this, one
11  should review any celiac disease diagnosis for
12  any use of olmesartan at the time of diagnosis.
13  Features that are usually found in
14  olmesartan-associated enteropathy but are not
15  found in celiac disease are collagenous sprue,
16  colitis, and gastritis.  Finally, one should
17  consider the possibility of other ARBs inducing
18  enteropathy as there are case reports of
19  valsartan and irbesartan associated with
20  enteropathy."
21          Do you see where I just read?
22      A.  Yes.
23      Q.  I want to start with the last sentence
24  first.  Do you agree with that sentence?

Page 132

1      A.  That there are case reports?  Yes.
2      Q.  Do you agree with the clinical
3  recommendation that's given in that sentence?
4      A.  Sure, can't hurt.
5      Q.  Do you have an opinion as to whether
6  there's a class effect for ARBs inducing
7  enteropathy?
8      A.  I don't.
9      Q.  Let's look now at the sentence --
10  rephrase.
11          Looking at what I just read up to but
12  before the last sentence, that is a clinical
13  recommendation from these authors, correct?
14      A.  Not entirely.
15      Q.  There are clinical recommendations in
16  that section that I just read, correct?
17      A.  The sentence begins "One should then
18  suspect."  That sentence is a clinical
19  recommendation.  The rest is not.
20          No, there's -- second half of the next
21  sentence also is a clinical recommendation.
22  Excuse me.
23      Q.  You agree that it makes sense and is
24  reasonable for clinicians to be vigilant and

Page 133

1  aware of olmesartan-associated enteropathy in
2  evaluating patients with clinical presentations
3  that have the features of sprue-like
4  enteropathy, it's reasonable for them to
5  consider that as part of their differential,
6  correct?
7      A.  I think given that these reports
8  exist, it would be reasonable to consider that,
9  absolutely.
10      Q.  And when a physician takes the patient
11  off the olmesartan and they improve or have
12  their condition completely resolved, it's
13  reasonable to keep the patient off the
14  olmesartan, correct?
15      A.  Since as a physician your goal is to
16  make your patient feel better and have better
17  health, the answer would be yes.
18      Q.  And when a patient makes that type of
19  decision, they're considering the concept of
20  cause and effect in determining whether or not
21  to hold the medication and give a new medication
22  permanently, or whether to put the patient back
23  on the medication, right?
24      MR. PARKER:  Objection.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 134

1    A.  In clinical terms.
2 BY MR. SLATER:
3    Q.  If the physician then says to the
4 patient, okay, you seem like you're better,
5 let's put you back on the olmesartan, and the
6 patient has the clinical symptoms recur, you
7 would agree at that point it's very reasonable
8 for the physician to say, I'm going to pull you
9 back off the olmesartan and we're going to find
10 a different medication for your high blood
11 pressure?
12    A.  Sure.
13    Q.  That's a reasonable clinical decision,
14 right?
15    A.  That's a completely reasonable
16 clinical decision.
17    Q.  And if the physician were to make that
18 decision based upon their clinical judgment that
19 the olmesartan was causing the condition, that
20 would be a reasonable clinical judgment based on
21 those facts, correct?
22    A.  I think you have to ask what you're
23 implying there.  If you're implying causation in
24 the scientific or legal sense, no, they don't

Page 135

1 have sufficient data to say that.  If you're
2 implying in a very loose sense that it might
3 cause it in this patient, it seems like whenever
4 this patient is off olmesartan they're better,
5 we should just use something else because
6 there's not much harm to them, then they can
7 think about it in any terms they like.
8    MR. SLATER:  Well, move to strike.
9    Q.  My question is very specific.  If the
10 doctor told the patient, you got better when we
11 took you off the olmesartan, you got sick again
12 when we put you back on the olmesartan, I think
13 that the olmesartan is causing your condition so
14 you should use a different hypertension drug,
15 and you shouldn't take the olmesartan anymore,
16 based on that clinical picture in that clinical
17 context, that's a reasonable medical judgment by
18 that physician, correct?
19    MR. PARKER:  Objection.  Asked and
20 answered.
21    A.  I think with some paraphrasing that's
22 correct.  I think it might be more appropriate
23 to say I think there's a chance that it's
24 causing that, let's put you on something else

Page 136

1 rather than I think it absolutely is.  So it
2 depends how you deliver that.  But in general
3 terms, yes.
4    MR. SLATER:  I just want to ask you
5 guys, I'm just planning, what time do you want
6 to eat lunch?  I don't want to burn a lot of
7 time on lunch discussion, I just want to know
8 what time you're thinking of breaking.
9    MR. PARKER:  Any time you'd like to,
10 Adam.  It's your deposition.
11    MR. SLATER:  All right.  Then I'm just
12 going to keep on going until you guys say -- cry
13 uncle.
14    MR. PARKER:  What time would you like
15 to eat?  We're good for a little bit, right?
16    THE WITNESS:  Yes.
17    MR. SLATER:  I might get sent to my
18 room, but that's about it.
19    MR. PARKER:  That's all right.
20    A.  Can we take a break for a minute just
21 to get more coffee?
22    MR. SLATER:  Sure.  Go off the video.
23    THE VIDEOGRAPHER:  Going off the
24 record.  The time is 11:51.

Page 137

1    (Whereupon, a recess was taken.)
2    THE VIDEOGRAPHER:  Back on the record.
3 The time is 12:01.
4    (Whereupon, Turner Exhibit Number 11,
5      Freeman article titled Drug-induced
6      Sprue-like Intestinal Disease, was
7      marked for identification.)
8 BY MR. SLATER:
9    Q.  Doctor, I'm showing you an exhibit
10 we've marked -- what exhibit did we say we are
11 up to actually?
12    THE STENOGRAPHER:  11.
13 BY MR. SLATER:
14    Q.  Doctor, I'm showing you what we've
15 marked as Exhibit 11 titled" Drug-induced
16 Sprue-like Intestinal Disease" published in the
17 International Journal of Celiac Disease.
18    Do you see this article?
19    A.  Yes.
20    Q.  Are you familiar with this?
21    A.  I think so.  I'm not 100 percent sure.
22 I'd have to look at my list.  I think I am.
23    Q.  Okay.  The International Journal of
24 Celiac Disease, is that a reputable journal?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 138

1    A.  I've never heard of it.  It looks like
2 it's from one of these predatory publishing
3 companies published outside Pub.com.  It looks
4 like it's from one of these sort of predatory
5 publishing companies.
6    Q.  Okay.  Let's look --
7    A.  It's a brand new journal.  It's just
8 volume two.  I don't know.
9    Q.  So someday maybe you'll publish
10 something in and lift their credit.
11       MR. PARKER:  Maybe so.
12    A.  Hopefully.
13 BY MR. SLATER:
14    Q.  You know you should send in an
15 article, getting deposed on drug-induced
16 sprue-like enteropathy.
17       MR. PARKER:  Let's go.
18 BY MR. SLATER:
19    Q.  I'm sure it will be of great interest
20 to the readership.  We can send the deposition
21 transcript in to them and they can take excerpts
22 and publish it.
23    A.  If you'd like to pay the page charges,
24 you're welcome to.

Page 139

1    Q.  Okay.
2    A.  I'm sure that they charge high page
3 charges in this journal.
4       MR. TURNER:  Let's go, guys.
5 BY MR. SLATER:
6    Q.  Okay.  At the very start of the
7 article there's a sentence that starts, "Celiac
8 disease (also termed gluten-sensitive
9 enteropathy or celiac sprue) is a
10 gluten-dependent small intestinal disorder seen
11 in genetically-predisposed individuals resulting
12 from a complex immune-mediated reaction to
13 specific gluten-peptides in wheat and other
14 grain products.  The precise precipitating event
15 is not known."
16       Just in terms of that general
17 statement about celiac disease, is that
18 accurate?
19    A.  I think that's accurate.
20    Q.  Turn forward, if you could, to
21 Page 51.  There's a section on "Non-steroidal
22 Anti-inflammatory Agents."
23       Do you see that?
24    A.  Yes.

Page 140

1    Q.  It starts out, "Some nonsteroidal
2 anti-inflammatory agents have been well
3 documented to cause mucosal toxicity,
4 particularly in the stomach and small
5 intestine."
6       Is that a factually accurate
7 statement?
8    A.  Yes, it is.
9    Q.  If you go to the very end of that
10 paragraph, it says, "Further studies are needed
11 to define the precise mechanism involved for the
12 histopathologic mucosal changes following
13 nonsteroidal anti-inflammatory drug use."
14       Do you see what I just read?
15    A.  Yes.
16    Q.  And would you agree with that
17 statement?
18    A.  In a sense.  I mean there's many
19 mechanisms that have been defined.  I don't
20 think it's entirely clear which contribute to
21 which events.
22    Q.  Even though the precise mechanism as
23 they describe it here still needs to be defined,
24 that doesn't take away from the fact that

Page 141

1 nonsteroidal anti-inflammatory agents can cause
2 mucosal toxicity as described here, correct?
3    A.  Correct.
4    Q.  And in a sense what I'm saying is even
5 though the mechanism is not entirely known, the
6 scientific community accepts that there is a
7 biological mechanism whereby the nonsteroidal
8 anti-inflammatory agents do cause mucosal
9 toxicity, correct?
10    A.  Sure.
11    Q.  And just one quick question about
12 these medications, nonsteroidal
13 anti-inflammatories.  They are given to a
14 patient in order to treat inflammation in the
15 body, that's their actual purpose, that's what
16 they do, correct?
17    A.  In general terms, yes.
18    Q.  However, in the small intestine, they
19 can cause inflammation, and actually do in some
20 patients cause inflammation, correct?
21    A.  Again, depending on context, yes.
22    Q.  Okay.  So the fact that a medication
23 which has anti-inflammatory properties, that
24 doesn't mean the medication will not cause

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 142

1  inflammation in the small intestine as a general
2  proposition, correct?
3      A.  All drugs can have toxicities.
4      Q.  Okay.  You can put that aside.
5          I want to ask you about something we
6  were -- follow up on something we were talking
7  about before.  I want to ask you about the
8  Rubio-Tapia patients, the 22 patients in that
9  study, okay?
10     A.  Yes.
11     Q.  With regard to those patients, and I'm
12 not going to go through the full clinical
13 picture and all the histopathologic findings,
14 they're in the article, the article speaks for
15 itself, you're familiar with the article's
16 description of those patients, correct?
17     A.  Yes, I am.
18     Q.  With regard to those 22 patients, it
19 was reasonable for the physicians treating them
20 at the Mayo Clinic to conclude that olmesartan
21 was associated with their -- what was termed
22 their sprue-like enteropathy, their collection
23 of clinical symptoms, correct?
24     A.  I don't think that's exactly correct.

Page 143

1      Q.  With regard to each of those 22
2  patients, the differential diagnosis would
3  reasonably include olmesartan-associated
4  enteropathy, sprue-like enteropathy, whatever
5  you want to call it, that would be a reasonable
6  thing to do, to include that in the differential
7  diagnosis, correct?
8      A.  Retrospectively, you would include
9  something related to olmesartan as a possible
10 cause, yes.  I think when they were seeing these
11 patients, they hadn't thought about that.
12     Q.  They figured it out later when they
13 then got the information that they talked about;
14 for example, patients reporting that when they
15 were in the hospital and were taken off
16 olmesartan because, for example, their blood
17 pressure had gotten lower, that they had gotten
18 better, and that's what essentially triggered
19 these doctors to look more closely at
20 olmesartan, correct?
21     MR. PARKER:  Objection.
22     A.  Yeah, that's fairly simplified, but
23 it's the gist of what they say in the beginning
24 of this article.

Page 144

1      MR. SLATER:  Okay.  We have an
2  article, I don't think, Peter, we put a number
3  on it, but it's titled "Celiac Disease" authored
4  by Dr. Green and Dr. Cellier.
5      A.  Is this a New England Journal article?
6  BY MR. SLATER:
7      Q.  It is.
8      MR. FOUNDAS:  You said it wasn't one
9  of the numbered ones?
10     MR. SLATER:  I don't think it is.  If
11 it is, I don't have the number in front of me.
12 Sorry.  But it's titled "Celiac Disease," New
13 England Journal of Medicine.
14     MR. PARKER:  Have you got it?
15     THE WITNESS:  I have it.
16     MR. PARKER:  Everybody has got a copy
17 but me.
18     THE WITNESS:  Well, they have to find
19 a copy for me.
20     MR. PARKER:  You hold on to that.
21     MR. FOUNDAS:  Give me a second.  Maybe
22 it's in here.
23     MR. PARKER:  This is what you're
24 looking for (indicating).

Page 145

1      MR. SLATER:  Did we not send it?
2      MR. FOUNDAS:  Not through it all yet.
3  BY MR. SLATER:
4      Q.  Do you have it in the room, Doctor?
5  Maybe I can send it up there.
6      MR. FOUNDAS:  We do have a copy here.
7      MR. SLATER:  The doctor has it?
8      MR. PARKER:  He's got a copy, so let's
9  just go ahead and I'll look at it later.
10     MR. SLATER:  It's not there, let's
11 forget it.  I may not have sent it.  So as long
12 as you have it, that's the key thing, Doctor.
13     MR. PARKER:  Okay.
14     MR. SLATER:  Let's mark it as whatever
15 the next number is.
16     (Whereupon, Turner Exhibit Number 12,
17     Green and Cellier article titled
18     Celiac Disease, was marked for
19     identification.)
20 BY MR. SLATER:
21     Q.  Okay.  Doctor, this article is listed
22 on your supplemental reliance list, correct?
23     A.  Yes.
24     Q.  Why did you include it on the

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 146

1  supplemental reliance list?
2      A.  I think it's a comprehensive review of
3  celiac disease, and people have likened the
4  pathology and clinical symptomatology associated
5  with diarrhea that's been associated with
6  olmesartan to celiac disease.
7      Q.  Would you consider the New England
8  Journal of Medicine to be a respected medical
9  journal?
10     A.  Yes.  We already discussed that.
11     Q.  Have you published in the New England
12 Journal of Medicine?
13     A.  I don't think so.  Maybe as a middle
14 author, but I don't think so.
15     Q.  Looking at this article, it says right
16 in the middle of the first paragraph, about five
17 lines down, "Celiac disease is precipitated, in
18 genetically predisposed persons, by the
19 ingestion of gluten."  Correct?
20     A.  Correct.
21     Q.  At a very basic level, that is
22 describing the mechanism, that you take gluten
23 and it precipitates this condition, at the very
24 general level, correct?

Page 147

1      A.  No, I wouldn't call that a mechanism.
2      Q.  Okay.  Let's go down to the "Mucosal
3  Immune Responses" section under "Pathogenesis."
4      A.  Sure.
5      Q.  It says, "In patients with celiac
6  disease, immune responses to gliadin fractions
7  promote an inflammation reaction, primarily in
8  the upper small intestine, characterized by
9  infiltration of the lamina propria and the
10 epithelium with chronic inflammatory cells and
11 villous atrophy."
12         Do you agree with that statement?
13     A.  Yes, or at least that's what's
14 thought.
15     Q.  Is that a statement of mechanism at
16 some level?
17     A.  Well, I think what it says is that,
18 and what we think, is that portions -- breakdown
19 products of gliadin are triggers, so in that
20 sense it's the initiation of a mechanism that
21 activates processes that presumably already
22 exist.
23     Q.  Let's go to the second page of this
24 article, Page 1732, there's -- just above the

Page 148

1  heading "Genetic Factors," there's a sentence
2  just above that, it says, "The mechanism of the
3  interaction between the processes in the
4  epithelium and lamina propria has not been
5  elucidated."
6         Do you see what I just read?
7      A.  Yes.
8      Q.  Even though that mechanism as
9  described there has not been elucidated, nobody
10 would challenge the fact that gluten causes
11 celiac disease, correct?
12         MR. PARKER:  Objection.
13     A.  Well, I think I just said that I don't
14 agree with your terminology.
15 BY MR. SLATER:
16     Q.  My question is this.  Even though the
17 mechanism has not been elucidated as described
18 in that sentence, nobody would question the fact
19 that gluten initiates a process that leads to
20 celiac disease, correct?
21     A.  I think it leads to symptomatology in
22 celiac disease.  If you have celiac disease,
23 stop taking gluten, you feel completely better,
24 do you still have celiac disease?  The answer

Page 149

1  would be yes.  So gluten is not necessarily
2  causing the disease or initiating the disease.
3      Q.  You're saying somebody can have the
4  genes for celiac, but the gluten is what
5  actually, in some of those people will actually
6  cause the person to have the symptoms --
7      A.  Yes.
8      Q.  -- associated with celiac, right?
9      A.  Right.  That's different than
10 mechanism.
11     Q.  Let's go down to the "Genetic Factors"
12 section, the second sentence.  "Celiac disease
13 does not develop unless a person has alleles
14 that encode for HLA-DQ2 or HLA-DQ8 proteins,
15 products of two of the HLA genes."
16         Do you agree with that statement as
17 being factually accurate?
18     A.  I think that's generally true.
19     Q.  It then says, "However, many people,
20 most of whom do not have celiac disease, carry
21 these alleles; thus, their presence is necessary
22 but not sufficient for the development of the
23 disease."
24         Do you see what I just read?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 150

1 A. Yes.

2 Q. And I think -- rephrase.

3 One of the things that's necessary for

4 the development of the disease is exposure to

5 gluten, correct?

6 A. Again, I think that's a semantic

7 argument. I think gluten certainly induces the

8 activation of processes that manifests as the

9 disease, but I don't think that's what they're

10 talking about here.

11 Q. Okay. Let's go to the next page,

12 "Clinical Manifestations." On Page 1733, under

13 "Clinical Manifestations," the article states,

14 "Clinical manifestations of celiac disease vary

15 greatly according to age group."

16 Do you see what I just read?

17 A. Yes.

18 Q. Do you agree with that statement?

19 A. Yes.

20 Q. Even within various age groups, the

21 clinical manifestations vary, correct?

22 A. Yes.

23 Q. Celiac disease is not a homogenous

24 disease entity, there is variation, correct?

Page 151

1 A. There is variation in severity and --

2 yes, severity primarily.

3 Q. There's a variation in terms of the

4 clinical symptoms, there's a variation of

5 severity, and there's even a variation in the

6 histopathology, correct?

7 A. Again, the severity, yes.

8 Q. Celiac disease has heterogeneity in

9 terms of its presentation, correct?

10 A. Well, again, I think it's what we just

11 said. It has heterogeneity in terms of the

12 severity of presentation.

13 Q. Even though there's this heterogeneity

14 and this variation in presentation and severity,

15 nobody would challenge that celiac disease is a

16 clinical entity, correct?

17 A. Can you make that a simpler question?

18 Q. Sure.

19 A. You've asked about five different

20 questions there.

21 Q. I don't think I got to five, Doctor,

22 but thanks for the credit. If I could do that

23 in so few words, then I would be a master

24 questioner --

Page 152

1 A. Well done.

2 Q. -- like Mr. Parker to your right, but

3 I'm not. I'm a novice here, and this is my

4 first deposition. Thank you for your patience.

5 Doctor, celiac disease is a recognized

6 clinical entity, even though there's variation

7 in the clinical presentation in terms of

8 symptoms, in terms of severity, correct?

9 A. Yes.

10 Q. Now, looking at Page 1733, at the top

11 of the second column, the first -- second full

12 sentence, it says, "The classic presentation in

13 adults is diarrhea, which may be accompanied by

14 abdominal pain or discomfort. However, diarrhea

15 has been the main presenting symptoms in less

16 than 50 percent of cases in the past decade.

17 Other, silent presentations in adults include

18 iron-deficiency anemia, osteoporosis, and

19 incidental recognition at endoscopy performed

20 for other reasons, such as symptoms of

21 gastroesophageal reflux. Less common

22 presentations include abdominal pain,

23 constipation, weight loss, neurologic symptoms,

24 dermatitis herpetiformis, hypoproteinemia,

Page 153

1 hypocalcemia, and elevated liver enzyme levels."

2 What I just read, you agree that is

3 accurate factually, correct?

4 A. Yes.

5 Q. Despite that variation in clinical

6 presentations, celiac disease is a recognized

7 clinical entity, correct?

8 A. That's a variation in symptomatic

9 presentations. All of these patients have a

10 spectrum of the same histopathology and the same

11 pathophysiology. So you're talking about

12 severity again, and so the answer is yes.

13 Q. We're also talking -- rephrase.

14 The authors are also talking about

15 variation in the symptoms, and essentially very

16 wide variation in symptoms, correct?

17 A. No, I think these are symptoms that

18 all relate directly to the malabsorption, so I

19 wouldn't call it wide variation.

20 I guess I should correct myself.

21 Dermatitis herpetiformis is probably not due to

22 the malabsorption, it is probably due to the

23 immune reactions.

24 Q. Is abdominal pain due to

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 154

1  malabsorption?
2      A.  I think it probably is.
3      Q.  Is constipation due to malabsorption?
4      A.  I think it may be.
5      Q.  You said all of these symptoms relate
6  to malabsorption.  Does that include
7  constipation?
8      A.  I answered.  I said it may be.
9      Q.  When you say it may be, are you saying
10  yes or no?
11      A.  I would say constipation is an
12  atypical presentation of malabsorption, but
13  there does end up being increased bulk, and that
14  may give patients that feeling.  So it would be
15  highly atypical, and along that spectrum they do
16  say that that's a less common presentation.  So
17  constipation wouldn't be what you'd normally
18  expect in somebody with celiac disease, but I
19  suppose it's possible.
20      Q.  You would admit there are some
21  patients who have constipation as a result of
22  malabsorption, correct?
23      A.  That's what they're implying here, and
24  I take that at face value.

Page 155

1      Q.  You don't dispute it, correct?
2      A.  No, I don't dispute it.  I'm saying
3  it's an unusual pathophysiology of
4  malabsorption.  But they're listing it, they're
5  making generalizations here, I don't think I've
6  read reference 35.  But the fact is that we're
7  picking up celiac disease cases at higher and
8  higher rates due to increased screening and
9  recognition and serologic assays, and I'm not
10  surprised that some patients that present with
11  constipation are later found to have celiac
12  disease.
13      Q.  This relation of symptomatology as
14  described here, the literature on olmesartan
15  also reflects a similar variation in
16  symptomatology, correct?
17      A.  Again, the symptoms are highly
18  overlapping.  I think there's a difference.  I
19  don't see vomiting included here.  It does seem
20  to be somewhat broader for olmesartan.
21      Q.  In essence what I'm driving at, is the
22  fact that there is a broad spectrum of clinical
23  presentations similar to this spectrum that
24  we're reading about for celiac, that in and of

Page 156

1  itself does not disprove that olmesartan
2  enteropathy exists as an entity, correct?
3      A.  Can you break that up?
4      Q.  Probably not.  Sounds difficult.  I'll
5  ask it again.
6          The fact that olmesartan enteropathy
7  as reported has a similar broad spectrum of
8  clinical manifestations as reported in the
9  literature, that in and of itself does not
10  disprove the existence of olmesartan enteropathy
11  as an entity, correct?
12      A.  Okay.  So you've made two statements
13  there.  I'll answer them separately if you can't
14  break them up.
15          The first is the fact that it has a
16  similarly broad presentation, I think it has a
17  broader presentation.
18          The second is that that doesn't
19  disprove that olmesartan could cause
20  enteropathy, and I would agree with that.
21      Q.  Go to the bottom of Page 1733.  It
22  says "Diagnosis."  It says at the very bottom,
23  "The diagnostic criteria developed by the
24  European Society for Pediatric Gastroenterology

Page 157

1  and Nutrition require only clinical improvement
2  with the diet," referring to a gluten-free diet,
3  "although histological improvement on a
4  gluten-free diet is frequently sought and is
5  recommended in adults because villous atrophy
6  may persist despite a clinical response to the
7  diet."
8          Do you see what I just read?
9      A.  Yes.
10      Q.  If I understand that correctly,
11  they're saying you'd like to see histology on
12  pathology specimens, but according to this
13  standard, this diagnostic criteria cited by the
14  articles, you can make the diagnosis simply on
15  clinical improvement with a gluten-free diet.
16  Am I reading that correctly?
17      A.  They're saying that the European
18  Society says that.  I think they're in the
19  minority there.  I think most seem
20  recommendations would be that you need further
21  evidence than improvement on a gluten-free diet.
22  I think -- and especially since 2007, it's
23  increasingly recognized that there are people
24  who have some sort of gluten sensitivity who do

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 158

1 not have celiac disease. So I would say no, I
2 don't think that's accurate.
3     Q.  Do the authors criticize that
4 criteria, diagnostic criteria?
5     A.  They don't make a comment either way.
6 But again, you need to recognize that this is
7 almost a ten year old paper.
8     Q.  You cited this in your reliance list
9 as something that was relevant, right, today?
10 Right? That's why you put it on the documents
11 list, correct?
12     A.  I think it provides helpful facts.
13 But I think it also has to be recognized in that
14 context. I didn't say it was authoritative.
15     Q.  Let's go to Page 1735 under "Biology
16 and Histologic Assessment." The last full
17 paragraph in the left column. It says, "The
18 spectrum of pathologic changes in celiac disease
19 ranges from near-normal villous architecture
20 with a prominent intraepithelial lymphocytosis
21 to total villous atrophy."
22         Do you agree that's an accurate
23 statement?
24     A.  Yes.

Page 159

1     Q.  And even though there is this spectrum
2 of pathology changes that can be seen, that does
3 not take away from the fact that celiac is a
4 recognized and accepted entity in the scientific
5 community, correct?
6     A.  I think describing it as a spectrum is
7 probably overstating your case. There's a
8 constant finding there, which is the prominent
9 intraepithelial lymphocytosis. The variation is
10 the degree of villous atrophy which reflects
11 severity. So I think you're trying to imply
12 that there's this huge spectrum, and there's
13 not.
14     Q.  There has been a reported spectrum of
15 pathology from normal or near-normal villous
16 architecture through total villous atrophy and
17 with other features as well in the literature
18 about olmesartan, correct?
19     A.  There's been descriptions of
20 completely normal histology without anything,
21 including intraepithelial lymphocytosis, on the
22 benign -- on the very bland end to ulceration
23 with neutrophils on the very severe end. Both
24 of those -- neither of those would be considered

Page 160

1 adequate for a diagnosis, for example, of celiac
2 disease. That's too broad.
3         So that's my point, is that you're
4 trying to imply a broader spectrum of the type
5 that's been described for olmesartan and celiac
6 disease, while the pathology of celiac disease
7 is not characteristic -- it is not, I'm sorry,
8 diagnostic, the typical or characteristic
9 findings are a much narrower spectrum than has
10 been described with olmesartan.
11         MR. SLATER:  Move to strike.
12     Q.  There is a spectrum of histopathology
13 reported in the literature regarding olmesartan,
14 correct?
15     A.  Yes.
16     Q.  In and of itself, that spectrum as
17 described is not sufficient to reject the
18 existence of olmesartan enteropathy, correct?
19     A.  Correct.
20     Q.  Look at the very bottom of the
21 left-hand column on 1735 over to the carryover,
22 it says, "The diagnosis is confirmed when there
23 is a favorable response to the diet."
24         Do you see that?

Page 161

1     A.  Yes.
2     Q.  That's a very clear statement by the
3 authors that the way you confirm the diagnosis
4 of celiac disease is by putting the person on a
5 gluten-free diet, and the person improves or
6 gets better, that's what they're saying,
7 correct?
8     A.  That's in the context of all the
9 things above. But yes.
10     Q.  That statement is consistent with
11 those who, from a clinical perspective, believe
12 that if you do a dechallenge of olmesartan and
13 the patient gets better, that that is enough to
14 make the diagnosis of olmesartan-associated
15 enteropathy, they're saying the same thing,
16 correct?
17     A.  I think in a subsequent paper
18 Dr. Green actually specifically says that a
19 clinical response to gluten withdrawal is not
20 sufficient to make a diagnosis of celiac
21 disease.
22     Q.  Do you want to show me that article?
23     A.  Sure.
24     Q.  We'll hold on that. We'll get back to

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 162

1  that. I just don't want to take time looking
2  for it, but I'll make a note.
3         With regard -- and I'm going to move
4  to strike.
5         With regard to my question, there are
6  clinicians who treat olmesartan enteropathy who
7  believe that if the patient improves and then
8  gets better after withdrawal of the olmesartan,
9  that is enough to make the diagnosis and to make
10 the treatment decision going forward to keep a
11 person off olmesartan, that in the medical
12 community, in the clinical community, there are
13 people that believe that and treat patients
14 based on that, correct?
15        MR. PARKER: Objection.
16     A. I can't tell you what they believe.
17 BY MR. SLATER:
18     Q. You don't know what the thinking is
19 within the clinical community about that
20 question?
21     A. I can tell you what articles have been
22 written, what articles say. I'm sure you can
23 find clinicians who think lots of things that
24 are inaccurate. I can tell you what's

Page 163

1  interpretable as fact, what's interpretable as
2  observation, phenomenon. I can't tell you what
3  people are thinking and whether it's accurate.
4         MR. SLATER: Move to strike.
5     Q. Do you not know what the thinking is
6  among those who actually treat and diagnose
7  olmesartan enteropathy in the clinical
8  community, for example, at major institutions
9  where celiac is treated?
10     A. Yeah, you know, University of Chicago
11 where I was until recently is one of those
12 institutions with a celiac center, and I would
13 say that what is recognized is that in some
14 patients, withdrawal of olmesartan seems to be
15 associated with improvement. Those patients
16 typically had negative celiac serologies and
17 don't have celiac disease by any variety of
18 measures. And that if withdrawal is correlated
19 with a response, then you should just take them
20 off of olmesartan.
21     Q. And the doctors at the University of
22 Chicago celiac center who had that
23 understanding -- rephrase.
24         And the doctors at University of

Page 164

1  Chicago who followed that line of thinking in
2  their medical judgment, you're aware, thought
3  that in those cases the person's
4  gastrointestinal illness had been caused by the
5  olmesartan, and that's why they chose to keep
6  the patient off the olmesartan after the
7  positive dechallenge, correct?
8         MR. PARKER: Objection.
9     A. I haven't had that conversation with
10 them, but I can speculate, if you'd like.
11 BY MR. SLATER:
12     Q. Well, that's your understanding,
13 that's the only reason they would keep the
14 person off the olmesartan, right?
15     A. No.
16     Q. I'll ask it differently. Well, let me
17 ask you this.
18         Do you know or not know whether they
19 made that judgment as to the fact that the
20 olmesartan was causing the symptoms, and that's
21 why I'll tell the patient don't take the
22 olmesartan anymore. Do you know?
23     A. You know, the physicians treating
24 celiac disease at University of Chicago are

Page 165

1  mostly scientifically rigorous people, and I
2  would anticipate that if you ask them, they
3  would say I don't know that it's causing it, but
4  I know that the patient does better when they're
5  not on it, and I can find an alternative, and so
6  I can make this patient better, and that's what
7  my goal is.
8     Q. Do you know if any of those
9  scientifically rigorous doctors at University of
10 Chicago have published and set forth their
11 thinking on whether olmesartan causes this
12 condition?
13     A. I'm not aware of any. There's a
14 pretty niche area, and I'm not aware of any
15 papers by any University of Chicago physicians.
16     Q. Go to Page 1736, please. It's in the
17 section that's titled "Treatment." The third
18 full paragraph right in the middle of the left
19 column, it says, "The elimination of gluten
20 usually induces clinical improvement within days
21 or weeks, though histologic recovery takes
22 months or even years, especially in adults, in
23 whom mucosal recovery may be incomplete."
24         Is that an accurate statement?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 166

1    A.  Yes.
2    Q.  The variation in the time to
3  histologic recovery, that in and of itself can
4  exist, and people still accept that celiac
5  disease is a recognized scientific entity,
6  correct?
7    A.  Yes.
8    Q.  The fact that the histologic recovery
9  in patients who are thought to have olmesartan
10  enteropathy can vary as reported in the
11  literature, that in and of itself does not
12  disprove the existence of olmesartan
13  enteropathy, correct?
14    A.  Correct.
15    Q.  Go to the "Summary," please, the very
16  end, Page 1740.  The summary says, "Celiac
17  disease occurs in nearly 1 percent of the
18  population in many countries.  The diagnosis,
19  which is straightforward in most cases, is
20  usually established on the basis of serologic
21  testing, duodenal biopsy, and observation of the
22  response to a gluten-free diet."
23      Do you see that?
24    A.  Yes.

Page 167

1    Q.  With regard to olmesartan enteropathy
2  and the diagnosis of that condition, it is
3  stated in the literature that if the patient has
4  negative serologic testing for celiac, and if
5  you see changes in the villous architecture on
6  the biopsy, and when you withdraw the olmesartan
7  the patient improves or gets better, that is
8  sufficient to make the diagnosis of olmesartan
9  enteropathy, correct?
10    A.  I'm not sure that I've seen a paper
11  state that.  I think probably several case
12  reports try to imply that.  If there's a paper
13  that says that specifically in those terms, I'm
14  happy to be shown it.
15    Q.  You're not familiar with the paper
16  that suggests that?
17    A.  I'm not familiar with the paper that
18  says that in those specific terms, and if it did
19  I would disagree with it, and I can give you
20  examples of why.
21    Q.  Are you aware that there are
22  physicians who actually diagnose and treat both
23  celiac and olmesartan enteropathy and related
24  conditions who believe that if you rule out

Page 168

1  celiac with serologies, you see villous atrophy,
2  whether partial or total, on biopsy, and the
3  patient improves or has resolution with
4  withdrawal of olmesartan, that that's enough to
5  make the diagnosis, are you aware that there are
6  clinicians who believe that who are at the
7  pinnacle of the treatment of these conditions?
8      MR. PARKER:  Objection.
9    A.  I doubt there's anyone at the
10  pinnacle.  I'm sure you can find people at
11  august institutions, even at celiac disease
12  centers, who will say that.  But I think anybody
13  with any common sense would have to reject that
14  you haven't sufficiently ruled out other causes
15  in your scenario.
16  BY MR. SLATER:
17    Q.  Just to be clear in the context of
18  what you said, you've actually never
19  participated in the diagnosis or treatment of an
20  olmesartan-associated enteropathy patient,
21  whether proven or whether suspected or
22  considered, right?
23    A.  That's true.
24      MR. SLATER:  I think it's a good time

Page 169

1  to get lunch.  Do you guys agree?
2      MR. PARKER:  We agree.
3      MR. SLATER:  Let's break.
4      MR. PARKER:  All right.
5      THE VIDEOGRAPHER:  Going off the
6  record.  The time is 12:38.
7      (Whereupon, a luncheon recess was
8      taken.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 170

1      AFTERNOON SESSION
2
3      (Whereupon, Turner Exhibit Number 13,
4      Setty, et al article titled Distinct
5      and Synergistic Contributions of
6      Epithelial Stress and Adaptive
7      Immunity to Functions of
8      Intraepithelial Killer Calls and
9      Active Celiac Disease, was marked for
10     identification.)
11     THE VIDEOGRAPHER:  Back on the record.
12  The time is 1:26.
13  BY MR. SLATER:
14     Q.  Doctor, we've provided you Exhibit 13,
15  which is a paper that you co-authored along with
16  Dr. Murray, correct?
17     A.  Well, yeah, I guess.
18     Q.  Were you -- well, let me ask you then,
19  why are you listed as one of the -- were you an
20  author, investigator?  What was your role with
21  this study?
22     A.  The reason I hesitated is I'm one of
23  the corresponding authors that directed the
24  study.  Joe was a collaborative because he

Page 171

1  provided patients.  So Joe was a co-author.  I
2  wouldn't normally think of the senior
3  investigators as co-authors.  That's a semantic
4  academic thing.
5      Q.  Looking at the article, it has to do
6  with celiac disease, correct?
7      A.  Yes.
8      Q.  The very beginning of the article, it
9  says, "The mechanisms of tissue destruction
10  during the progression of celiac disease are
11  poorly defined.  It is not clear how tissue
12  stress and adaptive immunity contribute to the
13  activation of intraepithelial cytotoxic T-cells
14  and the development of villous atrophy."
15      Is that a true statement?
16      A.  Yes.  Your quoting isn't quite
17  precise, but it's fine.
18      Q.  You mean I didn't read it correctly?
19      A.  Yeah.
20      Q.  I didn't read it correctly?
21      A.  I'm sorry?
22      Q.  I didn't read the sentence correctly?
23      A.  No, you didn't.
24      Q.  All right.  I'll try it again then.

Page 172

1      Doctor, looking at the first sentence
2  of the article, it says, "The mechanisms of
3  tissue destruction during progression of celiac
4  disease are poorly defined.  It is not clear how
5  tissue stress and adaptive immunity contribute
6  to the activation of intraepithelial cytotoxic
7  T-cells and the development of villous atrophy."
8      Did I read that correctly?
9      A.  Yes.
10     Q.  Is it a true statement?
11     A.  What?
12     MR. TURNER:  You're breaking up, Adam.
13  BY MR. SLATER:
14     Q.  Is it a true statement?
15     A.  Yes, it's a true statement.
16     Q.  Looking at the right-hand column of
17  that page, the first page of the article, the
18  end of the first paragraph, it says, "The
19  mechanisms underlining the licensing IE-CTL to
20  kill IECs are not completely understood, and
21  whether and how adaptive anti-gluten immunity
22  impacts the ability of IE-CTLs to induce villous
23  atrophy remains to be determined."
24      Do you see what I just read?

Page 173

1      A.  Yes.
2      Q.  Did I read it correctly?
3      A.  Yes.
4      Q.  Is it a true statement?
5      A.  Yes.
6      Q.  Even those these mechanisms that I
7  just read about from your article are not, as
8  you state, completely understood, or remain to
9  be determined, or are poorly defined, that
10  doesn't mean that celiac disease does not exist
11  as a recognized scientific entity, correct?
12     A.  Correct.
13     Q.  These mechanisms that are being
14  discussed, are these mechanisms at the molecular
15  levels?
16     A.  In this study?
17     Q.  What I just read, yes.
18     A.  What you just read were introductory
19  general statements.
20     Q.  Are they general statements regarding
21  molecular level mechanisms?
22     A.  They apply to that, yes.
23     Q.  So you agree you do not need to
24  understand mechanisms at the molecular level to

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 174

1  be able to state that there is a plausible
2  biological mechanism for a disease entity such
3  as celiac disease in order to recognize the
4  disease as scientifically accepted, correct?
5      A.  Correct.
6      Q.  And the same would hold true for
7  olmesartan enteropathy, the fact that the
8  molecular mechanisms are still being studied
9  does not mean that the entity does not exist,
10  correct?
11      A.  Correct.
12      Q.  You can put that aside.
13          I'd like to speak, if we could, for a
14  few minutes about the ROADMAP Study.  I think
15  you talked about that, mentioned it in your
16  report, correct?
17      A.  Yes.
18      Q.  The ROADMAP Study, do you know what
19  the primary endpoint was for that study?
20      A.  You're talking about the 2011 New
21  England Journal article?
22      Q.  Correct.
23      A.  The primary endpoint was the time to
24  first onset of microalbinuria.

Page 175

1      Q.  Did you read a study design?
2      A.  There was a previous publication on
3  the study design.  I don't know if I included it
4  in my list, and I may not have a copy here.  But
5  there was a previous completely separate
6  publication describing the study design in
7  detail.
8      Q.  Did you read that?
9      A.  I did.  Some time ago, but I did.
10      Q.  The study was not designed to study
11  gastrointestinal adverse effects, correct?
12      A.  That was not the primary endpoint.
13      Q.  Do you agree the study was not
14  designed in order to study gastrointestinal side
15  effects?
16      A.  It was not designed to primarily
17  determine side effects, but there was certainly
18  an element of the study that they were able to
19  do that because of the large population they
20  studied.
21          MR. SLATER:  Move to strike.
22      Q.  Very simple question.  The ROADMAP
23  Study was not designed to study gastrointestinal
24  side effects, correct?

Page 176

1      A.  The ROADMAP Study was intended to be
2  able to also assess side effects.  That's the
3  point of large studies like this.  That's one of
4  the outcomes that you can measure.  It's not the
5  primary outcome, not the primary endpoint, but
6  it's certainly something you can measure, they
7  have tables about it in the paper.
8      Q.  Do you know what the company's
9  position is as to whether or not the ROADMAP
10  Study, which they funded, was designed to study
11  gastrointestinal side effects?
12      A.  Are you going to continue to use
13  gastrointestinal specifically?  Because that
14  changes things a bit.
15      Q.  I'm asking you about gastrointestinal.
16      A.  I don't know how they could have,
17  given that this study was published in March,
18  2011, which means the design was several years
19  earlier before anybody had any thought that
20  there was any association or relationship
21  whatsoever between olmesartan and
22  gastrointestinal disease.  So how could you
23  possibly do that?
24      Q.  Do you know when the company began to

Page 177

1  receive adverse events indicating patients
2  suffering severe gastrointestinal side
3  effects -- rephrase.
4          Do you know when Daiichi began to
5  receive adverse event reports showing that
6  patients taking olmesartan were suffering for
7  symptoms such as severe diarrhea, significant
8  weight loss, hospitalizations?  Do you know when
9  the company started seeing those symptoms being
10  reported in patients taking olmesartan?
11          MR. PARKER:  Objection.
12      A.  My understanding is that there are
13  reports of celiac disease in patients taking
14  olmesartan beginning several years before this.
15  BY MR. SLATER:
16      Q.  I didn't ask about celiac.  I asked
17  about a constellation of symptoms such as severe
18  diarrhea, significant weight loss, the need for
19  multiple hospitalizations.  Do you know when
20  adverse event reports indicating that clinical
21  picture for patients taking olmesartan started
22  to come into the company?
23      A.  I couldn't tell you when adverse event
24  reports with that clinical picture started

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 178

1  coming in, no.
2      Q.  Once the company saw multiple, and
3  I'll say ten, reports indicating a syndrome of
4  significant gastrointestinal effects including
5  severe diarrhea, significant weight loss,
6  hospitalizations, once they saw more than ten
7  adverse event reports, that's something you
8  would expect them to start to look at and wonder
9  why are we getting these reports, right?
10     MR. PARKER:  Objection.
11     A.  I think they would reasonably be
12 expected to look at that and ask.
13 BY MR. SLATER:
14     Q.  And if they knew about that at the
15 time that they designed the ROADMAP Study,
16 that's something that they would have had the
17 ability to build into the study if they chose
18 to, right, to study those types of effects,
19 right?
20     A.  If they thought they were significant,
21 I mean certainly they'd have the ability.  But
22 you're talking about MedWatch reports, I assume,
23 is that true?
24     Q.  It is.

Page 179

1      A.  That level of data?
2      Okay.  So MedWatch reports are really
3  sort of the lowest quality of data you can
4  imagine.  They're vague.  There's no proof
5  needed.  The estimation of causative
6  relationship is really, you know, a weak
7  estimate at best.  It's essentially if you can't
8  prove -- if you can't definitively say no, then
9  you say yes.
10     So I'm sure they considered that when
11 they designed the study.  I wish I had the paper
12 with the details of the study design.  But I
13 don't know why, based on that, they would
14 specify gastrointestinal defects, because my
15 understanding is that the incidence was actually
16 lower than in the placebo groups, and I think
17 that's what you see here.
18     Q.  We'll get to that.  We'll get to what
19 the study showed, I promise you.  Actually,
20 let's deal with what you just said real quick.
21 Actually what they -- rephrase.  We will come
22 back to that later.
23     You're talking about the letter that
24 the two investigators wrote to the Mayo Clinic

Page 180

1  Proceedings, right?
2      A.  No.  I was actually talking about what
3  they designed in advance.  But there is that
4  letter, and that letter is relevant.
5      Q.  Let's talk about a couple things,
6  because you said a few things that we want to go
7  through now.
8      First of all, you have never worked at
9  a pharmaceutical company, right?
10     A.  No, I have not.
11     Q.  Do you know what level of importance
12 pharmaceutical companies who are regulated by
13 the FDA are supposed to pay to MedWatch reports
14 as they come in to the company, or adverse event
15 reports as they're made to the company?
16     A.  I couldn't cite, you know, policy to
17 you.  I could tell you that I would, as a
18 layperson in this area, suspect that they should
19 place high importance on them for what they are.
20     Q.  As adverse event reports came into
21 Daiichi regarding patients with a constellation
22 of symptoms such as severe diarrhea, vomiting,
23 dehydration, significant weight loss,
24 hospitalizations, do you understand that the

Page 181

1  company was supposed to take those adverse event
2  reports very seriously?
3      MR. PARKER:  Objection.
4      A.  That would be my general
5  understanding, but again, not as an expert.
6      MR. SLATER:  Move to strike from "but"
7  forward.
8  BY MR. SLATER:
9      Q.  You don't hold yourself out as an
10 expert with regard to how adverse event reports
11 are utilized, correct?
12     A.  No, I do not.
13     Q.  And you didn't form any opinions based
14 on adverse event reports in this case, correct?
15     A.  I looked at some adverse event
16 reports, and I factored those into my analysis,
17 yes.  You're asking a different --
18     Q.  I thought you only saw those reports a
19 week ago.
20     A.  Well, the MedWatch reports.  Case
21 reports are essentially the same thing --
22     Q.  Okay.
23     A.  -- published in a different format.
24     Q.  You equate -- I'm sorry.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 182

1  You equate a case report to an adverse
2  event report, and vice-versa?
3      A.  No, that's not what we were talking
4  about.
5      Q.  I thought you just said that you saw
6  case reports, which are essentially analogous to
7  adverse event reports.
8      A.  No, I said case reports are reports of
9  adverse events.  That's not a MedWatch report.
10 MedWatch reports are also reports of adverse
11 events.  But I would hope that there's more
12 detail in a case report, in many cases there is
13 not, in many cases the data provided in the case
14 reports is less, but there's a different
15 process, and they are different items.
16     Q.  Do you have an understanding of the
17 concept of power in a clinical study, in RCT for
18 example?
19     A.  Yes.
20     Q.  Do you have an opinion as to whether
21 or not the ROADMAP Study was adequately powered
22 to study adverse events, adverse effects from
23 olmesartan?
24     A.  I understand the concept of power

Page 183

1  analysis, but I think those statistical details
2  are outside my area of expertise.
3      Q.  You have no opinion on that question,
4  correct?
5      A.  I have no opinion on that question.
6      Q.  Do you know what Daiichi's position is
7  as to whether or not the ROADMAP Study was
8  adequately powered to study adverse drug
9  effects, including gastrointestinal effects?  Do
10 you know what Daiichi's position on that is?
11     A.  No.
12     Q.  If the ROADMAP Study was not
13 adequately powered to study any adverse effects,
14 including gastrointestinal adverse effects, that
15 would be significant, right?
16     A.  Sure.
17     Q.  You don't know the answer to that
18 question, though, right?
19     A.  I don't know the answer to that
20 question.  I know it was a pretty huge study.
21     Q.  If the ROADMAP Study was not
22 adequately powered to study adverse effects such
23 as gastrointestinal side effects, then you would
24 not want to rely on the ROADMAP Study to form an

Page 184

1  opinion one way or another on the question of
2  whether olmesartan is associated with sprue-like
3  enteropathy, correct?
4      A.  Well, I think you could rely on it to
5  say there's insufficient data if you assume that
6  it was underpowered, and that, you know, a
7  qualified statistician has proven that.
8      Q.  When you say "insufficient data," you
9  mean if it's underpowered it's not going to give
10 you reliable information on that question,
11 right?
12     A.  Right.
13     Q.  I think I might have touched on this
14 with you before, but I want to be very explicit.
15 You don't know whether there were any adverse
16 event reports generated by the -- rephrase.
17         You don't know whether Daiichi
18 generated an adverse event report or reports
19 regarding ROADMAP Study patients in the
20 olmesartan arm reporting gastrointestinal side
21 effects?  You haven't seen those, correct?
22     A.  I haven't seen those.
23     Q.  And you don't know if there are any
24 such adverse event reports in existence in which

Page 185

1  a patient had both a dechallenge and a
2  rechallenge, and based on the rechallenge the
3  company and the investigator both found that the
4  gastrointestinal side effects were definitely
5  related to the use of olmesartan, you don't know
6  if that exists, right?
7      MR. PARKER:  Objection.
8      A.  Are we talking about MedWatch reports
9  and that level?
10 BY MR. SLATER:
11     Q.  We're talking about a MedWatch report
12 generated by Daiichi based on a study
13 participant in the ROADMAP Study in the
14 olmesartan arm.
15     A.  I don't think MedWatch reports are of
16 the level of proof that you're implying.  I
17 don't think they confirm that something was
18 definitely caused by.  I do think you have to
19 check caused by or not caused by.  And my
20 general understanding is that if someone
21 anywhere in the chain says I think this might
22 have been caused by, then that dominates and you
23 can't undo that in order to prevent hiding of
24 cases.

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 186

1 So I think, I'm sure there are
2 MedWatch reports where the caused by list -- the
3 caused by is checked and there were dechallenge
4 and rechallenge, I've seen those in tables from
5 some of the reports I've seen. I don't think
6 that constitutes medical proof, and I don't
7 think anybody would hold it up to be.
8 Q. Who told you that the standard is what
9 you just said for whether or not the company
10 physicians would find something related? Where
11 did you get that information from?
12 A. You know, I think that sort of
13 understanding was in medical school, that these
14 sorts of adverse reaction reports are really the
15 lowest threshold, and the point is to catch
16 everything and not miss something that's
17 possible, not to prove what's true.
18 Q. Do you know if in any cases the
19 adverse event reports were evaluated by
20 physicians working at Daiichi who were actually
21 performing a differential diagnosis and applying
22 medical judgment? Do you know if that would
23 occur?
24 A. I don't know if that would occur.

Page 187

1 Q. You're assuming it didn't occur,
2 right?
3 A. No, I'm not making any assumption.
4 Q. You don't know one way or the other?
5 A. I mean I'd like to assume that it did
6 occur, but I don't know.
7 Q. The letter by Manne and Hallar to the
8 Mayo Clinic journal, did they state that there
9 were any MedWatch -- rephrase.
10 Did Manne and Hallar in their letter
11 to the Mayo Clinic journal provide any
12 information indicating that before they
13 submitted the letter they circulated it within
14 Daiichi for review?
15 A. They do list potential competing
16 interests. They do not say that they circulated
17 it.
18 Q. If it the manufacturer of olmesartan,
19 Daiichi, actually had a chance to review that
20 letter before it was submitted for publication,
21 is that the kind of thing that you would expect
22 to be disclosed?
23 A. I think they disclosed their competing
24 interests. If a member of Daiichi was an

Page 188

1 author, I think that needs to be disclosed, if
2 they were doing it as part of their paid work
3 for Daiichi. This doesn't say that. These guys
4 both apparently have appointments at the Hanover
5 Medical School, and so I think what they've done
6 is correct as long as it's inclusive. I'm in no
7 position to assess whether they were inclusive,
8 or accurate, or inaccurate.
9 Q. If the authors of this letter to the
10 editor submitted it to Daiichi in draft form,
11 and Daiichi actually added language to the
12 letter, should that be disclosed?
13 MR. PARKER: Objection.
14 A. You know, I think as a funder of the
15 original ROADMAP Study, which I think is true,
16 then Daiichi generally would -- in most cases
17 the drug company would have a right to see the
18 letter before and possibly suggest edits, but
19 it's ultimately the responsibility of the
20 authors.
21 BY MR. SLATER:
22 Q. The question is very simple. If
23 Daiichi had input into this letter, that's
24 something that should have been disclosed,

Page 189

1 right?
2 A. If Daiichi had -- I mean it depends.
3 What did they do?
4 Q. Added language suggesting that there's
5 no association, how about if they added that
6 language to the letter?
7 MR. PARKER: Objection.
8 A. Was there language like that already
9 in the letter?
10 BY MR. SLATER:
11 Q. No, no. Let's assume that the letter
12 was sent to Daiichi in draft, and then after
13 Daiichi reviewed it that language ended up in
14 the letter, you'd want to know that, right?
15 A. What did it say before that?
16 Q. It didn't say that at all. That
17 sentence wasn't there. It just found its way
18 into the letter after Daiichi reviewed it.
19 A. So before that, throughout the letter
20 it said we have no idea whether olmesartan
21 causes this or not, but here are results?
22 Q. If the company saw the letter and
23 their input resulted in Manne and Hallar saying
24 that they don't believe there's an association,

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 190

1 that should be disclosed, right?
2     A.  I think it is by saying that they -- I
3 mean you -- generally the authors take
4 responsibility for what's written.  It is true
5 that we often show them to other parties for
6 advice, people who are knowledgeable in the
7 area.  Usually that goes in acknowledgements,
8 and that might be there.  But this isn't a
9 paper.  It's a letter to the editor.  So you're
10 really restrictive what you can say.  I think
11 they disclose competing interests.
12         If a ghostwriting at Daiichi wrote the
13 entire thing for them, that should have been
14 disclosed.  Was that policy in 2012 at Mayo
15 Clinic Proceedings?  I don't know.  Different
16 journals have different policies, and that's
17 something that has gradually been increasing,
18 the expectation of that transparency.  Let's
19 recognize this is a letter to the editor,
20 there's not a lot of room, and the editors are
21 not going to allow you to put an additional page
22 of notes attached to it.
23         They've disclosed that they have
24 received money from Daiichi as lecturers and to

Page 191

1 support research grants.  Unless Daiichi rewrote
2 it, I think that's probably not unreasonable,
3 what they've done.
4     Q.  So when it was disclosed at the end of
5 this that both Manne and Hallar have been paid
6 by Daiichi, you think that is also communicating
7 to readers that the letter was submitted to
8 Daiichi in draft?  And look in the second
9 paragraph on the first page, halfway down the
10 second column, the sentence, "We detected no
11 association between treatment with 40 milligrams
12 of olmesartan once daily and the occurrence of
13 intestinal adverse effects in 2232 patients
14 treated for a median of 3.2 years in the ROADMAP
15 Study."  You think that if the company had that
16 sentence added, you think that's disclosed by
17 them saying we get paid by the company as
18 consultants basically?
19     A.  No.
20     Q.  Is that really what you're saying,
21 Doctor?
22     A.  That's not what I'm saying.  I guess,
23 looking at the data in their table, if they
24 hadn't had a sentence like that in there, I

Page 192

1 would think that they really didn't do a very
2 good job writing this, because that's the
3 take-home message.  So I can imagine --
4     Q.  It's --
5     A.  Can I finish?
6     Q.  If it's an underpowered study --
7     A.  Can I finish?
8     Q.  -- it's not the take-home message,
9 because you can't answer the question if it's
10 underpowered, right?
11         MR. PARKER:  Finish your answer.
12     A.  Can I finish my answer?
13 BY MR. SLATER:
14     Q.  Go ahead, Doctor.  I'm going to strike
15 it, but you go ahead.
16     A.  Okay.  So if, for example, this
17 statement, "However, our observation of a large
18 group of diabetic patients" was not there, but
19 somewhere else, because all through the next
20 column they talk about how it didn't come out in
21 any of their tests, I think then you would be
22 unreasonable to say if the company recommended
23 putting it there where the content already
24 existed elsewhere, is that the company

Page 193

1 manipulating, which I believe is what you're
2 driving at.
3         If the data showed that there was an
4 effect, and the company manipulated the data to
5 not show that, clearly that's wrong, and that
6 shouldn't have been.
7         But these guys have staked their
8 reputation on it, and they've disclosed that
9 they have potential competing interests.  Unless
10 somebody from the company wrote this, I think
11 they've done their duty.
12     Q.  So it's good enough -- I'll withdraw
13 that.
14         So you, who has all this involvement
15 with medical journals, would find if a journal
16 article was submitted to one that you're editing
17 or peer-reviewing, and you weren't told that the
18 actual sponsor of the study, the manufacturer of
19 the drug under study, had reviewed and had input
20 into the manuscript, you're fine if you don't
21 get told that, and it's passed off as if it was
22 independently written by the study
23 investigators?  You're fine with that, is that
24 what you're telling the jury and all the doctors

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 194

1 in the country that you know?
2     A.  I think you're stretching that to an
3 extreme, and I would not agree with the way
4 you've stated things.
5     Q.  Please, it's a yes or no question.
6 Tell every doctor in the country that you know
7 right now, yes or no, you're okay with that,
8 please.
9     A.  Okay with what?  Can we be specific?
10     Q.  You heard the question.
11     A.  Can you read it back?
12     Q.  I'll ask it again.
13         You're okay as an editor of medical
14 journals, a peer reviewer, when somebody is
15 writing an article about a study where the
16 sponsor of the study who manufactured the drug
17 being studied had input into how the article was
18 written, and that's not disclosed to you, and
19 the investigators who submit the article act as
20 if they wrote the article entirely
21 independently, you're fine with that?
22     A.  It depends on the level of input.
23     Q.  Changing the language in the article?
24     A.  Changing the language, or the meaning?

Page 195

1 Changing the language, or the meaning?
2     Q.  Both, or either one.
3     A.  If they change the meaning, I'm not
4 okay with it.  If they make grammatical edits to
5 language, I don't think that's a big deal.
6     Q.  It should be disclosed, though, so
7 that the editors and the peer reviewers can make
8 their own judgment as to whether the changes
9 were material, right?
10     A.  Do you know that it wasn't disclosed?
11     Q.  Do you see any disclosure here?
12     A.  I see a potential competing interest
13 disclosure.  When I see something like that on
14 an article at my journal, and I've done this
15 recently, I will contact the authors and ask for
16 more detail if I feel that more detail is
17 needed.  And I would assume that --
18     Q.  It's not disclosed here, right?
19     A.  It's not disclosed in what appears in
20 the journal.  There's a limit.  These are long
21 -- these can be longer conversations with a long
22 e-mail chain.  You know, I just had -- I think
23 in a paper I just accepted into our journal, I
24 just had a series of probably six e-mails and a

Page 196

1 telephone conversation with an author.  In the
2 end, I concluded that what they'd written in
3 their conflict of interest statement was
4 sufficient.  Is all the detail in those
5 reflected in that?  No.  It would take another
6 three pages of the journal.  Did it require that
7 it satisfy me?  Absolutely.
8     Q.  All right.  Well, you have a low
9 standard, I guess.  It's okay if people just say
10 whatever they want to say, that's fine.
11     A.  Hold on.  That's not true.  You're
12 calling me somebody with low standards?  That's
13 not true.
14     Q.  Okay.  That's how it sounds, but I'll
15 move on.
16     A.  You need to listen more carefully.
17     Q.  To the extent that patients were
18 judged by the investigators -- rephrase.
19         To the extent that ROADMAP Study
20 patients, one or more, were judged to have
21 suffered gastrointestinal affects consistent
22 with sprue-like enteropathy that were definitely
23 related to the use of olmesartan, and that that
24 judgment was made both by an investigator and by

Page 197

1 the company physician reviewing the adverse
2 event, that information should have been
3 disclosed in this letter, right?
4         MR. PARKER:  Objection.
5     A.  I don't think definitely came into
6 anything.  If a definite decision was made that
7 it was absolutely a cause in the rigorous
8 scientific sense of disease, it should have been
9 disclosed.
10 BY MR. SLATER:
11     Q.  There's no suggestion that any
12 patients in this study developed symptoms
13 consistent with a sprue-like enteropathy, they
14 don't suggest that or disclose that at all, do
15 they?
16     A.  Well, they do discuss that.
17     Q.  What do they say?
18     A.  They say "This finding might be
19 because sprue-like enteropathy is a rare event.
20 Indeed, the 22 reported cases in the report by
21 Rubio-Tapia, et al came from 16 different states
22 and were diagnosed at the Mayo Clinic during a
23 time frame of three years.  We cannot rule out
24 the possibility that in this" way -- "in this

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 198

1 very rare disease, the intestinal
2 renin-angiotensin system plays a role." I think
3 they've been up front about it.
4        MR. SLATER: Move to strike.
5    Q.  That wasn't my question.
6        My question is, did they disclose
7 anywhere in this letter that there were ROADMAP
8 Study patients, any of them, that had symptoms
9 consistent with sprue-like enteropathy?  Did
10 they disclose that here?
11    A.  They disclose that they had patients
12 with features consistent with that and many
13 other things, nonspecific features.
14    Q.  Did they disclose that any patients
15 were determined to have suffered from symptoms
16 consistent with sprue-like enteropathy that were
17 found to be related to the use of olmesartan?
18 Did they disclose that, based on that analysis,
19 that that was found with regard to any patients?
20    A.  That's the whole point of their
21 analysis.
22    Q.  Did they say that, Doctor?  Is it in
23 the article?  Do they disclose that?  Caused by
24 olmesartan, do they say that?

Page 199

1    A.  That's the question they're asking.
2        MR. SLATER: Doctor, non-responsive.
3 Move to strike.
4    Q.  Do they disclose here that there were
5 any patients where it was determined that
6 olmesartan caused symptoms consistent with
7 sprue-like enteropathy in an olmesartan patient
8 in this study?  Is that stated?
9    A.  I don't know how to answer your
10 question because you're trying to conclude that
11 they did a study to ask a question they already
12 knew the answer of.  I don't understand.
13    Q.  You don't understand that?  I'll try
14 to explain it to you.
15        Do they disclose in this letter that
16 there were one or more patients who had symptoms
17 that were analyzed by Daiichi and by the
18 investigators and determined that olmesartan
19 caused those sprue-like symptoms in that patient
20 as part of this study, including a patient who
21 had both a dechallenge and a rechallenge which
22 were both positive?  Is that disclosed?
23        MR. PARKER: Objection.  Foundation.
24    A.  No, they don't report on individual

Page 200

1 patients here, so no.
2 BY MR. SLATER:
3    Q.  Do they disclose that there were any
4 patients who had positive dechallenge and
5 positive rechallenge for gastrointestinal
6 illness as part of the olmesartan arm of this
7 study?  Do they disclose that?
8        MR. PARKER: Objection.
9    A.  That's not discussed.
10 BY MR. SLATER:
11    Q.  If that happened, that should have
12 been disclosed to make this a fair and balanced
13 discussion of this situation, correct?
14    A.  I would say if you want to make this
15 into a full paper, then yes, in the context that
16 patients with similar symptoms, which there
17 were, I think, just as many of or more in the
18 placebo group, depending which conditions you
19 look at, were analyzed in the same way, and you
20 could compare apples and apples.
21        It's the same problem as the
22 Rubio-Tapia study.  It's a great -- it's a great
23 case series to bring people's attention to a
24 potential problem, which I believe is the way

Page 201

1 they phrase it, but if you set up your study in
2 the Rubio-Tapia case to only include people who
3 were sick and got better coincident with
4 discontinuation of olmesartan, then you're never
5 going to find anybody in that study group who
6 withdrawal olmesartan, a dechallenge as you call
7 it, but I wouldn't agree that it's a controlled
8 dechallenge, but a dechallenge, you'll never
9 find people with negative dechallenge, because
10 you excluded them from your study.
11        So here they're trying with what is
12 considered the most rigorous scientific
13 approach, randomized controlled trials, yes,
14 they have been to be appropriately powered.  But
15 they're trying to use a randomized clinical
16 trial, the most rigorous approach, to detect a
17 signal from gastrointestinal disease, and they
18 are saying that they did not.  They're not
19 coming down to the individual patient level,
20 other than to say how many patients in
21 categories.
22        And I think in a letter to the editor,
23 that's appropriate, I assume that as any
24 academic would do, they took some time and

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 202

1 looked at their data and said should we write
2 this a full paper or a letter to the editor.
3 They apparently thought it wasn't that big a
4 deal, because they sent it to the same journal
5 where it was published, so they just wanted
6 continuity in the literature that, hey, we did
7 this big deal study that was published in the
8 New England Journal, but there was this little
9 report in the Mayo Clinic Proceedings, so we
10 just want to add to the Mayo Clinic Proceedings
11 that we didn't see any.
12        The threshold for publishing letters
13 to the editor in the Mayo Clinic Proceedings is
14 obviously incredibly low. So there's clearly --
15 they just wanted to make the statement as an
16 addendum to their data, but that's all it is.
17        MR. SLATER: Move to strike.
18     Q. The population of patients in the
19 ROADMAP Study were diabetic, right?
20     A. Yes.
21     Q. That's not representative across the
22 board of patients taking olmesartan, because all
23 olmesartan patients aren't diabetic, right?
24     A. That's true.

Page 203

1     Q. Diabetic patients can have diarrhea
2 for multiple reasons, correct?
3     A. That's true.
4     Q. Based upon the fact that the
5 population of patients in the ROADMAP Study were
6 diabetic, based on the fact that the study was
7 not designed to study adverse effects of the
8 gastrointestinal system, and based on the fact,
9 assuming I'm correct, that the study was
10 underpowered to study adverse effects such as
11 gastrointestinal side effects, the ROADMAP Study
12 does not answer the question at all about
13 whether there's an association between
14 olmesartan and gastrointestinal effects
15 sprue-like enteropathy, correct?
16     A. If everything you said is true, then
17 that's correct.
18     Q. What's next.
19        IBS is short for irritable bowel
20 syndrome, correct?
21     A. Correct.
22     Q. The mechanisms for IBS have been
23 postulated, but they have not been fully
24 determined, correct?

Page 204

1     A. Correct.
2     Q. Despite that, nobody would deny that
3 there is a clinical entity known as IBS which a
4 patient can be diagnosed with, correct?
5     A. No, I don't think that's true. I
6 think there are plenty of people who don't think
7 it's a real disease.
8     Q. There are people who think IBS is just
9 sort of a catchall diagnosis if you're not sure
10 what's going on?
11     A. Well, it is a catchall diagnosis, and
12 I think everybody, even the highest expert in
13 the field, would agree that it's a nonspecific
14 diagnosis and likely represents multiple
15 diseases.
16        What I'm saying is that I've certainly
17 run across physicians who think it's just an
18 extreme end of normal and it's not a disease. I
19 don't hold that opinion, but you asked about
20 everybody.
21     Q. With the clinical presentation that is
22 stated in the literature to be consistent with
23 olmesartan enteropathy, could be misdiagnosed
24 with IBS if the doctor doesn't know about the

Page 205

1 potential association of olmesartan, that can
2 happen, right?
3        MR. PARKER: Objection.
4     A. It depends on the level of evaluation.
5 What most of the reports associated with
6 olmesartan show is some histopathology, and by
7 definition IBS should have normal histology.
8 BY MR. SLATER:
9     Q. I'm talking about clinical diagnosis
10 without pathology.
11     A. Well, then the effects are so
12 nonspecific, so could a viral gastroenteritis.
13 Now you're just talking about very nonspecific
14 stuff. So it could be confused with IBS --
15     Q. Your patient has not had a biopsy,
16 they could be diagnosed with a whole host of
17 potential gastrointestinal disorders as opposed
18 to olmesartan where the doctor doesn't know to
19 include that in a differential diagnosis,
20 correct?
21        MR. PARKER: Objection.
22     A. Again, that's about three questions.
23 You're really good at this. Which ones do you
24 want me to answer, in what order?

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 206

1  BY MR. SLATER:
2      Q.  If you don't think you can answer the
3  question, I'll just move on.
4      A.  I can't answer the question as asked.
5  There's about three questions in there.
6      Q.  Okay.  Do you know why it is that
7  deliberate controlled rechallenge is generally
8  not attempted in cases where a doctor suspects
9  olmesartan enteropathy?
10         MR. PARKER:  Objection.
11     A.  I know it's written in the articles.
12 BY MR. SLATER:
13     Q.  Have you ever -- well, rephrase.
14         And what is written in the articles?
15     A.  Because of the symptomatology
16 associated and the desire not to reinduce that.
17     Q.  Because the doctors have documented in
18 the peer-reviewed literature that they think
19 it's too dangerous to deliberately rechallenge
20 in those cases, right?
21     A.  I don't know if dangerous is the word
22 they use, but they don't want to rechallenge,
23 and as a patient I would agree.
24     Q.  Due to the severity of the symptoms,

Page 207

1  for example, the doctors at the Mayo Clinic did
2  not deliberately rechallenge, correct?
3      A.  Let me check the terminology they
4  used.  I'm missing one.  Do we know where the
5  Rubio-Tapia paper went?
6          MR. PARKER:  I didn't take it, so I
7  can't tell you.
8  BY MR. SLATER:
9      Q.  I'll tell you where it is, Doctor.
10 Have you got the article?
11     A.  No, I can't find the article.  That's
12 what I'm looking for.
13     Q.  I'll read it to you.  If you want to
14 save time, I'll read it to you, and you can tell
15 me if you trust me.
16     A.  I'll agree with you that to my best
17 recollection that's the terminology they use.
18 Not dangerous, but severe.
19     Q.  I'm going to read to you from Page 735
20 of the Rubio-Tapia article.  It says, "No
21 deliberate rechallenge test with olmesartan was
22 undertaken because of the life-threatening
23 nature of the syndrome, although two patients
24 reported anecdotally that their symptoms had

Page 208

1  worsened when they restarted olmesartan before
2  the potential association was recognized, and
3  two patients experienced improvement when
4  olmesartan was stopped when they were
5  hospitalized (for dehydration and hypotension)
6  and worsened in the weeks following discharge
7  and reintroduction of olmesartan."
8          Is that your understanding of what
9  that article says?  I just read it to you.  You
10 can double check if you want.
11     A.  I think it's really telling actually,
12 because only two patients -- it's telling you if
13 you read their previous paper, too, that only
14 two of eight patients responded to olmesartan
15 withdrawal, but only the ones who improved were
16 included in the study.  It creates a whole lot
17 of confusion.
18     Q.  Actually what they wanted to do was
19 announced that they had found a new entity and
20 wanted to give to the medical community the
21 clearest picture they could give in introducing
22 this to the medical community.  That's a
23 reasonable thing for researchers to do, right?
24     A.  I think it's reasonable to announce a

Page 209

1  potential association, and that's what they did.
2  I don't think they believed that they had
3  discovered a definitive new entity.  I think
4  their terminology is very clear on that.  And I
5  think if you go back and read their collagenous
6  sprue paper you'll find that they had eight
7  patients there taking olmesartan, then they went
8  back and put these two papers together, they
9  then went back and told all those patients to
10 stop taking olmesartan.  Only two were included
11 in the proceedings paper, which implies that six
12 didn't do better.
13         MR. SLATER:  Move to strike.  It's not
14 responsive.
15     Q.  Doctor, I understand you want to talk
16 about certain things, and with all due respect
17 you don't have your numbers right, but I'd like
18 to try to stick to my questions.
19     A.  With all due respect, I think my
20 numbers are exactly right, and we can go through
21 the papers if you'd like.
22     Q.  Well, let's do this first.
23         Will you agree with me that those
24 physicians and researchers who were actually

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 210

1  considered to be authorities in this field with
2  regard to celiac disease and related disorders,
3  that they accept that olmesartan causes
4  sprue-like enteropathy in some group of
5  patients?
6      MR. PARKER:  Objection.
7      A.  Again, let's parse that out.  I think
8  that people who are experts in celiac disease
9  would agree that there's an association between
10 olmesartan and enteropathy in some patients.
11     Does that answer your question?
12 BY MR. SLATER:
13     Q.  Well, it doesn't, but I'll start
14 there.
15     The question is, those experts believe
16 that olmesartan does cause sprue-like
17 enteropathy, or otherwise known as
18 olmesartan-associated enteropathy, in some
19 number of patients?
20     MR. PARKER:  Objection.
21 BY MR. SLATER:
22     Q.  That's what the prevailing wisdom is
23 among the experts with regard to this question,
24 correct?

Page 211

1      MR. PARKER:  Objection.
2      A.  I would say I think if they thought
3  that, they wouldn't continue to use the term
4  associated.  They would say induced.
5  BY MR. SLATER:
6      Q.  Let's look at the Cartee and Murray
7  article.  Do you have that handy?
8      A.  Yeah.  Do you want to pull your copy
9  so it becomes an exhibit?
10     Q.  I don't know if we sent one up,
11 because we figured you'd have all the
12 literature.
13     MR. PARKER:  We've got it if you want
14 to ask questions.
15     A.  I have it.
16 BY MR. SLATER:
17     Q.  Okay.  You're familiar with this
18 article, correct?
19     A.  Yes, I am.
20     Q.  It was authored by Dr. Murray and
21 Dr. Cartee, correct?
22     A.  Correct.
23     Q.  And let's look to the question you
24 just raised.  Go to the -- to Page 4 of 8 on

Page 212

1  Page 420, there's a heading that says
2  "Hypothesized Mechanism."
3      A.  Yes.
4      Q.  Right under that heading it says, "The
5  damage induced by olmesartan is a chronic
6  inflammatory change similar, but not identical,
7  to celiac disease."
8      Do you see what I just read?
9      A.  I do.
10     Q.  So that's Dr. Murray and his co-author
11 saying that olmesartan causes a chronic
12 inflammatory change similar, but not identical,
13 to celiac disease?  That's what that sentence
14 means, correct?
15     A.  That's the implication.
16     Q.  Go to the next page, Page 5 of 8,
17 under "Discussion."  It says, "The recently
18 recognized syndrome of OAE initially reported in
19 case series and several case reports is indeed
20 quite rare.  The syndrome as reported is
21 clinically severe and may be life-threatening."
22     Do you see what I just read?
23     A.  Yes.
24     Q.  So even though they're using the term

Page 213

1  OAE in that sentence, they're clearly stating
2  they believe this syndrome exists, and that it
3  is clinically severe and may be life-threatening
4  when it happens to patients, correct?
5      A.  They're saying -- they're giving it a
6  name and saying that they believe it exists.  I
7  don't think they're saying it causes the
8  disease.
9      Q.  They're talking about a syndrome.
10     A.  Right, a syndrome.
11     Q.  Okay.  That's a clinical syndrome
12 they're talking about here, correct?
13     A.  They're talking about a clinical
14 syndrome and a drug association, not a drug
15 affect.
16     Q.  When they said "it induces a chronic
17 inflammatory change similar, but not identical,
18 to celiac disease," you agree with me that means
19 that the olmesartan causes this condition,
20 correct?
21     A.  That's under the header of
22 Hypothesized Mechanism.  Right above that they
23 comment that one of their patients that they
24 diagnosed as having, quote, OAE, then had a

Protected Information - Jerrold R. Turner, M.D., Ph.D.

Page 214

1 positive tTG and did better on a gluten-free
2 diet. So this paper actually documents how
3 unreliable that diagnosis can be.
4    Q. Let's give you that for argument sake,
5 that the diagnosis in some patients may be
6 unreliable. You agree with me that in some
7 patients the diagnosis is very reliable,
8 correct?
9    A. No.
10    Q. You don't think the diagnosis of
11 olmesartan causing a patient's gastrointestinal
12 syndrome of sprue-like enteropathy is a reliable
13 diagnosis in any case that's ever been reported
14 in the literature?
15    A. I haven't seen a case that has met
16 scientific rigor of causation.
17    Q. And that's because it didn't come out
18 of a blinded RCT, is that what you're testifying
19 to?
20    A. That's because it lacks everything
21 that you expect in something that shows
22 causation. A blinded RCT isn't the only way to
23 show that. But there's nothing here that shows
24 that, other than the anecdotal case reports and

Page 215

1 coincident disappearance or reappearance of
2 vaguely described symptoms. There's really
3 nothing rigorous here.
4    Q. Do you think that these researchers
5 like Dr. Murray and the others who have written
6 about what they found with their own patients
7 where they were able to determine that
8 olmesartan was causing the sprue-like
9 enteropathy, do you think they're all wrong and
10 you're right? Is that your testimony for this
11 jury?
12    A. No, I think they're being very careful
13 to state it like it is. They found an
14 association. But if you go back, they're also
15 on -- they're also on case-control studies which
16 are not as good as randomized controls, but here
17 at least you know everybody in your case group
18 fits your definition, and they couldn't find any
19 evidence there either.
20       So if you're just basing your
21 conclusions on isolated case reports, I don't
22 care if you have 1,000 of them, case reports
23 that are anecdotal and not properly worked up
24 for that sort of detail can't prove causation.

Page 216

1 That's all that's here is case reports.
2    Q. There's not only isolated case
3 reports, are there, Doctor?
4    A. There's just case reports and small
5 series of 10, 20 patients.
6    Q. What would you like to do to prove
7 this? Would you like to see somebody actually
8 structure a randomized controlled trial to study
9 this question?
10    A. You could do that. You could do
11 animal studies. You could do case control
12 studies. You could do controlled
13 dechallenge/rechallenge. There's a lot of
14 things you could do. None of it has been done
15 -- well, some of it has been done. To the
16 extent it's been done, none of it has shown a
17 clear causation.
18    Q. Okay. Let's start with RCTs.
19       Who is going to -- how many patients
20 would you need to put into an RCT to study
21 whether or not patients get sprue-like
22 enteropathy from the use of olmesartan? You
23 have no idea how many patients you'd need,
24 right?

Page 217

1    A. I don't know how many patients you'd
2 need.
3    Q. If anybody -- rephrase.
4       Okay. You don't know what the cost of
5 that study would be, right?
6    A. No, I don't.
7    Q. Okay. Tell me the study that Daiichi
8 -- I'm going to withdraw that actually. We
9 don't need to go there.
10       The Cartee article, I want to go
11 through a little bit of detail with you on this
12 before I lose track of it. This article is not
13 talking about the 22 Rubio-Tapia patients, it's
14 talking about a broader spectrum of patients,
15 correct?
16    A. I believe so. I'm not sure that the
17 Rubio-Tapia -- I think the Rubio-Tapia patients
18 are probably included in here. This is more of
19 a review conversational paper than a database
20 paper.
21    Q. Go to Page 58, please, the right
22 column, the second full paragraph, it says,
23 "Recognition of OAE as a clinical entity reminds
24 us of several key lessons in caring for