# EXHIBIT 1

Protected Information - Keith T. Wilson, M.D.

Page 114

1  whether a study supports an association or not.
2  I'm not looking to go into an interpretation. My
3  question is very simple.
4      Is there any article you can
5  point to where the authors conclude unequivocally
6  olmesartan is not associated with either
7  olmesartan-associated enteropathy, sprue-like
8  enteropathy, olmesartan-induced enteropathy,
9  however you want to name the condition? Any one
10 where the authors make that conclusion, it did
11 not associate it. Can you point to any article?
12      MR. CHRISTIAN: Objection. Form.
13      THE WITNESS: So, again, just
14      because they choose to write something
15      doesn't mean that that's what their
16      article showed. Their article showed
17      that there was no association when the
18      data were considered --
19 BY MR. SLATER:
20   Q.   Move to strike.
21   A.   -- in an unbiased manner.
22   Q.   Move to strike.
23      Doctor, it's a really simple
24 question.

Page 115

1      Is there any article you can
2  point to where that is the explicit conclusion in
3  the article?
4   A.   Well, I think Greywoode does come
5  to that conclusion.
6   Q.   Okay. Any others?
7      Well, rephrase.
8      So you think Greywoode concludes
9  unequivocally there's no association, even though
10 they say that this sprue-like enteropathy
11 recently associated is a rare event, and even
12 though they say olmesartan causes severe
13 sprue-like enteropathy; right? That's what
14 you're telling the jury and the judge; right?
15      MR. CHRISTIAN: Objection. Form.
16      THE WITNESS: I'm saying that a
17      key point to interpreting literature is
18      to have access to the data within the
19      paper and to be able to form your own
20      conclusion, and my interpretation of
21      their data is crystal clear. That there
22      was no association in that study.
23 BY MR. SLATER:
24   Q.   Okay. All right. Move to

Page 116

1  strike.
2      Doctor, let's -- let's try to get
3  on the same page because it's -- I realize what
4  you're trying to do, but it's starting to
5  obstruct my time.
6      I am not asking you to interpret
7  the data and tell me your opinion about whether
8  the data supports an association or not. So I
9  would appreciate it if you would stop answering
10 the questions as if that's what I'm asking. It's
11 a very simple question.
12      Is there any article where
13 there's an explicit conclusion by the authors
14 that olmesartan is not associated with sprue-like
15 enteropathy, olmesartan-associated enteropathy,
16 or any other way you would describe that
17 condition? Is there any article that makes that
18 explicit conclusion; yes or no?
19      MR. CHRISTIAN: Objection. Form.
20      THE WITNESS: So my concern is
21      that for reasons that are not clear to me
22      that authors that are providing data, as
23      was also seen in the Lagana study that
24      are also completely negative, are feeling

Page 117

1  compelled to keep referring back to these
2  case series. So they're -- they're sort
3  of dampening down the evidence from their
4  own study for reasons that I don't
5  understand.
6      So I don't think anybody wrote
7  that there was no association because of
8  the Mayo case series. However, the
9  Lagana study is also a negative study.
10 BY MR. SLATER:
11   Q.   Move to strike.
12      Is the answer no, there's no such
13 article you can point to?
14   A.   I'm not aware of any article
15 where the only conclusion, the only thing that
16 was stated at the end of the article was that
17 there's no association.
18   Q.   You're not aware of any article
19 that actually reached the conclusion and said
20 explicitly there is no association; correct?
21      MR. CHRISTIAN: Objection. Form.
22      THE WITNESS: How about if I read
23      you this sentence from Lagana in the
24      abstract:

Protected Information - Keith T. Wilson, M.D.

Page 118

1  "There were no statistically
2  significant differences between
3  olmesartan users with abdominal pain and
4  controls for any single histopathological
5  abnormality."
6  BY MR. SLATER:
7  Q.   Okay.  Move to strike as
8  nonresponsive.
9  I'm correct that there's no
10 article where the authors conclude there is no
11 association; correct?
12 MR. CHRISTIAN:  Objection.  Form.
13 THE WITNESS:  I'm going to look
14 at another one that was negative and see
15 what they wrote.
16 I guess I will say that no author
17 felt that they could safely state that,
18 even though their data suggested the
19 otherwise.
20 BY MR. SLATER:
21 Q.   Move to strike after the word
22 "that."
23 Am I correct that there is no
24 article you can point to where the authors

Page 119

1  conclude explicitly and unequivocally olmesartan
2  does not cause sprue-like enteropathy,
3  olmesartan-associated enteropathy, or any other
4  term you would use to cause that condition?
5  There's no other such article that draws that
6  conclusion; correct?
7  MR. CHRISTIAN:  Objection.  Form.
8  THE WITNESS:  Well, I think we
9  have to agree to disagree because I think
10 I've already answered that question.
11 BY MR. SLATER:
12 Q.   Well, this was a question about
13 causation as opposed to association.
14 So with regard to the word
15 "causation," there's no article you can point to
16 that reaches that conclusion; correct?
17 MR. CHRISTIAN:  Objection.  Form.
18 THE WITNESS:  I just cited two
19 articles that I think support that
20 conclusion.
21 BY MR. SLATER:
22 Q.   Let's look at -- well, rephrase.
23 One of the articles is Greywoode
24 where they say in the conclusion that olmesartan

Page 120

1  causes severe like sprue-like enteropathy.
2  That's one of the ones you're relying on; right?
3  MR. CHRISTIAN:  Objection.  Form.
4  BY MR. SLATER:
5  Q.   It's a yes or no question.
6  Correct?
7  MR. CHRISTIAN:  Objection.  Form.
8  MR. SLATER:  (Laugh).
9  THE WITNESS:  (Reviewing
10 document).
11 I mean, you're getting really
12 down to technicalities because the
13 conclusion of the Greywoode paper is
14 talking about a recent association, and
15 then they're saying future studies should
16 focus on the mechanisms, but I don't
17 think that that means that they think it
18 causes it.
19 BY MR. SLATER:
20 Q.   Actually, Doctor, your testimony
21 for this jury is that the Greywoode article
22 concludes there's no causal relationship between
23 olmesartan and sprue-like enteropathy, even
24 though in the conclusion the authors say future

Page 121

1  studies should focus on the mechanisms by which
2  olmesartan causes severe like -- severe
3  sprue-like enteropathy ; correct?
4  It's a yes or no.  That's
5  correct; right?  That's what you're telling this
6  jury?
7  MR. CHRISTIAN:  Objection.  Form.
8  THE WITNESS:  What is correct?
9  BY MR. SLATER:
10 Q.   You didn't understand my
11 question?
12 A.   It was too long.  Could you just
13 break it down?
14 Q.   Let's break it down?  Okay.  I'm
15 going to break it down.
16 You're telling the jury that the
17 Greywoode article concludes that olmesartan does
18 not cause sprue-like enteropathy, even though in
19 the conclusion they say that future studies
20 should focus on the mechanisms by which
21 olmesartan causes severe sprue-like enteropathy;
22 correct?
23 MR. CHRISTIAN:  Objection.  Form.
24 THE WITNESS:  So what I said was,

Protected Information - Keith T. Wilson, M.D.

Page 122

1  their data presented in that article do
2  not support an association or a
3  causation.  I can't speculate as to what
4  compelled them to write that sentence
5  that refers back to case series.
6  BY MR. SLATER:
7      Q.   Okay.  Move to strike.
8          The answer is -- well, rephrase.
9          My question is not predicated on
10 you interpreting the validity of what people said
11 or what you would have said in a conclusion based
12 on the data you read.
13         You understand that; right?  I'm
14 not asking you to interpret the data for this
15 question.  Do you understand that?
16         MR. CHRISTIAN:  Objection.
17         THE WITNESS:  I don't agree with
18     your question asking me to do that.
19         Can't hear you.
20 BY MR. SLATER:
21     Q.   If we can't get done in seven
22 hours, you've been evading these questions for so
23 long, I'm going to ask for more time.  So let's
24 try to stick to my questions instead of you

Page 123

1  telling me you're talking points about not
2  agreeing.  We already know what you agree or
3  don't agree with.
4          So I'm going to try to go through
5  my questions now and ask you to actually try to
6  answer them directly.
7          MR. CHRISTIAN:  Objection, Adam.
8  BY MR. SLATER:
9      Q.   So I'll ask the question again.
10         MR. CHRISTIAN:  He's been
11     answering the questions appropriately.
12         MR. SLATER:  No, he hasn't, and
13     when you suggest that, it's misleading
14     and it's disingenuous because he hasn't
15     been.
16         MR. CHRISTIAN:  I disagree.
17         MR. SLATER:  My questions are
18     very clear.  I keep asking him not to do
19     interpretation, and he keeps doing it.
20     He's wasting my time and he's dragging
21     this deposition out, okay?
22         MR. CHRISTIAN:  Let's just ask
23     your question.  Move on.
24 BY MR. SLATER:

Page 124

1      Q.   So here's the question, Doctor.
2  Focus.  Here's the question.
3          MR. CHRISTIAN:  Objection.
4  BY MR. SLATER:
5      Q.   Is there any article where the
6  authors write the words "olmesartan does not
7  cause sprue-like enteropathy, olmesartan
8  enteropathy" or however they might characterize
9  that condition, where there's an explicit
10 conclusion it doesn't cause this condition?  Is
11 there any article that says that?
12     A.   Not --
13         MR. CHRISTIAN:  Objection. Form.
14         THE WITNESS:  Not to my
15     knowledge.
16 BY MR. SLATER:
17     Q.   I want to be very clear for the
18 jury.
19         Do you think that
20 olmesartan-associated enteropathy, by whatever
21 label you want to put on it, should be evaluated
22 as a drug allergy in determining whether there's
23 causation or not; yes or no?
24     A.   I'd say no.  I said no.

Page 125

1      Q.   You say that diarrhea -- this is
2  number 3 of your comments on the Rubio-Tapia
3  article -- that diarrhea was noted to have been a
4  symptom for a median of 19.2 months; right?
5      A.   Correct.
6      Q.   Based on that, so this was
7  generally not a syndrome of rapid onset in the
8  majority of patients.
9          That's what you wrote; right?
10     A.   Yes.
11     Q.   Okay.  The duration for which the
12 symptom exists does not tell us whether it was a
13 syndrome of rapid onset; correct?
14     A.   I don't think I understand that
15 question.
16     Q.   There can be a condition where
17 there's a rapid onset where the patient can point
18 to that's when I got sick, that's when the
19 diarrhea got really bad, that's -- that's when
20 I -- when it hit me, and then the condition can
21 last for 19 or 20 months.
22         So you could have rapid onset,
23 and then it could last for 20 months after that;
24 right?

Protected Information - Keith T. Wilson, M.D.

Page 126

1    A.    That was not really what was
2  described in the case series, no.
3         I was, you know, all of these
4  points I was making, I was trying to highlight,
5  simply highlight the main findings of the paper.
6  So that when I looked at other literature, since
7  this was the original paper, I could find a way
8  to put the other papers in context with this one.
9         So that's just basically what
10 they said.
11    Q.    Okay.  Well, if I want to
12 understand your methodology and reasoning, we can
13 go through this and see what you think; right?
14    A.    Sure.
15    Q.    This teaches us your thinking;
16 right?
17    A.    Okay.
18    Q.    And to the extent that you said
19 things in here that are un -- that are incorrect
20 or unsupportable, that could undercut the
21 opinions you formed in this case; correct?
22       MR. CHRISTIAN: Objection. Form.
23       THE WITNESS:  I don't see how in
24    any way me listing the median number of

Page 127

1     months could be unsupportable.  That's --
2     that's what they wrote in the paper.
3  BY MR. SLATER:
4     Q.    Well, that's going to be for
5  someone else to decide who's a fact-finder in
6  this case, but the fact is, if you made mistakes
7  or made assumptions that are not factually
8  accurate, that could undercut the opinions that
9  you formed based on those assumptions; right?
10       MR. CHRISTIAN: Objection. Form.
11       THE WITNESS:  Sure.
12 BY MR. SLATER:
13    Q.    Well, let's look at this, and
14 I'll ask you this question.
15       Actually, let me ask you this.
16       Are you aware of whether most
17 patients who are diagnosed with
18 olmesartan-associated enteropathy can pinpoint
19 the point in time when they felt that they got
20 very sick and they can say yes, this is when I
21 became ill?
22       MR. CHRISTIAN: Objection. Form.
23       THE WITNESS:  So I -- as I
24    mentioned before, I reviewed two of the

Page 128

1     plaintiff cases, and that's exactly what
2     happened.
3  BY MR. SLATER:
4     Q.    Okay.  And just to be clear,
5  you've reviewed two cases.  Those are the only
6  two cases of potential olmesartan-associated
7  enteropathy you've ever reviewed in your life;
8  correct?
9     A.    Well, other than these papers
10 where they are summarizing 22 cases and then
11 other reports where they're summarizing cases.
12 So that's a modest amount of information.  It's
13 not the same as reading a four-inch chart, but
14 it's some interest in knowing about the cases.
15    Q.    You'll agree with me then that
16 patients with olmesartan-associated enteropathy
17 where it's diagnosed, most of those patients can
18 actually identify when they had the onset.  They
19 can say, this is when the onset of the disease
20 occurred acutely.  They can remember what
21 occurred; right?
22       MR. CHRISTIAN: Objection. Form.
23       THE WITNESS:  I can't really say.
24    I can only talk about the two cases where

Page 129

1     there seemed to be a pretty good sense of
2     them.
3  BY MR. SLATER:
4     Q.    So you don't know the answer to
5  that question?
6     A.    Because I don't have access to
7  all the charts from all of these patients.
8     Q.    The answer is you don't know;
9  right?
10       MR. CHRISTIAN: Objection. Form.
11       THE WITNESS:  Can you --
12 BY MR. SLATER:
13    Q.    I'm sorry.  I couldn't hear you.
14    A.    Could you restate the question?
15    Q.    You don't have an opinion one way
16 or another as to whether patients can pinpoint
17 when they got sick with this condition in terms
18 of an acute onset.  You don't have an opinion one
19 way or the other; correct?
20       MR. CHRISTIAN: Objection. Form.
21       THE WITNESS:  I suppose I don't
22    have a definitive opinion, no, because --
23    because I haven't seen the individual
24    cases here.

Protected Information - Keith T. Wilson, M.D.

Page 130

1  BY MR. SLATER:
2      Q.    Okay. In your list of
3  observations about this article in number 4, you
4  point out all the patients had weight loss;
5  right?
6      A.    Right.
7      Q.    That's a unifying feature of
8  these patients; correct?
9      A.    In this particular study.
10     Q.    Eight of the patients had their
11 stool tested, and they were found to have
12 steatorrhea; correct?
13     A.    Correct.
14     Q.    That's a sign of malabsorption;
15 correct?
16     A.    Yes.
17     Q.    You don't believe it's a
18 coincidence that all eight patients who are
19 tested actually had steatorrhea. You're not
20 thinking that's a coincidental finding, are you?
21         MR. CHRISTIAN: Objection. Form.
22         THE WITNESS: No. I'm trying to
23     lay out that in some of the patients they
24     tested it and some of them had it.

Page 131

1  BY MR. SLATER:
2      Q.    Well, every patient they tested
3  for it had this condition; right?
4      A.    But the most likely thing is, you
5  wouldn't test a patient for it if -- let's say
6  you had diarrhea and I asked you, so does your
7  stool flow? Is your stool foul smelling? Do you
8  see oil droplets in your stool? And you say no,
9  never. Then I might not think to send off a
10 fecal fat, at least in an initial assessment.
11     Q.    Move to strike.
12         Each of the eight patients who
13 were testified had this finding; correct?
14     A.    Yes.
15     Q.    At least among those eight
16 patients, that's a unifying feature; correct?
17     A.    But that's my exact point.
18 There's -- there's a bunch of other patients in
19 this study who comprise the 22. So we don't
20 know about them. So we don't know if it's a
21 unifying feature.
22     Q.    Doctor, you realize these are
23 patients who were being evaluated by the Mayo
24 Clinic where the Mayo Clinic only figured out

Page 132

1  later what had happened with these patients, and
2  then surmised that it was the olmesartan causing
3  these patients' condition.
4          They didn't know about the
5  association between olmesartan and this type of a
6  clinical presentation when they were working
7  these patients up. You know that; right?
8          MR. CHRISTIAN: Objection. Form.
9          THE WITNESS: Yes.
10 BY MR. SLATER:
11     Q.    Okay. Number 6, the serological
12 test for celiac disease IgA tissue
13 transglutaminase was negative in all patients in
14 the study; correct?
15     A.    Yes.
16     Q.    That is a unifying feature;
17 correct?
18     A.    Correct.
19     Q.    Did not have celiac disease;
20 correct?
21     A.    I didn't hear that exactly.
22     Q.    Do you agree with me that these
23 22 patients did not have celiac disease?
24     A.    That's a really interesting point

Page 133

1  that you raise because in the follow-up paper
2  from the same group, they indicated that several
3  of the patients were later discovered to have
4  celiac disease.
5      Q.    Actually, that's the
6  Cartee/Murray paper where they weren't talking
7  about the same patients; right?
8          MR. CHRISTIAN: Objection. Form.
9          THE WITNESS: The way that paper
10     is written, which is in a non-PubMed
11     journal, it's really hard to know who
12     they were talking about. I interpreted
13     it as that they were basically talking
14     about the same patients.
15 BY MR. SLATER:
16     Q.    If they weren't talking about the
17 same patients, your assumption drops out and it
18 undercuts your opinion; correct?
19     A.    Well, if they're considered the
20 experts about what this syndrome is, even if they
21 are other patients, if you now have patients that
22 you say, oh, when we worked them up, we didn't
23 think they had celiac disease but later they did,
24 then it undercuts their insinuation in this first

Protected Information - Keith T. Wilson, M.D.

Page 134

1 paper that, by definition, patients who have this
2 syndrome cannot have celiac disease.
3         Q.    Move to strike.
4               Let's come back to my original
5 question.
6               The 22 patients in this study did
7 not have celiac disease more likely than not;
8 correct?
9               MR. CHRISTIAN: Objection. Form.
10              THE WITNESS: At the time this
11       paper was submitted.
12 BY MR. SLATER:
13       Q.    So you agree with me; right?
14              MR. CHRISTIAN: Objection. Form.
15              THE WITNESS: As written in 2012,
16       yes.
17 BY MR. SLATER:
18       Q.    Would you say to a reasonable
19 degree of medical probability, even having read
20 the subsequent paper, that any of these patients
21 had celiac disease? You can't say that; right?
22       A.    I think I can say that it's my
23 interpretation of the follow-up paper that some
24 of them probably did have celiac disease.

Page 135

1        Q.    Okay. Which of the patients had
2 celiac disease based on your interpretation of
3 the subsequent paper, which we agree is not
4 talking just about these 22 patients but is
5 talking about other patients?
6               MR. CHRISTIAN: Objection. Form.
7               THE WITNESS: So it would have
8        been nice if they had included in Table 1
9        some sort of deidentified code for each
10       patient, and then it would have been nice
11       in the Martee paper if they had provided
12       actual data rather than just a free-form
13       discussion. There is no actual data
14       presented in the Martee paper -- Cartee
15       paper.
16 BY MR. SLATER:
17       Q.    Based on the data that you have
18 available, short of speculating, you can't say to
19 a reasonable degree of medical certainty that any
20 of the 22 patients had celiac disease; correct?
21              MR. CHRISTIAN: Objection. Form.
22              THE WITNESS: I'd like to take a
23       minute to look at the Cartee paper before
24       I answer that.

Page 136

1               I don't have it handy. I think
2        it's in the back here maybe.
3               (Reviewing document).
4               So to me the way I read this
5        sentence is it's more likely than not
6        that they are talking about the same
7        patients. It says -- I mean, they keep
8        citing reference 4, which is their Mayo
9        case series.
10              So they talk about repeat
11       endoscopy and follow-up and that's -- I'm
12       on -- I'm on page 4 of 8 of this article
13       on the right column.
14              They say "repeat endoscopy biopsy
15       showed histologic improvement," and they
16       refer to reference 4.
17              Then in the next paragraph:
18              "Several patients had a prolonged
19       course of symptom resolution or have yet
20       to make a complete clinical recovery.
21       Several received Infliximab and
22       budesonide. After the diagnosis and
23       treatment for OAE, several patients seen
24       at the Mayo Clinic likely had underlying

Page 137

1 clinical disease as evidenced by symptoms
2 with reinstitution of gluten into the
3 diet."
4               MR. CHRISTIAN: I think you said
5        "clinical." You see that?
6               THE WITNESS: What's that?
7               MR. CHRISTIAN: You misread. See
8        that?
9               THE WITNESS: Oh. "Several
10       patients seen at the Mayo Clinic likely
11       had underlying celiac disease as
12       evidenced by symptoms with reinstitution
13       of gluten into the diet."
14              So I thought it was implicit that
15       they were talking about the same
16       patients.
17 BY MR. SLATER:
18       Q.    So you think that the
19 Cartee/Murray article titled "Sprue-Like
20 Enteropathy Associated With Olmesartan" is
21 discussing the same 22 patients as described in
22 the Rubio-Tapia 2012 article?
23              MR. CHRISTIAN: Objection. Form.
24              THE WITNESS: It's my --

Protected Information - Keith T. Wilson, M.D.

Page 138

1  BY MR. SLATER:
2      Q.   Do you think it's identical
3  patients, patient group?
4          MR. CHRISTIAN: Objection. Form.
5          THE WITNESS: They don't specify.
6      So obviously I can't say if it's exactly
7      the same 22, but I think it's implicit
8      because they just referenced their paper
9      in the preceding sentence that I think
10     they're talking about the same patients.
11 BY MR. SLATER:
12     Q.   If you're wrong and the
13 Cartee/Murray paper is not limited to the same 22
14 patients, that undercuts your opinion; correct?
15     A.   Well, let's put it this way. I
16 think it could be that there could be some
17 additional patients, but that doesn't undercut my
18 opinion. Because if it's patient 23 and 24, it
19 just indicates the original case series was too
20 small.
21     Q.   Do you see that they actually
22 cite case reports of patients they didn't even
23 treat in this article and discuss those as well?
24     A.   Yes.

Page 139

1      Q.   Did you notice that?
2      A.   Yes.
3      Q.   Okay. It's clearly not an
4  identical group of patients; right?
5      A.   I can't answer that. I don't
6  know.
7      Q.   Discussed patients in this
8  article, the Cartee/Murray article, from case
9  reports that they didn't even treat. So it's not
10 the same 22 patients; right?
11     A.   But when they said "after the
12 diagnosis for OAE, several patients seen at the
13 Mayo Clinic," those other case series they're
14 talking about are from other locations.
15     Q.   They can be talking about other
16 patients seen at the Mayo Clinic not in the
17 original 22; right?
18     A.   Yes.
19         MR. CHRISTIAN: Objection.
20 BY MR. SLATER:
21     Q.   You don't know the answer of what
22 they're -- whether they are or they're not;
23 right?
24         MR. CHRISTIAN: Objection. Form.

Page 140

1          THE WITNESS: That's correct.
2      Can't hear you.
3  BY MR. SLATER:
4      Q.   On that, you can't say to a
5  reasonable degree of medical certainty that any
6  of the 22 original patients had celiac disease;
7  correct?
8          MR. CHRISTIAN: Objection. Form.
9          THE WITNESS: I can't say a
10     hundred percent because of the very
11     limited quality of this evidence in these
12     articles.
13 BY MR. SLATER:
14     Q.   You talk about the HLA-DQ genetic
15 testing; correct?
16     A.   Yes.
17     Q.   Number 7?
18     A.   Yes.
19     Q.   And you point out that this was
20 positive in 17 out of 21 patients; right?
21     A.   Right.
22     Q.   HLA-DQ typing would be positive
23 in 95 percent or more in celiac patients; right?
24     A.   Right.

Page 141

1      Q.   You say this "Strongly suggests
2  that some of these patients may have had a
3  genetic predisposition to an autoimmune
4  pathology"; right?
5      A.   Right.
6      Q.   That would speak to the mechanism
7  and to who's predisposed, but would not disprove
8  causality; correct?
9          MR. CHRISTIAN: Objection. Form.
10         THE WITNESS: So what I'm getting
11     at there is this idea that if it was just
12     simple causation, then you give the drug
13     and X percent of people should get the
14     syndrome regardless of any features of
15     those individuals.
16         You could walk into Norway,
17     Canada, Mexico, United States, African
18     American, Asian, white, doesn't matter.
19     You give the drug, boom, they get the
20     syndrome.
21         And what I'm trying to say here
22     is, there's some genetic predisposition,
23     but obviously I can't speculate anything
24     more than -- than that.

Protected Information - Keith T. Wilson, M.D.

Page 142

1  BY MR. SLATER:
2      Q.    People who develop celiac disease
3  have a genetic predisposition to celiac disease;
4  right?
5      A.    So I think that that's still
6  being worked out.  Because a positive HLA-DQ2 and
7  DQ8 does not mean that they have celiac disease.
8  It's just a matter of the way it's used is, if
9  those HLA typings are negative, then that is
10 considered good evidence that they don't have
11 celiac disease.  So having it doesn't rule it in.
12     Q.    You need to combine the
13 predisposition with the gluten to get celiac
14 disease; right?
15     A.    So most patients have positive
16 serologies for celiac disease, but there is this
17 entity that's referred to in a lot of this
18 literature of what people call "seronegative
19 celiac disease."
20          But most clinicians would like to
21 see a positive biopsy.  They'd like to see a
22 positive tTG.  They'd like to see the correct HLA
23 typing.  And they'd like to see a response to a
24 gluten-free diet.

Page 143

1      Q.    Seronegative celiac disease has
2  been noted in some articles -- rephrase.
3          Some patients who were diagnosed
4  with seronegative celiac disease have later been
5  reclassified as having olmesartan-associated
6  enteropathy.  That's documented in the
7  literature; correct?
8      A.    I think that's -- that may be
9  true, but I did find that to be a very difficult
10 thing to sort out in the papers.
11     Q.    Move to strike from "but"
12 forward.
13          Coming back to my point, it may
14 be that there are people with a genetic
15 predisposition that has not yet been identified
16 with regard to olmesartan, and when you combine
17 that predisposition with the introduction of
18 olmesartan, they get this condition.
19          That's possible; right?
20     A.    Yes.
21     Q.    In number 8, you talk about the
22 anemia.
23          You would agree with me that
24 normocytic normochromic anemia can occur with

Page 144

1  villous atrophy; correct?
2      A.    I tend to think of the classic
3  presentation of villous atrophy associated with
4  celiac disease as an iron-deficiency anemia.
5      Q.    And that can occur with celiac
6  disease; right?
7      A.    So that would be a microcytic
8  anemia with a low iron state.  So what -- what
9  the word "normocytic" means that the size -- the
10 average size of the red cell is normal, but in
11 iron-deficiency anemia, the red cells get
12 smaller.  And normochromic means that a color
13 measurement is normal.
14          So, yeah, patients can have a
15 normocytic normochromic anemia and that's --
16 that's more typical what we call "anemia of
17 chronic disease."
18          Unfortunately, there was -- I
19 don't recall any statement in here of iron or
20 ferritin level in these patients, which would
21 have been helpful, but one of the strong
22 indicators for upper endoscopy to rule out celiac
23 is, we routinely do that in people who have
24 iron-deficiency anemia.  That's a big part of our

Page 145

1  clinical practice is working that up.
2          So I just commented on it here
3  because I found it surprising.
4      Q.    It doesn't rule anything out,
5  though; right?
6      A.    I don't think so.
7      Q.    Number 9 you talk about 10 of 22
8  patients having hypoalbuminemia?
9      A.    Correct.
10     Q.    Indicative of protein loss or
11 malnutrition; right?
12     A.    Correct.
13     Q.    And then you point out that the
14 other cases didn't have it, suggesting a highly
15 variable case presentation; right?
16     A.    Correct.
17     Q.    The fact that there can be a
18 highly variable presentation doesn't mean that
19 the condition doesn't exist; right?
20     A.    It doesn't, but, again, if I were
21 to ask you at the end of you going through all of
22 this just for this one case series to define the
23 condition, you wouldn't be able to include
24 iron-deficiency anemia, you wouldn't be able to

Protected Information - Keith T. Wilson, M.D.

Page 146

1  include steatorrhea, you wouldn't be able to
2  include hypoalbuminemia, which are all signs of
3  malabsorption.
4      So to say it's definitely a
5  syndrome that causes malabsorption, I would not
6  be able to say that that's a written-in-stone
7  component of the syndrome.  I was trying to
8  explain that it's very hard to describe what the
9  syndrome is.
10     Q.   Well, one could have
11  malabsorption and not have to have
12  hypoalbuminemia.  They could have malabsorption
13  without steatorrhea; right?
14     A.   I suppose, but it's hard for me
15  to conceptualize substantial destruction of a
16  epithelium in the small bowel and not present
17  with some of those findings.
18     Q.   I know you didn't consider the
19  analogy to celiac, but in celiac, the
20  presentations can be highly variable; correct?
21     A.   Correct.
22     Q.   Let's look at number 10, small
23  bowel bacterial overgrowth.
24          First of all, you say that -- let

Page 147

1  me -- new question.
2          Number 10 you say small bowel
3  bacterial overgrowth was detected in 12 out of 22
4  patients; right?
5     A.   Correct.
6     Q.   You acknowledge in the next
7  sentence this could be secondary to a damaged
8  small intestine; correct?
9     A.   Correct.
10    Q.   You then analyze it a little
11  further and say:
12         "This suggests that other factors
13  could have caused disease in these patients and
14  further supports that the olmesartan use is an
15  association and not a pure cause and effect."
16         That's what you state; right?
17    A.   Right.
18    Q.   Okay.  And those are your words
19  that this evidence supports that olmesartan is an
20  association, not a pure cause and effect, and
21  that's your view here; correct?
22    A.   Correct.
23         MR. CHRISTIAN:  Adam, we have
24  about 10 minutes left.

Page 148

1  BY MR. SLATER:
2     Q.   Are you familiar with --
3          MR. CHRISTIAN:  We just have 10
4  minutes left.
5          MR. SLATER:  I'm sorry?
6          MR. CHRISTIAN:  I'm just letting
7  you know that we have 10 minutes left on
8  the tape.
9          MR. SLATER:  Okay.  Thank you.
10 BY MR. SLATER:
11    Q.   Give me one second.
12         On page 737 of the Rubio-Tapia
13  article, the top right corner, the authors point
14  out:
15         "Finding small bowel bacterial
16  overgrowth in 12 patients is intriguing and
17  consistent with prior observations of association
18  of small bowel bacterial overgrowth and
19  enteropathy in symptomatic patients with celiac
20  disease."
21         You don't disagree with that
22  statement; correct?
23    A.   No, I don't.
24    Q.   And then further down they say:

Page 149

1          "In this series, the lack of
2  clinical response to oral antibiotics suggests
3  that gastrointestinal symptoms are not explained
4  by the effects of an increased number of bacteria
5  in the small bowel."
6          And you don't disagree with that
7  statement, do you?
8     A.   So the word "suggest" is not as
9  strong as saying indicate.  So it's a suggestion.
10  It's a piece of information, but it doesn't -- it
11  doesn't disprove the notion that this overgrowth
12  is going on and could be contributing to the
13  condition.
14    Q.   Move to strike from "but"
15  forward.
16         The fact that there was no
17  clinical response to oral antibiotics would cut
18  against that bacterial condition being the cause
19  of the gastrointestinal symptoms; correct?
20    A.   So I'm not trying to say it's the
21  only cause.  I'm just saying it could be an
22  exacerbating factor, and clinicians know that
23  treating small intestinal bacterial overgrowth is
24  a daunting task.  Some patients struggle with

Protected Information - Keith T. Wilson, M.D.

Page 150

1  this for years and go through all different
2  rounds of antibiotics, and it's very difficult to
3  just eradicate it because we're not even sure if
4  we're treating a pathogen or if we're just
5  treating normal bacteria.  It's actually quite a
6  confusing entity.
7       Q.    So it's possible that the
8  patients who were found to have this finding
9  developed the condition in their small intestine
10  as described in the article, including the
11  villous atrophy and the inflammation, and as a
12  consequence or secondary to that, developed small
13  bowel overgrowth.  That's possible; right?
14      A.    Yes, but it's also possible they
15  had some other condition that predisposed them to
16  bacterial overgrowth and they just happened to be
17  taking olmesartan.
18      Q.    Move to strike from "but"
19  forward.
20           As you sit here now, for the 22
21  patients in the Rubio-Tapia article, you don't
22  have an opinion to a reasonable degree of medical
23  certainty that they have a diagnosis other than
24  olmesartan-associated enteropathy; correct?

Page 151

1           You don't have an alternate
2  diagnosis to a reasonable degree of medical
3  certainty for any of these patients; correct?
4           MR. CHRISTIAN: Objection. Form.
5           THE WITNESS:  Well, as I
6  indicated before, I do feel that their
7  follow-up article calls into question
8  some of the conclusions of this study,
9  but I haven't had the opportunity to know
10  anymore than what's in these two
11  articles.  I don't have access to patient
12  identifiers or to discussions with the
13  authors.
14  BY MR. SLATER:
15      Q.    Move to strike.
16           As you sit here now, you're not
17  giving an opinion to a reasonable degree of
18  medical certainty as to an alternative diagnosis
19  other than olmesartan-associated enteropathy as
20  the cause of these patients -- these 22 patients'
21  clinical presentation; correct?
22           MR. CHRISTIAN: Objection. Form.
23           THE WITNESS:  I don't have enough
24  information to give an alternative

Page 152

1      explanation.
2  BY MR. SLATER:
3      Q.    You comment on, in number 11, the
4  evidence of collagen deposition in 7 of the 22
5  patients?
6      A.    Right.
7      Q.    Right?
8      A.    Yes.
9      Q.    The literature talks about a
10  spectrum of clinical and histopathologic
11  findings; correct?
12      A.    In what condition?
13      Q.    The findings on biopsy.
14      A.    In general or in this?
15      Q.    The spectrum reported in the
16  literature for this condition; correct?
17      A.    Yes.
18      Q.    Okay.  There's a spectrum of
19  histopathologic findings with people with celiac
20  disease; correct?
21      A.    Correct.
22      Q.    Let's go to number 13, the
23  colonoscopies that you said were done on 13 of 22
24  patients.

Page 153

1      A.    Yes.
2      Q.    First of all, these were patients
3  that were given colonoscopies or endoscopies as
4  part of clinical decision-making by doctors who
5  were trying to help these patients in a clinical
6  setting; correct?
7      A.    Correct.
8      Q.    You point out that there were 7
9  patients who were found to have microscopic
10  colitis if we look at the table, Table 2;
11  correct?
12      A.    Correct.
13      Q.    You say in your report, and
14  putting aside the difference between 7 or 5
15  patients, that in the text of the article it is
16  stated that those patients who had microscopic
17  colitis, presumably meaning there was no
18  endoscopic evidence of disease.
19           That's what you state; correct?
20      A.    Yes.  I had to write that because
21  they didn't define for them what the term
22  "microscopic colitis" meant.  I had to assume
23  that's what it means.
24      Q.    Move to strike after "yes."

Protected Information - Keith T. Wilson, M.D.

Page 154

1    You're not suggesting that
2  endoscopies weren't done on those 7 patients, are
3  you?
4    A.    No, I'm not.
5        MR. CHRISTIAN:  Objection.  Form.
6  BY MR. SLATER:
7    Q.    Single one of those patients who
8  was found to have colitis was also found to have
9  disease on endoscopy with either partial or, in
10 most cases, total villous atrophy; correct?
11   A.    You cut out at the beginning of
12 the question.  I didn't hear it exactly.
13   Q.    For all 7 of the patients on
14 Table 2 who were found to have colitis, every one
15 of them was found to have either partial or, in
16 most cases, total villous atrophy on endoscopy;
17 correct?
18   A.    Yes.
19       MS. WADHWANI:  Adam, sorry to
20 interrupt.  There's only two minutes of
21 tape time left.
22       MR. SLATER:  All right.  Let's
23 break.
24       THE VIDEOGRAPHER:  Time now is

Page 155

1    12:14.  We are going off the record.
2  This is the end of Disk No. 2.
3        (Whereupon, at 12:14 p.m., a
4  luncheon recess was taken.)
5

Page 156

1        AFTERNOON SESSION
2          (12:55 p.m.)
3        KEITH T. WILSON, MD
4  called for continued examination and, having
5  been previously duly sworn, was examined and
6  testified further as follows:
7        EXAMINATION (CONTINUED)
8        THE VIDEOGRAPHER:  Time now is
9    12:55.  We are back on the record.  This
10   is the beginning of Disk No. 3.
11 BY MR. SLATER:
12   Q.    Okay, Doctor.  I'm looking at
13 your report, page 3, number 14, and I want to ask
14 a couple questions about some of the things you
15 point out.
16       First of all, you're referring to
17 with the article where they talk about the fact
18 that some therapies that had been used with the
19 patients before they came to the Mayo Clinic did
20 not apparently benefit them; right?
21   A.    Correct.
22   Q.    And, for example, if you look at
23 page 735 of the study?
24   A.    Yes.

Page 157

1    Q.    It talks about the fact that 20
2  of the patients were on a gluten-free diet for
3  months and didn't have any apparent clinical
4  benefit; right?
5    A.    Correct.
6    Q.    And then it talks about the fact
7  that steroids were used with 20 of the patients,
8  and they apparently didn't have apparent clinical
9  benefit; correct?
10   A.    Correct.
11   Q.    And then it points out in the
12 next paragraph:
13       "Clinical response was observed
14 in all 22 patients after suspension of
15 olmesartan."
16       Correct?
17   A.    That's what is stated, but that's
18 not a result, considering that in the patient
19 methodology section, they stated that they only
20 included patients who had improved off of
21 olmesartan.
22   Q.    Move to strike the tail end of
23 that answer.
24       The patients in this study, all

Protected Information - Keith T. Wilson, M.D.

Page 158

1  22, had a clinical response when they stopped
2  taking olmesartan; correct?
3      A.   Yes.
4      Q.   That's what is documented in this
5  study; correct?
6      A.   Correct.
7      Q.   And, again, these were patients
8  who were clinical patients who were not able to
9  be successfully treated, and it was only looking
10 back and figuring out the connection to
11 olmesartan that was the unifying feature, that
12 they got better when they got off olmesartan;
13 right?
14     A.   That's what they stated.
15     Q.   The fact that all 22 patients had
16 a clinical response to stopping olmesartan, that
17 is -- that's important evidence; right?
18     A.   It is, except for the fact that
19 it's circular reasoning because in order to be
20 included in the study, they had to have improved
21 off of olmesartan.  So they're not telling us how
22 many people they saw with complex presentations
23 that were negative for celiac disease that
24 actually had this condition.

Page 159

1      Q.   Move to strike after "it is."
2      These patients, it says, didn't
3  need other medications to control their symptoms,
4  that the clinical response was achieved just by
5  suspending the drug.  That's what it says; right?
6      A.   Right.
7      Q.   That is -- that's referred to as
8  a positive dechallenge, meaning the drug was
9  stopped and the symptoms went away.  That's what
10 a dechallenge is when it's positive; right?
11     A.   That's not what was done here.
12 This is just a retrospective story talking about
13 all different patients, and there's no -- there's
14 nothing systematic here.  There's no protocol for
15 dechallenge.
16     Q.   So this study you don't -- you
17 don't weigh this study at all because it was not
18 a systematic controlled study.
19     Do you think that this study
20 should not be considered?
21     A.   No, I weigh it.  I think it
22 should be considered.
23     Q.   The fact that these patients
24 recovered and had clinical responses to getting

Page 160

1  off the drug, that is significant evidence that
2  weighs towards causation; correct?
3          MR. CHRISTIAN:  Objection.  Form.
4          THE WITNESS:  Well, they didn't
5      write that.  They just said that this
6      study did not show causation.  They
7      specifically and explicitly stated that
8      they had not shown causation, that they
9      had shown an association.
10 BY MR. SLATER:
11     Q.   Move to strike.
12     First of all, Doctor, we'll get
13 to that, but that's not what they say.  We'll get
14 there, but we both know that's not what it says,
15 but we'll get there in a minute.
16         MR. CHRISTIAN:  Objection.  Form.
17 BY MR. SLATER:
18     Q.   I promise.
19     One of the Bradford Hill criteria
20 is cessation of exposure; right?
21     A.   Yes.
22     Q.   When the person -- rephrase.
23     When these patients stopped
24 taking the drug and got better, that fits with

Page 161

1  cessation of exposure; correct?
2      A.   In the most simplistic
3  interpretation.  However, this was not a
4  controlled study in any form.
5      Q.   Assuming that those 22 patients
6  actually stopped taking olmesartan and their
7  clinical condition responded to that, as reported
8  in the study, assuming that to be true, that is
9  significant evidence of causation and fits within
10 the Bradford Hill criteria for cessation of
11 exposure; correct?
12         MR. CHRISTIAN:  Objection.  Form.
13         THE WITNESS:  No, I don't agree
14      because it's -- it was not a controlled
15      study, as I stated.
16 BY MR. SLATER:
17     Q.   So you completely throw aside the
18 fact that all 22 patients are reported to have
19 had a clinical response to ceasing the drug
20 because this was not a controlled study?
21     Is that your testimony and that's
22 the standard methodology you're applying here?
23         MR. CHRISTIAN:  Objection.  Form.
24         THE WITNESS:  I don't completely

Protected Information - Keith T. Wilson, M.D.

Page 162

1  throw it aside. I said their conclusions
2  need to be tempered with skepticism
3  because we know from their 2010 paper
4  that there were other patients that were
5  on olmesartan that didn't get better with
6  discontinuation of the drug.
7  BY MR. SLATER:
8      Q.   With regard to the 22 patients --
9  well, one second. Move to strike.
10          With regard to the 22 patients
11  that are discussed in this article, if it's true
12  that they got off the drug and had a clinical
13  response to that, that fits the cessation of
14  exposure Bradford Hill criteria and would be
15  substantial, significant evidence of causation,
16  if it's accurate; correct?
17          MR. CHRISTIAN: Objection. Form.
18          THE WITNESS: I think I've
19      already answered that my concern is that
20      it's not like all these patients came in
21      and a specific protocol was employed
22      with, here's our strategy for removing
23      the drug and here's the way we're going
24      to follow them and here's the frequency

Page 163

1      of follow-up, and these are the times
2      where we're going to check their labs and
3      these are the times where we're going to
4      check their endoscopies.
5          It's all just a retrospective
6      story. You just can't make anymore of it
7      than that.
8  BY MR. SLATER:
9      Q.   If this had been a controlled
10  study and the dechallenges were done on some sort
11  of a protocol, then you would think this was very
12  significant evidence of causation; right?
13          MR. CHRISTIAN: Objection. Form.
14          THE WITNESS: Plus, the study is
15      underpowered. So you would have to
16      randomize people to dechallenge versus
17      not and follow them over time because
18      some people might spontaneously get
19      better, and you would need to control for
20      as many things as possible and you would
21      need a lot more than 22 patients.
22  BY MR. SLATER:
23      Q.   So your methodology is, unless
24  it's a randomized controlled study, you give very

Page 164

1  little weight to the results of the study;
2  correct?
3          MR. CHRISTIAN: Objection. Form.
4          THE WITNESS: I give it some
5      weight, but only in the context of what
6      it is. It's Level IV evidence. So I
7      don't say that it should be thrown out.
8      I'm just saying that it is what it is.
9  BY MR. SLATER:
10      Q.   My question is this: Because
11  it's not a randomized controlled study, you give
12  very little weight to the results and findings
13  and data from this study; correct?
14          MR. CHRISTIAN: Object.
15  BY MR. SLATER:
16      Q.   Do I understand your methodology?
17          MR. CHRISTIAN: Objection. Form.
18          THE WITNESS: Could you define
19      what you mean by "weight"?
20  BY MR. SLATER:
21      Q.   When you put all the evidence
22  onto the scales to try to form an opinion as to
23  whether or not olmesartan can cause this
24  enteropathy condition in some patients and you

Page 165

1      look at the results of this study, because it's
2      not randomized controlled, you think that's a
3      very minor factor in the overall analysis;
4      correct?
5      A.   What's a minor factor?
6      Q.   Something that won't have a
7  significant impact on your opinion.
8      A.   My opinion of this study is that
9  this is a reasonable description of 22 patients
10  that they saw, retrospective summary, a write-up
11  of various patients that came. Sort of like a
12  novel, but not something where they set out to
13  test a hypothesis or where they can provide
14  biologic plausibility or they can really give any
15  specific guidelines. It's just a fairly nice
16  write-up of a description of 22 patients.
17          So I don't throw it out
18  completely. I just feel like, as I've stated
19  repeatedly, it's Level IV evidence.
20      Q.   I'd like you to assume for
21  purposes of my question that the 22 patients,
22  when they got off of olmesartan, they had the
23  positive clinical response described in the
24  article. I'd like you to assume that occurred.

Protected Information - Keith T. Wilson, M.D.

Page 166

1    A.   Okay.

2    Q.   That is significant evidence;

3 correct?

4      MR. CHRISTIAN:  Object.

5      THE WITNESS:  I'm sorry.  You

6  broke up for the first 10 seconds of

7  that.

8 BY MR. SLATER:

9    Q.   You assume that the 22 patients,

10 as reported, got off of olmesartan and had the

11 positive clinical response described in the

12 article.

13      If it's true that that occurred

14 as described, that is significant evidence of

15 causation; correct?

16    A.   I've already answered that.  It

17 is not significant evidence of causation.

18    Q.   Well, that's because you think

19 it's not randomized or controlled?

20      MR. CHRISTIAN:  Objection. Form.

21      THE WITNESS:  That's one reason.

22 BY MR. SLATER:

23    Q.   Well, the reason you want to

24 randomize or control is to have a systematic

Page 167

1 approach to make sure that the -- that getting

2 off the drug is actually what caused the clinical

3 response; right?  You're trying to be sure that

4 there's a cause and effect relationship.

5      Do I understand that?

6    A.   Yes, that would be the best level

7 of evidence, but there could be something

8 intermediate where all the patients are lined up

9 in a row like horses starting in a race and you

10 say, okay, we're going to ring the bell and this

11 is the protocol.  And everybody is going to be

12 followed in a certain way and we're going to

13 follow people at certain intervals, and these are

14 the tests that we're going to get.  And then

15 we're going to have a nurse call you once a month

16 to check on your symptoms, see what's going on.

17 We're going to measure your weights.  We're going

18 to do all these things.

19      There's no protocol.  It's

20 standard and clinical that there has to be a

21 study protocol.  There is no study protocol here.

22    Q.   Okay.  And that's the reason why

23 you discount the results here; correct?

24    A.   Correct.

Page 168

1      MR. CHRISTIAN:  Objection. Form.

2 BY MR. SLATER:

3    Q.   I'd like you to assume that

4 despite the fact that there was no protocol.

5 There's no randomization.  This was not a

6 controlled study.  Because as we know, these were

7 actually patients being treated by real doctors

8 who actually do treat these conditions.

9      That despite the lack of control

10 or randomization, these patients actually did

11 have a positive clinical response to getting off

12 the olmesartan, okay?

13      MR. CHRISTIAN:  Objection. Form.

14 BY MR. SLATER:

15    Q.   If that is so, that is

16 significant evidence supporting causation;

17 correct?

18      MR. CHRISTIAN:  Objection. Form.

19      THE WITNESS:  So that's a

20 two-part question.

21      I think the first -- answer to

22 the first part of the question is, I will

23 give credit that they have described what

24 they think they've observed, but I will

Page 169

1    not say that this paper alone is enough

2    to say that there is significant

3    causation.  Because if there had been,

4    they would have made that conclusion and

5    they did not.

6 BY MR. SLATER:

7    Q.   Move to strike from "because" and

8 we'll get to that.  I promise we will get to

9 that.

10      MR. CHRISTIAN:  Objection. Side

11  bar.

12 BY MR. SLATER:

13    Q.   The article talked about the fact

14 that there was not a finding of intraepithelial

15 lymphocytosis; correct?

16    A.   Well, some of the patients had

17 that.  I just document in my report that it was

18 surprising that 8 out of 22 did not have

19 increased intraepithelial lymphocytes.

20    Q.   It is possible that the steroids

21 that these patients took reduced the inflammation

22 and, thus, reduced the prevalence of

23 intraepithelial lymphocytosis.

24      That's possible; right?

Protected Information - Keith T. Wilson, M.D.

Page 170

1    A.    Except it's -- sure, it's
2 possible, except for the fact that they
3 specifically said they didn't have a response to
4 steroids.
5    Q.    Well, they could have had a
6 response in terms of how the intestinal
7 architecture appeared, but not have actually felt
8 clinically better; right?
9         You could -- you could not feel
10 better, even though you don't have
11 intraepithelial lymphocytosis; right?
12    A.    That's a double negative. I'm
13 sorry. You're going to have to rephrase that. I
14 can't -- I can't process that one.
15    Q.    (Laugh).
16         The steroids could have made the
17 pathology look better, but the patients might not
18 have felt clinically better.
19         That's possible; right? That's a
20 possible outcome of using the steroids; right?
21    A.    Except for the fact that 15 of
22 the patients had severe villous atrophy and 7 had
23 partial. So it's pretty hard to say that the
24 steroids were working on one thing and not the

Page 171

1 other because the immunopathogenesis that's
2 assumed here is that it's activation of these
3 alleles that leads to the epithelial destruction.
4 So it's kind of hard to say that they shouldn't
5 relate to each other.
6         And that the paper is not well
7 enough written to tell us whether it's the same
8 people that had less alleles that also had less
9 atrophy. That would be nice to know, but it's
10 not written to that level of depth.
11    Q.    Let's look at number 15. The
12 fact that 17 of the 18 patients tested had
13 histologic recovery; right?
14    A.    Right.
15    Q.    And on Table 2, the 18th patient,
16 who's patient number 2, had improvement and had
17 gone from having total villous atrophy to focal
18 partial villous atrophy at 54 days; correct?
19    A.    Right.
20    Q.    In the histologic presentation;
21 correct?
22    A.    Right.
23    Q.    The rate of histologic recovery
24 with celiac disease is variable; correct?

Page 172

1    A.    Yes.
2    Q.    If I understand correctly, one of
3 your criticisms is that there were not follow-up
4 biopsies beyond those listed; correct?
5    A.    Right.
6    Q.    Again, these were patients in the
7 real world being treated. They were improving
8 and getting better.
9         So you would not expect to do
10 multiple follow-up biopsies on patients who were
11 improving and resolving their symptoms; right?
12    A.    I would agree with that.
13    Q.    You would agree with me one
14 possible cause of the villous atrophy described
15 in this article was the olmesartan.
16         That's a potential cause of that;
17 right?
18    A.    A potential cause, sure. Just
19 like it could have been other things with these
20 patient, as I listed.
21    Q.    In these patients -- I think we
22 went through this before -- you can't point to
23 another cause to a reasonable degree of medical
24 certainty for the villous atrophy described in

Page 173

1 this article; correct?
2         MR. CHRISTIAN: Objection. Form.
3         THE WITNESS: Well, we discussed
4    earlier today that it was my take on the
5    follow-up paper that some of these
6    patients may have actually had occult
7    celiac disease.
8 BY MR. SLATER:
9    Q.    May have what?
10    A.    May have had occult celiac
11 disease.
12    Q.    You're not saying they had occult
13 celiac disease to a reasonable degree of medical
14 certainty, though.
15         We've established that; right?
16    A.    Well, that's the flaw of the
17 Cartee paper. It's published in a non-PubMed
18 journal and is a very poor review. It's not
19 really very scientific in the way it's presented.
20 It's impossible to know what was discussed.
21    Q.    Move to strike.
22         The answer is I'm correct; right?
23    A.    Correct to what? Why don't you
24 restate the question.

Protected Information - Keith T. Wilson, M.D.

Page 174

1        Q.    You're not offering an opinion to
2   a reasonable degree of medical certainty that
3   these patients had occult celiac disease, any of
4   them?
5            MR. CHRISTIAN: Objection. Form.
6            THE WITNESS: I'm not willing to
7       say that none of them had that.
8   BY MR. SLATER:
9        Q.    You're not willing to say to a
10  reasonable degree of medical certainty that any
11  of these patients did have occult celiac disease.
12          You're speculating maybe some
13  did, but you're not saying to a reasonable degree
14  of medical certainty they did; right?
15       A.    I think at the time that
16  Dr. Murray wrote this paper, that was the
17  evidence that he had. I'm just saying that the
18  follow-up paper strongly suggests either it's
19  some of these patients or very, very similar
20  patients, some of them were later found to have
21  celiac after they had their drug stopped.
22       Q.    Very simply. With these 22
23  patients, you're not saying that their villous
24  atrophy, as documented, was to a reasonable

Page 175

1   degree of medical certainty caused by anything
2   other than olmesartan; correct?
3            MR. CHRISTIAN: Objection. Form.
4            THE WITNESS: I'm unable to say
5       because there's not enough information.
6   BY MR. SLATER:
7        Q.    You're not opining that it's a
8   coincidence that all 22 of these patients had
9   villous atrophy and all 22 had a clinical
10  response to withdrawal of olmesartan. You're not
11  saying that's a complete coincidence, are you?
12       A.    It can't be a coincidence because
13  those were the inclusion criteria for the case
14  write-up.
15       Q.    Okay. The likelihood is that for
16  the 22 patients who had villous atrophy, who had
17  the severe diarrhea, the weight loss, and then
18  resolution of the symptoms over time or, in the
19  one case, improvement over time after the
20  withdrawal of the drug, the likelihood is that
21  they were suffering from something caused by the
22  same syndrome; correct?
23            MR. CHRISTIAN: Objection.
24  BY MR. SLATER:

Page 176

1        Q.    That's the likelihood; right?
2            MR. CHRISTIAN: Objection. Form.
3            THE WITNESS: "Something caused
4       by the same syndrome." That's really
5       vague. I'm sorry, but I don't know what
6       that means.
7   BY MR. SLATER:
8        Q.    I'll ask it differently.
9            With regard to the 22 patients,
10  the likelihood is that the cause of their
11  condition was the same. That's the likelihood;
12  right?
13       A.    Because they bias this case
14  series by saying, we looked for patients that got
15  better off of olmesartan, but there's clearly
16  patients that they had that didn't get better off
17  of olmesartan. So their features were completely
18  different.
19       Q.    As to the patients who got better
20  when they got off of olmesartan, the likelihood
21  is that the olmesartan was causing the syndrome,
22  the diarrhea, the villous atrophy; correct?
23            MR. CHRISTIAN: Objection. Form.
24            THE WITNESS: I've already stated

Page 177

1       that it appears that there's an
2       association, but because it's
3       retrospective and the study was biased in
4       terms of who they selected, I can't use
5       the word "caused."
6   BY MR. SLATER:
7        Q.    Move to strike from the word
8   "but" forward.
9            Based on the information that is
10  available in the study, in this article, the
11  likely cause of these 22 patients' clinical
12  symptoms, their villous atrophy, was the
13  olmesartan; correct?
14            MR. CHRISTIAN: Objection. Form.
15  BY MR. SLATER:
16       Q.    Based on that information?
17            MR. CHRISTIAN: Same objection.
18            THE WITNESS: I think you've
19       asked me the same question multiple
20       times, and I've answered it the same way
21       each time.
22  BY MR. SLATER:
23       Q.    The reason you won't say yes to
24  causation is because it was not a controlled

Protected Information - Keith T. Wilson, M.D.

Page 178

1  study. Do I understand correctly?
2          MR. CHRISTIAN: Objection. Form.
3          THE WITNESS: That's one reason,
4      but I already talked about that, so
5      there's no placebo group. But also that
6      there's no protocol, there's no study
7      protocol. And because it's
8      retrospective, the information available
9      is patchy.
10         So that if I asked -- if I were
11     asked to define the syndrome that's
12     described here, the only two
13     commonalities are that they had villous
14     atrophy on their biopsy, because they all
15     had either partial or total, and that
16     they improved off of olmesartan because
17     they selected the patients that improved
18     off of olmesartan.
19         But all of the other features --
20     weight loss, gastric involvement, colonic
21     involvement, steatorrhea, anemia,
22     hypoalbuminemia -- none of those things
23     are consistent. There are more things
24     that are inconsistent than things that

Page 179

1      are consistent.
2  BY MR. SLATER:
3      Q.   In fact, the picture here is
4  analogous to celiac where you don't have the same
5  clinical presentation for all patients, but
6  gluten is the cause along with the person's
7  predisposition for their clinical presentation
8  and for their histopathologic presentation;
9  right?
10         MR. CHRISTIAN: Objection. Form.
11         THE WITNESS: I don't think
12     that's relevant because celiac disease
13     does not cause colitis, and some of these
14     patients had colitis. We know that
15     celiac disease does not cause colitis.
16  BY MR. SLATER:
17     Q.   In the sense that there's a
18  varied presentation with celiac, there's a
19  consistency between the two; correct?
20         MR. CHRISTIAN: Objection. Form.
21         THE WITNESS: I think that the
22     presentation with celiac disease can be
23     more easily summarized in textbooks
24     because 1 percent of the population has

Page 180

1      it. So then when you're summarizing what
2      the condition is and how to work it up,
3      you're dealing with 3 million Americans
4      that have celiac disease versus in this
5      you're talking about less than a hundred
6      cases in the world's literature. So,
7      therefore, I cannot compare the two.
8  BY MR. SLATER:
9      Q.   Let's look in the article page
10  735. The discussion, the second paragraph says:
11         "We acknowledge that this case
12     series lacks all the information necessary to
13     prove causality but, rather, reflects an
14  association."
15         You see that statement?
16     A.   Yes.
17     Q.   You agree with that statement;
18  correct?
19     A.   Yes.
20     Q.   Okay. Now, you see the word
21  "prove"?
22     A.   I see it.
23     Q.   You realize that in this
24  litigation we don't have to prove something. We

Page 181

1  just have to show more likely than not.
2         Are you aware of that?
3         MR. CHRISTIAN: Objection. Form.
4         THE WITNESS: I'm not an
5      attorney. So that's not my concern.
6  BY MR. SLATER:
7      Q.   Okay. They state that there was
8  no deliberate rechallenge because of the
9  life-threatening nature of the syndrome; correct?
10     A.   Yes.
11     Q.   That was a reasonable clinical
12  decision by the doctors treating these patients;
13  right?
14     A.   Well, the doctors treating the
15  patients weren't aware there was a syndrome. You
16  yourself said it was real world doctors taking
17  care of patients. So they made a clinical
18  judgment in those particular patients that they
19  didn't.want to restart this medication, just like
20  they might have held other medications.
21     Q.   Once these doctors realized that
22  the patients had gotten better off of olmesartan,
23  they felt it would be unsafe to put them back on
24  olmesartan to rechallenge them due to the

Protected Information - Keith T. Wilson, M.D.

Page 182

1  severity of the condition.
2        That was a reasonable clinical
3  decision; correct?
4        MR. CHRISTIAN: Objection. Form.
5        THE WITNESS: Potentially, yes,
6     but the thing that I find confusing about
7     your argument and about this paper is, I
8     don't believe for sure that all 22
9     patients were -- were cared for by
10    Dr. Murray. I don't really know.
11       So it could be that other members
12    of their group took care of these
13    patients. So I don't have the impression
14    they all sat down and said what they
15    think they needed to do. I think
16    individual physicians made their own
17    decisions.
18 BY MR. SLATER:
19    Q.   It says right here no deliberate
20 rechallenge test with olmesartan was undertaken.
21       That means that once they figured
22 out this association, they said, okay, we're not
23 going to put them back on the drug to
24 quote/unquote prove this because it would be too

Page 184

1        A.   No, but anecdotally, I mean,
2  we're not talking about science here. We're just
3  talking about a story.
4        Q.   Move to strike from "but"
5  forward.
6        This also indicates two patients
7  experienced improvement when olmesartan was
8  stopped when they were hospitalized for
9  dehydration and hypotension and worsened in the
10 weeks following discharge and reintroduction of
11 olmesartan.
12       You see that?
13       A.   Yes.
14       Q.   Okay. That is evidence, as
15 described, of a positive rechallenge. They were
16 put back on the drug and they got sick again.
17       That's what is being described
18 there; correct?
19       A.   To me, a rechallenge has to be
20 controlled.
21       Q.   You believe that rechallenge
22 for -- rephrase.
23       You define rechallenge only to
24 include a controlled rechallenge in your

Page 183

1  dangerous.
2        That's what that means; right?
3        A.   Yes.
4        MR. CHRISTIAN: Objection. Form.
5        THE WITNESS: That's what they
6     wrote.
7  BY MR. SLATER:
8     Q.   And that's a reasonable clinical
9  decision; right?
10       A.   I think if I ever thought that
11 anybody had a reaction of some sort to a medicine
12 I would -- even if it was really not even
13 certain, I wouldn't take the chance because
14 there's so many other medications we can use for
15 all the conditions we work with.
16    Q.   They talk about two patients
17 reporting anecdotally that their symptoms
18 worsened when they restarted olmesartan before
19 the potential association was recognized.
20       That's what the patients told
21 them; right?
22       A.   Correct.
23    Q.   Is there any reason to disprove
24 the patients that that's what happened?

Page 185

1  methodology?
2        A.   So by "controlled" I mean there
3  needs to be a study protocol. There needs to be
4  close observation of the patient. There needs to
5  be prescribed parameters that are going to be
6  followed.
7        It can't just be, we restarted
8  the medicine and they felt bad. We need to know,
9  did their atrophy come back? How many bowel
10 movements a day were they having? What happened
11 to their -- did they start having fecal fat
12 again? Did they become anemic? I mean, there's
13 nothing like that here. If this were real data,
14 it would be in the results section of the paper,
15 not in the discussion.
16    Q.   So there is no rechallenge that
17 you will -- rephrase.
18       So your methodology is, if
19 somebody was put back on the drug, unless it was
20 done in a controlled way pursuant to a study
21 protocol, you will not rely on that in
22 determining causation; correct?
23       MR. CHRISTIAN: Objection. Form.
24       THE WITNESS: I would say that in

Protected Information - Keith T. Wilson, M.D.

Page 186

1    general terms that would be true.
2  BY MR. SLATER:
3      Q.   Do you agree with me that based
4  on your reading of the overall literature that
5  there are patients who were on olmesartan, got
6  severe diarrhea, dehydration, and weight loss,
7  got off olmesartan and got better, and then went
8  back on olmesartan and their symptoms came back?
9          Do you agree that that has
10  happened to some patients?
11         MR. CHRISTIAN: Objection. Form.
12         THE WITNESS: I believe that that
13     has been described in some of these
14     papers, but only in the case series and
15     not in any controlled fashion.
16  BY MR. SLATER:
17     Q.   Move to strike from "but"
18  forward.
19         My question is: Do you believe
20  that that -- rephrase.
21         In drawing your assumptions as an
22  expert in this case, are you assuming that for
23  some patients that has actually occurred?
24         MR. CHRISTIAN: Objection. Form.

Page 187

1        THE WITNESS: What? Can you
2     restate what the "that" refers to?
3  BY MR. SLATER:
4      Q.    I just asked you about that there
5  are some patients who are on olmesartan,
6  developed severe diarrhea, dehydration, weight
7  loss, got off the olmesartan, their symptoms
8  improved or got better, and then later they were
9  put back on the olmesartan and they got back to
10  the same baseline of being sick again.
11         Do you believe in drawing your
12  assumptions that that has happened to some
13  patients?
14         MR. CHRISTIAN: Objection. Form.
15         THE WITNESS: There are -- I
16     think there are some scattered reports of
17     that, but nothing controlled.
18  BY MR. SLATER:
19     Q.    Move to strike from "but"
20  forward.
21         Are you aware of any patients who
22  are in a randomized controlled study who had a
23  positive dechallenge off of olmesartan and then
24  were later put back on olmesartan and had a

Page 188

1  positive rechallenge in the context of a
2  controlled randomized study?
3      A.    There have never been any
4  randomized controlled trials related to
5  olmesartan in terms of once this association was
6  recognized.  I'm not and I don't have access to
7  the original toxicity testing and such that was
8  done in patients during the Phase I and Phase II
9  trials before the drug was approved.
10     Q.    My question is: Do you know of
11  any patients who in a randomized controlled trial
12  on olmesartan developed symptoms consistent with
13  olmesartan-associated enteropathy, had a positive
14  dechallenge, meaning they got better off the
15  drug, and then were put back on the drug later
16  and got sick again?
17     A.    No, I'm not.
18     Q.    Are you aware of any patients
19  like that?
20     A.    No.
21     Q.    If there were any such patients
22  like that, would that be -- would that be
23  significant to you in forming your opinions?
24         MR. CHRISTIAN: Objection. Form.

Page 189

1        THE WITNESS: It would all depend
2     on the quality of the study, the power of
3     the study, what type of information they
4     collected.  It can't just be patient got
5     better, patient got worse.  Those aren't
6     scientific terms.
7  BY MR. SLATER:
8      Q.    If such a dechallenge and a
9  rechallenge were documented in a randomized
10  controlled trial, in and of itself, would that be
11  of significance to you?  Something you would want
12  to look closely at and consider giving
13  significant weight to?
14         MR. CHRISTIAN: Objection. Form.
15         THE WITNESS: Yes.
16  BY MR. SLATER:
17     Q.    If Daiichi was available --
18  rephrase.
19         If Daiichi and their lawyers who
20  hired you were aware of any such cases, would you
21  have liked to have been provided those so you can
22  consider that in forming your opinions?
23         MR. CHRISTIAN: Objection. Form.
24         THE WITNESS: So you just jumped

Protected Information - Keith T. Wilson, M.D.

Page 190

1   from RCT to the cases. So that's a
2   different thing.
3   BY MR. SLATER:
4       Q.   No, I actually didn't, but I'll
5   be -- I'll try to be as rigorous as you are with
6   the word "cases."
7           If such patients existed and were
8   known to Daiichi and their lawyers who hired you,
9   would you have wanted to see that data?
10          MR. CHRISTIAN: Objection. Form.
11          THE WITNESS: "Such cases,"
12      please define.
13  BY MR. SLATER:
14      Q.   Such cases as I just described.
15  A patient in a randomized controlled trial on
16  olmesartan, who had symptoms consistent with
17  olmesartan-associated enteropathy, who got better
18  off the drug and then got sick again on a
19  rechallenge.
20      A.   I don't think one patient would
21  mean anything, but if there were many patients
22  and it was all controlled and it were
23  peer-reviewed, then I'd be interested in looking
24  at it.

Page 191

1       Q.   So if that type of a patient --
2   rephrase.
3           So if that scenario actually
4   exists and is known to Daiichi and their lawyers,
5   you wouldn't even want to see it. It wouldn't
6   even matter to you?
7           MR. CHRISTIAN: Objection. Form.
8   BY MR. SLATER:
9       Q.   Is that your testimony?
10          MR. CHRISTIAN: Same objection.
11          THE WITNESS: I don't know
12      whether they have controlled data on
13      patients. I only know what's in the
14      literature. That's what I was asked to
15      do.
16  BY MR. SLATER:
17      Q.   That's my point. If they knew
18  about it, your testimony is you wouldn't want to
19  see it anyway because it wouldn't be of any
20  significance to you?
21          MR. CHRISTIAN: Objection. Form.
22          THE WITNESS: I'm really unable
23      to answer that because, frankly speaking,
24      I don't know what internal drug company

Page 192

1   documents look like, but my supposition
2   is, they don't reach the level of
3   evidence of what I would expect from a
4   peer-reviewed paper. It would just be
5   some -- I don't even know what it would
6   be because I haven't seen it.
7   BY MR. SLATER:
8       Q.   Really my question is pretty
9   simple.
10          If there's a patient in a
11  randomized controlled trial as I described, is it
12  your testimony you're fine not even seeing that,
13  it's not something that would be of any
14  significance to you sight unseen, you don't even
15  need to see it?
16          MR. CHRISTIAN: Objection. Form.
17  BY MR. SLATER:
18      Q.   Is that true?
19          MR. CHRISTIAN: Same objection.
20          THE WITNESS: I don't know one.
21      You just said "a patient." That's the
22      singular form. I don't think one patient
23      is worth trying to make any conclusions
24      about causation from.

Page 193

1   BY MR. SLATER:
2       Q.   Have you done any power
3   calculations?
4       A.   In my life? Sure.
5       Q.   Or calculations in this case. I
6   didn't see any in your report.
7           MR. CHRISTIAN: You cut off the
8       first part of your question.
9   BY MR. SLATER:
10      Q.   See any power calculations in
11  your report. Did you do any?
12      A.   What would you have liked me to
13  do a power calculation on?
14      Q.   I don't really understand why you
15  would ask -- answer me with that question, but we
16  can -- we can play it out if you want.
17      A.   Well, I was supposed to --
18      Q.   I can do that well for you,
19  Doctor. I'll ask it again.
20          I read your report. I didn't see
21  you do any power calculations.
22          Did I miss it? Did you do one?
23      A.   No, I did not.
24          Would you like me to expound on

Protected Information - Keith T. Wilson, M.D.

Page 194

1 what a power calculation is, or would you like to
2 define it for me?
3      Q.   No, I think I know what it is.
4 You don't need to expound.  I want you to get to
5 dinner with your wife.  So let's not expound.
6 Because if you expound, I'll tell her you were
7 late because you were expounding.
8      A.   She knows that I do that.
9      Q.   I bet she does.
10          Okay.  Let's look now back at the
11 discussion on page 735.  The authors state:
12      "Resolution of the presenting
13 symptoms and subsequent histologic improvement
14 after suspension of olmesartan, in the absence of
15 clinical evidence of other diseases associated
16 with enteropathy, suggest that the association is
17 not likely to be due to chance."
18          Do you see what I just read?
19      A.   Yes.
20      Q.   I didn't see you quote that
21 language in your report.  Did you?
22      A.   No, not to my memory.
23      Q.   I'm sorry.  What did you say?
24      A.   I -- (reviewing document).

Page 195

1      Q.   You can look at number 17 on page
2 4, your point 17.  I see you quoted the sentence
3 at the top of the paragraph.
4      A.   Uh-huh.
5      Q.   You didn't quote the last
6 sentence I just read to you about not likely
7 being due to chance; right?
8      A.   Right.
9      Q.   If the association is not likely
10 to be due to chance, then it is likely that there
11 is a causal relationship; right?
12      A.   No.
13          MR. CHRISTIAN:  Objection.  Form.
14          THE WITNESS:  It doesn't say
15      that.
16 BY MR. SLATER:
17      Q.   Yeah.  Well, I'm talking about
18 the meaning of the English language now with you.
19          If it's not likely due to chance,
20 meaning it's not just by chance, then it is more
21 likely that there is a causal relationship.
22          That's what that means in English
23 language; right?
24          MR. CHRISTIAN:  Objection.  Form.

Page 196

1          THE WITNESS:  So when we think
2 about statistical analysis, we -- we use
3 P values, which represent the probability
4 that something is due to chance alone.
5          So I don't know if you knew that
6 but, for example, a P value of .05 means
7 that --
8 BY MR. SLATER:
9      Q.   (Laugh).
10     A.   -- 5 out of a hundred times the
11 result could be just due to chance.  P value of
12 .01 would mean 1 out of a hundred times it could
13 be due to chance.  So it's a probability value.
14         So I'm very familiar with the
15 concept of something being likely or not likely
16 to be due to chance.  I didn't cite it because I
17 didn't think the sentence added anything.
18     Q.   Doctor, let's look at what you
19 did do.  And you know what?  You're probably
20 right.  Although, actually, I don't think you
21 know what a P value is, but we'll talk about it
22 another time.
23         MR. CHRISTIAN:  Object to the
24     side bar.

Page 197

1 BY MR. SLATER:
2      Q.   We'll go to it another time.  You
3 asked me.  You made fun of me.  Maybe we both
4 don't know.  Maybe we're equally noninformed on
5 it, but anyway --
6          MR. CHRISTIAN:  Objection.  Just
7      ask your questions, Adam.
8 BY MR. SLATER:
9      Q.   -- in your report number 17 --
10 I'm sorry.  I can't hear.
11         You wrote in number 17 --
12         MR. CHRISTIAN:  I said move on in
13     your questions.
14 BY MR. SLATER:
15     Q.   You wrote it was necessary -- is
16 someone talking?  Is someone talking?
17         MR. CHRISTIAN:  Go ahead.  I said
18     go ahead and ask your questions.  Go
19     ahead.
20         MR. SLATER:  Isn't that what I'm
21     doing?
22 BY MR. SLATER:
23     Q.   You felt it necessary and
24 relevant to quote in paragraph 17 on page 4, you

Protected Information - Keith T. Wilson, M.D.

Page 198

1  quoted where they said they acknowledge the case
2  series lacks all the information necessary to
3  prove causality but, rather, reflects an
4  association.
5       You quoted that language in your
6  report; right?
7     A.   Yes.
8     Q.   You quoted it because you wanted
9  to point out that the authors' conclusion was
10  that it showed an association, didn't prove
11  causation.  That's why you quoted it; right?
12    A.   Correct.
13    Q.   You didn't quote the bottom line
14  in the paragraph where they said that the
15  association is not likely to be due to chance.
16       You didn't quote that; correct?
17    A.   Because --
18       MR. CHRISTIAN:  Object to form.
19       THE WITNESS:  I didn't because
20    they're still talking about an
21    association.  So I didn't think it added
22    anything.
23  BY MR. SLATER:
24    Q.   Move to strike from "because"

Page 199

1  forward.
2       If we're just going by their
3  conclusion and quoting their language, if they
4  say it's not likely to be due to chance, that
5  means it's more likely that there is a causal
6  relationship?
7       MR. CHRISTIAN:  Objection.
8  BY MR. SLATER:
9     Q.   Correct?
10       MR. CHRISTIAN:  Objection.  Form.
11       THE WITNESS:  Well, wouldn't they
12    have written it the way they you just
13    said if that's what they thought?
14  BY MR. SLATER:
15    Q.   Move to strike.
16       That's what the word means in the
17  English language; correct?
18       MR. CHRISTIAN:  Objection.  Form.
19       THE WITNESS:  That's your
20    interpretation, not mine.
21  BY MR. SLATER:
22    Q.   If it's not likely due to chance,
23  it's more likely that it's not a chance
24  association, but there's actual cause and effect;

Page 200

1  right?
2     A.   No.
3       MR. CHRISTIAN:  Objection.  Form.
4  BY MR. SLATER:
5     Q.   Okay.  Olmesartan-associated
6  enteropathy, as described in the literature, is
7  an uncommon adverse drug effect; correct?
8       MR. CHRISTIAN:  Objection.  Form.
9       THE WITNESS:  It's rare, to say
10    the least.  Yes, it's very rare.
11  BY MR. SLATER:
12    Q.   A definition of "rare" something
13  that's peer-reviewed where the word "rare" is
14  defined?
15    A.   That's a good point.
16       That word is thrown around.  I
17  would say that there are some estimates in some
18  of these papers that we haven't discussed that
19  use surrogate markers that suggest that it's very
20  uncommon.
21    Q.   Very what?
22    A.   Very uncommon.
23    Q.   Okay.  All right.  So I'll use
24  that language.

Page 201

1       You would agree with me that
2  olmesartan-associated enteropathy, as described
3  in the literature, is an uncommon or a rare
4  adverse drug effect; correct?
5       MR. CHRISTIAN:  Objection.  Form.
6       THE WITNESS:  I don't know if I
7    can say "adverse drug effect" because
8    effect implies that there's more
9    certainty about it.  I would say
10    association.
11  BY MR. SLATER:
12    Q.   This was never prospectively
13  studied by the manufacturer; correct?
14    A.   I don't know.
15    Q.   As far as you know?
16    A.   I don't know.
17    Q.   You haven't seen anything
18  suggesting that Daiichi attempted to
19  prospectively study the issue; right?
20    A.   I'm not -- I don't know anything
21  about Daiichi and what they do.  I've never
22  talked to anybody from their company.
23    Q.   Anything indicating anybody has
24  prospectively studied this question?

Protected Information - Keith T. Wilson, M.D.

Page 202

1      A.     And the reason is that you would
2   need to follow such a huge number of patients to
3   potentially find any that it would be unfeasible
4   to do such a prospective study.
5      Q.     Right. So you trying to say that
6   you can -- that causation is not proven because a
7   controlled prospective study was not done, you'd
8   acknowledge that you wouldn't expect such a study
9   to be done; right?
10      A.     You could prospectively describe.
11   For example, you could look at some -- I mean,
12   I'd have to sit down and think about it. A de
13   novo study would be tough. There could be some
14   other ways of, for example, the way they went
15   back and reanalyzed the data from the ROADMAP
16   study. Albeit that has the caveat that that
17   wasn't their original end point, but they went
18   back and looked at that where you have a huge
19   number of patients. That sort of data.
20      Q.     Do you rely on the ROADMAP study
21   in part for your opinions?
22      A.     It's one of the -- one of the
23   articles that I thought was worth considering.
24      Q.     Calculation -- rephrase.

Page 203

1          In your methodology, did you rely
2   in part on the ROADMAP study data as supporting
3   your opinion?
4      A.     Yes.
5      Q.     Was the ROADMAP study data
6   important to you in forming your opinion?
7      A.     It was somewhat important.
8      Q.     Where an adverse drug effect or,
9   as you want to call it, an adverse drug
10   association has not been prospectively studied,
11   as it has not been prospectively studied here
12   with olmesartan, case reports of clinical results
13   can be very significant in providing information
14   about a potential adverse drug reaction; correct?
15          MR. CHRISTIAN: Objection. Form.
16          THE WITNESS: I'd say that that
17      should be considered, but there -- there
18      are other pieces of evidence that I
19      discussed in my report that didn't select
20      the cases based on the end point and then
21      working backwards but, rather, started
22      with looking at all people with diarrhea
23      or all people with other conditions and
24      then trying to follow through and make

Page 204

1      calculations.
2   BY MR. SLATER:
3      Q.     Move to strike from "but"
4   forward.
5          Are you aware that those who are
6   experts in the field who are celiac specialists
7   who see the most complex seronegative celiac
8   cases or the most serious unclassified sprue
9   cases, etc., that they accept that olmesartan
10   causes sprue-like enteropathy or
11   olmesartan-associated enteropathy in some number
12   of patients?
13          MR. CHRISTIAN: Objection. Form.
14          THE WITNESS: So having read the
15      expert reports of the people that I
16      listed, I became aware that there are
17      some people that think that, but I don't
18      think that's very scientific.
19   BY MR. SLATER:
20      Q.     Move to strike from "but"
21   forward.
22          Are you aware that the prevailing
23   scientific consensus among those clinicians who
24   actually evaluate and treat this condition is

Page 205

1   that olmesartan causes this condition in some
2   number of patients? Will you acknowledge that?
3      A.     No.
4          MR. CHRISTIAN: Objection. Form.
5      Go ahead.
6          THE WITNESS: I don't -- I don't
7      acknowledge that. The only information I
8      have on that is a couple of these expert
9      reports.
10   BY MR. SLATER:
11      Q.     Well, you've read multiple
12   articles where the articles say that olmesartan
13   causes this condition, that olmesartan induces
14   this condition.
15          You've seen that in multiple
16   articles; right?
17          MR. CHRISTIAN: Objection. Form.
18          THE WITNESS: I don't think it's
19      convincing.
20   BY MR. SLATER:
21      Q.     Move to strike.
22          You've seen that that language
23   exists in multiple peer-reviewed articles; right?
24          MR. CHRISTIAN: Objection. Form.

Protected Information - Keith T. Wilson, M.D.

Page 206

1   BY MR. SLATER:
2        Q.   I'm not asking if you agree. I'm
3   asking if you've seen it.
4        A.   I don't know about the word
5   "induced."
6        Q.   You don't -- you haven't seen the
7   word "induced"?
8        A.   I know --
9        Q.   Olmesartan-induced enteropathy?
10  You haven't seen that in any of the articles?
11       A.   It's possible, but it doesn't
12  come to my mind.
13       Q.   Carefully read these articles to
14  see what language was used?
15       A.   Of course I did.
16       Q.   Induced means caused; right?
17            MR. CHRISTIAN: Objection. Form.
18            THE WITNESS: So here's the way I
19       would define "induced" in my own
20       research.
21            I take cells and put them in a
22       dish. I add H. pylori. I measure an
23       output from the cells and I write
24       "H. pylori induced an increase in

Page 207

1        production of such and such factor."
2        I've published many papers writing things
3        like that.
4             That's not the same thing as
5        somebody perhaps using the word "induced"
6        in a discussion, but I don't recall the
7        use of that word. Perhaps it's buried in
8        one of these discussion sections.
9   BY MR. SLATER:
10       Q.   Do you know what the head of
11  pharmacovigilance at Daiichi Sankyo during the
12  time period when this was all being discovered,
13  do you know what he thinks olmesartan-induced
14  enteropathy means?
15       A.   No, I do not.
16       Q.   Would it be of any interest to
17  you to know that, or it would be irrelevant to
18  you?
19            MR. CHRISTIAN: Objection. Form.
20            THE WITNESS: I don't know the
21       inner workings of a drug company. So I
22       don't know the hierarchy. I don't know
23       what -- if something existed like that, I
24       don't know what the quality of the

Page 208

1        evidence is. I would just be
2        speculating.
3   BY MR. SLATER:
4        Q.   Would you like to understand all
5   those things so you'd understand what the company
6   that actually sold and monitored the drug, what
7   they actually know and think? Would you have
8   liked to have known that?
9            MR. CHRISTIAN: Objection. Form.
10           THE WITNESS: I don't think that
11       it's really relevant to the task that was
12       put before me of assessing the medical
13       literature and thinking about the science
14       behind that because internal documents
15       are not -- they're not peer-reviewed. I
16       don't know anything about how they're
17       constructed or -- or anything.
18  BY MR. SLATER:
19       Q.   Your comment 19 on page 4 of your
20  report says that -- talks about mechanism, the
21  concept of mechanism; right?
22       A.   Right.
23       Q.   You do not need to know the
24  mechanism of an association; correct?

Page 209

1            MR. CHRISTIAN: You might need to
2        restate that. We missed the middle part.
3   BY MR. SLATER:
4        Q.   You do not need to know the
5   mechanism in order to recognize that there is
6   clinical evidence of an association; correct?
7        A.   I suppose if the clinical
8   evidence were compelling with a lot more than
9   less than a hundred patients that have been
10  described, you could reduce your desire to know
11  about that. However, many other conditions, we
12  have a much better handle on what the biological
13  mechanisms may include. Here we have none.
14       Q.   You do not need to understand the
15  mechanism at a molecular level to have a
16  biologically plausible mechanism for a condition;
17  correct?
18            MR. CHRISTIAN: Objection. Form.
19            THE WITNESS: No, I don't agree
20       to that.
21  BY MR. SLATER:
22       Q.   In order to have a biologically
23  plausible mechanism, you have to understand the
24  mechanism at the molecular level?

Protected Information - Keith T. Wilson, M.D.

Page 210

1    A.   I think that you should
2  understand the -- at the pathophysiologic level
3  and at the molecular level, you should have some
4  understanding of that, yes.
5    Q.   Some understanding.  For example,
6  if, if -- let me ask you this question.
7    If those who believe that
8  olmesartan causes an immune-mediated response
9  that causes cellular changes in the intestine
10 that leads to villous atrophy, inflammation, and
11 the clinical symptoms that have been reported, if
12 that is accurate, that is a biologically
13 plausible mechanism; correct?
14    MR. CHRISTIAN:  Objection.  Form.
15    THE WITNESS:  But there is no
16  evidence of how it's activating the
17  immune response.
18 BY MR. SLATER:
19    Q.   Is true that is a plausible
20 biological mechanism; correct?
21    A.   You cut out at the beginning.  I
22 couldn't hear that.
23    Q.   I moved to strike and then I
24 said:  If that is true, that is a plausible

Page 211

1  biologic mechanism; correct?
2    A.   I just said, if there's no
3  understanding of how the immune response gets
4  activated, I'm not certain there is evidence that
5  the immune response gets activated.
6    Q.   I move to strike.
7    Here's my question.
8    I want you to assume that
9  olmesartan causes an immune-mediated response in
10 the intestine which leads to inflammation,
11 villous atrophy, the other findings that have
12 been seen in the studies, and the clinical
13 symptoms that have been reported.  I want you to
14 assume that to be true.
15    If so, that would be a plausible
16 biologic mechanism; correct?
17    MR. CHRISTIAN:  Objection.  Form.
18    THE WITNESS:  That's not --
19  that's -- first of all, that's just a
20  speculation.  It's not a biological
21  mechanism.
22 BY MR. SLATER:
23    Q.   Move to strike.
24    If that is factually true, that

Page 212

1  is a plausible biologic mechanism; correct?
2    MR. CHRISTIAN:  Same objection.
3    THE WITNESS:  That does not have
4    enough depth.
5  BY MR. SLATER:
6    Q.   If it's true that olmesartan
7  causes an immune-mediated response that causes
8  cellular changes in the intestine which leads to
9  inflammation, villous atrophy, and the other
10 histopathologic findings that have been reported
11 and leads to the clinical symptoms that have been
12 reported, if that is true, that is a plausible
13 biologic mechanism; correct?
14    MR. CHRISTIAN:  Objection.  Form.
15    THE WITNESS:  I think I've
16  already answered it.
17    MR. SLATER:  Question, please?
18    (The reporter read the record on
19  page 212 lines 6-13.)
20    MR. CHRISTIAN:  Objection.  Form.
21    THE WITNESS:  I will continue to
22  say that if I were to contrast this with
23  something like nonsteroidal drugs, which
24  can cause the same thing, we have a much

Page 213

1    better grasp of biologic mechanisms
2    whereby nonsteroidal drugs injure the
3    intestines.
4    I can -- I could.  I know you've
5    already told me you don't want to hear me
6    give discourses, but I could tell you
7    multiple mechanisms whereby NSAIDs cause
8    injury, and I don't know those mechanisms
9    here.
10 BY MR. SLATER:
11    Q.   Move to strike.
12    I'd just like you to answer my
13 question, please.
14    A.   I do not --
15    Q.   Wouldn't that be a plausible
16 biologic mechanism?
17    A.   And the answer is no.
18    MR. SLATER:  Laura, could you
19  pull out document 30 and mark that as the
20  next exhibit, please.
21    THE REPORTER:  Exhibit 11.
22    (Document marked for
23  identification purposes as Gutman
24  Exhibit 11.)

Protected Information - Keith T. Wilson, M.D.

Page 214

1 BY MR. SLATER:
2     Q.   Great.  Doctor, this is an
3 article titled "Drug-Induced Sprue-Like
4 Intestinal Disease," and I'd like you to turn to
5 page 51, please.
6         And if you look, there's a
7 section on nonsteroidal anti-inflammatories.  You
8 see that?
9         Do you see that in the bottom
10 right?
11     A.   Oh, yes.
12     Q.   "Further studies are needed to
13 define the precise mechanism involved for the
14 histopathologic mucosal changes following
15 nonsteroidal anti-inflammatory drug use."
16         Do you see what I just read?
17     A.   I see what you read.
18     Q.   And you don't disagree with that
19 statement, do you?
20     A.   I do disagree with it.
21     Q.   Okay.  Do you think the precise
22 mechanism has been identified?
23     A.   I don't think that the choice of
24 mechanism singular is correct.  I think there are

Page 215

1 multiple mechanisms.
2         And not all NSAIDs are going to
3 be the same.  However, it's well established that
4 NSAIDs block enzymes that produce prostaglandins,
5 and these prostaglandins are important in things
6 like controlling the mucus production and
7 controlling the bicarbonate secretion in the
8 small intestine and providing cytoprotection to
9 the epithelial layer and, therefore, it's pretty
10 evenly accepted that the depletion of the
11 prostaglandins is a contributing factor to the
12 effect of the NSAIDs.
13         But there's been other effects
14 that have been also postulated in terms of influx
15 of neutrophils and how that might occur.  There's
16 effects on the barrier.  All different things
17 like that that have been published.
18         MR. SLATER:  Let me -- let me
19     switch gears now and talk to you about
20     the Basson and Padwal studies and
21     let's -- let's mark both of those.  I'm
22     trying to see what number they are.
23         I think Basson would be number 9,
24     Laura.

Page 216

1         MS. PITTNER:  Got it.
2         MR. SLATER:  And Padwal would be
3     16.  Let's make Basson 12 and Padwal 13.
4         (Document marked for
5     identification purposes as Gutman
6     Exhibit 12.)
7         (Document marked for
8     identification purposes as Gutman
9     Exhibit 13.)
10 BY MR. SLATER:
11     Q.   Do you have them both?
12     A.   Yep.
13     Q.   All right.  I'm turning to it.
14         Okay, Doctor.  If you look at the
15 Basson article, Table 2.
16         The total patient years for
17 patients using olmesartan is 860,894; correct?
18     A.   Yes.
19     Q.   And the number of events, which
20 is defined as hospitalization for intestinal
21 malabsorption and celiac disease, is 48; right?
22     A.   Right.
23         MR. CHRISTIAN:  Objection.
24     Objection.  Form.

Page 217

1 BY MR. SLATER:
2     Q.   Do you see that?
3     A.   Can you restate that question,
4 please?
5     Q.   Counting the number of events,
6 and events were defined as hospitalization for
7 intestinal malabsorption and celiac disease;
8 right?
9         MR. CHRISTIAN:  Objection.  Form.
10         THE WITNESS:  What it says in the
11     abstract for the study design is that the
12     only thing that I'm seeing here is the
13     primary end point was incidence of
14     hospitalization with a discharge
15     diagnosis.
16         So we don't know if they were
17     necessarily admitted for that problem.
18     That was just a discharge diagnosis was
19     intestinal malabsorption.
20 BY MR. SLATER:
21     Q.   Okay.  Let's -- let me ask the
22 question.
23     A.   And I don't see anything about
24 celiac disease there.

Protected Information - Keith T. Wilson, M.D.

Page 218

1    Q.    Well, you don't know where I got
2  celiac disease?  It's described in the results
3  section in the first sentence of the discussion
4  of the -- in the article, but I'm happy to limit
5  it the way you want to.  So I'll ask the question
6  differently.
7           For the olmesartan users in
8  Basson, 48 events were listed, which were
9  hospitalizations for intestinal malabsorption;
10  correct?
11    A.    Well, it's hospitalizations where
12  that was the discharge -- discharge diagnosis.
13    Q.    Now, look at Padwal.  You can
14  also look at Table 2 in that article.
15           And you have patients who are
16  hospitalized for any GI disease and the person
17  years there is 17,647; correct?
18    A.    Yes.
19    Q.    Accounted for that; right?
20        MR. CHRISTIAN:  I think we missed
21    the first part, Adam.
22  BY MR. SLATER:
23    Q.    There were 498 events where
24  people were hospitalized for a GI disease-related

Page 219

1  condition; right?
2           Isn't that what it says right
3  next to the 17,647?
4    A.    Yes, but I'm not certain whether
5  that's their -- was their primary end point or
6  anything, I think.
7    Q.    I didn't ask you what the primary
8  end point was, did I?
9    A.    No.
10    Q.    I'm just trying to look at the
11  gastrointestinal issues.
12           So would you also in order to
13  compare the GI issues that were picked up also
14  need to include the next column, the noninfected
15  enteritis and colitis-related admissions?
16    A.    I don't think that you can add
17  them together.  I think they're just different
18  criteria.
19    Q.    Okay.  As between Basson and
20  Padwal, both relied on an evaluation of
21  administrative claims data; correct?
22    A.    I think that that's true, but
23  one's from France and one's from the US.  So
24  that's going to be pretty different.

Page 220

1    Q.    In terms of the number of patient
2  years, Basson had a substantially higher number
3  of patient years that were studied; correct?
4  We've just established that?
5    A.    Yes.
6    Q.    The outcome of the Basson study,
7  the data that was generated, when you weigh that,
8  would weigh in favor of a finding of causation;
9  correct?
10    A.    I can't make that conclusion
11  because they had no biopsy data they looked at.
12  It was just hospitalization from discharge
13  diagnosis for malabsorption.  So I think that
14  that falls short of making that conclusion.
15    Q.    In your analysis, did you factor
16  in the Basson study?
17    A.    It's on page 7.  At the bottom of
18  page 7 of my report.
19    Q.    Yeah, but now we're in your
20  deposition where I'm asking you under oath.  So
21  my question is this:
22           As you sit here now offering your
23  opinions, is the Basson data something that you
24  are considering in forming your opinions?

Page 221

1        MR. CHRISTIAN:  Objection.  Form.
2        THE WITNESS:  My conclusion about
3    the Basson study is that the data are
4    weak because there's no individual chart
5    review to validate anything.  It's just
6    an administrative database.  There's no
7    biopsies.  There's no other information
8    about the patients.
9           So I think --
10  BY MR. SLATER:
11    Q.    Those same comments would apply
12  to the Padwal study as well; right?
13        MR. CHRISTIAN:  Were you finished
14  with your answer?
15        THE WITNESS:  I don't even
16  remember what I was going to say.
17  (Laugh).
18           In other words, while this might
19  on the surface look like it's higher
20  quality evidence than a case report, it's
21  missing the crucial elements that I just
22  talked to -- talked about, which is that
23  nobody went through all these records of
24  these patients and determined if these

Protected Information - Keith T. Wilson, M.D.

Page 222

1  codings were even correct.  So it's just
2  sort of looking --
3  BY MR. SLATER:
4      Q.    Move --
5      A.    -- looking at a database.
6      Q.    Move to strike.
7            My question was this.
8            Well, let me follow up on that
9  first.
10           So an epidemiologic study as
11 conducted in Basson is not of significance to you
12 because they didn't do a chart review to
13 correlate symptoms and do more of a
14 patient-by-patient analysis.
15           I understand that correctly?
16     A.    Well, you just said it's not of
17 significance.  It's not a binary thing.  It's of
18 poor significance.  I have factored it into my
19 thinking, but I didn't just throw it out.  But I
20 also said that it's of very limited value.
21     Q.    Okay.  The same reasons that you
22 say Basson is of limited value, you would -- the
23 same applies to Padwal; right?
24     A.    I mean, I think some of the same

Page 223

1  caveats would ensue for Padwal as well; however,
2  at least it's from the United States.  So I might
3  have a better level of confidence about what
4  their administrative data might look like.
5      Q.    Do you have any expertise
6  regarding the level of information and data in
7  the French database they looked at, or are you
8  just biased against French data in favor of US
9  data --
10           MR. CHRISTIAN:  Objection.  Form.
11 BY MR. SLATER:
12     Q.    -- without any basis?
13           MR. CHRISTIAN:  Same objection.
14           THE WITNESS:  I don't have a way
15     to know what the French database looks
16     like.
17 BY MR. SLATER:
18     Q.    You just like US data better,
19 kind of like people who like California wines
20 better than French wines?
21           MR. CHRISTIAN:  Objection.  Form.
22           THE WITNESS:  I've had multiple
23     French people work in my research group.
24     I have two now.  So obviously I don't

Page 224

1  have anything against the French.
2  BY MR. SLATER:
3      Q.    Okay.  You have no scientific
4  reason to discount the Basson data just because
5  it's from France, do you?
6      A.    I'm just trying to make the point
7  that I, you know, I would leave it to people that
8  would dissect out this type of data on a daily
9  basis who might be more familiar with the French
10 versus American administrative databases.
11     Q.    Is the answer to my question no,
12 you have no scientific basis to discount the
13 Basson data because it's French?
14     A.    (Laugh).  If you put it that way,
15 I suppose I don't.  However, it's one was based
16 on discharges for malabsorption and the other is
17 at least more specific in terms of talking about
18 noninfective enteritis and colitis-related
19 admissions.  So it seems like --
20     Q.    That's actually the column we
21 didn't talk about it, isn't it, Doctor?
22           The other column, the one you
23 actually talked about, is gastrointestinal
24 disorders, which is actually broader and less

Page 225

1  specific than malabsorption, isn't it?
2      A.    Again, I don't know what the
3  criteria -- I have to say, I don't know what the
4  criteria for malabsorption were -- was in that
5  administrative database.  So that's one.  I just
6  don't have much confidence in that.
7            For example, we talked earlier
8  today about certain laboratory tests that might
9  be indicative of malabsorption, but I don't --
10 I'm not aware of how they defined it when they
11 coded the patients.
12     Q.    And that's part of your
13 methodology in discounting the data from Basson;
14 correct?
15     A.    I would say so.
16     Q.    I'm going to ask you a couple
17 questions about the ROADMAP study.
18           You're familiar with that study;
19 correct?
20     A.    Right.
21     Q.    The end points in that study had
22 nothing to do with gastrointestinal conditions;
23 right?
24     A.    I need to just find that again.

Protected Information - Keith T. Wilson, M.D.

Page 226

1    What number is that?  Oh, there
2 it is.  Okay.
3         So the original end point of that
4 study was to look at renal complications in
5 diabetics and to see if olmesartan might be
6 beneficial in reducing protein in the urine.
7    Q.    The primary end point in the
8 ROADMAP study was not to evaluate
9 gastrointestinal side effects in any way;
10 correct?
11   A.    That's my understanding.
12   Q.    This population of patients was
13 diabetic; correct?
14   A.    Correct.
15   Q.    Patients who take olmesartan
16 outside of the study population are not all
17 diabetic; correct?
18   A.    Correct.
19   Q.    You did no power calculation to
20 determine whether the ROADMAP study was
21 sufficiently powered to look for sprue-like
22 enteropathy or olmesartan-associated enteropathy;
23 correct?
24   A.    Correct.

Page 227

1    Q.    Did you draw any assumption as to
2 whether the study was adequately powered to study
3 that question?
4    A.    No, I didn't.
5    Q.    To study that question, it should
6 not be considered as answering that question;
7 correct?
8    A.    Well, let me explain something.
9 There are these large studies where they have
10 cohorts, like the Framingham Heart Study that --
11 or the Nurses Study that have proven to be
12 incredibly valuable to go back and reinterrogate.
13        So, for example, in the
14 Framingham Heart Study, if they were trying to
15 figure out whether aspirin prevented heart
16 attack, one of the benefits of that database is
17 that investigators have gone back and beautifully
18 demonstrated with articles in the New England
19 Journal of Medicine that aspirin turns out to be
20 protective against colon cancer development, but
21 that wasn't how that study was originally
22 designed.
23        So if you have a lot of patients,
24 you can do -- you can do something useful with

Page 228

1 that data set.
2    Q.    Move to strike.
3         If the ROADMAP study was not
4 adequately powered to a reasonable degree of
5 medical certainty based on this data, it would
6 not be of any significance in answering the
7 question of causation; correct?
8         MR. CHRISTIAN:  Objection.  Form.
9         THE WITNESS:  I can't state
10    whether it was adequately powered because
11    that wasn't part of the original design,
12    but you didn't let me before talk about
13    what power is.  So I think I'm compelled
14    now to discuss it.  So --
15 BY MR. SLATER:
16   Q.    Doctor, it's not fair for you to
17 give a speech I'm not asking you.  You can't just
18 talk about something you want to talk about.
19   A.    Okay.  Then I won't answer your
20 question as to whether it was adequately powered.
21   Q.    Okay.  I'll ask the question this
22 way.
23        If the study was not adequately
24 powered just to give an answer -- rephrase.

Page 229

1         If the study was not adequately
2 powered to evaluate severe gastrointestinal side
3 effects in patients taking olmesartan, then it
4 would not be useful in answering the question of
5 causation; right?
6         MR. CHRISTIAN:  Objection.  Form.
7         THE WITNESS:  I don't see any --
8    okay.  So in the beginning, they mention
9    the term "severe" in the first sentence,
10    but later they say "We detected no
11    association between treatment and the
12    occurrence of intestinal adverse
13    effects."
14        So they don't necessarily say
15    that the effects have to be severe.  They
16    list a bunch of potential intestinal
17    effects in their table here.
18 BY MR. SLATER:
19   Q.    Move to strike.  Nonresponsive.
20        If the ROADMAP study was
21 underpowered to evaluate gastrointestinal side
22 effects, it would be unscientific to rely on it
23 to answer the question of causation; correct?
24        MR. CHRISTIAN:  Objection.  Form.