# EXHIBIT 5

Protected Information - Benjamin Lebwohl, M.D., M.S.

```
     IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NEW JERSEY

                    - - -

   IN RE:  BENICAR          :  Civil No.
   (OLMESARTAN) PRODUCT     :  15-2606(RBK)(JS)
   LIABILITY LITIGATION     :
                            :

                    - - -

              February 10, 2017

                    - - -

              PROTECTED INFORMATION

                    - - -

           Oral expert deposition of
   BENJAMIN LEBWOHL, M.D., M.S., taken
   pursuant to notice, was held at the law
   offices of Robins Kaplan LLP, 601
   Lexington Avenue, Suite 3400, New York,
   New York, beginning at 9:45 a.m., on the
   above date, before Kimberly A. Cahill, a
   Federally Approved Registered Merit
   Reporter and Notary Public.


                    - - -

          GOLKOW TECHNOLOGIES, INC.
     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
```

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 130

1  clear that he could continue to
2  list articles that either --
3      MR. MURPHY: Is that what
4  you're telling him to do?
5      MR. SLATER: No, I'm not and
6  I can even say it outside -- I
7  just want to make a record that
8  you went to a new subject after
9  you started to question about what
10 articles talk about causation. I
11 just want to make it clear that he
12 wasn't asked are there any more
13 you want to list.
14     If you want to move to
15 another subject, it's fine. I
16 just don't want the record to seem
17 as if he finished.
18     MR. MURPHY: Oh, well, I
19 thought you had. I thought that I
20 had the four articles that spoke
21 strongly and then we have
22 Rubio-Tapia --
23     THE WITNESS: That was not
24 what I meant to convey. I think

Page 131

1  we got --
2      MR. MURPHY: My apologies.
3  I would like for you to exhaust
4  your list of articles that reached
5  the conclusion that olmesartan
6  causes sprue-like enteropathy.
7      THE WITNESS: Can you read
8  to me --
9      MR. MURPHY: Thank you,
10 Adam.
11     THE WITNESS: Can you read
12 to me the ones that I had
13 mentioned already?
14     MR. MURPHY: You had Talley,
15 Lebwohl and --
16     THE WITNESS: Ludvigsson.
17     MR. MURPHY: -- correct --
18 Marild and Lagana, Braunstein.
19     THE WITNESS: I believe I
20 mentioned some others. I
21 mentioned Rubio-Tapia --
22 BY MR. MURPHY:
23  Q.  Right. I'm saying before we
24 got to Rubio --

Page 132

1   A.  I went on and listed Basson
2  at some length, I think --
3   Q.  You listed Basson over here
4  on the right.
5   A.  Why don't I take a look. If
6  you really want every one of them, I must
7  say it's becoming increasingly taken for
8  granted, so it's often listed in the
9  title. Indeed, if you look for the
10 expression "olmesartan-induced
11 enteropathy," that's popping up left and
12 right in PubMed.
13  Q.  Just give me the list of the
14 articles.
15  A.  Why don't I take a look.
16     DeGaetani, did I mention
17 that one yet?
18     MR. SLATER: Not yet.
19     THE WITNESS: Would you like
20 me to go to the specific instance
21 of where causation was either
22 explicitly mentioned or at least
23 strongly implied?
24     MR. MURPHY: I'm just asking

Page 133

1  for the titles of the articles.
2      THE WITNESS: Okay.
3      (Pause.)
4      THE WITNESS: Aziz and
5  colleagues interpret the initial
6  Rubio-Tapia paper as indicating
7  causation.
8      (Pause.)
9      THE WITNESS: I would argue
10 that causation is strongly implied
11 in the review article by Nina
12 Burbure and colleagues,
13 B-U-R-B-U-R-E.
14 BY MR. MURPHY:
15  Q.  And you said, there, it's
16 implied.
17  A.  Strongly implied.
18  Q.  Strongly implied.
19  A.  In the case described by de
20 Fonseka, the title is "A case of
21 olmesartan-induced enteropathy."
22     I should also point out an
23 item that's in my report, a table of
24 causes of villous atrophy from the

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 134

1 physician reference uptodate.com, I can
2 reference my report to where that is.
3 That is peer reviewed. It's not in
4 PubMed and it's a subscription service.
5 It's on page 9 of my report. Olmesartan
6 is listed as a cause of small intestinal
7 villous atrophy.
8     Q.   That's not an article, is
9 it? That's just a chart.
10        MR. SLATER: Up-to-Date?
11        THE WITNESS: Well, I would
12 point out that it came from an
13 article in Up-to-Date. I did give
14 the caveat that it's not in
15 PubMed. It might not be widely
16 available to the general or
17 scientific public because it is
18 subscription. It's a subscription
19 service that is widely used by
20 physicians, certainly not
21 universally used, but it is a
22 peer-reviewed article.
23        MR. MURPHY: And that's what
24 I'm trying to understand.

Page 135

1 BY MR. MURPHY:
2     Q.   And the title of the
3 article?
4     A.   I don't have the title of
5 that article.
6     Q.   Okay. All right.
7     A.   On my person.
8     Q.   We can move on.
9        (Pause.)
10        THE WITNESS: Marietta,
11 Cartee, Rishi, and Murray,
12 "Drug-induced enteropathy."
13        Marietta and colleagues,
14 "Immunopathogenesis of
15 olmesartan-associated
16 enteropathy," Alimentary
17 Pharmacology and Therapeutics,
18 2015. Marthey and colleagues,
19 "Olmesartan-associated
20 enteropathy: results of a national
21 survey," Alimentary Pharmacology
22 and Therapeutics, 2014: "In
23 conclusion, this study shows that
24 olmesartan causes severe and

Page 136

1 potentially life-threatening
2 enteropathy with or without
3 villous atrophy."
4        Pardon me. Are we limiting
5 this to the peer-reviewed
6 literature or possibly internal
7 Daiichi documents?
8        MR. MURPHY: Articles. I
9 asked you for the articles.
10        THE WITNESS: Just making
11 sure.
12        MR. MURPHY: Okay.
13        THE WITNESS: Philip and
14 colleagues, "Spectrum of
15 Drug-induced Chronic Diarrhea,"
16 Journal of Clinical
17 Gastroenterology.
18        (Pause.)
19        THE WITNESS: Uehara and
20 colleagues, "Olmesartan-induced
21 Enteropathy Manifesting as
22 Wernicke-Korsakoff Syndrome."
23 BY MR. MURPHY:
24     Q.   Before you identify the next

Page 137

1 article, I want to be sure that I
2 remember what you said earlier about
3 Uehara. That was one of the articles of
4 which you had not been aware at the time
5 you generated your report; correct?
6     A.   I believe that either came
7 out later or only made its way to my
8 attention after I finished my report.
9     Q.   Okay. I'm sorry. Go ahead.
10     A.   Theophile and colleagues,
11 "Five cases of sprue-like enteropathy in
12 patients treated by olmesartan."
13        I should look at my
14 supplementary reliance list to make sure
15 that I'm being complete. I'm not sure if
16 everything in my binder here was on this
17 list, but based on the Uehara article,
18 that suggests that perhaps it is.
19        Did I mention Philip and
20 colleagues, "Spectrum of Drug-induced
21 Chronic Diarrhea"?
22     Q.   You did.
23     A.   Thank you.
24        How about Hammoudi and

# EXHIBIT 6

Protected Information - Jeffrey Warmke, Ph.D.

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF NEW JERSEY
 3
 4                    - - -
 5
        IN RE:  BENICAR          :   MDL NO. 2606
 6      (OLMESARTAN) PRODUCTS    :
        LIABILITY LITIGATION     :
 7                               :
 8
 9
                      - - -
10
                August 23, 2016
11
                      - - -
12
             PROTECTED INFORMATION
13
                      - - -
14
            Videotape Rule 30(b)(6)
15   deposition of DAIICHI SANKYO, INC., taken
     through its representative JEFFREY
16   WARMKE, Ph.D., taken pursuant to notice,
     was held at the law offices of Drinker
17   Biddle & Reath, LLP, 600 Campus Drive,
     Florham Park, New Jersey, beginning at
18   9:32 a.m., on the above date, before
     Kimberly A. Cahill, a Federally Approved
19   Registered Merit Reporter and Notary
     Public for the State of New Jersey.
20
21                    - - -
22
           GOLKOW TECHNOLOGIES, INC.
23     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
```

Protected Information - Jeffrey Warmke, Ph.D.

Page 110

1  protocol did not define asking specific
2  questions about any specific organ class
3  -- organ classes.
4      Q.   The CRFs, the case report
5  forms, do not list anywhere to fill in
6  specific information about any
7  gastrointestinal-related side effects;
8  correct?
9      A.   The case report forms
10 contain a place to report all reported
11 AEs.
12     Q.   There's no place in the case
13 report forms that actually specifically
14 calls out gastrointestinal side effects
15 or related issues.  That's not something
16 specifically asked for in the case report
17 form; correct?
18     A.   Correct.
19     Q.   The ROADMAP study was not
20 designed to study gastrointestinal side
21 effects of olmesartan; correct?
22     A.   The primary endpoint of the
23 ROADMAP study was the prevention of
24 microalbuminuria.  As part of the study,

Page 111

1  all reported safe -- AEs were collected.
2          MR. SLATER:  Move to strike
3      from "As" forward.
4  BY MR. SLATER:
5      Q.   The ROADMAP study was not
6  designed to specifically study
7  gastrointestinal side effects of
8  olmesartan; correct?
9      A.   Gastrointestinal events was
10 not one of the prespecified endpoints in
11 ROADMAP.
12     Q.   And it -- gastrointestinal
13 side effects was not the primary
14 endpoint, obviously, and was not a
15 specifically called out secondary
16 endpoint; correct?
17     A.   Gastrointestinal events was
18 not a predefined endpoint in the study.
19     Q.   At any point, did anybody at
20 Daiichi-Sankyo inform Professor Haller or
21 any of the other investigators about
22 postmarketing adverse events that were
23 being received by the company in
24 connection with gastrointestinal side

Page 112

1  effects?
2      A.   No.  Professor Haller was
3  clear that he received no communication
4  from Daiichi-Sankyo regarding the
5  potential for gastrointestinal side
6  effects up to and including the time he
7  wrote his letter to the Mayo Clinic.
8      Q.   Did Professor Haller see any
9  patients who had gastrointestinal side
10 effects in his treatment of patients over
11 the years?  Did you ask him that when you
12 met with him?
13     A.   I did not ask him that
14 specific question.
15     Q.   Did he tell you anything
16 along that line?
17     A.   He did not volunteer that he
18 had personally witnessed any patients
19 taking olmesartan with gastrointestinal
20 side effects and, in fact, indicated that
21 based on his review of the safety data
22 throughout the course of the ROADMAP
23 study, there was never an issue raised
24 about gastrointestinal side effects by

Page 113

1  the steering committee or by the data
2  safety monitoring committee.
3      Q.   And just to be clear, there
4  was never a time where anyone from
5  Daiichi-Sankyo informed Professor Haller
6  or the other investigators or the
7  steering committee that reports were
8  coming in of gastrointestinal side
9  effects, some being categorized as celiac
10 disease during a period of time; that was
11 not -- that information was not provided
12 to them; correct?
13     A.   As I said before, Professor
14 Haller indicated that he had not received
15 any communications from Daiichi-Sankyo
16 highlighting gastrointestinal side
17 effects.
18     Q.   Would that hold true for the
19 steering committee as well and the other
20 investigators?
21     A.   I did not interview all the
22 steering committee members during my
23 investigation, but Professor Haller
24 indicated that he had not been informed

Protected Information - Jeffrey Warmke, Ph.D.

Page 270

1  I'm not going to go through the whole
2  e-mail, but at the bottom of B, she says,
3  "It is almost impossible to design a
4  late-phase clinical trial with a proper
5  sample size that can detect all real
6  safety signals with conformity as
7  designed, one that can detect the real
8  signal for primary efficacy endpoint with
9  conformity."
10           Do you see what I just read?
11      A.   Yeah, I see that sentence.
12      Q.   And that's just a
13  statistical analysis of why it would be
14  that you wouldn't look to the data that
15  was supplied by the ROADMAP study to try
16  to determine whether there's an increased
17  risk of cardiac -- cardiovascular
18  mortality because it's just not what was
19  being looked at in this study. Right?
20      A.   I'm going to have to defer
21  that question to the statistical expert.
22      Q.   If you go to the very first
23  e-mail, the first page, there's an e-mail
24  now from Antonia Wang and she points out

Page 271

1  in part, the danger of conducting a small
2  study in this case for cardiovascular
3  event is seen all the time. She speaks
4  through it a little bit more and at the
5  end says, without proper preplanning and
6  appropriate sample size, we can get some
7  results that is inconclusive; correct?
8      A.   Yes.
9      Q.   And certainly there was no
10 effort to establish a sample size large
11 enough to study the question of
12 cardiovascular mortality. That's not
13 what the study was geared for. Right?
14     A.   The ROADMAP study was sized
15 and powered to detect a 30 percent
16 difference in the occurrence of
17 microalbuminuria. It was not powered and
18 sized to detect a meaningful difference
19 in clinical outcomes.
20           - - -
21           (Deposition Exhibit No.
22      3035, 3/4-3/5/10 E-Mail Chain
23      Among Caspard, Cuprys, et al,
24      OLM-DSI-0003999681 and

Page 272

1      OLM-DSI-0003999682, was marked for
2      identification.)
3           - - -
4           MR. PARKER: I want to take
5      a break. We've been going for
6      about an hour and 20 minutes.
7           MR. SLATER: Okay.
8           MR. PARKER: Okay?
9           THE VIDEO TECHNICIAN: The
10     time is 2:31 p.m. We are going
11     off the record.
12          (A recess was taken from
13     2:31 p.m. to 2:45 p.m.)
14          - - -
15          THE VIDEO TECHNICIAN: This
16     is DVD number 4. The time is 2:45
17     p.m. Back on the record.
18 BY MR. SLATER:
19     Q.   I've handed you Exhibit
20 3035, which is some e-mails that address
21 in part the ROADMAP study. Do you see
22 that?
23     A.   Yes, I see the e-mail.
24     Q.   I'm going to just start

Page 273

1  right at the top of the first page, an
2  e-mail from Herve Caspard in
3  pharmacovigilance to Rich Cuprys and
4  Allen Feldman.
5           Do you see that e-mail at
6  the top?
7      A.   Yes.
8      Q.   Who's Rich Cuprys?
9      A.   Rich Cuprys was in
10 regulatory affairs in the United States.
11     Q.   Herve Caspard writes to him
12 and is talking about a slide presentation
13 and then says towards the bottom that
14 Bill Bailey -- and he's someone in
15 medical affairs; correct?
16     A.   Yes.
17     Q.   -- that Bill Bailey should
18 send me today market research data that
19 will likely be relevant, stressing that
20 the ROADMAP population is very different
21 from the general population treated with
22 olmesartan in the U.S. I would like to
23 consolidate this information in a backup
24 slide.

Protected Information - Jeffrey Warmke, Ph.D.

Page 274

1    Do you see that?
2    A.   Yes.
3    Q.   And that's a true statement
4  that the ROADMAP population is very
5  different from the general population
6  treated with olmesartan in the United
7  States; correct?
8    A.   Yeah, there are differences
9  in the inclusion/exclusion criteria used
10 for the study versus what the label
11 indication would be, yes.
12         - - -
13         (Deposition Exhibit No.
14    3036, 6/11/10 E-Mail from DSI
15    Public Affairs to DaiichiSankyo -
16    Development Division and
17    DaiichiSankyo - Employees Only -
18    Commercial, OLM-DSI-0003998943 and
19    OLM-DSI-0003998944, was marked for
20    identification.)
21         - - -
22 BY MR. SLATER:
23    Q.   I've handed you Exhibit
24 3036, and this is a document that was

Page 275

1  circulated internally within your company
2  June 11, 2010.  Do you see that?
3    A.   Yes.
4    Q.   And it's written --
5  rephrase.
6         The document is circulated
7  by DSI public affairs.  And DSI, is that
8  Daiichi-Sankyo Japan?
9    A.   No.  In the United States,
10 the legal organization for Daiichi is a
11 holding company incorporated in Delaware
12 DSUS, Daiichi-Sankyo U.S.  An affiliate
13 of DSUS or a subsidiary company of DSUS
14 is Daiichi-Sankyo, Inc.
15        Daiichi-Sankyo, Inc. is
16 comprised of the R & D division based in
17 Edison, New Jersey and the commercial
18 division based in Parsippany, New Jersey.
19        So DSI would be the company
20 that includes the commercial organization
21 and the R & D organization.
22    Q.   This document, Exhibit 3036,
23 is circulated by DSI public affairs and
24 that would be the commercial and R & D,

Page 276

1  research and development, arm in the
2  U.S.?
3    A.   Yes, the public affairs
4  division for the U.S. organization.
5    Q.   And this is an internal
6  communication circulated on behalf of Dr.
7  Gormley, who is the president of
8  Daiichi-Sankyo in the U.S.; correct?
9    A.   As noted in the signature
10 line, at this particular time, Dr.
11 Gormley was president of the development
12 division, Daiichi-Sankyo pharma
13 development, which is one of two
14 divisions within DSI.
15    Q.   This is a response to a FDA
16 drug safety communication that was coming
17 out about the ROADMAP study and the
18 ORIENT study; correct?
19    A.   Yes.
20    Q.   And it's pointing out that
21 because the people taking Benicar in
22 these studies had a higher rate of death
23 from cardiovascular causes as compared to
24 placebo, the FDA was looking at data;

Page 277

1  correct?
2    A.   That's correct.
3    Q.   In the second to last
4  paragraph from the bottom, the last
5  sentence says, both studies -- which
6  would be ROADMAP and ORIENT; correct?
7    A.   Yes.
8    Q.   -- both studies had included
9  exploratory secondary endpoints, but were
10 not designed to make definitive
11 conclusions beyond the primary endpoints.
12        And that's a true statement;
13 correct?
14    A.   Yes.
15         - - -
16         (Deposition Exhibit No.
17    3037, 6/16/10 "Olmesartan
18    Cardiovascular Safety" White Paper
19    - FDA Regulatory Response,
20    OLM-DSI-0011644249 through
21    OLM-DSI-0011644324, was marked for
22    identification.)
23         - - -
24 BY MR. SLATER:

Protected Information - Jeffrey Warmke, Ph.D.

Page 278

1  Q. That's Exhibit 3037.
2  Exhibit 3037 is a report titled "White
3  Paper - FDA Regulatory Response" dated
4  June 16, 2010; correct?
5  A. Yes.
6  Q. And if I understand
7  correctly, this was a response to the
8  FDA's inquiries about the increased rates
9  of cardiovascular mortality in the
10 ROADMAP and ORIENT studies?
11 A. Correct.
12 Q. And this constituted your
13 company's position with regard to those
14 findings and this is what you told the
15 FDA; correct?
16 A. Yes.
17 Q. It was signed by Glenn
18 Gormley, the chief scientific officer and
19 president of the company; correct?
20 A. Yes.
21 Q. And Kazunori Hirokawa was
22 also a signatory to this report. He's
23 the global head of the research and
24 development unit?

Page 279

1  A. That's correct.
2  Q. This would be someone who
3  works in Japan?
4  A. Yes.
5  Q. If you go to page 10,
6  there's the introduction?
7  A. Yes.
8  Q. And if you go -- rephrase.
9  Please go to page 11, the carry-over page
10 of the introduction, the first -- the
11 second full paragraph. It indicates that
12 it's Daiichi-Sankyo's position that based
13 on the designs, sample sizes, and numbers
14 of incident events in the ROADMAP and
15 ORIENT studies, conclusions about the
16 effects of olmesartan on cardiovascular
17 mortality support a play of chance.
18    When it says a play of
19 chance, just meaning that they're
20 basically chance findings because of the
21 statistical status of the studies?
22 A. A chance finding due to the
23 small number of events observed in each
24 study.

Page 280

1  Q. It says: Neither study was
2  designed -- rephrase.
3     In the second paragraph of
4  the introduction on page 11, the second
5  sentence says: Neither study was
6  designed nor appropriately sized to
7  constitute an adequate test of a safety
8  or efficacy hypothesis related to
9  cardiovascular morbidity or mortality;
10 correct?
11 A. Yes.
12 Q. And that's a true statement;
13 correct?
14 A. Yes.
15 Q. And that would be a true
16 statement with regard to any of the
17 secondary endpoints; correct?
18 A. Yes.
19 Q. This also indicates that
20 there was -- rephrase.
21    This also indicates that in
22 the ROADMAP study, a large percentage of
23 patients had frank study
24 discontinuations, 1,025 patients, as well

Page 281

1  as protocol-driven discontinuations.
2  Right?
3  A. Yes.
4  Q. And thus only 68 percent of
5  randomized patients completed the study
6  while receiving double-blind study
7  medication; correct?
8  A. Correct.
9  Q. And these are reasons being
10 stated as to why the cardiovascular
11 mortality figures should not be
12 determinative of the risk/benefit
13 profile. That's what's being advocated
14 here; correct?
15 A. At the outset, the study was
16 not properly sized for a -- to adequately
17 test those endpoints. Furthermore, the
18 dropouts and discontinuations reduced the
19 available sample size, yes.
20 Q. At the very end of this
21 section, it says that while
22 Daiichi-Sankyo acknowledges the increase
23 in cardiovascular mortality in these
24 studies, the observations are considered

Protected Information - Jeffrey Warmke, Ph.D.

Page 282

1  to be chance findings that do not warrant
2  any modification to the current
3  olmesartan label.
4      That's the ultimate
5  conclusion. We don't need to provide any
6  further warnings or information in the
7  label, that's what this says. Right?
8      A.  That is the company's
9  position through this white paper, yes.
10     Q.  If they were -- rephrase.
11 If there was a safety endpoint that was
12 studied and not a chance finding then --
13 and it did show an increase in a side
14 effect for the olmesartan arm, then it
15 could warrant a modification to the
16 label.
17     A.  You're asking me to answer a
18 hypothetical.
19     Q.  Okay.
20     Go to page 57, please.
21     A.  (Witness complies.)
22     Q.  This is further analysis of
23 the study and it talks about the ROADMAP
24 study design. Do you see that? 6.1?

Page 283

1      A.  Yes.
2      Q.  About five lines down, it
3  says, "This was an event-driven study."
4  What does that mean?
5      A.  This was a prevention study.
6  The event that was driving the study was
7  the occurrence of microalbuminuria.
8      Q.  And then if you go down
9  another few sentences, it says, "ROADMAP
10 was neither designed nor adequately sized
11 as a clinical outcome study."
12     What does that mean?
13     A.  In this case, the outcome is
14 referring to hard clinical outcomes, like
15 mortality, and so the study wasn't sized
16 to measure differences in mortality
17 between the two treatment groups.
18     Q.  It wasn't sized or designed
19 to study mortality and morbidity or
20 anything other than the primary endpoint;
21 correct?
22     A.  The sample size and the
23 conduct of the trial was designed to
24 answer the question about the first

Page 284

1  incidence of microalbuminuria.
2      Q.  If you could go to page 58,
3  please, the second to the last long
4  paragraph, at the very end of that
5  paragraph, it says: In sum -- the
6  cardiovascular --
7      A.  I'm sorry. Page 58?
8      Q.  I'll start over. If you
9  just go over to page 58 --
10     A.  I've got it. Okay.
11     Q.  -- the next page discussing
12 the ROADMAP study design, it talks about
13 the fact that the double-blind period
14 only had a 68 percent completion rate and
15 there was only a 75 percent completion
16 rate for the overall study; correct?
17     A.  Yes.
18     Q.  And it says, "Thus,
19 information on vital and clinical status
20 at the end of the study is not available
21 for a full 25% of randomized patients."
22     And that's a true statement.
23 Right?
24     A.  Yes.

Page 285

1      Q.  And it says, "This made
2  accurate Kaplan-Meier estimates of
3  cumulative event rates impossible."
4  That's statistical speak, but essentially
5  saying that a certain analysis could not
6  be performed.
7      A.  That is the conclusion that
8  was reached in the white paper, yes.
9          - - -
10         (Deposition Exhibit No.
11     3038, 12/10/09 E-Mail Chain Among
12     Chavanu, Jaffe, et al,
13     OLM-DSI-0008208021 through
14     OLM-DSI-0008208024, was marked for
15     identification.)
16         - - -
17 BY MR. SLATER:
18     Q.  I've handed you Exhibit
19 3038, which is a chain of e-mails in
20 December of 2009 -- December 10, 2009 to
21 be precise -- do you see that?
22     A.  Uh-hum.
23     Q.  If you go to the third page
24 of this e-mail chain, I want to start

Page 326

1  discussions about the contents of the
2  actual article. Right?
3      A.  As we saw earlier, yes, the
4  biostatisticians at Daiichi-Sankyo
5  provided comments to Dr. Haller on the
6  manuscript.
7      Q.  Discussions that Professor
8  Haller did not disclose to you when you
9  met with him and spoke to him for five or
10 six hours. Right?
11     A.  There were discussions that
12 Daiichi-Sankyo provided comments on the
13 manuscript, but it was at the discretion
14 of the steering committee what to accept
15 and what to not accept.
16         MR. SLATER: Move to strike
17     from "but" forward.
18 BY MR. SLATER:
19     Q.  When you spoke to Dr. --
20 Professor Haller for six hours or
21 whatever it was, asked him about this
22 process, he never disclosed to you the
23 things I showed you in those e-mails a
24 few minutes ago, the fact that people at

Page 327

1  the company saw them as negotiating with
2  him and they were pressuring him to try
3  to make changes, he didn't disclose that
4  to you; correct?
5      A.  There were discussions that
6  comments came from Daiichi-Sankyo, but
7  that it was at his discretion and the
8  steering committee's discretion about
9  which comments to accept and which not to
10 accept.
11         MR. SLATER: Move to strike.
12         - - -
13         (Deposition Exhibit No.
14     3047, 10/13/15 MedWatch Report for
15     Mfr Report# SP-2006-003369,
16     OLM-DSI-0004767148-R through
17     OLM-DSI-0004767153-R, was marked
18     for identification.)
19         - - -
20 BY MR. SLATER:
21     Q.  I've just handed you Exhibit
22 3047. And this is a MedWatch report for
23 a patient who, if you look at the
24 narrative section, box B 5 on the left,

Page 328

1  you'll see was a patient that was
2  actually in the ROADMAP study.
3         Do you see that?
4      A.  Yes.
5      Q.  And I can tell you, we've
6  confirmed -- and if you want to reconfirm
7  for yourself, you can -- that this person
8  was in the olmesartan arm. You can take
9  my word for it or you can confirm it
10 yourself if you want to.
11     A.  Okay.
12     Q.  Now, this patient, it
13 indicates, was a 56-year-old woman who
14 was hospitalized due to gastroenteritis
15 and hypokalemia.
16         Do you see that in the
17 narrative section?
18     A.  Where in the narrative
19 section are you looking?
20     Q.  B 5 --
21     A.  B 5, okay.
22     Q.  -- the box that says
23 "Describe Event or Problem"?
24     A.  Uh-hum.

Page 329

1      Q.  And then if you turn to the
2  second page, there's a continuation of
3  that section. At the very top, it
4  indicates in part that the patient was in
5  the active trial phase when the serious
6  adverse event occurred.
7         Do you see that at the very
8  top of the first line?
9      A.  Yes, yes.
10     Q.  The second paragraph
11 indicates that on November 1, 2006, the
12 patient developed gastroenteritis with
13 hypokalemia. The treatment was
14 discontinued on November 6, 2006 and the
15 patient was hospitalized on November 17.
16        Further down, it indicates
17 the patient was released on November 28,
18 2006 from the hospital and all symptoms
19 ended on December 1, 2006.
20        Do you see that?
21     A.  Yes.
22     Q.  Then if you go down to the
23 middle, there's a follow-up note, March
24 26, 2007. Do you see that, middle of the

Protected Information - Jeffrey Warmke, Ph.D.

Page 330

1  page?
2      A.  Uh-hum.
3      Q.  It indicates:
4  Gastroenteritis disappeared and
5  reappeared when study drug was
6  reintroduced on the 3rd of December 2006.
7  The patient finally stopped intake of
8  study medication on 24 December 2006;
9  therefore, the investigator assessed a
10 causal relationship as probable.
11         And he says: The
12 investigator considered hypokalemia as
13 clearly related to dehydration due to
14 gastroenteritis.
15         Do you see that?
16     A.  Yes.
17     Q.  And then if you go down,
18 there's further follow-up information,
19 July 10, 2009.  It says: Serious adverse
20 event term was completed with
21 hypocalcemia unrelated to study
22 medication.  The patient was released
23 from hospital on December 5, 2006 and
24 fully recovered on 31 January 2007.

Page 331

1  Study medication was finally discontinued
2  due to adverse events, diarrhea, and
3  vomiting on 30 December 2006.
4          Do you see that?
5      A.  Yes.
6      Q.  And then if you go to the
7  bottom, there's assessments and it says,
8  at that point causal relationship -- let
9  me withdraw that.  Let me move to the
10 other thing I wanted to show you.  One
11 second.
12         All right.  Go now to page
13 3.  And there's a follow-up due to a
14 quality control check on August 7, 2009
15 which indicates, relationship of the
16 event, hospitalization because of
17 gastroenteritis, was corrected to
18 probably.
19         And -- you see that.  Right?
20     A.  Yes.
21     Q.  Let's go to the very -- page
22 4, the end of all these updates, the last
23 one: Based on follow-up -- final
24 follow-up information received on 21

Page 332

1  October 2009, the reporter's causality
2  assessment remains unchanged as probably
3  related for the event hospitalization
4  because of gastroenteritis.
5          And then it says further
6  down, the company's causality assessment
7  remains unchanged as related for the
8  event hospitalization because of
9  gastroenteritis.
10         Do you see that?
11     A.  Yes.
12     Q.  Now, first of all, the
13 coding on this, even though this person
14 was hospitalized because of -- rephrase.
15         When you look at the coding,
16 it does not indicate diarrhea and
17 vomiting even though that is referenced
18 in the narrative; correct?
19         MR. PARKER:  Objection. Now
20     we're getting beyond the scope of
21     the notice.
22         MR. SLATER:  I don't think
23     we are.  We're talking about the
24     data they reported.  Now we're

Page 333

1      going into the core data.  This is
2      the source documents.
3          MR. PARKER:  I'm not going
4      to argue.  I'm just making a
5      statement for the record.
6          MR. SLATER:  All right.
7  BY MR. SLATER:
8      Q.  You see that this patient
9  had its -- had the study medication
10 discontinued due to adverse events
11 diarrhea and vomiting on 30 December
12 2006, but diarrhea and vomiting are not
13 coded adverse event terms on the MedWatch
14 form; correct?
15     A.  Correct.
16     Q.  We also know this patient
17 was being given olmesartan and had a
18 successful dechallenge and then a
19 positive rechallenge:  When the person
20 went back on the drug, the symptoms came
21 back.  That's documented in this form.
22         So certainly your company
23 had this information available to it;
24 correct?

Protected Information - Jeffrey Warmke, Ph.D.

Page 334

1   MR. PARKER: Objection as to
2   form.
3   THE WITNESS: The
4   information is contained on the
5   MedWatch form, yes.
6   BY MR. SLATER:
7   Q. Okay.
8   So your company knew that a
9   patient that was actually being given
10  olmesartan during the ROADMAP study
11  developed gastroenteritis, vomiting, and
12  diarrhea so severe that she was
13  hospitalized. When she went off
14  olmesartan, she got better. When she
15  went back on it, she got sick again.
16  So your company had
17  firsthand information from a study it was
18  conducting that olmesartan likely caused
19  these symptoms; correct?
20  MR. PARKER: Objection as to
21  form.
22  THE WITNESS: The company
23  had the information as reported on
24  the MedWatch form, yes.

Page 335

1   MR. SLATER: You can put
2   that one down. I'm trying to get
3   to the part of the day where we
4   get you home for dinner. Let me
5   just make one note.
6   (Pause.)
7   MR. SLATER: Do you watch
8   Fast Times At Ridgemont High?
9   THE WITNESS: A long time
10  ago.
11  MR. SLATER: You know when
12  he says, like, this new schedule
13  is so confusing? All this paper
14  is so confusing.
15  I got a smile out of you. I
16  knew I could get that. Nobody can
17  keep a straight face when you make
18  a Spicolli reference.
19  - - -
20  (Deposition Exhibit No.
21  3048, 5/13/16 MedWatch Report for
22  Mfr Report# DSM-2008-01071,
23  OLM-DSI-0015261736 through
24  OLM-DSI-0015261739, was marked for

Page 336

1   identification.)
2   - - -
3   MR. SLATER: Everybody else?
4   Spicolli fans?
5   MR. PARKER: I have no idea
6   what you're talking about.
7   MR. SLATER: That's
8   unfortunate.
9   MR. PARKER: Okay.
10  MR. SLATER: We're going to
11  have a screening together, all of
12  us, both firms --
13  MR. PARKER: Ridgemont High.
14  MR. SLATER: -- all the
15  firms -- Fast Times At Ridgemont
16  High.
17  MR. PARKER: Okay.
18  MR. SLATER: Sean Penn's
19  first major role.
20  MR. PARKER: He's not one of
21  my favorite actors.
22  MR. SLATER: You'll like him
23  in this role. It'll loosen you
24  up, Bruce.

Page 337

1   BY MR. SLATER:
2   Q. Okay. I've handed you
3   Exhibit 3048, which is a MedWatch form
4   for a patient who you can see, if you
5   look in box B 5, was a ROADMAP patient.
6   Do you see that?
7   A. B 5, yes.
8   Q. And I can represent to you
9   that we determined this patient was in
10  the olmesartan arm of the study. You can
11  accept that or, if you need to check it,
12  you certainly can.
13  A. Okay.
14  Q. This patient that's
15  described here was a 60-year-old woman
16  who was, according to this, hospitalized
17  due to acute prerenal failure and was in
18  active trial phase when the adverse event
19  occurred. That's what it says on the
20  first page.
21  Do you see that?
22  A. Yes.
23  Q. Go to the second page,
24  please. The second paragraph of the

Golkow Technologies, Inc.                    Page 85 (334 - 337)

Protected Information - Jeffrey Warmke, Ph.D.

Page 362

1 exists. Right?
2   A. No, I do not.
3   Q. The reason it matters is
4 this -- well, I'll get to it.
5       Whatever it says in this
6 letter to the editor, I'm not going to
7 walk through the whole letter, he was
8 doing a statistical analysis based on a
9 comparison of the two arms of the study;
10 correct -- well, let me actually ask it
11 differently.
12      What Professor Haller and
13 Menne did in this letter is, they talked
14 about going back and looking at the data
15 to see if there were intestinal effects
16 in either arm and what was found;
17 correct?
18   A. He was looking for a
19 difference of incidence of GI AEs between
20 the treatment group and the placebo
21 group.
22   Q. That was not a subject that
23 was studied, correct, specifically? It
24 wasn't an endpoint at all; correct?

Page 363

1   A. It was not a predefined
2 endpoint.
3   Q. The study was not powered to
4 evaluate that question. Right?
5   A. That's correct.
6   Q. And, in fact, we went
7 through some language in the context of
8 the cardiovascular mortality issue where
9 Glenn Gormley in a white paper and in an
10 internal document actually talked about
11 the fact that you can't draw definitive
12 conclusions about that secondary endpoint
13 because of the way the study was
14 designed. It just -- it's not set up to
15 study that issue.
16      The same would hold true for
17 gastrointestinal effects probably even to
18 a larger extent. Right?
19      MR. PARKER: Objection;
20   form.
21      THE WITNESS: There was not
22   a prespecified endpoint for GI AEs
23   in the study, that's correct.
24 BY MR. SLATER:

Page 364

1   Q. Nowhere in this letter to
2 the editor to the Mayo Clinic does Dr.
3 Menne or Dr. Haller talk about any of the
4 olmesartan side patients who I showed you
5 today their documentation; that's not
6 discussed here at all. Right?
7      MR. PARKER: Objection.
8      MR. SLATER: Let me ask it
9   differently.
10 BY MR. SLATER:
11   Q. The specifics of patients
12 who developed or were documented to
13 develop gastrointestinal effects, that's
14 not discussed in detail here. Right?
15   A. The specifics of patients
16 who developed gastrointestinal AEs in
17 either the olmesartan or the placebo
18 group are not described here.
19      MR. SLATER: Let's go off
20   the video for a second.
21      THE VIDEO TECHNICIAN: Sure.
22   The time is 4:31 p.m. Off the
23   record.
24      - - -

Page 365

1      (A discussion off the record
2   occurred.)
3      - - -
4      THE VIDEO TECHNICIAN: The
5   time is 4:41 p.m. Back on the
6   record.
7      - - -
8      EXAMINATION
9      - - -
10 BY MR. PARKER:
11   Q. Dr. Warmke, good afternoon.
12 It's now 20 to 5:00. It's been a long
13 day, but I have a few questions I need to
14 ask you to address some of the issues
15 that Mr. Slater reviewed with you today
16 during the course of your deposition.
17 Okay?
18   A. Okay.
19   Q. Let's begin where we started
20 today with your qualifications; and I'm
21 not going to repeat anything that's been
22 said, but tell the jury what experience
23 you have professionally with clinical
24 trial.