# EXHIBIT 3

Protected Information - Steven M. Lagana, M.D.

```
1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEW JERSEY
3
4                    -    -    -
5

    IN RE:   BENICAR          :   MDL NO.  2606
6   (OLMESARTAN) PRODUCTS    :
    LIABILITY LITIGATION     :
7                            :
8
9
                     -    -    -
10

               February 7, 2017
11

                     -    -    -
12

             PROTECTED INFORMATION
13

                     -    -    -
14

                    Oral expert deposition of
15   STEPHEN M. LAGANA, M.D., taken pursuant
     to notice, was held at the law offices of
16   Robins Kaplan LLP, 601 Lexington Avenue,
     Suite 3400, New York, New York, beginning
17   at 10:09 a.m., on the above date, before
     Kimberly A. Cahill, a Federally Approved
18   Registered Merit Reporter and Notary
     Public.
19
20
                     -    -    -
21
22          GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Protected Information - Steven M. Lagana, M.D.

## Page 2

1 APPEARANCES:
2
3 MAZIE SLATER KATZ & FREEMAN, LLC
  BY: ADAM M. SLATER, ESQUIRE
  103 Eisenhower Parkway, 2nd Floor
4 Roseland, New Jersey 07068
  (973) 228-9898
5 aslater@mskf.net
  Representing the Plaintiffs
6
7 VENABLE LLP
  BY: BRUCE R. PARKER, ESQUIRE
8 750 East Pratt Street
  Suite 900
9 Baltimore, Maryland 21202
  (410) 244-7534
10 brparker@Venable.com
  Representing Daiichi Sankyo, Inc.
11
12 DRINKER BIDDLE & REATH, LLP
  BY: JESSICA L. BRENNAN, ESQUIRE
13 600 Campus Drive
  Florham Park, New Jersey 07932
14 (973) 549-7000
  jessica.brennan@dbr.com
15 Representing Daiichi Sankyo, Inc.
16
17 ALSO PRESENT:
18     Amy Klug, Esquire
       Assistant General Counsel
19     Daiichi Sankyo, Inc.
20
21
22          - - -
23
24

## Page 3

1          - - -
2        I N D E X
3          - - -
4
5 Testimony of: STEPHEN M. LAGANA, M.D.
6 By Mr. Parker          8
  By Mr. Slater          394
7
8          - - -
9        E X H I B I T S
10         - - -
11
12 NO.      DESCRIPTION      PAGE
13 Lagana-1    Notice of        8
              Deposition of
14            Stephen M. Lagana,
              M.D.
15
   Lagana-2    Packet of Bills    8
16             from Dr. Lagana,
               Beginning with
17             "Bill 9 - General"
18 Lagana-3    Rule 26 Expert    53
               Report of Stephen
19             Lagana, M.D.
               Regarding General
20             Causation
21 Lagana-4    Document Entitled  107
               "In re: Benicar
22             (Olmesartan)
               Products Liability
23             Litigation
               Supplemental
24             Reliance List for

## Page 4

1              Dr. Stephen M.
               Lagana
2
3 Lagana-5    2013 Article      115
               "Villous Atrophy
4              and Negative Celiac
               Serology: A
5              Diagnostic and
               Therapeutic
6              Dilemma", by
7              DeGaetani, et al
   Lagana-6    2016 Original     143
8              Article, "The
               clinical and
9              phenotypical
               assessment of
10             seronegative
               villous atrophy; a
11             prospective UK
               centre experience
12             evaluating 200
               adult cases over a
13             15-year period
               (2000-2015)" by
14             Aziz, et al
15 Lagana-7    2015 Paper        155
               "Self-limited
16             coeliac-like
               enteropathy: a
17             series of 18 cases
               highlighting
18             another coeliac
               disease mimic" by
19             Brown, et al
20 Lagana-8    2012 Original     166
               Article, "Severe
21             Sprue-like
               Enteropathy
22             Associated With
               Olmesartan" by
23             Rubio-Tapia,
               Murray, et al
24 Lagana-9    2016 Editorial    182

## Page 5

1              "Sprue-Like
               Enteropathy
2              Associated With
               Olmesartan: A New
3              Kid on the
               Enteropathy Block"
4              by Hujoel and
               Rubio-Tapia
5
   Lagana-10   2016 Article      218
6              "Olmesartan-
               associated
7              sprue-like
               enteropathy: a
8              systematic review
               with emphasis on
9              histopathology" by
               Burbure, Lagana, et
10             al
11 Lagana-11   Abstract 757      246
               "Angiotensin
12             Receptor Blockers
               Other Than
13             Olmesartan Are Not
               Associated with
14             Histologic Evidence
               of Duodenitis" by
15             Lagana, et al
16 Lagana-12   2015 Article      252
               "Sprue-like
17             histology in
               patients with
18             abdominal pain
               taking olmesartan
19             compared with other
               angiotensin
20             receptor blockers"
               by Lagana, et al
21
22 Lagana-13   2014 Paper        279
               "Sprue-like
23             Enteropathy
               Associated with
24             Olmesartan" by
               Cartee and Murray

Protected Information - Steven M. Lagana, M.D.

Page 6

1  Lagana-14  2015 Paper  305
       "Immunopathogenesis
2      of
       olmesartan-
3      associated
       enteropathy" by
4      Marietta, et al
5  Lagana-15  2015 Original  340
       Article "Severe
6      intestinal
       malabsorption
7      associated with
       olmesartan: a
8      French nationwide
       observational
9      cohort study" by
       Basson, et al
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1              - - -
2        DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  Page Line    Page Line    Page Line
7
8  Request for Production of Documents
9  Page Line    Page Line    Page Line
10 242 6
11
12 Stipulations
13 Page Line    Page Line    Page Line
14
15
   Question Marked
16
   Page Line    Page Line    Page Line
17
18
19
20
21
22
23
24

Page 8

1              - - -
2        (Deposition Exhibit No.
3    Lagana-1, Notice of Deposition of
4    Stephen M. Lagana, M.D., was
5    marked for identification.)
6              - - -
7        (Deposition Exhibit No.
8    Lagana-2, Packet of Bills from Dr.
9    Lagana, Beginning with "Bill 9 -
10   General", was marked for
11   identification.)
12             - - -
13       STEPHEN M. LAGANA, M.D.,
14   after having been duly sworn, was
15   examined and testified as follows:
16             - - -
17       EXAMINATION
18             - - -
19 BY MR. PARKER:
20   Q.   Dr. Lagana, good morning,
21 sir.
22   A.   Good morning.
23   Q.   Dr. Lagana, have you been
24 deposed before?

Page 9

1    A.   I have not.
2    Q.   I'm sure Mr. Slater has
3  reviewed what this procedure is
4  essentially all about and what will
5  happen. Let me just say that I'm sure in
6  the course of what will probably be a
7  long day that I will ask you questions
8  that are somewhat garbled. You may not
9  understand them --
10   A.   Okay.
11   Q.   -- because of the inartful
12 way in which I asked the question. If
13 that should happen, just tell me and I'll
14 do my best to rephrase the question.
15       All right?
16   A.   Sure.
17   Q.   And as I'm sure Mr. Slater
18 told you, this is not an endurance
19 contest. So to the extent you need a
20 break, simply tell me. Provided it's not
21 in the middle of my question, we will
22 accommodate those breaks as needed.
23       Okay?
24   A.   Yep.

Protected Information - Steven M. Lagana, M.D.

Page 10

1    Q.   Let's then start with what I
2  have marked in front of you as Deposition
3  Exhibit No. 1, which is the deposition
4  notice.
5          Counsel has provided us last
6  evening with some objections to those
7  requests and with statements that certain
8  documents would be produced, and what has
9  been produced to me this morning are
10 billing statements.
11         Is there anything else that
12 you have brought with you today that is
13 responsive to the deposition notice?
14   A.   Well, I have brought this
15 entire binder (Indicating), which
16 includes articles from the medical
17 literature as well as some of the reports
18 which I have relied upon.  And that would
19 be the extent of what I've brought with
20 me today.
21   Q.   Fair enough.  When you say
22 reports, are you referring to reports of
23 other experts in this litigation?
24   A.   I am.

Page 11

1    Q.   I see.
2          And are those reports of
3  both some who have agreed to testify for
4  the plaintiffs and some who have agreed
5  to testify for the defense?
6    A.   They are.
7    Q.   And the binder that you have
8  in front of you, you described it --
9  putting aside the reports -- as medical
10 literature that you reviewed?
11   A.   Yes.
12   Q.   How did the literature come
13 to you?  Was it provided to you by
14 counsel?
15   A.   This entire binder was
16 prepared for me by Mr. Slater and his
17 staff.  The articles within it are
18 articles which I've provided to them
19 primarily.  There are some that they have
20 provided to me, and there are some in
21 here -- this binder was prepared for
22 myself and another expert, Dr. Lebwohl,
23 so there are some that were resultant
24 from his work on the case.

Page 12

1    Q.   Let me make sure I
2  understand.  Can you tell me when you
3  received the binder?
4    A.   I saw the binder yesterday
5  and took possession of it today.
6    Q.   Okay.
7          At the time you submitted
8  your report, which was November 30th --
9  and we'll mark your report and we'll go
10 into your report in some detail today --
11 did you have a collection of literature
12 that you had reviewed for purposes of
13 writing that report?
14   A.   Yes.
15   Q.   And who obtained that
16 literature for you?  Is that a result of
17 you doing your own search or did counsel
18 provide that literature for you?
19   A.   I would have to estimate
20 that about 85 percent of the papers were
21 papers that I obtained through my own
22 research prior to this legal matter or
23 while preparing for this legal matter,
24 and several of the articles were sent to

Page 13

1  me by counsel.
2    Q.   And counsel being Mr. Slater
3  or his office?
4    A.   Uh-hum.  Yes.
5    Q.   When were you retained in
6  that litigation?
7    A.   I believe it was in early
8  2015 that we started talking.
9    Q.   And this may be helpful.  I
10 marked as Exhibit No. 2 a collection of
11 billing statements.  Collectively, I've
12 marked them as Exhibit No. 2.  And please
13 refer to that if that helps answer the
14 question as to when you were retained --
15   A.   Okay.
16   Q.   -- approximately.
17       MR. SLATER:  And, Bruce,
18     obviously, I told you there are
19     two invoices I didn't give you
20     because they're cases he consulted
21     in but didn't write a report, so
22     that would be I think shielded at
23     this point, so I just --
24       MR. PARKER:  I didn't know

Protected Information - Steven M. Lagana, M.D.

**Page 14**

```
1    whether that preceded --
2           MR. SLATER: I just want to
3    make it clear that I did hold back
4    two.
5           MR. PARKER: That's correct.
6           THE WITNESS: These invoices
7    all relate to 2016, so, yeah,
8    whatever is the earliest date in
9    here would be approximately when
10   we started working on these cases.
11          MR. PARKER: So please
12   correct me if I'm wrong. The
13   earliest date I see is on the
14   first page of this exhibit, which
15   is the billings for the general
16   causation opinion, and that
17   appears to be September 1, 2016.
18          THE WITNESS: On page 1,
19   you're --
20   BY MR. PARKER:
21     Q.   Well, this first page
22   (Indicating), sir, of the exhibit.
23     A.   Oh. I have a different
24   order of documents than you do.
```

**Page 15**

```
1      Q.   Mr. Slater said I would get
2    them confused.
3      A.   Okay.
4      Q.   The second page, excuse me,
5    your billings for the Block case reflect
6    a September 1, 2016 date.
7      A.   I agree.
8      Q.   And just leaf through, if
9    you would, that's the earliest date that
10   I saw when I quickly reviewed the
11   billings; is that correct?
12          (Pause.)
13          THE WITNESS: Yes.
14   BY MR. PARKER:
15     Q.   And who, if you recall, sir,
16   retained you? Who was the lawyer who
17   contacted you?
18     A.   Mr. Slater.
19     Q.   Had you ever worked with Mr.
20   Slater before?
21     A.   Yes.
22     Q.   In what type of litigation
23   matter?
24     A.   There was one case which I
```

**Page 16**

```
1    consulted with him on, and that was in
2    early 2015.
3      Q.   And what was the nature of
4    that case?
5      A.   It was a patient who had
6    used olmesartan and had fairly severe
7    side effects.
8      Q.   So it was an
9    olmesartan-related matter.
10     A.   Yes.
11     Q.   And that's the only other
12   matter prior to your retention in
13   September of 2016 in which you've worked
14   with Mr. Slater?
15     A.   Yes.
16     Q.   Have you ever been called
17   upon, I'll break it down, first by an
18   attorney to address a question of whether
19   a drug is causally related to an adverse
20   health outcome?
21          MR. SLATER: You're talking
22   about besides this litigation?
23          MR. PARKER: Yes, yeah.
24          THE WITNESS: By an
```

**Page 17**

```
1    attorney, you said.
2          MR. PARKER: Yes, sir.
3          THE WITNESS: Okay.
4          Not that I can recall at
5    this time.
6    BY MR. PARKER:
7      Q.   Putting aside olmesartan,
8    have you ever been asked by one or a
9    group of medical scientists to
10   participate in an investigation of
11   whether a drug is causally related to an
12   adverse health outcome?
13     A.   I'd like you to clarify the
14   question and the clarification I would
15   like is, are you referring to would
16   collaborating with colleagues on a
17   research project be under the providence
18   of your question?
19     Q.   Sure. I think that's fair.
20   Sure.
21     A.   Okay. A specific example
22   escapes me at the moment, but I think
23   it's probably likely.
24     Q.   Okay. Doctor, your billings
```

Protected Information - Steven M. Lagana, M.D.

Page 18

1 in this litigation are 500 -- your rate
2 -- excuse me -- is $500 an hour?
3     A.   Yes.
4     Q.   And allowing for the two
5 cases in which you have not been
6 disclosed, put those aside, can you look
7 through Exhibit No. 2 and tell me whether
8 it represents all of the billings on
9 matters involving olmesartan for which
10 you've been disclosed as an expert?
11     A.   I'm sorry.  May I ask for
12 clarification again?
13     Q.   Sure.  Yes, sir.  What is
14 it?
15     A.   Oh, you said look at bill 2
16 --
17     Q.   No, Exhibit 2.
18     A.   Oh, Exhibit 2.
19     Q.   The whole package.
20     A.   Okay.  Got it.  Got it.  Got
21 it.
22     Q.   I just want to know whether
23 it's reasonably complete.  That's all.
24     A.   Understood.

Page 19

1          (Pause.)
2          THE WITNESS:  These bills
3     reflect what I've submitted to Mr.
4     Slater thus far.  I've done
5     preparation work for this
6     deposition which I have not yet
7     billed to Mr. Slater.
8 BY MR. PARKER:
9     Q.   Approximately how many
10 hours?
11     A.   I would say approximately
12 25.
13          MR. PARKER:  Off the record.
14          - - -
15          (A discussion off the record
16     occurred.)
17          - - -
18          MR. PARKER:  Back on the
19     record.
20 BY MR. PARKER:
21     Q.   Dr. Lagana, when you were
22 retained by Mr. Slater, what was the --
23 and I'm speaking now with regard to the
24 billing -- it's referred to as Bill 9 -

Page 20

1 General.
2          What was the question, as
3 you recall, that you were asked to
4 address?
5     A.   Well, the question that was
6 posed to me in a general sense was, Mr.
7 Slater represented to me that he had a
8 number of cases which could represent
9 olmesartan enteropathy and he wanted my
10 expert opinion on that question, to
11 review both clinical histories as well as
12 pathologic specimens, and to give my
13 opinion on them.  And as part of that
14 work, a general causation statement was
15 going to be produced.
16          And so that's what I
17 understood that I would be doing and
18 that's what I did.
19     Q.   How do you define the term
20 -- and how did you define it in your
21 report -- general causation?
22     A.   Well, I would say causation
23 or general causation refers to, if a
24 stimulus leads to an event, that would be

Page 21

1 causation; and in medicine, we apply the
2 reasonable medical certainty threshold,
3 which means more likely than not.
4          So that is the background
5 that I used when evaluating this
6 question.
7     Q.   Is there a difference in
8 your understanding between the question
9 of general versus specific causation?
10     A.   Yeah, I would understand
11 them to be different insofar as, in a
12 general case, I'm opining about the
13 plausibility of this adverse event or,
14 you know, if we take it away from the
15 Benicar question and just say in general,
16 for any stimulus, is it likely that this
17 stimulus causes this event --
18     Q.   In the general population?
19     A.   I wouldn't necessarily say
20 in the general population, because there
21 are different -- populations can be
22 affected by diseases differently.  So,
23 for instance, in celiac disease, gluten
24 can affect genetically predisposed

Protected Information - Steven M. Lagana, M.D.

Page 22

1  patients by giving them celiac disease,
2  inflammation, villous atrophy, diarrhea,
3  but I wouldn't say gluten in a general
4  population causes that because, you know,
5  98 or 99 percent of us eat gluten with no
6  negative effects.
7          So I would say plausible to
8  the public.
9      Q.   I just need to follow up
10  with something. I'm not sure I
11  understand that.
12      A.   Sure.
13      Q.   Let me try to approach it
14  slightly differently. What do you
15  understand a question of specific
16  causation to involve?
17      A.   For a specific causation, I
18  would expect that we're talking about a
19  specific case.
20      Q.   Okay. Fair enough. Let's
21  put that aside.
22          So if you're asked the
23  question, can you arrive at an opinion as
24  to specific causality regarding Mr. Jones

Page 23

1  -- making up a name -- you would
2  understand your task to be whether or not
3  you can determine to a reasonable degree
4  of medical probability that olmesartan
5  was causing some adverse event in Mr.
6  Jones.
7      A.   Sorry. Could you just
8  repeat that, please?
9      Q.   Sure. I'm trying to better
10  understand in your mind what you
11  understood your task to be when asked a
12  question to assess whether olmesartan has
13  been proven by reliable, methodologically
14  sound, derived evidence of being a
15  general -- a cause of sprue-like
16  enteropathy in the general population.
17  And that's what I'm trying to understand,
18  how you approached that question.
19      A.   I think maybe the term
20  "general population" is throwing me a
21  little bit in this context, because we
22  know certainly plenty of people take
23  olmesartan and do not have sprue-like
24  enteropathy, so there is likely cofactors

Page 24

1  that are still being determined. They
2  may be genetic.
3          So in the public at large,
4  yes, I certainly believe olmesartan is
5  causative of sprue-like enteropathy in
6  some patients.
7      Q.   And did you attempt to
8  answer that question by looking at
9  individual cases or did you attempt to
10  answer that question by looking at
11  population-based studies?
12          MR. SLATER: I'm just going
13      to object to the form of the
14      question.
15          You can answer.
16          THE WITNESS: Okay. One
17      point that I would make before I
18      answer your question, if I may, is
19      that I was pretty deeply familiar
20      with this topic before Mr. Slater
21      called me, so that question to me
22      was an evolution, I would say, as
23      it should be in science. You get
24      initial reports and then you

Page 25

1      investigate them more deeply and
2      think about them more deeply.
3          In the case of olmesartan, I
4      was first introduced to it through
5      my clinical practice -- or
6      olmesartan enteropathy, I was
7      first introduced to it through my
8      clinical practice.
9          One of the senior
10      gastroenterologists at Columbia
11      during one of our
12      interdisciplinary conferences
13      mentioned a study by Dr. Murray
14      from the Mayo Clinic that was
15      going to be published soon and
16      described what -- the findings in
17      what would soon be published as
18      the Rubio-Tapia report in 2012 in
19      the Mayo Clinic Proceedings.
20          And during that time, we
21      started in our hospital reviewing
22      charts of patients who had
23      so-called seronegative celiac
24      disease. And my clinical

Protected Information - Steven M. Lagana, M.D.

Page 26

1 colleagues uncovered a number of
2 cases -- I believe there were 16
3 cases -- of patients who were
4 exposed to olmesartan who were
5 classified as having seronegative
6 celiac disease.
7       And so during that time, I
8 had seen many of these by biopsies
9 and many of the biopsies were
10 extremely abnormal, extremely
11 abnormal.
12       I can describe those cases
13 for you if you'd like as an
14 example or --
15 BY MR. PARKER:
16    Q.   I think we'll get into it
17 later, but for now, let's just go on.
18    A.   Okay.  And so my clinical
19 colleagues contacted these patients and
20 at least advised them about this new
21 association that was described; and I
22 can't say that I saw every follow-up
23 biopsy, but I saw quite a few follow-up
24 biopsies of patients who had discontinued

Page 27

1 olmesartan on the basis of
2 recommendations from Columbia physicians
3 and the degree of improvement, striking,
4 striking.
5       And that affected -- you
6 know, that certainly contributed to my
7 thinking and it seemed to me well beyond
8 what you could imagine would be a chance
9 association.
10       And since then, I've
11 followed the medical literature pretty
12 closely.  I read everything I see that
13 relates to olmesartan enteropathy and I
14 have over time certainly become more
15 convinced that this drug does cause this
16 syndrome in some patients.
17    Q.   I think we'll -- I'll
18 approach this by coming back in the
19 context of some of the actual literature
20 to try to better understand your method
21 by which you've reached certain opinions.
22    A.   Sure.
23    Q.   First, let me follow up on
24 what you just explained to me.  When did

Page 28

1 this discussion occur at Columbia where
2 you learned that the folks at Mayo were
3 going to be publishing a case series?
4    A.   I believe that was late 2011
5 or early 2012.
6    Q.   And do you recall that the
7 Mayo series was not published, at least
8 on the Internet, until June of 2012?
9    A.   I don't recall that specific
10 timeline.
11    Q.   We'll mark that and -- my
12 question is, are you confident that you
13 were made aware that he was going to
14 publish that six months in advance of
15 that paper being published?
16    A.   Well -- am I confident in
17 that.  You asked for the best of my
18 recollection of a conversation that
19 happened four or five years ago, six
20 years ago, so I believe, as I said, it
21 was late 2011-early 2012.  If it was, you
22 know, March or April of 2012, I wouldn't
23 think that that's specifically
24 inconsistent with that recollection.  So

Page 29

1 I -- you know, I can't give you the exact
2 date.
3    Q.   And the subsequent effort to
4 go back into the chart reviews, was that
5 precipitated by awareness that the folks
6 at Mayo were going to publish this paper?
7    A.   To the best of my knowledge,
8 yes.
9    Q.   We're going to come back to
10 that --
11    A.   May I just follow up on that
12 point?
13    Q.   Sure, absolutely.
14    A.   You know, here, we're
15 talking about this in the context of a
16 litigation and also in the context of
17 medical literature.
18       At the time, you know, this
19 was -- these were patients who were
20 essentially dying and -- or many of them
21 were close to death, in terrible shape,
22 and so this was a medical breakthrough
23 that, you know, affected us -- it was a
24 very profound effect and we were happy to

Page 30

1  have learned about this, not -- you know,
2  not because, you know, I thought I'd make
3  a few bucks billing Mr. Slater or because
4  we'd be able to write a few papers, but,
5  you know, this was really a dramatic
6  change that you don't see too often in
7  medicine.
8      Q.  How did -- well, excuse me.
9  Were the 16 patients that you described
10 finding still under the active care of
11 physicians at Columbia?
12     A.  As a pathologist, I don't
13 think I can answer that question terribly
14 accurately.  As I said, I saw a number of
15 follow-up biopsies, so certainly some of
16 them were.  I couldn't give you a
17 definite answer beyond that.
18     Q.  For purposes of the jurors'
19 understanding, Columbia is a referral
20 center for people who have various forms
21 of small bowel disease?
22     A.  Yes.
23     Q.  And it wouldn't surprise you
24 if some number of these 16 came from

Page 31

1  outside the greater New York-New Jersey
2  area to be examined by physicians at
3  Columbia.
4      A.  I would say that that is
5  very likely.
6      Q.  And when their treatment
7  ends, their examination ends, they go
8  back home, wherever they came from.
9      A.  I believe most of them leave
10 a phone number.
11     Q.  Okay.
12         My point simply is, you're
13 not able to tell me, for the reasons you
14 just described right now, whether any of
15 those 16 patients were still considered
16 to be under the active treatment of
17 physicians at Columbia at the time they
18 were recontacted.
19     A.  Well, a number of the
20 patients were rebiopsied at Columbia, so
21 certainly these were ongoing
22 patient-doctor relationships if they
23 returned to our clinic for rebiopsy.
24     Q.  Were they asked to come back

Page 32

1  for a rebiopsy?
2      A.  I wasn't there when these
3  conversations were happening, so I'd
4  rather -- I would only be guessing.
5      Q.  Sure.  Never want you to
6  guess.
7      A.  Okay.
8      Q.  Who was the physician, if
9  you know, who was leading the effort to
10 do this search and call up the patients?
11     A.  Well, we have a Celiac
12 Disease Center with several physicians
13 who deal with adults' complicated celiac
14 disease, such as Dr. Peter Green, Dr.
15 Benjamin Lebwohl, and Dr. Suzanne Lewis.
16         So I would say that this was
17 probably a center-wide effort and who was
18 actually making the phone calls, I
19 couldn't tell you.
20     Q.  Can you take a look --
21 again, going back to your billing
22 statement, labeled "Bill 9 - General,"
23 can you tell me the approximate amount of
24 time that it took you to actually write

Page 33

1  your report, the general causation
2  report?
3      A.  Well, it says here 7.89
4  hours.  I would think that that reflects
5  pretty accurately the time it took to
6  write the actual report.
7      Q.  Let me follow up.  I mean --
8  let me try to be clearer.
9      A.  Sure.
10     Q.  I'm assuming that some of
11 this time was spent reviewing or
12 re-reviewing the literature and not
13 actually drafting a report; is that
14 accurate?
15     A.  I see what you're saying.
16 Well, this is the first time that I've
17 been asked to write a general causation
18 report and it's possible that I perhaps
19 -- that perhaps Mr. Slater got lucky and
20 I did not bill some of the time that I
21 could have for reading.
22         I would think that --
23         MR. SLATER:  Thanks, Bruce.
24         THE WITNESS:  Yeah, I don't

Protected Information - Steven M. Lagana, M.D.

Page 34

1 know -- what is the statute of
2 limitations?
3       MR. PARKER:  You got at
4 least three years.
5       THE WITNESS:  Okay.
6       MR. SLATER:  Thanks again.
7       THE WITNESS:  The vast
8 majority of any of the papers that
9 I cited in this general report, I
10 had read previously and I had some
11 idea of what I was looking for or
12 what point I wanted to make and
13 where I was getting that from.
14       So, you know, I didn't
15 spend, you know, several days
16 hermetically sealed in my office
17 reviewing every paper again before
18 I started writing the report.  I
19 knew what I wanted to say.  This
20 comes up in my practice and that's
21 what I did.
22       But I would agree with you
23 that perhaps I could have billed
24 more hours for that.  The 7.89

Page 35

1 hours here most likely represents
2 writing time.
3 BY MR. PARKER:
4       Q.  And so following up on that,
5 none of this time then reflects time
6 spent either telephonically or in person
7 with Mr. Slater or other plaintiffs'
8 lawyers talking about the evolution of
9 your report, your general causation
10 report.
11       A.  Mr. Slater and I certainly
12 had phone calls related to a couple of
13 the cases that I can recall.  A general
14 call about my causation report, I don't
15 recall such a conversation.
16       Q.  Thank you.
17       MR. SLATER:  And I just --
18 I've been keeping quiet a little
19 bit, but obviously you really
20 shouldn't be asking about our
21 interaction that relates to a
22 report, because that would be
23 protected communications under the
24       --

Page 36

1       MR. PARKER:  I'm not going
2 to ask about the substance, but I
3 think I can ask --
4       MR. SLATER:  Well, you just
5 did, because you're talking about
6 the report.  So you're asking
7 about conversations about the
8 report, so that is the substance.
9       I didn't interrupt you, but
10 I would just prefer that we not go
11 any deeper into what he and I
12 discussed with respect to his
13 report --
14       MR. PARKER:  I'm not going
15 to go into the details, but I
16 think I'm entitled to know if you
17 met to talk about it.
18       MR. SLATER:  I don't think
19 actually you do, but I didn't stop
20 you, but I think that we need to
21 not go deeper into our
22 interactions with regard to the
23 report --
24       MR. PARKER:  I'm not going

Page 37

1 to --
2       MR. SLATER:  And I can
3 assure you, I'm not going to ask
4 questions with your experts about
5 their interactions with lawyers.
6 I have zero interest in that.
7       MR. PARKER:  Well, we have a
8 slightly different interest, but
9 I'm not going to go into it.
10 BY MR. PARKER:
11       Q.  Dr. Lagana, in the effort to
12 prepare your general causation report,
13 did you have discussions with other
14 physicians or scientists?
15       A.  I've discussed this disease
16 and this entity with other physicians and
17 scientists many times in the course of my
18 practice and in the course of research,
19 but I do not believe that I had any
20 specific conversations related to the
21 drafting of this report with anyone.
22       Q.  Okay.
23       Doctor, when you were
24 retained by Mr. Slater for the express

Protected Information - Steven M. Lagana, M.D.

Page 38

1  purpose of writing a general causation
2  report, did you understand your role to
3  be that of an advocate or a scientist,
4  medical scientist?
5      A.   Scientist, absolutely.
6      Q.   And do you think you
7  performed that task as a scientist would?
8      A.   Yes.  And I should say,
9  maybe if I could clarify, as a physician
10 scientist.  So I have both clinical
11 experience and, you know, experience
12 reading the literature.  So both of those
13 areas of expertise were brought to bear.
14     Q.   Certainly.
15          Would you agree that on the
16 essence of good science is for a
17 scientist to look at all reliable data on
18 a question being investigated?
19          MR. SLATER:  Objection.
20          You can answer.
21          THE WITNESS:  Well, within
22     certain limits.  It would have to
23     be something relevant to the
24     specific question one was

Page 39

1      considering.
2          There are tangential areas
3      that touch any area of medicine.
4      You can't review everything that
5      could potentially touch something,
6      but you do have -- I would agree
7      that part of the scientific review
8      is to look at the reliable,
9      peer-reviewed literature relating
10     to a topic at hand.
11 BY MR. PARKER:
12     Q.   Good science does not
13 involve a scientist choosing to ignore
14 evidence which is reliable, but
15 inconsistent with your opinion, is it?
16 That's not good science.
17          MR. SLATER:  Objection.
18          You can answer.
19          THE WITNESS:  When there are
20     good studies that are done that
21     relate to the topic, I would read
22     those studies and I would consider
23     them whether they supported my
24     particular point of view or did

Page 40

1      not; and, in fact, I would use
2      those studies to refine my point
3      of view or I might critique the
4      studies to think why they could
5      have been wrong or, as I said, I
6      may refine my view of things.
7          So I do consider well --
8      well-done studies that are
9      published in the peer-reviewed
10     literature whether they are in
11     keeping with my thinking or not.
12 BY MR. PARKER:
13     Q.   And what you just described
14 is what I think you would call a good
15 scientific approach or a good scientific
16 methodology.
17     A.   I would say so.
18     Q.   Okay.
19          Doctor, I want to change
20 topics just slightly --
21     A.   May I make one clarifying
22 statement as well?
23     Q.   Sure, sure.
24     A.   In the olmesartan

Page 41

1  enteropathy world, I assume, you know,
2  this is the backdrop that we're
3  discussing these cases -- that we're
4  discussing these questions, as far as
5  whether or not olmesartan enteropathy
6  exists, in the peer-reviewed medical
7  literature, I've not seen one article
8  that has argued that, you know,
9  Rubio-Tapia was wrong or that this was a
10 spurious association.
11          I am aware of some of the --
12 you know, the ROADMAP study and the
13 follow-up study and we can get into those
14 in more depth if and when you want to;
15 but before -- honestly, before reading
16 the defense expert reports, I had not
17 either read in the peer-reviewed
18 literature any argument against this
19 entity, nor in innumerable discussions
20 with gastroenterologists and
21 gastrointestinal pathologists, no one has
22 expressed skepticism about whether or not
23 this is a thing.
24          MR. PARKER:  Okay.  Move to

Protected Information - Steven M. Lagana, M.D.

Page 42

1   strike.
2   BY MR. PARKER:
3       Q.   Doctor, do you recognize the
4   difference between saying A is associated
5   with B and A is causing B?
6           MR. SLATER:  Objection to
7       the form.
8           You can answer.
9           THE WITNESS:  Well, there
10      are differences in -- there are
11      causal associations, so something
12      can be spuriously associated or it
13      can be causally associated.
14  BY MR. PARKER:
15      Q.   So simply saying that A is
16  associated with B does not in and of
17  itself mean A is causing B in medical
18  science.  Agree?
19      A.   When you determine that
20  there is an association, when you
21  determine that A is associated with B,
22  that's the first step in discovery and
23  you have additional work to do to prove
24  that A is causing B.

Page 43

1       Q.   All right.  So finding an
2   association is the first step.
3       A.   Uh-hum.
4       Q.   But it is not all that is
5   required before you can pronounce to a
6   degree of reasonable probability from a
7   scientific perspective that you have
8   proven causality.  Would you agree?
9       A.   Yeah, I think that's fairly
10  uncontroversial.
11      Q.   Have you had any new papers
12  published since the C.V. that was given
13  to us in November of 30th?
14      A.   May I review that C.V.?
15      Q.   Sure, yeah.
16      A.   Is it in here?
17          MR. SLATER:  Hopefully.
18          THE WITNESS:  Okay.
19          MR. SLATER:  I think it's
20      the back of your report.  It's a
21      two-sided copy.
22          THE WITNESS:  Okay.
23          MR. SLATER:  Oh, you know
24      what?  I don't think his C.V.'s

Page 44

1       attached to that copy.  He doesn't
2       have a copy of the report with a
3       C.V. on it.
4           MR. PARKER:  I have a
5       report, but no C.V.
6   BY MR. PARKER:
7       Q.   Have you published any
8   papers in the last couple months?
9           MR. SLATER:  I might have
10      his C.V. if you want him to look
11      at it --
12          MR. PARKER:  If it'll help
13      him to answer the question.
14          MR. SLATER:  I'm not going
15      to mark this copy because it's got
16      my notes all over it --
17          MR. PARKER:  That's fine.
18          MR. SLATER:  Do you want to
19      see it?
20          THE WITNESS:  Sure.
21          MR. SLATER:  Go ahead.
22          (Pause.)
23          THE WITNESS:  Okay.  And the
24      one that you have is up to date as

Page 45

1       of November --
2           MR. PARKER:  30th.
3           THE WITNESS:  -- 30th, 2016.
4       Do you have "Whole exome
5       sequencing identifies a homozygous
6       POLG2 missense" --
7           MR. PARKER:  I didn't
8       memorize your C.V.  I couldn't
9       tell you.
10          THE WITNESS:  So there's one
11      additional study that's a case
12      report completely unrelated to
13      this case.  It's a -- it was an
14      infant who had a rare genetic
15      mutation.
16  BY MR. PARKER:
17      Q.   Let me rephrase the
18  question, maybe make it more pointed and
19  helpful:  Have you published anything
20  since November 30th that's relevant to
21  olmesartan?
22      A.   No.  I have -- I would say I
23  have a review article which is accepted
24  and in press at Archives of Pathology

Protected Information - Steven M. Lagana, M.D.

Page 46

1 which relates to other medications in the
2 GI tract, but does not to the best of my
3 recollection mention olmesartan.
4      Q.    And you say it's a review.
5 Is this a review of your cases that
6 you've seen at Columbia or a review of
7 the literature?
8      A.    A review of the literature
9 with one case that I saw at Columbia.
10      Q.    And what other chemicals or
11 drugs are the subject of your review
12 article?
13      A.    These are polymers which are
14 used in renal failure patients,
15 sevelamer, for instance, Kayexalate, and
16 these polymers can be deposited within
17 the GI tract; and it's a
18 pathology-focused review aimed at helping
19 pathologists identify these fragments
20 when they see them.
21      Q.    Okay. So the gist of your
22 article is how to identify the polymer
23 fragments --
24      A.    Yes.

Page 47

1      Q.    -- in the renal tract?
2      A.    In the GI tract.
3      Q.    GI tract. Excuse me.
4      A.    Yeah. I don't know if
5 that's published yet. It's accepted. It
6 may or may not be on their website.
7      Q.    Have you received any
8 promotions at Columbia since November of
9 30th?
10      A.    No.
11      Q.    What is your current medical
12 research area, if you have one?
13      A.    I research mainly in two
14 areas: One is small intestinal pathology
15 and the other is liver cancer.
16      Q.    When you say your research
17 involves small intestinal pathology, can
18 you be more specific as to what your
19 research actually involves?
20      A.    Sure. I'm interested in
21 celiac disease and related conditions,
22 olmesartan enteropathy being one of them.
23 I'm interested in small intestinal
24 transplant. I'm interested to some

Page 48

1 extent in small intestinal neoplasia,
2 although that hasn't been a large focus
3 of my time, and liver cancer, as I
4 mentioned.
5      Q.    And when you say research,
6 are you doing in vitro or in vivo
7 experiments in this area? I'm talking
8 now about the small intestinal pathology,
9 not the liver cancer.
10      A.    Okay.
11      Q.    Describe for me the type of
12 research you're doing.
13      A.    Mostly I do translational
14 studies that look at clinicopathologic
15 correlations.
16      Q.    Okay. Meaning you're
17 looking at your microscope of biopsy
18 specimens taken from people.
19      A.    Correct.
20      Q.    Have you done animal
21 studies?
22      A.    I have -- yes, I have done
23 animal studies.
24      Q.    Describe for me the nature

Page 49

1 of the work that you've done with
2 animals.
3      A.    Fairly recently, for several
4 investigators, I have looked at mouse
5 models of -- let's see -- one was a colon
6 cancer model and one was, I believe, an
7 IBD model.
8           Neither of these manuscripts
9 have been drafted yet and I would not be
10 the primary or senior author on either of
11 them. I'd be a collaborator. So if you
12 want me to get too deep into the minutia
13 of those studies, I probably would not be
14 able to do them justice, but I think that
15 one was a neoplastic colon cancer model
16 and one was an inflammatory model.
17      Q.    Do you consider yourself to
18 be an animal pathologist?
19      A.    No.
20      Q.    I'm just curious, in a
21 general sense, why you were brought in to
22 look at pathology from a rodent model for
23 some outcome.
24      A.    To some extent, it's fairly

Page 50

1 analogous. There are subtle differences
2 that if you were looking for -- if you
3 were looking for a subtle variation
4 between the human and the animal model, I
5 think you might need someone with more
6 specialized knowledge in the murine
7 model.
8       For the basic question of is
9 this a cancer or not, I think it's not
10 hard for me to answer that question for
11 them. And as to why did they contact me,
12 I mean, you'd have to ask them that
13 question. I guess there are clinical
14 interactions. They found me reasonable
15 to work with and that's why they did it.
16    Q.   Without going into the
17 names, are these folks also at
18 Columbia --
19    A.   Yes.
20    Q.   -- who are doing the animal
21 research?
22    A.   Uh-hum.
23    Q.   Okay. Do you have any
24 research funded by the NIH?

Page 51

1    A.   I do not.
2    Q.   And have you ever in your
3 medical career?
4    A.   No.
5    Q.   Have you done -- and you
6 graduated in '08. Right? 2008 from
7 medical school?
8    A.   Uh-hum.
9    Q.   In your eight, going on now
10 nine, years of medical practice, have you
11 done any in vitro experiments?
12    A.   I did, yes, in medical
13 school.
14    Q.   Okay. Since leaving medical
15 school.
16    A.   Oh, sorry. I have again
17 helped other researchers with cell
18 culture models and that sort of thing.
19    Q.   Are you the author of any
20 published paper involving in vitro
21 experiments?
22    A.   Since medical school.
23    Q.   Yes, sir.
24    A.   Do you mind if I take

Page 52

1 another look at the C.V.?
2    Q.   Please, please.
3       MR. SLATER: You get three
4    shots, so choose well.
5       MR. PARKER: Memorize it.
6       (Pause.)
7       THE WITNESS: I would say
8    that everything I've published has
9    involved study of human tissues.
10 BY MR. PARKER:
11    Q.   Have you ever done any
12 consulting with any pharma companies,
13 pharmaceutical companies?
14    A.   You're talking about paid
15 consulting?
16    Q.   Yes, sir. Let's start
17 there.
18    A.   Okay. I don't believe so.
19    Q.   And lastly on
20 qualifications, in the area of the small
21 bowel disease disorders, do you consider
22 yourself to have expertise in any
23 particular disorders of the small bowel?
24    A.   Well, as a pathologist with

Page 53

1 an interest in small bowel pathology, I
2 think that I have expertise in most, if
3 not all, of the diseases that can affect
4 the small bowel.
5       And I qualify that just a
6 little bit because there are some rare
7 lymphomas, for instance, that affect the
8 small bowel which I would not hold myself
9 up as an expert on, but the vast majority
10 of both common and uncommon diseases that
11 we see, yes.
12       MR. PARKER: Okay. We can
13    put your C.V. aside.
14       - - -
15       (Deposition Exhibit No.
16    Lagana-3, Rule 26 Expert Report of
17    Stephen Lagana, M.D. Regarding
18    General Causation, was marked for
19    identification.)
20       - - -
21 BY MR. PARKER:
22    Q.   Let's go on to Exhibit 3,
23 which is a copy of your report, minus
24 your C.V., and the statement of your

Protected Information - Steven M. Lagana, M.D.

Page 54

1 references.
2      A.    By the way, may I make one
3 more clarification?
4      Q.    Sure.
5      A.    I may or may not at some
6 point have received an honorarium, or
7 maybe more than once, for doing -- doing,
8 like, surveys for companies that
9 manufacture antibodies used in diagnostic
10 pathology.
11           So when I say, no, I don't
12 believe that I've done any pharmaceutical
13 consulting, I don't think that I have,
14 but I have maybe done some of these paid
15 surveys for companies that make
16 antibodies.
17      Q.    Meaning that they send you a
18 questionnaire to fill out --
19      A.    Yeah, or, like, an online
20 sort of thing where I would look at
21 pictures and say does this antibody look
22 -- not antibodies for use in treatment of
23 people, antibodies used for staining
24 human tissues -- and saying, yes, this

Page 55

1 looks good or this doesn't look good.
2           And I don't exactly have a
3 firm recollection of that.  It would have
4 been years ago, but I don't want to hold
5 anything back.
6      Q.    I understand.
7           Now, let's take a look at
8 your report, which is Exhibit 3.
9      A.    Okay.
10      Q.    Does this report reflect all
11 the opinions which you generated as of
12 November 30th, when this was served on
13 us, in connection with your inquiry into
14 general causation?
15      A.    I would say that all of my
16 opinions makes it sound like it's a
17 completely exhaustive document and I
18 would not say it's an entirely exhaustive
19 document.
20      Q.    Well, are there specific
21 opinions that you had as of November 30th
22 on the question of whether olmesartan has
23 been proven to be a cause of general
24 causation -- excuse me -- has been proven

Page 56

1 to be a cause of olmesartan at the
2 population level or general causation
3 that are not in Exhibit No. 3?
4      A.    I would say that this
5 document was meant to be a concise
6 explanation of my thinking.  It wasn't
7 meant to be exhaustive and inclusive of
8 every thought I have on the topic, so I
9 think probably there were opinions and
10 thoughts that I had which were not
11 included in the document, including some
12 that I thought were somewhat obvious and
13 not -- not controversial, which I didn't
14 address directly.
15      Q.    Is there anything specific
16 you can think of now that gives me an
17 example of what you would call a material
18 opinion, if there were any, relative to
19 the question of general causation that I
20 would not see if I read that report?  And
21 I have.
22      A.    Okay.  I might be able to do
23 that if you give me a few minutes to look
24 through it.

Page 57

1      Q.    Sure.  Sure.
2      A.    Okay.
3           (Pause.)
4           THE WITNESS:  I think I
5      would have looked to have spoken a
6      little bit more about my own
7      experience seeing patients with
8      this condition, and I probably
9      would have cited more specifically
10      the numerous case reports that
11      include both dechallenge and
12      rechallenge because I think that's
13      very powerful evidence for direct
14      causation.
15           And I'm not sure if I
16      referenced the Basson study, the
17      French epidemiologic study, or if
18      I did in detail, but -- it looks
19      like I did not.  I would have
20      liked to have included that.
21           And those are the three that
22      -- those are the thoughts that
23      come to mind now.  I can't say
24      that that's absolutely everything

Protected Information - Steven M. Lagana, M.D.

Page 58

1    I would have done differently.
2  BY MR. PARKER:
3       Q.   Doctor, in your last answer,
4  you made reference to -- you used the
5  word "direct" causation.  We have talked
6  so far this morning about general
7  causation and specific causation.  Please
8  define the term "direct causation."
9       A.   When I use that term, I mean
10 that exposure A leads to outcome B
11 because of exposure to -- because of
12 exposure A.
13      Q.   And just so our language is
14 precise, when you say leads to, that's
15 synonymous with causes?
16      A.   Yes.
17      Q.   Doctor, what are the
18 diagnostic criteria for sprue-like
19 enteropathy associated with olmesartan
20 use?
21      A.   Well, it's a broad question
22 and maybe first I can start by defining
23 what the entity is and then we can talk
24 about what diagnostic criteria could be

Page 59

1  used to make the diagnosis.
2       And there are different
3  criteria, by the way, I should say, for a
4  gastroenterologist seeing a patient in
5  the office as compared to me as a
6  pathologist seeing the patient's slides
7  --
8       Q.   Let me stop you there.  Are
9  you comfortable addressing the criteria
10 that a gastroenterologist should be using
11 to diagnose the condition?
12      A.   Yes.
13      Q.   So then let's start first
14 with your area of specialty, pathology.
15 What are the pathologic criteria that you
16 need before you personally conclude that
17 someone has sprue-like enteropathy
18 associated with olmesartan use?
19      A.   The specific pathologic
20 criteria, that's not a simple question,
21 actually, because it really -- it's a
22 clinicopathologic diagnosis, so showing
23 me a slide in a vacuum, I can't give you
24 that diagnosis.  I can raise that as a

Page 60

1  possibility and then in following up with
2  the clinical information, certainly I can
3  get there as the most likely cause of the
4  pattern of injury that I see.
5       But I think you're asking me
6  to describe the histologic findings in
7  olmesartan enteropathy.  Would that be --
8  is that a fair way to characterize your
9  question?
10      Q.   I'll accept that answer.
11 It's not exactly what my question was,
12 but let's start there and then we can go
13 into a little bit further.
14      MR. SLATER:  You should let
15      him rephrase your questions.  He's
16      doing a better job.  Just kidding.
17      THE WITNESS:  Olmesartan
18      enteropathy affects the entire
19      gastrointestinal tract as far as
20      we know, most prominently in the
21      small intestine, but also
22      prominently in the stomach and the
23      colon.
24      And the way that we can

Page 61

1       identify that injury
2       histologically, the most common
3       finding, although it's not the
4       only finding, is inflammation and
5       that inflammation may be
6       lymphocytic or plasmacytic --
7       these are different types of
8       inflammatory cells -- and often
9       those are the cells that are
10      referred to as chronic
11      inflammatory cells, and we also
12      find acute inflammatory cells such
13      as neutrophils.
14      Those cells can be
15      distributed variably throughout --
16      throughout the gut and even in a
17      certain tissue location.  You
18      might find the lymphocytes in the
19      lamina propria.  You might find
20      them in the epithelium, so-called
21      intraepithelial lymphocytosis, and
22      the same can be said of the
23      neutrophils, eosinophils, et
24      cetera.

Protected Information - Steven M. Lagana, M.D.

Page 62

1   And what we see as sequelae
2   of this inflammation, we see a
3   variable picture. The most
4   extreme example in the duodenum or
5   in the small intestine would be
6   flattening of the duodenal villi
7   -- or, actually, I should say all
8   the small intestinal villi -- as
9   well as potentially fibrosis of
10  the lamina propria.
11          The inflammation and the
12  fibrosis can also be seen in the
13  stomach and the colon. There's no
14  potential for villous atrophy in
15  the stomach or colon because there
16  are no villi in either the stomach
17  or the colon.
18          And so, you know, these are
19  a -- what I have described for you
20  now are examples of what we can
21  see. It's not everything that we
22  can see and, in some cases, it's
23  the most extreme example.
24  BY MR. PARKER:

Page 63

1       Q.   And I don't want to cut you
2   off. I want to make sure you -- before I
3   follow up with you. Are you done with
4   your answer?
5       A.   There are additional
6   histologic findings that I've noticed.
7   Some patients have markedly increased
8   crypt apoptosis, which is death of cells
9   in a part of the tissue where they should
10  be proliferating, not dying.
11          I've encountered recently a
12  case of granulomatis inflammation
13  associated with olmesartan enteropathy,
14  which was new to me. I've seen crypt
15  atrophy which resembles autoimmune
16  enteropathy where you see a loss of the
17  crypts. I've also seen crypt
18  architectural distortion, such as
19  branched crypts, which is typically seen
20  in inflammatory bowel disease.
21          So I would say that there's
22  a pretty wide range of presentations
23  pathologically and really one needs to be
24  aware that it exists to make the

Page 64

1   diagnosis.
2       Q.   A couple follow-up
3   questions: Crypt apoptosis, is that the
4   opposite biological effect of crypt
5   hyperplasia?
6       A.   That's an interesting
7   question. No, not really. Hyperplasia
8   refers to the structure of the crypt, so
9   the crypt gets longer. That means
10  hyperplastic. Crypt apoptosis refers to
11  a specific cell within that crypt.
12          So you can -- although,
13  yeah, in one sense, the crypt is growing,
14  it's becoming hyperplastic -- sorry. I
15  guess this (Indicating) doesn't help --
16  and in the other sense, the cells are
17  dying. You can have both of those
18  phenomena happening at the same time,
19  both the crypt is growing, but within it,
20  too many individual cells are dying.
21          Sorry. May I grab a glass
22  of water?
23      Q.   Sure. Please, please,
24  absolutely.

Page 65

1       (Pause.)
2   BY MR. PARKER:
3       Q.   Doctor, you just told me
4   that there's a wide range of pathological
5   presentations in someone who presents
6   with enteropathy with a history of taking
7   olmesartan, if I've understood correctly.
8       A.   Yes.
9       Q.   I want to approach it this
10  way: Is there -- putting aside
11  neoplastic diseases in the small bowel,
12  okay, put that aside, is there any
13  histopathologic findings that you see in
14  other forms of small bowel disorders,
15  small bowel disease, that are not seen in
16  what you just described as sprue-like
17  enteropathy associated with olmesartan?
18      A.   May I ask you --
19          MR. SLATER: Objection --
20  yeah, I was going to object to the
21  question.
22  BY MR. PARKER:
23      Q.   Sure. I'm excluding
24  neoplastic histopathology. Okay?

Protected Information - Steven M. Lagana, M.D.

Page 66

1    A.    Yep.
2    Q.    In the context of other
3  histopathologic changes in the small
4  bowel, for all other entities, celiac
5  disease, autoimmune enteropathy,
6  collagenous sprue, unclassified sprue,
7  irritable bowel disease, do any of them
8  present with pathology not seen in the
9  long list that you just gave me for
10 sprue-like enteropathy?
11    A.    I see. Well, many of those
12 entities can overlap pathologically which
13 is why clinicopathologic correlation is
14 important in this diagnosis or necessary.
15         Are there some of those that
16 would not be -- could not potentially be
17 confused with olmesartan enteropathy?
18 There are certainly diseases which affect
19 the small intestine which I don't think
20 could ever rationally or reasonably be
21 confused with olmesartan enteropathy.
22    Q.    Such as?
23    A.    Certain infections, for
24 instance.

Page 67

1    Q.    Anything else, sir?
2    A.    I don't think that peptic
3  injury would be reasonably confused with
4  sprue-like enteropathy due to
5  olmesartan -- if you expect this to be an
6  exhaustive list, then please give me a
7  few more minutes to think about it.
8    Q.    Just take a few minutes to
9  think about it. It's important.
10    A.    Okay.
11         (Pause.)
12         THE WITNESS: I believe that
13    there are subtle differences
14    between many of the entities that
15    you've mentioned and olmesartan
16    enteropathy which an expert,
17    experienced GI pathologist, could
18    pick up on; but pathognomonic, no.
19 BY MR. PARKER:
20    Q.    I think what you just told
21 me before, however, was that if I laid
22 out in front of you pathology from
23 patients with diagnosed celiac disease,
24 autoimmune enteropathy, collagenous

Page 68

1  sprue, unclassified sprue, and someone
2  who had enteropathy who happened to take
3  olmesartan, you -- I think you told me
4  you wouldn't be able to tell the
5  difference amongst them.
6         MR. SLATER: Objection.
7         You can answer.
8         THE WITNESS: I wouldn't say
9    that that's what I said. I would
10    say that there are similarities.
11    Certainly there would be some
12    histologic similarities between
13    many of those entities. There are
14    histologic clues that I would be
15    able to appreciate.
16         You know, I -- I did write a
17    review article on this topic,
18    which I'm sure that you read,
19    which was aimed at helping
20    pathologists make the diagnosis
21    when faced with biopsies with
22    these findings.
23         And certainly I would
24    acknowledge that there is a subset

Page 69

1    of celiac disease patients, for
2    instance, whose biopsies would
3    look the same as an olmesartan
4    enteropathy patient and even, you
5    know, if I say I'm, you know,
6    God's gift to GI pathology still
7    couldn't make the distinction.
8    But there are examples -- a fair
9    number -- where I could.
10         For instance, I've noticed
11    and others have noticed and it's
12    in the literature, a fair
13    percentage of the olmesartan
14    enteropathy patients don't have
15    the degree of intraepithelial
16    lymphocytosis that you would
17    expect in a celiac disease patient
18    with flat mucosa, so if you happen
19    to have a case of olmesartan
20    enteropathy where the mucosa is
21    flat, if you wanted to tell me
22    that that's a celiac disease
23    patient, I would say, okay, this
24    would be a 3C, which is a more

Protected Information - Steven M. Lagana, M.D.

Page 70

1  severe form of celiac disease, and
2  I would expect to find copious
3  intraepithelial lymphocytes. I
4  have noticed in some olmesartan
5  enteropathy patients -- and as I
6  said, this is in the literature --
7  we don't necessarily find that.
8      So there are cases -- to get
9  back to your question, there are
10  cases in which I couldn't tell you
11  the difference and cases in which
12  I could strongly suspect one way
13  or the other.
14  BY MR. PARKER:
15     Q.  And in that review article,
16  didn't you also say that autoimmune
17  enteropathy is virtually
18  undistinguishable from olmesartan or
19  sprue-like enteropathy --
20     A.  Histologically, I would
21  agree with that.
22     Q.  And we're only talking about
23  pathology right now to be fair to you.
24  Okay?

Page 71

1     A.  Okay.
2     Q.  You've also published that
3  there is no cardinal histopathologic
4  finding associated with or seen with
5  patients who have sprue-like enteropathy.
6        MR. SLATER:  Objection.
7        You can answer.
8        THE WITNESS:  Yeah, I agree.
9  You have to look at the entirety
10  of the slide and think about all
11  the findings and -- to actually
12  make the diagnosis, as I've said,
13  you need clinicopathologic
14  correlation.
15  BY MR. PARKER:
16     Q.  So let's turn now, if you're
17  comfortable, to the GI clinical side.
18     A.  Sure.
19     Q.  What does a clinician have
20  to see clinically -- and you've given me
21  the pathologic piece of the puzzle. What
22  does a clinician have to see before he or
23  she in your opinion properly renders a
24  diagnosis of sprue-like enteropathy

Page 72

1  associated with olmesartan?
2        MR. SLATER:  Objection.
3        You can answer.
4        THE WITNESS:  In my opinion,
5  the most vital clinical piece of
6  data that the gastroenterologist
7  or primary care doctor can collect
8  to make that diagnosis is a
9  dechallenge, so whatever the
10  complaint is that the patient has,
11  if that resolves on
12  discontinuation of -- assuming
13  it's a GI complaint.  You know,
14  that's what we're talking about,
15  enteropathy here --
16  BY MR. PARKER:
17     Q.  Yes, sir.
18     A.  -- not pain in my earlobe.
19     Q.  I am not trying to be
20  tricky.  Yes, we're talking about the
21  gut, yes, GI.
22     A.  So if the complaints
23  improved following cessation of
24  olmesartan, I would say that that's

Page 73

1  strong evidence that the patient had
2  olmesartan enteropathy.
3     Q.  So there -- it can be -- any
4  GI complaint is worthy of this diagnosis
5  provided it goes away when you stop
6  taking olmesartan?
7     A.  "Goes away" is a strong -- a
8  strong term.  "Improves" is the word I
9  would use.  But there are different
10  levels of certainty that one can have.
11  For instance, in the patient who has
12  severe weight loss and diarrhea as
13  originally described by Rubio-Tapia, who
14  has a biopsy that shows total villous
15  atrophy, who has negative serologic
16  testing for celiac disease, then is taken
17  off olmesartan, the symptoms improve and
18  the biopsy resolves, well, I've just
19  described for you a case that is, you
20  know, hundred percent, locked, that's
21  what it is and it would be crazy to think
22  otherwise.  And -- in my opinion.
23        And in the real world, as
24  physicians are seeing more and more of

Protected Information - Steven M. Lagana, M.D.

Page 74

1 this, they're thinking about it sooner,
2 so if I -- if someone goes to a physician
3 now and says, I have -- I have nausea and
4 vomiting and it's been for the last
5 several months, and the physician sees
6 that the patient is on olmesartan, from
7 my interaction with treating physicians
8 -- and I'm not one -- a lot of them are
9 switching antihypertensives at that
10 point; and I would think if that patient
11 improved, that is good evidence of
12 olmesartan-induced injury if that's the
13 only change that was made.
14    Q.    Let me go back -- and that's
15 an important qualification.
16    A.    Yeah.
17    Q.    Let me come back to my
18 question. My question is, what are the
19 clinical features that have to be
20 present, if any, before one gets the
21 label?
22         And the first part of that
23 answer, you said, well, they have to have
24 dechallenge. Let me make sure I'm

Page 75

1 understanding. If someone were to come
2 in and their only complaint is abdominal
3 pain, there is no biopsy evidence of any
4 villi loss, there's no complaint of
5 diarrhea, they have not vomited, and the
6 GI doctor says stop the olmesartan and
7 their abdominal pain goes away in three
8 days, does that person get the diagnosis
9 of sprue-like enteropathy associated with
10 olmesartan?
11         MR. SLATER:  Objection to
12     the form.
13         You can answer.
14         THE WITNESS:  Well, the case
15     you've just described to me is a
16     nonclassical case --
17         MR. PARKER:  Okay.
18         THE WITNESS:  -- whether
19     that person had injury due to
20     olmesartan causing their abdominal
21     pain, that, I would conclude to be
22     fairly likely.
23         Whether they had sprue-like
24     enteropathy is a different

Page 76

1         question and I'm not sure that I
2     would put that particular label on
3     it.
4 BY MR. PARKER:
5    Q.    And that's what I'm trying
6 to drive at.  What do you have to have
7 when you come into the doctor, what
8 complaints, what findings by the doctor
9 do you have to have, before, as you put
10 it, the label goes on the patient?
11         MR. SLATER:  Objection to
12     the form of the question;
13     foundation.
14         You can answer.
15         MR. PARKER:  And if this is
16     outside your area of expertise,
17     just tell me and I'll move on, but
18     I thought you said you felt
19     comfortable answering the
20     question.
21         MR. SLATER:  And objection
22     to that lead-in just now.
23         You can answer.
24         THE WITNESS:  Well, I think

Page 77

1     it's really at the judgment of the
2     treating physician.
3 BY MR. PARKER:
4    Q.    So it can be anything if in
5 the judgment of the treating physician --
6 something as abdominal pain for a couple
7 days, in that physician's mind, that can
8 qualify for a label of sprue-like
9 enteropathy associated with olmesartan?
10    A.    I think that you would have
11 more definite and less definite cases and
12 I think if you are the treating
13 physician, your interest is the results;
14 and if someone had minimal abdominal pain
15 for three -- you know, for a few days and
16 stopped taking olmesartan and they
17 improved, I would not personally find
18 that to be a very plausible case of
19 sprue-like enteropathy.
20         But if you're trying to
21 whittle -- you know, kind of get to the
22 exact criteria, I don't think that we're
23 there yet. I don't think that we have --
24 we've seen a fairly wide presentation as

Protected Information - Steven M. Lagana, M.D.

Page 78

1  far as both symptoms and histopathology
2  and a lot of it has been very serious.
3  So it's not just, you know, a couple days
4  of mild pain. It's -- we've seen some,
5  as you're aware, very significant --
6  significantly ill patients.
7          And so I -- in my experience
8  at Columbia anyway, the patients who I've
9  seen labeled as sprue-like enteropathy,
10 there's not been one of them that I've
11 doubted the diagnosis and it hasn't been
12 a specific point that, oh, because of --
13 because of X, then Y. It's been, you
14 know, taking into account the entirety of
15 the clinical picture.
16     Q.   I think, however, Doctor,
17 what -- in answer to my question about
18 what are the clinical criteria, I think
19 you're telling me we're not there yet in
20 the medical community. Am I correct?
21         MR. SLATER: Objection;
22 mischaracterization.
23         You can answer.
24         THE WITNESS: Well, I'm

Page 79

1      saying that there are varied
2      clinical presentations and varied
3      pathologic presentations; and,
4      therefore, it requires the
5      patient's doctor to make a
6      reasonable assessment based on the
7      entire clinical picture.
8  BY MR. PARKER:
9      Q.   Let me approach it this way:
10 Doctor, if we went into the medical text,
11 I would be able to find the criteria for
12 diagnosing celiac disease; correct?
13     A.   Yes.
14     Q.   If I went into the medical
15 text, I could find the criteria for
16 diagnosing autoimmune enteropathy;
17 correct?
18     A.   You could find some listings
19 of criteria.
20     Q.   If I were to go into --
21     A.   May I make a point?
22     Q.   Sure, yes. As long as it's
23 answering my question.
24     A.   Okay. I think that

Page 80

1  physicians diagnosing autoimmune
2  enteropathy and if you were to go looking
3  through the literature for -- and
4  speaking to experts about how to do that,
5  it often does mimic to some extent the
6  process that a physician must go through
7  to diagnose olmesartan enteropathy.
8  There can be various histologic
9  presentations, various clinical
10 presentations. There are some antibodies
11 that are used in the diagnosis of
12 autoimmune enteropathy that are not
13 positive all the time.
14         So it still requires
15 clinical judgment.
16     Q.   My question, however, is, if
17 I went into the medical literature, would
18 I not find statements as to what must be
19 present within the range of variability,
20 what must be present before a patient is
21 labeled as having autoimmune enteropathy?
22         MR. SLATER: Objection.
23         This has been asked and answered.
24         You can answer.

Page 81

1          THE WITNESS: I'm not sure
2      that you would find universally
3      agreed upon criteria to that
4      extent. You would certainly find
5      people who have suggested
6      criteria. I couldn't say that
7      they're universally agreed upon by
8      experts and I wouldn't say that
9      every patient who's been labeled
10     with that would have fit that
11     specific set of criteria.
12 BY MR. PARKER:
13     Q.   Same question for
14 collagenous sprue: Are there not
15 recognized criteria for diagnosing
16 collagenous sprue?
17         MR. SLATER: Objection.
18         You can answer.
19         THE WITNESS: Collagenous
20     sprue is a bit of a more complex
21     topic because it can occur
22     secondary to another insult, such
23     as celiac disease or olmesartan,
24     or it can be what we refer to as

Protected Information - Steven M. Lagana, M.D.

Page 82

1    primary or idiopathic collagenous
2    sprue.
3         As far as the diagnostic
4    criteria for it, there's no
5    universally regarded pathologic
6    criteria.
7  BY MR. PARKER:
8       Q.   What about clinical?
9       A.   There are characteristic
10 findings, but I'm -- again, I would say
11 that I don't believe that there is a very
12 specific set of criteria that's agreed to
13 by -- by the majority of experts.
14      Q.   Same question for tropical
15 sprue -- I'm sorry.  You --
16      A.   Collagenous sprue, just to
17 get a little bit more into the weeds on
18 this, if I may, it depends how precise
19 you want to get with the criteria.
20           Thickened subepithelial
21 collagen layer is a criteria, but I could
22 also say, well, how thick is thickened
23 and we as a medical community haven't
24 really answered that question, so that's

Page 83

1  where I'm saying that there are
2  variabilities here.
3         And so you asked the
4  question of tropical sprue?
5       Q.   Yes, sir, same question.
6       A.   Okay.  And you're asking
7  about clinical and pathologic --
8       Q.   Are there diagnostic
9  criteria, clinical and/or pathologic --
10 if it happens to be a pathologic
11 diagnosis -- for making the diagnosis of
12 tropical sprue recognized in the medical
13 literature?
14          MR. SLATER:  Objection.
15      You can answer.
16          THE WITNESS:  There
17 certainly are sets of findings
18 that would be expected in tropical
19 sprue.  The most important
20 criteria for tropical sprue would
21 be response to antibiotics as well
22 as the clinical history of travel
23 to an endemic area.
24          So there are criteria.  A

Page 84

1       physician needs to apply them
2       thoughtfully to actually make that
3       diagnosis.
4  BY MR. PARKER:
5       Q.   I'm sure that's true for all
6  these conditions.
7       A.   These ones, yes.
8       Q.   Okay.  One other one that
9  comes to mind --
10      A.   May I make a point?
11      Q.   As long as it's responsive.
12      A.   Okay.  I suppose I'm
13 clarifying these issues because I -- I
14 want to differentiate these somewhat
15 unusual diseases or at least uncommon
16 diseases from something like
17 hypertension, where if I say what's the
18 criteria for hypertension, it's X number
19 of blood pressure readings of X.  It's
20 extremely simple.
21          You know, if someone has,
22 you know, for instance, a hemoglobin A1C
23 over a certain level, they have diabetes.
24 That's it.  You're done.

Page 85

1          Whereas, opposed to, these
2  are complex clinicopathologic entities
3  and, you know, although there are
4  characteristic findings clinically and
5  pathologically, they often require a lot
6  more thought and application of
7  differential diagnosis than something
8  straightforward like hypertension or
9  diabetes.
10      Q.   Doctor, from time to time,
11 professional organizations like the
12 American College of Gastroenterology gets
13 together a group of smart people and they
14 publish diagnostic criteria for various
15 disorders; correct?
16      A.   Yes.
17      Q.   Does the College of American
18 Pathologists do the same?
19      A.   The CAP, College of American
20 Pathologists, produces guidelines for
21 cancer diagnoses.  They wouldn't have a
22 set of criteria for something -- for an
23 inflammatory disorder such as the ones
24 we're discussing.

Protected Information - Steven M. Lagana, M.D.

Page 86

1    Q.   Are you a member of a
2  national medical society?
3    A.   Yes.  I'm a member of the
4  College of American Pathologists and the
5  U.S. and Canadian Academy of Pathology,
6  also the Rodger C. Haggitt GI Pathology
7  Society.
8    Q.   Do any of those other three
9  that you've just mentioned -- you've
10 talked about CAP -- issue pathologic
11 criteria for gastrointestinal disorders?
12   A.   The Haggitt Society does
13 from time to time.
14   Q.   Okay.  And certainly I think
15 you said the American College of
16 Gastroenterology does.
17   A.   I have seen -- yes.
18   Q.   And would you agree with me
19 that no professional association to this
20 day has published any criteria for
21 diagnosing, either on a clinical level or
22 a pathologic level, sprue-like
23 enteropathy associated with taking
24 olmesartan?

Page 87

1         MR. SLATER:  Objection.
2         You can answer.
3         THE WITNESS:  I would agree
4      that I haven't seen such a
5      document.  And I would also say
6      that -- actually, I think that
7      finishes my answer.
8  BY MR. PARKER:
9    Q.   Doctor, we've used the word
10 a couple times this morning, but not
11 defined it.  Define for me enteropathy.
12   A.   Enteropathy is injury to the
13 intestines, the small intestine
14 specifically.
15   Q.   Does it have to be
16 inflammatory injury?
17   A.   It is usually inflammatory.
18   Q.   Does -- when you say someone
19 has enteropathy, does it include
20 diarrhea?
21   A.   That would be an example of
22 one of the symptoms that would be
23 associated with a patient who has
24 enteropathy.

Page 88

1    Q.   What about malabsorption?
2    A.   That's another example of
3  one of the clinical symptoms that one can
4  see.
5    Q.   But I take it you can have
6  enteropathy without diarrhea; is that
7  correct?
8    A.   Yes.
9    Q.   Can you have enteropathy
10 without malabsorption?
11   A.   Yes, I believe so.
12   Q.   If -- and then what symptoms
13 do you have if you have enteropathy, but
14 you have not developed symptoms of
15 diarrhea and, I'll add one, vomiting?
16 Can you have enteropathy without
17 vomiting?
18   A.   Yeah, I think the clinical
19 findings associated with enteropathy are
20 potentially fairly broad.  You've
21 mentioned I think some of the more common
22 ones, nausea, vomiting, diarrhea,
23 malabsorption.
24        I would also not be

Page 89

1  surprised to see pain, either abdominal
2  or lower.  We've seen reports of fecal
3  incontinence.  Fatigue certainly is a
4  common one.  There have been reports of
5  patients with suspected enteropathy who
6  have had perforation of the colon.  You
7  could have various vitamin or mineral
8  deficiencies.  You could have --
9  subsequent to that, you could have bone
10 or skin or hair changes.  You could have
11 mood changes.
12        So those are -- you know,
13 I'm giving you examples in addition to
14 the ones that you have mentioned.  I
15 can't swear that I've remembered
16 everything, but these are some things
17 that one can see.
18   Q.   And when you say these are
19 some things that you can see, you're
20 talking about symptoms that are seen in
21 patients who have been pathologically
22 diagnosed as having enteropathy?
23        MR. SLATER:  Objection.
24        You can answer.

Protected Information - Steven M. Lagana, M.D.

Page 90

1    THE WITNESS: Patients who
2  have been deemed to have
3  enteropathy on the basis of their
4  physician's assessment.
5  BY MR. PARKER:
6    Q.  Is enteropathy ultimately a
7  pathologic diagnosis, the evidence of
8  inflammation in the small bowel?
9    A.  I think that that evidence
10 is certainly highly supportive.  I think
11 in certain instances in which you don't
12 have that evidence, but you have other
13 strong clinical evidence, I think it
14 would be reasonable to make the diagnosis
15 even in the absence of a biopsy.
16    Q.  Does villous atrophy cause
17 diarrhea?
18    A.  Villous atrophy likely does
19 cause diarrhea as we understand it
20 scientifically because --
21    Q.  How?
22    A.  Well, it gets back to the
23 purpose of what the villi -- why do we
24 have villi, why did we evolve to have

Page 91

1  villi, and the reason why is because they
2  increase the surface area for the
3  absorption of nutrients.
4    So if you have the tube of
5  the intestine, you have the villi
6  protruding up, they're fingerlike
7  projections; and if you can imagine a
8  tube with all of these fingerlike
9  projections, that has much more surface
10 area than a flat tube.
11    And so when you have villous
12 atrophy, you do have this flatness of the
13 mucosa.  That reduces the absorption of
14 nutrients and therefore you would have
15 looser stools more frequently.
16    Q.  How does the increased
17 concentrations of nutrients in the small
18 bowel produce diarrhea?  I'm not
19 following that.
20    A.  Okay.  Well, let's go a
21 little further in the GI tract and go
22 into the colon.  What does the colon do?
23 The colon mainly reabsorbs water from
24 stool, which is why you have formed

Page 92

1  stools, is because the colon has
2  reabsorbed water.
3    If you're not absorbing the
4  nutrients, fats and other nutrients, more
5  proximally, your stool is entering your
6  colon more -- in a more liquid format and
7  the colon is less able to reabsorb all
8  the water -- you'll never reabsorb all
9  the water, but it absorbs less, and thus
10 you have more watery stools.
11    Q.  So greater concentrations of
12 nutrients in the small bowel that have
13 not passed through the villi, as you
14 would want them to happen, you're
15 explaining to me, causes the colon not to
16 be able to absorb water, as is its
17 function, thus producing diarrhea?
18    MR. SLATER:  Objection.
19    You can answer.
20    THE WITNESS:  Well, to have
21 a more complex stool substance
22 entering the colon than what you
23 would like, that makes digestion
24 of -- or reabsorption of the water

Page 93

1    more difficult for the colon and
2    thus you have more voluminous
3    stool, which will be more watery;
4    and if you don't -- if you have
5    malabsorption, you're not
6    absorbing your fats, you'll also
7    have fat in the stool.
8  BY MR. PARKER:
9    Q.  Does diarrhea cause villous
10 atrophy?
11    A.  Does diarrhea cause villous
12 atrophy.
13    In my opinion, that would be
14 reversing the chicken and the egg.  I
15 couldn't swear to you that there couldn't
16 be an example of someone, you know -- let
17 me not speculate here and let me leave my
18 answer as, no, I don't -- I would
19 generally consider villous atrophy the
20 cause of the diarrhea, not diarrhea the
21 cause of the villous atrophy.
22    Q.  How do physicians,
23 pathologists or clinicians, determine if
24 someone has experienced malabsorption?

Page 94

1    A.   This is not a pathologic
2  diagnosis.  This is a clinical diagnosis
3  based on weight loss and also potentially
4  the composition of the stool.
5    Q.   And what would you look to
6  in the stool to determine whether the
7  person has -- the patient has experienced
8  malabsorption?
9    A.   My understanding of it would
10 be, fecal fat would be the cardinal -- or
11 the most commonly used test to determine
12 that.
13   Q.   So you -- if you saw
14 increased deposits of fat in the stool,
15 you could infer that they had experienced
16 malabsorption; is that correct?
17   A.   I'm not a
18 gastroenterologist, so I --
19   Q.   Okay.  If that's --
20        MR. SLATER:  Don't
21 interrupt.  Let him finish.
22        MR. PARKER:  Okay.
23        THE WITNESS:  Yeah, I think
24 -- I'd prefer not to answer that

Page 95

1  question because it's not my
2  specific --
3        MR. PARKER:  See, I was
4  helping him.  I was helping him.
5  BY MR. PARKER:
6    Q.   Okay.
7        We talked earlier about you
8  attending a medical conference or a
9  meeting of some sorts at Columbia where
10 someone explained what the soon-to-be
11 paper was going to report from the Mayo
12 Clinic.
13       You recall that?
14   A.   I do.
15   Q.   Okay.
16       Before you prepared your
17 report in this case on November 30th, a
18 report that concludes that the reliable
19 evidence has demonstrated to your
20 satisfaction, to a reasonable degree of
21 medical probability, that olmesartan
22 causes sprue-like enteropathy in the
23 general population -- that's your
24 conclusion, correct, of your report?

Page 96

1        MR. SLATER:  Objection.
2        You can answer.
3        THE WITNESS:  I'd like to
4  see if I used the term "general
5  population."
6        MR. PARKER:  Oh, sure.
7  Sure.
8        (Pause.)
9        THE WITNESS:  I don't see
10 that particular phrase, "general
11 population," but I would be happy
12 to answer your question as I -- as
13 I see it, which is, I believe, to
14 a reasonable degree of medical
15 certainty, that in some patients,
16 olmesartan causes enteropathy.
17 BY MR. PARKER:
18   Q.   What you seem to be saying
19 is that on a case-by-case basis, I have
20 determined that olmesartan is the
21 explanation for why someone has
22 enteropathy; correct?
23        MR. SLATER:  Objection.
24        You can answer.

Page 97

1        THE WITNESS:  That would
2  only be part of what I'm saying.
3  BY MR. PARKER:
4    Q.   Then what have I left out?
5    A.   Okay.  What you just said
6  characterizes my clinical experience
7  fairly, I would say, but it doesn't touch
8  the literature at all where we've seen
9  about a hundred cases that have been
10 reported in the peer-reviewed literature
11 that follow similar -- similar -- that
12 have similar findings.
13       And so that, of course, also
14 plays into my thinking and we've seen
15 epidemiological studies from France which
16 also play into my thinking.  So I do --
17 as I say, I believe in some patients,
18 olmesartan is the cause of their
19 enteropathy.
20   Q.   Other than the case by case,
21 you mentioned then case reports, but more
22 of them, and epidemiology, that's the
23 totality of the evidence that you just
24 described for me.

Protected Information - Steven M. Lagana, M.D.

Page 98

1    MR. SLATER: Objection.
2        You can answer.
3  BY MR. PARKER:
4    Q.   Correct?
5    A.   Well, I would say that those
6  are probably the most meaningful bits of
7  data that I've accrued over my years of
8  being aware of this topic.  There are
9  other bits of data as well, such as some
10  in vitro studies that have been reported
11  and discussion with colleagues, experts,
12  both within the United States and
13  internationally, so I -- my experience
14  has accrued over a number of years and in
15  different settings and largely before I
16  was involved in this litigation.
17        So I would say those are the
18  factors that have contributed to my
19  thinking.
20    Q.   What I'm still struggling to
21  understand is what you understand the
22  term "general causation" to be.  So let
23  me ask you this question:  How does
24  epidemiology play a role in your

Page 99

1  assessment of causation?
2        MR. SLATER: Objection to
3  the form of the question.
4        You can answer.
5        THE WITNESS: Well, I think
6  the French study for which Basson
7  was the first author was a
8  powerful epidemiologic study,
9  because it did show what I would
10  consider a profound difference
11  between olmesartan users and users
12  of other ARBs; and, furthermore, I
13  was very impressed by the fact
14  that the duration of exposure had
15  a significant impact on the risk
16  of outcome of enteropathy.
17        So I think that that -- that
18  particular study is a piece -- and
19  by the way, that was a huge study
20  looking at a lot of patients --
21  that is a piece of the -- of my
22  understanding and it contributes
23  to my understanding.
24  BY MR. PARKER:

Page 100

1    Q.   But I'm not understanding,
2  sir, how a study of a population -- which
3  is what that was.  Right?  It was a
4  population study?
5    A.   Uh-hum.
6        MR. SLATER: Objection.
7  BY MR. PARKER:
8    Q.   How does a population study
9  as you have described your approach to
10  addressing the question of causation --
11  how does the -- a population study weigh
12  into your calculus?
13        MR. SLATER: Objection;
14  asked and answered.
15        You can answer again.
16        THE WITNESS: It's a piece
17  of the -- it's a piece of the
18  picture.
19  BY MR. PARKER:
20    Q.   And as you -- the piece of
21  the picture are, individual or a number
22  of case reports weigh more heavily in
23  that calculus than epidemiological data?
24        MR. SLATER: Objection.

Page 101

1        You can answer.
2        THE WITNESS: I would say
3  that answer really depends on how
4  frequent an event we're talking
5  about.
6        I think if we're talking
7  about heart attacks, for instance,
8  if I were to say case reports of
9  heart attacks and the cases of
10  heart attack that I've seen at
11  autopsy weigh equally or more than
12  epidemiologic data on heart
13  attack, that would be a very
14  invalid and actually ridiculous
15  statement to make.
16        I think if we're talking
17  about an uncommon event -- and it
18  is my belief that olmesartan
19  enteropathy is fairly uncommon --
20  I think that the case reports
21  accrued from all over the world in
22  peer-reviewed medical journals are
23  actually extremely valuable; and,
24  furthermore, I think the cases

Protected Information - Steven M. Lagana, M.D.

Page 102

1  that I've experienced in my
2  clinical practice have been
3  incredibly instructive.
4       And as for epidemiologic
5  data, it can be supportive if --
6  if it's a big enough study to to
7  capture what is likely to be an
8  uncommon event.
9  BY MR. PARKER:
10      Q.  Let me approach it this way,
11 Doctor:  In medical sciences, typically a
12 rank order of the quality of the evidence
13 as it plays upon causation, questions of
14 causation, general causation; correct?
15      A.  There is a hierarchy of
16 evidence.  How applicable it is to
17 adverse drug events, I honestly don't
18 know.
19      Q.  All right.  On the question
20 of proving exposure to a drug and an
21 outcome, whether it's a beneficial
22 outcome or an adverse event outcome,
23 would you put randomized clinical trials
24 at the top of that list, double-blinded

Page 103

1  randomized clinical trials?
2       MR. SLATER:  Can I have that
3       question read back before he
4       answers?  I'm sorry.  I spaced out
5       on a text from someone.
6            - - -
7       (The court reporter read the
8       pertinent part of the record.)
9            - - -
10      MR. SLATER:  Objection.
11      You can answer.
12      THE WITNESS:  I think, in a
13 general sense, certainly the
14 double-blinded RCT is a powerful
15 study design, but it's designed
16 generally to track one or a few
17 specific outcomes and not
18 necessarily all potential
19 outcomes.
20      And so if something is,
21 again, an uncommon outcome, I
22 think the RCT can be woefully
23 underpowered to find it, in which
24 case, although in a general sense,

Page 104

1       yes, that's considered close to
2       the pinnacle of evidence,
3       meta-analysis being higher, there
4       are certainly examples where it
5       fails to be the most relevant
6       piece of data that's been
7       published.
8  BY MR. PARKER:
9       Q.  And for purposes of my
10 question, I'm not speaking about
11 olmesartan.  I'm speaking in a general
12 sense.  And you said, at the pinnacle,
13 you would put meta-analysis of randomized
14 clinical trials.
15      MR. SLATER:  Objection.
16      You can answer.
17      THE WITNESS:  I believe
18      that's generally what people
19      regard as the highest form of
20      evidence.
21 BY MR. PARKER:
22      Q.  And, again, all this is in a
23 general sense.  As we come down that list
24 in terms of its value in assessing

Page 105

1  causality, meta RCTs, randomized clinical
2  trials, at the next one, would you put
3  observational studies?
4       MR. SLATER:  Objection.
5       You can answer.
6  BY MR. PARKER:
7       Q.  Observational
8  epidemiological studies?
9       A.  I'd have to review the --
10 there are pyramids of this sort that have
11 been published.  I'd have to review it
12 before we get into the weeds of the
13 cohort study versus the case-control
14 study or what have you.
15      Q.  Would you place case series
16 and case reports below observational
17 epidemiological studies, prospective or
18 retrospective?
19      A.  In a general -- general
20 sense, not necessarily applicable to
21 olmesartan and not necessarily applicable
22 to a potentially unusual or uncommon
23 event, I would agree that most people who
24 rank hierarchies of evidence would list

Protected Information - Steven M. Lagana, M.D.

Page 106

1  it as you've said.
2      Q.  Have you ever participated
3  in an observational epidemiological study
4  as an investigator?
5      A.  An observational
6  epidemiological study.  Can you define a
7  little bit more narrowly what you mean by
8  an observational epidemiological study?
9      Q.  Well, let's deal with one
10 retrospectively first.  Going back into
11 medical records and pulling out the
12 medical records and either using a case
13 control or a cohort design, looking at a
14 question, but from the standpoint of the
15 -- observing what's in the medical
16 records.
17     A.  Yes.
18     Q.  Did that lead to a
19 publication on your C.V.?
20     A.  Yes, I believe a couple of
21 such examples are present.
22         Can we do a break?
23         MR. PARKER:  Absolutely.
24         MR. SLATER:  Nope.

Page 107

1         MR. PARKER:  Yes, we can.
2         (A recess was taken from
3  11:54 a.m. to 12:04 p.m.)
4             - - -
5         (Deposition Exhibit No.
6  Lagana-4, Document Entitled "In
7  re: Benicar (Olmesartan) Products
8  Liability Litigation Supplemental
9  Reliance List for Dr. Stephen M.
10 Lagana", was marked for
11 identification.)
12            - - -
13 BY MR. PARKER:
14     Q.  Doctor, I'm going to do some
15 housekeeping work before I forget to do
16 it.
17     A.  Sure.
18     Q.  Exhibit No. 4 is a list of
19 materials that were provided to me last
20 evening by Mr. Slater titled Supplemental
21 Reliance List for Dr. Lagana.
22         Can you tell me, sir, when
23 you were -- well, let me start first,
24 were these materials provided to you by

Page 108

1  counsel?
2      A.  Some were provided by
3  counsel.  Some were papers that I had in
4  my collection, and one or two may have
5  been papers which I asked counsel to find
6  because I couldn't download it at work.
7      Q.  And were these materials
8  that came to you either through your own
9  efforts or through counsel after you
10 submitted your report on November 30th?
11     A.  Many of these papers I had
12 read before I submitted my report.  I
13 didn't cite them directly, either because
14 they were sort of background information
15 or things I had read in the past, but
16 didn't specifically rely on for the
17 purposes of producing my report -- sorry.
18 Does that answer the question or, if not,
19 could you repeat it, please?
20     Q.  It's a partial answer.
21 Let's start with what you just partially
22 answered.
23         Which of these papers --
24 there are 17 numbered papers and then

Page 109

1  there are two itemized additional
2  materials.
3      A.  Okay.
4      Q.  Quite obviously, you didn't
5  get the expert reports -- well, I
6  shouldn't say that.  Let me exclude that
7  for the moment, so let me start again.
8         Let's start first with the
9  medical literature.  Which of the 17 can
10 you now tell me under oath you had read
11 before you submitted your report on -- on
12 November 30th?
13     A.  Okay.  Number 4, number 10
14 -- oh, wait.  Actually, no, that's a
15 mistake, not 10 -- number 14.  Number 15,
16 I had skimmed.  And 17 -- well, I think I
17 had skimmed 17, but let me not say that
18 definitively.
19     Q.  Thank you, sir.  You can put
20 that aside -- well, before I do that, I'm
21 sorry, let's go to the additional
22 material.
23         Can you tell me under oath
24 whether you have -- whether you read

Protected Information - Steven M. Lagana, M.D.

Page 110

1 either one of those two referenced
2 materials before you completed your
3 report on November 30th?
4       A.   Yes, I had definitely seen
5 the FDA health safety announcement.
6       Q.   Thank you, sir.
7            Let's go back to -- I was
8 questioning you about the conference that
9 you mentioned or the discussion at
10 Columbia where you learned about the Mayo
11 paper soon to be published.
12           Explain for me the analytic
13 process, if there was one, from that
14 point until you reached your conclusion
15 that the reliable scientific evidence had
16 proven that olmesartan was causing
17 sprue-like enteropathy in the general
18 population.
19      A.   So I became aware of the
20 association or the potential association
21 as a -- at the time when Dr. Green, Peter
22 Green, was speaking to a group of
23 physicians at Columbia and he explained
24 that, through his discussions with Dr.

Page 111

1 Murray, he had become aware of this
2 association that was soon to be
3 published.
4            And the -- there had been a
5 group within our -- within the Celiac
6 Disease Center who was working on a case
7 series of seronegative villous atrophy.
8 And so based on Dr. Green's discussion
9 with Dr. Murray, researchers within the
10 Celiac Disease Center went through the
11 database that they collect on each
12 patient that they see and noted that
13 16 -- if I recall correctly, 16 patients
14 were on olmesartan.
15           So over the course of the
16 next several months -- to put a ballpark
17 on it, let's say six to eight months -- a
18 number of these patients started coming
19 back to be rebiopsied after they had
20 discontinued olmesartan, presumably on
21 the advice of their celiac disease
22 doctors at Columbia.
23           And when I looked at the
24 biopsies from these patients and when I

Page 112

1 compared those biopsies to the biopsies
2 that they had when they were exposed to
3 olmesartan, I noted absolutely profound
4 changes, including in quite a few cases
5 the resolution of collagenous sprue. And
6 collagenous sprue up until a few years
7 ago had really been thought to be a
8 frequently fatal disease.
9            So it was a very surprising
10 -- surprising to see the degree of
11 improvement and it was gratifying, too,
12 on a professional and personal level.
13           And during that time, I was
14 following the literature and reading
15 about additional cases that were
16 published in the literature, and we were
17 seeing new cases at Columbia of patients
18 being referred to us for consideration of
19 this entity.  So I was exposed to
20 additional biopsy materials.
21           So I would say, you know,
22 between six months and a year, I started
23 to feel very confident that this is a
24 direct -- a direct causal relationship.

Page 113

1       Q.   Based on what you just
2 described to me.
3       A.   Based on the cases I
4 observed clinically, based on the
5 literature I reviewed, based on
6 discussions with other physicians who had
7 had similar -- similar experiences.
8 Those would be the main points that I --
9 I based my opinion on.
10      Q.   Doctor, you mentioned a
11 couple times today that some or all of
12 these 16 patients had, to use your words,
13 remarkable improvement or resolution of
14 their symptoms when they were instructed
15 to stop taking olmesartan; correct?
16      A.   Some of them, yes, that I --
17 some of them that I am -- that I'm
18 personally aware of, some of them, yes.
19      Q.   And are these --
20      A.   May I make a clarification?
21      Q.   Sure.
22      A.   I believe in the paper that
23 was published based on those patients and
24 others, the DeGaetani, et al that's in

Protected Information - Steven M. Lagana, M.D.

Page 114

1  our reference list, I believe all of the
2  patients improved, but I would personally
3  not say I -- I don't have personal
4  knowledge of every one of those patients.
5       Q.  And that was my next point.
6  In that paper, what they reported is,
7  there were two other important things
8  that were done for those patients:  They
9  had improvement on steroids and they had
10 improvement on immunosuppressants;
11 correct?
12       MR. SLATER:  Objection.
13       You can answer.
14       THE WITNESS:  I do know some
15 of them got steroids and improved
16 on steroids.  I would have to look
17 -- you used the word "all."  I
18 don't know.  I'd have to check,
19 but --
20       MR. PARKER:  Let's take a
21 look at it.
22       THE WITNESS:  Okay.
23 BY MR. PARKER:
24       Q.  By the way, pull out your

Page 115

1  report, sir.  I just want to make sure
2  I'm understanding.  I don't recall you
3  referencing this in your paper.  You said
4  that you had referenced this --
5       A.  Referencing DeGaetani?
6       Q.  Yes, sir.
7            - - -
8       (Deposition Exhibit No.
9       Lagana-5, 2013 Article "Villous
10      Atrophy and Negative Celiac
11      Serology: A Diagnostic and
12      Therapeutic Dilemma" by DeGaetani,
13      et al, was marked for
14      identification.)
15           - - -
16      (Pause.)
17 BY MR. PARKER:
18      Q.  Am I correct?
19      A.  Okay.  Yeah, that's correct.
20      Q.  Okay.  Well, fortunately, I
21 have a copy.
22      A.  Okay.
23      Q.  So Exhibit No. 5 is the
24 result of the work that was done that you

Page 116

1  just described which was instrumental in
2  you reaching your causation opinion;
3  correct?
4       A.  This is a piece of the
5  picture.
6       Q.  Fair enough.
7           Now, to the point you and I
8  were discussing before, just so I'm
9  understanding, this as described was an
10 effort by your colleagues -- and you were
11 not, by the way, a co-author of this
12 paper, were you?
13      A.  Correct, I was not.
14      Q.  Were you invited to be a
15 participant?
16      A.  I was not.
17      Q.  Did you review any of the
18 biopsies of these people that are
19 profiled here?
20      A.  I reviewed a number of
21 biopsies of patients that I believe were
22 described in this paper.
23      Q.  Okay.
24          And when you say a number of

Page 117

1  of the biopsies, were those biopsies that
2  had been done before they were
3  recontacted to come back or after they
4  came back?
5       A.  In a number of the patients,
6  I have seen both the before and after.
7       Q.  Let's turn to table 3.
8       A.  Okay.
9       Q.  And table 3 profiles the 16
10 patients out of the 72 that were
11 determined by their records or by
12 conversations to have taken olmesartan;
13 is that right?
14      A.  In table 3?
15      Q.  Yes, sir.
16      A.  Yep.
17      Q.  Doctor, if you can answer
18 this, in nowhere that I recall, but I may
19 have missed it, is there a discussion in
20 here about what other medications these
21 16 people were taking in addition to
22 olmesartan at the time they were
23 experiencing their diarrhea, is there,
24 sir?