# EXHIBIT 7

Protected Information - Benjamin Lebwohl, M.D., M.S.

1         IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF NEW JERSEY
3
4                        -    -    -
5

     IN RE:  BENICAR          :   Civil No.
6    (OLMESARTAN) PRODUCT      :   15-2606(RBK)(JS)
     LIABILITY LITIGATION      :
7                              :
8
9

                         -    -    -
10

                    February 10, 2017
11
                         -    -    -
12

                  PROTECTED INFORMATION
13
                         -    -    -
14

                    Oral expert deposition of
15   BENJAMIN LEBWOHL, M.D., M.S., taken
     pursuant to notice, was held at the law
16   offices of Robins Kaplan LLP, 601
     Lexington Avenue, Suite 3400, New York,
17   New York, beginning at 9:45 a.m., on the
     above date, before Kimberly A. Cahill, a
18   Federally Approved Registered Merit
     Reporter and Notary Public.
19
20
                         -    -    -
21
22          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph │ 917.591.5672 fax
23             deps@golkow.com
24

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 2

```
 1   APPEARANCES:
 2
 3   MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM M. SLATER, ESQUIRE
 4   103 Eisenhower Parkway, 2nd Floor
     Roseland, New Jersey 07068
 5   (973) 228-9898
     aslater@mskf.net
 6   Representing the Plaintiffs
 7   ROBINS KAPLAN LLP
     BY:  RAYNA E. KESSLER, ESQUIRE
 8   601 Lexington Avenue
     Suite 3400
 9   New York, New York  10022
     (212) 980-7400
10   rkessler@robinskaplan.com
     Representing the Plaintiffs
11
12   DRINKER BIDDLE & REATH LLP
     BY:  KENNETH A. MURPHY, ESQUIRE
13   One Logan Square, Suite 2000
     18th and Cherry Streets
14   Philadelphia, Pennsylvania  19103
     (215) 988-2700
15   kenneth.murphy@dbr.com
     Representing Daiichi Sankyo, Inc.
16
17   DRINKER BIDDLE & REATH, LLP
     BY:  JESSICA L. BRENNAN, ESQUIRE
18   600 Campus Drive
     Florham Park, New Jersey  07932
19   (973) 549-7000
     jessica.brennan@dbr.com
20   Representing Daiichi Sankyo, Inc.
21
22
23
24
```

Page 3

```
 1   ALSO PRESENT:
 2        Amy Klug, Esquire
          Assistant General Counsel
 3        Daiichi Sankyo, Inc.
 4
 5
 6
 7            - - -
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1
 2            - - -
 3          I N D E X
 4            - - -
 5   Testimony of:  BENJAMIN LEBWOHL, M.D.,
     M.S.
 6
     By Mr. Murphy              9
 7   By Mr. Slater             367
 8
 9            - - -
10          E X H I B I T S
11            - - -
12   NO.       DESCRIPTION       PAGE
13
     Lebwohl-1    Notice of         9
14               Deposition of
                 Benjamin Lebwohl,
15               M.D.
16   Lebwohl-2    Plaintiffs'      14
                 Responses and
17               Objections to
                 Defendants'
18               Requests in
                 Schedule A of
19               Benjamin Lebwohl,
                 M.D.'s Notice of
20               Deposition
21   Lebwohl-3    5/5/15 Invoice from 28
                 Lebwohl to Slater
22
     Lebwohl-4    Rule 26 Expert    34
23               Report of Benjamin
                 Lebwohl Regarding
24               General Causation
```

Page 5

```
 1   Lebwohl-5    2/9/17 Letter from 35
                  Slater to Sharko
 2
     Lebwohl-6    9/23/16, 11/18/16, 38
 3               and 11/29/16
                 Invoices from
 4               Lebwohl to Slater
     Lebwohl-7    Document Entitled  88
 5               "In re: Benicar
                 (Olmesartan)
 6               Products Liability
                 Litigation
 7               Supplemental
                 Reliance List for
 8               Dr. Benjamin
                 Lebwohl"
 9
10   Lebwohl-8    2014 Paper        178
                 "Sprue-like
11               Enteropathy
                 Associated with
12               Olmesartan" by
                 Cartee and Murray
13
     Lebwohl-9    2013 Paper "Villous 200
14               Atrophy and
                 Negative Celiac
15               Serology: A
                 Diagnostic and
16               Therapeutic
                 Dilemma" by
17               DeGaetani, et al
     Lebwohl-10   2015 Paper        255
18               "Immunopathogenesis
                 of
19               olmesartan-
                 associated
20               enteropathy" by
                 Marietta, et al
21   Lebwohl-11   2014 Paper        262
22               "Olmesartan, Other
                 Antihypertensives,
23               and Chronic
                 Diarrhea Among
24
```

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 6

1 Patients Undergoing
2 Endoscopic
3 Procedures: A
  Case-Control Study"
4 by Greywoode
  Lebwohl-12 2014 Original     271
5 Article "Sprue-like
  histology in
6 patients with
  abdominal pain
7 taking olmesartan
  compared with other
8 angiotensin
  receptor blockers"
9 by Lagana, et al

10 Lebwohl-13 10/10/15 MedWatch 307
   Report (Also Marked
11 as Exhibit 126)
   OLM-DSI-0004775145-
12 R and
   OLM-DSI-0004775146-
13 R

14 Lebwohl-14 10/11/15 MedWatch 320
   Report (Also Marked
15 as Exhibit 327)
   OLM-DSI-0004774183-
16 R and
   OLM-DSI-0004774184-
17 R

18 Lebwohl-15 Excerpts from the 335
   May 31, 2016
19 Deposition
   Transcript of
20 Yasushi Hasebe

21 Lebwohl-16 Sankyo Post 339
   Marketing Safety
22 Adverse Event
   Contact Log
23 Attaching 7/19/05
   MedWatch Report
24 (Also Marked as
   Exhibit 129),

Page 7

1 OLM-DSI-0011876006
  through
2 OLM-DSI-0011876014
3 Lebwohl-17 9/21/05 E-Mail from 346
  Robinson to Risk
4 Management
  Attaching Two
5 CIOMS, etc. (Also
  Marked as Exhibit
6 130),
  OLM-DSI-0011876015
7 through
  OLM-DSI-0011876036
8
  Lebwohl-18 List of Search 358
9 Terms
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 8

1        - - -
2     DEPOSITION SUPPORT INDEX
3        - - -
4
5 Direction to Witness Not to Answer
6 Page Line    Page Line    Page Line
7 46  19
8
9 Request for Production of Documents
10 Page Line    Page Line    Page Line
11 198  10
12
13 Stipulations
14 Page Line    Page Line    Page Line
15
16
   Question Marked
17
   Page Line    Page Line    Page Line
18
19
20
21
22
23
24

Page 9

1        - - -
2        (Deposition Exhibit No.
3     Lebwohl-1, Notice of Deposition of
4     Benjamin Lebwohl, M.D., was marked
5     for identification.)
6        - - -
7        BENJAMIN LEBWOHL, M.D.,
8     M.S., after having affirmed, was
9     examined and testified as follows:
10        - - -
11        EXAMINATION
12        - - -
13 BY MR. MURPHY:
14     Q.  Good morning, Dr. Lebwohl.
15     A.  Good morning.
16     Q.  My name is Ken Murphy. I am
17 the attorney representing the Daiichi
18 defendants in the litigation that brings
19 us here today, and this is an opportunity
20 for me to ask you some questions.
21        I'll start with a couple of
22 preliminary instructions. The first is,
23 if there is anything about a question
24 that I pose to you that you don't

Page 10

1  understand or if you have any question in
2  your mind about what I mean, so indicate.
3  I'll try to rephrase or explain myself.
4         Fair enough?
5     A.  Yes.
6     Q.  Okay.
7         The assumption by all will
8  be that if you answer the question that I
9  asked, that you indeed understood what I
10 was asking you.
11        I would ask that you keep
12 your responses verbal.  Nods of the head,
13 shrugs of the shoulders, uh-huh, uh-uh,
14 kind of difficult for Ms. Cahill to
15 properly record.  So I will ask that you
16 keep your responses verbal to yes, no, or
17 whatever explanation you require.
18        Okay?
19    A.  I understand.
20    Q.  Okay.  And your last name, I
21 want to make sure I am pronouncing it
22 correctly, is it Lebwohl?
23    A.  You got it.
24    Q.  Okay.

Page 11

1         I want to show you or
2  provide you what's been marked as Exhibit
3  No. 1 for the deposition.  That's the
4  Notice of Deposition that was issued to
5  counsel.
6         My question to you is
7  whether you've seen that, that is,
8  Exhibit No. 1, before.
9     A.  I have.
10    Q.  Accompanying the notice is a
11 Schedule A that asks you to bring with
12 you certain documents.  Do you see that?
13    A.  Is this in the same packet
14 that you just provided?
15    Q.  Do you see Schedule A?
16    A.  I see Schedule A at the top.
17    Q.  Yes.
18    A.  And so, yes, I see it.
19    Q.  Okay.  And Schedule A asks
20 you to bring with you certain documents
21 and other items.  Do you see that?
22    A.  I see that.
23    Q.  Okay.
24        Did you bring any of those

Page 12

1  items?
2     A.  I have a binder on my person
3  that I've brought.
4     Q.  Okay.  And what -- the
5  materials that are in the binder, what
6  are they?
7     A.  They are documents relating
8  to the literature review.  I believe the
9  legal term is my reliance list.
10    Q.  Okay.
11    A.  I've also -- in addition to
12 published papers in the binder, I also
13 have my own report, a paper copy of my
14 own report, and expert reports by Drs.
15 Wilson and Turner, as well as an FDA drug
16 safety communication.
17        MR. SLATER:  And, counsel,
18        obviously I handed you the
19        invoices at the start before we
20        went on the record, so you have
21        all the invoices.
22        MR. MURPHY:  Correct.
23        MR. SLATER:  Other than the
24        one that I withhold as work

Page 13

1         product because that case is not a
2         case where Dr. Lebwohl's been
3         disclosed as an expert.
4         MR. MURPHY:  Understood.
5  BY MR. MURPHY:
6     Q.  Is there anything requested
7  in Schedule A -- any request, document
8  request, in Schedule A -- that you have
9  not satisfied?
10        MR. SLATER:  Counsel, you
11        realize that we provided to you
12        our responses which have our
13        formal responses and objections.
14        Right?  And you realize that's
15        something that an attorney would
16        have input into as well.  Right?
17        MR. MURPHY:  I'm going to
18        get there in a moment, but to
19        answer your question, yes, I
20        acknowledge that you provided
21        objections and responses
22        yesterday.  I'm simply curious to
23        know what the doctor's response is
24        to my question.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 14

1    THE WITNESS: In
2    consultation with counsel, I
3    believe that I've satisfied these
4    requests.
5        MR. MURPHY: Okay.
6        Let's mark this as 2.
7        - - -
8        (Deposition Exhibit No.
9    Lebwohl-2, Plaintiffs' Responses
10   and Objections to Defendants'
11   Requests in Schedule A of Benjamin
12   Lebwohl, M.D.'s Notice of
13   Deposition, was marked for
14   identification.)
15       - - -
16   BY MR. MURPHY:
17       Q.   Doctor, we've marked as
18   Exhibit 2 to your deposition a document
19   that we received from your counsel titled
20   "Plaintiffs' Responses and Objections to"
21   --
22       MR. SLATER: I'm not his
23   counsel, but we know what you
24   mean.

Page 15

1        MR. MURPHY: Okay.
2    BY MR. MURPHY:
3        Q.   -- "to Defendants' Requests
4    in Schedule A of Benjamin Lebwohl, M.D.'s
5    Notice of Deposition."
6        My question to you is, have
7    you seen this document before?
8        A.   Yes.
9        Q.   And when did you see it?
10       A.   I saw this document
11   yesterday.
12       Q.   The binder that you brought
13   with you today, among other things, it
14   includes the items that you reference in
15   your -- in the reliance list that is
16   attached to your report; correct?
17       A.   Correct.
18       Q.   Does it also include items
19   that were identified in a supplemental
20   reliance list that you provided?
21       A.   Can I see our supplemental
22   reliance list? I just want to make sure
23   that -- that I'm answering accurately.
24       Q.   Well, let me ask you this:

Page 16

1    When you generated this binder or you
2    prepared this binder, what was the
3    purpose for preparing the binder?
4        MR. SLATER: Objection to
5    form.
6        You can answer the question.
7        THE WITNESS: Mr. Slater
8    advised that it would be
9    beneficial to have easy access to
10   relevant literature on the topic
11   for the day.
12   BY MR. MURPHY:
13       Q.   And the relevant -- and
14   strike that.
15       The documents that you refer
16   to as the relevant literature, does the
17   relevant literature include all of the
18   literature upon which you rely for your
19   opinion?
20       A.   In terms of immediate or
21   relevant literature, yes, but I'm also
22   relying on my experience with patients as
23   well as my experience in medicine,
24   clinical medicine, evidence-based

Page 17

1    medicine, and epidemiology.
2        And so, for example, if I
3    took course work in epidemiology and I'm
4    relying on my -- what I've learned from
5    that course work, of course that's not
6    going to be in this binder.
7        Q.   Just so that I am clear, my
8    question was focused on the literature,
9    and so I'm simply trying to determine
10   whether all of the literature that you
11   have in that binder constitutes the
12   literature upon which you rely for your
13   opinion.
14       A.   The olmesartan
15   specific-related literature, I'd say yes.
16       Q.   Does the binder include
17   literature that is not
18   olmesartan-specific?
19       A.   Yes, and I can give you an
20   example if you'd like.
21       Q.   You can give me an example?
22       A.   Yes.
23       Q.   Please do.
24       A.   So, for example -- and this

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 18

1  is on my reliance list -- Lebwohl, et al,
2  "Sex and racial disparities in duodenal
3  biopsy to evaluate for celiac disease"
4  which we published in Gastrointestinal
5  Endoscopy gastroenterology journal in
6  2012.
7      Q.   That is an example of a
8  piece of literature upon which you do not
9  rely to support your opinion.
10      MR. SLATER: Objection;
11  mischaracterization, foundation.
12      MR. MURPHY: That's a
13  question. I didn't make a
14  statement. I asked a question.
15      MR. SLATER: Well, you kind
16  of did, actually, so I'm going to
17  object the way I think I need to.
18      MR. MURPHY: That's fair,
19  Mr. Slater.
20      MR. SLATER: I know it's
21  fair, thank you.
22      MR. MURPHY: I'll rephrase
23  the question.
24      MR. SLATER: You don't have

Page 19

1      to. You don't have to trust me.
2      MR. MURPHY: I'll rephrase
3      the question.
4  BY MR. MURPHY:
5      Q.   The article that you just
6  identified, is that an example of an
7  article upon which you do not rely to
8  support your opinion as set forth in your
9  report?
10      MR. SLATER: Objection;
11  mischaracterization, foundation --
12      THE WITNESS: That is not
13  such an example. I believe the
14  question -- perhaps it could be
15  read back -- was whether there was
16  literature in this binder that was
17  not directly related to
18  olmesartan.
19  BY MR. MURPHY:
20      Q.   Right. And so the question
21  then becomes, literature that is not
22  directly related to olmesartan --
23      A.   Or perhaps I can clarify.
24      Q.   Let me ask you a question

Page 20

1  and we may get there.
2      MR. SLATER: Let him
3      struggle through it and then you
4      can answer it.
5  BY MR. MURPHY:
6      Q.   Literature that is not
7  directly related to olmesartan, is there
8  literature not directly to olmesartan
9  that you rely upon to support your
10  opinion?
11      A.   There is certainly
12  literature that doesn't mention
13  olmesartan by name, for example,
14  literature on celiac disease for which
15  there are certain analogies to olmesartan
16  enteropathy, but -- that are in this
17  binder that I do indeed rely upon.
18      However, if you were to look
19  at the full text of this article, you
20  wouldn't find the word "olmesartan"; and
21  if you were to ask clinicians or experts
22  in olmesartan enteropathy, they might not
23  come to mind to reference this paper.
24      As I was the first author of

Page 21

1  this paper, I'm intimately aware of what
2  we did in that paper. I thought that it
3  was relevant to cite it because I learned
4  a fair amount about misdiagnosis or
5  underdiagnosis when I was researching
6  that specific study.
7      But I believe the question
8  was whether there were any articles that
9  are olmesartan-related articles and I
10  think that I rely on this even though one
11  wouldn't immediately assume that this is
12  an olmesartan-related article.
13      Q.   I appreciate your response.
14  Are there any articles in that binder
15  that you don't rely upon in setting forth
16  your opinion?
17      (Pause.)
18      THE WITNESS: These are all
19      appropriate to be on a reliance
20      list.
21  BY MR. MURPHY:
22      Q.   My question is, are there
23  any there that you don't rely upon? I
24  understand that you're saying they're all

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 22

1  appropriate to be on the reliance list,
2  but do you rely upon all of them?
3       A.   None of them are a linchpin,
4  if that's what you mean, but I have made
5  reference to them or I find that they are
6  relevant to the discussion, if that's
7  what you mean by relying upon.  There are
8  none that should be taken off.
9       If there were serious
10 problems, for example, with any one of
11 these, I don't think it would be accurate
12 to say that, well, I rely on all of
13 these; and so if this one has serious
14 problems, then there's a problem with my
15 overall conclusion.
16      But I think that they are
17 all relevant in one way or another.
18      Q.   Okay.
19      Dr. Lebwohl, how many times
20 have you testified as an expert witness
21 at trial?
22      A.   I've never testified as an
23 expert witness at trial.
24      Q.   How many times have you

Page 23

1  offered deposition testimony as an
2  expert?
3       A.   I've offered deposition --
4  or I've been deposed as an expert once.
5       Q.   And when was that?
6       A.   It was in December 2012.
7       Q.   What type of matter was
8  that?
9       A.   It was a medical malpractice
10 case.
11      Q.   And by whom were you -- or
12 on whose behalf were you engaged, the
13 plaintiff or the defendant?
14      A.   I was engaged by the
15 defendant.
16      Q.   Have you ever had occasion
17 to offer any testimony regarding
18 causation where a drug was alleged to
19 cause injury to someone?
20      A.   Can you repeat the question?
21      Q.   Sure.  Have you ever had
22 occasion to offer expert testimony in a
23 litigation where the allegation is that a
24 drug caused injury to someone?

Page 24

1       MR. SLATER:  With the
2  exception of what we're doing with
3  Benicar, counsel?
4       I'm asking you to clarify.
5  Are you including this litigation
6  or --
7       MR. MURPHY:  Other than what
8  brings us here today.
9       MR. SLATER:  Okay.  Thank
10 you for your clarification.  It
11 was much appreciated.
12      THE WITNESS:  No, I have
13 not.
14 BY MR. MURPHY:
15      Q.   The medical malpractice
16 matter that you referenced earlier, did
17 you generate a report in that matter?
18      A.   I did not generate a written
19 report to the best of my recollection,
20 but it was a few years ago.  I think I
21 would have remembered writing it, but I'm
22 fairly confident that it was all -- that
23 my services involved reviewing files,
24 conversation with the attorney, followed

Page 25

1  by -- followed by a deposition.
2       I'm just not sure if there
3  were any, for example, brief attestations
4  confirming my opinion that I needed to
5  sign, but I certainly didn't prepare the
6  kind of report that I went into when
7  preparing this current report under
8  question.
9       Q.   So you don't recall
10 generating a report, but if you did
11 generate a report, it wasn't like the one
12 you've generated in this litigation; is
13 that your -- what you're telling me?
14      A.   Yes.
15      Q.   What was the alleged
16 malpractice in the matter where you
17 provided expert testimony?
18      A.   It was a medical malpractice
19 case and I'm honestly not sure how many
20 of the details I am supposed to be
21 granting or divulging to people who were
22 not involved in the case.
23      If Mr. Slater believes that
24 I am obligated to describe everything I

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 26

1 remember from the case and he thinks that
2 that is a legitimate thing to do that
3 wouldn't violate any legal or medical or
4 ethical norms, I would go ahead and do
5 so, but I'd like to check with him first.
6 I hope you understand.
7         MR. SLATER:  Yeah, if you
8     were deposed and they took your
9     deposition, I mean, as long as --
10     he's not going to ask you what you
11     discussed with the attorneys
12     because obviously that, I wouldn't
13     think that you would answer.
14         He just I think wants to
15     know generally what was the
16     medical issue.
17         MR. MURPHY:  That is
18     correct.
19         THE WITNESS:  In that case,
20     the medical issue was a case of
21     colon cancer and the issue at play
22     was whether the colonoscopies
23     performed prior to the colon
24     cancer diagnosis met the standard

Page 27

1 of care.
2         MR. MURPHY:  Okay.  Thank
3     you.
4 BY MR. MURPHY:
5     Q.   With regard to this
6 litigation that brings us here today
7 involving olmesartan, when were you
8 initially engaged as an expert witness?
9     A.   I'm not sure precisely when
10 I formally agreed to be an expert
11 witness, but I can tell you, if this is
12 what you're looking for, when I first
13 communicated with Adam Slater.
14     Q.   My question to you is
15 slightly different.  When were you first
16 approached regarding the prospect of you
17 serving as an expert witness in this
18 litigation?
19     A.   I'm not sure when precisely
20 I said yes to be an expert witness,
21 because this was a conversation that
22 evolved over the course of a number of
23 months.
24         I -- probably if I had to

Page 28

1 pin a date on it, I think it wouldn't be
2 until sometime in 2016 when I realized
3 that the question at hand that I was
4 going to be addressing was regarding
5 general causation.
6         MR. MURPHY:  Let's mark this
7     as Exhibit 3.
8         - - -
9         (Deposition Exhibit No.
10     Lebwohl-3, 5/5/15 Invoice from
11     Lebwohl to Slater, was marked for
12     identification.)
13         - - -
14 BY MR. MURPHY:
15     Q.   Dr. Lebwohl, I've handed you
16 what's been marked as Exhibit 3 to your
17 deposition.  It is one of a number of
18 invoices that Mr. Slater provided to me
19 earlier today.
20         This particular invoice has
21 a date of May 5th, 2015.  Do you see
22 that?
23     A.   I do.
24     Q.   And this is -- was this an

Page 29

1 invoice that you submitted to Mr. Slater?
2     A.   It was.
3     Q.   And below -- or I should
4 say, on the document, among other things,
5 you have dates and you have description
6 of a task that you performed; correct?
7     A.   Correct.
8     Q.   And the first date we see
9 there is 4/14/2015; correct?
10     A.   Correct.
11     Q.   So you would agree with me
12 that you were approached about the
13 prospect of being an expert in this
14 litigation at some point prior to April
15 of 2015; correct?
16         MR. SLATER:  Objection.
17     You can answer.
18         THE WITNESS:  I was
19     certainly approached for my advice
20     and expertise by Mr. Slater before
21     April 2015.
22 BY MR. MURPHY:
23     Q.   Okay.
24         So when were you first

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 30

1 approached by Mr. Slater for your advice
2 and expertise regarding this litigation,
3 specifically olmesartan?
4     A.   To the best of my
5 recollection, I believe it was early
6 2015, give or take a couple of months.
7     Q.   And before Mr. Slater
8 contacted you in early 2015 about this
9 litigation, had any other attorney
10 approached you regarding this litigation?
11     A.   To the best of my
12 recollection, no. That said, I get a lot
13 of e-mails, but -- and it's possible that
14 I might have either missed or I'm not
15 remembering any specific one, but I
16 certainly didn't respond, if I got any.
17     Q.   But when Mr. Slater reached
18 out to you, that's when you began, in
19 your view, to function as an expert in
20 this litigation; is that fair to say?
21          MR. SLATER: Objection.
22          You may answer.
23          THE WITNESS: No. I
24     consider myself an expert in

Page 31

1     olmesartan enteropathy --
2          MR. MURPHY: In this
3     litigation. I'll rephrase the
4     question.
5 BY MR. MURPHY:
6     Q.   When Mr. Slater reached out
7 to you, that is when you became an expert
8 in this litigation; correct?
9          MR. SLATER: Objection.
10          You can answer.
11          THE WITNESS: I would like
12     to think that I was an expert on
13     this subject matter that is being
14     litigated well before he reached
15     out to me. Indeed, I think that's
16     why he reached out to me.
17          But I began my engagement in
18     this particular litigation in my
19     role as an expert at that time. I
20     contend, though, that I was an
21     expert in the subject matter
22     before then.
23 BY MR. MURPHY:
24     Q.   And that I understand and I

Page 32

1 have no quibble with it, and just so that
2 we're on page, so as best you recall, it
3 was in or about early 2015 when you began
4 functioning as an expert in this
5 litigation on behalf of Mr. Slater; is
6 that correct?
7     A.   That sounds right.
8     Q.   And what were you asked to
9 do?
10     A.   By Mr. Slater?
11     Q.   Yes.
12          MR. SLATER: And just he's
13     only asking in the very general
14     sense, because our communications,
15     that would be work product he's
16     not going to ask about.
17          MR. MURPHY: And to be
18     clear, to set the tone for the
19     day, I will never ask you about
20     conversations you had with Mr.
21     Slater or any other counsel for
22     plaintiffs. I'm not interested in
23     particulars in that regard.
24          I simply at this point am

Page 33

1     trying to determine what were you
2     asked to do as an expert when you
3     were engaged by Mr. Slater. Your
4     task was what?
5          THE WITNESS: I see.
6     Initially, to the best of my
7     recollection, he asked for advice
8     on this entity of olmesartan
9     enteropathy, specifically what I
10     thought was going on, what my
11     opinion was about olmesartan and
12     enteropathy, my opinion on the
13     literature at the time. We had
14     several conversations related to
15     that.
16          He asked me to summarize
17     what I knew about the existing
18     literature; and at some point, he
19     began bringing up additional parts
20     of the medical literature that I
21     had not yet seen and he asked my
22     opinion on that.
23          And again at some point, he
24     asked me to review some cases of

Page 34

1  potential olmesartan enteropathy
2  and he asked my opinion on those.
3  BY MR. MURPHY:
4  Q.  Had you ever worked with Mr.
5  Slater prior to the time he reached out
6  to you in early 2015?
7  A.  No.  In fact, I'd never met
8  him before that time.
9  MR. MURPHY:  This is 4.
10  - - -
11  (Deposition Exhibit No.
12  Lebwohl-4, Rule 26 Expert Report
13  of Benjamin Lebwohl Regarding
14  General Causation, was marked for
15  identification.)
16  - - -
17  BY MR. MURPHY:
18  Q.  Doctor, we've handed you
19  what's been marked as Exhibit 4 to your
20  deposition.  That appears to be a report
21  that you generated, along with -- and two
22  exhibits.
23  Is that what you recognize
24  it to be?

Page 35

1  A.  It is, though I'm not sure
2  what you mean by the two exhibits.  Do
3  you mean the Exhibit 1 and Exhibit 2 at
4  the back of this packet?  That's what you
5  mean?
6  Q.  Yes, Doctor.
7  A.  Not -- okay.  Because this
8  is called Exhibit 4, so I just wanted to
9  make sure.
10  Also, I believe there is
11  either -- it's an addendum or
12  modification to the report that we also
13  either submitted or I signed -- that I
14  signed, so I would say this is not the
15  complete report in that manner of
16  speaking.
17  MR. SLATER:  I think he
18  might be talking about the letter
19  I sent you yesterday.
20  MR. MURPHY:  Sure.
21  - - -
22  (Deposition Exhibit No.
23  Lebwohl-5, 2/9/17 Letter from
24  Slater to Sharko, was marked for

Page 36

1  identification.)
2  - - -
3  BY MR. MURPHY:
4  Q.  So you now have in front of
5  you what's been marked as Exhibit 5.  Is
6  that the addendum to which you refer?
7  A.  Yes.  Thank you.
8  Q.  And so do Exhibits 4 and 5
9  constitute your report in this case?
10  MR. SLATER:  Objection.
11  You can answer.
12  THE WITNESS:  Yes, Exhibit 4
13  plus Exhibit 5 are my report.
14  BY MR. MURPHY:
15  Q.  Focusing on Exhibit 4, which
16  is the report, or at least the first
17  iteration of the report without the
18  addendum and modification, how long did
19  it take you to generate that report?
20  A.  I think it would depend a
21  bit on whether you mean the actual
22  writing time, typing time, or if you
23  would also include supplemental
24  literature review, conversations back and

Page 37

1  forth with Mr. Slater.  So I would ask
2  you to clarify?
3  Q.  Sure.
4  I'll approach it slightly
5  differently:  When did you begin writing
6  the report?
7  A.  I began the daunting task of
8  facing a blank page on the computer, I
9  believe, in late October.
10  Q.  Late October of 2016?
11  A.  Yes.
12  Q.  And when did you complete
13  that task?
14  A.  I believe I signed the final
15  version of the report on the day it was
16  due, on or abouts, maybe the day before.
17  Q.  Now, if you look to page 44
18  of the exhibit, there is a date of
19  November 30.  As best you recall, was
20  that the date that you completed it?
21  A.  As best I recall, yes.
22  MR. MURPHY:  Let's mark this
23  as 6, please.
24  - - -

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 38

1      (Deposition Exhibit No.
2   Lebwohl-6, 9/23/16, 11/18/16, and
3   11/29/16 Invoices from Lebwohl to
4   Slater, was marked for
5   identification.)
6         - - -
7   BY MR. MURPHY:
8      Q.   Doctor, you have in front of
9   you what's been marked as Exhibit 7 --
10         MR. SLATER:  These aren't
11   all the invoices I gave you.
12   Right?
13         MR. MURPHY:  No, they
14   aren't.
15         MR. SLATER:  Because I gave
16   you more.
17         MR. MURPHY:  Indeed, you
18   did.
19         THE WITNESS:  Can I clarify?
20   This says 6.
21         MR. MURPHY:  I'm sorry.  6.
22   I got ahead of myself.
23   BY MR. MURPHY:
24      Q.   You have in front of you

Page 39

1   what's been marked as Exhibit 6.  These
2   are three invoices that you submitted to
3   Mr. Slater, correct, dated September
4   23rd, November 18, and November 29;
5   correct?
6         MR. SLATER:  I think you --
7   I know what you're doing.  I think
8   you missed one, the 28th.  If
9   you're just trying to do the
10   general consulting as opposed to
11   the Norman Block case.
12         MR. MURPHY:  Right.
13         MR. SLATER:  You missed the
14   28th, which I gave you also -- oh,
15   no, no, you're right.  You're
16   right.  You're good.  I just read
17   the body of it.
18         Hey, look, I get to be
19   proven wrong just once.
20         MR. MURPHY:  The day's long.
21   I'll restate.
22         THE WITNESS:  Yes, please,
23   thank you.
24         MR. MURPHY:  That's no

Page 40

1   problem.
2   BY MR. MURPHY:
3      Q.   You have in front of you
4   what's been marked as Exhibit 6, which is
5   comprised of three invoices; correct?
6      A.   Correct.
7      Q.   And the dates on those
8   invoices are September 23, November 18th,
9   and November 29; correct?
10      A.   Correct, 2016, all of them.
11      Q.   Okay.
12         Now, do these invoices
13   reflect the time and the tasks that you
14   brought to bear in generating your
15   report?
16      A.   They are certainly relevant
17   to my generation of the report.
18      Q.   Do these invoices reflect
19   all that you billed Mr. Slater for the
20   time spent in generating your report?
21      A.   No.
22      Q.   Are there other invoices
23   that reflect time that you spent
24   generating your report?

Page 41

1      A.   Not yet, but I'll be sure to
2   make one up.
3      Q.   Okay.
4         So as we sit here today, we
5   don't have all of the invoices that you
6   have -- strike that.
7         As we sit here today, you
8   have not billed Mr. Slater for all the
9   time spent in generating your report.
10      A.   I've not yet billed Mr.
11   Slater for all the time I spent preparing
12   for this deposition, so perhaps I
13   misspoke.
14      Q.   That's not my question.  My
15   question is specific to your report.
16      A.   With regard to my report,
17   these are the invoices and there are no
18   other invoices out there or forthcoming
19   in terms of generation of this report.
20      Q.   Okay.
21      A.   I may have misunderstood.
22      Q.   No problem.
23         So everything -- all the
24   time associated and all the cost

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 42

1 associated with generating your report is
2 reflected in these three invoices;
3 correct?
4     A.   Correct.
5     Q.   I'll come back to that.
6         I understood you to say that
7 you believe that you started generating
8 this report in late October; is that
9 right?
10        MR. SLATER:  Objection.
11        THE WITNESS:  I started
12     writing up or typing up the report
13     in late October.
14 BY MR. MURPHY:
15     Q.   If you look at Exhibit 6,
16 the first invoice dated -- which is dated
17 September 23, the first entry for time is
18 dated September 11, 2016.
19        Do you see that?
20     A.   I do.
21     Q.   Is that when you first began
22 working on the report?
23     A.   As far as I can remember,
24 that's when I first got into the mode of

Page 43

1 thinking that any materials I was
2 reviewing would now be relevant to a
3 written report.
4         Mr. Slater had me review
5 cases and engage me for discussion and
6 review of the literature before that
7 time, but that was not for concrete
8 preparation for the report, so -- per se,
9 so, yes, in that these activities were
10 the first that were clearly demarcated
11 for preparation of the report.
12     Q.   And those other activities
13 that Mr. Slater had asked you to engage
14 in before September 11 of 2016, did you
15 bill him for those?
16     A.   Yes.  I believe we reviewed
17 those.
18     Q.   Would that be what we see
19 reflected in Exhibit 3?
20     A.   Yes.
21     Q.   So a total of one hour?
22     A.   I believe I spent other time
23 discussing specific cases and reviewing
24 -- or certain cases with Mr. Slater that

Page 44

1 is not among these two exhibits.
2     Q.   So the general -- the
3 general topic as addressed in your
4 report, when did you start working on
5 that?
6         MR. SLATER:  Objection;
7     asked and answered.
8         THE WITNESS:  I started
9     writing the report in late October
10    and I started working on it in a
11    general manner in September of
12    2016.
13 BY MR. MURPHY:
14     Q.   And prior to that time,
15 prior to September of 2016, were there
16 anything -- were there any things that
17 you had done toward that end; that is,
18 prior to 2016, had you done any work
19 related --
20        MR. SLATER:  Objection.  You
21    asked this question multiple
22    times.
23 BY MR. MURPHY:
24     Q.   -- related to the general

Page 45

1 report?
2         MR. SLATER:  Objection;
3     asked and answered.
4         You can answer again.
5         THE WITNESS:  My
6     communications with Mr. Slater
7     about certain patients were not
8     directly related to this report.
9         MR. MURPHY:  Okay.
10 BY MR. MURPHY:
11     Q.   Doctor, did any other doctor
12 or any student provide you assistance in
13 generating your report?
14     A.   No.
15     Q.   So the report is something
16 that you prepared yourself?
17     A.   I prepared the report with
18 Mr. Slater.  He may have had a student or
19 someone who works with him to help his
20 end of things, but on my end of things, I
21 prepared the work without assistance.
22     Q.   Well, you refer to Mr.
23 Slater's end of things --
24        MR. SLATER:  He's not going

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 46

1 to talk any further about that.
2 That subject's closed.
3        MR. MURPHY: I understand.
4 I'll ask a question and if you
5 want to instruct him not to
6 answer, that's fine, but I will
7 ask the question I want and we'll
8 get beyond that.
9        MR. SLATER: Why don't you
10 ask your question and then we'll
11 see what it actually is, but you
12 know the rule. Right?
13       MR. MURPHY: That's what I'm
14 saying.
15 BY MR. MURPHY:
16    Q. When you refer to Mr.
17 Slater's end of things, what do you mean
18 by that?
19       MR. SLATER: Don't answer.
20 Next question. You're not
21 answering. So, counsel, go to
22 your next question.
23       MR. MURPHY: That's fine.
24 BY MR. MURPHY:

Page 47

1    Q. If I can draw your attention
2 to page 43 of your report, in your
3 conclusion section, you write, "there is
4 substantial evidence that, taken on
5 aggregate, establishes the causal
6 relationship between olmesartan and
7 sprue-like enteropathy, to a reasonable
8 degree of medical certainty."
9        That's what you write;
10 correct?
11    A. Correct.
12    Q. If called to trial in this
13 litigation, is that the opinion that you
14 intend to offer?
15       MR. SLATER: Objection.
16       You can answer.
17       THE WITNESS: This is what I
18 believe and if asked if I still
19 believe this question -- this
20 statement, I would respond
21 affirmatively.
22 BY MR. MURPHY:
23    Q. Are there any opinions
24 regarding olmesartan that you intend to

Page 48

1 offer at trial that are not set forth in
2 this report?
3        MR. SLATER: Objection.
4        You can answer.
5        THE WITNESS: I can't think
6 of anything concrete that is out
7 there that I think is missing with
8 regard to the question at hand.
9 BY MR. MURPHY:
10    Q. Dr. Lebwohl, do you intend
11 to offer any opinions regarding the
12 mechanism by which olmesartan purportedly
13 causes the condition sprue-like
14 enteropathy?
15       MR. SLATER: Objection.
16       You can answer.
17       THE WITNESS: Can you repeat
18 the question?
19       MR. MURPHY: Sure. Would
20 you read it back, Kim?
21        - - -
22       (The court reporter read the
23 pertinent part of the record.)
24        - - -

Page 49

1        THE WITNESS: Yes.
2 BY MR. MURPHY:
3    Q. Have you written any papers
4 on this purported mechanism of action?
5    A. I've certainly written
6 papers that investigate a link between
7 olmesartan use and biological changes
8 that could be relevant to sprue-like
9 enteropathy.
10       MR. MURPHY: Move to strike
11 as nonresponsive.
12       MR. SLATER: Just so know,
13 that doesn't mean it's actually
14 going to happen. He's allowed to
15 place things on the record.
16       MR. MURPHY: As we all do.
17 BY MR. MURPHY:
18    Q. My question to you is
19 whether you have written any papers that
20 address this mechanism of action on which
21 you have an opinion.
22       MR. SLATER: Objection;
23 asked, answered.
24       You can answer it.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 50

1       THE WITNESS: I've certainly
2   written about and investigated the
3   matter of the clinical phenotype
4   seen in patients due to olmesartan
5   and a potential organic basis for
6   that, in other words, small
7   intestinal histologic changes.
8   BY MR. MURPHY:
9       Q.   Have you conducted any
10  experiments addressing this purported
11  mechanism of action?
12      A.   I've conducted
13  epidemiological experiments.
14      Q.   Regarding the mechanism of
15  action that we're discussing?
16      A.   Olmesartan-induced
17  enteropathy is a clinical diagnosis that
18  includes, among other features,
19  histologic changes; and the mechanism by
20  which olmesartan induces this clinical
21  phenotype are histologic changes and I've
22  certainly conducted epidemiologic
23  experiments in that domain.
24      One issue that might be a

Page 51

1   source of misunderstanding perhaps is
2   that mechanisms can refer to molecular or
3   subcellular mechanisms, cytokines and
4   chemokines, or, beyond the cellular
5   level, more of a macroscopic mechanism.
6       The biologic mechanism in
7   some cases between olmesartan and severe
8   diarrhea requiring dehydration would be
9   in some cases villous atrophy or other
10  histologic changes.  That is a biological
11  mechanism.
12      Q.   To the extent that you have
13  conducted experiments addressing this
14  purported mechanism of action, are they
15  addressed in any papers that you have
16  written?  Those experiments?
17      A.   I have addressed the
18  mechanism -- this mechanism -- in at
19  least one such study.
20      Q.   And just so that we're
21  clear, my question to you is focused on
22  experiments that you say you've conducted
23  addressing the mechanism of action; and
24  my question is, are those experiments the

Page 52

1   subject of any papers that you have
2   written?
3       MR. SLATER:  Isn't that the
4   question he just answered?
5       MR. MURPHY:  I want to make
6   sure we're clear.  We've had
7   misunderstandings earlier today.
8       MR. SLATER: Objection.
9       You can answer.
10      THE WITNESS:  I must clarify
11  what I mean by mechanism, because
12  based on the repeated questioning,
13  I'm getting the sense that perhaps
14  you're referring to a cellular or
15  subcellular mechanism.
16      I am referring to a more
17  broad biological mechanism that
18  looks more at organs or systems
19  and, yes, I've published in that
20  matter.
21  BY MR. MURPHY:
22      Q.   And what articles have you
23  published that addressed experiments that
24  you conducted on that mechanism of

Page 53

1   action?
2       A.   I published a paper with Dr.
3   Lagana, for example --
4       Q.   And what is the date, the
5   year, of that paper?
6       A.   This is the paper I'm
7   referring to, a "Sprue-like histology in
8   patients with abdominal pain taking
9   olmesartan compared with other
10  angiotensin receptor blockers," published
11  in the Journal of Clinical Pathology and
12  its publication date was January 2015.
13      Q.   Any others?
14      A.   Not that come to mind, no.
15      Q.   And just so that we're
16  clear, it's your testimony that that
17  article that you wrote with Dr. Lagana
18  addresses experimentation that you
19  conducted on the mechanism of action by
20  which you say olmesartan causes
21  sprue-like enteropathy; correct?
22      A.   This was a study that
23  broadly investigated histologic changes
24  among not just olmesartan, but other

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 54

1  angiotensin receptor blockers
2  specifically looking for changes that
3  might represent a more subtle histologic
4  finding that had previously been
5  published in the, at that point,
6  still-being-characterized olmesartan
7  enteropathy.
8       MR. MURPHY: I don't think
9  you understood my question.
10      Kim, would you read it back,
11  please?
12      MR. SLATER: You know what?
13  Just for the record, you don't
14  have to say that.
15      MR. MURPHY: No, I -- it is
16  --
17      MR. SLATER: You can just
18  ask her to reread the question,
19  because, honestly, I think you're
20  not understanding what
21  he's saying. So there's no
22  benefit to you telling him he
23  doesn't understand your question,
24  so let's not do that.

Page 55

1       MR. MURPHY: I don't do
2  that. I don't do that. You've
3  been with me long enough. You
4  know I don't do that.
5       Would you just please read
6  the question back?
7           - - -
8       (The court reporter read the
9  pertinent part of the record.)
10          - - -
11      THE WITNESS: I believe I've
12  answered this in that my
13  understanding of mechanism speaks
14  more broadly than a cellular or
15  molecular basis.
16      We were looking more broadly
17  than that and, yes, in those broad
18  terms, I think it's certainly
19  relevant and can be described as
20  an experiment regarding the
21  mechanism of olmesartan
22  enteropathy and related or more
23  subtle conditions.
24      MR. MURPHY: Okay. Thank

Page 56

1  you.
2       Are you okay to take a
3  break?
4       MR. SLATER: Sure. Do you
5  need a break?
6       (A recess was taken from
7  10:36 a.m. until 10:46 a.m.)
8       THE WITNESS: Can I add a
9  matter to my recent answer about
10  mechanism of action?
11      MR. MURPHY: Sure.
12      THE WITNESS: I found one
13  other study that I was involved
14  with as a participant, a designer.
15  It was by DeGaetani and
16  colleagues. I'm not sure if I can
17  tell you precisely the title of
18  that paper unless I get lucky and
19  find it in this large binder.
20      MR. SLATER: It's actually
21  not in the Table of Contents.
22  It's right in the beginning, right
23  after the Table of Contents.
24      THE WITNESS: The title of

Page 57

1  the paper is "Villous atrophy and
2  negative serial serology: a
3  diagnostic and therapeutic
4  dilemma."
5       The first author is
6  DeGaetani. The senior author's
7  Peter Green. I was a participant
8  in this study. It was published
9  in the American Journal of
10  Gastroenterology in 2013.
11 BY MR. MURPHY:
12  Q.   And that was a paper that
13  addressed an experiment on the mechanism
14  of action that we were talking about;
15  correct?
16  A.   Again --
17      MR. SLATER: Objection.
18      You can answer.
19      THE WITNESS: Again, when --
20  when contemplating mechanism by
21  which olmesartan causes this
22  clinical phenotype, this is an
23  experiment in that domain.
24      MR. MURPHY: Okay.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 58

1 BY MR. MURPHY:
2    Q.   Your report -- in your
3 report, you identify yourself as a
4 gastroenterologist; correct?
5    A.   I am a gastroenterologist.
6    Q.   Are you a pathologist?
7    A.   I am not a pathologist,
8 though I frequently participate in
9 clinicopathologic conferences and I have
10 frequent interactions with pathologists
11 as part of my day-to-day clinical and
12 research life.
13    Q.   Are you a toxicologist?
14    A.   I am not a toxicologist,
15 though I've interacted with toxicologists
16 in terms of clinical and teaching
17 responsibilities and I've certainly
18 studied potential adverse effects of
19 medications.
20    Q.   You have some training in
21 epidemiology; is that right?
22    A.   I practice epidemiology.  I
23 conduct epidemiological research.  I'm on
24 the faculty in the department of

Page 59

1 epidemiology at Mailman School of Public
2 Health, and so I am an epidemiologist.
3    Q.   But you're not a biologist.
4    A.   That's a term we don't
5 really use so much in clinical research
6 or epidemiological research; but if you
7 mean colloquially the notion of someone
8 who performs in vitro studies with
9 pipettes and tissue cultures, that is not
10 my day to day or -- focus.
11    Q.   I understand.
12        Dr. Lebwohl, have you read
13 any articles that indicate or suggest
14 that olmesartan causes inflammation in
15 the intestine of animals?
16    A.   I am not deeply acquainted
17 with the animal literature on olmesartan
18 except for what I would argue is the most
19 relevant animal, humans.
20    Q.   So you're not familiar with
21 the animal studies.
22    A.   I do not have a deep
23 familiarity with animal studies relating
24 to olmesartan.

Page 60

1        I would add that animal
2 studies are most helpful in preclinical
3 testing and they are most helpful in the
4 absence of any clinical data; and,
5 unfortunately, we now have a large amount
6 of data about human beings who've been
7 harmed by olmesartan.
8    Q.   In the conclusion section of
9 your report that we looked at a moment
10 ago, you wrote in part that there is
11 substantial evidence that, quote, taken
12 on aggregate, establishes this causal
13 relationship.
14        When you write "taken on
15 aggregate," do you mean taken as a whole?
16    A.   What I mean by taken on
17 aggregate is just that; but if you'd like
18 me to clarify, it's that it's more than
19 one single study, more than one single
20 case that provides the convincing
21 evidence of this causal relationship;
22 it's the aggregate or the collection of
23 these data.
24    Q.   Is -- are there studies and

Page 61

1 data to the contrary that you're aware
2 of?
3    A.   I'm not aware of any
4 published studies that dispute causality.
5 In fact, this is now an entity that's
6 being increasingly recognized around the
7 world.
8        And until I read expert
9 reports from the defendants' side and
10 until I started reviewing depositions, I
11 had no idea that there were people who
12 denied the existence of olmesartan
13 enteropathy.
14    Q.   Your review of defendants'
15 reports was something that you engaged in
16 after you wrote your report; correct?
17    A.   To the best of my
18 recollection, correct.
19    Q.   Is it your opinion, Dr.
20 Lebwohl, that all medical literature on
21 the subject indicates that olmesartan
22 causes sprue-like enteropathy?
23    A.   I would say that there is no
24 convincing published literature that puts

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 62

1  forth that olmesartan does not cause
2  enteropathy or the olmesartan enteropathy
3  clinical phenotype. There are certainly
4  studies that have nothing to do with
5  olmesartan enteropathy that are in the
6  published literature. There are also
7  studies of olmesartan that do not
8  specifically investigate olmesartan
9  enteropathy. There are also studies that
10  are post hoc analyses of previous
11  experiments that were not powered or
12  predestined -- or predesigned, rather --
13  to investigate olmesartan enteropathy,
14  and those are in the literature.
15       But there are no convincing
16  studies that essentially deny the
17  existence of olmesartan enteropathy, nor
18  can I even find an editorial or opinion
19  piece in the published literature by any
20  expert in the field that suggests that
21  olmesartan does not, in a subset of
22  individuals, cause olmesartan
23  enteropathy.
24       Q.   Were there reports or

Page 63

1  articles that you read that specifically
2  addressed that question, that is, whether
3  olmesartan causes sprue-like enteropathy
4  in a subset of individuals?
5       MR. SLATER: Objection.
6       You can answer.
7       THE WITNESS: I think that
8       the bulk of literature on the
9       subject of olmesartan enteropathy
10      addresses this question of
11      whether, in a subset of
12      individuals, olmesartan causes
13      sprue-like enteropathy.
14  BY MR. MURPHY:
15      Q.   And how many randomized
16  controlled trials address this issue that
17  you're aware of?
18      A.   To my knowledge, there have
19  been zero randomized controlled trials
20  designed to investigate the outcome of
21  olmesartan enteropathy; and, frankly, if
22  anyone approached me with -- asking my
23  advice about designing such a study, I
24  would have told them it would be

Page 64

1  prohibitively expensive given what we now
2  know about the time course and what we're
3  increasingly learning about the incidence
4  of olmesartan enteropathy.
5       I believe a randomized trial
6  would probably be a lousy way to
7  investigate olmesartan enteropathy.
8       MR. MURPHY: Move to strike
9       everything after "if anyone asked
10      me."
11  BY MR. MURPHY:
12      Q.   Doctor, with regard to the
13  time course that you referenced, what is
14  the time course to onset?
15      A.   Is that the end of your
16  question?
17      Q.   That's the end of my
18  question and if you don't know what I
19  mean by that, I'm happy to rephrase the
20  question.
21      A.   The time course from onset
22  to diagnosis can be quite long,
23  particularly relating to the relative
24  lack of knowledge in the community of

Page 65

1  olmesartan enteropathy. Patients can
2  suffer for prolonged periods of time,
3  typically months, but perhaps longer,
4  years even, and I would also say that the
5  time course has been quite variable.
6       Q.   And with regard to that last
7  point, the variable time course, there
8  are case reports, in fact you've referred
9  to, where the time course has been less
10  than a year; correct?
11      A.   There have been reports of
12  olmesartan causing enteropathy in a time
13  course of under one year.
14      Q.   And the fact that the time
15  course in certain instances is more than
16  two years suggests that there might be
17  other environmental factors that are
18  causing the enteropathy; correct?
19      A.   I would say more than in
20  some instances. If -- allow me, please,
21  to look at the first case series by
22  Rubio-Tapia and colleagues.
23       (Pause.)
24       THE WITNESS: In the study

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 66

1  by Rubio-Tapia and colleagues, the
2  mean duration of olmesartan use
3  was actually 3.1 years, with a
4  range reported of .5 years, in
5  other words about six months, to
6  seven years.
7       Now, you were asking about
8  whether that is related to a
9  hypothesized mechanism?
10      MR. MURPHY:  No.
11      Kim, would you read my
12  question back, please?
13           - - -
14      (The court reporter read the
15  pertinent part of the record.)
16           - - -
17      THE WITNESS:  No.  First of
18  all, it's not in some instances.
19  It seems to be often if not
20  perhaps the majority of instances
21  as far as we know, but the fact
22  that this does appear to be a --
23  more of a long-term adverse effect
24  suggests that this is not an acute

Page 67

1  allergic reaction.
2       It suggests that there does
3  appear to require either some sort
4  of cumulative effect of damage or
5  some sort of priming of the immune
6  system or some cofactor that
7  perhaps was not present during --
8  at the beginning or onset of
9  olmesartan use, but with long
10 enough time of exposure of
11 olmesartan, that as yet
12 unidentified cofactor could be
13 triggering olmesartan's induction
14 of enteropathy.
15 BY MR. MURPHY:
16      Q.  Is it your --
17      A.  If I could just finish.
18      Q.  I'm sorry.  I didn't know
19 you were...
20      A.  So celiac disease in certain
21 ways provides an analogous situation.
22 People with celiac disease develop
23 symptoms, and the biologic mechanism for
24 the symptoms in many patients is villous

Page 68

1  atrophy and the cause of that is gluten.
2       And yet the onset of not
3  just symptoms, but villous atrophy, in
4  celiac disease can occur as young as
5  first year of life when gluten is first
6  introduced, but often can happen years
7  later, even in -- even in adulthood.  It
8  doesn't mean that it was something else
9  that was responsible for the celiac
10 disease.  It's clearly gluten that is the
11 cause.
12       In epidemiology, we
13 sometimes use the term "causal pies" when
14 discussing causality and it's a metaphor.
15 If you've ever played the game Trivial
16 Pursuit, the notion that you win the game
17 when you've filled out the entire pie,
18 olmesartan is what is necessary for
19 developing olmesartan enteropathy, but it
20 might not be sufficient.  There might be
21 some other factors that need to be
22 present.
23       So we don't yet know what
24 those factors are, but one can speculate,

Page 69

1  for example, someone taking olmesartan
2  for years, but then has some breakdown in
3  the gut barrier that allows olmesartan to
4  encounter components of the immune system
5  that it had not previously been exposed
6  to, so a gastroenteritis or some other
7  cofactor, and only when that happens does
8  the patient develop olmesartan
9  enteropathy.
10       This is -- this strikes me
11 as one plausible way to explain why
12 olmesartan doesn't cause enteropathy in
13 everyone, but only in some individuals
14 who have those other cofactors or who
15 develop those cofactors over time.
16      Q.  So is it your -- your
17 testimony, Doctor, that in your view,
18 olmesartan causes sprue-like enteropathy
19 in individuals in different ways?
20      A.  I would say that it causes
21 enteropathy in a subset of individuals,
22 and the clinical manifestations and
23 laboratory and histologic manifestations
24 can vary.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 70

1  Q.  So with regard to an
2  individual who presents with enteropathy
3  after olmesartan therapy compared to an
4  individual who develops enteropathy after
5  olmesartan therapy after two years, is it
6  your understanding that olmesartan
7  affects those two individuals similarly?
8      MR. SLATER: Objection.
9      You can answer.
10     THE WITNESS: You know, the
11  first hypothetical you provided
12  didn't specify a time course. I
13  think -- and perhaps you could
14  read back the question, the first
15  half of the -- of that question.
16     - - -
17     (The court reporter read the
18  pertinent part of the record.)
19     - - -
20     THE WITNESS: So that's
21  somewhat vague --
22     MR. MURPHY: Less than a
23  year. So with regard to an
24  individual who presents with

Page 71

1  enteropathy incident to olmesartan
2  therapy in less than a year --
3      THE WITNESS: Do you mean
4  due to olmesartan therapy?
5      MR. MURPHY: No. An
6  individual who is taking
7  olmesartan and they then present
8  with symptoms of enteropathy.
9      THE WITNESS: While still
10  taking the olmesartan regularly or
11  intermittently or what have you?
12     MR. MURPHY: Yes -- in less
13  than one year, comparing that
14  individual to someone who does not
15  present with enteropathy while on
16  olmesartan therapy until two years
17  or more, my question to you is,
18  does the olmesartan -- in your
19  view, does the olmesartan cause
20  the enteropathy in the same way?
21     THE WITNESS: I don't think
22  we know enough to be sure yes or
23  no. It's very possible that there
24  are very similar features between

Page 72

1  those two and that the major
2  differences between someone who
3  presents late and someone who
4  presents early could be related to
5  the development of whatever that
6  unidentified cofactor is.
7      But even getting beyond
8  biology, there could be social
9  differences. For example, someone
10  could have the unfortunate
11  experience -- and I've certainly
12  seen such cases -- of a patient
13  going from doctor to doctor,
14  including gastroenterologists, and
15  being misdiagnosed again and again
16  until finally someone who was
17  familiar with the clinical entity
18  of olmesartan enteropathy makes
19  the diagnosis.
20     Someone else who is luckier,
21  though still unlucky because he or
22  she has this syndrome, might get
23  it more promptly recognized
24  because they were in an area or in

Page 73

1  an institution or had a provider
2  or knew someone who was more
3  familiar with the entity.
4      We have great experience in
5  this regard in the world of celiac
6  disease. There has been, you
7  know, a real spectrum of duration
8  of symptoms prior to diagnosis and
9  this is due to another -- a number
10  of factors; but even for celiac
11  disease, in which gluten triggers
12  enteropathy in the susceptible
13  individuals, there are people who
14  go to multiple doctors and don't
15  get recognized, and so there's
16  certainly a wide variation.
17     Sometimes these two clinical
18  phenotypes are very similar. It's
19  just that one person suffered for
20  longer before she got diagnosed.
21  Sometimes the phenotypes are
22  different.
23  BY MR. MURPHY:
24     Q.  You mentioned similarities

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 74

1 between celiac disease and sprue-like
2 enteropathy. With regard to the
3 histological or histologic presentations
4 or manifestations of celiac disease, are
5 they similar to the histologic
6 presentation of one who is suffering from
7 sprue-like enteropathy?
8      A.   Histologically, celiac
9 disease and olmesartan enteropathy share
10 some features, which is an explanation
11 for the phenomenon we've observed where
12 many people with olmesartan enteropathy
13 are initially misdiagnosed with celiac
14 disease.
15      Q.   Olmesartan doesn't cause
16 celiac disease, does it?
17      A.   That's an interesting
18 question. In the case series by
19 Rubio-Tapia, a proportion of patients had
20 been initially diagnosed with celiac
21 disease.
22         (Pause.)
23         THE WITNESS: They state
24 that the cause of the enteropathy

Page 75

1 could not be established and then
2 it goes on to say for disorders
3 associated -- that included --
4 included investigation for
5 disorders associated with
6 nonresponsive celiac disease.
7         And so those patients had
8 initially been misdiagnosed with
9 celiac disease and, indeed, when
10 you look at the subsequent
11 literature of the case reports
12 that have come up from around the
13 world, often, patients are
14 initially misdiagnosed with celiac
15 disease.
16         Indeed, an epidemiologic
17 study by Basson and colleagues
18 looked at celiac disease as a
19 secondary outcome because of and
20 informed by this phenomenon of
21 people initially being
22 misdiagnosed with celiac disease.
23 And so they are closely related in
24 that -- in that way.

Page 76

1      That said, I am not sure
2 that they are only related in that
3 one looks like the other. It is
4 possible that someone with celiac
5 disease could then develop
6 olmesartan enteropathy and it is
7 also possible that olmesartan
8 enteropathy can occur and a
9 patient subsequently develops
10 celiac disease and, related to
11 that, it's possible that
12 olmesartan could even trigger
13 celiac disease.
14      I would say the jury's not
15 out on that and it is in need of
16 further study.
17 BY MR. MURPHY:
18      Q.   Did you mean that the jury
19 is out on that, that is, the jury hasn't
20 spoken on that question; is that what you
21 mean to say?
22      A.   Why don't I rephrase.
23      Q.   That's fine.
24      A.   Because I probably have the

Page 77

1 least legal expertise in the room.
2         MR. SLATER: Don't be sure
3 about that.
4         THE WITNESS: The matter has
5 not been decided upon.
6 BY MR. MURPHY:
7      Q.   So my question was whether
8 olmesartan causes celiac disease and my
9 -- my sense of your answer is, it's
10 unknown?
11      A.   I would say, first of all,
12 that I was not asked to formulate an
13 opinion on that for the purposes of
14 today's deposition, but what I would say
15 is that we don't know.
16      Q.   And with regard to the
17 Rubio-Tapia paper that you were referring
18 to, wasn't it the case that part of the
19 inclusion criteria was that participants
20 had to be -- had to rule out celiac?
21      A.   Let's take a look.
22         Their inclusion criteria
23 included that the cause of their
24 enteropathy could not be established

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 78

1 after systematic diagnostic evaluation
2 that included investigation for disorders
3 associated with nonresponsive celiac
4 disease. And their second criteria --
5 criterion is that they had to improve
6 clinically after discontinuation of drug.
7     Q.   Okay.
8          And so my -- I guess my
9 follow-on question to you is, were the
10 Rubio-Tapia participants assumed not to
11 be suffering from celiac disease?
12     A.   Ultimately, yes, in fact,
13 the authors' comment, no patient had
14 recurrence of symptoms after restarting a
15 gluten-containing diet.
16          Our understanding of celiac
17 disease today is that celiac disease
18 doesn't go away. There have been very
19 rare documented reports of something
20 called transient celiac autoimmunity, but
21 in general, celiac disease is a lifelong
22 diagnosis and that gluten causes
23 recurrence of the abnormalities.
24          And so these authors

Page 79

1 concluded that these patients in this
2 case series did not have celiac disease.
3     Q.   And one of the reasons they
4 concluded that was because they were
5 exposed to gluten or reexposed to gluten
6 and there was no change.
7     A.   That's one of the reasons.
8 Also, they do make allusion to the
9 systematic evaluation that included
10 investigations for disorders associated
11 with nonresponsive celiac disease and had
12 not come up with an alternative plausible
13 explanation and, third, these patients
14 were better once the cause was
15 identified, olmesartan.
16     Q.   Let me direct your attention
17 to your report and in particular your
18 reliance list. Are you there?
19     A.   Yes.
20          MR. SLATER: No, you're not.
21 You said the reliance list?
22          MR. MURPHY: In his report.
23          MR. SLATER: Yeah, you gotta
24 go to your report.

Page 80

1          MR. MURPHY: That would be
2 Exhibit 2 to your report.
3          MR. SLATER: The last thing
4 you want to rely on is the Table
5 of Contents my office did, which
6 is incomplete.
7          THE WITNESS: Thank you
8 both, gentlemen. Give me a
9 moment.
10          (Pause.)
11          THE WITNESS: Okay. I'm
12 there.
13 BY MR. MURPHY:
14     Q.   In your reliance list, you
15 identify certain deposition transcripts
16 that you reviewed; correct?
17     A.   Correct.
18     Q.   And the first one you
19 identify is Allen Feldman?
20     A.   Yes.
21     Q.   And on the next page, you
22 identify Donald Hinman. It's on page 2
23 of your -- if we have the same document.
24          MR. SLATER: Right there

Page 81

1 (Indicating).
2          THE WITNESS: Thank you.
3 Yes, thank you.
4 BY MR. MURPHY:
5     Q.   Below Mr. Hinman is Yasushi
6 Hasebe. Do you see that at the bottom of
7 page 2?
8     A.   Hasebe?
9     Q.   Yes.
10     A.   Yes.
11     Q.   And on the next page, you
12 identify Hideki Tagawa.
13     A.   Yes.
14     Q.   Page 4, Jeffrey Warmke?
15     A.   Yes, I see that.
16     Q.   Page 6, Herve Caspard;
17 correct?
18     A.   Yes.
19     Q.   And if you go to page 8,
20 Crawford Parker is another deposition
21 that you reviewed; correct?
22     A.   Yes.
23     Q.   If you go to page 11, at the
24 bottom of page 11, Tina Ho is a witness

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 82

1 whose deposition you reviewed; correct?
2    A.   Correct.
3    Q.   Do you know how many Daiichi
4 company witnesses were deposed in this
5 litigation?
6    A.   I do not.
7    Q.   But you -- are you aware
8 that you have not reviewed them all?
9    A.   I review what Adam Slater
10 shows me and so I'm really not sure.
11    Q.   The depositions that you did
12 review, your review of those depositions,
13 was that work for which you charged Mr.
14 Slater?
15    A.   The depositions that I read
16 carefully, word for word, and closely, I
17 believe are enumerated in my invoices. I
18 did read through the other ones, but it's
19 possible, first, that I didn't invoice if
20 it was brief.
21    Q.   So there may be some
22 transcripts that you reviewed that are
23 not reflected in an invoice; is that
24 right?

Page 83

1      MR. SLATER: You mean --
2      when you say not reviewed, you
3      mean names. Right?
4      MR. MURPHY: Pardon me?
5      MR. SLATER: You're asking
6      whether the person was named in an
7      invoice. Right?
8      MR. MURPHY: Correct.
9      THE WITNESS: Not all of the
10      depositions on this reliance list
11      are named in my invoices and that
12      reflects the depth at which I
13      spent time reviewing the
14      depositions.
15 BY MR. MURPHY:
16    Q.   So if not identified in an
17 invoice, had not reviewed in depth; is
18 that what you're saying?
19    A.   Not reviewed in depth to the
20 degree that, for example, the ones that I
21 did invoice for.
22    Q.   I'm going to ask you to take
23 a look at Exhibit 6 you have in front of
24 you.

Page 84

1    A.   I have it.
2    Q.   For the invoice for
3 September 23, among other things, you
4 identify the deposition review of Allen
5 Feldman; correct?
6    A.   Can you tell me the date
7 again?
8    Q.   Sure. September 23, 2016.
9    A.   Oh, on that invoice, yes.
10    Q.   You also have or identified
11 a review of deposition of Hideki Tagawa.
12    A.   Yes. I should clarify. It
13 says September 23, 2015. That was meant
14 to be 2016. I think it's obvious.
15    Q.   Okay.
16      And if we look at the next
17 invoice under exhibit -- or in Exhibit 6
18 --
19    A.   Yes.
20    Q.   -- there are no deposition
21 reviews identified there; correct?
22    A.   It is correct that none were
23 explicitly named, but it's very possible
24 that the documents that I reviewed during

Page 85

1 that time for which I invoiced included
2 some of those brief reviews of those
3 other depositions.
4    Q.   And if we turn to the third
5 page of Exhibit 6, that is your invoice
6 dated November 29; correct?
7    A.   I see it, yes.
8    Q.   That document does not
9 reference review of any deposition
10 transcripts; correct?
11    A.   It does not, but I believe I
12 probably looked at depositions, either
13 ones that I had previously reviewed so as
14 to refresh in preparation of my report or
15 some of those other ones that are on the
16 reliance list.
17    Q.   So just so that we're clear,
18 there is no reference to -- in your bills
19 or your invoices, no reference to review
20 of Mr. Warmke's or Dr. Warmke's
21 deposition; correct?
22    A.   He is not named on the
23 invoice.
24    Q.   Okay. Nor is Dr. Hinman;

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 86

1  correct?
2      A.   Correct.
3      Q.   Nor is Tina Ho.
4      A.   That's correct, she's not
5  mentioned in the invoices.
6      Q.   And nor is Herve Caspard.
7      A.   That is correct.
8      Q.   In your reliance list that
9  accompanies your report, you identify the
10  expert report of Steven M. Lagana as
11  something that you relied upon; is that
12  right?
13      A.   I'm just going to go back to
14  my reliance list.
15      Q.   You can look at the end, on
16  page 21 of your report, so that you see
17  what I'm referring to.
18      A.   I see it.
19      Q.   So you identified Dr.
20  Lagana's report as something that you
21  relied upon.
22      A.   Yes.
23      Q.   To what extent do you rely
24  on his report to reach your opinion?

Page 87

1      A.   Well, I read his report and
2  found that it was largely congruent with
3  my report. Dr. Lagana's area of
4  expertise, while like mine, is olmesartan
5  enteropathy, among other areas. His
6  report was more of a histopathological
7  discussion and I found it helpful,
8  because I felt that it complemented my
9  report, which focused more on the
10  clinical and epidemiological aspects of
11  this condition.
12      Q.   Without the benefit of Dr.
13  Lagana's report, do you still reach the
14  opinion set forth in your conclusion?
15      A.   If there were no other
16  expert reports on this matter, including
17  Dr. Lagana's report, so if Dr. Lagana's
18  report had not been written, I would
19  still have reached the same conclusion
20  regarding causality.
21      Q.   So to what extent do you
22  rely on Dr. Lagana's report?
23      MR. SLATER:  I'm sorry.
24      Didn't he just answer that

Page 88

1      question? I object. Asked and
2      answered.
3      You can answer.
4      THE WITNESS:  Well, I found
5      that Dr. Lagana's report gave
6      additional supporting, helpful
7      information, primarily from a
8      histopathologic perspective, which
9      I did not deeply address, but that
10      he did -- or I should clarify,
11      that I did not address as in depth
12      as he did.
13          - - -
14      (Deposition Exhibit No.
15      Lebwohl-7, Document Entitled "In
16      re: Benicar (Olmesartan) Products
17      Liability Litigation Supplemental
18      Reliance List for Dr. Benjamin
19      Lebwohl", was marked for
20      identification.)
21          - - -
22  BY MR. MURPHY:
23      Q.   Doctor, you have in front of
24  you what's been marked as Exhibit 7 to

Page 89

1  your deposition and it is a supplemental
2  reliance list for Dr. Benjamin Lebwohl.
3  This is a document that was provided to
4  us by Mr. Slater yesterday.
5      Is this your supplemental
6  reliance list?
7      A.   Yes.
8      Q.   Now, the materials that we
9  saw reflected in Exhibit 2 to your
10  report, including the reference to the
11  depositions and the various pieces of
12  literature, are -- and Dr. Lagana's
13  report, am I correct that those are all
14  of the things that you relied upon to
15  reach the conclusion that we saw
16  reflected at the conclusion -- I'm sorry
17  -- reach the opinion that we saw
18  reflected in the conclusion of your
19  report?
20      MR. SLATER:  Objection.
21      You can answer.
22      THE WITNESS:  I believe we
23      went over this earlier when I
24      related that there are certainly

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 90

1   aspects of my clinical experience
2   and my background and course work
3   that I took, if you recall.
4        If you'd like, we could read
5   that answer back. Maybe that
6   would suffice or I could repeat it
7   or paraphrase it again.
8   BY MR. MURPHY:
9        Q.   Just so that we are clear, I
10  understand fully that part and parcel of
11  what you bring to an opinion is your
12  background and experience.
13       We here are talking about a
14  reliance list that is identified in
15  enumerated items that you have relied
16  upon and that is what constitutes Exhibit
17  2 to your report, a list of articles, a
18  list of depositions, and an expert report
19  that you relied upon in reaching your
20  opinion; correct?
21       MR. SLATER: Objection.
22       You can answer.
23       THE WITNESS: Exhibit 2 was
24  the plaintiffs' --

Page 91

1        MR. MURPHY: No, Exhibit 2
2   to your report.
3        THE WITNESS: Oh,
4   understood.
5        Can you repeat the question?
6   I'm sorry.
7        MR. MURPHY: Sure. Sure, I
8   can.
9   BY MR. MURPHY:
10       Q.   Exhibit 2 to your report
11  called a reliance list identifies the
12  things and the items of information,
13  including articles, expert reports,
14  deposition transcripts, that you rely
15  upon in reaching your opinion; correct?
16       A.   This is my reliance list and
17  this is what I relied upon in terms of
18  the available documents, published
19  literature, et cetera, in formulating my
20  opinion, with the proviso that I said
21  previously: That sometimes it's helpful
22  to bring up well-established ideas when
23  they come up in a helpful way.
24       I would say, for example,

Page 92

1   causal pies was not something that's in
2   my reliance list, but is well established
3   in epidemiology.
4        Q.   The medical literature that
5   is identified in Exhibit 7, the
6   supplemental reliance list --
7        A.   I see it.
8        Q.   -- that medical literature
9   was -- that list of literature was not
10  something that you relied upon to
11  generate your report and your opinion;
12  correct?
13       MR. SLATER: Objection.
14       You can answer.
15       THE WITNESS: I'm sorry.
16       There are several negatives in
17  that question, so I'm not sure --
18       MR. MURPHY: That's fine.
19  BY MR. MURPHY:
20       Q.   The list of medical
21  literature runs from 1 to 23. Do you see
22  that?
23       A.   I do.
24       Q.   Those articles listed, 1 to

Page 93

1   23, were they articles that you relied
2   upon when you initially generated your
3   report?
4        A.   I can't say there was one
5   that was a linchpin, especially at the
6   time that, for example, I was first
7   writing the report.
8        I can think of some that
9   have come up while I was generating the
10  report, but perhaps not explicitly or not
11  in detail, and only subsequently did we
12  realize this belongs on a reliance list.
13       Q.   And so my -- my next
14  question to you is, why were these
15  medical articles not included on your
16  initial reliance list?
17       A.   Well, we could go through
18  them if you'd like. There were -- for
19  example, Julian Abrams and colleagues,
20  "Seronegative celiac disease: increased
21  prevalence with lesser degrees of villous
22  atrophy," this is something I was -- that
23  I was aware of. I'm a colleague of Dr.
24  Abrams', but it was, shall we say, in the

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 94

1 back of my mind and not explicitly in the
2 fore of things when I was preparing this
3 report, but only in subsequent review or
4 in further discussion with Mr. Slater or
5 in review of subsequent depositions did I
6 realize, well, this is relevant, we
7 should put this in.
8           For Padwal and colleagues,
9 this was a study that I had minimal or
10 very vague recollection of at the time
11 that I wrote the report, and only when I
12 saw that it was cited in other reports
13 did I realize this really should be
14 something that I should comment on or
15 take into account.
16           And I can go over some
17 others if you'd like. So --
18      Q.   Well, let me -- I'm sorry.
19      A.   For example --
20      Q.   Go ahead.
21      A.   -- let me just finish -- I
22 believe Uehara and colleagues was a case
23 report that I was not aware of until
24 after I completed my report and only

Page 95

1 noted it subsequently.
2           So I would say we can't
3 generalize about why each of these made
4 it in. I would say those are probably
5 the big baskets, background knowledge
6 that I assume people take for granted --
7 there's something called the curse of
8 knowledge where you assume that the
9 person you're talking to has the same
10 background in terms of experience, but,
11 of course, in this situation, we
12 shouldn't assume that and so some of
13 those made it in that way.
14           But these other baskets are,
15 I wasn't aware it existed or I was only
16 dimly aware and only after subsequent
17 review of documents did I realize this is
18 relevant.
19      Q.   So for certain of these
20 articles listed in your supplemental
21 report, you simply were unaware of them
22 at the time that you generated your
23 report; correct?
24      A.   I think for Uehara

Page 96

1 specifically, I'm fairly confident that I
2 didn't know about that paper until I
3 wrote the report, but I'd have to
4 double-check.
5      Q.   Are there any others that
6 you can identify that you were unaware of
7 at the time that you wrote your report?
8      A.   Well, I can give you an
9 example. It depends what you mean by
10 unaware --
11      Q.   Well, it's your terms, it's
12 your term.
13      A.   -- so I'll say that by
14 unaware, for example, Stephen Lagana in
15 reference number 23, "Angiotensin
16 Receptor Blockers Other than Olmesartan
17 Are Not Associated with Histologic
18 Evidence of Duodenitis" Annual Meetings
19 Abstract, that eventually was further
20 developed and made its way into a
21 publication that is on my reliance list,
22 but only after this abstract presentation
23 was specifically discussed in a
24 deposition did I realize that perhaps

Page 97

1 that version of it should be on it.
2           I certainly remember when we
3 developed that abstract and I remember
4 presenting it, but at the time of
5 developing my report, I didn't remember
6 it at the time.
7      Q.   And then there are -- well,
8 before I ask that question, are there any
9 others that you were unaware of at the
10 time that you wrote your report?
11           MR. SLATER: Objection.
12           You can answer.
13 BY MR. MURPHY:
14      Q.   Have we exhausted that list?
15      A.   I'm not sure if I knew about
16 the paper by Al-Bawardy and colleagues,
17 reference number 8, "Collagenous sprue
18 cross-sectional imaging: a comparative
19 blinded study."
20           I am aware of this study.
21 I'm not sure when it first popped into
22 PubMed, for example. I do see that it
23 has the date January 5th, 2017, so it's
24 very possible that it hadn't been out

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 98

1 there at the time that I wrote my report.
2 I think that would be a helpful hint.
3         I would say I was -- Padwal
4 and colleagues I think I gave as an
5 example of something that really was not
6 something that I -- was in the forefront
7 of my recollection and I remember seeing
8 it noted and asking myself, have I seen
9 this, and then I had to look at it again
10 and it sort of jogged my memory. I think
11 that chalk that one up to search engine
12 optimization. It's not something that
13 mentions olmesartan in its title, so it
14 could have been that I missed it when
15 doing a literature review.
16         I think that -- I'm pretty
17 sure that number 19, Gujral and
18 colleagues, was an article that I was not
19 specifically aware of at the time that I
20 generated my report, but actually went
21 back, because there was a statement in
22 one of the expert reports that I thought
23 -- that I took an issue with that
24 suggested that it's irrelevant to study

Page 99

1 small bowel disease with a certain cell
2 line.
3         But I was aware that this
4 cell line has been used and so -- in the
5 study of small bowel disease, and so I
6 did a quick search and I thought that
7 that was illustrative of that point.
8         I wasn't aware at the time
9 that it was even a matter of dispute that
10 CACO cells could be used to study small
11 bowel disease. I took it for granted,
12 curse of knowledge once again. But once
13 I saw that even that was up for question,
14 I told myself, wait a minute, of course
15 there's literature on this and so I found
16 that. That is just one of the examples.
17     Q.   And various of these other
18 articles you included on this
19 supplemental list because you saw them
20 referenced in one or more expert reports
21 that you had reviewed?
22     A.   So, again, there was a mix
23 of reasons why these made it onto the
24 supplemental list, but one of those was,

Page 100

1 yes, my recollection was -- was
2 stimulated by seeing these mentioned in
3 either expert reports or depositions.
4     Q.   With regard to the condition
5 sprue-like enteropathy, what are the
6 characteristics of that syndrome?
7     A.   Sprue-like enteropathy, are
8 you referring to olmesartan enteropathy
9 as sprue-like enteropathy that's been
10 variously called sprue-like enteropathy
11 associated with enteropathy, olmesartan
12 enteropathy, or olmesartan-induced
13 enteropathy? Is that what you mean?
14     Q.   Correct.
15     A.   There are a number of
16 characteristics. It is a clinical
17 diagnosis that takes into account a
18 number of parameters on a number of
19 different axes. There are histological
20 features. There are clinical features
21 and there are temporal features.
22         And I would say there's no
23 one case that is the platonic ideal of
24 olmesartan enteropathy, but there are

Page 101

1 various features that have been reported.
2     Q.   When you say that there are
3 various, they vary from patient to
4 patient; is that correct?
5     A.   The features can vary from
6 patient to patient, just like in a heart
7 attack, it's reasonable, especially
8 colloquially, to say, a heart attack, the
9 features are chest pain. But there are
10 plenty of people who have a heart attack
11 or a myocardial infarction don't have
12 that. Now, that is a clinical entity
13 that has much more of a studied track
14 record, so there have been formal
15 definitions.
16         That's not the case in
17 olmesartan enteropathy at this point
18 because it's, A, new and, B, inadequately
19 recognized and studied.
20     Q.   Now, one thing I neglected
21 to ask you is whether there were any
22 deposition transcripts that you reviewed
23 after you finished or concluded your
24 report.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 102

1    A.   Yes, there were.
2    Q.   Which were they?
3    A.   I reviewed a deposition just
4  the other day by Stephen Lagana. I
5  reviewed a deposition recently by Dr.
6  Daniel Leffler. And I'm not sure if
7  there were others, but perhaps if I look
8  at my reliance list?
9        MR. SLATER: He's talking
10       about subsequent to that.
11            THE WITNESS: I'm not sure
12       if there are others. I can't
13       recall any at the moment, but --
14  BY MR. MURPHY:
15    Q.   Have you read Dr. Kessler's
16  deposition?
17    A.   I did not read Dr. Kessler's
18  deposition.
19    Q.   But you do recall having
20  read Dr. Leffler's deposition transcript
21  and Dr. Lagana's deposition transcript.
22    A.   I read both of those
23  transcripts.
24    Q.   Earlier, when I had asked

Page 103

1  you about your opinion and you explained
2  that there was a -- that literature taken
3  as a whole -- body of evidence, as a
4  whole, supported this conclusion, I
5  wanted to ask the question, but now I
6  think it's appropriate given the list in
7  front of you, which articles reach the
8  conclusion, Dr. Lebwohl, that olmesartan
9  causes sprue-like enteropathy?
10    A.   I think that there are a
11  number. Some of the articles are more
12  explicit than others, but certainly the
13  word "cause" and "induce," which I take
14  as analogous to "cause," are out there in
15  the literature and they're out there more
16  and more.
17        So, for example, in
18  commentary by Dr. Talley --
19    Q.   If I can stop you for a
20  second, because I'd like to follow with
21  you --
22    A.   Is it all right if I read
23  what Dr. Talley wrote? Because I thought
24  that this is pretty compelling and I was

Page 104

1  about to, and I think that this is
2  particularly relevant for two reasons --
3    Q.   That's fine. I simply want
4  to make sure that we are working off the
5  same list so it's easy to follow where
6  you are, and we have a couple lists out
7  there. We have your supplemental
8  reliance list. We also have the reliance
9  list that initially accompanied your
10  report. Okay?
11        MR. SLATER: He's using the
12       index to the literature.
13            MR. MURPHY: That's fine. I
14       would like him to use --
15            MR. SLATER: You can't tell
16       him what to reference --
17            MR. MURPHY: No, no, no -- I
18       beg your pardon?
19            MR. SLATER: You can't tell
20       him what to reference.
21            MR. MURPHY: No. What I can
22       do is, I can make reference to the
23       things that he's provided in the
24       litigation. And what he's

Page 105

1        provided is his reliance list and
2        the supplemental list that you
3        were good enough to provide last
4        night, and that's what I would
5        like him to look to to identify
6        those articles.
7            MR. SLATER: Look, do you
8        want a copy of the Table of
9        Contents? I mean, he's -- you
10       have all those articles. You can
11       take your time and look to them.
12       He's going to look at whatever he
13       wants. It's right in front of
14       him.
15            MR. MURPHY: Adam, I'm
16       simply trying to make it easier
17       for all of us to follow along.
18            MR. SLATER: I think it's
19       not going to be as tough as you
20       think it is. He's going to tell
21       you the title and you can find it
22       on the list and he can go to the
23       next one.
24            It'll be easier; it will be

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 106

1  fine. It'll be longer the way you
2  want to do it.
3      MR. MURPHY: No, it's not,
4  but we'll --
5      MR. SLATER: It is. You can
6  go back to what you were saying.
7      MR. MURPHY: We won't fight.
8  I have your supplemental list. I
9  have your initial list. The
10 article that you were going to
11 first identify is which one,
12 Doctor?
13     THE WITNESS: It's by
14 Nicholas Talley. I believe
15 Nicholas is his first name.
16     MR. MURPHY: So give me an
17 opportunity to find Nicholas
18 Talley between these two.
19     (Pause.)
20     MR. MURPHY: Okay.
21     THE WITNESS: Are you ready?
22 Because I was going to answer the
23 question more fully. I'm not
24 finished with my answer.

Page 107

1      MR. MURPHY: I simply wanted
2  you to identify the article. If
3  you want to further explain, there
4  will be an opportunity for Mr.
5  Slater to explain -- or give you
6  the chance to explain why you
7  think that's the case.
8      I, at this point as I'm
9  asking the questions, I just want
10 the name of the article.
11     THE WITNESS: But there are
12 multiple articles.
13     MR. MURPHY: That's fine.
14 So let's go to the next one.
15     THE WITNESS: So the first
16 was, as I said, Talley, Annals of
17 Internal Medicine.
18     The next one mentioning
19 causation or causality --
20 BY MR. MURPHY:
21     Q.   And I just want to make sure
22 that we are on the same question. Which
23 articles that you've read conclude that
24 olmesartan causes sprue-like enteropathy,

Page 108

1  that's what I'm asking about.
2      MR. SLATER: He was
3  answering the question.
4      MR. MURPHY: Okay. I -- go
5  ahead.
6      THE WITNESS: Some of these
7  articles take even for granted
8  that it causes sprue-like
9  enteropathy -- that olmesartan
10 causes sprue-like enteropathy and,
11 again, I have not encountered
12 anyone in the peer-reviewed
13 literature taking a view to the
14 contrary, saying that I do not
15 believe that olmesartan causes
16 sprue-like enteropathy in a subset
17 of individuals.
18     It is so accepted that often
19 the use of the term "cause" or
20 "induce" is not in a conclusion
21 section, but even in the
22 introduction or elsewhere.
23     Here's one. Lebwohl and
24 Ludvigsson, editorial, "Sprue-like

Page 109

1  enteropathy due to olmesartan and
2  other angiotensin receptor
3  blockers - the plot thickens."
4  You'll note that the word "due to"
5  is in the title, but the word
6  "cause" is also in table 1 of that
7  article.
8  BY MR. MURPHY:
9      Q.   Okay. Do you have another?
10     A.   I have others, yeah.
11     Q.   Okay.
12     A.   Marild and colleagues,
13 Marild, Lebwohl, Green, Murray,
14 Ludvigsson, "Blockers of angiotensin
15 other than olmesartan in patients with
16 villous atrophy: a nationwide
17 case-control study," I would note that
18 olmesartan causes enteropathy.
19     Q.   M-A-R-I-L-D?
20     A.   Yeah, though the A has one
21 of those small, little angstrom Swedish
22 symbols above it. I believe there are
23 others.
24     "Sprue-like histology in

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 110

1  patients with abdominal pain taking
2  olmesartan compared with other
3  angiotensin receptors blockers," Lagana,
4  Braunstein, Arguellas-Grande, Bhagat,
5  B-H-A-G-A-T, Green, and Lebwohl.
6         I believe there are others.
7  I would say in a more circumspect, but
8  more convincing manner, Rubio-Tapia in
9  the initial case series suggest causality
10 in a manner of caution.  That would be
11 "Severe sprue-like enteropathy associated
12 with olmesartan."
13     Q.   Well, let me -- I just want
14 to ask you a question about that:  Isn't
15 it the case that Rubio-Tapia, et al
16 stated that the case series lacks all the
17 information necessary to prove causality?
18     A.   This is why I gave that
19 caveat that it's more circumspect, but
20 that's not the end of the story.  If we
21 look in Rubio-Tapia's article, while they
22 do mention that cautious statement --
23 they make that cautious statement, they
24 also note the following:  "Resolution of

Page 111

1  the presenting symptoms and subsequent
2  histologic improvement after suspension
3  of olmesartan and the absence of clinical
4  evidence of other diseases associated
5  with enteropathy suggests that the
6  association is not likely to be due to
7  chance."  So they are getting there.
8         And then in their
9  conclusion, they write, "Physicians who
10 encounter patients with diarrheal
11 syndromes should consider medications as
12 a cause."
13        So they're using the
14 language of causality, though I
15 acknowledge in this particular study,
16 because they really were the first to
17 characterize it, they were being quite
18 conservative and cautious in their
19 scientific terminology.
20     Q.   Nonetheless, you believe
21 that what this article concludes is that
22 olmesartan causes sprue-like enteropathy.
23     A.   I think that when
24 enumerating literature that conclude that

Page 112

1  olmesartan is a cause of sprue-like
2  enteropathy, I think I would be remiss if
3  I didn't note that, in the conclusion
4  section, they're saying think about
5  medications as a cause.
6     Q.   Okay.  I take your
7  explanation --
8     A.   I would say though that --
9  and I acknowledged it when I brought this
10 up as a specific article -- it wasn't
11 quite as forceful as, for example, the
12 conclusion by Talley, which of course had
13 the benefit of numerous additional case
14 reports, a study Basson and colleagues,
15 and time.  Talley is significantly more
16 forceful in terms of his opinion on
17 cause.
18     Q.   So the Lagana, Marild,
19 Lebwohl, and Talley articles are in your
20 view a bit more forceful than the
21 Rubio-Tapia article with regard to
22 causation pronouncement; is that fair to
23 say?
24     A.   I would say those other

Page 113

1  articles do not exercise as much walking
2  back as Rubio-Tapia and colleagues do,
3  which makes -- makes sense given that the
4  subsequent authors had the benefit of
5  further data and time.
6         There are others that are
7  similar to these --
8     Q.   Similar to which?
9     A.   Similar not to the
10 Rubio-Tapia, but to those other articles
11 that I mentioned that mention
12 olmesartan-induced enteropathy, either in
13 the title, the abstract, or elsewhere in
14 the manuscript, not always in the
15 conclusion, but I would add that that's
16 because this is something that is taken
17 as a given in the community that studies
18 this.
19     Q.   You were able to identify
20 four articles before we got to
21 Rubio-Tapia.  Are there others that fit
22 into the category of the first four you
23 gave me --
24     A.   I believe there are.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 114

1    Q.   -- that you want to identify
2  for me?
3    A.   Why don't I take a look.
4    Q.   Please do.
5    A.   I think the Basson paper
6  does address the issue of causality.
7    Q.   It reaches a conclusion
8  regarding causality; is that what you're
9  saying?
10   A.   Not exactly.
11   Q.   Or does it assume from the
12 beginning that causality exists?
13   A.   Let's look at how the Basson
14 paper ends. Basson and colleagues write,
15 "This paper shows with a higher level of
16 evidence the association between
17 intestinal malabsorption and olmesartan
18 exposure"; and then a couple of sentences
19 later, "Patients treated with olmesartan
20 should be informed about the risk of this
21 complication and should be advised to
22 seek medical attention if they experience
23 GI symptoms."
24       So while they do not in all

Page 115

1  capital letters say olmesartan causes
2  enteropathy, they certainly suggest it,
3  because why would a group of
4  investigators say if you're taking this
5  medicine and you have these symptoms, you
6  need to get this checked out if they
7  thought that this was an association and
8  a correlation rather than causation?
9        Because that's really what
10 we're trying to tease apart when we have
11 some people who use the word
12 "association" and some people use the
13 word "cause" or "induce."
14       Typically, the real question
15 is, is there a third variable lurking?
16 And if Basson and colleagues believe that
17 a third variable were lurking, they would
18 not be telling patients to go check this
19 out if you're on olmesartan.
20   Q.   I understood you to say --
21 and I think we understand -- that Basson,
22 et al were looking at malabsorption;
23 correct?
24   A.   Basson, et al used the data

Page 116

1  that they had available to them and they
2  looked at codes relating to
3  hospitalization for malabsorption --
4    Q.   Right.
5    A.   -- and also for celiac
6  disease.
7    Q.   So my question --
8    A.   They were looking really for
9  a surrogate for enteropathy. After all,
10 there's no international classification
11 of diseases code for sprue-like
12 enteropathy induced by olmesartan. There
13 might be in the future, but right now
14 there isn't, and especially in the days
15 before this was widely at least reported
16 to be a problem with olmesartan.
17       This is what they had and so
18 that's what they used.
19   Q.   So with regard to the
20 features of the sprue-like enteropathy,
21 olmesartan-associated enteropathy, is
22 malabsorption a common feature?
23   A.   It is a clinical feature,
24 though --

Page 117

1    Q.   I said common feature. Is
2  it a feature that is common to all who
3  have been diagnosed or are suspected of
4  having that condition?
5    A.   Malabsorption in and of
6  itself is not necessary for sprue-like
7  enteropathy. Malabsorption in and of
8  itself is actually -- has been defined in
9  different ways by different individuals.
10       There can be clinical
11 malabsorption based solely on the fact
12 that the patient reports seeing changes
13 in one's bowel movement that looks like
14 fat in the toilet -- and I apologize if
15 I'm being explicit -- there is
16 malabsorption which is declared based on
17 the presence of deficiencies of various
18 vitamins, and then there's malabsorption
19 that's based on formal stool testing and
20 other testing.
21       Malabsorption therefore is a
22 somewhat broad term that's defined
23 variously in the medical literature and
24 in clinical practice. And so to say that