# EXHIBIT 7

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 238

1  the risk of chronic diarrhea?
2      A.   Because you're asking about
3  either paper, why don't I deal with them
4  one at a time?
5      Q.   That is fine.
6      A.   The Lagana paper was
7  interested in abdominal pain, and chronic
8  diarrhea was not the subject of that
9  paper.
10     Q.   Okay.
11     A.   So while it did not have a
12 finding, it also didn't have a question
13 in that regard.
14     Q.   All right.
15     A.   As for the Greywoode paper,
16 we did examine diarrhea.  Can you repeat
17 the question about diarrhea?
18     Q.   Right.  Did it show an
19 association between olmesartan use and
20 the risk of chronic diarrhea?
21     A.   We did not find that
22 olmesartan was statistically associated
23 with chronic diarrhea.  In that analysis
24 of only about 102 or 103 patients who

Page 239

1  take olmesartan, I believe I touched on
2  this earlier, but just to clarify, this
3  was a case-control study that we designed
4  during the early phases of our
5  understanding of olmesartan enteropathy
6  and we wanted to know to what degree the
7  current, or at the time, description of
8  that clinical phenotype represented the
9  tip of an iceberg.
10         And so we know that we
11 endoscope people for chronic diarrhea.
12 What we didn't know is whether olmesartan
13 is a common cause and the huge underlying
14 cause.  We were -- I would say, in
15 retrospect, we were swinging for the
16 fences.  We were looking for a really
17 large effect, once we found that
18 olmesartan was not terribly common among
19 patients who come to our endoscopy suite.
20         That said, when one designs
21 a study and receives data, does analysis,
22 and we find that there are far fewer
23 users of olmesartan in either arm, case
24 or control, than we initially intended,

Page 240

1  one has a choice.  One could shove the
2  data in a drawer and it never sees the
3  light of day because it was not
4  statistically significant; and, indeed,
5  there are referees out there and
6  reviewers out there who have indicated
7  that if I see a paper like this, I
8  wouldn't accept it.
9          Our group generally opts for
10 another choice, which is to come to terms
11 with what we found and even if this
12 results in an answer that's not
13 definitively yes or no, we get it out
14 there, because it's my belief that if we
15 -- if we publish data that we analyze,
16 that serves science, but also gets the
17 word out regarding this condition.
18     Q.   With regard to the criterion
19 consistency in your report, you say, "see
20 adverse event reports and case series
21 below," and those AERs and case series
22 are later discussed in your paper.
23         Do you see that?
24         MR. SLATER:  What page are

Page 241

1      you on?
2          THE WITNESS:  What page?
3          MR. MURPHY:  28.
4          THE WITNESS:  I see that.
5  BY MR. MURPHY:
6      Q.   So you rely on certain
7  adverse event reports and case series
8  with regard to satisfaction of the
9  consistency criterion of Bradford Hill.
10 Right?
11     A.   This is an important piece
12 of the consistency criteria in Bradford
13 Hill that there is a clinical phenotype
14 that's frequently observed.  It doesn't
15 mean there's not a spectrum, but that
16 there are some common themes.
17     Q.   And with regard to
18 consistency, AERs and certain case
19 reports are what you rely upon in
20 satisfying that criterion; correct?
21         MR. SLATER:  Objection.
22         That's a mischaracterization of
23         what he just said.  You asked him
24         the question, and he answered it.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 242

1       THE WITNESS: I look
2   carefully at AERs and case reports
3   because in general, in
4   epidemiological research, even
5   though some people like to put up
6   a generic pyramid in terms of
7   quality of research publications,
8   in truth, often there's a
9   trade-off between quality and
10  quantity.
11       And so, for example, one
12  could derive helpful information
13  from claims-based data that one
14  cannot get from case reports or
15  case series, but the opposite is
16  also true, because often we can
17  get a convincing narrative
18  regarding the degree of
19  symptomatology and dechallenge and
20  rechallenge data that we can get
21  from a case report or case series
22  that we would not be able to glean
23  from a population-based or large
24  cohort study.

Page 243

1       So it really is about taking
2   all of these into account and
3   acknowledging the limitations of
4   each study type, but not
5   minimizing the strengths either.
6   BY MR. MURPHY:
7       Q.   And with regard to the case
8   series that you looked at and you discuss
9   in your paper, some of them report 100
10  response to immunosuppression; correct?
11  For example, DeGaetani --
12      A.   When you say 100 response,
13  do you mean 100 percent response?
14      Q.   Correct.
15      A.   I would take issue with that
16  characterization, because while all of
17  them, all 16 out of 16 olmesartan users,
18  had a clinical improvement, one, that's
19  not the same thing as saying a 100
20  percent response and, two, they all
21  relapsed after immunosuppression.
22       Years later, I think most
23  patients and their doctors would disagree
24  that they had a 100 percent response to

Page 244

1   prednisone or budesonide or whatever it
2   was. If anything, it was a transient
3   response, because after all, they all
4   relapsed after, so I certainly wouldn't
5   characterize that as 100 response or 100
6   percent response.
7       Q.   But majority; correct?
8       A.   I think --
9       Q.   You would agree with
10  majority.
11      A.   I think it's the same issue,
12  that all of these patients had some
13  degree of response, but it's not clear
14  that they had a large response. It just
15  -- it just characterizes that they had a
16  clinical response, which in and of
17  itself, by the way, is somewhat
18  subjective. It depends a little bit on
19  what parameter one's measuring, on what
20  the patient's reporting, and when he or
21  she is reporting it.
22       And it's very possible for
23  two groups of investigators to be
24  encountering the same emerging clinical

Page 245

1   condition, but to characterize either the
2   presence or absence of a response or the
3   degree of response somewhat differently
4   and particularly in the absence of some
5   sort of disease assessment score.
6       Q.   Was there a response noted
7   to immunosuppression in the Rubio-Tapia
8   paper?
9       A.   When you refer to the
10  Rubio-Tapia paper --
11      Q.   2012.
12      A.   Okay. Just wanted to make
13  sure we're on the same page.
14       Their inclusion criterion
15  seem to preclude much of a response. For
16  example, if you look on page 733, they
17  actually excluded a patient from their
18  series because they improved clinically
19  and histologically with oral budesonide
20  before suspension of olmesartan.
21       That kind of patient might
22  have made it into our series depending on
23  the ultimate outcome with regard to
24  whether that response was durable,

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 246

1 whether symptoms returned after
2 discontinuation of budesonide, which is
3 an immunosuppressant, and ultimately what
4 happened to that patient once the
5 olmesartan connection was discovered.
6        So I think that these
7 patients are of a somewhat different
8 denominator simply because of different
9 inclusion criteria.
10     Q.   Right.  The fact was, the
11 inclusion criteria, per se, dictated that
12 immunosuppression did not work.
13     A.   These investigators chose to
14 characterize a group with
15 olmesartan-associated enteropathy and by
16 definition they chose to report on what
17 happened to those patients who did not
18 initially get better with
19 immunosuppression.
20        It appears that later on,
21 they publish further clinical data about
22 some other patients who either did not
23 get all better or much better after
24 cessation of olmesartan or had a more

Page 247

1 variable response to immunosuppression.
2     Q.   So there was a difference in
3 outcome in the different groups with
4 regard to immunosuppression; correct?
5     A.   There was a difference in
6 inclusion.  These are apples and oranges.
7 These patients in Rubio-Tapia by
8 definition didn't get better with
9 corticosteroids.  They may have had
10 others who did get better, but didn't
11 include that in their initial case
12 series.
13        We were more inclusive and
14 considered that any improvement, any
15 improvement, with immunosuppression would
16 not be an exclusion criteria.  Indeed, as
17 I pointed out, this series that we
18 published was not designed to look for
19 olmesartan.  It happens to be that that
20 was described while we were analyzing the
21 data and then lo and behold we found that
22 the lion's share of drug-induced villous
23 atrophy was due to olmesartan.
24        We set out to do this paper

Page 248

1 in a very different manner compared to
2 Rubio-Tapia and colleagues who
3 specifically, apriori, said we want to
4 look at those patients who aren't getting
5 better, who perhaps some had been
6 previously diagnosed and treated
7 unsuccessfully with celiac disease, and
8 even those on steroids, they didn't get
9 better; if we had patients who did get
10 somewhat better, we're not going to
11 include them for this initial case
12 series.
13        The DeGaetani paper have a
14 very different set of inclusion criteria,
15 and so it doesn't make sense to compare
16 outcomes with regard to immunosuppression
17 when you're stacking the deck in advance
18 with regard to how they did with
19 immunosuppression at the outset on the
20 Rubio-Tapia paper.
21     Q.   But the fact remains that
22 there were those who had been exposed to
23 olmesartan, had been exposed to
24 immunosuppressants, and did not have a

Page 249

1 response.  There was such a group of
2 people.  And then there was another group
3 of people who had been exposed to
4 olmesartan, had then been given
5 immunosuppressants, and they did have a
6 response, two different groups of people;
7 correct?
8     A.   Which papers are you talking
9 about?
10     Q.   I'm talking about two groups
11 of people.
12        MR. SLATER:  Objection.
13        MR. MURPHY:  If you cannot
14 answer my question, that's fine.
15        THE WITNESS:  What's the
16 question?
17        MR. MURPHY:  Do you want to
18 read the question back, please?
19        - - -
20        (The court reporter read the
21 pertinent part of the record.)
22        - - -
23        MR. SLATER:  Objection; lack
24 of foundation, ambiguity.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 250

1  You can answer.
2  THE WITNESS:  I would put
3  forth that it's not coherent to
4  mix two series together and assume
5  that their definition of response
6  to immunosuppression's the same.
7  As I mentioned earlier, response
8  can be subjective both in terms of
9  durability, temporality, and also
10  strength of response.
11  And so to say that these are
12  two separate clinical phenotypes
13  that are lopsided in one -- in
14  terms of where they're being
15  distributed with regard to which
16  center they're going to does not
17  make sense.  One has to be
18  cautious when looking at terms
19  like response.
20  MR. MURPHY:  Okay.
21  BY MR. MURPHY:
22  Q.  With regard to the
23  specificity factor or criterion -- and
24  again I'm on page 28 of your report --

Page 251

1  A.  I see.  Thank you.
2  Q.  -- you cite Basson as a
3  paper that provides evidence to satisfy
4  that criterion; correct?
5  A.  I do cite that.  I would
6  also say that the fact that the case
7  reports have been torrential coming in
8  regarding olmesartan and have been so
9  sparse with regard to angiotensin
10  receptor blockers other than olmesartan
11  further lends the notion that there is
12  something about olmesartan that's
13  different with regard to its -- its
14  propensity to cause enteropathy.
15  It's harder to cite the lack
16  of case reports when writing something
17  up, but I think that that silence is
18  somewhat deafening.
19  Q.  Sprue-like enteropathy is a
20  condition that is caused by things other
21  than medicine and drugs; correct?
22  A.  The words "sprue-like
23  enteropathy" these days generally are
24  followed by "olmesartan" either right

Page 252

1  before or right after; but if you're
2  referring to villous atrophy and if
3  you're going to use those two terms
4  interchangeably, then, yes, villous
5  atrophy can be caused by things other
6  than drugs.
7  Q.  So I'll take another pass at
8  this.  With regard to the condition or
9  the phenomenon sprue-like enteropathy,
10  what are its features?
11  A.  What are the features of
12  sprue-like enteropathy related to
13  olmesartan?
14  Q.  Which you say is related to
15  olmesartan.  As I understand you, Doctor
16  -- and I want to make sure that you
17  appreciate my question -- sprue-like
18  enteropathy in your mind these days is
19  caused by olmesartan; correct?
20  A.  Olmesartan enteropathy is a
21  known clinical entity.  That is not the
22  same thing as saying that all villous
23  atrophy is due to olmesartan.  That would
24  be foolish.

Page 253

1  But this condition that's
2  been variously termed sprue-like
3  enteropathy associated with olmesartan,
4  olmesartan enteropathy,
5  olmesartan-induced enteropathy, yes, I
6  believe that is caused by olmesartan.
7  Were you asking about
8  clinical features?
9  Q.  Yes.
10  A.  I believe I answered earlier
11  in the day that there are a number of
12  both signs and symptoms across a spectrum
13  of several different axes, including
14  clinical, histopathological, and other
15  signs in terms of laboratory
16  abnormalities.
17  There's no one uniform set
18  of strict criteria that's been developed
19  and there does appear to be a spectrum of
20  abnormalities on all of these axes.
21  Q.  How are we doing on time?
22  Q.  You're fine.
23  MR. SLATER:  Do you want to
24  take a break?

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 254

1    THE WITNESS: Yeah, maybe
2  less than a five-minute break.
3    MR. MURPHY: Sure.
4    MR. SLATER: Sure, stretch
5  your legs.
6    (A recess was taken from
7  3:32 p.m. to 3:41 p.m.)
8  BY MR. MURPHY:
9    Q.  Doctor, let me take your
10 attention back to page 28 and your
11 reference to the Bradford Hill criteria
12 in your report.
13   With regard to the factor or
14 criterion biological plausibility, you
15 cite the Marietta paper
16 "Immunopathogenesis of
17 olmesartan-associated enteropathy";
18 correct?
19   A.  I do cite that, though I
20 should say this is not exhaustive.  First
21 of all, in terms of other criteria I
22 don't list here, cessation of exposure,
23 for example, and there's abundant
24 dechallenge data; but specifically

Page 255

1  regarding the criterion of biological
2  plausibility, I mention "(see above under
3  Medical Literature)" and that's relevant.
4    The Marietta paper is also
5  relevant, but I believe that the link
6  between these symptoms and this clinical
7  phenotype and olmesartan can be explained
8  by certain histological findings that
9  have been identified, just like the link
10 between gluten and feeling ill has
11 biological plausibility, namely villous
12 atrophy and other histologic findings,
13 among others.
14   Q.  With regard to the Marietta
15 paper that you cite here, if you want to
16 go to it, we can --
17   A.  If you're going to be asking
18 me about it, I should take a look.  Do
19 you have questions?
20   MR. MURPHY: Let's mark it.
21     - - -
22   (Deposition Exhibit No.
23 Lebwohl-10, 2015 Paper
24 "Immunopathogenesis of

Page 256

1    olmesartan-associated enteropathy"
2    by Marietta, et al, was marked for
3    identification.)
4      - - -
5  BY MR. MURPHY:
6    Q.  Doctor, you have in front of
7  you what's been marked as Exhibit 10.
8  That's the Marietta paper that you
9  reference in your report in connection
10 with biological plausibility; correct?
11   A.  Among other evidence for
12 biological plausibility, I do cite that
13 study, yes.
14   Q.  Okay.
15   Now, do you recall that in
16 this paper, in the Marietta paper in
17 front of you marked as Exhibit 10, that
18 NSAID-induced enteropathy was not ruled
19 out or controlled for?
20   A.  I'm not sure what you mean
21 by "controlled for."  I don't see a
22 specific note of NSAIDs as an exclusion
23 criterion.  It appears that the specimens
24 that were included in this study were

Page 257

1  those who had olmesartan-associated
2  enteropathy as abbreviated as OAE, and so
3  I don't see that they used NSAID
4  enteropathy, which is a very different
5  clinical phenotype and often histologic
6  phenotype compared to olmesartan
7  enteropathy, but I don't see specific
8  references to NSAIDs.
9    Q.  And my question to you is,
10 do you know whether the patients for whom
11 these biopsies were taken had been on
12 NSAIDs?
13   A.  I know that in their
14 inclusion criteria, they note that an
15 alternate cause for the enteropathy could
16 not be established after a systematic
17 diagnostic investigation that included
18 investigation for disorders associated
19 with nonresponsive celiac disease as
20 previously reported.
21   That kind of workup
22 typically involves examination of one's
23 medical history that include medication,
24 whether specified or not specified

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 258

1 explicitly.
2     Q.   In this study, olmesartan
3 was compared to another -- at least one
4 other ARB; correct? And when I say ARB,
5 I mean angiotensin receptor blocker.
6     A.   Among the different
7 comparisons that were done.
8     Q.   That was one of the
9 comparisons that was done; correct?
10     A.   There were -- there were
11 comparisons to a non-olmesartan ARB.
12     Q.   And with regard to the
13 dosage of olmesartan versus the
14 non-olmesartan ARB, do you know whether
15 there was bioequivalence established?
16     A.   If you mean whether the
17 concentration of these two medications in
18 vitro was the same in their experiments,
19 I do not see that they were calculated to
20 be the same, if that's what you're
21 asking.
22         What these investigators
23 wanted to know is, when you're bathing
24 the -- these tissue with these agents,

Page 259

1 are you seeing differences, did they go
2 ahead to make sure that these would be
3 identical in terms of their
4 concentrations.
5         It doesn't appear that to be
6 the case.
7     Q.   Okay. And that is my
8 question.
9     A.   But I would add that what
10 they really want to know is, is there in
11 vitro activity with regard to some immune
12 activation.
13         Now, the amount of
14 olmesartan or the not-olmesartan ARB
15 that's actually present at the enterocyte
16 level can be extremely variable in human
17 beings simply because of variable rates
18 of dissolving and absorption.
19         But, no, I don't think that
20 these investigators made sure that these
21 were identical concentrations in their
22 experiments.
23     Q.   Would it not be important to
24 ensure that the concentrations were equal

Page 260

1 to the extent there is comparison between
2 these two agents?
3     A.   I think that the
4 concentration of any drug at the
5 enterocyte level can be so variable
6 between individuals that whether the
7 concentration of these two drugs are
8 identical is not essential.
9         I would say that if I were
10 in an ideal world and wanted everything
11 to be equal, I would want the
12 concentrations to be the same and I'd
13 want all rechallenges to be controlled in
14 an experimental setting. But that's not
15 the world that we live in, and so it
16 appears that they did what they had
17 available.
18     Q.   Earlier in your testimony,
19 you made reference to the cell line Caco
20 cells.
21     A.   Yeah, Caco or Caco-2.
22     Q.   Caco-2 cells.
23     A.   Yeah.
24     Q.   And in this paper, the

Page 261

1 authors discuss that it was that cell
2 line that they were utilizing for
3 purposes of their study; correct?
4     A.   Among their varied
5 experiments, Caco-2 cells were utilized
6 in this study.
7     Q.   And Caco-2 cells are cells
8 that are found in the large intestine;
9 correct?
10     A.   My understanding is that
11 Caco-2 are derived from a colonic or
12 specifically colon cancer derivation and
13 has been studied extensively in
14 understanding physiology and pathology of
15 the small and large bowel, somewhat akin
16 to HeLa cells, in case you're familiar
17 with that, which are cervical
18 cancer-derived cells, which are of course
19 used ubiquitously in basic science
20 experiments well beyond cervical cancer,
21 but have been found to have helpful
22 applicability to other diseases.
23     Q.   And just so that we're
24 clear, your view is, the fact that these

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 262

1  cells are from -- or are colonic, are
2  from the large intestine, does not have
3  any impact on the analysis of small
4  intestine enteropathy.
5      A.  I'd say that Caco-2 cells
6  have been studied extensively in the
7  context of small intestinal diseases.
8  It's widely accepted.  There's good
9  literature on this.  And so, no, it does
10 not strike me as having a red flag.
11         MR. MURPHY:  I want to mark
12     the next exhibit, Greywoode.
13             - - -
14     (Deposition Exhibit No.
15     Lebwohl-11, 2014 Paper
16     "Olmesartan, Other
17     Antihypertensives, and Chronic
18     Diarrhea Among Patients Undergoing
19     Endoscopic Procedures: A
20     Case-Control Study" by Greywoode,
21     was marked for identification.)
22             - - -
23 BY MR. MURPHY:
24     Q.   Doctor, you have in front of

Page 263

1  you Exhibit 11 to your deposition, which
2  is the Greywoode article, in which you
3  participated with Dr. Braunstein and Dr.
4  Green and others; correct?
5      A.  That's correct.
6      Q.  We talked about this -- this
7  article earlier just a bit, but, number
8  one, I wanted to mark it and make sure
9  it's in the record of your deposition.
10         My first question is, in
11 this paper describing your study, you all
12 were seeking to determine whether
13 olmesartan use was more common among
14 patients noting diarrhea as a reason for
15 their EGD or colonoscopy as compared to
16 controls who want -- who underwent
17 neither.
18     A.  No.
19     Q.  No?
20     A.  So everyone underwent an EGD
21 or a colonoscopy.
22     Q.  Okay.
23     A.  The question was why were
24 they having the EGD or colonoscopy. Some

Page 264

1  people have it done for a screening
2  colonoscopy, when we turn 50, that's our
3  fate, is that we get screened for colon
4  cancer typically with a colonoscopy.
5         People have EGDs in this
6  country not just as a screening.
7  Typically, there's an issue and, in some
8  people, that's diarrhea.  In some people,
9  it's something else.
10        So we used this setting, our
11 endoscopy suite, but for a pragmatic
12 reason.  It turns out that we capture
13 outpatient medication use pretty well and
14 accurately in our endoscopy suite,
15 because outpatients have preprocedure
16 interviews, and so we thought that would
17 be a good time to figure out -- or
18 setting to figure out -- if there's any
19 association that we have the power to
20 pick up between diarrhea and olmesartan.
21        So both cases and controls
22 underwent EGD and/or colonoscopy.  The
23 issue is, why were they having it done.
24 And cases were having it done for

Page 265

1  evaluation of diarrhea.  One can have an
2  EGD for evaluation of diarrhea.  One can
3  have a colonoscopy for evaluation of
4  diarrhea.  So we chose those as our
5  cases.
6         And then controls, because
7  of the makeup of the study, we thought
8  that in colonoscopy patients, screening
9  would be appropriate.  We don't think
10 they have diarrhea, as far as we can
11 tell, based on the indication field of
12 the endoscopy report.
13        Now, because there's no
14 screening EGD, we picked another kind of
15 control, and so a common reason people
16 have an EGD that's not diarrhea is
17 reflux, acid reflux -- a lot of people
18 have it -- to evaluate acid reflux.
19        So those were our controls,
20 but everyone had one of these procedures.
21 I hope that clarifies.
22     Q.   Sure.  And the question was,
23 why were they having these procedures?
24     A.   The question was not why are

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 266

1  we having these procedures. The
2  classification was why are we having
3  these procedures in terms of whether you
4  were a case or a control.
5      Q.   And the case were the folks
6  who were taking olmesartan.
7      A.   No. Case-control studies
8  are that you start with the definition of
9  the outcome. The cases were those who
10 were having diarrhea.
11      Now, it might be helpful to
12 go over the difference between
13 case-control studies and cohort studies.
14 In cohort studies, the exposed are those
15 who are having the olmesartan and the
16 unexposed are not having olmesartan and
17 then the outcomes, diarrhea,
18 malabsorption, celiac disease, what have
19 you, depending on the design of the
20 study.
21      In the case-control study,
22 you start with the outcome, and so the
23 cases are those who have the outcome and
24 in this case it was diarrhea and an

Page 267

1  outpatient, and the controls were they're
2  here for some other reason, screening and
3  reflux.
4      What we were interested in
5  measuring was the exposure and whether
6  olmesartan was more common in one group
7  or another among these patients. We had
8  no idea how common olmesartan use was in
9  this population.
10     Q.   I appreciate that. But your
11 conclusion is set forth in the first page
12 of the article, page 1239; correct?
13     A.   The conclusion of the
14 abstract section?
15     Q.   Yes.
16     A.   I'm there.
17     Q.   "Our findings suggest that
18 neither olmesartan nor other ARBs were
19 associated with diarrhea among patients
20 undergoing endoscopy," that's what you
21 state; correct?
22     A.   "Were associated with
23 diarrhea among patients undergoing
24 endoscopy" is what we stated, in this

Page 268

1  population at least.
2      Q.   Now, the follow-on sentence,
3  "The spruelike enteropathy recently
4  associated with olmesartan is likely a
5  rare adverse effect and milder
6  presentations are unlikely," my question,
7  Doctor, is, when you refer to -- you and
8  your colleagues refer to -- milder
9  presentations, what do you mean?
10     A.   Well, one hesitates before
11 trying to trumpet the implications of
12 one's study too self-servingly and I
13 don't want to go beyond the scope of what
14 we looked at here.
15      Are you asking about the
16 rare adverse event or the milder
17 presentations?
18     Q.   My question was focused on
19 the milder presentations.
20     A.   Okay. Well, what I'd say is
21 that we did not pick up a signal in this
22 population of outpatients undergoing
23 diarrhea. That said, there has to be a
24 huge proviso that there are only about

Page 269

1  105 taking olmesartan in this whole study
2  and we now know that given the relative
3  rarity of olmesartan enteropathy, one
4  cannot rule out an association based on
5  105 patients taking olmesartan,
6  particularly outpatients.
7      Q.   And when you refer to milder
8  presentations, what are you actually
9  talking about when you refer to, again,
10 milder presentations?
11     A.   So I'm referring to the kind
12 of presentation that would be
13 sufficiently mild so as to have a patient
14 undergo this kind of procedure.
15      But I would add that we
16 actually didn't know a huge amount about
17 this in terms of what their actual
18 symptoms were. All we knew based on this
19 study was, were they outpatients, why
20 were they having their endoscopy, and
21 what was their age/gender, and what were
22 they taking.
23      I would also point out, you
24 know, this was published in 2014 and I'm

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 270

1 not sure I would still put forth that
2 milder presentations are unlikely in
3 general. They were not detected in this
4 small study, but the more we learn about
5 the relative uncommon prevalence or
6 incidence of olmesartan enteropathy and
7 the fact that you need a lot more
8 patients to -- on olmesartan to detect
9 something and the fact that there have
10 been a flower in the case reports that
11 put forth more mild presentations, I'm
12 less confident that it's still the case
13 that milder presentations are unlikely.
14       I was putting forth a
15 hypothesis in the setting of a limited
16 abstract word count where I couldn't put
17 in these provisos that you are kindly
18 letting me put in here.
19       Q.   There was more that you had
20 to say, but you were constrained by page
21 limitation; is that what you're saying?
22       A.   In the world of academia,
23 word count can sometimes limit our
24 ability to express ourselves totally

Page 271

1 clearly.
2             MR. MURPHY: Let's mark as
3       12 -- I'm going to mark the Lagana
4       paper that you wrote with Dr.
5       Braunstein, Dr. Green, and others.
6                 - - -
7             (Deposition Exhibit No.
8       Lebwohl-12, 2014 Original Article
9       "Sprue-like histology in patients
10       with abdominal pain taking
11       olmesartan compared with other
12       angiotensin receptor blockers" by
13       Lagana, et al, was marked for
14       identification.)
15                 - - -
16             THE WITNESS: Okay.
17 BY MR. MURPHY:
18       Q.   Do you have it?
19       A.   Yes.
20       Q.   Now, Dr. Lagana is a
21 pathologist; correct?
22       A.   Yes, he's a pathologist.
23       Q.   And his report, you
24 reviewed; is that -- is he on your

Page 272

1 reliance list?
2       A.   I'm just --
3             MR. SLATER: You told me not
4       to say anything to shorten the
5       time --
6             THE WITNESS: I'm just
7       glancing at my reliance list to
8       make sure I don't speak
9       inaccurately. Give me a minute to
10       find my reliance list.
11             MR. SLATER: It's right
12       here. He's your report.
13             THE WITNESS: Thank you.
14             MR. SLATER: I helped you.
15       Take a walk around the table twice
16       to just eat up that time I just
17       saved.
18             THE WITNESS: Yes, it's
19       listed on my reliance list.
20 BY MR. MURPHY:
21       Q.   His general report.
22       A.   Correct.
23       Q.   In the study that's
24 discussed in the paper in front of you,

Page 273

1 you and your colleagues compared 20
2 olmesartan-exposed patients undergoing
3 duodenal biopsy to a control group of 20
4 non-ARB users.
5       A.   No, we did not compare the
6 two of those. We compared each group to
7 matched controls.
8       Q.   And was there yet another
9 group?
10       A.   There were four groups
11 total. There was an olmesartan user
12 group. There were the controls matched
13 to olmesartan users. Third, there was
14 another non-olmesartan ARB users group
15 and, fourth, there was a control group
16 matched to those non-olmesartan ARB
17 users.
18       Q.   All right.
19             And as reported in your
20 abstract on the first page, you concluded
21 that there were no statistically
22 significant differences between
23 olmesartan users with abdominal pain and
24 controls for any single histopathological

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 274

1 abnormality. Right?
2      A.   We wrote, "No single
3 histopathological finding was
4 significantly more common in olmesartan
5 users than controls," yes.
6      Q.   So what I said is correct?
7      A.   That was an accurate
8 paraphrase of what we wrote.
9      Q.   If I could direct your
10 attention to table 2, among your group of
11 olmesartan users who demonstrated one or
12 more sprue-like feature, there was 10 of
13 20; correct?
14      A.   In table 2?
15      Q.   Yes, sir.  If you look to
16 the bottom --
17      A.   The final row does indicate
18 that 10 of 20 or 50 percent exhibited one
19 or more sprue-like features.
20      Q.   Now, the controls were the
21 folks who were not taking olmesartan;
22 correct?
23      A.   There are two groups of
24 controls.

Page 275

1      Q.   Right.  Non-olmesartan and
2 non-ARB total --
3      A.   I wouldn't lump them
4 together.
5      Q.   Understood.
6      A.   Each was matched to its own
7 ARB user, so there was a control group
8 matched to the olmesartan users and there
9 was a control group matched to other ARB
10 users.
11      Q.   So just focusing on the
12 olmesartan users, the controls matched to
13 the olmesartan users, 4 out of 20 of
14 those folks reported one or more
15 sprue-like features; correct?
16      A.   Well, those folks didn't
17 report any of these things.  These were
18 all blinded observations by an expert
19 pathologist.  But, yeah, it was -- these
20 -- one or more features were observed by
21 that pathologist in 4 out of the 20
22 matched controls.
23      Q.   And then with regard to the
24 group that was taking an ARB other than

Page 276

1 olmesartan, in 9 of the 20, one or more
2 sprue-like features was observed or were
3 observed; correct?
4      A.   9 out of 20 patients had one
5 or more sprue-like feature observed in
6 that group, but I would be cautious in
7 comparing the olmesartan users directly
8 to the other ARB users because they had
9 some differences, which I believe we
10 characterize in table 1.
11      Q.   And with regard to the
12 matched controls, that is, the folks that
13 were matched to the other ARB users, 12
14 out of 20 demonstrated one or more
15 sprue-like features; correct?
16      A.   Correct in that if you look
17 at table 2, 12 out of 20 controls matched
18 to the other ARB users exhibited one or
19 more features.
20      Q.   So the largest number of
21 reports of sprue-like features came from
22 a matched control group that was not
23 exposed to olmesartan; correct?
24      A.   Well, I think if one zooms

Page 277

1 out and just looks at raw numbers, one
2 can say the biggest number in that table
3 in parentheses is in that column, but I
4 don't think that that's a sound way to
5 look at this.
6           We matched controls to users
7 for a reason.  If the olmesartan users
8 and the other ARB users differ in terms
9 of baseline characteristics, then it's
10 appropriate to compare the matched
11 control to the appropriate user and not
12 to just look at what's the largest number
13 on that table.
14      Q.   But just so that we are
15 clear, 12 out of 20 folks who had not
16 been exposed to an ARB generally or
17 olmesartan in particular demonstrated one
18 or more sprue-like features; correct?
19      A.   That's what we found.
20      Q.   Okay.  That's all I'm
21 asking.
22           Now I'm going to ask you to
23 go back to your report, specifically page
24 16.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 278

1    A.   I'm at page 16.
2    Q.   Okay.
3         And I'm four lines up from
4    the bottom to the right, the sentence
5    begins, "Of note, we discussed a case
6    report we defined as having 'considerable
7    relevance to our study,' describing a
8    patient who presented with constipation,
9    but not diarrhea, and varied findings on
10   duodenal biopsy" and then you cite to
11   Talbot, T-A-L-B-O-T; correct?
12   A.   I see that.
13   Q.   Now, in the actual statement
14   that I read, you indicate that that
15   patient reported with constipation, not
16   diarrhea; correct?
17   A.   Correct. And, indeed, it
18   says in the research layer, the patient
19   reported no diarrhea, but had occasional
20   mild constipation.
21   Q.   I had earlier asked you
22   about features of olmesartan-associated
23   enteropathy, and my question to you here
24   is whether constipation is among those

Page 279

1    features.
2    A.   It has been reported among
3    patients with evidence of olmesartan
4    enteropathy. I would say that based on
5    what we know today, I believe that
6    diarrhea is more common than
7    constipation, but constipation can be a
8    feature.
9    Q.   Constipation can be a
10   feature. Diarrhea can be a feature;
11   correct?
12   A.   Yes, both could be features
13   of olmesartan enteropathy, though we have
14   more reports and experience with diarrhea
15   as a feature.
16   Q.   How about vomiting?
17   A.   Vomiting has been reported
18   as a feature of olmesartan enteropathy.
19   That is not a necessary feature, but it
20   certainly been reported in adverse event
21   reports or in case reports or case
22   series.
23   Q.   Are there any features that
24   you would characterize as necessary

Page 280

1    features?
2    A.   Yes.
3    Q.   Which of them are necessary?
4    A.   Exposure to olmesartan.
5    Q.   Anything else?
6    A.   I think it's hard to be
7    black and white about a prototypical
8    clinical scenario right now. There
9    appears to be a spectrum, both
10   histologically and clinically.
11        And so while there are
12   certain features that have been reported
13   commonly in patients with olmesartan
14   enteropathy, like diarrhea, like weight
15   loss, that seems to be particularly
16   common, there are also patients who have
17   neither of those who end up having
18   olmesartan enteropathy. Vomiting is
19   another such example.
20        But really none of them is
21   absolutely necessary for the development
22   of olmesartan enteropathy.
23   Q.   With regard to this patient
24   that is discussed in the Talbot paper,

Page 281

1    was the patient given or exposed to a
2    gluten-free diet at any point?
3    A.   It says in the research
4    letter that most remarkably, a
5    gluten-free diet -- oh, I'm misspeaking.
6    I'm -- in the beginning of their letter,
7    they're characterizing the Rubio-Tapia
8    paper.
9         Later on, they do note that
10   a trial of a gluten-free diet was
11   considered, but the patient elected not
12   to pursue this given the absence of
13   symptoms, et cetera.
14   Q.   So there was no gluten-free
15   diet imposed.
16   A.   Not at the time of the
17   description of the case, no. It was
18   suggested or brought up, but the patient
19   had other -- other plans in mind, I
20   suppose.
21   Q.   And with regard to the
22   discontinuation of olmesartan, was there
23   any follow-up to determine what happened
24   or how the patient responded to the

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 282

1 discontinuation of olmesartan?
2    A.   This research letter is
3 somewhat open-ended with regarding what
4 happened ultimately. I can quote. It
5 says, "Olmesartan therapy will be
6 discontinued with monitoring of Vitamin
7 B-12 levels," et cetera, implying that
8 this is a work in progress.
9    Q.   So it's unclear what
10 happened with this patient --
11       MR. SLATER: Objection.
12       You can answer.
13 BY MR. MURPHY:
14    Q.   -- upon discontinuation of
15 olmesartan; is that right?
16    A.   Based on what's described in
17 this research letter, we don't have
18 long-term data on what happened to that
19 patient.
20    Q.   In your report, that is,
21 your report setting forth your opinion,
22 do you identify all of the case reports,
23 Doctor, where olmesartan rechallenge is
24 described?

Page 283

1    A.   Is the question regarding
2 whether I mentioned every single
3 publication or adverse event report that
4 includes a rechallenge?
5    Q.   No. Do you identify those
6 case reports -- do you identify where
7 rechallenge was described?
8    A.   I make reference to
9 rechallenge in the report and if you'd
10 like, I can give you an example.
11    Q.   Sure.
12    A.   In my summary of the
13 Rubio-Tapia 2012 paper, I describe that
14 -- the following: "All patients improved
15 upon dechallenge and deliberate
16 rechallenge was not performed due to the
17 severity of the risk; however, the
18 authors note that a rechallenge occurred
19 in a history of four patients."
20       I then quote, "No deliberate
21 rechallenge test with olmesartan was
22 undertaken because of the
23 life-threatening nature of the syndrome,
24 although two patients reported

Page 284

1 anecdotally that their symptoms had
2 worsened when they restarted olmesartan
3 before the potential association was
4 recognized, and two patients experienced
5 improvement when olmesartan was stopped
6 when they were hospitalized for
7 dehydration and hypotension and worsened
8 in the weeks following discharge and
9 reintroduction of olmesartan."
10       Q.   So as to Rubio-Tapia,
11 rechallenge was not something that was
12 planned or anticipated. It was, the term
13 that was used, anecdotal.
14    A.   I think the anecdotal has a
15 disparaging implication, frankly, in the
16 discussion of a potentially fatal drug
17 effect. In fact, many case series
18 involved very ill patients who when
19 rechallenged don't do so under controlled
20 circumstances, because no caring
21 physician would -- or -- would offer or
22 no patient who is very ill likely from
23 olmesartan would agree to a so-called
24 controlled rechallenge in many

Page 285

1 circumstances.
2       Instead, we rely on this
3 kind of story where olmesartan is
4 reintroduced over the course of a
5 drawn-out illness in which patients are
6 off olmesartan because, for example,
7 they're hospitalized and so they get
8 better during that hospitalization, in
9 retrospect clearly due to the olmesartan,
10 or because they're losing so much weight,
11 suddenly their high blood pressure -- or,
12 rather, gradually, their high blood
13 pressure -- is no longer a pressing issue
14 and they're taken off the olmesartan and
15 they get better.
16       One wouldn't call those
17 controlled, but I'd be hesitant to
18 dismiss them as anecdotal. I think it's
19 quite compelling.
20    Q.   "Anecdotal" was a term that
21 you read. That is where -- the origin of
22 my use of the term "anecdotal."
23       But my question to you is --
24 was simply whether the folks -- the

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 286

1  Rubio-Tapia authors and investigators --
2  planned, intended to conduct a
3  rechallenge.
4       A.   They are clear that they did
5  -- they deliberately did not do that
6  because of the life-threatening nature of
7  the syndrome.
8       Q.   Understood.
9            And so then my question to
10 you is, are there any other case reports,
11 other than Rubio-Tapia, that describe a
12 rechallenge?
13      A.   There are other case reports
14 that describe a rechallenge.
15      Q.   Which one or ones?
16      A.   Are you referring to
17 published articles by medical literature
18 or also adverse event reports?
19      Q.   That you discuss in your
20 report.
21      A.   Okay.  Would you like me to
22 mention all of them or just one of them
23 or what would you like?
24      Q.   Well, you can just -- you

Page 287

1  can identify one of them and I'll have a
2  follow-up question and we'll see whether
3  your answer applies to all.
4       A.   Marthey and colleagues, the
5  title of the paper is
6  "Olmesartan-associated enteropathy:
7  results of a national survey."  That
8  includes reports of rechallenges.
9       Q.   And the rechallenges
10 reported upon by Marthey, et al, do they
11 indicate the duration of the
12 discontinuation period before rechallenge
13 was initiated?
14      A.   Can you repeat the question?
15      Q.   Sure.
16           Do they indicate the
17 duration of the discontinuation period,
18 that is, the period between
19 discontinuation and reinitiation?
20      A.   They use one illustrative
21 case in a figure that indicates the
22 duration of olmesartan holiday, if that's
23 what you mean.
24      Q.   Yes.

Page 288

1       A.   But they also mention that
2  they found other olmesartan rechallenges
3  that they're reporting in this study in
4  which they do not specify the duration of
5  dechallenge period or drug holiday prior
6  to rechallenge.
7       Q.   So with regard to the drug
8  holiday, that one instance of drug
9  holiday that is identified in terms of
10 duration, how long was that drug holiday?
11      A.   So what's illustrated in one
12 case, it appears that in this one
13 patient, there were multiple drug
14 holidays and they each lasted about one
15 month.
16      Q.   One month.
17      A.   In that one case.
18      Q.   And do you know, Doctor,
19 whether a one-month drug holiday is
20 sufficient to allow the changes that were
21 caused by the diarrheal illness to
22 resolve?
23      A.   I know, based on my clinical
24 experience of taking care of patients

Page 289

1  with olmesartan enteropathy, that the
2  clinical improvement can in some cases be
3  quite rapid and dramatic, well -- well
4  less than one month.
5       Q.   So is the answer to my
6  question, your experience is that a
7  one-month holiday is sufficient?
8       A.   Not universally sufficient,
9  but certainly it's compatible with a
10 positive dechallenge and rechallenge.
11      Q.   When you say it's
12 compatible, what do you mean?
13      A.   It's within the realm of
14 patients I've seen certainly and what's
15 been reported in the medical literature.
16      Q.   The last part of what you
17 said, I think I caught it, it's been
18 reported in the medical literature that a
19 one-month holiday is sufficient; is that
20 what you said?
21      A.   It's been reported that a
22 one-month holiday has resulted in
23 resolution of symptoms or improvement of
24 symptoms such as is the case in this

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 290

1  study that I just referenced.  And we're
2  talking about clinical symptoms, not
3  necessarily other abnormalities, whether
4  it be laboratory or histologic.
5         And, again, analogy's
6  helpful in this regard.  So in celiac
7  disease, if you take a patient with
8  severe symptoms who's eating gluten and
9  you diagnose him successfully and you
10  start a gluten-free diet, in the context
11  of appropriately elevated celiac disease
12  serologies, often clinical improvement
13  well predates improvement of histology,
14  which can sometimes take years, or
15  serology, which has, again, a more
16  variable -- a more variable time course
17  with regard to improvement or resolution.
18         And I've observed a similar
19  clinical variability with olmesartan.
20      Q.   So the clinical
21  manifestation of getting better is not
22  necessarily proof that the histologic
23  changes have occurred.
24      A.   A clinical response does not

Page 291

1  correlate with a histologic response, if
2  that's what you're asking.  That's
3  certainly the case in celiac disease.
4         And I think we have less
5  histologic data upon which we rely on the
6  olmesartan story, but I believe that the
7  situation is analogous, that you can
8  potentially have a difference between how
9  a patient is doing clinically when
10  dechallenged and how they're doing
11  histologically.
12         Now, the scientist in me
13  wants to know that answer very well and
14  wants to study this more, but as a
15  patient who cares -- as a physician who
16  cares for patients, the patient cares
17  most about clinical response; and when
18  you have a patient in front of you who's
19  so much better off olmesartan, it is not
20  always clinically so relevant to the
21  patient how they are doing
22  histologically.
23      Q.   But to the extent that there
24  is a rechallenge attempted, is it not

Page 292

1  important to determine whether,
2  histologically, there has been repair?
3         MR. SLATER:  Objection.
4         You can answer.
5         THE WITNESS:  If you're
6  referring to histology after
7  rechallenge, I would not assume
8  that there's repair.
9  BY MR. MURPHY:
10      Q.   I'll take one step back.  We
11  were addressing the drug holiday and
12  whether a one-month drug holiday was
13  sufficient; correct?
14         MR. SLATER:  I'm sorry.
15         We're not talking about a drug
16         holiday in Columbia, are we?  All
17         right.  That was a bad joke.  Go
18         ahead.
19         THE WITNESS:  Can you repeat
20         the question?
21         MR. MURPHY:  Oh, sure.
22  BY MR. MURPHY:
23      Q.   We were discussing drug
24  holiday and whether a drug holiday of one

Page 293

1  month was sufficient before embarking
2  upon a rechallenge.
3      A.   You'd asked me about
4  duration --
5      Q.   Duration.
6      A.   -- and so forth, yes.
7      Q.   And one of the things that
8  you told me is that you had observed a
9  drug holiday of one month to be
10  sufficient to observe clinical
11  improvement.
12      A.   I've observed that by
13  looking at the literature and, clinically
14  with my patients, I've had patients tell
15  me that they felt markedly improved, even
16  within days.  And, indeed, a lot of the
17  rechallenge data we have comes from
18  hospitalizations, which are typically,
19  thankfully, measured in doses of days and
20  not weeks.
21         And often these are multiple
22  dechallenges, often just for a few days
23  at a time, and yet the patients are off
24  the drug long enough to feel

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 294

1 significantly better and have a taste of
2 what they ultimately will achieve once
3 it's figured out that it was olmesartan
4 all along and then they're off it for
5 good.
6       Q.   Before a rechallenge can be
7 initiated, there has to be a drug
8 holiday; correct?
9            MR. SLATER: Objection.
10           You can answer.
11           THE WITNESS: I'm not sure
12       what you mean by "there has to
13       be." Now, as I mentioned earlier,
14       people don't take drugs as a
15       continuous drip or infusion.
16       People take drugs or medications
17       on a schedule, and so one is
18       technically off a drug even if
19       they're taking it daily, but that
20       I would not consider to be a
21       holiday.
22           We need to take into account
23       the half-life. Once one's missing
24       a day or two of drug, if it's

Page 295

1       prescribed daily, that has been
2       reported to result in significant
3       improvement.
4 BY MR. MURPHY:
5       Q.   I want to make sure we're
6 properly wording this. In the papers
7 that discuss rechallenge, there is a
8 period at which the patient discontinued
9 the olmesartan; correct?
10      A.   That's the definition of a
11 dechallenge.
12      Q.   Right. And what I have been
13 asking you about is the duration of the
14 period of nonuse which we have called the
15 holiday, drug holiday; correct?
16      A.   You've asked me -- I've
17 given you one example of duration; and if
18 you'd like to know other durations, I
19 could try to find some more for you.
20      Q.   It's not the duration. It's
21 just the definition I'm talking about,
22 that period between discontinuation and
23 reinitiation.
24      A.   In this situation, it was

Page 296

1 approximately one month according to the
2 figure.
3       Q.   And so my question to you is
4 whether you know if one month is
5 sufficient to allow the histological
6 changes of the diarrheal illness to
7 resolve.
8            MR. SLATER: Objection.
9       This has been asked and answered
10      multiple times.
11          You can answer.
12          THE WITNESS: I believe
13      there's marked variability in
14      healing rates. I'm primarily
15      relying on extensive experience we
16      have with an analogous
17      enteropathy, namely celiac
18      disease, in terms of gluten and
19      variable rates of intestinal
20      healing that correlate poorly with
21      clinical improvement. We have
22      less data on olmesartan for the
23      reasons I described earlier, but I
24      believe that there's a similar

Page 297

1       variability.
2           How are we doing? Can we
3       take a brief --
4           MR. MURPHY: We can take a
5       brief break.
6           (A recess was taken from
7       4:34 p.m. to 4:44 p.m.)
8 BY MR. MURPHY:
9       Q.   Doctor, let me direct you to
10 page 37 of your report.
11      A.   I'm on 37.
12      Q.   At Roman numeral 4, there's
13 the heading "Internal Documents
14 Addressing Olmesartan Enteropathy." Do
15 you see that?
16      A.   I see it.
17      Q.   And your first sentence
18 there reads, "Daiichi Sankyo's internal
19 documents provide foundational
20 information that is helpful in
21 understanding the nature of Olmesartan
22 enteropathy, and the causality."
23          Did I read that accurately?
24      A.   Correct.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 298

1    Q.   Now, internal pharma company
2  documents aren't the type of things you
3  rely upon in your practice in making
4  decisions whether to prescribe for your
5  patients, are they?
6    A.   Internal documents are by
7  their definition not something that I'm
8  or anyone typically privy to, and so I
9  don't have the opportunity to rely on
10  those on a day-to-day basis in my
11  clinical practice.
12       However, given that the
13  clinical entity that's discussed is one
14  that I'm very familiar with, have cared
15  for in terms of my clinical practice, and
16  have published on, I did not find it
17  difficult to review those.
18    Q.   Doctor, are you aware that
19  internal communications among
20  pharmaceutical company employees are not
21  part of or included in filings with the
22  FDA?
23       MR. SLATER:  Objection; lack
24       of foundation.

Page 299

1  BY MR. MURPHY:
2    Q.   Are you aware of that?
3       MR. SLATER:  Objection; lack
4       of foundation,
5       mischaracterization.
6       THE WITNESS:  I think that
7       when one discusses internal
8       documents, this could refer to
9       confidential documents that no one
10       is privy to outside the company,
11       as well as documents that are
12       shared with the FDA, but not the
13       general public.
14  BY MR. MURPHY:
15    Q.   Have you ever been employed
16  by a pharmaceutical company, Doctor?
17    A.   No.
18    Q.   The internal documents
19  addressing olmesartan enteropathy that
20  you reference here in your report, how
21  did you come to select those documents?
22    A.   Can you specifically point
23  out where in my report we're referring to
24  or in general?

Page 300

1    Q.   We're at page 37 and you
2  make the statement that internal
3  documents provide foundational
4  information, right, that is helpful in
5  understanding the nature of olmesartan
6  enteropathy and the causality.
7    A.   Okay.  Now I understand the
8  question.  I thought that you were asking
9  for a specific document.
10       I encountered them in the
11  course of my preparation of this report
12  when I was reviewing depositions and
13  documents were included as exhibits,
14  which included, but were not limited to,
15  internal documents, and that's when I
16  reviewed them.
17    Q.   Those were provided to you
18  by counsel; correct?
19    A.   Yes.
20    Q.   Are you aware that in this
21  litigation, Daiichi has produced millions
22  of pages of documents?  Are you aware of
23  that?
24    A.   I certainly haven't looked

Page 301

1  at all these pages, but I would imagine
2  that any large company that produces a
3  drug that ultimately is approved
4  generates a lot of paper, maybe --
5  hopefully not all printed out, but I
6  imagine it's abundant and I wouldn't be
7  surprised if it were in the millions.
8    Q.   And with regard to the
9  company documents that were provided to
10  you as exhibits to depositions and the
11  like, do you think it's important to
12  understand the context in which those
13  documents were created?
14    A.   I think when reviewing any
15  document, it's important to think about
16  when that document was created, who
17  created it, who it was sent to, and what
18  was done in response and so by -- by
19  that, I mean -- I would mean context.
20       I don't think one has to
21  read the millions of pages in order to
22  have a good context of what these
23  documents are about.
24    Q.   Well, my question was

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 302

1 specific to reviewing an individual
2 document, and that is whether it's
3 important to have a context for the
4 creation of the document. That was my
5 question.
6        MR. SLATER: Objection to
7   the form.
8        You can answer.
9        THE WITNESS: It's somewhat
10   abstract. What I'd say is, in
11   terms of documents that I was
12   privy to in the course of
13   reviewing depositions, the
14   depositions provided some context
15   and it's also helpful to look at
16   the date of the document and
17   understand where people were in
18   terms of their understanding of
19   what was going on, and so that
20   often provides appropriate
21   context.
22 BY MR. MURPHY:
23   Q. Before you were engaged as
24 an expert in this litigation, had you

Page 303

1 ever submitted a MedWatch report?
2   A. I vaguely recollect, years
3 ago, when I was a trainee, reaching out
4 to the FDA about an adverse effect that I
5 witnessed in a patient of mine. It was
6 not related to olmesartan. And I can't
7 be sure to what extent it was completed.
8        I certainly never heard back
9 from the FDA, and I remember the process
10 was one that left me with the feeling
11 that these adverse events surely go
12 underreported.
13   Q. So that we are clear, my
14 question to you about ever having
15 submitted a MedWatch report is not
16 specific to olmesartan. I just want you
17 to understand that.
18        So am I to understand that
19 the one instance in which you vaguely
20 recall having prepared and submitted a
21 MedWatch report dealt with olmesartan?
22   A. Oh, it definitely was not
23 about olmesartan.
24   Q. Ah.

Page 304

1   A. It was about a nutritional
2 supplement that appeared to cause liver
3 damage, and I was very concerned about it
4 and so I remember reaching out to the FDA
5 and being somewhat frustrated with the
6 process.
7        I felt that, ideally,
8 reporting adverse drug effects shouldn't
9 be onerous and should be easy to do, and
10 that left me with the sense that adverse
11 drug effects are underreported because
12 it's not so easy.
13   Q. In your practice, Doctor, do
14 you go online and try to view MedWatch
15 reports?
16   A. I certainly read case
17 reports of adverse drug interactions.
18 Sometimes that's done in the context of
19 collated reports, for example, Micromedex
20 or other frequently used resources that
21 include a mix of published literature and
22 summaries of MedWatch reports. That's
23 one.
24        There's also a site that's

Page 305

1 NIH sponsored that's specifically
2 tailored towards liver toxicity, and so
3 I'm quite familiar with reading the
4 contents of the report, if not the
5 physical report itself.
6        Q. And so my question was, with
7 regard to MedWatch reports in particular,
8 do you go online and review them in your
9 clinical practice?
10   A. In my day-to-day clinical
11 practice, I don't specifically review
12 MedWatch reports in their native form, so
13 to speak; but as I say, there are
14 abstractions of those reports, including
15 in some cases very close reiterations of
16 those reports, that make their way into
17 these other resources cited above. They
18 tend to be more user friendly, handy, and
19 readily available.
20        Q. So to the extent one or more
21 MedWatch reports may be discussed in a
22 larger article, so to speak, that is the
23 context in which you typically would
24 review a MedWatch report. Fair to say?

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 306

1    A.    So that's right in that I
2  will see encapsulations of MedWatch
3  reports in the context of lists of
4  reports of adverse effects of drugs.
5    Q.    In your clinical practice,
6  do you diagnose or treat your patients'
7  conditions based upon your review of
8  MedWatch reports?
9    A.    When I am diagnosing or
10 treating patients, if the issue of a
11 drug-related effect might come out and
12 rise to the fore in terms of my
13 differential diagnosis, I would use one
14 of those -- one of those resources
15 online, which again are not the MedWatch
16 reports themselves, but may incorporate
17 elements from them.
18        So indirectly, yes;
19 directly, less so.
20    Q.    Doctor, I'm going to ask you
21 to turn to page 32 of your report.
22    A.    Okay. I'm on page 32.
23    Q.    And starting at the bottom,
24 you make reference to a number of

Page 307

1  MedWatch reports and the testimony that
2  certain company witnesses gave relative
3  to those, and I'm going to ask you a
4  couple questions about those MedWatch
5  reports. Okay?
6    A.    Okay.
7        - - -
8        (Deposition Exhibit No.
9    Lebwohl-13, 10/10/15 MedWatch
10   Report (Also Marked as Exhibit
11   749), OLM-DSI-0004775145-R and
12   OLM-DSI-0004775146-R, was marked
13   for identification.)
14        - - -
15 BY MR. MURPHY:
16    Q.    So, Doctor, you have in
17 front of you Exhibit 13, and Exhibit 13
18 is a MedWatch report that is the subject
19 of your discussion at page 32 regarding
20 Tina Ho.
21    A.    I see that there's a
22 MedWatch report referenced on the bottom
23 of page 32. I don't see that a report
24 number is made reference to in that

Page 308

1  report in that section and so I can't
2  confirm that this report corresponds to
3  that report number.
4    Q.    And so if you look at
5  Exhibit 13, it has an exhibit number from
6  Tina Ho's deposition; correct?
7    A.    It says 749.
8    Q.    Correct.
9        MR. SLATER: I'll agree that
10   this is Exhibit 749.
11        MR. MURPHY: From Tina Ho's
12   deposition?
13        MR. SLATER: From Tina Ho's
14   deposition. I was really close by
15   when that happened.
16        MR. MURPHY: I got that
17   sense.
18 BY MR. MURPHY:
19    Q.    So just so that we are
20 clear, Doctor, what Mr. Slater is saying
21 is that Exhibit 13 in your hand is the
22 MedWatch report about which Tina Ho was
23 questioned as reflected in your report.
24    A.    On the bottom of page 32.

Page 309

1  Because I believe Tina Ho was questioned
2  about more than one MedWatch report to
3  the best of my recollection. I just want
4  to make sure I'm not misspeaking, that
5  this is the right MedWatch report for
6  this specific scenario.
7    Q.    Correct. That's the one.
8        MR. SLATER: Right. From 32
9    over to 33.
10        THE WITNESS: Thank you.
11   Just being careful.
12        MR. SLATER: No, you should
13   be. It's a lot of paper.
14 BY MR. MURPHY:
15    Q.    Now, with regard to this
16 MedWatch report, just a couple questions:
17 Do you see that this patient reported
18 abdominal pain two months after beginning
19 olmesartan?
20        MR. SLATER: Objection;
21   incomplete.
22        THE WITNESS: Well, let's
23   see. So this event date is
24   specified as March of 2006. A

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 310

1  date within March isn't specified,
2  so -- but they mention March 2006.
3  The report was generated in 2015.
4     Of note, 2006, the date of
5  the event, well predated
6  widespread dissemination or really
7  any dissemination of olmesartan
8  enteropathy --
9     MR. MURPHY: Doctor, do you
10  remember my question?
11     MR. SLATER: Yeah, you can
12  quietly read and then answer his
13  question, just so --
14     THE WITNESS: I believe you
15  were asking about symptoms in this
16  patient.
17     MR. MURPHY: I asked you
18  whether the document indicates
19  that the patient reported pain
20  after two months of olmesartan
21  therapy.
22     (Pause.)
23     THE WITNESS: On the second
24  side of the report, it notes that

Page 311

1  the patient suffered abdominal
2  pain in March of 2006 under
3  therapy with Olmetec R, 20
4  milligrams a day, that was started
5  two months before -- before,
6  period.
7     And so if that's what you're
8  referring to, that's what's
9  mentioned there --
10  BY MR. MURPHY:
11     Q.   Given what you read, does
12  that indicate to you that the patient
13  reported abdominal pain two months after
14  having started olmesartan therapy?
15     A.   Well, there's more that's
16  reported in this document.
17     Q.   With respect to the question
18  I just asked you?
19     A.   It's very possible that this
20  patient had --
21     MR. SLATER: I'm sorry.
22  Before you -- can I hear the
23  question read back? I'm sorry. I
24  looked at an e-mail.

Page 312

1     MR. MURPHY: Sure.
2     MR. SLATER: Yeah, I know.
3  I totally lost it.
4     Can you just reorient me,
5  Kim?
6        - - -
7     (The court reporter read the
8  pertinent part of the record.)
9        - - -
10     THE WITNESS: I would say
11  that abdominal pain, I clearly see
12  documented two months after
13  treatment with olmesartan, but --
14     MR. MURPHY: Okay.
15     THE WITNESS: -- diarrhea
16  and vomiting began one month after
17  treatment of olmesartan. We can
18  see that on the first page of the
19  MedWatch document.
20     It's possible that this
21  patient also had abdominal pain at
22  that point because it's very
23  common for someone who's having
24  diarrhea and someone who's having

Page 313

1  vomiting, particularly if it's
2  severe enough to have concomitant
3  abdominal pain.
4     But the specific question of
5  abdominal pain in terms of
6  temporality, it appears that two
7  months is when it's first
8  documented in this summary.
9  BY MR. MURPHY:
10     Q.   Focusing on the diarrhea --
11  diarrhea within one month after starting
12  olmesartan therapy, that is inconsistent
13  with the onset of symptoms reported by
14  Rubio-Tapia in their 2012 paper; correct?
15     MR. SLATER: Objection.
16     You can answer.
17     THE WITNESS: The range
18  reported by Rubio-Tapia was .5
19  years to 7 years, and so the
20  soonest they were able to -- or
21  the earliest report that they had,
22  at least that fit the inclusion
23  criteria that we talked about
24  earlier, was six months and so

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 314

1     this does fall out of the range of
2     the initial case series.
3          MR. MURPHY: Okay.
4     BY MR. MURPHY:
5          Q.   Now, there was abdominal
6     pain followed by diarrhea. We've read
7     that in this MedWatch report; correct?
8          MR. SLATER: Objection;
9     incomplete.
10         You can answer.
11         THE WITNESS: Abdominal pain
12    was noted two months after
13    starting olmesartan. Diarrhea and
14    vomiting was noted one month after
15    starting olmesartan, so I'm not
16    sure it's accurate that there was
17    abdominal pain followed by
18    vomiting, diarrhea. It could be
19    that it was actually the reverse
20    if we were to take this report
21    literally.
22         It's also possible that they
23    were all swirling around together,
24    which is frequently what happens

Page 315

1     when patients have GI upset, that
2     the exact temporality of which of
3     these GI upset symptoms happened
4     first, some patients recall it
5     pristinely; others, it's just a
6     generalized GI upset and they all
7     sort of happen together.
8     BY MR. MURPHY:
9          Q.   Those two symptoms, diarrhea
10    and abdominal pain, occurring within two
11    months after initiation of olmesartan
12    therapy, that alone, is that sufficient
13    to make a diagnosis of sprue-like
14    enteropathy caused by olmesartan?
15         A.   Well, one doesn't like to
16    take symptoms in a vacuum. Certainly
17    that along with the rest of this report
18    review was enough to lead the
19    manufacturer to assess that the causal
20    relationship between drug and this event
21    was definite.
22         Q.   The assessments made by the
23    manufacturer were not done pursuant to a
24    full case workup, are they?

Page 316

1          A.   Is that a question?
2          Q.   Yes.
3          A.   Can you define "pursuant to
4     a fuel case workup"?
5          Q.   Sure. When you endeavor to
6     determine the cause of your patient's
7     enteropathy, you do a workup; correct?
8     Or you engage in a differential
9     diagnosis; correct?
10         A.   I engage in a differential
11    diagnosis.
12         Q.   And so the causation
13    assessment made by the company, as you
14    term it, was not done pursuant to a
15    differential diagnosis, was it?
16         A.   I disagree. One can
17    generate a differential diagnosis when
18    reviewing data even without having that
19    patient across the desk from you or on
20    the examining table. One makes one's
21    impression based on the available data.
22         In some cases, there's a
23    wealth of data and you can go back and
24    talk to the patient. In others, there's

Page 317

1     more limited data or circumscribed data,
2     but the process of formulating a
3     differential diagnosis and then
4     concluding the probability that there was
5     a causal relationship, that's a similar
6     process. It's just that the inputs may
7     vary.
8          Q.   Is it your understanding,
9     Doctor, that the MedWatch reports that
10    you've seen in this litigation were --
11    that is, the causation assessments made
12    in those MedWatch reports -- were done
13    pursuant to a differential diagnosis?
14         A.   They were done pursuant to
15    the available data that was there at the
16    time. Now, a differential diagnosis is a
17    process that's very commonly employed
18    when attempting to assess for causality
19    because one has to keep in mind what the
20    alternatives are.
21         Now, if someone had reviewed
22    this and said, you know, I think the
23    alternative is X, Y, or Z, they would not
24    be characterizing the causal relationship

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 318

1  between a suspected drug and the event as
2  definite, because implicitly, a
3  differential diagnosis suggests an
4  alternative as a more plausible cause.
5      Q.   In this MedWatch report that
6  we're looking at here, Exhibit 13, is
7  there any mention or evidence of a biopsy
8  having been taken?
9      (Pause.)
10      THE WITNESS:  Based on
11  what's written in this MedWatch
12  report, I do not see a report of a
13  biopsy having been performed.
14      MR. SLATER:  We gotta take a
15  break for about three minutes.  I
16  just got an e-mail.  I gotta call
17  someone back.  This will probably
18  be maybe our last break before he
19  finishes, but I gotta take three
20  minutes.
21      THE WITNESS:  All right.
22      (A recess was taken from
23  5:09 p.m. to 5:14 p.m.)
24  BY MR. MURPHY:

Page 319

1      Q.   Doctor, directing your
2  attention to page 33 of your report --
3      A.   I'm on page 33.
4      Q.   -- and the first full
5  paragraph, you identify a MedWatch report
6  and you say it's reported to
7  Daiichi-Sankyo on March 22nd, 2007.
8      Do you see that?
9      A.   I see that.
10      Q.   And then you go on to say
11  that it discusses a patient with reported
12  massive diarrhea, severe dehydration, and
13  a 20-pound weight loss; correct?
14      A.   I do mention that in the
15  report.
16      Q.   And then you then state,
17  "There is positive dechallenge and
18  positive rechallenge as the symptoms
19  abated when the medication was stopped,
20  and the symptoms recurred when the
21  medication was restarted."
22      A.   Give me a moment.  I lost
23  track of where you were reading from.
24      Here, I have it.  I see it.

Page 320

1      - - -
2      (Deposition Exhibit No.
3      Lebwohl-14, 10/11/15 MedWatch
4      Report (Also Marked as Exhibit
5      347), OLM-DSI-0004774183-R and
6      OLM-DSI-0004774184-R, was marked
7      for identification.)
8      - - -
9  BY MR. MURPHY:
10      Q.   Doctor, I'm handing you
11  what's been marked as Exhibit 14 to your
12  deposition.  And if you take a look at
13  the top-right aspect of the document, you
14  will see the MedWatch number that you
15  reference in your report.
16      A.   I see it, yes.
17      Q.   So with regard to this
18  patient, as you had stated, the MedWatch
19  report in the description of event or
20  problem states at least in part, massive
21  diarrhea, a weight loss of 20 pounds, and
22  severe dehydration while taking Benicar.
23  It's in the first page in box number 5.
24      Do you see that?

Page 321

1      A.   I'm looking now.  Give me a
2  moment, please.
3      Q.   Uh-hum.
4      (Pause.)
5  BY MR. MURPHY:
6      Q.   So my question was --
7      MR. SLATER:  Hang on.  He's
8      still reading.
9      THE WITNESS:  I'm almost
10      done --
11      MR. SLATER:  I want him to
12      take the time to actually read the
13      document to prepare for the
14      question.
15      (Pause.)
16      THE WITNESS:  Okay.
17  BY MR. MURPHY:
18      Q.   And having read the entire
19  document, you see where there's follow-up
20  information provided by the patient's
21  doctor; correct?  The back side of where
22  you were reading.
23      A.   Are you referring to the
24  additional information received on March

Page 322

1 22nd, 2007?
2    Q.  Correct.
3    A.  I see that section.
4    Q.  Right.
5        And it reads at least in
6 part, according to the physician, the
7 patient has never experienced similar
8 events; and then the next sentence, the
9 physician also reported the patient has a
10 history of atrial fibrillation for which
11 he takes Rythmol SR, 325 milligrams,
12 twice daily.
13       Do you see that?
14   A.  I do.
15   Q.  Are you familiar with the
16 common side effects associated with that
17 medicine?
18   A.  If you're referring to
19 propafenone --
20   Q.  No, I'm referring -- yeah,
21 exactly, propafenone.
22   A.  Offhand, I can't list a list
23 of the most common, but it would not be
24 unexpected for it to have the typical

Page 323

1 list of side effects that many drugs are
2 associated with in -- when measured in
3 their phase three studies, but offhand, I
4 can tell you that it has not been shown
5 to be associated with or to cause
6 enteropathy.
7        This is a medication that I
8 am familiar with and it is not one of the
9 medications that have been -- that have
10 been jumping out in my clinical
11 experience.
12       I'd also point out that
13 despite the fact that propafenone is in
14 the picture and the patient does take
15 propafenone, Allen Feldman, who was the
16 vice president of pharmacovigilance at
17 Daiichi, testified that in this case, the
18 only plausible case of this patient's
19 illness was olmesartan.  And I agree with
20 that assessment.
21       MR. SLATER:  Just for the
22   record, you said "case of."  You
23   mean "cause of."
24       THE WITNESS:  Correct.  The

Page 324

1    only plausible cause of this
2    patient's illness was olmesartan.
3 BY MR. MURPHY:
4    Q.  And with regard to the
5 testimony you attribute to Dr. Feldman,
6 Dr. Feldman was testifying to what was,
7 in fact, reflected in this MedWatch form,
8 correct, as being the only thing that one
9 could rely upon to make a determination?
10   A.  I believe that those were
11 the data that he was looking at at the
12 time of that assessment.
13   Q.  Right.
14       Now, going back to the side
15 effects, the common side effects,
16 associated with propafenone, are you
17 aware that nausea, vomiting, and
18 constipation are reported as common side
19 effects?
20       MR. SLATER:  Objection.
21   You can answer.
22       THE WITNESS:  I'm not at all
23   surprised to hear it.  In fact, if
24   you were to take many prescription

Page 325

1    drug medications, if you look at
2    common side effects, for example,
3    in a Physicians' Desk Reference or
4    in Epocrates, you'll find nausea,
5    vomiting, diarrhea.  That in and
6    of itself is a far cry from the
7    kind of clinical phenotype that we
8    observed with olmesartan.
9 BY MR. MURPHY:
10   Q.  You reference --
11   A.  I also --
12   Q.  I'm sorry.  Go ahead.
13   A.  I also don't see any
14 indication that the Rythmol, otherwise
15 known as propafenone, was adjusted or
16 changed during the course of his illness;
17 and if you have a medication that has as
18 a somewhat generic side effect these GI
19 disturbances and then you have olmesartan
20 which has been implicated in sprue-like
21 enteropathy and you change one and not
22 the other, and the patient gets better
23 and you have rechallenge data, which is
24 evinced here -- if you look on the first

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 326

1 page, the diarrhea returned when the
2 Benicar was continued, and that's also
3 coded here in box number 8, the diarrhea
4 appeared after reintroduction -- I don't
5 think it's plausible and I don't think it
6 would pass the laugh test if one were to
7 say, well, the -- it was actually the
8 propafenone that is a plausible
9 alternative cause of his problems when,
10 in fact, we don't have that kind of
11 dechallenge or rechallenge history.
12         And I think it would be
13 unlikely that both medicines would be
14 started and stopped at the same time.
15     Q.   So that was a question that
16 I was going to ask you.  With regard to
17 discontinuation of olmesartan, do you
18 know whether the propafenone was
19 discontinued at the same time?  It
20 doesn't indicate, does it?
21     A.   It doesn't say that it was
22 discontinued.  It says that he takes
23 propafenone, and so my understanding is
24 that he continued to take that.

Page 327

1         After all, as you likely
2 know, it's an antiarrhythmic and
3 especially when someone's acutely ill,
4 stopping the antiarrhythmic is not
5 something that's generally done.
6 Particularly if one's atrial fibrillation
7 is intermittent, times of stress can
8 worsen atrial fibrillation.
9         So while it's not explicitly
10 pointed out here, in every MedWatch
11 report you're never going to get the
12 entire story.  There are going to be
13 situations where if you had the patient
14 in front of you, you might for various
15 reasons ask for clarifications, but I
16 have no indication here that it would be
17 plausible that the propafenone were
18 stopped at exactly the same time that the
19 olmesartan was stopped and introduced at
20 the same time that the olmesartan were
21 reintroduced.
22         I think Occam's razor and
23 general common sense would indicate that
24 the propafenone is what we call a red

Page 328

1 herring in this case.
2     Q.   That's your read of the
3 document, but the document is silent on
4 that question of when the propafenone was
5 discontinued; correct?
6         MR. SLATER:  Objection.
7         MR. MURPHY:  Or whether it
8 was discontinued; correct?
9         MR. SLATER:  Objection.
10         THE WITNESS:  The document
11 mentions propafenone but does not
12 make any mention of any change in
13 the propafenone, and so my
14 interpretation is that this was
15 not modulated in perfect
16 congruence with the olmesartan.
17 Why would someone generate a
18 report where both medicines were
19 stopped at the same time and one
20 is only mentioning one in terms of
21 its starting and stopping and then
22 mentioned as the patient was
23 taking the other medication when,
24 in fact, they were started and

Page 329

1 stopped at the same time?  That
2 doesn't seem to make any sense.
3         I see that propafenone is
4 mentioned and I have no reason to
5 doubt that he had been on
6 propafenone during this time, but
7 I have no evidence to think that
8 someone would only selectively
9 report the dechallenge and
10 rechallenge data regarding
11 olmesartan and totally leave out
12 any relevant propafenone dose
13 changes.
14 BY MR. MURPHY:
15     Q.   Assuming that they had that
16 information; correct?
17     A.   What I would say is that --
18     Q.   Assuming that they had that
19 information; correct?
20     A.   They of course had
21 information on propafenone, but they did
22 not -- they did not -- the fact that they
23 did not comment on its temporality and
24 the fact that they had access to this

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 330

1  information indicates to me that they
2  knew about the timing of the olmesartan
3  and they did not see a similar timing
4  with regard to the propafenone.
5      Q.   Does the document that is
6  this MedWatch report indicate what the
7  patient's drug holiday was before
8  rechallenge?
9          (Pause.)
10         THE WITNESS:  The document
11     indicates when the olmesartan was
12     first stopped and it also
13     indicates that the diarrhea
14     returned when it was restarted.  I
15     do not see -- give me a minute.
16     Maybe it's here somewhere.
17         (Pause.)
18         THE WITNESS:  I do not see a
19     date for the rechallenge; however,
20     rechallenge is mentioned in both
21     the narrative and the check
22     box.  So I can't give you an
23     estimation with regard to the
24     duration of the drug holiday, if

Page 331

1      that's your question.
2  BY MR. MURPHY:
3      Q.   There's no indication about
4  the duration of the drug holiday;
5  correct?
6          MR. SLATER:  Objection.
7          You can answer.
8          THE WITNESS:  Certainly one
9      can infer by reviewing this
10     document that there was some
11     degree of drug holiday and that
12     the olmesartan was discontinued
13     and, that at some point
14     afterwards, it was restarted.
15         It appears that the drug
16     holiday -- well, the length is not
17     specified --
18         MR. MURPHY:  And that was my
19     question.
20         THE WITNESS:  Well, the
21     length is not specified.
22         It appears that the drug
23     holiday was longer than 12 days
24     and I say that based on the

Page 332

1      narrative that says Benicar was
2      discontinued on January 2nd.  The
3      diarrhea and dehydration resolved
4      on January 14th and subsequently
5      in the report -- and elsewhere in
6      the report, rather -- it says that
7      the diarrhea returned when the
8      Benicar was continued, i.e.
9      reintroduced.
10         I can't give you the precise
11     duration of the drug holiday based
12     on this, but, again, I agree with
13     Allen Feldman.  I think that the
14     only plausible cause of this
15     patient's illness was olmesartan
16     enteropathy.
17 BY MR. MURPHY:
18     Q.   And Dr. Feldman was
19 testifying to what was set forth in the
20 MedWatch report; correct?
21     A.   He, like anyone who
22 interprets MedWatch reports, was applying
23 differential diagnosis and coming to the
24 conclusion that olmesartan was causing

Page 333

1  enteropathy in that scenario.
2      Q.   Is it your testimony, Dr.
3  Lebwohl, that he testified based upon a
4  differential diagnosis that he conducted?
5  Is that your testimony?
6      A.   I don't see him using the
7  words in that -- in that specific
8  instance, but Tina Ho, for example,
9  mentioned that when they're looking at --
10 and I quote -- when they're looking at
11 the known characteristics of a subject's
12 clinical state, that's differential
13 diagnosis, and later says there's
14 actually definitions of related and not
15 related which, again, just lumps in the
16 different clinical criteria that the
17 medical reviewer would be applying in
18 doing a differential and exercising
19 medical judgment.
20         And so a differential
21 diagnosis can certainly be applied when
22 reviewing a MedWatch case report.
23     Q.   And my question simply to
24 you is whether you were stating that Dr.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 334

1  Feldman conducted a differential
2  diagnosis when he offered his testimony.
3      A.   I do not see him explicitly
4  using the term "differential diagnosis"
5  in that testimony; however, the fact that
6  he mentions that the only plausible cause
7  of this patient's illness was olmesartan
8  indicates that alternative explanations
9  have been considered and rejected.
10     Q.   Let me direct your attention
11 to page 34 of your report.
12     A.   I'm at page 34.
13     Q.   Yes.
14         And toward the -- I guess
15 four lines up from the bottom of the
16 first paragraph, five actually, you
17 write, "Yasushi Hasebe, the global head
18 of CSPV, based in Japan, was questioned
19 about another adverse event report, and
20 agreed, quote, that the olmesartan was
21 one of the factors causing the severe
22 diarrhea, dehydration, and
23 hospitalization described."
24         And then you give a cite to

Page 335

1  the deposition and then you state, "These
2  acknowledgments of causality demonstrate
3  CSPV's understanding and acceptance of
4  causality."
5      A.   I see that.
6          MR. MURPHY:  Let me direct
7      your attention to what we'll mark
8      as 15.
9              - - -
10         (Deposition Exhibit No.
11     Lebwohl-15, Excerpts from the May
12     31, 2016 Deposition Transcript of
13     Yasushi Hasebe, was marked for
14     identification.)
15             - - -
16 BY MR. MURPHY:
17     Q.   Doctor, I'm handing you
18 what's been marked as Exhibit 15 to your
19 deposition and it is an excerpt from the
20 deposition of Yasushi Hasebe.  It
21 includes that section of the deposition
22 that you cite here on page 34.  Okay?
23     A.   I'm sorry.  I'm looking at
24 page numbers in 160's, 164 --

Page 336

1      Q.   Uh-hum.
2      A.   Oh, and I see it skips.
3      Q.   Yeah, I said the excerpt
4  includes what you cite.
5      A.   I see.  I'm on page 34.  Is
6  there just one page 34?
7          MR. SLATER:  Did you say to
8      go to page 34?
9          MR. MURPHY:  No, I didn't.
10         THE WITNESS:  Oh, I thought
11     you mentioned page 34.
12         MR. SLATER:  That was your
13     report.
14         MR. MURPHY:  No, that was
15     your report.
16         THE WITNESS:  Oh, I was
17     confused.  Page 34 of my report,
18     not page 34 of the deposition.  A
19     lot of paper.
20 BY MR. MURPHY:
21     Q.   And on page 34 of your
22 report, you cite to the page of Yasushi
23 Hasebe's deposition where you contend he
24 made an acknowledgment of causality;

Page 337

1  correct?
2      A.   I reference page 173 and,
3  assuming this pagination is the same, let
4  me get there and take a look.
5          (Pause.)
6          THE WITNESS:  Okay.  I'm
7      here.
8  BY MR. MURPHY:
9      Q.   And on page 173, at line 14,
10 there is questioning by Mr. Slater.  Do
11 you see that?
12     A.   I do.
13     Q.   "You're not denying that the
14 olmesartan was one of the factors causing
15 the severe diarrhea, dehydration and
16 hospitalizations described in this
17 adverse event report.  You're not denying
18 that, right?"
19         There was an objection and
20 then Mr. Hasebe says, "Correct, I think
21 that's one of the factors."
22         Do you see that?
23     A.   I do.
24     Q.   And if you look over on page

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 338

1 174, Mr. Hasebe provides a further
2 explanation. Do you see that? "What I
3 want to say is that if there are other
4 suspect drugs -- as for any other suspect
5 drug, it's one of the combination drugs
6 that are being taken, in those cases then
7 you would have to look into the details,
8 the background of the patient and the
9 various other factors and otherwise you
10 would not be able to identify or make the
11 determination about what causes such
12 symptoms."
13      Do you see that?
14      A.   I do.  I would like to read
15 actually the exchange that happened in
16 between those two excerpts because they
17 were close to each other, and I just want
18 to make sure that I have somewhat of a
19 better context.
20      MR. SLATER:  Are you still
21 going to ask questions about this
22 one or are you done?
23      MR. MURPHY:  No, I'm done.
24      MR. SLATER:  He's done.  Let

Page 339

1      it go.  It's fine.
2      THE WITNESS:  Okay.
3      MR. SLATER:  I'll come back
4 to it on my questioning later.
5      THE WITNESS:  Okay.
6      MR. SLATER:  I promise.
7      MR. MURPHY:  Let me, in the
8 interest of time, ask you to turn
9 to page 36 of your report.
10      THE WITNESS:  I'm on page
11 36.
12 BY MR. MURPHY:
13      Q.   And in the first full
14 paragraph, you reference a MedWatch
15 report for an adverse event reported to
16 Daiichi-Sankyo on July 14th, 2005.  Do
17 you see that?
18      A.   I see that.  I cite it as an
19 example.
20      (Pause.)
21      MR. MURPHY:  16.
22      - - -
23      (Deposition Exhibit No.
24 Lebwohl-16, Sankyo Post Marketing

Page 340

1      Safety Adverse Event Contact Log
2      Attaching 7/19/05 MedWatch Report
3      (Also Marked as Exhibit 129),
4      OLM-DSI-0011876006 through
5      OLM-DSI-0011876014, was marked for
6      identification.)
7      - - -
8      MR. SLATER:  This whole
9 thing is the exhibit all together?
10      MR. MURPHY:  Yeah.
11 BY MR. MURPHY:
12      Q.   So, Doctor, you have in
13 front of you Exhibit 16, which is the
14 MedWatch report that you discuss in the
15 first full paragraph on page 36 of your
16 report; correct?
17      A.   I'm just checking to see if
18 the number correlates, 003790.  Yes, it
19 does.
20      Q.   And you state in your report
21 that this -- a MedWatch report for an
22 adverse event reported to Daiichi-Sankyo
23 on July 14th, 2005 documents a
24 36-year-old male who developed severe

Page 341

1 vomiting, diarrhea, and weight loss about
2 one year after starting Benicar HCT;
3 correct?
4      A.   Give me a moment just to
5 refresh my memory looking at this
6 MedWatch report again.
7      Q.   I'm just asking whether
8 that's what you say in your report.
9      A.   That's what I write in my
10 report, yeah.
11      Q.   Okay.
12      (Pause.)
13      THE WITNESS:  Okay.  Do you
14 have questions?
15      MR. MURPHY:  Yes, I do.
16 BY MR. MURPHY:
17      Q.   Again, you indicate that the
18 patient experienced weight loss, severe
19 vomiting, and diarrhea while being
20 treated with Benicar; correct?
21      A.   That's what I wrote.
22      Q.   And, in fact, the patient --
23 it's reported that the patient started
24 Benicar a year before his symptoms, while

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 342

1 also intentionally dieting, attempting to
2 lose weight; correct?
3     A.   It does say that he was
4 intentionally dieting; and despite that
5 and even though weight loss is the goal
6 of intentional dieting, the fact that
7 he's reporting weight loss in my opinion
8 doesn't undercut the notion that he's
9 been dieting.
10        In medicine, we like to say
11 that a successful diet is a disease until
12 proven otherwise.  It's very possible
13 that he was trying to lose weight and was
14 unsuccessful and then when he started
15 developing these other severe symptoms,
16 then he was tragically successful in his
17 weight loss or perhaps the weight loss
18 accelerated.
19        MR. SLATER:  One second.  He
20    just answered quickly.  I just
21    object to the foundation of the
22    question.  I didn't want interrupt
23    him.  I didn't want to object when
24    he was speaking, but I just wanted

Page 343

1    you to know that because there's a
2    flaw there.
3 BY MR. MURPHY:
4     Q.   And in this MedWatch form,
5 Exhibit 16 that we're looking at, is
6 there any evidence of a biopsy having
7 been taken?
8     A.   I suspect a biopsy was done
9 --
10    Q.   No, my question is --
11    A.   -- I cannot point you to --
12    Q.   -- it indicated or reflected
13 in the document?  That's my question to
14 you.
15    A.   Biopsy, the word, was not
16 used, but there is a pair of important
17 words that strongly suggest a biopsy was
18 done and I believe the biopsy was done in
19 this case.  The word is celiac disease.
20 It says concomitant diseases, celiac
21 disease.  Celiac disease is triggered by
22 gluten and is diagnosed based on biopsy.
23 The fact that one is going on record with
24 a diagnosis of celiac disease to me

Page 344

1 strongly suggests that a biopsy was done.
2        In fact, this -- if all I
3 knew was that this was a 35-year-old man
4 with celiac disease, who's black, I would
5 immediately start to wonder about
6 alternative explanations for so-called
7 celiac disease and question if it's a
8 misdiagnosis.
9        We know that people who
10 self-define as having black race have
11 much less celiac disease in terms of
12 their prevalence; and while it's
13 certainly possible -- and I have a
14 handful of patients with celiac disease
15 who self-identifies African-American -- I
16 also have -- I can remember at least one
17 black patient who was told she had celiac
18 disease, but, in fact, on further workup,
19 had olmesartan enteropathy.  And so this
20 to me immediately raises concern.  And
21 then -- that's not even seeing that he
22 was on olmesartan yet.
23        And then I see he was on
24 olmesartan and he had a positive

Page 345

1 rechallenge in the context of two
2 positive dechallenges.  This to me is
3 illustrative of the kind of cases that
4 exemplify olmesartan enteropathy.
5     Q.   Doctor, at page 36 of your
6 report --
7     A.   I'm on page 36.
8     Q.   -- at the bottom, toward the
9 bottom of the page, four lines up, you
10 begin a sentence "Another example"?  Do
11 you see that?
12    A.   I see it.
13    Q.   "Another example is a
14 MedWatch documenting an adverse event
15 reported to Daiichi Sankyo on September
16 15, 2005, with regard to a 58 year old
17 female patient who took Benicar for two
18 years."
19    A.   I see that.
20        MR. MURPHY:  I'm going to
21    mark as Exhibit 17 the MedWatch
22    report that you reference.
23        - - -
24        (Deposition Exhibit No.

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 346

1    Lebwohl-17, 9/21/05 E-Mail from
2    Robinson to Risk Management
3    Attaching Two CIOMS, etc. (Also
4    Marked as Exhibit 130),
5    OLM-DSI-0011876015 through
6    OLM-DSI-0011876036, was marked for
7    identification.)
8        - - -
9        THE WITNESS:  Would you like
10   me to take a look at it and answer
11   some questions?
12       MR. MURPHY:  You can take a
13   look at it now, sure.
14       (Pause.)
15       THE WITNESS:  There are some
16   duplicate pages here.  I'm just
17   going to quickly confirm that
18   there's nothing on one page that
19   isn't on the other, but I think
20   these are exact duplicates.
21       (Pause.)
22       THE WITNESS:  Okay.
23   BY MR. MURPHY:
24       Q.   This MedWatch report reports

Page 347

1    on a 58-year-old female; correct?  And if
2    you need orientation, you know, look to
3    page -- the Bates page ending in 31.
4        A.   Okay.
5        Q.   I think you have it there in
6    your right hand.  I'm talking about the
7    MedWatch report, not your --
8        A.   Because I'm at 36.
9        Q.   Look at the MedWatch report.
10       A.   31?  I don't see page
11   numbers.
12       Q.   That's (Indicating) the page
13   I want you to look at.
14       A.   The one that you're pointing
15   at.
16       Q.   Yes.
17       A.   Okay.
18       Q.   Now, this MedWatch report
19   relates to a 58-year-old female; correct?
20       A.   Yes.
21       Q.   And the patient had
22   complaints of nausea, vomiting, and
23   dehydration; correct?
24       A.   Yes.

Page 348

1        Q.   There were no reports or
2    complaints of diarrhea; correct?
3        MR. SLATER:  Objection.
4        You can answer.
5        THE WITNESS:  Give me a
6    moment, please.
7        I don't see diarrhea
8    mentioned.
9    BY MR. MURPHY:
10       Q.   The patients who were the
11   subject of the 2012 Rubio-Tapia paper,
12   did they all report diarrhea?
13       A.   Diarrhea, if -- if I recall
14   correctly -- and why don't I take a look
15   to confirm -- diarrhea was an inclusion
16   criterion.  So in order to be in the
17   Rubio-Tapia paper, you needed to have
18   diarrhea.
19       And so it's entirely
20   possible that there were patients even at
21   that time who had olmesartan enteropathy,
22   but didn't make it into the Rubio-Tapia
23   paper because they didn't have diarrhea.
24       Q.   With regard to the patients

Page 349

1    whose charts you reviewed after you spoke
2    with Dr. Green, did those patients all
3    report diarrhea or do you recall?
4        A.   There was a real spectrum.
5    In some people, it was -- diarrhea may
6    have been present, but was less
7    prominent.  In others, it was more
8    vomiting, if I recall correctly.  I would
9    say that gastrointestinal symptoms
10   globally were a feature, which is how
11   they made their way to us, but I'm not
12   sure if they all had diarrhea.
13       And certainly it's borne out
14   with the subsequent case reports and case
15   series since the initial Rubio-Tapia
16   paper that no longer we're restricted to
17   requiring diarrhea in order to get into
18   the paper.  You can see there's a whole
19   clinical spectrum, including vomiting,
20   which is fairly prominent.
21       Q.   So my question was limited
22   to the charts that you reviewed after
23   having spoken with Dr. Green.  You
24   understand that?

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 350

1     A.   In terms of those who I was
2  worried about, I'm not sure they all had
3  diarrhea, if that's what your question
4  is.
5     Q.   So the answer to the
6  question is, you're not sure whether all
7  of those folks had diarrhea?
8     A.   I'm not.  It's very possible
9  that they had other gastrointestinal
10 symptoms that were sufficiently
11 distressing to be coming to me and for me
12 to be worrying about them, but diarrhea
13 has clearly not been shown to be present
14 in all patients with olmesartan
15 enteropathy and I don't believe it was
16 present in all of those who we first
17 identified during those revelatory first
18 days.
19    Q.   Is nausea, vomiting,
20 dehydration, in the absence of villous
21 atrophy, sufficient to reach a diagnosis
22 of sprue-like enteropathy?
23    A.   Nausea, vomiting, and
24 dehydration are certainly compatible with

Page 351

1  sprue-like enteropathy related to
2  olmesartan.  Now, you still also need to
3  have taken olmesartan.  I would say that
4  olmesartan plus those would put it high
5  on my differential.  If the patient had
6  never taken olmesartan before, I would
7  not consider olmesartan enteropathy.
8     Q.   Now, did you happen to note
9  in the -- as you reviewed the MedWatch
10 report, that the patient who is being
11 reported here indicated that she did not
12 think that Benicar was the cause of her
13 symptoms?
14    A.   I see that she was quoted on
15 saying that and I also noted at the same
16 time the date at which this happened,
17 which was in 2005, and also I wouldn't
18 have thought back in 2005 that Benicar
19 would be causing this, because almost
20 everyone -- except perhaps internally,
21 almost everyone was in the dark about
22 Benicar and diarrhea.  I might have
23 agreed with the patient back then.
24    Q.   But you have no

Page 352

1  understanding or knowledge of why the
2  patient made the statement, assuming it
3  was true that she stated that, that she
4  didn't think the drug had anything to do
5  with her symptoms; you don't know why she
6  stated that, do you?
7     A.   All I know is that she
8  stated that and I might have stated the
9  same thing because, back then, knowledge
10 regarding olmesartan enteropathy was not
11 disseminated, certainly not in the lay
12 public, but even among the very
13 specialists that were seeing these
14 patients.
15         I think it's important to
16 elicit patients' opinions on what they
17 think is wrong with them.  I typically do
18 that in my clinical practice.  I think
19 that even though it's an important
20 practice to do, that doesn't necessarily
21 make it true, the statement that the
22 patient says.
23    Q.   In your report, you indicate
24 in at least one point that there were

Page 353

1  certain reports of celiac disease that
2  should have been included in one or more
3  of the Daiichi reports on incidence of
4  celiac disease.
5         You recall that?
6     A.   I'm going to check my report
7  and look at the specific reference.  If
8  you have a page number, I'll be glad to
9  follow your lead.
10    Q.   Okay -- well, let me ask you
11 a slightly different question in the
12 interest of time.  You know that there
13 were times when --
14    A.   Oh, I got one if you want.
15    Q.   You got one.  Go ahead.
16    A.   So the case that we reviewed
17 recently, the young black man with celiac
18 disease diagnosis, this was one of the
19 reports that I mentioned was not included
20 in the analysis of celiac cases prepared
21 by Herve Caspard.  Is that relevant to
22 the question you just asked?
23    Q.   It is, it is.
24         So when looking for cases of

Protected Information - Benjamin Lebwohl, M.D., M.S.

Page 354

1  celiac disease or any other condition,
2  are you aware that there are search terms
3  that are used to query a database?
4       A.   Generically when looking for
5  any disease and -- in any database?
6       Q.   In an adverse event
7  database.
8       A.   There are certain terms that
9  are queriable and as a general matter of
10 speaking, such terms can be queried, yes.
11      Q.   Have you ever had occasion
12 to generate search terms to query an
13 adverse event database to pull or
14 identify instances of a certain type of
15 adverse event?
16      A.   In general, with regard to
17 any kind of search database or you
18 specifically mean MedWatch reports or you
19 mean in my clinical or research practice?
20      Q.   In your research practice.
21      A.   Have I applied search terms
22 to --
23      Q.   Yes.
24      A.   -- identify adverse events?

Page 355

1  I've certainly employed search terms.
2       Q.   And just so that we're
3  clear, the search terms that you employ,
4  you run them through the database;
5  correct?
6       A.   That's what I meant by
7  employing search terms.  I enter them
8  into the database.  That's one way to --
9  it's one way to identify a link, using
10 search terms.  I wouldn't say it's
11 necessarily the only way one should try
12 to identify a link.
13      Q.   And if one were looking
14 through an adverse event database for
15 reports suggestive of sprue-like
16 enteropathy or olmesartan-associated
17 terms to query an adverse event database;
18 terms to query an adverse event database;
19 correct?
20      A.   Not if the condition isn't
21 fully characterized or cataloged, for
22 example, like in a registry.  So, for
23 example, prior to 2012, when the public
24 was made aware of olmesartan enteropathy,

Page 356

1  it would have been very helpful if
2  Daiichi, for example, had a registry that
3  followed these patients, cataloguing them
4  consistently.
5            Instead, we're left with
6  scattered reports of celiac disease,
7  likely misdiagnosed as celiac disease,
8  and we have to rely on these secondary
9  endpoints because we don't have a
10 specific term for this disease that was
11 out there, was being reported
12 consistently, but not monitored in a
13 registry or in any other formal capacity.
14      Q.   Do you have any
15 understanding or awareness of how the FDA
16 queries its adverse event database to
17 find reports of a given adverse event?
18      A.   Well, I've never been on the
19 inside of the FDA and had that role, but
20 physically I've been at the FDA and given
21 talks at the FDA.  And so I can't say
22 I've looked over the shoulder of someone
23 running these queries --
24      Q.   I'm simply asking you, do

Page 357

1  you know how it's done?
2       A.   I have a general sense how
3  it's done, though if you put me in front
4  of a computer and put an FDA hat on me,
5  I'd probably have trouble getting past
6  the login and password stage, frankly.
7       Q.   And is it your understanding
8  that certain search terms are generated
9  and then input into the database?
10          MR. SLATER:  Objection.
11      We're mixing foundations here.
12          You can answer.
13          THE WITNESS:  In general
14      when looking for outcomes, various
15      search terms or diagnosis codes
16      are used.
17          MR. MURPHY:  Search terms
18      and diagnosis codes.
19          THE WITNESS:  Yes.
20          MR. MURPHY:  I'm going to
21      mark as Exhibit 18 a list of
22      search terms.
23              - - -
24          (Deposition Exhibit No.