Exhibit C

Protected Information - Keith T. Wilson, M.D.

1    general overview of the workup of acute and

2    chronic diarrhea.  So that was the main reason I

3    consulted it.

4         Q.    Do physicians in clinical

5    practice routinely consult UpToDate for

6    information about medications and side effects,

7    that sort of thing?

8         A.    I, frankly, can't really say what

9    other doctors do.  I just know that on occasion I

10   will.  If I see a patient in the hospital and I

11   see something that I feel like I need a refresher

12   on, I'll just go to it because it's the fastest

13   thing I can think of.  I'll either do that or

14   just run a PubMed first.

15        Q.    Do you consider -- do you

16   consider UpToDate to be a reliable source of

17   medical information?

18        A.    You know, with the caveat that

19   it's written, there's no peer review.  It's just

20   -- it's somewhat reliable, but it's not as

21   reliable as a peer-reviewed randomized controlled

22   trial.  So --

23        Q.    Have you relied on UpToDate in

24   the course of evaluating or treating patients you

Protected Information - Keith T. Wilson, M.D.

1    were involved with?

2            A.      In my life?  Sure.

3                    Can I restate that?  I don't know

4    that I would use the word "rely."  I rely on my

5    clinical judgment.  I may consult it to see what

6    people are writing about current testing for

7    what's the latest thinking about all the

8    serologies you should consider for celiac disease

9    or anything that might have come along, but,

10   again, it's not a peer-reviewed source of

11   information.

12           Q.      In your treatment or evaluation

13   of patients, are there times where you will look

14   up information on UpToDate and incorporate that

15   information into your decision-making?

16           A.      Very rarely.

17           Q.      Why bother looking at them?  I

18   mean, I'm not sure.  You said you look at it and

19   now it sounds like --

20           A.      It's a quick --

21           Q.      -- you're telling me it's like

22   something that you wouldn't even, it's like a

23   comic book.  I can't get -- I can't get a sense

24   from you what it is.  I mean, so let's try to pin

Protected Information - Keith T. Wilson, M.D.

1    section where I utilized it primarily was pages

2    13 --

3              Q.      Fine.   Where is that?

4              A.      Pages 13 to 14.

5                      Sorry.   It's actually just

6    through the second paragraph on page 14.

7              Q.      The information on page 13

8    through the second paragraph of page 14, was that

9    all taken from UpToDate?

10             A.      I mean, I used UpToDate as a way

11   for me to organize my thoughts, but some of what

12   I wrote were -- what I wrote was just my own

13   impression.

14             Q.      Try to do a thorough review of

15   UpToDate to find relevant information relevant to

16   this case and to your opinions?

17             A.      I didn't hear the beginning of

18   what you said.

19             Q.      I say, did you attempt to be

20   thorough in finding relevant information, meaning

21   relevant to the opinions you were going to give

22   in this case?

23             A.      I don't think I would say

24   "thorough," no.   I would say that I typed in

Protected Information - Keith T. Wilson, M.D.

1    there "diarrhea evaluation" or something like

2    that and found what they said.

3         Q.    So in reviewing UpToDate, you

4    didn't find the fact that it lists causes of

5    small intestinal villous atrophy other than

6    celiac disease, and one of those listed is

7    medications, for example, olmesartan?  You didn't

8    see that when you went on UpToDate, did you?

9              MR. CHRISTIAN:  Objection.  Form.

10             THE WITNESS:  I honestly can't

11        recall because I wrote this report over a

12        month ago, and I don't remember reading

13        that.

14   BY MR. SLATER:

15        Q.    Anywhere; correct?

16        A.    To my recollection.

17        Q.    I'm saying, that's not referenced

18   anywhere in your report; right?

19        A.    No.

20        Q.    On page 19, you list Sleisenger

21   and Fordtran's "Gastrointestinal and Liver

22   Disease."  What is that?

23        A.    So that's a textbook that when I

24   was in my training was sort of considered the

Protected Information - Keith T. Wilson, M.D.

1    be met to establish causation; is that your

2    understanding?

3           A.    I don't -- I think it's more of a

4    legal situation with the Bradford Hill criteria.

5    I think that the more criteria you have, the

6    stronger your case that there is an association.

7           Q.    Okay.  Here's the question.  Move

8    to strike.

9                 Do you know in application of the

10   Bradford Hill criteria whether it is necessary to

11   satisfy each criteria to prove causation?  Do you

12   know?

13                MR. CHRISTIAN:  Objection.  Form.

14                THE WITNESS:  I don't really know

15        if you need -- so you're -- you're acting

16        like as if every criteria is a binary

17        result, and nothing in medicine is a

18        binary result.

19                So it would be more how good is

20        the evidence for each of those criteria,

21        and then you would factor in everything

22        at the end.

23   BY MR. SLATER:

24           Q.    Move to strike after "I don't

Protected Information - Keith T. Wilson, M.D.

```
 1   be met to establish causation; is that your

 2   understanding?

 3          A.    I don't -- I think it's more of a

 4   legal situation with the Bradford Hill criteria.

 5   I think that the more criteria you have, the

 6   stronger your case that there is an association.

 7          Q.    Okay.  Here's the question.  Move

 8   to strike.

 9              Do you know in application of the

10   Bradford Hill criteria whether it is necessary to

11   satisfy each criteria to prove causation?  Do you

12   know?

13                    MR. CHRISTIAN:  Objection.  Form.

14                    THE WITNESS:  I don't really know

15          if you need -- so you're -- you're acting

16          like as if every criteria is a binary

17          result, and nothing in medicine is a

18          binary result.

19              So it would be more how good is

20          the evidence for each of those criteria,

21          and then you would factor in everything

22          at the end.

23   BY MR. SLATER:

24          Q.    Move to strike after "I don't
```

Protected Information - Keith T. Wilson, M.D.

1    feel that they need to be when they have their

2    diet when they travel and such.  I've been

3    interested in that exact question, and I think

4    each patient has a different experience.

5            Q.      Doctor, it's a very simple

6    question.

7                    Is there anything in the

8    published literature that you can point to that

9    says there is a dose effect with regard to gluten

10   and celiac disease?

11           A.      So the answer is, I don't know

12   because I have not run a search on that because

13   this condition that we're discussing here is not

14   celiac disease.  So it did not occur to me to

15   look at the tens of thousands of papers about

16   celiac disease and gluten.

17           Q.      Do you --

18           A.      So I'm not --

19           Q.      -- realize that were not --

20           A.      So I'm not prepared -- go ahead.

21           Q.      I'm sorry.  Are you still

22   talking?

23           A.      I'm not prepared to expound upon

24   that detailed question.

Protected Information - Keith T. Wilson, M.D.

1              MR. CHRISTIAN:  Objection.  Form.

2              THE WITNESS:  It doesn't disprove

3         that there could be an association.

4    BY MR. SLATER:

5         Q.     The term "association" -- well,

6    rephrase.

7              When one talks about an

8    association, there are different -- rephrase.

9              There is a spectrum of

10   associations from associations where you would

11   say it's unlikely to be causal, all the way up to

12   causal associations where you believe, yes,

13   there's an association and it causes -- one

14   causes the other.  There's a spectrum; right?

15             MR. CHRISTIAN:  Objection.  Form.

16             THE WITNESS:  I think that that's

17        probably true.

18   BY MR. SLATER:

19        Q.     And you agree that there is an

20   association between olmesartan and olmesartan

21   enteropathy as described in the literature.  You

22   just disagree that there is a causal association;

23   correct?

24        A.     What I would say is that there

Protected Information - Keith T. Wilson, M.D.

1    are case series suggesting an association.

2    However, there are multiple negative studies that

3    I cited in my report that are higher level

4    evidence that are different than just collecting

5    cases where things were looked at in a more

6    unbiased manner, and they found no association.

7         Q.    Is there any article in the

8    literature that you can point me to where the

9    conclusion of the article is that there is no

10   association between olmesartan and olmesartan

11   enteropathy?  Any article where that's the

12   conclusion where they say there is no

13   association?

14        A.    So I just want to double-check

15   what I'm about to say.  So just give me a moment.

16             Okay.  So if you look at the

17   abstract to the Greywoode article published in

18   2014 out of Columbia, they looked at 2,088

19   patients undergoing upper endoscopy and 12,428

20   patients undergoing colonoscopy, and they did a

21   multivaried analysis.  Meaning they factored in

22   different criteria which, you know, I'm not

23   certain what every criteria were that they

24   included.

Protected Information - Keith T. Wilson, M.D.

1              But they found that there was no

2      statistically significant association between

3      olmesartan and diarrhea among those undergoing

4      either type of procedure, and the review of the

5      pathology reports also showed no association.

6              And then the concluding sentence:

7              "Our findings suggest that

8      neither olmesartan nor other ARBs were associated

9      with diarrhea among patients undergoing

10     endoscopy."

11         Q.    Doctor, look at the conclusion of

12     the article.

13         A.    That is the conclusion.

14         Q.    Actually, don't do that.  Go to

15     the next sentence, actually, in the abstract.

16              Do you see the next sentence in

17     the abstract after the one you just read?

18         A.    Yeah, of course I do.

19         Q.    And what does that sentence say?

20     Read it for the record, please?

21         A.    "The sprue-like enteropathy

22     recently associated with olmesartan is likely a

23     rare adverse effect and milder presentations are

24     unlikely."

Protected Information - Keith T. Wilson, M.D.

```
 1          Q.      So they don't conclude the

 2    association doesn't exist; right?  They actually

 3    say it does exist, but it's probably rare?

 4          A.      They don't say it exists.  They

 5    say "recently associated with."  It doesn't mean

 6    that they're advocating it one way or the other.

 7          Q.      Doctor, look at the conclusion of

 8    the article, the last page.  It says:

 9                  "Our findings suggest that the

10    sprue-like enteropathy recently associated with

11    olmesartan is a rare event and milder

12    presentations causing diarrhea among substantial

13    numbers of outpatients are unlikely."

14                  Do you see what I just read?

15          A.      Yes.

16          Q.      So they're calling it a rare

17    event; right?

18          A.      Right.

19          Q.      Next sentence.

20                  Future studies should focus on

21    the mechanisms by which olmesartan causes severe

22    sprue-like enteropathy, and the identification of

23    patient-related risk factors that predispose for

24    this rare but serious outcome."
```

Protected Information - Keith T. Wilson, M.D.

1                   Do you see that sentence?

2          A.      I see that sentence.

3          Q.      Do you see that the authors

4    actually are saying olmesartan causes severe

5    sprue-like enteropathy?  Do you see that, that's

6    what they say --

7                   MR. CHRISTIAN:  Objection.

8    BY MR. SLATER:

9          Q.      -- in their conclusion?

10                  MR. CHRISTIAN:  Objection.  Form.

11                  THE WITNESS:  But that is not

12          consistent with the findings of their

13          study.  So it doesn't make any sense that

14          they're just referring back to other

15          people's studies at that point.

16   BY MR. SLATER:

17         Q.      Doctor, move to strike.

18                  Do you see that that's what the

19   sentence says?

20         A.      I do, but I don't agree with it

21   because that's not the conclusion of their

22   research.

23         Q.      Question, okay?

24                  I'm not asking you to interpret

Protected Information - Keith T. Wilson, M.D.

1    whether a study supports an association or not.

2    I'm not looking to go into an interpretation.  My

3    question is very simple.

4              Is there any article you can

5    point to where the authors conclude unequivocally

6    olmesartan is not associated with either

7    olmesartan-associated enteropathy, sprue-like

8    enteropathy, olmesartan-induced enteropathy,

9    however you want to name the condition?  Any one

10   where the authors make that conclusion, it did

11   not associate it.  Can you point to any article?

12             MR. CHRISTIAN:  Objection.  Form.

13             THE WITNESS:  So, again, just

14        because they choose to write something

15        doesn't mean that that's what their

16        article showed.  Their article showed

17        that there was no association when the

18        data were considered --

19   BY MR. SLATER:

20        Q.    Move to strike.

21        A.    -- in an unbiased manner.

22        Q.    Move to strike.

23             Doctor, it's a really simple

24   question.

Protected Information - Keith T. Wilson, M.D.

1                  Is there any article you can

2      point to where that is the explicit conclusion in

3      the article?

4            A.     Well, I think Greywoode does come

5      to that conclusion.

6            Q.     Okay.  Any others?

7                  Well, rephrase.

8                  So you think Greywoode concludes

9      unequivocally there's no association, even though

10     they say that this sprue-like enteropathy

11     recently associated is a rare event, and even

12     though they say olmesartan causes severe

13     sprue-like enteropathy; right?  That's what

14     you're telling the jury and the judge; right?

15                  MR. CHRISTIAN:  Objection.  Form.

16                  THE WITNESS:  I'm saying that a

17           key point to interpreting literature is

18           to have access to the data within the

19           paper and to be able to form your own

20           conclusion, and my interpretation of

21           their data is crystal clear.  That there

22           was no association in that study.

23     BY MR. SLATER:

24           Q.     Okay.  All right.  Move to

Protected Information - Keith T. Wilson, M.D.

1    strike.

2                    Doctor, let's -- let's try to get

3    on the same page because it's -- I realize what

4    you're trying to do, but it's starting to

5    obstruct my time.

6                    I am not asking you to interpret

7    the data and tell me your opinion about whether

8    the data supports an association or not.  So I

9    would appreciate it if you would stop answering

10   the questions as if that's what I'm asking.  It's

11   a very simple question.

12                   Is there any article where

13   there's an explicit conclusion by the authors

14   that olmesartan is not associated with sprue-like

15   enteropathy, olmesartan-associated enteropathy,

16   or any other way you would describe that

17   condition?  Is there any article that makes that

18   explicit conclusion; yes or no?

19                   MR. CHRISTIAN:  Objection.  Form.

20                   THE WITNESS:  So my concern is

21        that for reasons that are not clear to me

22        that authors that are providing data, as

23        was also seen in the Lagana study that

24        are also completely negative, are feeling

Protected Information - Keith T. Wilson, M.D.

```
 1              compelled to keep referring back to these
 2              case series.  So they're -- they're sort
 3              of dampening down the evidence from their
 4              own study for reasons that I don't
 5              understand.
 6                   So I don't think anybody wrote
 7              that there was no association because of
 8              the Mayo case series.  However, the
 9              Lagana study is also a negative study.
10    BY MR. SLATER:
11              Q.    Move to strike.
12                   Is the answer no, there's no such
13    article you can point to?
14              A.    I'm not aware of any article
15    where the only conclusion, the only thing that
16    was stated at the end of the article was that
17    there's no association.
18              Q.    You're not aware of any article
19    that actually reached the conclusion and said
20    explicitly there is no association; correct?
21                   MR. CHRISTIAN:  Objection.  Form.
22                   THE WITNESS:  How about if I read
23              you this sentence from Lagana in the
24              abstract:
```

Protected Information - Keith T. Wilson, M.D.

```
 1                    "There were no statistically
 2          significant differences between
 3          olmesartan users with abdominal pain and
 4          controls for any single histopathological
 5          abnormality."
 6   BY MR. SLATER:
 7          Q.     Okay.  Move to strike as
 8   nonresponsive.
 9                    I'm correct that there's no
10   article where the authors conclude there is no
11   association; correct?
12                    MR. CHRISTIAN:  Objection.  Form.
13                    THE WITNESS:  I'm going to look
14          at another one that was negative and see
15          what they wrote.
16                    I guess I will say that no author
17          felt that they could safely state that,
18          even though their data suggested the
19          otherwise.
20   BY MR. SLATER:
21          Q.     Move to strike after the word
22   "that."
23                    Am I correct that there is no
24   article you can point to where the authors
```

Protected Information - Keith T. Wilson, M.D.

1          Q.     So here's the question, Doctor.

2     Focus.  Here's the question.

3                 MR. CHRISTIAN:  Objection.

4     BY MR. SLATER:

5          Q.     Is there any article where the

6     authors write the words "olmesartan does not

7     cause sprue-like enteropathy, olmesartan

8     enteropathy" or however they might characterize

9     that condition, where there's an explicit

10    conclusion it doesn't cause this condition?  Is

11    there any article that says that?

12         A.     Not --

13                MR. CHRISTIAN:  Objection.  Form.

14                THE WITNESS:  Not to my

15          knowledge.

16    BY MR. SLATER:

17         Q.     I want to be very clear for the

18    jury.

19                Do you think that

20    olmesartan-associated enteropathy, by whatever

21    label you want to put on it, should be evaluated

22    as a drug allergy in determining whether there's

23    causation or not; yes or no?

24         A.     I'd say no.  I said no.

Protected Information - Keith T. Wilson, M.D.

1             documents look like, but my supposition

2             is, they don't reach the level of

3             evidence of what I would expect from a

4             peer-reviewed paper.  It would just be

5             some -- I don't even know what it would

6             be because I haven't seen it.

7    BY MR. SLATER:

8             Q.     Really my question is pretty

9    simple.

10            If there's a patient in a

11   randomized controlled trial as I described, is it

12   your testimony you're fine not even seeing that,

13   it's not something that would be of any

14   significance to you sight unseen, you don't even

15   need to see it?

16            MR. CHRISTIAN:  Objection.  Form.

17   BY MR. SLATER:

18            Q.    Is that true?

19            MR. CHRISTIAN:  Same objection.

20            THE WITNESS:  I don't know one.

21            You just said "a patient."  That's the

22            singular form.  I don't think one patient

23            is worth trying to make any conclusions

24            about causation from.

Protected Information - Keith T. Wilson, M.D.

```
 1              Q.      So if that type of a patient --
 2     rephrase.
 3                      So if that scenario actually
 4     exists and is known to Daiichi and their lawyers,
 5     you wouldn't even want to see it.  It wouldn't
 6     even matter to you?
 7                      MR. CHRISTIAN:  Objection.  Form.
 8     BY MR. SLATER:
 9              Q.      Is that your testimony?
10                      MR. CHRISTIAN:  Same objection.
11                      THE WITNESS:  I don't know
12              whether they have controlled data on
13              patients.  I only know what's in the
14              literature.  That's what I was asked to
15              do.
16     BY MR. SLATER:
17              Q.      That's my point.  If they knew
18     about it, your testimony is you wouldn't want to
19     see it anyway because it wouldn't be of any
20     significance to you?
21                      MR. CHRISTIAN:  Objection.  Form.
22                      THE WITNESS:  I'm really unable
23              to answer that because, frankly speaking,
24              I don't know what internal drug company
```

Protected Information - Keith T. Wilson, M.D.

1           documents look like, but my supposition

2           is, they don't reach the level of

3           evidence of what I would expect from a

4           peer-reviewed paper.  It would just be

5           some -- I don't even know what it would

6           be because I haven't seen it.

7    BY MR. SLATER:

8           Q.     Really my question is pretty

9    simple.

10          If there's a patient in a

11   randomized controlled trial as I described, is it

12   your testimony you're fine not even seeing that,

13   it's not something that would be of any

14   significance to you sight unseen, you don't even

15   need to see it?

16          MR. CHRISTIAN:  Objection.  Form.

17   BY MR. SLATER:

18          Q.     Is that true?

19          MR. CHRISTIAN:  Same objection.

20          THE WITNESS:  I don't know one.

21   You just said "a patient."  That's the

22   singular form.  I don't think one patient

23   is worth trying to make any conclusions

24   about causation from.

Protected Information - Keith T. Wilson, M.D.

```
 1              evidence is.  I would just be

 2              speculating.

 3    BY MR. SLATER:

 4         Q.    Would you like to understand all

 5    those things so you'd understand what the company

 6    that actually sold and monitored the drug, what

 7    they actually know and think?  Would you have

 8    liked to have known that?

 9                   MR. CHRISTIAN:  Objection.  Form.

10                   THE WITNESS:  I don't think that

11              it's really relevant to the task that was

12              put before me of assessing the medical

13              literature and thinking about the science

14              behind that because internal documents

15              are not -- they're not peer-reviewed.  I

16              don't know anything about how they're

17              constructed or -- or anything.

18    BY MR. SLATER:

19         Q.    Your comment 19 on page 4 of your

20    report says that -- talks about mechanism, the

21    concept of mechanism; right?

22         A.    Right.

23         Q.    You do not need to know the

24    mechanism of an association; correct?
```

Protected Information - Keith T. Wilson, M.D.

```
 1              Q.      In terms of the number of patient

 2    years, Basson had a substantially higher number

 3    of patient years that were studied; correct?

 4    We've just established that?

 5              A.      Yes.

 6              Q.      The outcome of the Basson study,

 7    the data that was generated, when you weigh that,

 8    would weigh in favor of a finding of causation;

 9    correct?

10              A.      I can't make that conclusion

11    because they had no biopsy data they looked at.

12    It was just hospitalization from discharge

13    diagnosis for malabsorption.  So I think that

14    that falls short of making that conclusion.

15              Q.      In your analysis, did you factor

16    in the Basson study?

17              A.      It's on page 7.  At the bottom of

18    page 7 of my report.

19              Q.      Yeah, but now we're in your

20    deposition where I'm asking you under oath.  So

21    my question is this:

22                      As you sit here now offering your

23    opinions, is the Basson data something that you

24    are considering in forming your opinions?
```

Protected Information - Keith T. Wilson, M.D.

1    So, you know, I don't have a way to put it in any

2    context other than that.

3            Q.      The question is:  Is that a

4    reasonable recommendation to physicians seeing

5    patients with this type of a clinical

6    presentation?  Do you agree that's a reasonable

7    recommendation?

8            A.      I think that in medicine we

9    always like to be conservative, and if we think

10    that anything has been published, we always

11    factor that into our consideration.

12            Q.      If a patient comes into a

13    gastroenterologist or a family physician, whoever

14    it may be, who takes olmesartan and the patient

15    has severe diarrhea, dehydration, and weight

16    loss, based upon the medical literature as it

17    stands now, it's a reasonable -- reasonable

18    decision to take the patient off the olmesartan

19    and see if the patient gets better, and if the

20    patient does, to just switch their

21    anti-hypertensive and avoid having to do invasive

22    biopsies and that sort of thing.

23                    That's a reasonable approach;

24    correct?

Protected Information - Keith T. Wilson, M.D.

```
 1                    MR. CHRISTIAN:  Objection.  Form.
 2                    THE WITNESS:  So I think the
 3            reasonable approach if somebody is that
 4            sick is to stop any medication that you
 5            can find that's ever been associated with
 6            a GI distress, and then make a decision
 7            about for each of those medications
 8            whether they're needed or not or whether
 9            an alternative can be used.  So there's
10            many medications that can cause GI side
11            effects.
12    BY MR. SLATER:
13            Q.    Let's -- let's talk about a
14    patient who is on olmesartan and is not taking
15    any other medications that cause severe diarrhea,
16    dehydration, and weight loss, that that's --
17    olmesartan is the only drug they're taking that
18    is known to cause that spectrum.
19                    Based on the literature that
20    exists now, if a patient came into a doctor
21    reporting those symptoms, it would be reasonable
22    for the doctor to stop the olmesartan and then,
23    if the person were to improve and then get
24    better, to not restart the olmesartan but to go
```

Protected Information - Keith T. Wilson, M.D.

```
1              A.      Yes.

2              Q.      Okay.  I'm handing you what's

3      been marked as Exhibit 9 to your deposition,

4      which you indicated was your updated CV or

5      resume, as of what date?

6              A.      February 20, 2017.

7              Q.      Okay.  And is Exhibit 9, is that

8      a true and correct copy of your CV?

9              A.      Yes.

10             Q.      Does it accurately summarize your

11     education, training, and professional experience?

12             A.      Yes.

13             Q.      Will you turn to your report,

14     which is Exhibit No. 4 in this case.

15                     Do you have your report in front

16     of you?

17             A.      Yes.

18             Q.      Turn to page 10.  At the bottom

19     of page 10, you were just asked a few questions

20     about -- this is where the section starts on the

21     Bradford Hill criteria; is that correct?

22             A.      Yes.

23             Q.      Okay.  I want to ask you some

24     questions about this criteria.
```

Protected Information - Keith T. Wilson, M.D.

```
 1                        The number one criteria you list

 2      there is strength of association; correct?

 3              A.       Correct.

 4              Q.       In your evaluation of general

 5      causation in this case, did you evaluate the

 6      strength of the association that you found in the

 7      published medical literature?

 8              A.       Yes.

 9              Q.       Is that something that you do

10      every day in your practice and in your research

11      is evaluate strength of association?

12              A.       Yes, I --

13                       MR. SLATER:   Objection.

14      BY MR. CHRISTIAN:

15              Q.       You can still answer.

16              A.       Yes, I do that.  Whenever I'm

17      considering any type of data that's published,

18      whether it be something that's already published

19      or something that I'm handling as an editor for a

20      journal or whether I'm handling as a reviewer for

21      an article, I need to determine what I think the

22      quality of the associations are within that work.

23              Q.       And you use -- utilize that

24      methodology in your evaluation in Exhibit No. 4,
```

Protected Information - Keith T. Wilson, M.D.

```
 1    your report?

 2           A.    Yes.

 3                 MR. SLATER:   Objection.

 4    BY MR. CHRISTIAN:

 5           Q.    Or did you use that methodology

 6    in your report?

 7           A.    Yes.

 8           Q.    What is the second criteria

 9    listed on the top of page 11?

10           A.    It should be consistency.

11           Q.    Okay.  And did you evaluate

12    consistency in looking at the evidence in this

13    case as it relates to olmesartan and sprue-like

14    enteropathy?

15           A.    Yes.  In fact, that's really a

16    striking flaw in the literature is that there is

17    so much inconsistency in trying to define this

18    syndrome, and I've discussed some of this in my

19    deposition today.

20           Q.    And in looking at the issue of

21    consistency, is that something that you do every

22    day in your practice and research?

23           A.    Yes.

24           Q.    The next item there listed is
```

Protected Information - Keith T. Wilson, M.D.

1    temporality or study design suitability; is that

2    correct?

3            A.      Yes.

4            Q.      And did you use the methodology

5    of analyzing temporality or study design

6    suitability in coming up with your opinions in

7    this case?

8            A.      Yes.

9            Q.      Is that something you do every

10   day in your practice and research?

11           A.      Yes.  We often have --

12                   MR. SLATER:  Objection.

13                   THE WITNESS:  Can I continue?

14   BY MR. CHRISTIAN:

15           Q.      Yes.

16           A.      So often in designing our human

17   studies -- for example, I'm mentoring a senior

18   fellow, who's joining our faculty in a new study

19   that we're starting, and we had to very carefully

20   think through the study design of the

21   measurements we were going to make in patients on

22   and off the medication for Crohn's disease.  And

23   we do the same thing when we design animal

24   experiments.

Protected Information - Keith T. Wilson, M.D.

```
 1          Q.      And the next item listed there is

 2   biological gradient.

 3                  Can you explain what that means?

 4          A.      So it's very important to

 5   consider the idea that if something just is

 6   cytotoxic at a low dose and you can't establish

 7   if there's a gradient, it's very hard to

 8   determine the effect in an experimental system.

 9                  In the human system, it's

10   implicit that if somebody -- if patients were to

11   have a deleterious effect of a medication, it

12   seems that there should be some evidence of a

13   dose effect; i.e. that, for example, some

14   medications might be well tolerated at one dose,

15   but if you increase it high enough, it could

16   lower the seizure threshold and they could get

17   seizures, or it could cause acute renal failure

18   or what have you.

19                  So that oftentimes it's very

20   important to be able to determine if there is a

21   gradient to an adverse effect.

22          Q.      And, Dr. Wilson, did you analyze

23   biological gradient in your analysis as

24   summarized in Exhibit No. 4?
```

Protected Information - Keith T. Wilson, M.D.

```
 1              A.      Yes.  In fact, I indicated that

 2      there's no evidence of a biological gradient in

 3      these studies.

 4              Q.      And is evaluating biological

 5      gradient something you do every day in your

 6      practice and research?

 7              A.      Yes.  When we design experiments,

 8      we often will do a dose-response of an inhibitor.

 9      We will use dose-responses of a stimulant that

10      we're using, such as the amount of bacteria we

11      add to cells.  So we're always factoring that

12      type of thing in.

13              Q.      And with respect to the next

14      category listed, specificity, do you evaluate the

15      issue of specificity as a methodology in your

16      everyday practice?

17              A.      Yes, it is.

18              MR. SLATER:  Objection.

19              THE WITNESS:  So there's this

20          concept of whenever you're evaluating any

21          clinical studies, you should factor in

22          sensitivity and specificity, but in the,

23          you know, that's sort of assessing, for

24          example, the merits of a certain test.
```

Protected Information - Keith T. Wilson, M.D.

```
 1              Here what we're looking at in

 2          specificity, it's something different.

 3          We're trying to see, to determine if

 4          there were to be causation, there needs

 5          to be a very specific outcome from a

 6          specific exposure.

 7              So this idea that there could be

 8          a loose collection of responses is

 9          something that, in my opinion, lowers the

10          quality of the evidence.

11   BY MR. CHRISTIAN:

12          Q.    Did you utilize this methodology

13   in coming up with your opinions in Exhibit No. 4?

14          A.    I did.

15          Q.    The next one is called biological

16   plausibility.

17              What is that?

18          A.    Well, I think that's the biggest

19   sticking point in this entire case, which is that

20   in order -- it's my understanding that, according

21   to Bradford Hill criteria, in order for something

22   to be likely to be causal, there should be a

23   plausible biological mechanism.

24              And in this scenario, I gave the
```

Protected Information - Keith T. Wilson, M.D.

```
 1    example of how things like the immunosuppressive
 2    effects of HIV can be quantified by looking at a
 3    CD4 count, for example, and that can be
 4    predictive of whether people get an
 5    immunocompromised state that leads to
 6    opportunistic infection.
 7              Here we don't have any evidence
 8    of any particular driving force because it was
 9    originally speculated that it would be TGF beta
10    driven, a loss of TGF beta immunoregulation, but
11    that was really an overly simplistic thought
12    process and there are many immunoregulatory
13    pathways and, in fact, when they looked in the
14    Marietta paper at TGF beta, signaling they
15    couldn't see any differences.
16         Q.    Dr. Wilson, was part of your
17    methodology in coming up with your opinions in
18    Exhibit 4 analyzing biologic plausibility?
19         A.    It was.
20         Q.    And is that something you do in
21    your everyday practice and research?
22         A.    Absolutely.
23         Q.    Number 7 is coherence.
24              Did you analyze coherence in
```

Protected Information - Keith T. Wilson, M.D.

1    looking at the medical literature that you

2    summarize in Exhibit No. 4?

3            A.    So I found this one to be tough

4    because that's supposed to be looking at the

5    natural history of a disease, and since this is a

6    syndrome that seems to occur in a very small

7    number of cases, I found it very difficult to put

8    together a coherent explanation of what this

9    disease process is.  So, for example, as I

10   enumerated here, because of the poor quality of

11   the evidence.

12            Does it include things like

13   gastric and colonic involvement?  Is that

14   necessary to say that somebody has the syndrome?

15   What is the role of the HLA status?  What is the

16   role of various other factors that were put forth

17   but don't seem to be consistent between the

18   studies?

19            So that further evidenced that

20   causation is less likely because there's not

21   coherence between the studies.

22            Q.    As part of your methodology in

23   coming up with your opinions in this case, did

24   you utilize the concept of coherence?

Protected Information - Keith T. Wilson, M.D.

1          A.     I tried to see if there was any,

2    and I didn't find much evidence of that.

3          Q.     Is that something that you do in

4    your everyday practice and research?

5          A.     Yes.

6          Q.     Number 8 is experimental

7    evidence.

8                 Did you use in your methodology

9    an analysis of experimental evidence relating to

10   sprue-like enteropathy and olmesartan?

11         A.     I tried, but I couldn't find

12   much.  The Marietta paper, I already discussed in

13   my report that the deficiencies there in terms of

14   trying to provide evidence of a mechanism, and

15   also animal data is weak.  So the experimental

16   evidence is something I considered, but it's

17   poor.

18         Q.     Do you, Dr. Wilson, analyze

19   experimental evidence in your everyday practice

20   and research?

21         A.     I do that a lot.  That's what I

22   do every day.

23         Q.     Okay.  And number 9, reasoning by

24   analogy.

Protected Information - Keith T. Wilson, M.D.

```
 1                    Did you evaluate reasoning by

 2    analogy as part of your methodology in coming up

 3    with your opinions in this case?

 4                    MR. SLATER:  Objection.

 5                    THE WITNESS:  Yes, I did because

 6           I considered whether or not other ARBs

 7           could have the same effect, and the

 8           evidence on that is the jury is still

 9           out, so to speak, because there's a

10           couple of scattered case reports, but

11           there hasn't been any real effort to try

12           and show that it's a class-specific

13           effect.  So there's not really any

14           reasoning by analogy.

15    BY MR. CHRISTIAN:

16           Q.     So in your everyday practice at

17    Vanderbilt University and your work at the VA

18    hospital, do you incorporate these nine different

19    methodologies when you're trying to determine

20    whether something is causing something else?

21           A.     I do.

22                    MR. SLATER:  Objection.

23                    MR. CHRISTIAN:  Thank you,

24           Dr. Wilson.  That's all the questions I
```

# Exhibit D

In re Fosamax (Alendronate Sodium) Products Liability Litigation, Not Reported in...

2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

2013 WL 1558690
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

In re FOSAMAX (ALENDRONATE SODIUM)
PRODUCTS LIABILITY LITIGATION.
Bernadette Glynn and Richard Glynn, Plaintiffs,
v.
Merck Sharp & Dohme Corp, Defendant.

Civil Action Nos. 11–5304, 08–08.
|
April 10, 2013.

**Attorneys and Law Firms**

Donald A. Ecklund, James E. Cecchi, Carella Byrne Cecchi Olstein Brody & Agnello, P.C., Roseland, NJ, Christopher A. Seeger, David R. Buchanan, Seeger Weiss, LLP, Newark, NJ, Edward Braniff, Weitz & Luxenberg, New York, NY, for Plaintiffs.

David J. Heubeck, Venable LLP, Baltimore, MD, Karen A. Confoy, Fox Rothschild LLP, PC, Lawrenceville, NJ, for Defendant.

OPINION

PISANO, District Judge.

**\*1** Plaintiffs Bernadette Glynn and Richard Glynn ("Plaintiffs") bring this lawsuit against Defendant Merck, Sharp, & Dohme Corp. ("Defendant"), which manufactures Fosamax, a drug approved by the United States Food and Drug Administration ("FDA") for the treatment and prevention of osteoporosis. This matter is part of the multi-district litigation concerning Fosamax and involves allegations that Fosamax causes atypical femur fractures ("AFFs [1]") and that it caused Plaintiff Mrs. Glynn ("Mrs.Glynn")'s femur fracture. Presently before the Court is Defendant's Omnibus *Daubert* Motion to exclude the expert testimony of Dr. Charles N. Cornell ("Dr.Cornell"), Dr. Michael J. Klein ("Dr.Klein"), Dr. David Madigan ("Dr.Madigan"), and Dr. Cheryl Blume ("Dr.Blume") as well as a motion to exclude the causation testimony of the treating physicians—Dr. Robert Busch

("Dr.Busch"), Dr. Robert Lindsay ("Dr.Lindsay"), Dr. Frederick Fletcher ("Dr.Fletcher"), and Dr. Britton Limes ("Dr.Limes") [docket # 28]. This Court heard oral argument on February 21, 2013 and April 2, 2013. For the reasons outlined below, the Motion is denied as to Drs. Cornell, Klein, Madigan, and Blume. The treating physicians' causation testimony will not be excluded if their opinions are based on their treatment and care of Mrs. Glynn.

**I. DISCUSSION**

Federal Rule of Evidence 702 provides that a witness

> qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

This Rule requires the proponent of expert testimony to show the "requisite 'qualifications, reliability, and fit' " or in other words, that "(1) the witness is qualified as an expert in a particular field; (2) the methodology applied by the witness is sufficiently reliable; and (3) the witness's testimony 'fits' the facts of the case in dispute—that is, the proffered testimony would assist the trier of fact." *Jones v. Synthes USA Sales, LLC,* 2010 WL 3311840, \*4 (D.N.J. Aug.19, 2010); *see also McNamara v. Kmart Corp.,* 380 Fed. Appx. 148, 151 (3d Cir.2010); *Meadows v. Anchor Longwall & Rebuild, Inc.,* 306 Fed. Appx. 781, 788 (3d Cir.2009); *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008); *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003).

First, the expert must be qualified; this requirement is interpreted liberally and "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 741 (3d Cir.1994).

In re Fosamax (Alendronate Sodium) Products Liability Litigation, Not Reported in...

2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

**\*2** Second, "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Id.* at 742. An expert's opinion is reliable if it is "based on 'good grounds,' i.e., if it is based on the methods and procedures of science." *Id.* at 744. This inquiry requires a court to examine the "scientific validity and thus the evidentiary relevance and reliability [ ] of the principles that underlie a proposed submission" and to focus "solely on principles and methodology, not on the conclusions ... [the expert] generate[s]." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 594–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert,* the Supreme Court outlined several factors that a court may take into consideration in determining reliability, including whether the hypothesis can be tested, whether the methodology "has been subjected to peer review and publication," the methodology's rate of error, "the existence and maintenance of standards controlling the technique's operation," and whether there is general acceptance in the scientific community. *Id.* at 593–94. The proponent of the expert testimony must demonstrate that the opinions are reliable by a preponderance of the evidence. *In re Paoli,* 35 F.3d at 744.

Third, expert testimony "must fit the issues in the case" or in other words, "be relevant for the purposes of the case and must assist the trier of fact." *Schneider,* 320 F.3d at 404. The Court must determine "whether [the] expert testimony proffered ... is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Schiff,* 602 F.3d 152, 173 (3d Cir.2010). This standard "is not that high" but "higher than bare relevance." *In re Paoli,* 35 F.3d at 745.

The Court's role, at a *Daubert* hearing, is to act "as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Schneider,* 320 F.3d at 404. In keeping with its gatekeeping role, this Court will apply the *Daubert* analysis to each expert.

### A. Dr. Cornell

Plaintiffs offer Dr. Cornell, an orthopedist, as an expert in causation, to establish that Fosamax causes AFFs and Mrs. Glynn's Fosamax use caused her AFF.

### 1. Dr. Cornell Is Qualified as an Expert

Dr. Cornell is currently a Professor of Clinical Orthopedic Surgery at Weill Cornell College of Medicine and has been the Richard Laskin Chair in Orthopedic Surgery since 2011 [docket # 102, Ex. 8, Dr. Cornell's Report ("Cornell Report") at 2]. In addition, Dr. Cornell is an attending orthopedic surgeon at the Hospital for Special Surgery in New York City and currently serves as the hospital's Director of the Department of Orthopedic Surgery. *Id.* He is a "specialist in orthopedic trauma ... and metabolic bone disease," which includes osteoporosis and osteopenia [docket # 102, Ex. 10, Dr. Cornell's Deposition ("Cornell Dep.") at 69:13–16; 71:14–17]. About 80% of all the fractures Dr. Cornell treats surgically are fractures "as a consequence of osteoporosis or osteopenia." *Id.* at 72:6–21. He has treated two patients with atypical fractures related to bisphosphonate use. Cornell Report at 3. Moreover, he has "participated in a study to determine a management strategy for the treatment of symptomatic bisphosphonate-associated incomplete atypical femoral fractures, which was peer reviewed and published in the Hospital for Special Surgery Journal." *Id.* Although Defendant argues that Dr. Cornell is not qualified because he is not trained in epidemiology and is unfamiliar with "the most basic epidemiological terms and concepts" (Db13 [2]), Dr. Cornell does not have to possess a particular subspecialty—epidemiology—to testify as an expert. *See Schneider,* 320 F.3d at 406–07 (determining that testimony was improperly excluded because an individual "was not an expert in the sub-specialty about which he opined"); *Holbrook v. Lykes Bros. S.S. Co., Inc.,* 80 F.3d 777, 783 (3d Cir.1996) (declaring that the lower court erred by requiring the expert to have a particular specialization and "exact background"); *see also Keller v. Feasterville Family Health Care Ctr.,* 557 F.Supp.2d 671, 675 (E.D.Pa.2008) (recognizing that expert testimony cannot be excluded because "the expert is without the appropriate specialization" and that "[a] certain degree of background is not required"). Because Dr. Cornell has the academic background and professional experience with osteoporosis, osteopenia, and fractures associated with those diseases, he is qualified to testify as an expert in this case. *See Schneider,* 320 F.3d at 407.

### 2. Dr. Cornell's Methodology Is Sufficiently Reliable

**\*3** Dr. Cornell formed his opinion using the Bradford Hill criteria, which are "nine factors widely used in the scientific community to assess general causation." *Gannon v. United Sates,* 292 Fed. Appx. 170, 173 (3d Cir.2008);

Case 1:15-md-02606-RBK-JS   Document 1116-3   Filed 04/21/17   Page 41 of 48 PageID: 18948

In re Fosamax (Alendronate Sodium) Products Liability Litigation, Not Reported in...

2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

Cornell Dep. at 329:5–8. General causation is when "an observed association between a chemical and a disease is causal." *Magistrini v. One Hour Martinizing Dry Cleaning,* 180 F.Supp.2d 584, 592 (D.N.J.2002), *aff'd,* 68 Fed. Appx. 356 (3d Cir.2003). The nine Bradford Hill factors are: "1. Temporal Relationship, 2. Strength of the association, 3. Dose-response relationship, 4. Replication of the findings, 5. Biological plausibility (coherence with existing knowledge), 6. Consideration of alternative explanations, 7. Cessation of exposure, 8. Specificity of the association, and 9. Consistency with other knowledge." FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 599–600 (3d ed.2011), *available at* http://www.fjc.gov/public/pd f.nsf/lookup/ SciMan3D01.pdf/$file/SciMan3D01.pdf; *see also Gannon,* 292 Fed. Appx. at 173 n. 1; *In re Avandia Mktg., Sales Practices & Products Liab. Litig.,* 2011 WL 13576, *3 (E.D.Pa. Jan.4, 2011); *Magistrini,* 180 F.Supp.2d at 592–93. "[O]ne or more of the factors may be absent even where a causal relationship exists and ... no factor is a sine qua non of causation. *Magistrini,* 180 F.Supp.2d at 593 n. 9.

Dr. Cornell used the Bradford Hill criteria to form an opinion on whether Fosamax causes AFFs. Cornell Dep. at 331:4–8; Cornell Report at 4. In applying the nine Bradford Hill factors, he reviewed Plaintiff's medical records from 1996 to present, the office notes and depositions of her treating physicians, and "past and current medical literature on the topics of osteopenia, osteoporosis and their prevention and treatment with bisphosphonate drugs including alendronate," particularly publications concerning the FIT and FLEX studies and that described the appearance of AFFs. Cornell Report at 3, 4–5. He "review[ed] the original trials, the randomized trials, that led to the approval of Fosamax for the treatment of osteoporosis, and then wanted to review many of the case reports, the case series, the summed analysis, and some of the review papers that took all of this information and put it into a more readily digestible form." Cornell Dep. at 56:13–23. Dr. Cornell attempted to "present a balanced analysis" and pointed out studies on both sides of the issue. *Id.* at 58:5–16. He concluded that Fosamax can cause AFFs and "Fosamax use was a substantial contributing factor to Mrs. Glynn's femur fracture." Cornell Report at 4. The methodology Dr. Cornell used is sufficiently reliable because the Bradford Hill criteria are "broadly accepted" in the scientific community "for evaluating causation," *Gannon,* 292 Fed. Appx. at 173 n. 1, and "are so well

established in epidemiological research," *In re Avandia Mktg. ., Sales Practices & Products Liab. Litig.,* 2011 WL 13576, at *3.

**\*4** Defendant, however, argues that Plaintiffs do not explain the scientific methodology used by Dr. Cornell or show that his methodology is sufficiently reliable. Instead, Defendant asserts that Dr. Cornell's "weight-of-the-evidence" methodology just lists some studies, only some of which support causation, and concludes that the weight of the evidence shows that Fosamax causes AFFs. Defendant explains that this method is inadequate because Dr. Cornell does not discuss how these studies establish causation or why certain studies outweigh others that do not find causation. Additionally, Defendant points out that Dr. Cornell has not done an evaluation of possible biases or confounding factors found in the studies. Because Dr. Cornell does not show that his methodology is sufficiently reliable to show general causation, Defendant argues that he cannot establish specific causation—that Mrs. Glynn's Fosamax use caused her AFF. Defendant explains that the Bradford Hill criteria do not apply to specific causation, and Dr. Cornell's differential diagnosis was unreliable because he did not rule out the possibility that other things could have caused Mrs. Glynn's fracture.

Defendant is free to address these issues on cross-examination, but Defendant's concerns do not prohibit Dr. Cornell from testifying as an expert because he is qualified and the methodology he used is sufficiently reliable. *See Milward v. Acuity Specialty Products Group, Inc.,* 639 F.3d 11, 15 (1st Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 1002, 181 L.Ed.2d 734 (2012) (stating *"Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct"; instead, the "proponent of the evidence must show only that 'the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.' ").

Regarding Dr. Cornell's specific causation opinion that Fosamax caused Mrs. Glynn's femur fracture, he applied the differential diagnosis method, which is "a technique that involves assessing causation with respect to a particular individual." *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 807 (3d Cir.1997). It "is a process by which a physician rules out alternative causes through review of a patient's medical histories and

*In re Fosamax (Alendronate Sodium) Products Liability Litigation, Not Reported in...*
2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

records, physical examination of the patient, laboratory testing, study of relevant medical literature, and other techniques." *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Products Liab. Litig., 890 F.Supp.2d 552, 561 (E.D.Pa.2012).* The "technique is generally accepted in the medical community." *Id.*

Here, Dr. Cornell applied the differential diagnosis method by examining Mrs. Glynn's past medical history and conducting his own examination of her on September 26, 2012, after which he concluded that "[t]o a reasonable degree of medical certainty, Mrs. Glynn suffered a nontraumatic [AFF] in the setting of seven years of full dose Fosamax and alendronate therapy." Cornell Report at 34–36. Dr. Cornell reviewed radiographs taken on April 17, 2009 to evaluate the fracture and reviewed follow-up X-rays, hospital records, rehabilitation records, orthopedics records, prescription records from pharmacies, and deposition transcripts, among other things, in forming his opinion [docket # 109, Ex. 78, Appendix B to Cornell Report]. He ruled out possible alternative causes of Mrs. Glynn's AFF. Cornell Report at 38–40, 42–43, 45–46. Dr. Cornell did not have to "rule out every possible alternative cause of" Mrs. Glynn's AFF; instead, only "[o]bvious alternative causes need to be ruled out." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 156 (3d Cir.1999).* Thus, Dr. Cornell applied the differential diagnosis method in arriving at his conclusion that Mrs. Glynn's Fosamax use was a substantial contributing factor to her AFF.

**\*5** Therefore, the methodology used by Dr. Cornell in arriving at both his general and specific causation opinions is sufficiently reliable. Both the Bradford Hill criteria and differential diagnosis are widely used and accepted in the scientific community to arrive at causation opinions.

### 3. Dr. Cornell's Testimony Fits the Facts of the Case

Finally, Dr. Cornell's testimony fits the facts of the dispute and will assist the trier of fact because Plaintiffs seek to show that Mrs. Glynn's AFF was caused by her Fosamax use and Dr. Cornell not only opines that AFFs are caused by long term bisphosphonate use, like Fosamax, but also that Mrs. Glynn's Fosamax use was a "substantial contributing factor to her" AFF. *See* Cornell Report at p. 22, 47. Consequently, Dr. Cornell's proffered testimony will assist the trier of fact in determining whether Fosamax caused Mrs. Glynn's AFF.

Because Dr. Cornell is qualified, used a methodology that is sufficiently reliable, and his opinion fits the facts of a case, his expert testimony is admissible under *Daubert.*

### B. Dr. Klein

Plaintiffs asked Dr. Klein, a pathologist, to offer his opinion on whether Fosamax use causes AFFs and the "mechanism by which those fractures are precipitated" [docket # 103, Ex. 11, Dr. Klein's Report ("Klein Report") at 2].

### 1. Dr. Klein Is Qualified as an Expert

Dr. Klein is currently the Director of Pathology and Laboratory Medicine at the Hospital for Special Surgery where he has "direct clinical responsibilities for patients ...." *Id.* at 3–4. He also has "direct clinical responsibilities ... as a consultant at Memorial Sloan– Kettering Cancer Center, and as an outside counsel for leading pathology laboratories at major hospitals and institutions around the country." *Id.* at 4. Dr. Klein has reviewed the pathology for at least four patients with AFFs [docket # 105, Ex. 37, Dr. Klein's Deposition ("Klein Dep.") at 41:4–12]. Dr. Klein is currently a Professor of Pathology and Laboratory Medicine at Weill Cornell Medical College. Klein Report at 3. He is involved with several publications, including as the lead author and editor of *Non-neoplastic Diseases of Bones and Joints,* the only peer-reviewed, comprehensive textbook on the issue, and as a member of the editorial boards of *Human Pathology, Skeletal Radiology, Advances in Anatomical Pathology,* and *HSS Journal. Id.* Dr. Klein is the Consultant Editor of Research for *The Journal of Bone and Joint Surgery (American)* and has authored or co-authored more than 180 articles, most of which relate to bone pathology. *Id.* Therefore, Dr. Klein possesses "a broad range of knowledge, skills, and training" to qualify him as an expert in pathology. *In re Paoli, 35 F.3d at 741.*

### 2. Dr. Klein's Methodology Is Sufficiently Reliable

Like Dr. Cornell, Dr. Klein used the Bradford Hill criteria to form his opinion. Klein Report at 2. As discussed above, the Bradford Hill methodology is sufficiently reliable because it is "widely used in the scientific community to assess general causation." *Gannon, 292 Fed. Appx. at 173.* In applying the nine Bradford Hill criteria, Dr. Klein reviewed human and animal studies

and studies performed by Defendant to form his opinion. *See* Klein Report at 19–38. The studies revealed a strong association between bisphosphonates, like Fosamax, and microdamage in the bones as well as decreased bone toughness. *See id.* at 20, 25–30, 32. In addition, Dr. Klein noted a strong association between delayed fracture healing, due to altered bone quality, in patients and animals taking bisphosphonates. *Id.* at 23–24, 29. These findings were replicated in several studies discussed in Dr. Klein's report. Moreover, Dr. Klein cited one study which recognized the *"duration-*dependent, as well as dose-dependent, effect bisphosphonates have on the skeleton." *Id.* at 27. Another study mentioned in Dr. Klein's report noted that the "cessation of bisphosphonate treatment may be prudent for women on therapy who sustain a nonvertebral fracture." *Id.* at 30. Thus, Dr. Klein applied the Bradford Hill criteria, including the strength of association, replication of findings, dose-response relationship, and cessation of exposure factors.

**\*6** Based on his review of the studies, Dr. Klein concluded that "alendronate significantly alters the cellular properties of bisphosphonate-treated bone." *Id.* at 38. AFFs are not

> attributed to low bone mass or osteoporosis alone, indicative of bone that has fundamentally compromised bone microstructure. Unless a damaging force exerts tension across the entire cortex, the laws of physics and biomechanics as applied to bone further support the conclusion that bone quality and microstructure must be fundamentally compromised for a transverse fracture in a hollow cylinder[, like the femur,] to follow.

> [*Id.*]

Thus, Dr. Klein opined that there is a causal relationship between Fosamax and AFFs. *Id.* at 2. He used a sufficiently reliable methodology, the Bradford Hill criteria, in forming this opinion.

Defendant, however, argues that the Bradford Hill criteria apply to epidemiology studies, which Dr. Klein's report does not discuss. Defendant contends that Dr. Klein has not provided support for the proposition that a general causation conclusion can be established using the Bradford Hill criteria and human or animal biopsy data. In addition, Defendant asserts that if Dr. Klein discussed epidemiology studies in his report, he did not demonstrate that he is qualified to interpret that evidence because he

has no expertise in epidemiology and does not understand the most basic epidemiology terms. Moreover, Defendant points out that Dr. Klein conceded that the mechanism regarding how bisphosphonates cause AFFs has not been established and that the theories Dr. Klein uses to support his conclusion about mechanism—microdamage, decrease in tissue heterogeneity, bone brittleness, and delayed healing—have not been proved with human data.

Yet, Dr. Klein has properly applied the Bradford Hill criteria to epidemiological studies. Epidemiological studies include randomized trials in which one group is exposed to an agent, such as Fosamax, and another group is not, and the effect of the agent or lack thereof is observed. FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 555–56. Here, Dr. Klein examined randomized trials, such as Dempster et al., Boskey et al., and Donnelly et al.; in each of these studies, some women were given alendronate or another bisphosphonate and others were not. Klein Report at 20–21. Moreover, the Federal Judicial Center's Reference Manual on Scientific Evidence states that "toxicology models based on live animal studies ... may be used to determine toxicity in humans" in addition to observational epidemiology. FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 563.

For his testimony to be admissible, Dr. Klein is not required to show that the mechanism has been definitely established. Instead, he just needs to show that the methodology he used to arrive at his opinion is sufficiently reliable. *See Milward,* 639 F.3d at 15 (stating *"Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct"; instead, the "proponent of the evidence must show only that 'the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.' "). Dr. Klein arrived at his opinion on the mechanism by examining several studies and using a scientific method that is sufficiently reliable.

### 3. Dr. Klein's Testimony Fits the Facts of the Case
**\*7** Lastly, Dr. Klein's testimony fits the facts of the dispute and will assist the trier of fact. *See Jones,* 2010 WL 3311840, at \*4. Through Dr. Klein's testimony, Plaintiffs seek to show that Fosamax causes AFFs and

Case 1:15-md-02606-RBK-JS    Document 1116-3    Filed 04/21/17    Page 44 of 48 PageID: 18951

In re Fosamax (Alendronate Sodium) Products Liability Litigation, Not Reported in...

2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

the mechanism by which this happens. *See* Klein Report at 2. Dr. Klein opines that Fosamax causes AFFs and discusses several ways this happens—microdamage, abnormal osteoclasts, altered bone quality, and delayed fracture healing. Thus, Dr. Klein's testimony will assist the trier of fact in determining whether Fosamax causes AFFs, the ways in which this happens, and ultimately, his testimony will aid the jury in deciding whether Mrs. Glynn's Fosamax use caused her AFF.

### C. Dr. Madigan

Plaintiffs asked Dr. Madigan, a statistician, to give his opinion regarding "whether a signal of problematic oversuppression of bone turnover and associated [AFF] ... existed for Fosamax, using industry standard pharmacovigilance techniques and data sources, and the adverse event terms selected by Merck to internally evaluate the same" and "assess the strength of that signal, if any, in comparison to the signal, if any, for such events in other products indicated for the prevention and treatment of osteoporosis" [docket # 33, Ex. 30, Dr. Madigan's Report ("Madigan Report") at ¶ 5].

### 1. Dr. Madigan Is Qualified as an Expert

Dr. Madigan is Professor and Chair of Statistics at Columbia University. *Id.* at ¶ 1. He is an elected Fellow of the Institute of Mathematical Statistics and the American Statistical Association, and from 1995 to 2005 was the 36th most cited mathematician worldwide. *Id.* In 2010, he completed a term as Editor of the journal *Statistical Science. Id.* Dr. Madigan has consulted for companies such as Novartis, Pfizer, and Sanofi–Aventis on several issues, "many related to drug safety." *Id.* at ¶ 2. He has statistical experience with clinical trials and has published more than 100 technical papers on many topics, including pharmacovigilance [3]. *Id.*

Within the last few years, drug safety "with a focus on the development and application of statistical methods for pharmacovigilance" has been "one of [Dr. Madigan's] significant research interests ...." *Id.* at ¶ 3. He has published work in several journals, including *Drug Safety, Pharmacoepidemiology and Drug Safety,* and *Epidemiology. Id.* Dr. Madigan is an investigator in the Mini–Sentinel project, which is "a pilot project sponsored by the FDA to inform and facilitate development of a fully operational active surveillance system, the Sentinel System, for monitoring the safety of FDA-

regulated medical products." *Id.* He is the "methods lead for the Observational Medical Outcomes Partnership, a public-private partnership between the FDA and the pharmaceutical industry, which addresses "research methods that are feasible and useful to analyze existing healthcare databases to identify and evaluate safety and benefit issues of drugs already on the market." *Id.* Dr. Madigan is a member of the FDA's Drug Safety and Risk Management Committee, which "advises the FDA Commissioner on risk management, risk communication, and quantitative evaluation of spontaneous reports for drugs for human use and for any other product for which the FDA has regulatory responsibility." *Id.* Dr. Madigan is qualified as an expert because he has "a broad range of knowledge, skills, and training [to] qualify ... [him] as such." *In re Paoli,* 35 F.3d at 741. Defendant does not dispute Dr. Madigan's qualifications.

### 2. Dr. Madigan's Methodology Is Sufficiently Reliable

**\*8** Dr. Madigan examined the FDA's Adverse Event Reporting System ("AERS") database for a "possible association between Fosamax and a series of ... terms selected by Merck to evaluate oversuppression of bone turnover and associated" AFFs. Madigan Report at ¶ 25. The terms were: bone development abnormal, bone disorder, bone formation decreased, fracture delayed union, fracture malunion, fracture nonunion, low turnover osteopathy, pathological fracture, stress fracture, fracture, and femur fracture. *Id.* at ¶ 26. Dr. Madigan used "two industry-standard signal detection algorithms ... to assess whether or not Fosamax presented a safety signal" indicating oversuppression of bone turnover or AFFs. *Id.* at ¶ 25. The QScan pharmacovigilance software computed the statistics. *Id.* at ¶ 27. Dr. Madigan then compared the Fosamax signals to other oral bisphosphonates and a non-bisphosphonate used for the treatment and prevention of osteoporosis. *Id.* at ¶ 25. After reviewing the data, Dr. Madigan opined that

industry standard pharmacovigilance techniques and datasources reveal the presence of a clear signal for oversuppression of bone turnover and associated atypical femur fracture events utilizing the terms selected by Merck for such analysis. By standard metrics of "signal" detection, the signal is strong, consistent, and not ambiguous. Of perhaps greater concern, the signal was striking in comparison to that for other drugs indicated for the prevention and treatment of osteoporosis. As early as 2001-2002, the

spontaneous report data for Fosamax provide signals for a number of indicators of suppression of bone turnover. For the comparator drugs, such signals either never appear or appear years later.

[*Id.* at ¶ 36.]

This opinion is admissible because it is based on a method that is sufficiently reliable. *See Jones,* 2010 WL 3311840, at *4. Two factors that a court may take into consideration in determining reliability is whether the methodology has been subjected to peer review and publication and whether there is general acceptance in the scientific community. *Daubert,* 509 U.S. at 593–94. Here, Dr. Madigan's method, data mining in pharmacovigilance, is generally accepted in the scientific community and has "become routine both in the pharmaceutical industry and amongst regulators worldwide." Madigan Report at ¶ 8. In fact, "[p]harmaceutical companies, health authorities, and drug monitoring centers use SRS databases for global screening for signals of new adverse events or changes in the frequency, character, or severity of existing adverse events (AEs) after regulatory authorization for use in clinical practice." *Id.* at ¶ 9. "SRS systems provide the primary data for day-to-day drug safety surveillance by regulators and manufacturers worldwide." *Id.* at ¶ 14. In addition, the QScan software Dr. Madigan used in formulating his opinion is generally accepted by the scientific community because it "has been in widespread use for over 10 years and has been validated extensively." *Id.* at ¶ 28. Moreover, "[m]any peer-reviewed publications report results derived from QScan." *Id.* Thus, Dr. Madigan's methodology is sufficiently reliable.

**\*9** Although Defendant argues that Dr. Madigan's methodology is unreliable because he did not review the substance of the adverse event reports to see if they actually involve AFFs or oversuppression of bone turnover, this argument is inappropriate on a *Daubert* motion. Dr. Madigan's testimony will be subject to cross-examination, and the credibility of his opinion will be ultimately determined through the adversarial process. Dr. Madigan's methodology is sufficiently reliable because it is generally accepted in the scientific community, and therefore, Plaintiffs have satisfied the second prong of *Daubert.*

**3. Dr. Madigan's Testimony Fits the Facts of the Case**

Lastly, Dr. Madigan's testimony fits the facts of the case and will assist the trier of fact because it is related to Plaintiffs' failure to warn claim. *See Jones,* 2010 WL 3311840, at *4. A failure to warn claim requires a plaintiff to show "(1) that a manufacturer has a duty to warn (2) against dangers resulting from foreseeable uses about which it knew or should have known and (3) that failure to do so was the proximate cause of the harm." *In re Fosamax Prods. Liab. Litig.,* 2013 WL 76140, *3 (S.D.N.Y. Jan.7, 2013). Dr. Madigan's testimony fits the facts of this case because he opines that "[a]s early as 2001–2002, the spontaneous report data for Fosamax provide[d] signals for a number of indicators of suppression of bone turnover," meaning Defendant knew or should have known that Fosamax caused certain dangers in 2001–2002, thus imposing on Defendant a duty to warn of those dangers. Madigan Report at ¶ 36.

Defendant, however, argues that Dr. Madigan's testimony does not fit the facts of the case because it is irrelevant since there is no reasonable standard of care that would have required Defendant to conduct data mining. This is also a matter left to the credibility determination of the jury.

As a result, Dr. Madigan's expert testimony is admissible under *Daubert* because he is qualified, he used a sufficiently reliable methodology, and his opinion fits the facts of the case.

**D. Dr. Blume**
Dr. Blume is offered as an expert in pharmacovigilance and FDA regulation. Plaintiffs offer the testimony of Dr. Blume to: (1) "address the timeliness and completeness of the efforts undertaken by [Defendant] ... to fully inform prescribers and patients of the increasingly adverse benefit risk assessments associated with long-term Fosamax use in postmenopausal women"; (2) "evaluate the negative consequences of protracted bone oversuppression," including AFFs, in people receiving Fosamax; and (3) "to consider the pharmacovigilance activities undertaken by [Defendant] to evaluate the noted adverse events during the relevant time periods" [docket # 119, Ex. 33, Dr. Blume's Report ("Blume Report") at ¶ 6].

**1. Dr. Blume is Qualified as an Expert**
Dr. Blume received her Ph.D. in Pharmacology and Toxicology from the West Virginia University

Medical Center and is currently the President of Pharmaceutical Development Group, Inc. (PDG), "a consulting firm ... specializing in pharmaceutical development and registration activities." *Id.* at ¶ 1. In this role, she "has been responsible for preclinical and clinical (Phases I–IV) programs associated with pharmaceutical product development and the securing of pre-marketing approvals" for many drugs before the FDA. *Id.* at ¶ 2. Additionally, Dr. Blume has directed "all phases of interactions with [the] FDA relating to the prosecution of New Drug Applications (NDAs), Abbreviated New Drug Applications (ANDAs), Supplements to New Drug Applications (sNDAs), and the associated approval procedures," including "the collection and evaluation of postmarketing adverse medical events, the preparation of updated product labeling, and the dissemination of accurate, complete and timely product-related information to health care providers." *Id.* at ¶ 3. She was responsible for "regulatory review of promotional and education materials for both brand-name and generic drug products." *Id.* Dr. Blume's responsibilities include the "design, execution, and interpretation of pivotal safety-related trials and the development and implementation of pharmacovigilance procedures intended to detect new safety signals and track the evolution of previously identified signals." *Id.* at ¶ 4. She has directed "all phases of interactions with the FDA relating to post-approval labeling procedures regarding changes to safety-related information based upon postmarketing signal tracking and pharmacovigilance efforts," including "collection and evaluation of postmarketing adverse medical events, review and interpretation of the results of postmarketing clinical studies, the preparation of updated product labeling and other communication tools, and the dissemination of new product information to health care providers, patients, and consumers." *Id.* at ¶ 5. Dr. Blume possesses the knowledge, skills, and training necessary to qualify her as an expert. *See In re Paoli,* 35 F.3d at 741. Defendant does not dispute Dr. Blume's qualifications.

### 2. Dr. Blume's Methodology Is Sufficiently Reliable

*\*10* Dr. Blume reviewed published studies (Blume Report at ¶¶ 57–74), Merck's Period Safety Update Reports (*id.* at ¶ 75), Dr. Madigan's report (*id.* at ¶¶ 76–78), Merck's Worldwide Adverse Experience System ("WAES") (*id.* at ¶ 79), and epidemiological studies (*id.* at ¶¶ 82–90). *See also* docket # 119, Ex. 5, Dr. Blume's Deposition ("Blume Dep.") at 148:9–18; 338:9–20

(stating that she looked at the WAES database, literature reports, epidemiological studies, the AERS database, and Dr. Madigan's report). She discussed the "specific regulatory procedures and regulations" pharmaceutical manufacturers have to comply with, including procedures and regulations related to FDA approval, labeling, postmarketing surveillance, and reporting requirements. *Id.* at ¶¶ 11–34. Dr. Blume evaluated all of this information using "her years of experience" in "the industry," *see In re Viagra Products Liability Litigation,* 658 F.Supp.2d 950, 962 (D.Minn.2009), and opined that

the scientific literature, Merck's internal adverse event database, the AERS database, and epidemiology analyses confirmed the increasingly adverse risk-benefit profile related to long-term Fosamax use in the indicated populations. However, Merck permitted their labeling and other prescriber information to remain static with respect to both the deteriorating risk-benefit assessment and the escalation in ... [AFF] reports. Such omissions do not comply with the regulatory and industry standards of responsible pharmaceutical companies .... Merck also should have undertaken timely and adequate studies to more clearly elucidate the risks of Fosamax use in the various indicated populations. Finally, Merck should have disseminated Dear Healthcare Professional Letters to advise prescribers and their patients of the escalating safety and efficacy concerns. Merck's omissions have likely resulted in the exposure of numerous patient populations to unnecessary risks associated with the initiation and ongoing treatment with Fosamax.

[Blume Report at ¶ 110.]

Dr. Blume states that "[b]y the early 2000's, it was known that ... [AFFs] were clinically significant events ...." *Id.* at ¶ 109. Dr. Blume opines that Defendant should have changed the Fosamax label "to include escalating warning and precautionary risk information related to" AFFs. *Id.* Instead, Dr. Blume notes that Defendant "did not identify these fractures in the labeling until 2009" even though it received reports that AFFs were "associated with Fosamax use as early as 2002." *Id.* at ¶¶ 31, 82.

Defendant argues that the Court should exclude Dr. Blume's opinions on: (1) the legal requirements governing pharmaceutical manufacturers and Defendant's compliance with those requirements; (2) Defendant waiting too long to add information about femur fractures

to the Adverse Reactions section of the label; (3) Defendant failing to add a warning or precaution about femur fractures to the Fosamax label before 2009; (4) Defendant's failure to timely investigate a potential link between Fosamax and AFF; (5) Defendant's alleged motives or state of mind; (6) the causation or mechanism of AFF; and (7) the drug Evista is safer than Fosamax. Yet, because *Daubert* concerns the narrow issue of whether expert testimony is admissible, this is not the appropriate time for Defendant to request that the Court preclude Dr. Blume from testifying about certain topics. Defendant may question Dr. Blume's opinions or methodology on cross-examination. *See Milward,* 639 F.3d at 15 (stating "[s]o long as an expert's scientific testimony rests upon "good grounds," based on what is known, ..., it should be tested by the adversarial process, rather than excluded").

**\*11** Despite Defendant's issues with Dr. Blume's opinions, Plaintiffs have satisfied the second prong of *Daubert* because Dr. Blume's methodology is sufficiently reliable.

### 3. Dr. Blume's Testimony Fits the Facts of the Case
Dr. Blume's testimony fits the facts of the case because she opines that it was known in the early 2000's that AFFs were associated with Fosamax use. *See* Blume Report at ¶¶ 31, 82. Dr. Blume's testimony is relevant and will assist the trier of fact in deciding Plaintiffs' failure to warn claim because Dr. Blume's opinion is relevant to whether and when Defendant knew or should have known that AFFs were associated with Fosamax and therefore, when Defendant should have sought a label change. *See Schneider,* 320 F.3d at 404 (recognizing that expert testimony must "be relevant for the purposes of the case and must assist the trier of fact").

### E. Treating Physicians
Defendant argues that the Court should preclude causation testimony from Plaintiffs' treating physicians —Drs. Busch, Lindsay, Fletcher, and Limes—because: (1) Plaintiffs have not provided Rule 26 disclosures for any of the treating physicians; and (2) none of the treating physicians are able to offer a reliable causation opinion to a reasonable degree of medical certainty.

Plaintiffs, however, assert that they do not intend to elicit expert testimony from the treating physicians; instead, the treating physicians will testify about Mrs. Glynn's care and treatment, which does not require Rule 26 disclosures.

Treating "physicians are not required to submit expert reports when testifying based on their examination, diagnosis and treatment of a patient." *Patterson v. Howard,* 2010 WL 1050052, \*4 (D.N.J. Mar.18, 2010). Federal Rule of Civil Procedure 26(a)(2)(B) requires a witness to submit a written report only "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." A "treating physician is not necessarily retained or specially employed to provide expert testimony simply because he or she proffers on causation and prognosis" because "doctors may need to determine the cause of an injury in order to treat it." *Pease v. Lycoming Engines,* 2012 WL 162551, \*12 (M.D.Pa. Jan.19, 2012). In order to "determine whether a party retained or specially employed a treating physician to provide expert testimony," the Court must examine "whether the treating physician acquired his opinion as to the cause of ... plaintiff's injuries directly through his treatment of the plaintiff." *Id.* (internal quotation omitted). As a result, treating physicians are not required to submit expert reports "if they form their opinion on causation or prognosis as part of the ordinary care of a patient." *Id.*

Therefore, the testimony of Drs. Busch, Lindsay, Fletcher, and Limes is appropriate if it is based on their care and treatment of Mrs. Glynn. This Court will not allow, however, any expert testimony on causation from these physicians.

### II. CONCLUSION
**\*12** For the reasons outlined above, this Court denies Defendant's *Daubert* Motion as to Drs. Cornell, Klein, Madigan, and Blume. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

2013 WL 1558690, 91 Fed. R. Evid. Serv. 106

Footnotes

1    The abbreviation of atypical femur fracture (singular) is "AFF."

2    Db13 means page 13 of Defendant's brief.

3    Pharmacovigilance is the surveillance of spontaneous reporting system ("SRS") databases "for the early detection of
     drug hazards that are novel by virtue of their clinical nature, severity, and/or frequency." *Id.* at ¶ 7.

---

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.