IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| IN RE: BENICAR (OLMESARTAN) PRODUCTS LIABILITY LITIGATION | MDL No. 15-2606(RBK/JS) |

**MEMORANDUM OPINION AND ORDER**

This Opinion addresses the only objection the Court received regarding the "Final [Allocation] Recommendation of the Benicar Common Benefit Committee." (Hereinafter "FR"). Oral argument is not necessary. Fed.R.Civ.P.78; L.Civ.R.78.1. For the reasons to be discussed, the objections of Gerald J. Williams, Esquire and Mark R. Cuker, Esquire, are OVERRULED. (Hereinafter Williams and Cuker will be collectively referred to as "WC").[1] The Court finds WC's allocation is fair, reasonable and equitable, and in accord with the Court Ordered directions given the Benicar Common Benefit Committee ("CBC").

**Background**

This litigation concerns the blood pressure medication Olmesartan, sold by defendant Daichi Sankyo under the name Benicar, as well as Benicar HCT, Azor, and Tribenzor. Plaintiffs allege ingestion of Benicar causes sprue-like enteropathy and Benicar

---

[1] For present purposes, the abbreviations "WC" and "WCB" are synonymous.

1

induced enteropathy which results in symptoms similar to celiac disease and other complications.

After the JPML assigned this MDL to the Honorable Robert B. Kugler, the matter proceeded expeditiously to an eventual settlement. The first case management conference was held on April 29, 2015. Thereafter, members of plaintiffs' Steering and Executive Committees were appointed (May 20, 2015 Order, Doc. No. 18) and an Order regarding plaintiffs' counsels' "Time and Expense Reporting of Common Benefit Fees and Related Costs" was entered. [May 22, 2015 Order CMO No. 3, Doc. No. 21]. Over the course of the next 1½ - 2 years, the parties vigorously, yet professionally, litigated the case, including taking and defending scores of depositions and arguing numerous discovery disputes. Tens of millions of electronic documents were produced in discovery.

In or about the summer of 2017, the parties reached an agreement in principle to settle. The settlement was announced in court on August 1, 2017. The settlement covers approximately 2000 filed cases and thousands of claimants. Due to the complexity of the settlement, and the need to allocate the agreed upon settlement sum, the settlement is not yet finalized. However, the Court is hopeful everything will be "wrapped up" before the end of the year.

Now that the participants in the settlement process will soon be paid, it is time to turn to plaintiffs' attorneys' claim for

2

common benefit fees and costs.[2] The Court's Orders set forth the approval process.[3] On February 26 and 27, 2019, CMO Nos. 41 and 41A appointed the members of the Common Benefit Committee ("CBC") and generally described the role of the CBC. To assure transparency, objectivity and fairness, the Court made sure the CBC included a representative group of plaintiffs' attorneys and not just those with leadership positions and substantial common benefit claims. The Court specifically made sure the CBC included at least one member who was not making a claim for benefits. The CBC's Preliminary Recommendation was issued on June 13, 2019. After WC obtained leave of Court to serve a late objection, WC objected to the Preliminary Recommendation. After considering WC's objection, the CBC's Final Recommendation ("FR") was issued. WC then filed its objections which are now before the Court. (Hereinafter "objections"). This Opinion only addresses WC's objections. Judge Kugler will decide whether to approve the CBC's Final Recommendation.

As to WC, the Preliminary Allocation awarded it $100,000 for 1125 submitted hours which resulted in an effective hourly rate of $89.00. After WC's objection to the Preliminary Allocation was considered, the CBC reduced WC's common benefit hours to 1066 but increased its award to $110,000. This resulted in an effective

---

[2] CMO 41B provides, "[n]o Common Benefit award and allocation shall be paid or distributed prior to the payments to the participants in the ongoing Settlement Process." Id. ¶11.
[3] Fees and costs are addressed in the allocation. WC's objections only concern its allocated fee.

hourly rate of $103.00.[4] WC complains the allocated sum and billing rate are too low compared to comparator firms. WC asks the Court to increase its billing rate to $272.00 per hour which results in an award of $290,000.

**Discussion**

The first issue the Court needs to address is the standard of review to apply to WC's objections. In order to get to the crux of the matter sooner rather than later, and to avoid arguments not directly related to the merits of WC's objections, for present purposes only the Court will accept WC's position that the Court should review the CBC's Final Recommendation de novo. CMO No 41B provides, "[t]he CBC shall perform a fair, equitable, and transparent evaluation of each CB Request[.]" Id. ¶3. The Court will undertake to examine if this was done as to WC.[5]

Preliminarily, the Court notes that a pure lodestar analysis cannot be done. CMO 41B recognized this fact: "[w]hile time and expense records will be considered, the CBC and the Court recognize that a simple lodestar analysis is not practical or feasible, and that not all tasks are of equal value[.]" Id. ¶9. Further, it is universally recognized that when it comes to the allocation of common benefit funds, "not all types of work are created equal." Haas v. Burlington County, C.A. No. 08-1102 (NLH/JS), 2019 WL

---

[4] WC does not object to the reduction of its common benefit hours.
[5] WC does not argue its allocation was not transparent.

4648569, at *5 (D.N.J. Sept. 3, 2019)(citation and quotation omitted).

WC's objections are premised on its belief that it was treated significantly less favorably than similarly situated firms. The Court disagrees and finds that WC was treated fairly and equitably. For this reason, the Court overrules WC's objections.

WC's dispute primarily relates to its argument that the billing rate awarded for its document review work is too low. WC's argument, however, is based on the erroneous premise that its final assessment was grounded on the fact it only paid $80,000 of its $105,000 common benefit assessment. "The Committee's justification for [its] disparate award is that WCB paid only $80,000 of a $105,000 assessment." Objections at 2. WC is wrong. As set out in detail in the CBC's Final Recommendation, the CBC considered the totality of the circumstance in its assessment. The CBC concluded that the type of work done by WC, the importance of the work, and the quality of the work were the most important allocation factors. Accord Haas, 2019 WL 4648569, at *5. This is evidenced by the fact the CBC concluded that the work done by firms other than WC was of a "higher level[] of complexity and importance." FR at 32. In addition to evaluating the complexity and importance of WC's work, the CBC also considered the fact that "numerous [WC] entries … were not for the common benefit." Id. The CBC also considered the fact that a significant number of WC's

5

hours were spent reviewing documents in preparation for a "minor witness."[6]  Id.  Thus, WC's argument that its allocated billing rate was only based on its delinquent payment is wrong.  In addition, the Court disagrees with WC's assertion that, "[t]he recommended fee allocation to WCB is a glaring outlier, inconsistent with the award to other firms and irreconcilable with any purported methodology used."  Objections at 1.  A close comparison to other firms shows that WC was treated fairly and equitably.

WC's argument that it was treated unfairly is refuted when it is compared to comparator firms, Pearson and Taylor Martino.  These two firms also did not pay their full assessments.  Pearson was only awarded an hourly rate of $51.81, half of WC's rate, and did not object to its allocation.  Although the hourly rate for the Taylor Martino firm is $132.00, approximately 20% higher than WC, this is justified because the firm "devoted significant time to the work-up of bellwether cases selected by the Court."  Id.  As to WC, the CBC's analysis was consistent with CMO 41B which required the CBC to "prioritize the most important work that advanced and drove the litigation, and set the groundwork for resolution."  Id. ¶9.

---

[6] The Court agrees it is appropriate to examine the importance of the documents an attorney reviews when considering the hourly rate to award.  This is relevant to evaluating the firm's contribution to the successful outcome of the case.  The Court also agrees with the CBC's apparent conclusion that more weight should be given to documents reviewed for witnesses who ultimately turn out to be important to plaintiffs' case.

Although not discussed in detail in the FR, the Court agrees with the notion that WC's failure to fully pay its assessment should be an important allocation factor. The Court agrees with the CBC's statement that, "[t]he obligation to pay assessments to fund the litigation [is] critical to the advancement of the litigation[.]" FR at 31-32. CMO No. 3 recognized the importance of common benefit assessments: "[t]he Court … acknowledges that reasonable common benefit time and expenses are necessary for the collective prosecution of all cases in this MDL litigation." Id. at 1. CMO No. 3 also notes, "[t]he recovery of compensation for common benefit time expended and cost reimbursement will be allowed and is <u>essential</u> in this MDL litigation." Id. at 2 (emphasis added). The fact that WC may have been "penalized" because it did not fully pay its assessment should not be a surprise to WC. CMO No. 3 provides that the, "[f]ailure to timely submit any assessment to the PEC by a Participating Counsel will be grounds for the denial and/or partial denial of attorneys' fees awarded in the case and/or removal from the PEC/PSC." Id. at 2. This is a recognition that unless common benefit assessments are fully and timely paid, the MDL cannot be effectively managed and litigated.

The Court disagrees with WC's argument that the "penalty" for WC's non-payment must necessarily be proportional to the payment shortfall. If there was a rule of proportionality, firms could make a strategic or economic decision to accept a penalty rather

7

than pay an assessment in full. It is critical to the effective management and progress of an MDL that participating firms timely and fully pay their assessments. In order to assure the smooth management of an MDL, every reasonable step should be taken to incentivize firms to timely and fully pay their assessments. If this means treating firms harshly in the short term as a trade-off for a long-term benefit, so be it. The CBC, not the Court, is in the best position to evaluate the "penalty" to be assessed for delinquent payments. After all, the CBC, not the Court, has intimate knowledge regarding the impact a monetary shortfall has on the progress of the case. After reviewing all relevant papers, the Court does not find that any alleged "penalty" to WC because of its delinquent payment was unreasonable or, as WC argues, "was greatly disproportionate to WCB's shortfall in paying cost assessments." Objections at 12.

The unreasonableness of WC's suggested allocation is evidenced by comparing WC's work to other firms who were awarded rates less than WC's request for $272 per hour. A glaring example is the Robins Kaplan ("RK") firm which was awarded $248 per hour. Rather than just reviewing documents, RK was a leader in this MDL. Tara Sutton, Esquire, was on the plaintiffs' Executive Committee and Chaired the Science and Expert Committee. Ms. Sutton actively and effectively participated in numerous court conferences, arguments, and settlement sessions. Ms. Sutton's stellar work

putting together plaintiffs' expert case was critical to the successful resolution of the MDL. In addition, another RK attorney, Rayna Kessler, Esquire, served as liaison counsel in the New Jersey State Court litigation and Federal/State Liaison Counsel for the MDL. FR at 25. Ms. Kessler's work made a significant contribution to the effective and efficient management and progress of the MDL. By no means does the Court intend to diminish the work done by WC. However, it would be inequitable to award WC its requested fee of $272 while RK's fee is capped at $248. The CBC's allocation to WC was consistent with the mandate of CMO No. 41 which provides that, "[t]he CBC's allocation shall prioritize the most important work that advanced and drove the litigation and set the groundwork for resolution." Id. ¶9.

Another illustrative example is the Lieff Cabraser ("LC") firm. They were awarded an hourly rate of $259 per hour even though its attorneys included a Co-Chair of the Science Committee. In addition, the lawyers in the firm were invaluable to preparing plaintiffs' expert reports and attending and defending expert depositions. FR at 17. Similar to the Robins Kaplan firm, it would be inequitable to grant WC its requested hourly rate of $272 when LC is capped at $259.

As to the other specific arguments made by WC, they will be briefly addressed. WC argues its effective hourly rate of $103.00 "was less than half the average rate awarded to other firms

9

primarily performing document reviews." Objections at 1. However, the summary of work done, as set forth in the Final Recommendation, shows that each of the alleged comparator firms did important substantive work besides reviewing documents: (1) Johnson Becker (member of plaintiffs' Steering and Discovery Committees, worked on lists of custodians and deponents, and prepared discovery requests); (2) Lieff Cabraser (conducted expert document review, Co-Chair of Science Committee, assisted with preparation of expert reports and deposition preparation, defended depositions, and deposed one witness); (3) Rhine Law Firm (attended Steering Committee calls and meetings); (4) Sanders Law Firm (engaged in ESI management at the highest level, member of Steering and Bellwether Committees, significant involvement in the day-to-day activities of the litigation, conducted research on third-parties, drafted subpoenas, assisted with privilege challenges, managed deposition calendar, and prepared deposition summaries); (5) Taylor Martino (assisted with workup of bellwether case and attended Steering Committee calls and meetings); and (6) Wagstaff Cartmell (conducted expert related activities and member of Steering, Science and Expert Committees).

WC complains about the billing rates allocated to contract attorneys. However, there is no controlling case law that requires contract attorneys be treated differently than other attorneys. As with the entire allocation, the CBC, not the Court, is in the best

position to evaluate the common benefit contract attorneys contributed to the case. This is an inherently subjective judgment that is not likely to meet everyone's evaluation about how they should be treated. That being said, it is apparent the CBC did an unbiased evaluation of all relevant evidence and prepared a detailed report summarizing its judgment.[7] The Court agrees with the CBC's judgment on how to treat contract attorneys absent material unfair disparities or treatment, which did not occur here. Depending on the facts of a particular case, contract attorneys may be treated better, worse or the same as other attorneys. "The allocation of fees is not an exact science, and the methodology used may vary, so long as it is designed to produce results that are both fair and reasonable." In Re C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation ("Pelvic Mesh"), MDL No. 2187, et al., 2019 WL 4458579, at *15 (W.D.Va. March 12, 2019).

The Court disagrees with WC's argument that full-time attorneys must necessarily be awarded a higher billing rate than contract attorneys. Objections at 9. The Court is reluctant to adopt a hard and fast rule about how contract attorneys should be treated. Hours spent on the same task by similarly skilled or experienced lawyers may or may not be of equivalent value. Pelvic Mesh, at *14 (citation and quotation omitted). The CBC, not the Court, has firsthand knowledge of the common benefit conferred by

---

[7] Although not specifically addressed in the FR, the same detailed information available to WC had to have been reviewed by the CBC.

11

different firms and attorneys, and is in the best position to evaluate the relative importance and contribution to the common benefit.  As noted in In re Vioxx Products Liability Litigation, 802 F.Supp.2d 740, 774 (E.D.La.2011), "in the real and imperfect world of litigation it is an accepted fact that not all work hours are entitled to the same compensation rate.  The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation."  The Court finds that WC was treated fairly and equitably in comparison to other firms and attorneys.

Last, WC takes issue with the CBC's criticism of the tasks done by its paralegals and the number of hours devoted to a document review for a minor witness.  Objections at 17-19.  This criticism is ironic in view of WC's position that the CBC focused too much on its delinquent payment.  In any event, the Court finds the CBC's comments are well taken.[8]

**Conclusion**

In conclusion, the Court finds WC's objections are ill-founded and, therefore, are overruled.  While the CBC's work was necessarily subjective, as to WC, the CBC's allocation is fair, reasonable and equitable.  WC's allocation was rightly based on the CBC's collective consideration and judgment of WC's contribution to the common benefit.  The fact that WC disagrees

---

[8] WC argues a lodestar cross check should be done.  Objections at 5.  However, WC ignores CMO No. 41B which recognizes this "is not practical or feasible."  CMO 41B  ¶9.

with the CBC's judgment is not sufficient to change WC's allocation.

## ORDER

Accordingly, for all the foregoing reasons, it is hereby Ordered this 5th day of November, 2019, that the objections of Gerald L. Williams, Esquire and Mark R. Cuker, Esquire, to the "Final [Allocation] Recommendation of the Benicar Common Benefit Committee," are OVERRULED.

s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge